1          IN THE UNITED STATES DISTRICT COURT

2     FOR THE DISTRICT OF MARYLAND/NORTHERN DIVISION

3     UNITED STATES OF AMERICA

4                                      CRIMINAL NO.

5      v.                             L 06-0444

6     STEVEN SODIPO, ET AL            June 9, 2008

7               Defendants

8     _____/

9                         DAY THREE

10                   TRANSCRIPT OF PROCEEDINGS

11           BEFORE THE HONORABLE BENSON E. LEGG,

12            UNITED STATES DISTRICT CHIEF JUDGE

13    APPEARANCES:

14    On behalf of the United States:

15    Andrea Smith, AUSA

16    Paul Budlow, AUSA

17

18    On behalf of the Defendants:

19    Kenneth W. Ravenell, Esquire

20    Kevin Jesse McCants, Esquire

21

22

23    Reported By:

24    Jacqueline Sovich, RPR, CMR, FOCRR

25    Official Court Reporter

```
 1                    (PROCEEDINGS)
 2            MS. SMITH:  Good morning, Your Honor.
 3            THE COURT:  Miss Smith, if you would call the case,
 4     please?
 5            MS. SMITH:  Andrea Smith in behalf of the United
 6     States, along with Paul Budlow, calling United States versus
 7     Steven Sodipo and Callixtus Nwaehiri, L 06-0444.
 8            THE COURT:  Thank You.
 9            Mr. Ravenell?
10            MR. RAVENELL:  Thank you, Your Honor.  Good morning.
11     For the record, Ken Ravenell, Julie Reamy, and Josh Morrow on
12     behalf of Mr. Sodipo, all present.
13            THE COURT:  Good morning.  Mr. McCants?
14            MR. MCCANTS:  Good morning.  Kevin McCants on behalf
15     of Mr. Nwaehiri.
16            THE COURT:  Good morning to you and to Mr. Nwaehiri.
17            Mr. Thompson I believe has given you the bad news
18     that one of our jurors, a gentleman from Western Maryland, has
19     reported that he's stranded with car trouble.  It would have
20     been helpful if he let us know this about an hour ago, but he's
21     still in Western Maryland, and there's no estimated time of
22     arrive.  I assume he has to get his car repaired.
23            So my proposal would be to excuse him from the jury
24     and move one of the alternates into the jury and then begin
25     opening statement.
```

1           But before I do that, I wanted to see whether that

2    was acceptable to counsel.

3           Miss Smith?

4           MS. SMITH:  Yes, Your Honor, it's acceptable.

5           THE COURT:  Thank you.  Mr. Ravenell?

6           MR. RAVENELL:  Yes, Your Honor.

7           THE COURT:  Thank you.  Mr. McCants?

8           MR. MCCANTS:  Yes, Your Honor.

9           THE COURT:  Second, my understanding is that the

10   government has raised an objection to the materials that the

11   defense prepared to show to the jury during opening statements.

12   And I have reviewed the materials, and they appear to be

13   photographs that at some point will come into evidence in the

14   case.  And there's a certificate that apparently what will be

15   coming in, that these materials are evidence, rather than

16   charts and demonstrative aids.

17          Paragraph 44 of the pretrial checklist, as explained

18   during the pretrial conference, essentially gives each side a

19   veto.  The rule is that either any evidence that counsel

20   believes in good faith will come into evidence in the case

21   eventually can be used and referred to in opening statement, or

22   that none of it is used in opening statement.

23          And, apparently, the veto has been exercised.  So we

24   go to the default position that none of it is to come in.

25          Miss Smith, for the record, do you object to the

1    showing the jury in opening statement these pieces of evidence?

2              MS. SMITH:   I do, Your Honor.

3              THE COURT:   Thank you.

4         Mr. Ravenell, do you wish to be heard on this?

5              MR. RAVENELL:   Yes, Your Honor.   First, there's a

6    flaw that these photos are evidence.   We see them as

7    demonstrative aids.   We're not going introduce them as

8    evidence.

9              THE COURT:   Well, thank you.   That does change the

10   analysis slightly.   The demonstrative aid would include

11   something like an organizational chart, a diagram, some other

12   thing that is created by one of the attorneys that would not

13   fall into the category of evidence, and these are pictures of

14   New Care and different people who are involved in the case, and

15   therefore they're not demonstrative aids.

16        In order for them to come in, to be shown to the

17   jury, they would have to be marked as exhibits and introduced

18   into evidence record as evidence.

19             MR. RAVENELL:   Your Honor, in an opening statement, I

20   disagree that the Court is allowed to preclude us from using

21   documents or what we term to be demonstrative aids in

22   presenting our opening statement when we have no intention of

23   introducing these photos as evidence.

24        First, the Court's rules checklist 45, says the

25   demonstrative aids, but does not give a definition for

1    demonstrative aids.  And the first I've heard of the definition

2    of demonstrative aids, just a moment ago, we see these as being

3    a demonstrative aid.  They're not documents turned over to us

4    by the government, as the government alleged earlier to your

5    clerk.

6              These are photos that we ourselves prepared, and we

7    don't intend to introduce them, but it's important in

8    presenting my opening statement to the jury what we intend to

9    prove.

10             So I don't believe that the Court should simply

11   preclude use of what we see as demonstrative aids and merely

12   because they're photographs that the government says they

13   believe is evidence.

14             Well, we don't.  And they're not items that the

15   government turned over us to as they alleged.

16             THE COURT:  Good.  Thank you.

17             Evan, do you have the checklist?  Thank you.

18             Paragraph 44 of the pretrial checklist states "Unless

19   otherwise agreed" and by otherwise agreed that means agreed by

20   counsel, "no evidence may be shown to the jury during opening

21   statement."

22             So that if there is an objection lodged by counsel

23   for the other side, then that evidence may not be presented to

24   the jury during opening statement.

25             Number 45 states that "Exhibits and demonstrative

1    aids may not be displayed to the jury during opening statement

2    or closing argument unless they have previously been shown to

3    opposing counsel.  Please also show any new demonstrative aid

4    you intend to display during closing argument to opposing

5    counsel before doing so."

6         The photographs that have been presented to me, and I

7    will have this opening statement packet marked as Court's

8    Exhibit Number 1 so there will be a record of it, would fall

9    into the category of evidence, because these photographs are

10   not demonstrative aids.  They're evidence, and, therefore, they

11   are excludable under paragraph 44.

12        Even if they could be categorized as simply

13   demonstrative aids, they would be excludable under 45 because

14   they weren't shown to opposing counsel seasonably ahead of time

15   having this brought to my attention before the beginning of

16   opening statement.

17        So that is my ruling, and I don't need to hear

18   anything more on it.  Thank you.

19        MR. RAVENELL:  I appreciate, Your Honor, may I ask

20   permission to be heard briefly on that point, to clarify one

21   point?

22        THE COURT:  You can clarify one point.

23        MR. RAVENELL:  Yes, Your Honor.  As I read Rule 45,

24   it simply indicates to show to the government previously.  It

25   doesn't give a time limit, or a time period of when to show the

1    government the items.  The government has seen the photographs.

2    It is, in fact, as the government indicated, similar to some

3    they have seen themselves.  There's nothing surprising about

4    them.

5         And, again, keeping with the Court's rule, there's

6    nothing in the rule that says showing it to the government some

7    particular period of time in advance of trial, in advance of

8    opening statement.

9         THE COURT:  Good.  Thank you.

10        As I stated, the photographs are not demonstrative

11   aids.  They are exhibits.  And they can't be shown to the jury

12   a demonstrative aid is something that's created for the trial

13   that does not purport to be reality.  So the photographs are

14   excludable on that basis.

15        Is there anything more I should do before bringing

16   the jury and swearing them in and giving them the preliminary

17   instructions, Miss Smith?

18        MS. SMITH:  No, Your Honor.  I just wanted to advise

19   the Court sitting at the trial table is Special Agent Joseph

20   Rosati of the DEA and joining us in the well of the room Jesse

21   Siegle, who's a summer intern law clerk with the U.S.

22   Attorney's office, and he will be here through the duration of

23   the trial assisting us.

24        THE COURT:  Good.  Thank you.

25        MS. SMITH:  Thank you, Your Honor.

1           THE COURT:  Mr. Ravenell, shall I bring in the jury,

2    sir?

3           MR. RAVENELL:  Yes, Your Honor, thank you.

4           THE COURT:  Mr. McCants?

5           MR. MCCANTS:  Yes, Your Honor, we're ready.

6           THE COURT:  Thank you.

7           MR. RAVENELL:  Your Honor, may counsel approach

8    briefly?

9           (At the bench)

10          MR. RAVENELL:  You received a couple of motions from

11   us, one obviously dealing with Mr. Kaps, who is going to be one

12   of the government's early witnesses.

13          Does the Court have a time when you'll take those

14   particular up issues up, right after opening statement, or how

15   does the Court wish to handle it?

16          THE COURT:  Well, what relief are you seeking with

17   respect to Mr. Kaps?

18          MR. RAVENELL:  Your Honor, I don't know if the Court

19   had a chance to review the memorandum, but we're asking Mr.

20   Kaps not be allowed to testify until the Court decides whether

21   these items should be turned over and why they haven't been

22   turned over.

23          Additionally, Your Honor, what we did not put in our

24   memorandum, we received on Friday a memo from the government, a

25   DEA 6, where Mr. Kaps was interviewed on February 8th of 2008.

1    When we received the DEA 6, the government indicated with a Fax

2    appended that they had just received it from DI Hamilton, who

3    sat in on the interview on February 8, 2008 and then prepared

4    that DEA 6.

5            Why it took two months or three months to prepare it,

6    almost four months now, I don't know why.  But when we received

7    it, Hamilton's notes indicated that she's still working on two

8    other DEA 6s from 3-25 and 3-36-08, where there were interviews

9    of Mr. Kaps.

10           Now, the government has given us handwritten notes

11   from Miss I guess DI Hamilton, but that have not given us the

12   report.

13           I asked Miss Smith this morning when we can expect to

14   get the DEA 6.  Obviously, it would be nice to have it before

15   the witness testifies, or at least before we cross-examine the

16   witness, instead of basically giving us, I said look, there are

17   things in the notes that we have, and there's abbreviations,

18   those kind of things, so that when the agent does her DEA 6,

19   she won't be able to explain what she means by that, still

20   giving us, I was basically told to go ask her.

21           I think it's an obligation for the government to give

22   us these things, just as we've used their obligation not to

23   just tell us go fishing in 33 boxes somewhere and see if you

24   can look through it.

25           I mean on the eve the trial so we can find any

1    evidence that may be Brady, Jencks are or Giglio, that's not

2    how it's supposed to be done.

3         So at some point once we're finished with opening,

4    I'd like the Court to deal with these issues before Mr. Kaps

5    testifies.

6         THE COURT:  What I'll do, opening should take a

7    couple of hours, so we'll deal with it when the jury is given a

8    break after opening statement.

9         MR. RAVENELL:  The other thing, Your Honor, we have

10   filed a motion to reconsider, and there's several things that

11   we have raised on the motion to reconsider.

12        One of the foremost is that the issue about the

13   deaths, and --

14        THE COURT:  The what?

15        MR. RAVENELL:  The deaths the Court indicated that

16   the government be allowed to introduce evidence regarding RC

17   and RH.

18        Part of our motion to reconsider asks the Court for

19   reconsideration, gives the Court additional information you did

20   not have of the last hearing.

21        Similar to there was information regarding Mr. Holt,

22   where we think the Court had incorrect information when you

23   made those rulings.

24        So I'd ask the government not be allowed to mention

25   these deaths in opening statement so the Court has a chance to

1    fully review the memorandum and revisit those issues, one way

2    or the other, Judge.

3          THE COURT:  My ruling on that latter issue is that

4    counsel for both sides may refer to any evidence that I ruled

5    in my opinion that I issued last week, that is counsel can

6    forecast that they have had is coming in, if it turns out that

7    I eventually do decide to reconsider, then I will tell the jury

8    that they should -- well, they're going to be told that opening

9    statement isn't evidence anyway, so there will be no evidence

10   on those points.

11          But the ground rule for today, and for opening

12   statement, is any evidence that I rule to be acceptable can be

13   mentioned during opening statement.

14          MS. SMITH:  Your Honor, I can state for the record

15   other than mentioning the death is one of the possible side

16   effects of abuse and addiction, in terms of hydrocodone, the

17   government was not going to discuss those events anyway.

18          THE COURT:  Good. Thank you.

19          (Open court)

20          (Jury present)

21          THE COURT:  Our first alternate is where?  Good.

22   Thank you.

23          Ladies and gentlemen, good morning.  Please be

24   seated.

25          I will give you the bad news that we have lost one of

1    your number, Juror Number 2, who lives in Western Maryland, has

2    been stranded at home with car trouble, and there's simply no

3    way for him to get here today.   So I have reluctantly been

4    forced to excuse Juror Number 2, which means that Alternate

5    Number 1 will now be moved into the jury in place of Juror

6    Number 2.

7              So if Alternate Number 1 would readjust your seat,

8    please?

9              Good.   The jury is now seated.

10             Mr. Thompson, if you would administer the oath,

11   please?

12             THE CLERK:   Thank you.   Members of the jury panel

13   chosen in the present case, please stand and raise your right

14   hand.

15             (Jury sworn.)

16             THE CLERK:   Thank you.   You may be seated.

17             THE COURT:   Ladies and gentlemen, the first order of

18   business is for me to give you brief instructions as to your

19   conduct as jurors and to help define the job of the jury.

20             The first thing to bear that mind is that this is a

21   criminal case, and there are a number of important

22   constitutional safeguards that attend all criminal trials.

23             It's been a couple weeks since we were here last, so

24   let me simply remind you of them.   The indictment is not

25   evidence.   It is merely an accusation, an accusation that the

1    defendants deny.

2            The defendants are presumed innocent.  The burden of

3    proof rests solely with the government.  The government's

4    burden is to prove guilt beyond a reasonable doubt in order to

5    secure a conviction.  The jury's verdict must be unanimous.

6            The defendants have no obligation to testify.  If the

7    defendants decline to testify, the jury may not infer guilt

8    from silence.

9            What is the job of the jury?  What is it that we ask

10   you to do?  At the end of the day after all the evidence is in,

11   after jury instructions by me, and after closing argument of

12   counsel, you will retire to deliberate.

13           At that time, all of the evidence, except for

14   testimony, will be brought into to you for your consideration.

15           You'll also be given a verdict sheet.  The verdict

16   sheet will list each of the counts of the indictment, and will

17   list each defendant, who is named in that count, and then you

18   will be asked a question with respect to the defendant at

19   issue, how do you find him with respect to Count 1 of the

20   indictment, for example.  And then there are two boxes, guilty,

21   not guilty.

22           So at the end of the day, you will be given a verdict

23   sheet that tracks each count of the indictment, and asks a

24   simple question do you find the defendant guilty or not guilty?

25           It is your job as jurors to answer those questions.

1          Well, how do you go about doing this?  And this

2     brings up one of the principal functions of the jury, which is

3     to find the facts.  The jury are the sole and exclusive judges

4     of the facts.  It is the Judge who instructs the jury on the

5     law.

6          So that I supply the law, you as jurors supply the

7     facts.

8          And it is by applying the law that I give to you to

9     the facts as you find them that results in your reaching a

10    verdict.

11         Now, how do you go about finding the facts?  The

12    facts are to be found by the jury based on and only on the

13    evidence presented here in the courtroom.

14         At present, there's nothing in this courtroom.

15    There's no evidence upon which you could find the facts in this

16    case.

17         A trial essentially consists of the controlled

18    presentation of evidence to the jury for your consideration.

19    And one of my duties is to regulate the evidence that can come

20    in here to the courtroom for you to consider.

21         Now, in admitting evidence, and allowing it to come

22    into the courtroom, I play no role in assessing or evaluating

23    the strength or weakness of that evidence.  I'm simply like an

24    on/off switch, either the evidence comes in for your review or

25    it's excluded.

1        If evidence comes in, then the value of that

2   evidence, the probative value, is entirely up to the jury to

3   decide.

4        In that regard, I as the Judge have no interest at

5   all in the outcome of this case.  I am completely indifferent

6   as to what your verdict will eventually be.

7        I have only one objective, and that is to to ensure

8   that both sides, the government and the defendants, receive a

9   fair impartial and reasonably expeditious trial.

10       So if there's anything that happens during this case

11   and a ruling, suppression expression, statement of mine that

12   might seem to you to be some sign as to what I think your

13   verdict should be, disregard it.  That would be entirely

14   unintentional.  I have no interest in the outcome of this case.

15       Well, what is evidence?  What is the grist from which

16   you will find the facts of the case?

17       Evidence includes the testimony of witnesses.  There

18   will be a number of people who will walk through those doors,

19   who will raise their right hand, who will swear to tell the

20   truth.  And they will answer questions posed by counsel.

21   Testimony includes the answers of the witnesses and not the

22   questions posed by counsel.

23       The second category of evidence are the documents

24   that will be admitted into evidence in this case.  We live in a

25   society that's full of paper, and in any case, paper will be

1    marked as an exhibit, will be admitted into evidence, and those

2    documents are evidence from which you can find the facts of the

3    case.

4           In most trials, tangible objects other than evidence

5    will come into the record.  For example, if this were a patent

6    case involving some high tech laser emitting device, there

7    would be introduced into the record as exhibits any number of

8    lasers and parts and objects.

9           So testimony, documents, and tangible objects other

10   than documents will all be introduced into record here as

11   exhibits and evidence.

12          Stipulations also constitute evidence.  Stipulations

13   are agreements between the two sides, the government and the

14   defense, that a certain fact is true.  Stipulations are

15   essentially timesaving devices.

16          Let's assume that this were a civil case involving an

17   automobile accident.  Counsel might stipulate that the

18   automobile accident took place June and 7th 1982, at 4 p.m., in

19   the afternoon, at which time it was 55 degrees and overcast.

20   So those facts which both sides can agree to are stipulated to,

21   and should be considered by the jury as given.  And

22   stipulations are essentially timesaving devices.

23          Well, if that is evidence, as I've described, what is

24   not evidence?  What is not evidence includes the questions

25   posed by counsel, statements of counsel, arguments of counsel,

1    any guess that you might have as to the answer to a question

2    that I have directed not be answered.

3         Occasionally, you will hear in trial a question

4    raised by counsel, and there will be an objection.  I will

5    sustain the objection, which means that that question is not to

6    be answered.  You are not to speculate as to what the answer

7    might have been, had the question been answered.

8         Sometimes testimony will come in, for example, the

9    statement of a witness, and I will decide that that testimony

10   should not have been given, and I will exclude it.  I will

11   strike it from the government.  Any testimony that I have

12   ordered stricken from the record should be disregarded and is

13   no longer evidence.

14        Remember the evidence from which you will decide the

15   case involves things that are brought into the courtroom for

16   you to consider.  That means that anything that you hear or see

17   about this case outside the courtroom is not evidence and

18   should not be considered by you.

19        There are two types of evidence, direct and

20   circumstantial.  Let me give you an example.  Direct evidence

21   is that evidence taken in by a witness from one of the five

22   senses.

23        So let us assume that this was the automobile

24   accident case, a witness walks into the courtroom, is sworn to

25   tell the truth, takes the witness stand, and testifies about

1    something that she heard, or personally observed.  So the

2    witness might say I was there June 7th, 1982, at the time of

3    the accident, and here is what I perceived.  I saw that it was

4    a bright day.  I could tell that it was 65 degrees Fahrenheit.

5    I heard the sound of the collision as the two cars collided.  I

6    could small the burning rubber.

7         So that the witness is testifying about something

8    that the witness perceived directly, and the witness is

9    relating those perceptions here in court.

10        That's all there is to direct evidence.

11        Well, if that's direct evidence, what is

12   circumstantial evidence?  And let me give you a brief example.

13   Let's assume that it is February, and a farmer wakes up in the

14   morning bright and early, as usual, and puts on his clothes and

15   his boots and goes outside into the farm yard.  The farmer can

16   tell that it has snowed night before because there's two and a

17   half inches of snow on the ground.  The farmer looks at the

18   snow, and he sees the tracks of an animal.

19        Now, the farmer has no direct experience of that

20   animal that passed through his farm yard that night before.  He

21   didn't see the animal.  He didn't smell it.  He didn't touch

22   it.  He didn't taste it.  But he can infer from the tracks in

23   the snow that an animal did pass through the barnyard the night

24   before.  And that's all there is to circumstantial evidence.

25        When you are considering circumstantial evidence,

1    always remember that it must be analyzed carefully to see which

2    way the evidence points.

3            When I was younger, there would be periodic sightings

4    of the  so-called Loch Ness monster.  And television crews

5    would be on the sandy bank of Loch Ness, and they would show

6    the footprints of the supposed Loch Ness monster.

7            The jury always has to consider whether the

8    footprints show the Loch Ness monster itself or whether they're

9    simply the result of some prankster, some school boys have

10   taken a cast and made impression in the sand for fun.

11           So all evidence has to be weighed.  Direct evidence

12   must be weighed by the jury, so must circumstantial evidence.

13           As we discussed during the voir dire, jury selection,

14   one of the big jobs of the job is to weigh and assess and

15   evaluate the credibility of the witnesses.  When a witness

16   takes the stand and testifies, the jury must size up that

17   witness's testimony to see whether you believe it in whole or

18   in part or not at all.

19           So here is a nonexclusive checklist for you to run

20   through when you are observing the testimony of a witness to

21   see whether you believe it or not.

22           Did the witness have a good opportunity to observe

23   what it is that the witness has testified about?

24           Were they close or far away?

25           Was it dark, or was it broad daylight?

1            Does the witness have an accurate memory?

2            Does the witness have a good ability to describe

3     accurately what it is that they saw or heard and are testifying

4     about?

5            Does the witness have some kind of connection to the

6     prosecution or the defense that might give them a motive to

7     shade one way or the other?

8            Does the witness have something to gain from his or

9     her testimony?

10           Do they have a rooting interest?

11           Do they have any kind of bias or favoritism?

12           What do I think about the witness's body language or

13    demeanor?

14           Did the witness's testimony hold up on

15    cross-examination when that testimony and was probed and

16    tested?

17           How did the witness's testimony stack up against the

18    other evidence in the case that you as jurors found believable?

19           Whether you as jurors believe a witness in whole or

20    in part is entirely up to you and your good common sense.

21           Now, what about the conduct of the jury?  The first

22    rule is don't talk to anyone outside the jury about the case.

23    This includes people at home.  It's always natural when you go

24    home for the weekend or at night to have your friends and

25    relatives ask you what you're doing in Federal Court, what kind

1   of case is it, what do you think about the case, and your

2   answer should be very interesting case, I can't talk to you

3   about it now, but I'd love to fill you in after the case, the

4   trial is over, and we have returned a verdict.

5        Remember a trial is the controlled presentation of

6   evidence.  So when I as the Judge decide what evidence can

7   reach you here in the courtroom and what must be excluded, that

8   means that you should not be exposed to any information about

9   the case outside the courtroom.  So if anything appears in the

10  paper about the case, stop reading it.  If you hearing about

11  the case on radio or television, change the channel, turn off

12  the set.

13       Don't investigate the case.  This includes

14  prohibition against doing any Internet searches or reviews on

15  your computer.  Don't talk -- another rule is don't talk to

16  other members of the jury until you are locked in to

17  deliberate.

18       Now, this may seem to be an odd sort of instruction.

19  You are all strangers.  You've come from all different parts of

20  the state to form this jury.  The one thing that you have

21  immediately in common is this trial.

22       At some point, we're going to have to review all of

23  the evidence and reach a verdict, so why shouldn't you start

24  talking about the case now?  Wouldn't that be more efficient?

25  And the answer is, it might be more efficient, but it would be

1   less fair for this simple reason, a trial takes place over a

2   period of time, days, sometimes weeks, sometimes even months.

3          It's important that the jury keep an open mind

4   throughout entire presentation of the evidence.  At that point,

5   when all the evidence is in, you can begin forming opinions.

6          If you were to start talking about the case now, and

7   forming opinions now, you would be less open-minded and

8   receptive for the evidence that comes in later in the case.

9          So, for that reason, keep an open mind until all of

10  the evidence has been received.

11         You have been given paper and pencil.  You may take

12  notes if you wish to do so.  You're certainly not required to

13  take notes.  If you do take notes, I ask you not to show your

14  notes to the other members of the jury.  They're for you alone.

15  I also ask you not to let the note-taking process cause you to

16  miss any of the testimony.

17         If you remember back to school, sometimes you'd be so

18  engrossed in writing notes that you'd miss five or ten minutes

19  of what the teacher was saying.  So keep one eye open and one

20  ear open for the testimony that comes in even when you are

21  taking notes.

22         If you don't take notes, remember to pay careful

23  attention, because it will be your duty when you do retire to

24  deliberate to remember the evidence, discuss it intelligently,

25  and reach a verdict.  So listen carefully at all times.

1          What are the different phases of a trial?  We've

2     already had jury selection, and that's done.  What happens

3     next?  The next order of business is opening statement.

4     Counsel for the government and for each of the defendants will

5     be able to give you from their perspective, an outline of what

6     they anticipate the evidence will be in the case.

7          Their statements in opening statement is not supposed

8     to be argument, and it's certainly not evidence.  It's simply

9     an outline that will enable you to understand better the

10    evidence as it comes in.

11         Sometimes a helpful analogy might be this.  Evidence

12    comes in in discrete bits, from testimony, from documents, from

13    other tangible things, from stipulations.

14         You can analogize those bits of evidence to the

15    pieces of a jigsaw puzzle.  When you open up the jigsaw puzzle

16    box, there's simply a jumble.  That's why on the cover of the

17    jigsaw puzzle box they gave you a picture of what the completed

18    puzzle looks like, because it gives you a frame of reference

19    that helps you understand and put together the pieces better.

20         Always remember, however, that a trial is a contest

21    between two opposing views of reality.  The government takes

22    the position in this case that the two defendants, Mr. Sodipo

23    and Mr. Nwaehiri, are guilty of the crimes charged in the

24    indictment.

25         The defendants have denied that they are guilty, so

1   you have these two competing views of reality so that the

2   picture of the jigsaw puzzle that the government presents will

3   be different from the picture that the defense presents, but

4   it's helpful to the jury to have both world views to help you

5   understand the evidence better as it comes in.

6           Following the opening statements, the government will

7   put on its case-in-chief, call witnesses, introduce documents

8   and other things into the record.

9           After the government's case is over, the government's

10   case-in-chief is over, the defendants then have an opportunity

11   to put on evidence, if they wish to do so.

12           Remember, the defendants in a criminal case have no

13   burden of proof.  The sole burden of proof rests with the

14   government.  Therefore, the defendants in a criminal case are

15   never obligated to put any evidence on, but they may, if they

16   wish to do so.

17           If the defendants put on an affirmative defense case,

18   then the government is permitted to come back for a brief

19   rebuttal because in the government is entitled to do this

20   because the government has burden of proof.

21           Following the presentation of all of the evidence, I

22   will give you the jury instructions that explain the various

23   counts of the indictment, explain the legal principles, give

24   you the law that you are to apply to the facts.

25           After jury instructions, you will hear closing

1    argument from counsel.  Closing argument of counsel, again, is

2    not evidence.  It is not to be considered by the jury as

3    evidence.

4         If opening statement is prospective about what the

5    evidence will be in the case, or is likely to be in the case,

6    closing argument is retrospective, and counsel are permitted to

7    marshal the evidence, to state from their vantage points the

8    implications of the evidence, and to argue that you should

9    return a verdict in their favor.

10        The prosecution will be asking for a verdict of

11   guilty, and the defense will be asking for a verdict of not

12   guilty.

13        Again, we give counsel the opportunity to discuss the

14   evidence to remind you of the evidence, to help put it in

15   context.  But, again, your view of the evidence, your decisions

16   regarding the evidence, your findings of fact are for you and

17   you alone to make.

18        Following closing argument, you will then retire and

19   deliberate and reach a verdict in this case.

20        Now, one point of view concerning etiquette.  In some

21   some courthouse, there is separate circulation for jurors and

22   for everyone else.  So jurors come on a separate elevator, or

23   they come up a separate staircase.  They have got a jury

24   deliberation room.  They then come in here to court.  They then

25   go back to the jury deliberation room, and they go out through

1    separate stair case or elevator to their transportation.

2            With separate circulation, the witnesses, the

3    attorneys, the parties to the case don't run into jurors, which

4    is the best possible situation.

5            But here we don't have separate circulation.  And

6    from time to time, you may run into in the hall or even in the

7    elevator some of the participants in the case.  And they have

8    all been instructed that if they run into a juror in the

9    cafeteria or elevator, they are to look downward and avoid eye

10   contact.  So if that happens, nobody's trying to be

11   disrespectful or unfriendly.  They're simply trying to avoid

12   the rule that there is to be no interaction between the jury

13   and anyone else involved in the case.

14           Good.  Let me simply ask counsel if there are any

15   other preliminary instructions they would have me give to the

16   jury at this time.

17           Miss Smith?

18           MS. SMITH:  No, Your Honor, thank you.

19           THE COURT:  Thank you.

20           Mr. Ravenell?

21           MR. RAVENELL:  No, Your Honor, thank you.

22           THE COURT:  Mr. McCants?

23           MR. MCCANTS:  No, Your Honor.

24           THE COURT:  Thank you.  With the preliminary

25   instructions in mind, let me now call upon government to

1    present its opening statement.

2              MS. SMITH:   Thank you, Your Honor.

3              Good morning.

4              THE JURY:   Good morning.

5              MS. SMITH:   Thank you for coming back.

6              May it please the Court, let me begin by thanking you

7    for your service.   And as I said, thank you for coming back.   I

8    know you probably feel you didn't have a whole lot of choice so

9    you're here.

10             But let me just say something about that, in this

11   country, we enjoy tremendous rights guaranteed to us by the

12   United States Constitution, the right the a jury trial.   The

13   presumption of innocence, all the things that we hold near and

14   dear that many of us believe separate us from the rest of the

15   world, very, very important.

16             A jury trial is one of those sacred rights that we

17   hold near and dear.   And without jurors, the right means

18   precious little.   So let me thank you, and I'm sure I speak for

19   everybody, to the attention that you will be giving us in the

20   next several weeks for the time away from your lives, the

21   service that you provide.   It is a service, it's part of good

22   citizens of this country, went thank you.

23             Let me introduce you to the gentlemen sitting at the

24   trial table, Paul Budlow Assistant United States attorney, next

25   to him Special Agent Joseph Rosati with the DEA, and sitting

1    right behind the table is Mr. Jesse Siegle, who is a law clerk

2    in our office who's going to assist us.

3         My name is Andrea Smith and I'm the Assistant U.S.

4    Attorney.  And together we are going to bring to you the

5    government's evidence, one piece at the time.

6         Your goal, as the Court has said, is to figure out

7    what happened.

8         And in particular, in this case, not only piece

9    together the events that happened the comings and goings, the

10   meetings, but you will also be asked to determine what is in

11   defendants' minds, what was their thought process?  What they

12   knew and when they knew it?

13        And that is part of what this case is about.

14        You don't need a law degree.  You don't need a

15   medical degree.  You don't need a pharmacy degree.  You need

16   common sense.  You need life experience.

17        There's another Judge in this courthouse where the

18   Judge says we've all been around the block, we've all been

19   around different blocks, but we've all been around the block.

20   So it's that collective knowledge that we all bring together

21   and sort things out.

22        One of the my favorite examples of using common sense

23   is the story about one of my daughters when she was about two,

24   three, four years old, I had suspected for a while that she was

25   stealing chocolate kisses off this little bowl I kept on a

1    shelf outside the kitchen.  And I came around the corner one

2    day and she was standing by the bowl, besides the look on her

3    face, she had a little bit of chocolate right here.  And I

4    said, oh, stealing chocolate kisses?  I leaned over right in

5    her face and she said, no, I'm not.  And, of course, chocolate

6    breath hit me in my face.  And the decision wasn't real hard.

7    It was common sense.  It was nothing magical or you don't need

8    a degree in anything, and that is the everyday judgment that

9    you bring to the courtroom that we are relying on.

10          It's not hard.  And, again, just try to relax.  I

11   know it's a little nervous, whatever, but try to relax.  We'll

12   get into sort of a pattern over the next couple of days.

13          Let me caution you, this isn't like television.  It's

14   not going to happen in an hour.  It's not going to be all tied

15   up.  The evidence, like the Court said, is like a puzzle.  It

16   doesn't come in, in order.  It doesn't come in all sort of

17   connected, it's different pieces at different times, and you do

18   need to suspend your judgment until you see the big picture

19   within your life experience decide what it means.

20          As I think you know, both defendants are pharmacists,

21   Mr. Sodipo, and Mr. Nwaehiri.  And let me begin by saying a

22   word about the terminology of pharmacy, because I don't think

23   any of you on the jury are pharmacists, I'm not a pharmacist.

24   And pharmacy just like any other field, engineering, the

25   insurance world or every field has its own jargon.  And if we

1    take it slowly and break it down, it's not that complicated, at

2    least for the purposes of what we need to accomplish here.

3           Drugs fall into three basic categories.  There are

4    controlled substances.  There are what we call dangerous drugs

5    and over-the-counter drug.

6           The first category, controlled substances, are drugs

7    that are highly addictive or susceptible to abuse.  And they

8    are organized in categories called schedules.

9           So sometimes you hear them called scheduled drugs or

10   controlled schedule drugs or controlled schedule substances,

11   and they are organized through Schedules I through V, I being

12   the higher abuse potential, the higher the schedule, the V

13   being the less abuse potential, the lower schedule.

14          Schedule I's are drugs that have absolutely no

15   medical use or application.  They are highly susceptible to

16   abuse, and they're drugs like heroin.  There's no accepted

17   legitimate use for heroin in the medical field.  And heroin is

18   a Schedule I drug.

19          Schedule II is a drug that does have a limited

20   medical use, a legitimate medical use, but it's still a highly

21   addictive drug.  Drugs like morphine.  Drugs like opium.  Even

22   drugs like cocaine are used in very limited ways by the medical

23   community.  Oxycodone, powerful pain killer, these are all

24   Schedule II drugS.  Going down the scale to III, IV, and V in

25   descending order, are drugs that do have the legitimate medical

1     use and are less likely to lead to addiction than I and II.

2     Examples of Schedule III are hydrocodone or amphetamines.

3     Schedule iv, Xanax, phentermine, some steroids.

4          Schedule v is mostly cough syrups.  All of them have

5     some potential for abuse, but as you go back to I, it becomes

6     more and more serious.  Any of these drugs, as I said, have

7     that potential.  But if used properly, they provide all the

8     wonderful advantages of modern medicine.

9          Now, that was the first category.  The second

10    category that I call dangerous drugs are drugs that are less

11    dangerous, so they're not scheduled, but they still require a

12    prescription, because there's maybe some potential for abuse,

13    and there's also potential for serious allergic reaction.  So,

14    again, you need a prescription.  Penicillin, Amoxicillin,

15    diabetic drugs, heart medications, things that aren't typically

16    make you feel high, make you feel happy, but still have some

17    issues that need to be monitored carefully.

18         And, finally, you have over-the-counter drugs,

19    everyday pain and cough and cold medications.  Benadryl,

20    Tylenol, Ibuprofen, Pepsid.  In the pharmaceutical aids,

21    over-the-counter drug, OTC, over-the-counter drugs, may also

22    include things like shampoo and lotions, anything the FDA has

23    gotten involved in, but that's about as much detail as we need

24    on that.

25         Those are the three categories of the descending

1        order of seriousness and things of that nature.  The drug that

2        you will hear about in this case from start to finish is

3        hydrocodone.  Hydrocodone is a widely prescribed, widely used

4        commonly known as Vicodin, Lortab, Norco, some other names, and

5        when combined with things like acetaminophen, the stuff in

6        Tylenol combined with Ibuprofen, stuff in Advil or Motrin, is a

7        Schedule III controlled substance.

8                So the categories that I gave you, it's a controlled

9        drug, and it's not I, it's not II, it's Schedule III.

10               Hydrocodone is a wonderful drug.  It is effective and

11       has accepted medical purpose to treat moderate to severe pain.

12               But hydrocodone is nevertheless subject to being

13       abused, and it's highly addictive, and if not monitored

14       properly, can even lead to death.

15               There are several charges in this case, counts that

16       you will have to decide at the end of the case.  And for the

17       moment, right now, I'm going to take this time and discuss

18       Count 1 with you.

19               In Count 1, the government alleges that the

20       defendants have conspired to violate Title 21, United States

21       code, Section 841.

22               That is the statute that makes it illegal to

23       distribute or possess, possess with intent to distribute,

24       substances like the scheduled drugs the controlled substances I

25       just spoke about, unless expressly authorized by law.

1           So you cannot possess them.  You cannot distribute

2      them.   You cannot do anything unless the law allows it.

3           This is also the statute that's typically used when

4      people are caught on the street selling things like cocaine and

5      heroin, what we commonly known or call illegal or street drugs.

6           The law and our common sense tells us that ordinary

7      citizens, anybody, cannot possess, distribute, handle, illegal

8      drugs like heroin under any circumstances.  That is the statute

9      that the government uses.

10           But the law also applies to controlled substances,

11      the everyday type, like the hydrocodone, anything that's

12      scheduled that we commonly would call legal drugs, and in this

13      case, it's hydrocodone, because you also know from your life

14      experiences that people can't have those drugs except under

15      very limited circumstances.

16           For example, when they've gotten a prescription from

17      their doctor.  You can't walk around with a way pocket full of

18      controlled substances unless you're allowed to have it, unless

19      it is expressly authorized by law.

20           Finally, there's a third application in this case

21      which applies supplies in this case, the statute.  It means the

22      doctors, pharmacists, nurses, and other medical personnel, can

23      only, can only handle, distribute, dispense, these drugs,

24      pharmaceuticals and controlled substances as authorized by law.

25      Just because they're a pharmacist or a doctor, they still have

1    to handle these things properly.

2         What the law allows will be part of your decision.

3    And it will be described in more detail by the Judge at the end

4    of the case.

5         Don't worry about it now.  There's too many things to

6    remember, really, just try to get the big picture.  And at the

7    end of the case, you will decide.

8         We have alleged, the government has alleged that

9    these men did not dispense or distribute these drugs as

10   authorized by law.  They did not follow the law.  And they are

11   charged in Count 1 with conspiracy to illegally distribute

12   hydrocodone.

13        So to be clear, this is not a case about the

14   distribution of illegal drugs, like heroin.  It is the illegal

15   distribution of drugs, controlled substances, hydrocodone.

16        Members of the jury, this is not a case simply about

17   pharmacists who violated the professional responsibilities,

18   although you will hear that this certainly did.  They turned

19   their backs on the professional responsibilities.  They closed

20   their eyes.

21        This is not a case simply about poor judgment,

22   although you will hear that they used very, very poor judgment.

23        This is not a case simply about malpractice, if you

24   will.  This is a case about a crime.  The government's evidence

25   that will show that the conduct of these defendants were so

1    egregious, so flagrant, so extreme, and so beyond the scope of

2    any prudent and professional judgment that it can only be

3    considered criminal.

4         We are confident that, at the end of the evidence,

5    the government argues to you, you will agree.

6         Mr. Sodipo and Mr. Nwaehiri have college degrees.

7    They're trained pharmacists, licensed by the State of Maryland,

8    registered with the DEA to handle and dispense controlled

9    substances.  And with that license and registration came a

10   responsibility.  Together they owned and operated New Care

11   Pharmacy.

12        And in October of 2006, when the DEA closed their

13   doors, there were in excess of 50 employees.

14        The business began in the early 1990s, and was

15   through the hard work and vision of these two men, these

16   defendants, and others, it was a thriving business, something

17   to be proud of.

18        New Care was what's called a closed-door pharmacy.

19   They did not have walk-in street traffic.  You could not walk

20   in, plunk down a prescription and get it filled like you would

21   at CVS or Walgreen's.  They cater to assisted living

22   facilities, some large, some small, some private, some

23   subsidized by the government or state funding.  They delivered

24   required medications and supplies to these homes.  And they

25   would -- the patients in these facilities would have standing

1    prescriptions from the doctors, and they would make sure every

2    month, or every week, that whatever that patient needed would

3    be sent to that home, and that they would keep up with the

4    changes.   And they would service these facilities.

5            What kind of supplies?   Ostomy supplies, syringes

6    diapers.   What kind of medications?   Over-the-counter drugs,

7    Ibuprofen, Tylenol, shampoo, non controlled drugs, dangerous

8    drugs as I called them, insulin, blood pressure medicine,

9    cholesterol medicines.   And they delivered controlled

10   substances, too.

11           These defendants were working to expand the scope of

12   this business, not only locally in Maryland, but they

13   endeavored one day to distribute and dispense drugs in Nigeria

14   and other western African nations so desperately in need of

15   quality medical care.

16           But New Care did more than that.   They sent nurses.

17   They had an entire nursing service.   And they sent services

18   into small private assisted living homes, separate and apart

19   from the pharmaceutical service to help the ill and the

20   disabled.   New Care was more than that.   They had a

21   manufacturing operation.   Under the direction of these

22   defendants, employees were working to create lotions, herbal

23   remedies for marketing not only here but in Africa.

24           And New Care was more than that.   They had a real

25   estate development and custom building business that the

1    defendants also owned to send to Africa.  Great things were
2    under way.  These men built this business from the ground up
3    from the early '90s until 2006.  It was something to be proud
4    of.
5              But ladies and gentlemen, something went wrong.
6    Something went terribly wrong.
7              What happened?  They got greedy.  Nothing more,
8    nothing less.
9              The oldest story in the world.  Greed.
10             You will hear evidence about a group of men in
11   Orlando and Tampa, Florida, in that vicinity, who began an
12   Internet business sometime in the year 2003, maybe before that.
13   Barry Brooks Dr. Juan Ibanez, those are two of the men, Adam
14   Kaps, Nick Camarata,, don't be about worrying about the names
15   right now.  You will know all of this like they're people
16   you've known your whole life at the end of the trial, don't
17   worry about the details.
18             But these people created numbers with initials like
19   IHE, and GDN and PDP, and they stand for thing, like Internet
20   Health Enterprises, Prescription Drug Planet, Global Data
21   Network.
22             They created corporations, and these corporations
23   created web sites.  These corporations hired whiz kids,
24   computer whiz kids.  They hired doctors, and they recruited
25   pharmacies.  And they began a process that ultimately

1   distributed more than a 50 million doses of a powerful

2   addictive pain killer hydrocodone across the United States.

3          How did it work?  A computer, customer would go to

4   the computer.  They would type in their favorite drug.  Or they

5   used Google and Yahoo!, a search engine, and they would get a

6   list of websites, probably thousands of them.  But if they

7   ended up on one of these websites, www.onlinescript.com,

8   firstmedicine.com, epaymedicineglobal.com,

9   prescriptiondrugplanet.com.

10          They would fill out a perfunctory questionnaire, what

11   hurts, pick a body part?  What helps?  Pick a drug.  They would

12   present a valid credit card, that was key, a valid credit card.

13   There would be a followup telephone call to make sure that the

14   credit card was authorized.  There would be a follow up

15   telephone call called a consultation where a person

16   representing themselves as a doctor or physician's assistant

17   would ask them a handful of question, well, have you ever had

18   an MRI?  Does the pain radiate?  A few of these questions.  And

19   you will hear some of these conversation that have actually

20   been taped.

21          Medical records or some version thereof would be

22   Faxed in to an 800 number, somewhere in Florida.

23          The customer's credit card was charged for the

24   consultation, approximately $115.

25          The customer's credit charge was charged for the

1    drug, 75 to $100, which by the way, when you're talking

2    generics, it's something like 5 to 800 percent over the cost of

3    the drug.

4            The credit card was charged for standard shipping,

5    something like $25.  And if you need it overnight, you could

6    get it overnight for a little more.  And the drug would arrive

7    at the customer store by Fed-Ex or DHL or the next day.

8            New Care was recruited by these men in Florida

9    sometime between June of 2004 and January, 2005.

10           Members of the jury, you will hear that the law

11   requires that all the manufacturers, like Cardinal Health and

12   McKesson, they must keep records of which pharmacy they sell

13   certain Schedule II's and Schedule III's.  It's part of the

14   controlled, controlled drug, controls that are kept on certain

15   drugs.  And they send these records to DEA, and DEA reviews

16   them, and analyzes them.

17           Through these records maintained by DEA, we know from

18   the distributors that were selling hydrocodone to New Care and

19   defendants, who, by the way, are the owner of New Care, in case

20   I didn't make that clear.

21           In the year 2003, New Care purchased for resale to

22   the clientele 4200 doses of hydrocodone.  That's 4,200 doses.

23           In 2004, they purchased for resale 4,600 doses of

24   hydrocodone.  In the year 2005, New Care purchased from their

25   distributors for resale to customers 4.2 million doses of

1    hydrocodone.

2              In 2006, by October 10th, DEA closed their doors,

3    there was an additional 4.8 million doses of hydrocodone.

4              Assuming for the moment 90 doses to a prescription,

5    that means in 2003 and 2004, clientele in the assisted living

6    facility received approximately 50 or 60 prescriptions total

7    for each year.

8              It also means in 2005 and 2006, less than 22 months,

9    New Care filled more than 100,000 prescriptions.

10             When the government shut New Care's doors, the DEA

11   seized their computers.  Their computers were analyzed, and the

12   information in their computers was completely consistent with

13   the information that the DEA had from the distributors.

14             And it establishes between January first of 2005 and

15   October 10th of 2006, less than 22 months, New Care distributed

16   in excess of 9.9 million doses of hydrocodone to customers in

17   all 50 states and the District of Columbia.

18             The data in their very own computers tells us that

19   the same 11 doctors prescribed 98 percent of these

20   prescriptions.

21             And most of these doctors were in Florida.  Over and

22   above the cost of the drugs, IHE, that Florida corporation, the

23   conspirators down there, they paid New Care $20 for every

24   prescription that went out the door.

25             There were days, too many of them, where these 11

1    doctors each prescribed hundreds of prescriptions to patients

2    all over the United States.  You know from your own experience,

3    a doctor cannot see a hundred patients a day, much less 300

4    patients in a day.

5            So other than the sheer numbers, the shocking numbers

6    that speak for themselves, how do we know this is a problem?

7    Why is this a problem?

8            Well, let's begin with the doctors.  The law requires

9    for a doctor to prescribe a controlled substances, it must be

10   within the usual course of the doctor's professional practice

11   and for legitimate medical purpose.  There must be a valid

12   doctor/patient relationship, and the drug prescribed must be

13   related to a condition suffered by the patient.

14           This is the part of the statute where it says doctors

15   can only do thing with drugs as authorized by the law.  That is

16   what the statute means based upon regulations and the law, and

17   you get into the codes and regulations that are promulgated to

18   support the language of the statute.

19           Without this foundation, valid doctor/patient

20   relationship, the drug that's related to the client, issued in

21   the professional practice, without that, an order for a

22   controlled drug is not a valid prescription.  And legally, it's

23   not a prescription at all.  Without this foundation, doctors

24   and pharmacists are drug dealers, no different than pushers.

25           So this means that drugs given out through an invalid

1    prescription is an illegal act.   It is a crime.

2              Okay?   So you're thinking, all right, well, we're not

3    talking about doctors here.   We're talking about pharmacists.

4    What does the law require of a pharmacist?   How is a pharmacist

5    to know what is behind that little white piece of paper?

6    Someone comes in, hands it over, what are they supposed to

7    know?

8              Well, they're trained in pharmacy school, years of

9    practice, in this case 14 years of practice, common sense,

10   information sent regularly from the Maryland State Board of

11   Pharmacy to all pharmacists that are licensed in the state and

12   the Maryland Division of Drug Control, information sent from

13   the DEA.

14             What should a pharmacist look for in order to

15   determine if a prescription is valid?

16             Well, if the doctor's in one location and the patient

17   is many miles away, that might be a tip-off.

18             If the doctors, or if the doctor or doctors that are

19   issuing these prescriptions are issuing ridiculous numbers and

20   they're all for hydrocodone, all the patients are getting the

21   same drug regardless of age, sex, health, or complaint.

22             Patients were paying for drug many times the amount

23   that they would pay through conventional costs.

24             These are what we call flags of the legitimacy, and

25   they're there, if you want to see them.   If you close your eyes

1    to them, you won't see them.

2          Pharmacists have -- and this again goes back to the

3    statute, a corresponding responsibility to the responsibility

4    of doctors, not to practice medicine, but according to the law

5    to be sure that these are legally valid prescriptions.  They

6    have the responsibility to notice, to look, to make sure, and

7    if they're not sure, they can call the doctor.  They can call

8    the patient.  They can ask questions.  And if they're not sure,

9    they need to refuse to fill a prescription.

10         The pharmacists are the gatekeepers.  They are the

11   ultimate control between highly addictive and abusive drugs and

12   the public.

13         They're it.  They are the last line of defense.

14         To knowingly fill an invalid prescription is a crime.

15   And that's where the knowledge, what they knew and when they

16   knew it, is going to be part of your decision.

17         The Court will tell you at the end of the case there

18   are two things you will have to decide, whether the

19   prescriptions are valid, because you'll have to decide.  I

20   mean, there's nothing wrong with filling a prescription or

21   keeping your eyes closed if the prescription's valid, so the

22   government has to prove to you that these prescriptions were

23   not valid.

24         And the other thing you will have to decide is

25   whether these defendants, these pharmacists with 14 years of

1      practice, knew that these were not valid prescriptions.

2             The Court will also tell you that the legal

3      definition of knew, the legal definition of knowledge, is knew

4      or was willfully blind.

5             You will hear from witnesses who worked with these

6      men during this period of time.  You will hear their words.

7      You will hear about their conduct.  You will hear about the

8      telephone calls that poured into New Care day after day from

9      agitated customers because their drugs were a day late or the

10     bottle was a pill short.

11            You will hear about the questions asked by the

12     distributors, what are you doing with all these drugs?  And

13     finally cut them off.  What did they do?  They found another

14     distributor.

15            You will hear about the things these men told so many

16     people to cover up what they were doing.  And using your common

17     sense, after a review of the evidence, like the child with the

18     chocolate on her face, without passion, without sympathy, but

19     as judges of the facts, you will conclude, of course, the money

20     was too good, they turned their backs on their professional

21     responsibility.  They closed their eyes.

22            In conclusion, let me mention there are other counts

23     for you to decide, there are several drug counts, money

24     laundering charges, tax violations.  I won't describe them but

25     to say money laundering is not as complicated as it sounds.  If

1   money is obtained through an illegal means, and then it is used

2   to then support the illegal means, that's one way of money

3   laundering.

4            So, for example, when the Internet companies paid New

5   Care their $20 per prescription and reimbursed them for the

6   pills, and New Care turned around and bought more hydrocodone

7   and then went back into the cycle, then they're promoting the

8   business, it's that a simple, it's money laundering.

9            Again, don't worry about it now.  You will get

10  instructions probably longer than you ever hoped you would get

11  at the end of the case.  Together over the next several weeks,

12  you'll hear the evidence, you'll be given the Court's

13  instructions on each count, and you'll sort it out in time one

14  step at the time.

15           It is our job to present the evidence to you.  You do

16  not need to believe me.  You do not need to be convinced of

17  anything I have told you, because you will evaluate the

18  evidence.  You will reach your own conclusion.  The presumption

19  of innocence would be overcome as you put pebbles on a pile and

20  build a mountain.  At some point, there is a tipping point, and

21  you will know in your heart and you will deliver the only

22  verdict that is just, these men are guilty.  They turned their

23  backs on their education, their training, their years of

24  experience, along with professional responsibilities.

25           They not only closed their eyes, they did not want to

1    know that the prescriptions they were filling were invalid.
2    But they did nothing.
3           They not only closed their eyes, they did not want to
4    know that they were dispensing controlled substances in a way
5    not authorized by law.  But they did it.
6           They not only closed their eyes, and didn't want to
7    know they were committing a crime, they did know.
8           Members of the jury, they must be held accountable.
9    Thank you for listening.
10          THE COURT:  Thank you, Miss Smith.
11          Ladies and gentlemen, we'll take a brief recess until
12   quarter of, and then we'll come back and we'll hear opening
13   statements from Mr. Ravenell and Mr. McCants.
14          (Recess)
15          THE COURT:  Please be seated unless you wish to stand
16   for the jury.
17          MR. RAVENELL:  Your Honor, before you bring the jury,
18   we're trying to locate Mr. McCants.
19          THE COURT:  Well, I think that he's late, so that he
20   may miss part of your argument, just so long as he's here for
21   his own argument.  You can bring in the jury, please.
22          THE BAILIFF:  They're putting away their food.
23          (Pause.)
24          (Jury present)
25          THE CLERK:  Jurors all present.

1                    THE COURT:  Good.  Thank you, Mr. Thompson.

2                    Welcome back, ladies and gentlemen.  Please be

3       seated.  Mr. Ravenell, you have the floor, sir.

4                    MR. RAVENELL:  Thank you, Your Honor.

5                    Good morning.

6                    THE JURY:  Good morning.

7                    MR. RAVENELL:  I think I said good morning in about

8       ten minutes, and I'm still there.

9                    Now, I first want to thank you all, and I know that

10      we're going to be together for the next several weeks, and I

11      want to thank you for what I know you're going to get, which is

12      going to be your undivided attention to the evidence in this

13      case, and a fair verdict at the end of all the evidence in this

14      case.  I have no doubt you're going to do that.

15                   We went through a process.  Some of you have actually

16      sat on juries before.  We go through this process which is

17      designed to try to select people who can sit and listen to all

18      the evidence in the case, and be fair to both sides.  And then

19      obviously, the lawyers, listen to all the answers you guys gave

20      you, looking at what we know about you, which is not a lot,

21      they don't give us much information on the little sheets.  So

22      we try to decide who would be best to sit of all the people,

23      the 80 people that came in, to sit and give a fair verdict to

24      the parties.

25                   And lucky you.  Now, I say that as a joke, but it is

1    lucky you, but really this process could not work without you.

2    Obviously, we don't agree with the government.

3            Now, I will tell you, I'll discuss with you, there's

4    something Miss Smith said I absolutely agree with, but the

5    ultimate issue in this case whether in fact Mr. Sodipo, Mr.

6    Nwaehiri are guilty of crimes as have been charged, we don't

7    agree.  If we agreed, we wouldn't need you.

8            So what we're going to ask you to do is to listen to

9    the evidence, listen to the presentation of evidence from both

10   sides, and then make what we know will be the right decision.

11           Now, I'm confident the evidence is going to show the

12   right decision the men are not guilty of the crimes as charged.

13   The government, obviously, at this point, thinks you're going

14   to find otherwise.  We don't know, we don't have that crystal

15   ball.  And, quite frankly, you don't have a crystal ball.  The

16   Court has told you, you haven't heard any evidence yet.  So the

17   next couple weeks, you will see witnesses come to the witness

18   stand.  They will testify, and questions will be asked of them,

19   and you're going take all that and make a determination.

20   You're going to look at documents.  At some point, you'll go

21   into that jury room, sit down, 12 of you, even though I guess

22   we have 15 of you here, only 12 will have chance to deliberate,

23   because that's the way the system works, only 12 jurors can go

24   in the end of the trial and deliberate and make a decision.

25           Now, when you decide what you're going to do in this

1   case, you'll hopefully be guided by us in the presentation of
2   evidence of what we think is important, what the final call
3   would be what you think is important and what the Judge tells
4   you the law is.

5           I know what the law is.  The Court knows what the law
6   is.  You don't know yet.  And you're going to that learn at the
7   end of the case.

8           Sometimes it seems a little one-sided or backwards to
9   tell you listen to all the evidence, and we'll give you the law
10  later.  Maybe it's better sometimes to give you the law first.
11  So when you begin hearing evidence, you begin to put it all
12  together, but that's how the system works this way, it's worked
13  very well for many years.  So I guess we'll continue to do it
14  that way.

15          Now, one thing I want you to remember, when you
16  listen to the evidence in this case, is that this case is not
17  about numbers.  It's about guilt or innocence.  The men who are
18  sitting here charged with a crime.  And what the government has
19  already done in their presentation to you is talk about the
20  sheer numbers.  And what they hope to do is to prejudice you
21  by, well, there were large numbers of as they say doses, units.
22  And I want to try to help you with what you're going to be
23  hearing a little bit, and then we'll come back to it in a
24  moment.

25          But what they're talking about dosage units.  How

1   many tablets.  They can call it what they want.  But the real

2   point is they're talking about number of tablets.

3         And the government says, well, in this case, you'll

4   find there were 8 million tablets.  And I ask you to think

5   about the reason you're here in this case is to put those

6   things into perspective.

7         Now, before we delve into that a little further, let

8   me kind of back up here.  As I told you, there's some things

9   that Miss Smith said that I absolutely agree with her on, and

10  that's, quite frankly, in many ways what I would touch on, will

11  touch on anyway, which is actually the character of these two

12  men.  These men, the government has told you a little bit

13  about, and I'll tell you a little bit more about speaking first

14  with Mr. Sodipo.

15        Mr. Sodipo migrated to this country in 1979 from

16  Nigeria.  He's 51 years old.  He's married, married for the

17  last 17 years.  He and his wife, four children, and three

18  stepchildren, he's been a member of the same church for the

19  last 17 years, goes every Sunday.  He is a hard-working decent

20  man.

21        And the government says, yes, Mr. Sodipo and Mr.

22  Nwaehiri were hard-working and decent men, but something went

23  wrong. Hum.  We agree with the first part of it.  They are

24  hard-working, decent men.  We also agree that something went

25  wrong.  The something that went wrong is they were arrested and

1     charged with crimes they did not commit.

2          Mr. Sodipo, when he came to this country, enrolled in

3     college.  He graduated from Howard University in 1986 from

4     Pharmacy School with a degree in Pharmacy.  He immediately got

5     his pharmacy license in D.C.

6          In 1986, he got his pharmacy license here in Maryland

7     in 1988.  He worked for different businesses, in the pharmacy

8     business here in Maryland.

9          And in 1993, he and Mr. Nwaehiri opened their own

10    business, and they started their own pharmacy, New Care.  As

11    you heard Miss Smith talk, it was a closed-door pharmacy.  It's

12    not a pharmacy you may be familiar with, such as Rite Aid or

13    CVS when you walk in with a description.  She described

14    accurately what is a closed-door pharmacy.  And they generally

15    supply drugs to long-term care assisted living facilities.  But

16    that's all they did.

17         As you heard, they had other businesses, these are

18    hard-working adventurous, men who decide we want to make money

19    the right way.

20         Now, the government says it was greed.  Well, our

21    entire country is based on capitalism, people work hard.  And I

22    know it will probably be something wrong with trying to make

23    money, if you only do it the right way, and that's what they

24    did for all the years the government's told you about.

25         They started this business.  They were down on

1    Madison Street, I think the address is 327 Madison Street in a

2    small place that had about 2200 square feet.

3           You'll see photographs in the trial, where they

4    started the business.  And they had the business there from

5    1993 to about 2002.

6           And in June of 2002, and this is before there is any,

7    any involvement, in Internet prescriptions.

8           In 2002, they bought this business, and you'll see

9    photographs of the place that they bought.  And it was quite

10   different.  Instead of having a small 2200 square foot

11   building, this was a 55,000 square foot building that they

12   purchased.

13          You'll see how they decorated and appointed the

14   place.  You'll see that hard work is what these men are used to

15   doing, and that's how they achieved what they achieved through

16   hard work.  It had nothing to do with Internet business, just

17   working hard and doing the right thing.

18          And I think the evidence is going to show they didn't

19   just all of a sudden change who they are.  They didn't just

20   change their spots.  They didn't become what the government

21   wants to you believe they became, criminals.

22          As the Court told you, the mere fact that someone's

23   charged with a crime is not proof they committed it.  That's

24   why we have these trials.  It's for you to decide whether the

25   government can prove to you beyond a reasonable doubt that

1    these men committed crimes.

2          And when they started the business, or moved the

3    business after purchasing the new facility in June of '02, they

4    moved in January 1 of '03.

5          Now, you'll hear evidence that these men did not

6    become involved in the Internet business until January, 2005.

7    So they're in this new building.  All they have there, you'll

8    see photographs that they will put together, because of the

9    hard work and all of the other businesses they have going, the

10   home care business, the home builders, their beauty aid

11   business, and they had ideas about expanding, bringing drugs to

12   areas of Africa that needs it so desperately, as the government

13   says, is correct.  At the same time, the government is telling

14   you that they're committing these crimes.

15         You'll be the judges whether these men are men who

16   turned a blind eye, or whether these are men who intentionally

17   chose to commit crimes the government wants you to believe.  It

18   has to convince you to obtain the verdicts they wish to obtain.

19         Now, remember that what you'll see is that these men

20   are no strangers to working hard and giving their all.  Mr.

21   Sodipo bought a home in 1997.  You'll see the home.  Beautiful

22   home.  Big home.

23         Mr. Nwaehiri did the same.  All from hard work.

24   These men were doing well.  It wasn't greed.  It was hard work.

25   And being able to show that, when you work hard, they didn't

1    just keep it to themselves.  They employed approximately 60

2    people who were working for them when the government came that

3    to their businesses, October 10th, 2006.  And Miss Smith says

4    the DEA shut them down.  That's just not accurate, that is to

5    say we would show they were not shut down by DEA.  They had

6    searched, the DEA doesn't have the power or authority to shut

7    them down.  They didn't shut them down.

8         But what we have now is a trial where you will decide

9    whether what the DEA did on October 10th, 2006 was justified,

10   but that's not even an issue, is it?  The issue's going to be

11   whether the government will prove to you beyond a reasonable

12   doubt that these men committed the crimes they alleged.  And

13   we're going to help you to work through this whole issue of

14   they tell you, as I said, look at the numbers, you know, that

15   these men prescribed 4,000 doses or tablets, of hydrocodone in

16   2004 and then in 2005, it's 4 million.

17        Well, see, that's an effort to mislead, quite

18   frankly, because when you look at the evidence, you'll see what

19   really happens.

20        Think about this.  What happened in 2005 when the

21   defendants, that they became involved in telemedicine.  We all

22   know that the Internet is changing every aspect of our lives.

23   You now even have doctors being in one location, using the

24   Internet, using computers to perform surgery from a remote

25   location.  Everything's changing.  Internet's not just changing

1    other aspects of your lives.   It is changing every aspect of

2    your lives, including the way we purchase drugs for our ills.

3    That's what telemedicine is about, particularly this area we're

4    dealing with, you'll be dealing with in this case.

5            You know, when I heard the government talk about look

6    at the differences and the changes and say, well, you had 4,000

7    dosage units, 4,000 tablets and this year, and the next year

8    you have 4 million, well, you'll see the evidence is going to

9    show you that that's easily explained.   If you are supplying

10   tablets, pills, to assisted living facilities, to the older

11   people in Baltimore City, not even entire Baltimore City,

12   because it was a closed-door pharmacy, but prescribing

13   medication and dispensing medication to a small group of the

14   nursing homes that they in fact supplied, and they become

15   legally, because no one will tell you that it is illegal to be

16   involved in the Internet business of dispension of drugs.   They

17   can tell you something, it's not true, I don't think.   It's not

18   illegal to be involved in the dispensing of medication the

19   Internet.   It is not.   So what the government is telling you is

20   it's the numbers that they were dispensing that will tell that

21   you there's a crime, and that they turned their blind eye to

22   these other things.

23           Imagine why there would not be a significant increase

24   in tablets being distributed if you were once distributing to

25   this small group, and now, because of the use of the Internet,

1    legal use of the Internet, you're able to dispense and

2    distribute drugs to 50 states.  The 50 states.  And that's what

3    you'll see, these drugs were being distributed to the 50

4    states.

5         And they suggest to you, well, it's the numbers tells

6    you that there's a crime.  Examine the numbers.

7         Also, we're talking about prescription.  You get a

8    prescription, when you go to the doctor, they'll give you a

9    prescription.  They don't give you a prescription for one pill.

10   You're getting a prescription that says get 90 pills.  60

11   pills.  We don't look at pills.  We look at what the doctor

12   prescribed, the prescription.

13        That's what you'll see here that these prescriptions

14   generally are for 90 pills, what one would normally get when

15   you get a prescription if you went to Rite Aid and got your

16   prescription filled by your doctor.

17        Another thing that you should be careful about, when

18   the governments tells you things like the defendants are the

19   ultimate gatekeepers, they are the ones who must protect the

20   public from drugs given to the public because these are

21   possibly dangerous drugs.

22        The defendants are the ultimate gatekeepers.

23        Well, what you will see in this case is that you will

24   ask yourself is -- the Court's going explain to you what the

25   law is, and what the law is, is that the government has to

1    prove to you beyond a reasonable doubt that the doctors who
2    prescribe the medication, prescribed it outside the scope of
3    medical practice and not for the legitimate purpose.  That's
4    not personally what I have the problem with, but even if they
5    would somehowe prove to you, the government is then required to
6    prove to you beyond a reasonable doubt that Mr. Sodipo knew
7    that the drugs prescribed by the doctor were prescribed outside
8    the scope of medical practice and not for legitimate purposes.
9         You examine what happened in this case, and you'll
10   hear the witnesses.  The government seems to abandon all
11   responsibility and say it's the defendants who have an ultimate
12   gatekeepers.
13        Well, you will see through the evidence that makes no
14   sense.  Because the people, the group who are the ultimate
15   gatekeepers in this case is the DEA.  It is the DEA who in fact
16   certifies all of these doctors to allow the doctors who are
17   prescribing the medication to prescribe these drugs.
18        The DEA, unless the DEA gives a certificate to these
19   doctors, they have no right to prescribe the drugs.  Each of
20   these doctors had DEA certification.  The defendants checked
21   that out.
22        Now, when the defendants checked it out, it's what
23   the doctors were by the DEA.  The government suggests they
24   shouldn't rely upon that, they are the ultimate gatekeepers.
25        I'm going to tell you what else the evidence is going

1    to show.  The evidence is going to show that in July 2004, the

2    DEA began an investigation of this Internet group down in

3    Florida.  And that as early as July, 2004, DEA was meeting

4    undercover posing as members of individuals from a pharmacy,

5    meeting with these men from the Internet group.

6         The evidence is going to also show that, in November

7    of 2004, November 4, 2004, that the DEA met with and recorded

8    conversations with Dr. Ibanez, the person that you heard

9    mention, the Dr. Ibanez and Barry Brooks.  Those are the people

10   who were running this Internet group.

11        The DEA met with Dr. Ibanez in January 4, 2004,

12   undercover capacity, again posing as pharmacist, who's looking

13   to get involved in the Internet business.  And Dr. Ibanez told

14   the DEA exactly what he was doing.  It's on tape.  He didn't he

15   said here is how I do it.  Here's how we do it.

16        Now, the government says, what Dr. Ibanez was doing

17   was a crime.  It was so clearly a crime the defendants should

18   have seen it.

19        But what you will hear from the DEA, after meeting

20   with Dr. Ibanez, and recording those conversations, the

21   defendants didn't start, didn't become involved in this

22   business until January '05.  The DEA was aware of what Ibanez

23   and what others were doing since July '04.  Did they did send

24   out warnings to the defendants and say don't deal with Ibanez,

25   don't deal with IHE, that they send that to anyone in the

1    community, any other pharmacists, any other doctors, this man

2    has committed a crime, don't deal with him?

3         This man is suspected of being involved in the crime.

4    Don't deal with him?  No.

5         What you'll see is that they did nothing.  And then

6    after Mr. Sodipo, doing their due diligence deciding that this

7    telemedicine was appropriate, they went to Board of Pharmacy

8    before they got involved and checked it out.  And they asked

9    for information about what was proper and not proper, because

10   this is a new area.  It's a gray area because it is so new, as

11   many areas are when you begin to be wedded with the Internet,

12   with something different, something that is normal, we have the

13   pharmacy business wedded to the Internet, it's new.

14        But remember there are other areas in our lives that

15   were done this way.  We are wedded to the Internet.  It becomes

16   enough.  It doesn't exactly make it illegal to do it.

17        The evidence is going to show that, after meeting

18   with Dr. Ibanez in January '04, even before New Care became

19   involved with the Internet group, the government allowed Dr.

20   Ibanez and all these other doctors who had DEA certifications

21   to continue to distribute these drugs, continue to write

22   prescriptions for these drugs, when the defendants were

23   arrested in October, 2006, two years after the government

24   recorded Dr. Ibanez telling him exactly what he did, he still

25   had his DEA certification.  He was still writing prescriptions.

1     Each of those doctors were still writing the same

2     prescriptions.

3              So they tell you the defendants are the ultimate

4     gatekeepers, and forget about what the DEA should be doing.

5     DEA didn't pull the certifications of these doctors and say

6     what you're doing is incorrect.  Two years, December '07, a

7     year after defendants had been arrested, Ibanez is still

8     running the same business.

9              So when one tells you that you should use your common

10    sense, I agree.  I want you to use your common sense.

11             You're going to hear, also, that there were 19

12    pharmacies, not just New Care.  19 pharmacies that were

13    involved.  Only one sits here.

14             Only one sits here.

15             You consider all the evidence in this case.  Don't

16    let the government try to scare you with numbers.  You know,

17    what I thought I heard the government talk about the numbers

18    and not really touching on telemedicine, and I didn't mention

19    that term, they don't have to, I thought about something that I

20    read recently.  I was on vacation recently, and I started

21    reading, and I read so much what I do with the law, it takes me

22    forever to read a book for enjoyment.  I started to read

23    Obama's book Audacity.  He's talking about a meeting he had

24    with the founders of Google.  When he met with the two young

25    men who founded Google, when he sat with those men, they showed

 1    him a globe, and on the globe, it had all these lights in

 2    certain areas.

 3            And he was explaining to him that all those lights,

 4    if you look at the U.S, they're just lights everywhere, you

 5    look at Europe, lights everywhere.  You look at Australia, and

 6    you look at Africa there are few lights, and certain parts of

 7    South America, very few lights.  And what was told to him was

 8    all the lights are all the people who are online using Google

 9    at that time.  And he was talking about how different it was,

10    just Obama's not old, he's in his forties, just how different

11    it is when you take the Internet and do what those young men

12    from Stanford did with Google.

13            And it doesn't make it bad because people take the

14    Internet and show us that it can become more.  We reach people

15    all over the world through it.

16            It becomes, quite frankly, the evidence I think will

17    show that many people choose to use Internet because it makes

18    it more convenient.  It saves time and money.

19            For example, if you're in great pain, sometimes

20    people have pain so much that they can't even leave their home

21    without the use of their medication.  And instead of getting in

22    your car, driving to your doctor, fighting the traffic, sitting

23    in a doctor's office, some places for two hours, depending if

24    you're going to a clinic or going to your particular doctor,

25    depending how long they keep you waiting, people may say, look,

1    it's easier for me to just use my credit card and buy my drugs

2    over the Internet and have it delivered to my home.

3            People use Internet for other things delivered to

4    their home versus going to the mall to shop, because it's more

5    convenient.  And they choose to spend their money that way, and

6    they save their time for the familes.

7            So Internet's not bad.  And the evidence will not

8    show that it's bad.  And these men's decision to become part of

9    a changing world of telemedicine isn't a crime.

10           Look at the evidence.  Make the government show you

11   that these men committed a crime.  I think you'll find that

12   they won't.

13           The Court's going instruct you, obviously, as I said

14   on what the standards of proof are that the government has to

15   prove beyond reasonable doubt, and what the elements of the

16   crimes are.  And then you'll make the decision about what

17   occurred in this case, with these facts, with these men, and I

18   think the evidence is going to show that they were good men

19   before the Internet business, and they are good men after the

20   Internet business, and they were good men during the Internet

21   business.  They didn't commit crimes merely because they were

22   involved in their Internet business.  Thank you.

23           THE COURT:  Thank you, Mr. Ravenell.

24           Mr. McCants, you have the floor, sir.

25           MR. MCCANTS:  Thank you, Your Honor.

1              Good afternoon, ladies and gentlemen.

2              THE JURY:  Good afternoon.

3              MR. MCCANTS:  It is my pleasure to represent Mr.

4      Callixtus Nwaehiri, and my pleasure getting to know Mr. Steven

5      Sodipo.

6              And it's been very interesting my part as a lawyer to

7      learn about this area that is new, very common in rural areas

8      such as Montana areas of telemedicine when people prefer to

9      order prescriptions overt Internet as opposed to going to the

10     doctor's office.

11             What I am going to do ask you at the end of the case

12     is to return the only true verdict, the only right verdict,

13     burden of proof, not guilty of all charges.

14             In doing that, may I ask you to first and foremost

15     follow the Court's instructions.  The first and formost

16     instruction is that the government has the burden of proof.

17             Very important, as the party holding the burden of

18     proof, to hold them to that their word.  They will not stand

19     before you and say, well, these men were greedy, and then after

20     a couple weeks in trial, say, well, they do refills, so maybe

21     they want to be greedy.  They said let them prove it, because

22     they can't.

23             Mr. Nwaehiri moved to this country in 1987.  He was

24     married in 1987.  He has five children, attends the same church

25     near his home.  He has a Bachelor of Science degree in

1    Pharmacy.   In 2005, he began a Ph.D. program, which he still
2    continues in pharmacy.   Sound complicated, probably is.

3            He worked.   Since graduating, he's worked in three
4    different states; Texas, Delaware.   And, of course, Maryland as
5    a pharmacist practicing.

6            Never -- never disciplined by a Board of Pharmacy.
7    He worked from 1987 to 1992 for Rite Aid as a pharmacist.   And
8    then in 1993, he partnered up with Mr. Sodipo and developed New
9    Care Health Services, which served as a closed door pharmacy.

10           I'm trying not to repeat some of the things that Mr.
11   Ravenell said, but I'm going to leave you with five, ten
12   points, that will still be standing once the government
13   presents their evidence, presents their case, and based on
14   those points, and the other points that are raised, once again,
15   ask you for an acquittal of these charges, which are all based
16   on whether or not they knew that there was not a doctor/patient
17   relationship, that they somehow had some reason to believe that
18   medical records were not reviewed by a doctor that issued them.
19   The government will have no evidence of that.   Absolutely no
20   evidence.

21           There's no legal standard in telemedicine that there
22   be a physical.

23           In 2005, New Care health services entered into a
24   contract, a legal relationship, evidence in writing, no
25   backyard deal, nothing under the table, a legitimate contract.

1    You'll see the contract with a pain center in Florida.

2        Mr. Ravenell's already pointed out, he touched on

3    that the DEA questioned about it, never shut them down.   Never

4    did anything that caused these doctors' licenses to be revoked.

5    Doctors are fully licensed writing prescriptions.

6        You'll hear evidence, and the evidence will show that

7    the owners of New Care took measures to make sure that licenses

8    were in place, did they spot check and made sure medical

9    records were there for patients that were asking for these

10   medications?

11       That's Point 1.   Point 2 is that the government will

12   not be able to show because these gentlemen efforts to shop

13   around or hide the purchases of bulk sales of hydrocodone.   No.

14   They went right to the suppliers that they had used in the

15   business.   And you'll hear a lot of conversation about Cardinal

16   And McKesson.   They didn't try to spread it out, a little here

17   and there to hide anything at all With full knowledge that

18   these purchases of hydrocodone will be recorded in a system

19   could you tell us ARCOS, goes directly to the DEA.   All this is

20   documented.

21       There's nothing insidious here.   It's simply a new

22   area of medicine, telemedicine, which I was, well ,not really

23   too surprised, but the government didn't mention it at all.

24   What they did mention is numbers that just sound large,

25   Millions of dosages.   These were prescriptions.   Normally 90

1    prescriptions in a bottle, sometimes less, which brings the

2    numbers down drastically.

3            I'm going to correct something the government

4    mentioned in the opening statement.  DEA shutdown.  I have to

5    repeat it simply I know Mr. Ravenell said it was simply

6    blatantly untrue.  The DEA never shut down New Care.  After

7    they came in, and took the computers, he said, oh, this is

8    obviously wrong, obviously, illegal.  Obviously, there's no

9    doctor/patient relationship.  Show the other Maryland firms

10   that are doing this telemedicine.  We're going to shut down Mr.

11   Nwaehiri and Mr. Sodipo, and we're going to target this

12   pharmacy.  You've got to ask yourself why.

13           The key is they didn't break the law.  They shut them

14   down.  They didn't shut them down.  They stopped them with

15   controlled dangerous substances being distributed.  They

16   couldn't shut down something that had been built from the

17   ground up.  The other parts to the business continue.

18           I think it's very important point, it's going to come

19   out in the evidence, that in venturing into telemedicine, these

20   men did it the most responsible and the only thing they could

21   have done is they went, they approached the Maryland Board of

22   Pharmacy.  Is it all right for us to do this?  Can we have some

23   directions?  Can we have some guidance?  And you'll see

24   letters.  You'll hear the testimony about that.

25           I want to you ask yourself what else could they have

1     done?  Don't mention telemedicine like other companies have

2     done.  19 was only associated with the Florida pharmacy that

3     someone in the DEA office said this much must be too much,

4     they're wrong.  But there are hundreds of pharmacists,

5     pharmacies that are involved in telemedicine across the

6     country.

7              So he went to the Maryland board for direction.  Does

8     that sound like a criminal?

9              Have we ever heard a of a street-level drug dealer

10    approaching the police, that's the analogy, say, hey, look,

11    we're going to sell cocaine, is it, can you give us a little

12    direction?

13             It's a criminal trial, criminal charges brought

14    against these men.  And I'm going to ask you why, ask yourself

15    why.

16             Once again, this whole concept of greed bothers me

17    more than anything.  It caught me by surprise, perhaps.  The

18    hydrocodone part of this is less than 18 percent of the

19    business that New Care did.  It operated a company, 60

20    employees, a lot of employees doing every job they had in that

21    company just because a couple pharmacists, perhaps one whose

22    spouse works for the DEA, says, well, could we do this, should

23    we be in telemedicine?  It doesn't make it a crime.  It doesn't

24    make it a crime because one agent talks to the prosecutor's

25    office and decides to bring some charges.  That's why we have

1    juries.

2            On behalf of Mr. Nwaehiri, I want to welcome you

3    here.  It's difficult for me to see him sitting in that chair,

4    and I'm glad you the jury are here to hear the evidence to make

5    a decision that you all have to live with.  Thank you.

6            THE COURT:  Thank you, Mr. McCants.

7            Ladies and gentlemen, it's 12:30.  Why don't we take

8    the luncheon recess now and come back at 1:30 for the first

9    witness to be called by the government.  I'm going to stay here

10   with counsel.  I will look forward to seeing you then at 1:30.

11   Have a pleasant lunch.

12           (Jury recessed)

13           THE COURT:  Please be seated.  Thank you.

14           The record will show that the jury has now retired.

15           Mr. Ravenell, I'd be happy to hear from you and Mr.

16   McCants on the motion concerning Mr. Kaps.

17           MR. RAVENELL:  Thank you, Your Honor.

18           Your Honor, has the Court gotten a chance to review

19   the filing?

20           THE COURT:  I have.  I've read it in its entirety.

21           MR. RAVENELL:  All right.  Thank you, Your Honor.

22           Your Honor, as I indicated, in addition to what is

23   set forth in the motion, we received from the government Friday

24   a document -- let me find it -- which was a DEA 6 prepared by

25   Agent Carrie Hamilton, prepared on June 4, '08, but it details

1    an interview of Mr. Kaps on February the 8th, of 2008.  In the

2    cover sheet, I'll read, here's a report on Adam Kaps's

3    interview that was conducted on 2-8-08.  It says finally

4    exclamation point.  I'm working on the report regarding the

5    3-25 and 3-26 interviews of Kaps and will forward it as soon as

6    I'm finished.

7         So in addition to the information in in our motion,

8    and we still don't have that DEA 6, I had indicated we had

9    received a note, handwritten notes from Agent Hamilton

10   regarding those meetings.

11        I can tell the Court, in reviewing them, there's some

12   areas that have abbreviations that I assume will be cleared up

13   when the agent actually prepares the document.  So we're still

14   awaiting that particular document.

15        But turning to the items set forth in the written

16   motion, Judge, as I pointed out, in November of, November 14th,

17   2007, DEA executed a search and seizure warrant on the business

18   of Mr. Kaps at Creative Logics down in Florida.  And during

19   that time, Agent Hamilton spoke to Mr. Kaps.  This is detailed

20   in a DEA 6 regarding that 11-14-07 meeting.  According to Agent

21   Hamilton, she told Mr. Kaps he should have known that the

22   internet business was illegal because Kaps was involved in a

23   similar raid in Haines City, Florida in October 2003 where DI

24   Graumlich advised Kaps those involved in the distribution of

25   prescription drugs via Internet were part of a conspiracy to

1    distribute controlled substances.

2           Now, we have asked the government to turn over to us

3    any information they have regarding Mr. Kaps that we are

4    entitled to from that 2003 investigation.

5           I want to point out, Your Honor, this is the same

6    area, the Haines City, Florida, the person that Mr. Kaps was

7    working for in 2003, was Barry Brooks, the same person he was

8    working for the time period he was working with, during the

9    time period of this alleged conspiracy.  It's really the same

10   individuals, Mr. Brooks, Mr. Kaps, and some others.

11          Dr. Ibanez was around maybe started actually in this

12   particular group a little after the 2003 raid, replacing one of

13   the doctors.  There was a Dr. Dominick, who was involved in

14   2003, who was replaced by another doctor, and then Dr. Ibanez

15   replaced that doctor.

16          But this is kind of the same group of individuals

17   that may have walked in and out of I guess the alleged

18   conspiracy of the government.

19          As you heard, the government said this conspiratorial

20   group started in 2003 or 2004.  Well, we had this incident

21   happened in 2003 in October when Mr. Kaps was interviewed, and

22   the notes that we do have, he in fact was questioned about the

23   2003 raid, and in one of the reports he actually made a

24   comment, well, there was a lot going on, and I was very

25   stressed, so I don't remember everything that happened during

1    that 2003 raid.

2            If the government has, Your Honor -- well, strike

3    that.

4            I'll go -- we asked the government to give us any

5    information they had that would qualify as Brady, Jencks, or

6    Giglio material regarding Mr. Kaps that may have come from that

7    2003 matter that certainly seems to be closely related to the

8    alleged continued conspiracy here.

9            What we got back, we've set forth in our papers, the

10   government tells us, well, there are 15 boxes of business

11   documents and 18 boxes of Faxed medical records, and there is a

12   spread sheet, and Graumlich has in his office down in Florida

13   and basically we can contact Graumlich and have it if we wish

14   to try to find whether there are certain documents that exists.

15           And the Court well knows it's the government's

16   obligation to review material in their possession doesn't mean

17   just Miss Smith's office or Mr. Budlow's office, but United

18   States government.

19           If they have information that in any in fact include

20   discoverable matter, they have an obligation to review it and

21   not simply say going on a fishing expedition.

22           And if it's there, you find it.  And if it's not, so

23   what?

24           Well, I think the law requires the government to do

25   more.  They should have reviewed those documents, had it for

1    now five years from 2003, and apparently they've not done much

2    since this case or done anything to review these documents

3    instead of telling us to have at it.

4        One, we'll be moving to exclude Mr. Kaps's testimony

5    until that review has been done, and I understand Mr. Kaps is

6    one of the their witnesses today.  Certainly, I don't believe

7    that he should be allowed to testify until that review has been

8    done, Judge.

9        In addition, I don't believe he should be allowed to

10   testify until we receive the DEA 6, or at least the Court

11   should be told when the DEA 6 will be ready, those two DEA 6's

12   that Agent Hamilton, I indicated -- I asked Miss Smith earlier

13   when they would have the DEA 6s prepared and the agent

14   indicated she was still working on, I was simply told talk to

15   Agent Hamilton.

16       I don't believe the way the government should be

17   allowed to handle this matter, our clients are on trial and

18   facing very serious penalties for a very serious crime.  We

19   think the rules and the law requires more from the government,

20   and we're asking the Court for action.

21       THE COURT:  Thank you.

22       Mr. McCants, I'd be happy to hear from you, if you

23   wish to add anything on this issue.

24       MR. MCCANTS:  No, Your Honor.  I just wanted to adopt

25   for Mr. Nwaehiri.

```
1              THE COURT:  Certainly.  Then Mr. Ravenell's argument
2    is adopted.
3              Miss Smith?
4              MS. SMITH:  Thank you, Your Honor.
5              Initially, I'm not sure which complaint to address
6    first.  The government is not clear under what theory the
7    defense is entitled to reports written by someone who is not a
8    witness in this case, for starters.
9              The reports written by Carrie Hamilton are not
10   Jencks.  They do not contain Brady.
11             The government, out of an abundance of fairness,
12   turned over the notes written by Agent Hamilton in her
13   interview of Mr. Kaps, which, frankly, we didn't have to do.
14   We've done that as soon as she sent us her final DEA report on
15   one of her three sets of notes.  We immediately forwarded them
16   to the defense with the cover e-mail just so that they couldn't
17   accuse us of springing this on them at the last moment.  And
18   they know we just got it on Thursday and gave it them to on
19   Friday.  In that e-mail she, said I'm still working on the
20   other two.
21             All of that aside, the government doesn't understand
22   under what theory we are obligated to turn that over, number
23   one.
24             Number two, with regard to the 15 boxes and the 18
25   boxes, the government has had extensive conversations with
```

1    Assistant U.S. Attorney Kathy Peluso, Middle District of
2    Florida, who has been involved in this prosecution since 2003.
3    And she, like me, know what the government's discovery
4    obligations are, and she has looked through everything for
5    possible Brady, possible Jencks, and whatever she has
6    determined, and her and I have discussed it.
7         We've had questions, and we actually turned over
8    1,820 pages in September of '07 involving much of this earlier
9    investigation.
10        I would also point out that unlike the defendant's
11   complaint in which they first learned about this 2003 search
12   warrant at the end of May, in the discovery letter that was
13   sent to the defense, on March 10th, 2008, they received a
14   10-page report of investigation, again, authored by Carrie
15   Hamilton.
16        Paragraph 16 reads DI Hamilton told Kaps that the
17   websites had illegally distributed controlled substances.  DI
18   Hamilton explained to Kaps that he should have known that what
19   the sites were doing was illegal because he had been present
20   when a search warrant executed in Haines City, Florida in
21   October of 2003, and DI James Graumlich told him those were
22   part of a conspiracy to illegally district controlled
23   substances.  Kaps said the situation in 2003 had involved Dr.
24   Dominique's dispensing medications.
25        DI Hamilton says Dominique's spending license had not

1   been the problem when the controlled prescription were issued

2   and dispense the without a valid doctor/patient relationship.

3           For the defendants to first claim that they didn't

4   have any reason to be asking about that 2003 search until the

5   last day of May is incorrect.  They've had this information

6   since March.

7           And to demand of us the week before trial that we get

8   33 boxes for them to evaluate when I have already asked the

9   prosecutor to evaluate them for Jencks and Brady, and when they

10  had this information earlier, is just not justified to hold up

11  Mr. Kaps's testimony.

12          Well, I think I've already made the point they're not

13  entitled to these reports by DI Hamilton.  They don't exist.  I

14  can't make them exist.

15          And the boxes, you know, because they're alleging

16  they may be Brady or they may be Jencks, you know, I've made

17  them available to them, I don't know what more I can do.

18          THE COURT:  Let me ask this, DI Hamilton, who is she?

19  What's her relationship with the case?

20          MS. SMITH:  She's a diversion agent in St. Louis.

21  She was the first DEA diversion agent.  There are special

22  agents and diversion agents.  She's a diversion agent who,

23  through her role as an agent in that community, discovered what

24  a pharmacy was doing and then linked the case back to Florida,

25  and then DI Graumlich and her essentially spent the next four,

1     five years piecing together this monster of a conspiracy.

2              Literally from Colorado to Montana, all over the

3     United States and trying to put the pieces together in

4     identifying all the conspirators.

5              THE COURT:  And the notes that you've turned over to

6     the defense concern what?

7              MS. SMITH:  Her interview of Adam Kaps, which

8     happened just three different interviews, which all just

9     happened within the past three months.  February -- four

10    months.

11             THE COURT: So that --

12             MS. SMITH:  She gave us her handwritten notes, and

13    even though the defense aren't entitled to them, we turned them

14    over.

15             THE COURT:  Now --

16             MS. SMITH:  Your Honor, and I'd like to state on the

17    record, these notes are extraordinary.  One of those people

18    that has handwriting that is just as clear as it can be, and

19    it's single-spaced on a long legal pad, like 20 pages, they're

20    extraordinary.

21             THE COURT:  So that DI Hamilton did interview Mr.

22    Kaps on three occasions relatively recently.  She has not yet

23    prepared a DEA 6.  Therefore, there's no DEA 6 to turn over to

24    the defendants.  But that her interview notes have been turned

25    over?

1            MS. SMITH:  That's right.

2            THE COURT:  And I take it that when if and when she

3     prepares the DEA 6, that that will be turned over to the

4     defendants?

5            MS. SMITH:  Even though they're not entitled to it,

6     yes, Your Honor.

7            THE COURT:  Now, on the 2003 incident in Haines City,

8     Mr. Kaps, was he working for Creative Logics in 2003, or was

9     that something he was working for more recently?

10           MS. SMITH:  It was part of that, Your Honor.  It was

11    the genesis of that.

12           THE COURT:  And he was filling prescriptions for

13    them?

14           MS. SMITH:  Mr. Kaps is the --

15           THE COURT:  Oh, that's right.

16           MS. SMITH:  He's the whiz kid.  He's the computer

17    whiz kid.

18           THE COURT:  So he was working for them, and then

19    there was a search and seizure warrant executed in 2003, and

20    during that search and seizure warrant, DI Graumlich told Mr.

21    Kaps that, in her view, that what -- that the website was

22    operating illegally; is that correct?

23           MS. SMITH:  She specifically actually told him that

24    what Dr. Dominique, who was writing the prescriptions at that

25    time, what he was doing was illegal.

1              THE COURT:  Now, Mr. Kaps helped out other Internet

2     medical websites, correct, in the future?

3              MS. SMITH:  The business grew, yes, Your Honor.

4              THE COURT:  Now, is he going to contend that he never

5     -- well, let me run through it this way.

6              My recollection from earlier hearings is that the

7     government does not contend that Mr. Kaps was an innocent dupe,

8     but you contend that he was a co-conspirator; is that correct?

9              MS. SMITH:  Yes, Your Honor.

10             THE COURT:  And --

11             MS. SMITH:  And, Your Honor, I think it's worth

12    noting that he recalls that conversation and doesn't deny it.

13    He recalls being advised at that time that what Dr. Dominique

14    was doing was wrong, was illegal.

15             THE COURT:  Now, has DI Graumlich and her team looked

16    through these documents that were seized in 2003?

17             MS. SMITH:  Yes, Your Honor.

18             THE COURT:  And did she look through them with a view

19    toward determining whether there was any Brady information,

20    Giglio, Jencks that would apply to this case being tried here

21    today?

22             MS. SMITH:  Yes, Your Honor.

23             THE COURT:  And she determined that there were none?

24             MS. SMITH:  That's correct, Your Honor.

25             THE COURT:  Now, if I assume that those documents

1    that were seized and reviewed would, if analyzed, show the same

2    kind of illegal invalid prescriptions and that is part of the

3    government's theory today; is that correct?

4          MS. SMITH:  Correct, Your Honor.

5          THE COURT:  So this, well, will Mr. Kaps be admitting

6    that he was in fact guilty of aiding and abetting and assisting

7    in being part of a conspiracy, or is he --

8          MS. SMITH:  Your Honor, we didn't intend to ask him

9    for a legal conclusion about his behavior.  He -- one moment,

10   Your Honor.

11         (Pause.)

12         MS. SMITH:  Your Honor, as exact as I can be, Mr.

13   Kaps will testify that he questioned it from time to time, and

14   he was advised by doctors that what they were doing was legal,

15   and when things like search warrants or problems,

16   administrative searches of pharmacies or places were shut down,

17   he was always told reasons that there were other problems.  The

18   doctor wasn't doing it right, or whatever the issue was, it was

19   a state board problem, as opposed to a DEA problem.

20         We have not asked Mr. Kaps what he believes his own

21   role was in this legally.  Obviously, factually his role is

22   what he would be talking about.

23         THE COURT:  Good.  Thank you.

24         Mr. Ravenell?

25         MR. RAVENELL:  Yes, Your Honor.  Your Honor, first,

1    the government may have misread what we've wrote.  We never

2    suggested we just learned of the search warrant.  Our papers

3    make it clear that we were aware of the execution of a search

4    warrant, and we're aware, and the report that was 11-14-07,

5    that Graumlich allegedly told Kaps that he should have been

6    aware of what was going on.

7         Carrie Hamilton told Kaps she was aware what was

8    going on in this alleged conspiracy because of his alleged

9    involvement or connection to the search warrant in '03.

10        What we've said is we were not aware that there were

11   33 boxes of documents until we received that letter from the

12   government recently telling us there were 33 boxes of

13   documents.

14        Now, Your Honor, I understand that you talk about

15   gatekeepers that it's really the government who has an

16   obligation to review the matters in their possession to

17   determine whether, in fact, discovery, whether there's any

18   Brady, Giglio Jencks material.  I understand.

19        Now, I will tell you, until a moment ago, that was

20   the first we'd ever heard from the government they've had

21   anyone review these documents as the Court just asked to

22   determine whether in fact there was Brady, Jencks or Giglio

23   material.  We were not told that.  And we had a conversation.

24   We were not told of any writing the government had sent us

25   back.  First I've heard it.

1          Now, assuming the government telling the Court, and I
2     think I heard them correctly, that the government has spoken
3     with the prosecutor in Tampa, and that that prosecutor and
4     Agent Graumlich, one or both, has reviewed the documents with
5     an eye toward determining whether there is Brady, Jencks, or
6     Giglio, understandable, Judge, we are stuck with that.
7          The other only other thing for the Court to do is
8     would be obviously try to go down and review all these
9     documents and leave the trial.  We shouldn't have to do that or
10    to ask the Court to do it.
11         I don't think it's appropriate to ask the Court to do
12    it at the moment, to review 33 boxes of documents to see
13    whether there are certain things that exist.
14         But certainly it will be a test at some point, maybe
15    not today, whether the government has in fact met that standard
16    that has been proposed to the Court, that the agent and
17    prosecutor in Florida has done what they're supposed to do.
18         If that's what happened, and that's what the
19    information is, then that's what it is, Judge.  I have to
20    accept what the proffered, as I think the Court will have to at
21    this point.
22         On the other aspects suspects of Mr. Kaps, the
23    question the Court asked, it sounds to me that Mr. Kaps would
24    be denying that he knew that this was an illegal activity
25    because, consistent with what the government has told us in the

1    past, and as represented a moment ago, what he would say he was

2    told by Dr. Ibanez and others and Barry Brooks was perfectly

3    legal and does not sound like he's going to say I knew this was

4    wrong, but I continued to do it, anything of that nature.

5    That's fine.

6          But I think that only makes it more concerning about

7    what he did know in 2003, and should make the Court more

8    concerned about what may be in that material that sits in

9    Florida and in the those 33 boxes, Your Honor.

10          Thank you.

11          THE COURT:   Thank you.   Based upon the record that

12   has been made, I will deny the motion in limine for two

13   reasons:

14          First, Miss Smith has told me that the government,

15   which includes Special Agent Graumlich, is mindful of the

16   government's obligation to produce relevant and discoverable

17   information that is discoverable under Jencks, Giglio, or

18   Brady, and that the government, or that Diversionary Agent

19   Graumlich has reviewed the materials, and has in fact produced

20   anything that would be discoverable and must be produced under

21   either of those three doctrines.

22          It is not the practice of the Court to conduct an

23   independent review of all of the materials in a case to see

24   whether that obligation has been performed.   That would be an

25   impossible burden.

1           Two, there is an important safeguard in this case,

2     and that is that the government has represented that these

3     materials are available to the defense if they wish to review

4     all of them or if they wish to go down to Florida to do a spot

5     check to make sure, to do a random sample to verify that what

6     is obligated to be produced has been produced.

7           So the motion in limine is now moot.

8           Second, with respect to DI Hamilton's notes, she is

9     not expected to be a witness in this case.

10          Two, she has not yet prepared a DEA 6.

11          And, three, she has produced her handwritten notes.

12          So, in my view, the government's obligations have

13    been satisfied.  I can't require the government to produce a

14    document that has not been prepared.  She has produced her

15    handwritten notes.  And so that is more than the law requires,

16    but because notes usually do not fall within the scope of

17    Jencks material, it's only a verbatim statement.  But here the

18    government's produced more than what they're obliged to produce

19    to the defense.  So I will deny the motion in limine.

20          Look forward to seeing everyone at 1:30.  Thank you.

21          (Luncheon recess.)

22          THE COURT:  Please be seated unless you wish to stand

23    for the jury.

24          (Jury present).

25          THE CLERK:  Jurors all present.

1            THE COURT:  Thank you.

2            Welcome back, ladies and gentlemen.  Please be

3     seated.

4            Miss Smith, whenever you're ready to call your first

5     witness.

6            MS. SMITH:  Mr. Budlow?

7            MR. BUDLOW:  Your Honor, the government calls Linda

8     Tur-Rojas.

9            THE CLERK:  If you'll raise your right hand.

10           (The Witness is sworn.)

11           THE CLERK:  Please be seated.  Ma'am, if you would,

12    first I need you to adjust the microphone to yourself.

13           THE WITNESS:  Is that okay?

14           THE CLERK:  Bring it down a little bit.

15           THE WITNESS:  Is that okay.

16           THE CLERK:  Yes, ma'am.  If you'll state your name,

17    spell your name for the record.

18           THE WITNESS:  Linda Sue T U R - R O J A S.

19                   DIRECT EXAMINATION

20    BY MR. BUDLOW:

21    Q.  Good afternoon.

22    A.  Good afternoon.

23    Q.  Who's your employer?

24    A.  My employer is the Drug Enforcement Administration.

25    Q.  Also known as the DEA, correct?

1    A.   DEA.

2    Q.   And how long have you been employed by DEA?

3    A.   Been working there about five years.

4    Q.   What is your title?

5    A.   IT Specialist, Information Technologist, or Computer

6    Specialist.

7    Q.   And what generally are your responsibilities as an IT

8    Specialist?

9    A.   I help people in organization with computer hardware and

10   software problems.  It might be as simple as someone having

11   trouble logging or if they forgot their password, or it could

12   be as complex as developing and installing a multimillion

13   dollar system.

14   Q.   Who are the people that you're helping with computer

15   problems?

16   A.   The people that work in DEA.

17   Q.   And can you explain what the concept of production printing

18   is?

19   A.   Production printing is a large system that I put in myself

20   in about 2004, and it is a system that produces large volume of

21   mailings.

22   Q.   In terms of the hardware, how would a production printer

23   compare to the typical large copier in a law office?

24   A.   Compared to a large copy machine, a printer is similar.

25   But in terms of printing the way most of us have a small

1    printer at home or in our office, it's not at all the same at

2    all.  It's very, very complex.

3              I have four printers in this operation.  The largest

4    one comes up to about my chin.  It's about 12 feet long, four

5    feet wide, inserting equipment that comes after that is about

6    27 or 28 feet long, very large printer.

7    Q.  What's your role with regard to the production printing?

8    A.  I actually developed the system and put it into place, and

9    now I run it with a staff.  We print a lot of forms,

10   applications, and mass mailing letters every day.

11   Q.  Can you explain what exactly the production printer does

12   once you tell it to do something?

13   A.  The software is very complicated.  It's not as easy as

14   using Word Perfect or Word or something like that,

15   unfortunately.  And when it prints it's printing tens and

16   hundreds of thousands of pages.  We also print seven million

17   order forms a year, so it's very large, large volumes.

18   Q.  Does the machine just do the printing, or does it do

19   folding and inserting envelopes as well?

20   A.  The printer prints it, it comes out through the output

21   trays and gets loaded on to the inserting equipment, which is

22   the very long, 27, 28 feet long, and it will fold the paper,

23   add any inserts, moisten the flap, seal it, and stamp it, and

24   then stack it up for loading into mail bins.

25   Q.  I think you mentioned this is used for mass mailing

1    letters.  Can you give us an example of what a mass mailing

2    letter is?

3    A.  A mass mailing letter is a term we use for a large volume

4    of letters that would take someone sitting at their desk weeks

5    or months to do.

6         So I may need to print a letter of guidance, not me

7    personally, because that's not my job, I just print the letter,

8    but DEA may want to print a letter advising of a new regulation

9    that's come out, giving guidance maybe to 10,000 people, maybe

10   to a hundred thousand people at a time.

11   Q.  And when you are responsible for one of those mass mailings

12   to thousands of individuals, does the machine or the system

13   that you're doing having any quantity assurance to make sure

14   that all of the letters that were supposed to go out actually

15   went out?

16   A.  There's a number of checks and balances that we put into

17   place.  There's an audit log at the beginning, where we count

18   how many records in a data file, and that tells us how many

19   come into us to the data file.

20        Once I compile a job and send it, I go to a manual

21   log and make an entry in that on how many letters are coming

22   out.  The operator will check at the end of the run when

23   they've put the thing in the mail bin, they'll have the

24   equipment run a report to tell it how many things ran.

25        And then they will come tell me if there's a

1    discrepancy.

2    Q.  Is there a machine that actually counts the number of

3    envelopes?

4    A.  Yes.

5    Q.  I'd like to draw your attention now to early, 2005, were

6    you an IT Specialist with the DEA at that time?

7    A.  Yes, I was.

8           MR. BUDLOW:  Your Honor, may I approach the witness?

9           THE COURT:  You may.

10   Q.  I'm showing you what's been marked for identification, or

11   what's been marked as government's exhibit number 1.  Do you

12   recognize that letter?

13   A.  Yes.  This a letter that we call a six-page letter or

14   Internet Pharmacy Letter.

15   Q.  And is that a copy of a letter that you sent out?

16   A.  Yes, it is.

17   Q.  And just generally when were those letters sent out?

18   A.  We started printing them and mailing them out March fifth,

19   2005.

20   Q.  And specifically, what was your assignment with respect to

21   that letter?  How did it come to you, and what did you do?

22   A.  I received a draft of this letter, and data file from the

23   programmers, and I personally typed it into the software and

24   mapped the data file to the letter, that's telling the software

25   what do with the date.

DIRECT EXAMINATION

1              I want the name and address here.  I want the

2     registration number here.  And then I compiled the software

3     that takes an image of the letter, pulls the first record of

4     the data file, pulls another image of the letter, and the

5     second record in the data file, it continues to do that

6     sequentially through the file, and then it sends it to the

7     printer.

8     Q.  And did you do that with that letter?

9     A.  Yes, I did it myself.

10    Q.  You mentioned pulling records out of the data file, is that

11    the addressees, information about where you're sending the

12    letter?

13    A.  Right.  The data file has name and address of whoever's

14    going to receive a letter.

15    Q.  Who is the group of people that were receiving that letter?

16    A.  On this letter, we had 30,975 active pharmacies that this

17    letter was sent to.

18    Q.  Is that all of the active pharmacies on file with DEA at

19    that time?

20    A.  At that time.

21    Q.  So that letter was sent to all active pharmacies?

22    A.  Correct.

23    Q.  And was a log kept of all the pharmacies that were sent

24    that letter?

25    A.  The actual original data file is kept, yes.

1   Q.   And does that show which pharmacies were mailed the letter

2   on given dates?

3   A.   No, it doesn't show that.

4   Q.   Is there a way to cross-reference the data file with your

5   records to determine which pharmacy?

6   A.   The way I know that is in my manual file, I wrote an entry

7   that 6,774 pharmacies were mailed this letter on March fifth.

8   Q.   Okay.  Now, what's the date on the letter?

9   A.   The date on this letter is February, 2005.

10   Q.   But, obviously, it took more than one day to get it mailed

11   out, and went into March; is that correct?

12   A.   Uh-huh.

13   Q.   Did the date on the letter change?

14   A.   The date on the letter did not change, no, from this date.

15   Q.   Looking at government's exhibit 1, who is the addressee on

16   that letter?

17   A.   New Care Home Health Services.

18   Q.   And could you read the address for the members of the jury?

19   A.   3423 to 3425 Sinclair Lane, Baltimore, Maryland, 21213.

20   Q.   And moving onto the right side of the top of the letter,

21   there is a BN and then a number.  Can you explain what a BN

22   number is?

23   A.   This is a unique number.  Each registrant is given it.

24          MS. REAMY:  The defense objects, Your Honor.  The

25   witness is reading from the letter, the letter that's not in

1    evidence as of yet.

2             MS. SMITH:  Yes, it is.

3             THE COURT:  Well, if I could see counsel, please?

4             (At the bench)

5             THE COURT:  I was talking, this was the subject I was

6    talking about with Mr. Shea before last week, and his

7    recollection, and my recollection was in the pretrial

8    conference, you were working under the ground rule of the local

9    rules to the effect that if a document is referenced by

10   counsel, and I showed you government exhibit 1, that the

11   document is immediately, is automatically received into

12   evidence, unless there's an objection that's lodged to it.

13            So she is reading from a letter, but the letter is in

14   evidence.

15            MR. RAVENELL:  Let me address it.  I was not aware of

16   the Court was operating, sometimes we do not.  But if the Court

17   is now telling us you're operating -- as you all know, I've

18   practiced here for many years.  Some judges operate under local

19   rules, some don't.  I've been before you on many occasions

20   where we have and we haven't.

21            To make sure I'm clear, is the Court telling us for

22   this trial, if it's referenced, unless there's an objection

23   versus objecting as Miss Reamy is now?

24            THE COURT:  Well, let's go back to usually, in most

25   of the trials that I've conducted, I have not used the local

1    rule, but have gone through the method of introducing each

2    exhibit, but in the pretrial hearing, counsel have said they

3    wanted to use the local rule.  So that's the principle that

4    we're operating under is that do you object to using the local

5    rule.

6          MR. RAVENELL:  Actually, Your Honor, I apologize, but

7    I don't recall that conversation where we had that conversation

8    that we agreed to use the local rules.  I apologize for not

9    having that recollection.

10         But, yes, I do object to that.  I think it's a better

11   practice that we're not running into a problem of missing an

12   objection to let us object as we generally do.  As the Court

13   indicated, we generally do not follow the local rule.  We

14   generally object on a particular document before a witness

15   begins to speak from it.  That's my preference, and I do

16   apologize.  I don't have that recollection that we had this

17   discussion.

18         THE COURT:  Why don't we do this, if we decided at

19   the pretrial conference that we were going to follow the local

20   rule, then I won't change things midstream.  But I will in this

21   case deem that there was an objection lodged to the DEA letter,

22   which simply for the record was exhibit number?

23         MR. BUDLOW:  1.

24         THE COURT:  This is the Internet Pharmacy Letter.

25   There was an objection, this letter was the subject of a motion

1    in limine, and I will overrule the objection for the reason

2    that I stated in the written opinion denying the motion in

3    limine.

4              MR. RAVENELL:  Thank you, Your Honor.

5              MS. REAMY:  Thank you, Your Honor.

6              (Open court)

7    BY MR. BUDLOW:

8    Q.  Miss Tur-Rojas, can you tell us what the BN letter on that

9    states?

10   A.  What it states or what it means?

11   Q.  Well, I guess the question originally what is a BN number?

12   A.  This is a unique number to identify this particular

13   registrant, New Care Home Health Services, at this location.

14   Q.  And were you able to check the records of the DEA and

15   determine what New Care BN number is?

16   A.  Yes.

17   Q.  Is the number reflected on government's exhibit number 1,

18   New Care Home Healthcare Services unique BN number?

19   A.  Yes.

20   Q.  And were you able to determine, based on your records,

21   whether or not that letter, or a copy of that letter that

22   you're holding, government's exhibit number 1, was mailed to

23   New Care Home Health Services at 3423-3425 Sinclair Lane in

24   Baltimore, Maryland?

25   A.  Yes, it was.

DIRECT EXAMINATION

1    Q.   It was?  When was that mailer?

2    A.   I believe it was mailed on March fifth, 2005.

3    Q.   And were you able determine exactly what number of letters

4    that was, all that were mailed that day?

5    A.   The reason I believe that is because, in the data file, it

6    was record 675 in the data file.  And because my entry in the

7    log said that I had -- we had mailed out 6,774 letters that

8    day, then this should have been in that well within that range.

9    It would have gone out that day.

10   Q.   And can you read the first line in the letter underneath of

11   the address, what's the first thing that it says?

12   A.   Warning, warning, warning, warning, warning, warning.

13   Q.   And what is the punctuation mark that occurred after each

14   word warning?

15   A.   An exclamation point.

16   Q.   I'm not going to read the entire document, but could you

17   read in the first paragraph?

18   A.   "The following frequently asked questions are being

19   published by the Drug Enforcement Administration's, DEA, Office

20   of Diversion Control as an educational public awareness

21   component relative to the use of the Internet for the purposes

22   of purchasing, prescribing, dispensing and importing of

23   controlled substances.

24        The DEA recognizes that while some Internet sites

25   facilitate legitimate prescribing and dispensing practices,

1   other sites facilitate the illegal sale of controlled

2   substances.  These sites have illicit activity to enable some

3   consumers to illegal purchase controlled substance without

4   realizing they are committing crime.  The DEA regards this as a

5   critical issue and is taking steps to address it.  This

6   document is intended to serve as general guidance to

7   prescribers, pharmacists, the regulatory and law enforcement

8   communities, as well as the general public regarding the

9   application of current laws and regulations to controlled

10  substance transaction conducted via the Internet.

11  Q.  Thank you.  This is a six-page mostly single-spaced letter?

12  A.  Yes, sir.

13  Q.  And after that paragraph, there are various subtitles and

14  questions with corresponding answers; is that correct?

15  A.  That's correct.

16  Q.  Starting with the first subtitle, could you just read on

17  page 1 the subtitle and the question?

18  A.  "Can an individual order drugs using the Internet without

19  seeing a doctor?"

20  Q.  And that's the first question under the subtitle questions

21  for patients/consumers; is that right?

22  A.  Right.

23  Q.  Going down to page 2, what is the next question that's

24  listed under questions for patients/consumer?

25  A.  What are the types of risks taken by individuals when

1    ordering drugs via the Internet?  How can those risks be

2    minimized?

3    Q.  And, again, each one of these questions, there are

4    single-spaced answers from multiple paragraphs to just a couple

5    sentences?

6    A.  That's correct.

7    Q.  Now, page 3, just read the question at the top first?

8    A.  "Can underage individuals acquire drugs on the Internet?

9    How can this be prevented from happening?"

10   Q.  And this next section is entitled "General Information"?

11   A.  "What are the basic requirements for prescribing dispensing

12   and importing controlled substances."

13   Q.  And what is the next subtitle at the bottom?

14   A.  "Questions for DEA registrants."

15   Q.  Can you read that question?

16   A.  And the question is, "Is it legal for Internet pharmacies

17   to approach a physician to write prescriptions based on online

18   consultations with customers/consumers?"

19   Q.  Now, moving to page 4, if you could read the first two

20   questions?

21   A.  "Can an independent pharmacy purchase supplies on the

22   Internet?  What procedures must be followed?  Does the label on

23   a prescription via the Internet indicate the Internet pharmacy

24   order registered location that filled the prescription?"

25   Q.  As to the next question, could you read the question and

1    answer?

2    A.   "Does being an Internet pharmacy change a pharmacy's

3    responsibilities under DEA regulations?"

4    Q.   What's the answer?

5    A.   "No.   Internet pharmacies are still authorized to sell

6    controlled substances only when there is a valid prescription

7    from a DEA registered practioner who issued the prescription in

8    the usual course of his or her professional practice.

9    Q.   And if you could just read the next two questions?

10   A.   "Is it possible for an Internet pharmacy to fill

11   prescriptions for Schedule II controlled substances?"

12         "Is it possible for an Internet pharmacy to fill

13   prescriptions for Schedule III to V controlled substances?"

14   Q.   And then moving on to page 5, again, just reading the

15   questions?

16   A.   "Is it legal to buy controlled substances from foreign

17   Internet sites and have them shipped to the U.S?

18         "Does it make a difference if an individual has a

19   prescription from a U.S. doctor for controlled substances and

20   buys from a foreign Internet site?

21         "Are the rules different from lifestyle drugs?

22         "What does the VIPPS seal seen on Internet pharmacy

23   sites mean?"

24   Q.   And then the last question prior to answers to on page 6?

25   A.   "Where should complaints be directed regarding an Internet

1     pharmacy site that appears to be illegally selling drugs?"

2     Q.   Thank you, Ms. Tur-Rojas.

3          Your Honor, I have no further questions at this time.

4          THE COURT:   Thank you, Mr. Budlow.

5          Mr. Ravenell, your witness, sir.

6          MS. REAMY:   I'll be conducting this examination.

7          THE COURT:   Thank you, Miss Reamy.   Go right ahead.

8                    CROSS-EXAMINATION

9     BY MS. REAMY:

10    Q.   Good afternoon.

11    A.   Good afternoon.

12    Q.   Just to be clear, about what you do, it's my understanding

13    that you don't develop any of the content of the materials like

14    the letter that we were just discussing?

15    A.   No, I don't.

16    Q.   You just print the documents to make sure that the machines

17    that do the printing function properly?

18    A.   Correct.

19    Q.   Okay.  And so when you get a document like this letter, the

20    content has already been provided by someone else --

21    A.   Correct.

22    Q.   -- correct?

23         And you don't change that content in any way before

24    you send the document out?

25    A.   I do slight formatting changes.

1    Q.   Okay.   And what type of formatting changes would you do?

2    A.   Presentation wise, or readability issues or something that

3    to get more attention to certain points.

4           If I see a spelling or grammatical error, I don't do

5    it on my own.   I still would go back to the author of the

6    letter and have them approve any changes I make.   But those are

7    the kind of changes I would make if I saw them.

8    Q.   So you wouldn't make any substantive changes?

9    A.   No, nothing of substance, no.

10   Q.   Now, you indicated that you had access to a database to

11   determine when this letter had been sent out to New Care,

12   correct?

13   A.   I have a manual log that I can maintain.

14   Q.   You had to go to some other source to determine when in

15   fact the letter might have gone out?

16   A.   Right.

17   Q.   And you're able to deduce that it probably went out on May

18   -- or March the 5th --

19   A.   March 5.

20   Q.   -- 2005, correct?

21   A.   Uh-huh.

22   Q.   But you doesn't have any specific recollection yourself

23   mailing that specific letter?

24   A.   No.

25   Q.   Because this is a mass mailing system --

1    A.  Correct.

2    Q.  -- correct?

3            Okay.  And now, the letter, as you read to the jury,

4    was addressed to New Care Home Health Services, correct?

5    A.  Correct.

6    Q.  And that was the name, New Care Home Health Services was

7    listed just above the address of the company, which you stated

8    was 3423-3425 Sinclair Lane in Baltimore, 21213; is that

9    correct?

10   A.  That's correct.

11   Q.  Okay.  Now, that letter, and that address, did not include

12   the name of Steven Sodipo?

13   A.  No, it does not.

14   Q.  It does not include the name of Callixtus Nwaehiri?

15   A.  No, it does not.

16   Q.  It wasn't addresses to any of the six or so pharmacists

17   that were working at New Care at that time?

18   A.  No.

19   Q.  Okay.  Now, the letter wasn't addressed to any particular

20   person at all, was it?

21   A.  No.

22   Q.  In fact, it was only addressed to the general company name;

23   is that correct?

24   A.  That's correct.

25   Q.  Okay.  And likewise, the letter wasn't addressed to the

CROSS-EXAMINATION

```
 1    Director of Pharmacy?

 2    A.  No.

 3    Q.  Or the Chief Pharmacist?

 4    A.  No.

 5    Q.  The CEO of New Care?

 6    A.  No.

 7    Q.  Or the supervising pharmacist?

 8    A.  No.

 9    Q.  Okay.  None of those types of titles were included in the

10    address this printed on this letter?

11    A.  No.

12    Q.  Okay.  And let me ask you, what happened to the letter once

13    it arrived in New Care?

14    A.  I don't know.

15    Q.  So you have no idea whether it landed in the accounting

16    department or the billing department or the home nursing home

17    or the pharmacy?

18    A.  No, I don't know.

19            MS. REAMY:  Okay.  Court's indulgence.

20            (Pause.)

21    Q.  Now, you indicated there's a unique letter that's included

22    at the top, I'm sorry, not letter, but a unique set of letters

23    and numbers, BN?

24    A.  The registration number.

25    Q.  Yes, registration number, thank you.
```

1              And that's a registration number that is provided by

2    the DEA?

3    A.   Correct.

4    Q.   And that registration number is where, is assigned a

5    specific entity to track their location and the general

6    information about the company, correct?

7    A.   The word track bothers me.  It's a number.

8    Q.   To identify?

9    A.   Identifies this business at this location.

10   Q.   So it's fair to say that the DEA would be able to associate

11   that number with the specific pharmacist that would be located

12   at that pharmacy?

13             MR. RAVENELL:  Your Honor, may counsel approach?

14             THE COURT:  I was may.

15             (At the bench)

16             MS. SMITH:  Your Honor, let me --

17             MR. RAVENELL:  I think I asked to approach.

18             MR. BUDLOW:  In the order of things, I'd love to hear

19   what's going on.

20             MS. SMITH:  Yes, the government's on this side.

21             MR. RAVENELL:  Your Honor, previously, the Court

22   wrote a letter addressing counsel about decorum in the

23   courtroom.

24             And Miss Reamy is questioning the witness, and I can

25   hear Miss Smith saying no.

1              MS. SMITH:  I --

2              MR. RAVENELL:  It's just improper.

3              MS. SMITH:  Your Honor, I reacted, and I apologize,

4    he's absolutely right.

5              THE COURT:  It probably would be taken care of?

6              MS. SMITH:  Yes.

7              MR. RAVENELL:  I hope.

8              (Open court)

9    BY MS. REAMY:

10   Q.  Now, if the DEA is maintaining these registration numbers

11   for the pharmacy in general, would it not maintain the same

12   type of registration numbers for the individual pharmacist?

13   A.  It's not really my area of expertise, so I'm not

14   comfortable answering that.

15   Q.  So you don't know?

16   A.  My understanding of what it is might not be the official

17   answer, so I would rather not speculate.

18              MS. REAMY:  I have no further questions.

19              THE COURT:  Good.  Thank you, Miss Reamy.

20              Mr. McCants?

21              MR. MCCANTS:  Yes.

22                    CROSS-EXAMINATION

23   BY MR. MCCANTS:

24   Q.  Good afternoon, ma'am.

25   A.  Hi, good afternoon.

1    Q.  This letter, well, how much does the DEA send out mass

2    filings or mass letters?

3    A.  Mass mailing letters?  Maybe four to six times a year.

4    Q.  And how often would you say the DEA sends out specific

5    letters to pharmacists?

6    A.  Specific letters?

7    Q.  Yes.  Such as addressing --

8    A.  Just to a specific pharmacist?

9    Q.  Yes.

10   A.  I wouldn't know that, because I just get the mass, mass

11   mailing ones.

12            MR. MCCANTS:  No further questions.

13            THE COURT:  Thank you.

14        Mr. Budlow?

15                     REDIRECT EXAMINATION

16   BY MR. BUDLOW:

17   Q.  Just briefly.

18            How often do the letters state at the top warning

19   warning warning warning?

20   A.  This is the only one I've done with this.

21            MR. BUDLOW:  Thanks.

22            THE COURT:  Thank you.  Thank very much for coming.

23   You are excused.

24            MR. BUDLOW:  Your Honor, the government calls Adam

25   Kaps.

 1                THE COURT:  Good.  Thank you.

 2                THE CLERK:  If you'll raise your right hand.

 3                (The Witness is sworn.)

 4                THE CLERK:  Please be seated.  Sir, if you would, if

 5     you'll state your name and then spell your name for the record.

 6                THE WITNESS:  My name's Adam Kaps, A D A M, K A P S.

 7                          DIRECT EXAMINATION

 8     BY MR. BUDLOW:

 9     Q.  One P, right?

10     A.  Yes.

11     Q.  Okay.  Good morning.  Good afternoon.

12     A.  Hello.

13     Q.  Mr. Kaps, how old are you?

14     A.  What did you say?

15     Q.  How old are you?

16     A.  28.

17     Q.  What is your occupation?

18     A.  I'm an IT consultant.

19     Q.  What's your educational background?

20     A.  I'm a high school dropout.

21     Q.  Can you briefly describe for the ladies and gentlemen of

22     the jury your experience in IT consulting and also as it

23     pertains to IT programming?

24     A.  Sure.  I've been programming since I've been ten years old.

25     I started working professionally for Internet service providers

```
 1    when I was 17.  And I've done different programming jobs,
 2    everything from small websites to working on large E commerce
 3    sites.
 4    Q.  How did you start programming at age 10?
 5    A.  My father got me interested in it.
 6    Q.  Could you just maybe briefly describe what IT programming
 7    is, what does that mean?
 8    A.  Sure.  It's basically the development of applications for a
 9    particular need or desire or back end programming in that
10    database actually controlling the data that other applications
11    utilized.
12    Q.  All right.  Did you work for Barry Brooks and his various
13    companies?
14    A.  Yes.
15    Q.  When did you first meet Mr. Brooks?
16    A.  At the end of February, 2003.
17    Q.  And how is it that you met him?
18    A.  I met him through a referral.
19    Q.  Who referred you?
20    A.  Somebody that I had done work for.
21    Q.  And what was his name?
22    A.  Dennis.  I forget his last name.
23    Q.  All right.  Can you describe Barry Brooks?
24    A.  Yes.  He's a pretty big person in stature.  He's British.
25    He's a rather large person, not really just very muscular, and
```

1    he has kind of a bald head.

2    Q.  Did you say bald head?

3    A.  Yes.

4    Q.  And when you first met him, what was his business?  What

5    was the business name?

6    A.  It was Global Data Network, Inc.

7    Q.  Does that have an acronym?

8    A.  GDN.

9    Q.  GDN?

10           Where was it located?

11   A.  That was located in Haines City, Florida.

12   Q.  What exactly did Mr. Brooks hire to you do?

13   A.  He hired me take over this current IT consultant's position

14   and also do web development on the web site that he wanted to

15   create, and do some general office computer and networking.

16   Q.  Did they -- at the time of the interview, did they have

17   somebody who was performing those tasks?

18   A.  Yes.

19   Q.  And was that person moving on, if you know, or were you

20   going to be in addition?

21   A.  I was going to be replacing him.

22   Q.  And what is web development?  What does that mean?

23   A.  Web development is basically utilizing different

24   programming technologies and applications to create a website

25   or something on the web that can be interacted with.

1    Q.   So it's sort of the programming that goes on behind what

2    everybody does when they get on the computer and surf the

3    Internet?

4    A.   That's correct.

5    Q.   Can you give the jury a brief explanation of what GDN was?

6    What was the business?  What did they do?

7    A.   Sure.  They provided service for medical consultation over

8    the telephone, and then when the consultations were done, they

9    had -- they would ship out medications to the patients.

10   Q.   You said there were medical consultations over the

11   telephone.  How did the consumer get to that point?  How did

12   they get to the telephone conversation?

13   A.   They would find the online website, register with the

14   website, and sign up and then call the service.

15   Q.   So the website was providing medical consultations and

16   prescriptions if they were -- if they were approved?

17   A.   Yes.

18   Q.   And when you began, how many different websites were

19   connected with GDN?

20   A.   There were three.

21   Q.   And what were they?

22   A.   Aaamedicineworldwide.com.  The second was Meds123.com.  And

23   then the third was Firstmeds.com.

24   Q.   And when you first started, are you aware how much gross

25   receipts on the business were on a monthly basis?

1    A.   Approximately 300,000.

2    Q.   Who were the employees that worked for the business at that

3    time?  If you'll give a brief description of what they did?

4    A.   There were several employees, several customer service

5    staff.  A manager for the office.  The IT guy at the time.  And

6    then there was the physician, and he had physician assistants.

7    Q.   Okay.  Who was the physician?  What was his name?

8    A.   Dr. Dominick.

9    Q.   And how many physician assistants worked with Dr. Dominick,

10   if you know?

11   A.   I believe at that time there were two.

12   Q.   And you, of course?

13   A.   And me.

14   Q.   And who were the owners of the business?

15   A.   The owners of GDN were Anthony Bolt and Barry Brooks.

16   Q.   And did they have any involvement in the day-to-day

17   operations of the business?

18   A.   Initially, they did.

19   Q.   How much so initially?

20   A.   They had a fair amount, and then once everything got set

21   up, they came in sporadically throughout the day or through the

22   week.

23   Q.   How long has, if you know, that business operation been

24   going on before you started?

25   A.   I believe two years prior.

1    Q.   Did you make any changes not long after you made?

2    A.   I made several changes.

3    Q.   Describe what the changes were?

4    A.   I took over the actual server that the websites ran off of.

5    I moved it to a different location to a company called Off

6    Planet where it gets served from the Internet.

7         I also did some security upgrades on the server, and

8    various other aspects to the actual security of the server.

9    And then also started on some web marketing techniques on the

10   website.

11   Q.   What is web marketing?

12   A.   Web marketing is Internet marketing or marketing to the

13   Internet community.

14   Q.   Okay.  Which types of web marketing techniques did you

15   institute after you started working for GDN?

16   A.   SEO, which is Search Engine Optimization.

17   Q.   Search Engine Optimization?

18   A.   That's correct.

19   Q.   What is that?

20   A.   That's basically going through a website and finding

21   keywords that are relevant to the service or website that

22   you're dealing with, and making sure that they're -- there's a

23   certain quantity of them.  So when search engines go to the web

24   page, they can find those keywords in the results.

25   Q.   So if you're doing search engine optimization, are you

1    putting certain words in your websites?

2    A.   Yes.

3    Q.   And explain why you put those words in your websites?

4    A.   So they could be found when a keyword, or somebody types in

5    a phrase into a search engine, those pages will pull up that

6    are relevant to that.

7    Q.   As an example a search engine Yahoo.com, Google.com?

8    A.   Yes.

9    Q.   Were there any other types of web market techniques that

10   you instituted at that time?

11   A.   Yes.  We started with a pay-per-click advertisement.

12   Q.   Could you back up?  Was there something related to message

13   boards?

14   A.   Yes.  There was also message board advertising going on

15   already at Mr. Barry Brooks that I was doing.  And then

16   somebody was assigned that job.  And what that actually is,

17   that would be there's a message board called Drugbuyers.com and

18   on there is a community with reviews and comments regarding

19   Barry -- the Brooks companies service.  And there would be

20   reviews or comments or help requests, and there would be a user

21   on there that would answer questions or promote the site and

22   service internally, with that particular user or other users

23   around it.

24   Q.   Let me back up a little, explain -- because we're not all

25   28, what's a message board?

1    A.   Message board is kind of like a spot on the Internet where

2    you can post messages, and they stay there and everyone can

3    read it, and then other people can reply to it.  It's an

4    interactive forum.

5    Q.   Do they tend to deal with particular topics you would go to

6    the topics that interested you if were you and the person on

7    the Internet?

8    A.   Yes.

9    Q.   Was there a particular message board by a particular name

10   you all were targeting?

11   A.   Yes, it was Drugbuyers.com.

12   Q.   And what specifically did you do to market the business on

13   Drugbuyers.com?

14   A.   There was a user that represented the site and the service,

15   that would answer questions, or if somebody had an issue or a

16   problem, they would try to assist that person.  And then there

17   were other users that would advertise as if they experienced

18   the website in a positive way.

19   Q.   And those were GDN employees that were doing that?

20   A.   Yes.

21   Q.   Can you give sort of a tangible example of someone that

22   worked for GDN that went on and did what you said?

23             MR. RAVENELL:  Objection, may counsel approach?

24             THE COURT:  You may.

25             (At the bench).

1           MR. RAVENELL:  Your Honor, in line with the Court's

2      ruling, I have not objected to some background, but all of the

3      information that the government is bringing out from this

4      witness is prior to this group that the defendants were

5      allegedly involved in, and to have testimony from this witness

6      about where someone from GDN would basically pose as, you know,

7      a customer and we like what's happening with the drug, et

8      cetera, when it is not part of this alleged conspiracy, you

9      know, I think it's improper because it sends the wrong message,

10     one the jury shouldn't have it because it's not part of this

11     alleged conspiracy.  It's background.  We don't want the jury

12     to view this was occurring in this alleged conspiracy what they

13     were doing back in 2003.

14           THE COURT:  Good.  Thank you.

15           Mr. Budlow?

16           MR. BUDLOW:  Your Honor, I disagree what the witness

17     is describing is not part of the alleged conspiracy, the

18     conspiracy didn't begin in January of 2005.  That's when their

19     involvement began, but the conspiracy was ongoing.

20           This witness is merely explaining how the conspiracy

21     took place and how the advertising was made to the community of

22     drug buyers to find their website and to purchase drugs from

23     the various websites.

24           THE COURT:  And who's testifying?  Who's testifying

25     about what year, 2003.

1          MR. BUDLOW:  He is speaking right now as to the

2     changes he put into place from 2003.  He do not testify

3     clearly, or I didn't ask him, whether or not these marketing

4     techniques continued into 2005.

5          I can represent to the Court that most that I'm

6     planning on discussing what he did, but I have not specifically

7     asked the witness what the message board activity did.

8          THE COURT:  Subject to the government's proffer that

9     they're going to connect this up, I will permit it.  I've

10    already started to draw a list for when we get to the line

11    where individuals are mentioned to see whether they are alleged

12    co-conspirators.

13         So I'm undertaking that effort, because my

14    understanding is that this 2003 testimony is part of the early

15    phases of the conspiracy that the defendants allegedly joined.

16    So on that basis, I'll overrule the objection.

17         MR. RAVENELL:  If I may, Your Honor, just briefly.

18    A, I don't think this is covered by the indictment, this time

19    period.  But, so that's, I think that's what frames the

20    indictment or the conspiracy the defendants are alleged to be

21    part of.

22         Additionally, if I understood Mr. Budlow, he did not

23    speak to the witness to find out whether this message board

24    activity is an activity that continued during the period of the

25    alleged conspiracy the defendants became involved in.  So I

1    don't think that ground work's laid.

2         It's one thing to say there are some things that may

3    have continued, but if I understood him correctly, he cannot

4    proffer that the witness would say this message board activity

5    continued beyond the start of his involvement in the business

6    in 2003.

7         THE COURT:  Well, part of the marketing effort of the

8    conspiracy would have to be -- would have to go over that to

9    2003, minding that what he's testifying to is that the broad

10   issue is that we had, he was working for an Internet medical

11   service that had the doctor on board, three physician

12   assistants, and they engaged in work trying to drum up business

13   for the website.

14        MR. RAVENELL:  Maybe I'm not being clear.  Maybe it's

15   just me not being clear, because it seemed like there's a

16   disconnect from what I was saying, which is I agree that maybe

17   every activity, but we're talking about a particular activity,

18   the government is trying to elicit from a witness that they

19   cannot say continued in to the time period of this alleged

20   conspiracy.  That's where where we differ, I think.  Maybe I'm

21   not clear.

22        THE COURT:  But my point was that, this is my ruling,

23   the specific marketing activity doesn't have to have started in

24   2003 and then continued up into conspiracy in the indictment.

25   The broad subject is marketing for the website trying to drum

1    up business for the website.  That would be an activity that's

2    in furtherance of a conspiracy.  So, in my view, this is all

3    appropriate background.  So I'll overrule the objection.

4            (Open court)

5            MR. RAVENELL:  Thank you, Your Honor.

6            THE COURT:  You're welcome.

7    BY MR. BUDLOW:

8    Q.  Just trying to remember what my last question was.

9            Oh, thank you.

10           Excuse me.

11           Mr. Kaps, as to the message boards, explain how an

12   employee from GDN would get onto the message board.  I don't

13   want to put words in your mouth, but essentially represent

14   positive things about the website.

15   A.  A representative from the company would log on to the

16   message board and pose as somebody that was a customer and had

17   a positive experience.  And it might include comments such as

18   received order from yesterday, everything went well, great

19   customer service, things of that nature.

20   Q.  And did that employee actually receive an order the day

21   before?

22   A.  No.

23   Q.  So they were misrepresenting the fact that they had engaged

24   in visits to the website?

25   A.  Correct.

1    Q.  And was there a particular GDN employee who was doing that,

2    or were there a number of people that did it?

3    A.  Alex Terrero was the gentleman hired to do that.

4    Q.  Do you know how to spell his last name?

5    A.  I'm not exactly, but I believe it's T E R R E R O.

6    Q.  And how long did that continue for, if you know?

7    A.  Till Barry's companies were closed.

8    Q.  And that was sometime in 2007?

9    A.  Yes.

10          MR. RAVENELL:  Objection, Your Honor, leading.

11          THE COURT:  I'll sustain the objection.

12   Q.  Do you know when Barry's businesses were closed?

13   A.  Yes.

14   Q.  When was that?

15   A.  In November of 2007.

16   Q.  And I had cut you off before when you were mentioning

17   another form of web marketing.  Could you tell the ladies and

18   gentlemen of the jury about the last or the other form of web

19   marketing?

20   A.  That would be pay-per-click, which is advertising that is

21   relevant to search engine results, and it's usually listed, for

22   example, on Google on the right side of the page.  And if you

23   type in a keyword, or a phrase, it would bring up something

24   relevant to that.

25          And the pay-per-click is the advertising isn't

1    charged unless somebody actually clicks on the ad or the term

2    or, sorry, on the advertisement.

3    Q.   Did you initiate the pay-per-click advertising?

4    A.   Yes.

5    Q.   When you first initiated the pay-per-click advertising,

6    which search engine did you use?

7    A.   Google.

8    Q.   Specifically, with respect to Google, could you explain in

9    the standard view page in the search after between the left

10   side and right side and where the advertized results versus non

11   advertised results?

12   A.   Sure.  If you entered a term in the Google, on the left

13   side of the screen, there's naturally those are results that

14   Google actually finds and ranks, and that are not paid for.

15            On the right side of the screen are the

16   advertisements are ads are actually displayed.

17   Q.   And when would -- what would cause Google to cause GDN or

18   whatever business that Barry Brooks was running at the time,

19   what would cause them to charge them for this advertising?

20   A.   When somebody that that searched for a term actually

21   clicked on the advertisements that linked over to Barry's

22   companies.

23   Q.   And every time there was a click by a consumer or Internet

24   web surfer, that would be a charge?

25   A.   Correct.

1    Q.   And if you know, how much initially was the charge from

2    Google?

3    A.   I believe roughly $2.

4    Q.   And when approximately when did you initiate the

5    pay-per-click advertising with Google?

6    A.   I believe it was either at the end of June or beginning of

7    July, 2003.

8    Q.   And what were the search terms that you used that were

9    designed to create this advertising?

10   A.   There was tremendous amount of search terms.  The one that

11   was -- one of the ones that were most effective was hydrocodone

12   or a brand version of that.  Also a no prescription required

13   was another one that generated revenue, other similar terms or

14   phrases.

15   Q.   And why did you put in the term no prescription required?

16   A.   On research of competitor sites, that term was listed on

17   there.  And the service did not require a prescription.  It

18   generated a prescription for the end user.

19   Q.   And you mentioned that, in addition to hydrocodone, there

20   were other drug names, brand names of hydrocodone were

21   successful, do you know what those brand names are?

22   A.   Some of them Vicodin, lortab I believe were the two most

23   popular.

24   Q.   How long did you continue the search engine optimization

25   form of web marketing?

1    A.   The SEO for the website continued as long as the websites

2    were running.

3    Q.   Not specifically with Google, but in general throughout

4    those sites as well, how long did you continue the use of

5    pay-per-click advertising as a form of web marketing?

6    A.   The pay-per-click also lasted until the sites were closed.

7    However, there was an interruption with Google, and we moved

8    over to a different search engine.

9    Q.   Okay.  We'll get to that in a minute.

10            What effect did the pay-per-click and the other web

11   marketing have on the business operation?

12            MR. RAVENELL:  Objection.

13            THE COURT:  I'll overrule the objection.

14   A.   It greatly increased the revenue and the amount of

15   customers that were coming in.

16   Q.   And can you quantify the sort of scripts per week that you

17   were doing after the greatly increased revenue?

18   A.   There was approximately a thousand percent increase.

19   Q.   And how did this affect the business's need for pharmacy?

20   A.   Increased it.

21            MR. BUDLOW:  One moment, Your Honor.

22            (Pause)

23   Q.   You said that the increased web marketing had an increase

24   in the business's income.  What was the source of the

25   business's income?

1                    MR. RAVENELL:  Objection, Your Honor.

2                    THE COURT:  I will overrule the objection.

3                    MR. RAVENELL:  Based on knowledge.

4                    THE COURT:  Well, if you're capable of testifying

5      based upon your own knowledge, how did the website make money?

6                    THE WITNESS:  I am.

7                    THE COURT:  Do you know?

8                    THE WITNESS:  Yes.

9                    THE COURT:  Okay.  You may answer.

10                   THE WITNESS:  Can you restate the question?

11     BY MR. BUDLOW:

12     Q.  Yes.  What was the source of the income, if you know?

13     A.  It was from consultation and medication payments that were

14     derived from majority credit card transactions.

15     Q.  And what medication were being sold?

16     A.  The vast majority was hydrocodone or a brand of.

17     Q.  You said you had -- you needed more pharmacies.  What about

18     your other staffing needs result of this growth in business?

19     A.  That also was increased.

20     Q.  Which types of staffing need to be increased?

21     A.  Customer service.  There were some more PA's that were

22     placed under Dr. Dominick, because the customer service had

23     quite a few people at the time.

24     Q.  Mr. Kaps, do you have any medical or pharmaceutical

25     training?

1    A.  I do not.

2    Q.  Do you have any experience in pharmaceutical sales?

3    A.  I do not.

4    Q.  Early on when you first started and after this initial

5    growth of the business -- actually, let me withdraw that.

6         When you said business grew a thousand percent, what

7    timeframe are we in now?  At what point did that happen?

8    A.  Third and fourth quarter of 2003.

9    Q.  So you had only been there six to nine months at that time?

10   A.  Yes.

11   Q.  What was your understanding of the legality of this

12   business?

13             MR. RAVENELL:  Objection.

14             THE COURT:  I'll overrule the objection.

15             MR. RAVENELL:  May counsel approach?

16             THE COURT:  You may.

17             (At the bench)

18             MR. RAVENELL:  I'm going to object to a witness

19   giving his view as to whether something is legal or not.  I'd

20   also like to have some proffers what he's going say, what his

21   basis of knowledge is.

22             THE COURT:  Mr. Budlow?

23             MR. BUDLOW:  Your Honor, as to a proffer, the witness

24   is going to state that he was working for a business that

25   employed doctors that were issuing prescriptions, and that he

1    believed that there was a doctor right there, that it was okay.

2              THE COURT:  The indictment states that the conspiracy

3    began at a time when the Grand Jury but not later than some

4    time in 2004, and continuing until on or about October 10,

5    2006.

6              So he's testifying, or the government's proffer is

7    he's testifying about a time when he is at the beginning of a

8    conspiracy; is that correct?

9              MR. BUDLOW:  Yes.

10             THE COURT: And that Mr. Kaps is a member of the

11   conspiracy?

12             MR. BUDLOW:  Yes.

13             THE COURT:  And that he knowingly and voluntarily

14   joined the conspiracy with the knowledge of at least some of

15   its aims and objectives, correct?

16             MR. BUDLOW:  There's certainly evidence of that.

17             THE COURT:  Good.  Then he is capable of testifying

18   as to his understanding as to whether he was acting legally or

19   illegally.  So I will overrule the objection on that basis.

20             (Open court)

21   BY MR. BUDLOW:

22   Q.  This one I remember.  What was your understanding of the

23   legality of the business at that time?

24   A.  To my understanding at that time, I was told that it was a

25   legit and legal way of doing telemedicine.

1    Q.  And who was it that told you that?

2    A.  Dr. Dominick at the time and also Barry Brooks.

3    Q.  And how much were you being paid when you first signed up

4    with GDN?

5    A.  A thousand dollars per week.

6    Q.  And did that change after the business grew rapidly?

7    A.  Yes.

8    Q.  How so, what caused it to change?

9            THE COURT:  Now, are we talking about his salary?

10   Q.  Yes.  Thank you.  Did your salary change?

11   A.  My salary stayed the same, but I got a commission.

12   Q.  And how is it you went from not getting a commission to

13   getting a commission?

14   A.  I negotiated it.

15   Q.  With whom?

16   A.  By Barry.

17   Q.  Okay.  And then how much did that equate to on an annual

18   basis in 2004, 2005, 2006?

19   A.  Between 300 and 450,000.

20   Q.  Between 300 and 450,000, which year was that?

21   A.  2004.  And right around 2003, 2004.

22   Q.  How about 2005?

23   A.  I believe that went up to around 650 to 700,000.

24   Q.  And 2006?

25   A.  Just under a million.

1    Q.   And you mentioned earlier that you were told by Dr.

2    Dominick and Barry Brooks that this was an acceptable practice

3    of telemedicine, I don't know if I got your quote right, were

4    you ever specifically told what telemedicine was?

5    A.   Not really.  Not verbatim or not in a clarified definition.

6    Q.   I'd like to move now to the fall of 2003, did there come a

7    time when the DEA executed a search and seizure warrant at the

8    business?

9    A.   Yes.

10   Q.   And where was the business located at that time?

11   A.   In Haines City, Florida.

12   Q.   And can you tell the jury of the jury about what happened

13   that day from your perspective?

14   A.   Sure.  I had worked late the night previously.  So I was

15   awakened by a series of calls.  The customer service manager

16   reached me and said that there were officers outside the door,

17   specifically sheriff's officers.  So I got up, went into some

18   clothes, she came over, we talked about it real quick, and then

19   I headed over there.  I announced my name when I arrived, and

20   there were DEA agents and investigators there.

21        I was asked to a series of questions regarding Dr.

22   Dominick and his involvement in the business and what he did,

23   and also everybody else's relationship that was currently

24   working there.

25   Q.   Okay.  And other than asking you questions, did the agents

1    ask you for any specific form of help?

2    A.   They wanted to take copies of the server so the server was

3    located in a different area across the state.  So we had driven

4    over there, and I provided them with access to the servers to

5    take copies.

6    Q.   Did they force you to help them?

7    A.   No.

8    Q.   Okay.  You did that of your own free will?

9    A.   Yes.

10   Q.   What's a server?

11   A.   A server is a computer that normally is in something called

12   the network operations center that contains data or

13   applications that other users use.  In this particular case,

14   the server is the public computer that the websites run off of

15   and the database runs off of.

16   Q.   Other than you and the other employees that you mentioned

17   that were present at the time of the search and seizure warrant

18   was executed, was Barry Brooks there, too?

19   A.   Yes.

20   Q.   From your perspective, from the questions you were asking

21   and what you were told, could you tell what the focus of the

22   agents inquiry was?

23             MR. RAVENELL:  Objection.

24             MR. MCCANTS:  Objection.

25             THE COURT:  Well, this is based upon what they told

1    you that were interested in; is that correct?

2              MR. BUDLOW:  Yes, Your Honor.

3              THE COURT:  Good.  So what did they say they wanted?

4              MR. RAVENELL:  Objection.  May counsel approach?

5              THE COURT:  I'm going to overrule the objection.  I

6    think I'm on firm ground here.  You can answer.

7              THE WITNESS:  They didn't tell me exactly what they

8    were looking for, but the questioning was focused on Dr.

9    Dominick.

10   Q.  To your knowledge --

11             THE COURT:  I'm sorry, focused on?

12             THE WITNESS:  Dr. Dominick.

13             THE COURT:  Good.  Thank you.

14   Q.  Dr. Dominick, do you know how todthousand spell his name?

15   A.  Not offhand.

16   Q.  Do you know his first name?

17   A.  Jean.  Or John.

18   Q.  Say his middle name?

19   A.  It's Jean or John.

20   Q.  Or Jean?

21   A.  Yes.

22   Q.  My French isn't that good.

23             As far as you know, was anyone arrested that day?

24   A.  I don't believe so.

25   Q.  After the execution of that search warrant, did you have

1    any concerns about the business operation?

2              MR. RAVENELL:  Objection, Your Honor.

3              THE COURT:  I'm sorry.  Did you have any new

4    concerns?

5    Q.  Yes.

6              THE COURT:  I'll overrule the objection.  You may

7    answer.

8    A.  Yes.

9    Q.  And did you discuss those concerns with Barry Brooks?

10   A.  Yes, I did.

11   Q.  What did he tell you?

12   A.  He said that Dr. Dominick was working --

13             MR. RAVENELL:  Objection, Your Honor.

14             THE COURT:  I'll overrule the objection, because it's

15   a conversation with Mr. Brooks.

16             MR. RAVENELL:  Your Honor, may counsel approach to

17   put something on the record?

18             THE COURT: You may certainly.

19             MR. RAVENELL:  Thank you.

20             (At the bench)

21             THE COURT:  Yes, sir.

22             MR. RAVENELL:  The Court said you overruled the

23   objection because a conversation with Barry Brooks, but I'm not

24   aware of why that would make it admissible simply because the

25   conversation was with Barry Brooks.  I mean this is still a

1    hearsay comment.

2           THE COURT:  Because my understanding is that Mr. Kaps

3    is going to testify about a conversation with Mr. Brooks, that

4    I believe was going to center on Dr. Dominick and the legality

5    of the enterprise.

6           Kaps, Brooks, Dominique, are all members of this

7    conspiracy because they're all members of this Internet

8    website.

9           So if Kaps and Brooks are going to talk about this

10   the website with Dr. Dominick, that's all co-conspirator

11   testimony.

12          MR. RAVENELL:  Your Honor, that's the problem I have

13   with that.  The mere fact that the government says we believe

14   this person was in the conspiracy is kind of putting the cart

15   before the horse.  Every time the government utters those

16   words, whatever that person says then comes into evidence.

17   That's just not the law, with all due respect.  The government

18   simply says he's a member of the conspiracy.  Therefore,

19   anything they say kind of comes in.

20          The government has not given the Court any evidence

21   that makes Mr. Kaps a member of the conspiracy.  In fact, Mr.

22   Kaps has said I was told, I thought everything was fine because

23   there's a doctor on board issuing these prescriptions.  How

24   does it make him part of the conspiracy simply because the

25   government says we think this is?

1           THE COURT:  This is my ruling.  Let's assume that you

2    had an off-loader in an drug organization and this man's job

3    was to go to the beach and offload boats, take marijuana off

4    the boat.  You can believe that the marijuana laws of the

5    United States permitted it, and but he was told it was entirely

6    legal and could have gotten assurances from the person had he

7    was working for that what he was doing was legal.  But as long

8    as he knowingly and willfully intentionally picked up the bale

9    of marijuana and moved it from the boat to the shore, then he

10   is acting illegally.  And if he has a conversation with his

11   boss about where do you want me to that move the marijuana

12   bales, that is a conversation in furtherance of the conspiracy

13   and therefore is admissible.

14           Here what's been represented, what looks like the

15   government's going to get into is that there's a conversation

16   between Mr. Kaps and Mr. Brooks about the business of the

17   website and whether what they're doing was legal or not.  So

18   it's a conversation in furtherance of the conspiracy.

19           MR. RAVENELL:  Your Honor, I apologize.  I cut you

20   off.

21           THE COURT:  But we can't have a debate every time.

22   That's my ruling.  I understand your position fully, and I'm

23   now overruling your objection.  I've given you two

24   opportunities to talk.  We're not going to have a debate every

25   time you --

```
 1              MR. RAVENELL:  I understand, but there's something
 2       about the Court said I do need to address, and I understand
 3       what the Court's ruling is, but I could just address one point?
 4       The analogy the Court gave just doesn't work for this case for
 5       all the reasons we've had conversations before, whereas if that
 6       person is unloading knowingly marijuana, that alone makes it
 7       evil.  So clearly, it's a crime and whether someone told him
 8       that it wasn't a crime, so that's what we have here.  What we
 9       have is this man working on an Internet business, all he says
10       is I'm working for this business, I've been told what we're
11       doing is legal, and I have a doctor on board, and I think it's
12       legal.  It's just not the same.  The analogy doesn't work when
13       the crime -- when the item per se is illegal.  And we've all
14       had this conversation.

15              I thought that the Court indicated that you agreed
16       with that, that that analogy doesn't work for this case because
17       the acts are not clearly illegal such as the fact of unloading
18       the drugs from a boat knowing that they're drugs, whether
19       someone told you it was good, it doesn't matter.
20       That's not what we have here.

21              THE COURT:  My understanding, based upon the proffer
22       of the government, is he's about to now to get a lot more
23       information about whether what he's doing was legal or illegal;
24       is that correct?

25              MR. BUDLOW:  Yes.
```

1           MR. RAVENELL:  Actually, I thought government's

2    proffer was that he's going to get information that it was

3    still legal, Dominique told him that doctor, Mr. Brooks told

4    him that it was, if anything, Dr. Dominick, DEA was focusing on

5    Dr. Dominick, and not the website people, that what the website

6    people were doing was still legal.

7           I think the Court may have misunderstood what the

8    proffer is.  It's not going to be now I know it's illegal.

9    It's going to be I'm still being told it's legal.

10          THE COURT:  What is he going to testify to on this

11   score?

12          MR. BUDLOW:  And I think Mr. Ravenell is sort of

13   mixing apples and oranges to a certain extent in this sense.

14   The co-conspirator doesn't have to get on the witness stand and

15   say I was a co-conspirator.  The test is whether or not the

16   evidence would indicate that the individual is a

17   co-conspirator.  Mr. Kaps is not going say I believed that what

18   I was doing was illegal.

19          What the evidence will show, which has been disclosed

20   to the defense, and they're fully aware this is coming, is that

21   many pieces of evidence were in Mr. Kaps's face that were

22   indications that there was something wrong with this business,

23   such as after Dr. Dominick was arrested, Dr. DeFrank, or after

24   was shut down about Dr. Dominick, did Dr. DeFrank was arrested.

25   And then pharmacy after pharmacy and pharmacy was shut down and

1    there were different arrests and problems.  This is a

2    conversation he had on regularly.

3         He's going to maintain he was suspicious, and did ask

4    questions, but relied on the assurances.  Just because he says

5    I'm not co-conspirator doesn't mean that the evidence shows

6    that he is.  In this specific discussion in regard to his

7    relaying a conversation that he had with Barry Brooks, whether

8    or not Mr. Kaps is a co-conspirator in relation to that

9    conversation, isn't really relevant, because if Mr. Brooks is

10   convincing a non conspirator about the legality of his

11   business, that's a relevant conversation by a co-conspirator

12   made clearly in furtherance of the conspiracy.

13        THE COURT:  That is a correct analysis of Brooks,

14   Dominique, the people who were running the website are trying

15   to rally the troops and keep them in line, and that is a

16   statement by a co-conspirator in furtherance of the conspiracy.

17   You can have a statement that's made by a co-conspirator to a

18   non co-conspirator, and that statement is admissible as long as

19   it is within the scope of and in furtherance.

20        MR. RAVENELL:  The problem with that, Your Honor, the

21   government is simply saying Brooks is a co-conspirator as well.

22        MR. BUDLOW:  He's indicted.

23        MR. RAVENELL:  Are you finished?

24        MR. BUDLOW:  I'll let you know.

25        MR. RAVENELL:  The fact that Brooks has been charged

1    later on, and I agree that he's been charged, the government

2    says Brooks is a --

3              MS. SMITH:  801(d)(2).

4              THE COURT:  Mr. Ravenell has the floor.

5              MR. RAVENELL:  The government's position is he's been

6    indicted.  Well, that doesn't make one a co-conspirator under

7    the rule.  There's nothing in the rules that says simply being

8    indicted alleviates the government the requirement of proper

9    reason why this person is a co-conspirator for the purpose

10   statement coming in.  There's no rule that says simply because

11   he's indicted that he's a co-conspirator for the point of

12   introducing a prior statement.

13             I'll ask the government to point me to 801(d)(2), if

14   you're charged, that's required.

15             MR. BUDLOW:  If Your Honor, if --

16             THE COURT:  In the Fourth Circuit Criminal Handbook

17   2007 Edition, Paul Horn, says that "Statements of

18   co-conspirators in furtherance of conspiracy are distinguished

19   from admissible conversations.  However, the exception to the

20   exception has itself been narrowly construed, rejecting

21   defendants' contention that conversations that he had might be

22   idle chatter.

23             "The District Court may conditionally admit recorded

24   statements of co-conspirators before the evidentiary foundation

25   is made so long as the evidence finally admitted."

1            Citing Blevins, 960 F. 2d, 1256, to allow a trial

2    court to conditionally admit statements under the assumption

3    that the government is going to bring in evidence that Mr.

4    Brooks and Dr. Dominick are members of that the conspiracy.

5            As Mr. Budlow pointed out, whether or not Mr. Kaps

6    would be considered to be a member of the conspiracy, he's

7    working at the website.  And if Brooks and or Dominique are

8    trying to reassure him so that he'll continue working on the

9    website, keeping things moving, then that would be a statement

10    in furtherance of the conspiracy by a conspirator.  So I'm

11    going to overrule the objection.

12            MR. RAVENELL:  And, Your Honor, I do want to thank

13    the Court for hearing me out on that point.  I thought there

14    was a misconnect, and I think there was, and I think this

15    actually helps us all.

16            THE COURT:  The point that you made is a very telling

17    point.  It really does go to the heart of the case.  And some

18    of the evidentiary problems in the case is that distributing

19    crack cocaine is illegal without having any kind of analysis.

20    And here you have to have a two-step process that the

21    prescriptions have to be valid, and then you have the outside

22    in the course, so it makes it a much more difficult analysis.

23    We have someone like Kaps, who's pure Internet company, and so

24    the question is what does he know about the legality, and the

25    people in the telephone and what does he know about the

1    illegality.

2           One of the reasons that I am keeping track of the

3    different people who are mentioned is that at some point when

4    we get further into this, and certainly, at the end of the

5    government's case, you can be heard fully on a motion that they

6    never proved the conspiracy, they never connected up the

7    conspiracy, that there are a lot of conversations that are

8    between people that were not in furtherance of the conspiracy

9    and therefore you ask for a mistrial.

10          So I would encourage counsel to do what I am doing,

11   to keep a tally list of people who are mentioned.

12          Now, so far, there's not been a tremendous amount of

13   information about Brooks, and Dr. Dominick, and, for example,

14   there wasn't any testimony so far of filling the illegal

15   prescription because there hasn't been any testimony about the

16   prescriptions they're filling and what the customer service

17   people did, or what kind of medical information they had

18   gotten, which is were why I'm really operating on the realm of

19   admitting the recorded statements before the complete

20   evidentiary foundation is laid so long as the evidence, or the

21   evidence is fairly supports the required showing so they're

22   still building their prima facie case for all the

23   co-conspirator statements.

24          MR. RAVENELL:  Thank you, Your Honor.  Obviously, I

25   see it the way the Court does, and that's why we have to make

1     these objections as we go along because, as the Court well

2     knows, I can't come up at the end of the day and make the

3     objection and say, Judge, take this objection at the end of the

4     day referred back to everything else.  The Fourth Circuit's

5     going to say you didn't object, you didn't object, you didn't

6     object, waive, waive, waive, waive, waive.  And so unless, and

7     obviously, I'm not asking for any kind of continuing line of

8     objection, I don't think it's appropriate for these questions.

9              THE COURT:  Good.

10             (Open court)

11    BY MR. BUDLOW:

12    Q.  All right.  Just to bring you back to where we were, I

13    think we were discussing a conversation that you had with Barry

14    Brooks about some concerns you were having after the search

15    warrant was executed in the fall of 2003.

16             Can you tell the ladies and gentlemen of the jury

17    what Barry Brooks told you?

18    A.  Yes.  It was a conversation, and he basically mentioned

19    that, you know, that the business was still a legal thing.

20             MR. RAVENELL:  I'm sorry, the witness said?

21    A.  That Barry mentioned that the business is still something

22    that can be legally done, and that Dr. Dominick was just

23    working for too many sites and prescribing too many

24    prescriptions within the time period that he was actually

25    working.

```
 1    Q.  And was Dr. Dominick doing some self-prescribing or -- I'm

 2    sorry, self-dispensing?

 3    A.  Yes.

 4    Q.  What is self-dispensing, or what do you believe it to be?

 5    A.  It allows the doctor to actually have medication at hand

 6    and give that to his patient.

 7    Q.  The doctor can act almost like a pharmacist, right?

 8    A.  Yes.

 9              MR. RAVENELL:  Objection to the testimony from Mr.

10    Budlow.

11              THE COURT:  I'm sorry?

12              MR. RAVENELL:  Objection to the leading nature of the

13    question.

14              THE COURT:  Well, I think it was a legitimate

15    followup question, so I'll overrule the objection.

16    Q.  And did Mr. Brooks make any comments to you during this

17    explanation about Dominique's self-dispensing?

18    A.  And that he also made mention that, you know, he was a

19    self-dispensing physician, and that, you know, probably

20    shouldn't have that.  We should have a pharmacy that is

21    dedicatedly sending out prescriptions instead of having a

22    doctor do both.

23    Q.  And at the time that the search warrant was executed, was

24    Dr. Dominick working in the same building that you were working

25    in?
```

1    A.   Yes.

2    Q.   So did you see him on a regular basis?

3    A.   On a fairly regular basis.

4    Q.   What is it that Dr. Dominick was doing?

5    A.   He was doing telephone consultations.

6    Q.   With who?

7    A.   With the customers or patients that were with the service.

8    Q.   What, if anything, were those telephone conversations

9    leading to?

10   A.   A prescription and then medication.

11   Q.   And literally how did the prescription become written and

12   what happened to the medication?

13   A.   The consultation occurred over the telephone, but the

14   prescription was created and stored electronically within the

15   site we interfaced that was provided to the doctor.

16   Q.   Who created the prescription, the doctor?

17   A.   The doctor would authorize the prescription.

18   Q.   And which doctor was that?

19   A.   Dr. Dominick.

20   Q.   Okay.  So, for example, if he authorized a given

21   prescription, how then would that -- who would send the

22   medication out?

23   A.   One of his staff, or there was people at that business that

24   specifically were sending out medication.

25   Q.   And where was the medication stored?

1    A.   There was a walled-off area, like a secure area where the

2    medication was stored.

3    Q.   In that building?

4    A.   In the building.

5    Q.   And it was shipped to the customers from that building?

6    A.   Yes.

7    Q.   And do you know if there was a reason why the drugs were

8    kept in a walled-off area?

9    A.   I believe it's something related to the security, because

10   it's medication, but I don't know for sure.

11   Q.   Do you know what happened to Dr. Dominick's medical

12   license?

13              MR. RAVENELL:   Objection.

14              THE COURT:   What happened to his medical license?

15              MR. BUDLOW:   Correct.

16              THE COURT:   And the basis of knowledge?

17              MR. BUDLOW: I'll withdraw it.

18   BY MR. BUDLOW:

19              Do you know, if you can answer this yes or no, do you

20   know if something occurred relating to Dr. Dominick's medical

21   license after the execution of the search and seizure warrant?

22              MR. RAVENELL:   Objection.

23              THE COURT:   Well, it depends upon who told him.

24   Q.   Did you have -- I'll withdraw it again.

25              THE COURT:   Did you have any conversations about Dr.

1    Dominick's medical license?

2              THE WITNESS:  Yes.

3              THE COURT:  And with whom?

4              THE WITNESS:  Barry Brooks.

5              THE COURT:  Then I'll overrule the objection.

6              MR. BUDLOW:  Thank you, Your Honor.

7    BY MR. BUDLOW:

8    Q.  Hat did Mr. Brooks tell you about Dr. Dominick's medical

9    license?

10   A.  He said it was suspended.

11   Q.  And after that occurred, did Dr. Dominick continue to work

12   for the business?

13   A.  No, he did not.

14   Q.  Was a new doctor hired to replace Dr. Dominick?

15   A.  Yes.

16   Q.  How was the new doctor found?

17   A.  There was another consultant that Barry utilized,

18   Strickland Hollander.

19   Q.  Strickland?

20   A.  Hollander.

21   Q.  Could you spell his last name?

22   A.  H O L L E N D E N, E R.

23   Q.  Oh, E R.  You described him as a consultant.  He's not

24   somebody who worked in the building on a regular basis?

25   A.  No.

1    Q.   Okay.  And how was Strickland Hollander contacted?  Who

2    contacted him to help find this new doctor?

3    A.   Barry Brooks.

4    Q.   And did Strickland Hollander find a new doctor?

5    A.   Yes.

6    Q.   Who did he find?

7    A.   Dr. DeFrank.

8    Q.   Do you know that doctor's first name?

9    A.   Salvador.

10   Q.   What else did Strickland Hollander do for the business

11   after than finding Dr. Salvador DeFrank?

12   A.   He extended his credit for merchant accounts.

13   Q.   Can you explain what merchant accounts are and why the

14   business needed someone to extend their credit for these

15   accounts?

16   A.   A merchant account is where money is stored and processed

17   from a credit card transaction, and there were several merchant

18   accounts for these companies, because the merchant account

19   provider had monthly Kaps or limits.

20        For example, one, there'd be like three or four

21   accounts that had a thousand dollar limits so there would be

22   multiple accounts like that.

23   Q.   Why couldn't GDN get its own multiple merchant accounts for

24   the business?

25   A.   Because the owners were British.

1    Q.   And do you know where Dr. DeFrank's practice was?

2    A.   I believe it was in Texas.

3    Q.   And where was GDN?

4    A.   In Florida.

5    Q.   And what was Dr. DeFrank's involvement with the business?

6    A.   He took over the operation from where Dr. Dominick left it.

7    He took over.   The patients were transferred over to him, and

8    he started doing telephone consultations.

9    Q.   Did he move his practice to Florida?

10   A.   He did not.

11   Q.   Did he ever come to Florida?

12   A.   He came to Florida briefly.

13   Q.   How many times, if you know?

14   A.   Maybe two or three offhand.

15   Q.   And when you say that the patients were transferred to

16   Texas from Florida, how that occur?

17   A.   They were -- there's a document that I believe I saw that

18   mentioned he's -- that is authorized.

19            MR. RAVENELL:   Objection, move to strike.

20            THE COURT:   Sorry.   I'm sorry.   You saw a document?

21            THE WITNESS:   There's a document that Dr. DeFrank

22   signed and Dr. Dominick I believe authorized to transfer the

23   patients responsibility over to --

24            MR. RAVENELL:   Objection, Your Honor.   Move to

25   strike.

 1              THE COURT:  Let me ask this, did you see this

 2      document?

 3              THE WITNESS:  Yes.

 4              THE COURT:  Then I'll overrule the objection.

 5              MR. RAVENELL:  Your Honor --

 6      Q.  Did do you know if the patients --

 7              MR. RAVENELL:  May counsel be heard?

 8      Q.  Are you objecting or do you just want to talk?

 9              THE COURT:  No.  He's asked permission of me to come

10      to the bench.

11              MR. RAVENELL:  Thank you, Your Honor.

12              MR. BUDLOW:  I didn't hear an objection.

13              MR. RAVENELL:  I tend to respond to the Court, not

14      counsel.

15              (At the bench)

16              MR. RAVENELL:  I'll try to keep my request to you and

17      not to Mr. Budlow.

18              Your Honor, if a witness saw a hearsay document, the

19      witness doesn't just get to testify about the document.  What

20      is in the document is still hearsay.  It doesn't eliminate the

21      rule of hearsay.

22              THE COURT:  At this point, I don't know that you

23      meant the document at all.  It's some document signed by Dr.

24      Dominick which allegedly transfers the patients to Dr. DeFrank?

25              MR. RAVENELL:  Correct.  But what the witness is

1    doing is testifying about a document, testifying what's in that

2    document.

3         And when we look at the analysis, it is hearsay if

4    someone told him and the person's not a member of the

5    conspiracy.  Let's take that out, just someone told him that

6    this is what happened, it would be barred and hearsay.  The

7    fact that he saw it in a piece of paper doesn't change the

8    analysis that it's still hearsay.

9         THE COURT:  And what's the nature of the document?

10        MR. BUDLOW:  Your Honor, these are -- the nature of

11   the document is that this is the witness's understanding of how

12   the patients were somehow formerly transferred from the Florida

13   doctor to the Texas doctor.  There's no -- we don't have the

14   document.  We don't know any more information about the

15   document than that.

16        The government's position is this is a business

17   record.  And to the extent there's hearsay within hearsay, that

18   these are all of co-conspirators, so Dr. Dominick saying to Dr.

19   DeFrank here take my patients from Florida to Texasa, I mean

20   patients who have addresses all over the country.  And you can

21   have them and write prescriptions.  Right now, that's a

22   statement in furtherance of the conspiracy that this witness

23   said he saw.

24        MR. RAVENELL:  Your Honor, that is amazing.  The

25   government can tell you he never seen a document.  Yet, he can

1    tell you what the document says and what the document purports

2    to be.  He's telling you a document he's never examined is a

3    business record, that suggests that every piece of paper found

4    in a business makes it a business record.

5         We don't know whether this paper was seen.  We don't

6    know where he saw it.  Even if he did see it at the business,

7    there are rules on whether someone whether a document is a

8    business document requires a lot more than I saw it at the

9    business.

10        THE COURT:  Well, here's what I'll do.  I don't know

11   whether this document has any legal or medical effect.  Now,

12   he's going to testify that he saw this document?

13        MR. BUDLOW:  He just did testify that he saw the

14   document.

15        MR. RAVENELL:  May I comment what he first said was I

16   believe I saw a document.  That was his first comments.  I

17   believe I saw a document.

18        THE COURT:  Well --

19        MR. BUDLOW:  SMITH:  That's what I'm saying.

20        THE COURT:  Counsel, the first thing would to be able

21   to find out is whether he ever saw a document that was written

22   that took the form of writing from Dr. Dominick to Dr. DeFrank.

23        Now, if the writing was a communication from

24   Dominique to DeFrank, and it concerns the patients/customers of

25   the Internet service, then he can testify about the

1    communication.

2         I saw this object.  It was a letter.  Here are the

3    words that I read, that I read the letter.  Then what I will do

4    is I will instruct the jury that this writing that is being

5    testified to only in so far as it bears upon a communication

6    from doctor, from one man, one doctor to another, and that this

7    witness is not competent to testify as to any legal or medical

8    significance of the document.

9         MR. BUDLOW:  Could I have one moment, Your Honor?

10        (Pause.)

11        MR. BUDLOW:  Your Honor, my understanding of the way

12   things progressed was I asked the witness the question.  There

13   was an objection.  The Court asked a followup question, did you

14   see the document?  The witness says yes.  And the witness has

15   over objection testified as to the general nature of the

16   document.

17        Unless the Court's inclined to strike based on Mr.

18   Ravenell's objection, which I'm getting the sense you're not,

19   I'm not planning on discussing the document any further.

20        I may ask him if he learned about the nature of the

21   substance of the document from other means, such as

22   conversations with Barry Brooks or other individuals, but the

23   evidence came in.  I wasn't planning on addressing the document

24   additionally.

25        THE COURT:  So what has he said about this document

1    so far?

2          MR. BUDLOW:  I believe he said that the document was

3    a transfer of care of the patients from Dr. Dominick to Dr.

4    DeFrank, and that he did see the document.

5          THE COURT:  Well, I think what you should, if you

6    want to do this right now, the record's confused.  What you

7    should do is ask him whether he has any knowledge whether or

8    not patients of the Internet company were transferred from

9    doctor from one doctor to another.  And let's assume he will

10   say I do know the some information, what is the source of that

11   information?  If it's Dr. Dominick, Barry Brooks, Dr. DeFrank,

12   told them about it, and then he can testify about the

13   conversation.

14         If he saw a document, then he can testify to that

15   document, that he saw, and I will tell the jury it's

16   communication between from A to B, from one doctor to another,

17   and that he's not in a position to express any kind of legal or

18   medical significance.

19         MR. RAVENELL:  I'll ask the Court to look at 803,

20   803(6), deals with business records, and this just doesn't

21   qualify.  And unless it qualifies --

22         THE COURT:  This wouldn't be a business record, a

23   member of the conspiracy to another one would be oral

24   conversation, and another would be a writing.  If let's assume

25   there was a note that the witness saw from A to B, which says

1    please pick up five kilograms of marijuana and take it to

2    Tampa, that would be admissible even though it's not a business

3    record, because it is a communication from one member of the

4    conspiracy to the other, as long as he can authenticate it

5    sufficiently to get it in.

6         MR. RAVENELL:  That's my problem, Your Honor, is that

7    it's one thing for a witness to say I heard two people

8    speaking, so I can clearly tell you that it was this person

9    speaking to that person or both alleged members of the

10   conspiracy versus I saw a doctor that has a name at the top and

11   a name at the bottom and without us having any ability to

12   examine that.  We've never seen it.  The government doesn't

13   have it.  That we're now supposed to take that as being a

14   statement from one co-conspirator to another, when we don't

15   have the document to examine and all the person's relying upon

16   is that there are names on it that he recalls, how then does

17   that qualify as a statement of a co-conspirator when the Court

18   can't be assured that it really is the statement of those two,

19   or one of those co-conspirators?  You can't even test it.

20        THE COURT:  If he says that it's a writing, then,

21   obviously, to lay the foundation, how did you know what kind of

22   stationery is it on?  Did you recognize the signatures?  Where

23   did you see it?

24        The document is like any other thing if you've lost,

25   misplaced, torn up, as long as the person saw the document, put

1    it back at the time he was testifying about, saw it, he can

2    testify to it as long as there's additional information it was

3    written from Mr. A to Mr. B.

4         Right now, I don't know anything about the document,

5    whether he's going to testify that I saw a document, or whether

6    somebody simply told him about it.

7         If it's a document, we're going to have to lay the

8    foundation as to whether or not the document, did you sign it,

9    do you recognize the signature?  If there's still a problem,

10   we'll come back and see what happens.

11        MR. RAVENELL:  Therefore, Your Honor, based on that

12   point, I want to make sure we're clear what Mr. Budlow was

13   suggesting because the witness had answered is the evidence is

14   already there.

15        What I'm hearing the Court saying the evidence is not

16   yet in.  So I'd ask the Court to strike the answer that was

17   given and tell the jury to ignore it to see whether in fact he

18   will establish the foundation to get the statement in.

19        Because right now, if Mr. Budlow is correct and the

20   jury heard it the way he did, they believe that information is

21   now before them.

22        THE COURT:  Let's do it this way.  Let's see what he

23   says.  If he says that I saw a letter, if it turns out that

24   writing, that he's allowed to testify about the writing, I'll

25   let it in.  If it turns out somebody told him about it I will

1    tell them to disregard the testimony about the writing.

2                MR. RAVENELL:   Okay.

3                (Open court)

4    BY MR. BUDLOW:

5    Q.   Thank you, Your Honor.

6                Mr. Kaps, do you know if some time after Dr. Dominick

7    was no longer working for the business, the patients were

8    transferred from Dr. Dominick to a different doctor?

9    A.   Yes.

10   Q.   And how is -- what's your source of information as that

11   occurring?  Conversations and a document.

12               THE COURT:   Well, let's, go to the conversations

13   first.

14   Q.   Okay.  Let's go to the conversations first, I like that

15   question.  Who were the conversations with?

16   A.   I was over hearing Barry talking to I believe it was

17   DeFrank asking him whether or not he would accept the transfer

18   of patients over to him.

19   Q.   And was this an in-person conversation or telephone

20   conversation?

21   A.   That was a telephone conversation between Barry.

22   Q.   And about how long did it last?

23   A.   I don't know, maybe five, ten minutes.

24   Q.   Five or ten minutes?

25   A.   Yeah.

1   Q.   And after that conversation, after hearing your end of it,

2   did you have any conversations about or with Barry Brooks about

3   either the content of the conversation or what Dr. DeFrank's

4   answer to his question was?

5   A.   Yes.

6   Q.   And what was -- what did you learn?

7   A.   I learned that DeFrank was going to accept the transfer.

8   He was willing to do it, and that it was going to get done

9   quickly.

10  Q.   Okay.  And you answered my initial question by saying that

11  there were two sources from which you learned about this

12  transfer of patients from Dr. Dominick to Dr. DeFrank.  One was

13  the conversations you just told us about with Barry Brooks, and

14  the other was what?

15  A.   A document.

16  Q.   Okay.  Now, when, or where were you when you saw the

17  document?

18  A.   In an office at the business.

19  Q.   Okay.  And who had the document, under what conditions did

20  you observe the document?

21  A.   I believe it was on the desk that Barry would utilize.  It

22  was on the desk that Barry would utilize when he came into the

23  office.

24  Q.   And was anybody else in the room besides you?

25  A.   I think Tony was there.

1    Q.  And can you describe -- don't tell us the content of the

2    document.  Just describe first shape, color, that kind of

3    thing.

4    A.  It's standard 8 and a half by 11 letter size paper.

5    Q.  And was it in a letter format or some other format?

6    A.  Business type format.

7    Q.  When you say business, you mean business letter, medical

8    records, if you know?

9    A.  Just standard grammatical format for a business letter.

10   One page.

11   Q.  And was this before or after the conversation that you had

12   with Barry Brooks about the transfer of patient care?

13   A.  This was after.

14   Q.  And can you describe what you saw in the letter?

15              THE COURT:  Can I ask this, was the letter signed?

16              THE WITNESS:  It was signed at this time.

17              THE COURT:  By whom?

18              THE WITNESS:  DeFrank.  Dr. DeFrank.

19              THE COURT:  And did you recognize his signature?

20              THE WITNESS:  It appeared to be his signature, yes.

21   Q.  Which doctor, who was it to, and who was it from?

22   A.  It was -- it was a general, generalized letter stating I

23   think it said something to the effect of --

24              MR. RAVENELL:  Objection.

25              THE COURT:  Well, why don't we do this, ladies and

1    gentlemen it's 3:15.  Let's take a 15-minute recess, and we'll

2    come back at let's say 35 minutes after the hour.  I'm going

3    say here with counsel and our witness.

4              (Jury recessed)

5              THE COURT:  Please be seated.  The record will show

6    that the jury has retired.

7              Mr. Kaps, if you could describe the letter, tell me

8    what the contents were?

9              THE WITNESS:  Okay.  The letter was basically a brief

10   paragraph, and I'm paraphrasing it, I believe it said I Dr.

11   Salvador DeFrank will take over care for patients on this day,

12   and I believe it was the date that he would actually start and,

13   then there's a signature underneath that.  It was very, very

14   short.

15             THE COURT:  So it was a letter from Dr. DeFrank to

16   Barry Brooks?

17             THE WITNESS:  I don't remember who it was addressed

18   to.  I believe it was more actually not even addressed.  I

19   don't remember reading like a to or whatnot.  It was more like

20   I'm certifying that I'm doing this type letter.

21             THE COURT:  Good.  Thank you.

22             Mr. Budlow, anything else on the authentication of

23   the letter?

24             MR. BUDLOW:  No, Your Honor.

25             THE COURT:  Thank you.

1            Mr. Ravenell?

2            MR. RAVENELL:  May I?

3            THE COURT:  Certainly.

4    BY MR. RAVENELL:

5    Q.  Do you know when it was that you saw this letter?

6    A.  Not exactly.

7    Q.  Well, do you recall what year it was?

8    A.  Yes.  It was year at the end of 2003.

9    Q.  And how long was it after the business or was it --  strike

10   that.

11            Was it before or after the business in Haines city

12   was raided by the DEA?

13   A.  It was afterwards.

14   Q.  Okay.  How long afterwards?

15   A.  A couple weeks, the end of November comes to mind.

16   Q.  And had you ever met Dr. DeFrank when you saw that letter?

17   A.  No.

18   Q.  So you told the Court that it was Dr. DeFrank's signature,

19   but you had never met him before; is that correct?

20   A.  Yes.

21   Q.  Thank you.

22   A.  I can explain that.

23            THE COURT:  Well, were you familiar with his

24   signature, or did you subsequently become familiar with his

25   signature?

1                THE WITNESS:  One of the procedures for a new doctor

2     was that they had to send a page with three signatures on it,

3     so that -- so the signature was digitized and then placed onto

4     the prescriptions.

5                THE COURT:  And did you see Dr. DeFrank's three

6     signatures?

7                THE WITNESS:  Yes.

8                THE COURT:  And was the signature on the letter

9     similar to the eventually digitized signature?

10               THE WITNESS:  Yes.

11               THE COURT:  Good.  Thank you.

12               MR. RAVENELL:  Briefly, Your Honor.

13    BY MR. RAVENELL:

14    Q.  You said the letter was not addressed to anyone, it was

15    just Dr. DeFrank's signature on the bottom of what you believe,

16    paraphrase, or your recollection what was written on the piece

17    of paper; is that correct?

18    A.  That's correct.

19    Q.  Okay.  Was there any heading on the paper at all?

20    A.  I don't remember.

21    Q.  Do you know what happened with the piece of paper after you

22    saw it?

23    A.  I'm not 100 percent sure what happened to it.

24    Q.  Are you sure -- do you have any idea what happened to the

25    paper from your recollection, whether it was 100 percent or

1    not?

2    A.   I believe it was put into -- there's on the desk, there was

3    a filing cabinet, and I believe it was placed into there.

4    Q.   What makes you believe that, did you see it being done?

5    A.   That's normally where the paperwork was.

6    Q.   So you were just going on what normally you see pieces of

7    paper in a filing cabinet, but you didn't see him put this

8    piece of paper in a filing cabinet; is that correct?

9    A.   That's correct.

10   Q.   So basically, if I understood you correctly, you saw the

11   piece of paper on the desk, and you didn't see it any more

12   after that?

13   A.   That's correct.

14            MR. RAVENELL:   Thank you.

15            THE COURT:   Good.   Thank you.   Based upon the

16   testimony of the witness, the objection to the document is

17   overruled.   I see no need for a curative instruction.   And

18   we'll recess until 35 minutes after.

19            (Recess.)

20            THE COURT:   Please be seated, unless you wish to

21   stand for the jury.

22            (Jury present)

23            THE COURT: Welcome back, ladies and gentlemen, please

24   seated.

25            Mr. Budlow, whenever you're ready.

1    BY MR. BUDLOW:

2    Q.   Thank you, Your Honor.

3              Mr. Kaps after the transfer of care from Dr. Dominick

4    to Dr. DeFrank, where was Dr. DeFrank located?

5    A.   Text.

6    Q.   And who worked with him?

7    A.   I believe they were two PA's or so out of that he hired.

8    Q.   And what did Dr. DeFrank and his PA's do in Texas?

9    A.   They provided consultation over the telephone.

10   Q.   And what happened as a result of the consultation?

11   A.   He was arrested in Texas.

12             MR. RAVENELL:   Objection, Your Honor.

13             THE COURT:   I will overrule the objection.

14   Q.   And --

15             MR. RAVENELL:   Your Honor, objection.

16             THE COURT:   I'm sorry.

17             MR. RAVENELL:   May counsel be heard, Your Honor?

18             THE COURT:   Well, how do you know that he was

19   arrested?

20             THE WITNESS:   It was told to me by Barry Brooks.

21             MR. RAVENELL:   Your Honor, it wasn't a question of

22   him being arrested.   It was -- I don't want --

23             THE COURT:   Why don't you come forward, then?

24             (At the bench)

25             MR. RAVENELL:   Your Honor, the problem is, the

1    question was what happened as a result of the consultations?

2    And Mr. Budlow's confirmed what I thought he didn't think that

3    was going to be the answer.  I think he felt there were going

4    to be prescriptions filled.  The witness said he was being

5    arrested.  It makes it seems like he was arrested merely

6    because he was doing consultations.  That made a false

7    impression.  Mr. Budlow can speak to himself, that's not what

8    he was expected the witness to stay.

9         MR. BUDLOW:  Not at that time.  However, I proffer to

10   the Court I anticipate clarifying that.  I anticipate bringing

11   out the fact that Dr. DeFrank was later arrested, and it was as

12   a result of this activity, not strictly consultations, but I'll

13   bring out based on conversations with Barry Brooks what Barry

14   explained to him was Dr. DeFrank was arrested as a result of

15   his activity with the websites in terms of the consultations

16   and the prescriptions and related activity.

17        So it came out in an unintended way but in a way that

18   I think is certainly going to be clarified in an admissible way

19   by the government.

20        THE COURT:  Your original question was what?

21        MR. BUDLOW:  What happened as a result.

22        MR. RAVENELL:  What was the result of the

23   consultations, and he said he was arrested.

24        MR. BUDLOW:  I was anticipating him to say

25   prescriptions were issued.

1            THE COURT: Why don't you go back and reask that

2     question and then get the answer to that.

3            MR. BUDLOW:  Absolutely.

4            (Open court)

5     BY MR. BUDLOW:

6     Q.  Let me back up to Dr. DeFrank's activities in Texas.  As a

7     result of the consultations, was there any prescribing activity

8     going on?

9     A.  Yes.

10    Q.  Okay.  And how so?

11    A.  The telephone consultations that he had he would prescribe

12    through the interface to the service.

13    Q.  And you had testified that earlier before Dr. DeFrank was

14    involved, there were also PA's in Florida.  Were there still

15    PA's in Florida while Dr. DeFrank was in Texas?

16    A.  Yes.

17    Q.  And what were the PA's in Florida doing?

18    A.  They were also doing consultations.

19    Q.  Was there a doctor in Florida that was working with them

20    for those consultations?

21    A.  No.

22    Q.  And were there prescriptions being prescribed by the PA's

23    in Florida?

24    A.  Yes.

25    Q.  What's a PA?

1    A.  Physician assistant.

2    Q.  And while Dr. DeFrank was working for the business writing

3    prescriptions, who was filling the prescriptions?

4    A.  I believe in the beginning it was a pharmacy called TDI,

5    and then after that there were several pharmacies in Tampa.

6    Q.  T Guy was one of the pharmacies?

7    A.  TDI.

8    Q.  TDI.  I wasn't even close.  Do you know where TDI was

9    located, what state?

10   A.  I believe it was Pennsylvania.

11   Q.  So TDI in Pennsylvania and other pharmacies in Florida?

12   A.  Yes.

13   Q.  And so it was all outside pharmacies unlike the situation

14   with Dr. Dominick, who was self-dispensing?

15   A.  Correct.

16   Q.  How long did Dr. DeFrank work for Barry Brooks's companies?

17   A.  About six months.

18   Q.  And do you know what happened at the end of that six months

19   to end that relationship?

20   A.  Yes.

21   Q.  And how did you learn about what happened, from what

22   source?

23   A.  From Barry Brooks.

24   Q.  Okay.  And what did Barry Brooks tell you?

25              MR. RAVENELL:  Objection, Your Honor.

1        THE COURT:  I'll overrule the objection.

2   A.  He said that Dr. DeFrank was arrested, and there were

3   charges being bought against him.

4   Q.  And what --

5        MR. RAVENELL:  Objection to the 801(d)(2)(E).

6        THE COURT:  Well, you mean for the accuracy of the

7   statement?

8        MR. RAVENELL:  No, Your Honor, not the issue of

9   accuracy.  It's what is admissible under 801(d)(2)(E).

10        THE COURT:  Thank you for clarifying the basis of the

11   objection.  I will nevertheless overrule the objection and let

12   the answer stand.

13   BY MR. BUDLOW:

14   Q.  Mr. Kaps, what else did Barry Brooks tell you about Dr.

15   DeFrank arrested including, if any, reasons?

16   A.  He mentioned that Dr. DeFrank --

17        MR. RAVENELL:  Objection, Your Honor.

18        THE COURT:  This is a conversation about what had

19   happened with Dr. DeFrank?

20        THE WITNESS:  Yes.

21        THE COURT:  Good.  Then I'll permit it.

22        MR. RAVENELL:  Your Honor, I know we've had these

23   issues, but may I briefly put something on the record?

24        THE COURT:  Certainly.

25        (At the bench)

1          MR. RAVENELL:  Your Honor, the problem I have with

2     this is that 801(d)(2)(E) does not mean that every statement by

3     a co-conspirator comes in and that we ferret it out later.  It

4     just doesn't allow for that.

5          And what is happening here is that the rule they have

6     is whenever Barry Brooks speaks, somehow it qualifies as

7     801(d)(2)(E).  It just doesn't.  The government hasn't even

8     proffered, there's nothing about what he said.

9          For example, the mere fact that the man got arrested

10    doesn't mean that this person Brooks telling this, telling Kaps

11    that DeFrank got arrested, makes that statement in furtherance

12    of the conspiracy.

13         It has to be in furtherance of the conspiracy, not

14    just saying Brooks told him.  And what I see happening here is

15    that, as long as Brooks says it, the Court is finding that it

16    comes in.  And that's just not the law, with all due respect,

17    Your Honor.

18         And I keep objecting because there has to be a stop

19    to this thing where it's Brooks utters it, it automatically is

20    admissible.  That's just not the law.

21         THE COURT:  That was Dr. DeFrank, do you contest that

22    he was arrested?

23         MR. RAVENELL:  I don't contest that he was arrested.

24    But the fact that this Brooks told him that he was arrested and

25    then that that Brooks may even in fact tell him why I was

1    arrested, the mere fact that Brooks gave information to this

2    person to Mr. Kaps doesn't mean that the information imparted

3    is to further the conspiracy.  There's got to be just something

4    more proffered than that he said it.

5            THE COURT:  I think there's a kernel of an issue

6    here.  Let me ask you this, where are you going from this

7    point?

8            MR. BUDLOW:  Your Honor, this is one of a number of

9    examples of conversations between Barry Brooks and Adam Kaps

10   related to moving the company forward despite legal problems,

11   such as arrest of doctors, searches of various pharmacies, and

12   other sort of law enforcement-related issues.

13           And every time that Adam Kaps would talk to Barry

14   Brooks about this, Barry Brooks would offer explanations and

15   various reasons for either the arrests or the conduct of law

16   enforcement that would justify to Adam Kaps what was going on.

17           And the government's position is these are comments

18   that are clearly in furtherance of the conspiracy.  Mr. Kaps

19   has already demonstrated that he is a very important cog in

20   this business in that he helped change this business from the

21   -- basically increased their gross revenue over a thousand

22   percent in a short period of time.

23           Barry Brooks then every time something negative

24   happens, having a conversation with him saying I'm going to

25   paraphrase it's okay, this is legal, we're not doing anything

1    wrong, it's not my fault, it's somebody else's fault.  That's

2    all in furtherance of the conspiracy.

3         In fact --

4         MS. SMITH:  Your Honor, to follow, I would just like

5    to add the record should reflect, if it doesn't, we can

6    certainly make it clearer that Mr. Kaps is the person that

7    makes all the electronic connections happen, has to know who's

8    in, who's out, where they're located, what electronic activity

9    they're doing, what information they need access to, so, of

10   course, being apprised of the change in personnel in the

11   conspiracy is something that Mr. Kaps has to know and is

12   clearly in furtherance, based upon the evidence that's already

13   in.

14        (Pause.)

15        THE COURT:  I think the problem is essentially this,

16   most co-conspirator's statements come in to show the nature and

17   scope of the conspiracy and the fact of the conspiracy.  So if

18   the person says I talked to, they were arranging for a

19   shipment, we know the evidence is there's a drug shipment, and

20   we have conversations among co-conspirators about the drug

21   shipment, the principal reason that those conversations are

22   being admitted is to show that working relationship with the

23   people involved, that they're discussing things, they're

24   working together, they're collaborating.

25        So here you have the fact that Dr. DeFrank was

1   arrested.  That's relevant, because it shows that Brooks, to

2   keep the conspiracy going, would have to ensure other people

3   got in the conspiracy.  The problem is that the focus is not so

4   much on the interaction between the people that some discrete

5   fact that happened, let's assume you have a drug case, and you

6   had a conversation between two co-conspirators, and one says

7   yes, we sent the shipment from Tampa to Orlando, and that's

8   testified to at trial.  But there wasn't a shipment from Tampa

9   to Orlando.

10   What Mr. Ravenell is objecting to is all these facts

11   come in, facts like the shipment from Tampa to Orlando without

12   any kind of evidence that there ever was such a shipment.  So I

13   think is that basically it.

14   MR. RAVENELL:  Yes, Your Honor, and what we're having

15   is we get all of the statements that we don't -- when we

16   analyze everything, first, you're not getting proffers from the

17   government about what these things, or what this really means.

18   The government says, well, anything that happens

19   almost under Miss Smith's analogy, anything that happens in the

20   conspiracy, it's important, so it's admissible.  And that is

21   just, number, one not the rules that allows for that under the

22   law.

23   What we're to be very mindful of is where we get to

24   the point where everything that comes out of Brooks's mouth,

25   and that's what we're having happen now, if this man can mutter

1    it, then it's admissible, and that can't be.

2         Some things the Court has allowed in, where it's been

3    closer where a witness says Brooks told him A, B, C, D, the

4    government's position is either way, if Brooks tells him it's

5    illegal, then it comes in.  If Brooks tells him that it's

6    legal, then it comes in.  It's pretty much whatever Brooks says

7    is going to further the conspiracy.

8         If Brooks says it's illegal, but we can keep doing

9    it, then that comes in.  If Brooks says it's legal, but we can

10   keep doing it, then that comes in.  Because whatever Brooks

11   says, from the government's position, furthers the conspiracy

12   as long as they keep moving forward.

13        And that suggests that as long as you and I talk

14   about anything, almost, it's furtherance of the conspiracy, and

15   that is just too broad.

16        MR. BUDLOW:  Your Honor, may I add something?

17        THE COURT:  The problem is, under conspiracy law,

18   that everything that Brooks, if you have Mr. Brooks, Mr.

19   Sodipo, and Mr. Nwaehiri are all members of the same

20   conspiracy, and let's assume that Mr. Sodipo and Mr. Nwaehiri

21   joined the conspiracy in 2004.  If the conspiracy itself

22   started in 2003, then they are bound in evidence about the

23   pre-existing conspiracy admissible against Mr. Sodipo and Mr.

24   Nwaehiri.

25        The other principle of conspiracy law, by joining the

1    conspiracy, Mr. Sodipo and Mr. Nwaehiri, they're agents of

2    Brooks, and Brooks is an agent of theirs.  So that statements

3    that Brooks makes to another co-conspirator about the

4    conspiracy are the statements that an agent authorized agent to

5    and are admissible against defendants, and statements made by a

6    co-conspirator being a completely unrelated third person are

7    also admissible.  It doesn't have to be from one witness to

8    another.  The only test is whether it's in furtherance of the

9    conspiracy and within the scope of the conspiracy.

10          If Brooks is talking to -- talking business with Mr.

11   Kaps, and he's talking about how we need another doctor, how

12   are we going to get another the doctor, the reason we need

13   another doctor is because DeFrank was arrested.  We're going to

14   have to find another doctor.  We're going to have to find more

15   pharmacies.  I'm going to go talk to five pharmacies.  You talk

16   to five.  All of those conversations about the business are all

17   admissible.

18          Now, if you have a fact, if there's a fact that's

19   coming in, for example, that Mr. DeFrank, Dr. DeFrank wasn't

20   arrested, then you can deal with that.  But as long as we don't

21   have some specific problem with any of the underlying facts

22   that they're testifying about, it's just all admissible,

23   because your clients under conspiracy law are partners of

24   Brooks, and everything that he says that is in furtherance of

25   the conspiracy can be attributed to them.

1           So if he says we need another doctor, when DeFrank

2    was arrested, you know, he can testify to that.

3           MR. RAVENELL:  I have not heard that to be the

4    proffer of what he would say, Judge.  You're just giving an

5    example, but I have not heard that to be the proffer of what

6    he's going to say.

7           THE COURT:  Well, I thought that your objection was

8    that Mr. Kaps said DeFrank was arrested.

9           MR. RAVENELL:  Just that he was arrested.  My point

10   is just saying that he was arrested doesn't mean that that

11   statement alone was in furtherance of the conspiracy.  The

12   statement he was arrested, how does it make it in furtherance

13   of the conspiracy?

14          THE COURT:  Because what the proffer from Mr. Budlow

15   is, the one coming next is, DeFrank's arrested, we got to get

16   somebody else, or we've got deal with the problem with DeFrank

17   being arrested.  We've got to get more pharmacies.  Some

18   pharmacies are shut down and other pharmacies are recruited.

19   All of that discussion, just you know, we lost an associate, we

20   need to get another associate.

21          MR. RAVENELL:  And I guess we'll see what the next

22   answer is to next question, I'll see whether the proffer holds

23   out.  If the proffer holds it, that's one thing.  If the

24   proffer doesn't, we'll be back.

25          THE COURT:  But there is a -- but there is a -- there

1    is a troubling aspect that you put your finger on, is that it's

2    having a narrative.  Usually, the co-conspirator statements are

3    not the whole narrative.  They're usually just part of it.  And

4    usually the co-conspirator statements come in primarily to show

5    the working relationship among the people who are involved.

6    They don't come in sort of in a general odd way to show all of

7    the facts happened.

8             MR. RAVENELL:  Right.

9             THE COURT:  So having Mr. Kaps talk with Mr. Barry

10   Brooks is sort of like an oral narrative of WW II for, you

11   know, what really happened on D-Day.

12            MR. RAVENELL:  Obviously, the problem with that, I

13   understand the Court, is that we have no ability to

14   cross-examine Barry Brooks about any of this.  I understand

15   what 801(d)(2)(E) stands for, but that's the concern.

16            That's why the Court has to be so careful.  When I

17   say careful, I'm not admonishingd the Court, but careful when

18   we allow this kind of evidence in with the view under Blevins

19   we're going to connect them later, because that is the problem

20   with entire 801(d)(2) allowing evidence in first and revisiting

21   it at the end of the day, because we will never have a chance

22   in this trial to cross-examine Barry Brooks about what

23   happened.  We're stuck with this man saying Brooks said these

24   things.

25            THE COURT:  The two problems with that:  One, you

1      don't have -- I forget, what's the name of the hearing that

2      they have in other circuits?

3              MS. SMITH:  Gosh.  I used to know it.

4              THE COURT:  So we don't have the hearing to establish

5      the --

6              MR. RAVENELL:  The conspiracy.

7              THE COURT:  The admissibility of the conspiracy

8      evidence, it just comes in subject to a very loose good faith

9      test.

10             I've already read the statement from the Fourth

11     Circuit Handbook to the extent for the proposition that it's

12     admitted with a good faith and they'll connect it up basis.

13             And I haven't had a problem with any of the testimony

14     that's been elicited so far.  It seems to me that if DeFrank --

15     if Kaps and Barry Brooks are talking about DeFrank getting

16     arrest and the problems they'll have to solve because of that

17     arrest, that's all well within the good side of the ledger.

18             But another time it would be a problem is if it

19     turned out that DeFrank wasn't arrested, you know, he died of

20     natural causes, or something else happened, then you'd have to

21     figure out a way to tell the jury that they're getting wrong

22     information here and this is only being admitted for a limited

23     purpose.  Or it will turn out that Dr. DeFrank died in an

24     automobile accident and not because he was arrested.

25             But so far it's all well within those parameters of

1    the conspiracy.

2              MR. RAVENELL:   Thank you for hearing us out.

3              (Open court)

4    BY MR. BUDLOW:

5    Q.   Mr. Kaps, you were telling us about a conversation that you

6    had with Barry Brooks about Dr. DeFrank's arrest.   Before you

7    tell us about the conversation, tell us or answer this

8    question, was information relating to which doctors were

9    filling from the websites pertinent to your job?

10   A.   Not really.

11   Q.   Okay.   Were you involved in effecting anything with the

12   interface that Dr. DeFrank used in Texas?

13   A.   What do you mean by effecting the interface?

14   Q.   The either monitoring what he was -- what was going on in

15   Texas or setting up or making programming changes related to

16   Dr. DeFrank's activity in Texas?

17   A.   I would make programming changes to the interface as

18   requested, yes.

19   Q.   And did that occur whenever a new -- like a new doctor came

20   on board?

21   A.   No.

22   Q.   And when you spoke with doctor -- with Barry Brooks about

23   Dr. DeFrank's arrest, how long after this arrest did it occur?

24   A.   I think it was either the same day or the day after.

25   Q.   And what did Bary Brooks tell you about DeFrank?

1          MR. RAVENELL:  Objection, Your Honor.

2          THE COURT:  I'll overrule the objection.

3   A.  He mentioned that Dr. DeFrank was I believe it's a

4   podiatrist, a foot doctor, as Barry called him, and that was

5   probably a mistake, and we should have a regular doctor.

6   Q.  So what was then the situation as far as having a doctor

7   filling prescriptions for the business at that time?

8   A.  There was no doctor at that time.

9   Q.  And was there any discussions between Barry Brooks and

10  anyone else that you're aware of about getting another doctor?

11  A.  Yes.

12  Q.  And did you talk to Barry Brooks about that?

13  A.  He talked to me about it.

14  Q.  What did he tell you?

15  A.  He said that he was going to bring Dr. Juan Ibanez on board

16  even though he had some --

17          MR. RAVENELL:  Objection, Your Honor.

18          THE COURT:  I'll overrule the objection.  You said he

19  was going to, Mr. Brooks said that he was going to bring Dr.

20  Ibanez on board?

21          THE WITNESS:  Yes.  Okay.

22  Q.  And what else did Brooks tell you, actually I will withdraw

23  that.

24          How much longer was it until Dr. Ibanez came on

25  board?

```
 1    A.   I think it was about a week to a week and a half, max, two.

 2    Q.   And where did Dr. Ibanez work from?

 3    A.   From the Haines City office and then later on at an office

 4    in Kissimmee, Florida.

 5    Q.   So, initially, he came into the business and worked where

 6    the business was located?

 7    A.   Yes.

 8    Q.   And did he bring anyone into the business with him?

 9    A.   He took the PA's that were in Florida and he had them

10    working for him then.

11    Q.   And at what point in time was this that Dr. Ibanez came to

12    the business, if you can put a date on that?

13    A.   I believe it was the third quarter, perhaps the ending of

14    the second quarter of 2004.

15    Q.   And so what does that mean?  What month is that?  What's,

16    tell us when those quarters are.

17    A.   Right around August.

18    Q.   Okay.  And at that time, was the business still operating

19    under the same three websites that you told us about earlier?

20    A.   No, it had expended.

21    Q.   It had what?

22    A.   It expended.

23    Q.   And do you know the reason for the expansion?

24    A.   There were a couple different reasons.  One of the reasons

25    to distance the existing three websites that were mentioned
```

1    before away from Dr. Dominick.  And the second was to create

2    more business.

3    Q.  And why would the business need to distance themselves from

4    what happened with Dr. Dominick?

5              MR. RAVENELL:  Objection.

6              THE COURT:  Well, if you could establish basis of

7    knowledge?

8    Q.  Are you aware of any negative publicity relating to Dr.

9    Dominick's arrest?

10             MR. RAVENELL:  Objection, leading.

11             THE COURT:  Well, was distancing your idea or

12   somebody else's idea?

13             THE WITNESS:  Somebody else's idea.

14             THE COURT:  And who was that?

15             THE WITNESS:  It was Barry Brooks.

16             THE COURT:  Then you can say what he said.

17             THE WITNESS:  Okay.

18   BY MR. BUDLOW:

19   Q.  What did Mr. Brooks tell you he wanted to distance the

20   business from?

21   A.  From Dr. Dominick and the news articles that were showing

22   up about him.

23   Q.  And did Mr. Brooks refer to any other negative information

24   that was out there besides the news articles?

25   A.  Other than related to Dr. Dominick, not at that time.

1   Q.  Now, not just related to Dr. Dominick, other than news

2   articles, was there other negative information out --

3           MR. RAVENELL:  Objection.

4   A.  Yes.

5           THE COURT:  That he told you about?

6   Q.  And what was that?

7   A.  And there is postings or messages on drug buyers in

8   particular about the event.

9   Q.  Okay.  And what were the new sites, you said there were

10  sort of an expansion of the sites, what were the new sites?

11  A.  There were two new ones.  First one Online-scripts.com, and

12  the second one was Norco-medication.com.

13  Q.  Now, by the end of 2004, how was the business running?

14  A.  Pretty good.

15  Q.  All right.  Were you having any problems with any of the

16  pharmacies?

17          MR. RAVENELL:  Objection, leading.

18          THE COURT:  I'll overrule that objection.

19  Q.  Were there any problems relating to the pharmacies?

20  A.  There were a couple problems.

21  Q.  And what were the problems?

22          MR. RAVENELL:  Objection.

23          THE COURT:  Overruled.  You may answer.

24  A.  The pharmacies that were both in PA, in Pennsylvania, and

25  in Tampa were having problems either being closed or choosing

1   not to work anymore.

2   Q.  And what do you mean by being closed?  Well, first of all,

3   where did you learn the information about the problems the

4   pharmacies were having?

5   A.  From Barry.

6   Q.  And you say from Barry, were there other people in the

7   business that talked about it as well?

8   A.  Yes.

9   Q.  And who were they?

10  A.  Strick.

11  Q.  Strick is Strickland Hollander you mentioned earlier?

12  A.  Yes.

13  Q.  Okay.  Anyone else?

14  A.  No.

15  Q.  And which doctors did you hear discussing this?

16  A.  Ibanez.

17  Q.  And based on your discussion with those people, what did

18  you learn that it meant that one of the pharmacy was closed, or

19  closed down?

20  A.  That had meant that either the pharmacy board or the DEA

21  had come in and closed down or shut down the business.

22  Q.  And did there come a time during this time, or at some

23  point during this time, was there a term used by Barry Brooks,

24  was the word visit used?

25          MR. RAVENELL:  Objection, Your Honor.

1    A.  Yes.

2            THE COURT:  I'll overrule the objection.

3    A.  Yeah, it was referred to as being visited.

4    Q.  Okay.  And was this -- did it have a special meaning, the

5    word visit?

6    A.  It basically meant that the DEA had come and done some type

7    of action.

8    Q.  And around the same point in time, I think you testified

9    that the business, the volume of the business, had been

10   growing; is that correct?

11   A.  Yes.

12   Q.  Okay.  Was the business able to keep up with the growth of

13   the business, or did you have enough pharmacies to keep up with

14   the growth of businesses?

15   A.  There were at times.  And then pharmacies would be closed

16   or stopped working.  So more pharmacies would have to be sought

17   out.

18   Q.  And how about the volume of work as it related to the

19   numbers of doctors that you had, that were you able to handle

20   all the business, or did you make any changes there?

21   A.  There's a constant expansion with the doctors and the PA's,

22   Q.  During that expansion, what employee at GDN was responsible

23   for bringing in new doctors?

24   A.  Ibanez took over all the responsibility for all the doctors

25   and PA's.

1    Q.  Prior to Ibanez, who was doing it?

2    A.  Either Barry himself or Strickland.

3    Q.  And do you know why it changed?

4    A.  I think Barry didn't have much luck with finding them

5    himself or Strick being able to find them and Ibanez offered

6    basically to take care of the entire aspects of that.

7    Q.  When you say that, when Dr. Ibanez took over the recruiting

8    of doctors, was there a structural change in the way the

9    business was run as it related to the doctors?

10   A.  Yes.

11   Q.  And can you explain to the members of the jury what that

12   was?

13   A.  Sure.  Dr. Ibanez created a company, or already had a

14   company that he would hire the doctors and the PA's and control

15   all of that himself.  And then he would be paid a flat fee for

16   that.  And he would pay the doctors depending on whatever their

17   contract with them and the PA's.

18   Q.  What was Dr. Ibanez's flat fee based on?

19   A.  A consultation.

20   Q.  A consultation?

21   A.  Yes.

22   Q.  So he got a particular fee for each consultation that any

23   of the doctors working for him did?

24   A.  Yes.

25   Q.  Prior to that change, how were the doctors paid?

1    A.   They were also -- as far as I know, they were always paid

2    by consultation.

3    Q.   And were they paid by Ibanez prior to the change or

4    directly by the company?

5    A.   Directly by the company prior to that.

6    Q.   And when Ibanez, Dr. Ibanez, over this aspect of the

7    business, you said he had his own business already, what was

8    the name of that business?

9    A.   Med Manage.

10   Q.   Now, I want to jump -- I don't know if I'm jumping ahead,

11   but another subject we talked about, which was the

12   pay-per-click advertising, as far as pay-per-click advertising

13   with the company Google, how long did that last?

14            Actually, I withdraw that question.

15            Thank you.  Okay.  Same question, how long did your

16   relationship with Google last?

17   A.   I believe just over a year and a half.

18   Q.   Why did it end?

19            MR. RAVENELL:  Objection.

20            THE COURT:  And what is your basis of knowing that

21   the relation, or why the relationship ended?

22            THE WITNESS:  With Google?

23            THE COURT:  Yes.

24            THE WITNESS:  Their policies changed regarding with

25   several keywords.

1              THE COURT:  And do you have direct knowledge of this?

2              THE WITNESS:  Yes.

3              THE COURT:  Good.  You may answer.

4    BY MR. BUDLOW:

5    Q.  Okay.  Explain what that policy change was.

6    A.  The policy change within Google was they were requiring a

7    certification from a third party company that required a

8    company with certain keywords, such as hydrocodone, or the

9    other brand names and other things similar to to be VIPPS

10   certified, which is a certification by the American Board of

11   Pharmacy, or Pharmacists.

12   Q.  So if I understand this, they weren't banning the use of

13   those terms; is that correct?

14   A.  That's correct.

15   Q.  They were only banning who could use those terms?

16   A.  Correct.

17   Q.  And were any of the pharmacies and other individuals

18   filling prescriptions for the businesses, Barry Brooks's

19   businesses, were any of them VIPPS certified?

20             MR. RAVENELL:  Objection.

21             THE COURT:  Do you know the answer to that?

22             THE WITNESS:  Yes.

23             THE COURT:  You may answer.

24             MR. RAVENELL:  Your Honor, objection, basis of

25   knowledge.  How can he know it?

1          THE COURT:  This is as to whether they enjoy this

2     certification from Google.

3          MR. BUDLOW:  No.  From the third party company that

4     contracted with Google.

5          THE COURT:  Good.  So what what's your basis for

6     knowing they were they were or were not so certified?

7          THE WITNESS:  When Google put in the new poliy, Barry

8     wanted to have a pharmacy that was VIPPS certified.  And he

9     asked all the existing pharmacies, and none of them were.

10          THE COURT:  I'll overrule the objection.

11     BY MR. BUDLOW:

12     Q.  So after the relationship with Google ended, what did the

13     business do in terms of continuing or discontinuing

14     pay-per-click advertising?

15     A.  We -- the company continued to use pay-per-click

16     advertising, but not directly through Google.  There's

17     something called third-party search engines, which they're a

18     search engine in themselves, but themselves advertized directly

19     with Google.  And they also have pages that display on Google.

20          So if you put in a search term, such as hydrocodone,

21     not in the right side, but on the left side, a page would show

22     up with their information.  And you click on that, and then it

23     would have the results for that keyword.

24     Q.  And could you give us a time frame of when this ceasing of

25     operation with Google occurred?

1    A.   I believe the fall of 2004.

2    Q.   And let's move now to the beginning of 2005, where was the

3    business located?

4    A.   In Kissimmee, Florida.

5    Q.   And was the entire business located in Kissimmee?

6    A.   No.

7    Q.   Where else was it located?

8    A.   It was also located at a particular residence where the PA

9    or the doctors worked.

10   Q.   Let's -- what was in the -- let me show you these

11   photographs first.  Mr. McCants, did you see them?

12              (Pause.)

13   Q.   Showing you first government's exhibit 2 C, do you

14   recognize that photograph?

15   A.   Yes.

16   Q.   What is that a photograph of?

17   A.   That photograph is of I believe it's 8 Broadway Street in

18   Kissimmee.

19   Q.   And what was located inside of that building?

20   A.   The customer service for Internet Health Enterprises.

21   Q.   And this is government's exhibit 2 D, do you recognize

22   that?

23              Actually, let me take it out of the -- do you

24   recognize that building?

25   A.   It --

1   Q.  Sorry.

2   A.  -- appears to be the same building.

3   Q.  Same angle or different angle?

4   A.  Different angle.

5   Q.  And 2 E, do you recognize this?

6   A.  Yes.

7   Q.  What is that a photograph of?

8   A.  The directory of that building.

9   Q.  So in this building was just customer service?

10  A.  Yes.

11  Q.  And in the beginning of 2005, about how many customer

12  service representatives were working in that building?

13  A.  I believe 11 to 12.

14  Q.  All right.  Now, if you look at the photograph, which is

15  government's 2 E, and work your way down from the top group, in

16  front of the letter G, lists the business Internet Health

17  Enterprises.

18          Do you recognize that business?

19  A.  Yes.

20  Q.  What is that business?

21  A.  That business was the company for online.scripts.com and

22  Norco-medication.com.

23  Q.  That was one of Barry's businesses?

24  A.  Yes, it was one of those.

25  Q.  And are there any other businesses directly related to

1    Barry's businesses?

2    A.   No.

3    Q.   Okay.   Where were you working out of at that time?

4    A.   Another office building in Kissimmee.

5    Q.   Was that just the IT part of the business?

6    A.   At that timeframe, yes.

7    Q.   And where was Dr. Ibanez working out of, at that time,

8    beginning 2005?

9    A.   Either remotely or at a previous location, at a complex

10   called Park Hill.

11   Q.   Park Hill, is that a doctor's office?

12   A.   No, that's a plaza with multiple different types of

13   businesses.

14   Q.   When you say he might have been working remotely, what does

15   that mean?

16   A.   At that time there was a new phone system that the doctors

17   and the PA's were utilizing that allowed them to work from

18   their homes.

19   Q.   So, other than Ibanez, do you know where the other doctors

20   and PA's were working out of?

21   A.   Exactly?

22   Q.   Generally, like offices, residences?

23   A.   Their homes.

24   Q.   Okay.   And were there in any of these locations, the

25   business locations where Barry's companies were, do you know if

1    there were any treatment beds in any of those locations?

2    A.  Dr. Dominick had a clinic that he was going to be opening,

3    but I believe had a treatment bed or two.

4    Q.  One or two?

5    A.  One or two.

6    Q.  What about the building in Kissimmee?  We just showed you

7    in government's 2 C, D, and E, were there any treatment beds in

8    that facility?

9    A.  No.

10   Q.  Okay.  So originally you worked -- actually, I can move

11   back.

12          Originally, you worked for a company called GDN,

13   could you tell us what GDN stood for?

14   A.  Global Data Network, Ink.

15   Q.  Who owned and operated that company?

16   A.  Barry Brooks and Anthony Bolt.

17   Q.  You mentioned IHE, you said it stood for Internet Health

18   Enterprises.  Explain when that business was initiated?

19   A.  That was initiated in the last quarter of 2003.  It was

20   originally for a different project, and then Barry basically

21   put his foot down, and it became a carbon copy of GDN.

22   Q.  Who started the IHE business under its original form?

23   A.  Barry Brooks and myself.

24   Q.  And did it ever operate in the way you had originally

25   intended?

1    A.   No.

2    Q.   So what did it ultimately do?  What did the business IHE

3    do?

4    A.   It did telemedicine and shipped out medications.

5    Q.   And was it involved with the Internet in any way?

6    A.   Yes.

7    Q.   How so?

8    A.   Through an online website, registration and advertising.

9    Q.   What about business by the initials PMS, what does that

10   stand for?

11   A.   President Management Systems, LLC.

12   Q.   And what did that business do?

13   A.   It was another carbon copy.

14   Q.   Did the same things as GDN and IHE?

15   A.   That's correct.

16   Q.   And then what about PDP, what is that?

17   A.   Prescription Drug Planet, and that was underneath

18   Recognized Marketing LLC, and that also became another carbon

19   copy of the other existing companies.

20   Q.   Who controlled the companies GDP, IHE, PMS, and PDP?

21   A.   Barry Brooks.

22   Q.   Who controlled the money received by these companies?

23   A.   Barry Brooks.

24   Q.   You said that all of them operated as prescription

25   telemedicine related to the Internet.  Who was in charge of the

1    design programming and maintenance of those websites?

2    A.  I was.

3    Q.  And did all of the websites operate in the same basic

4    manner?

5    A.  Yes.

6    Q.  And did they operate in the exact same way at all times, or

7    were there changes over the years or over time?

8    A.  There were changes over the years.

9    Q.  I'd like to reference early 2005, and if you could at this

10   time review the process literally if you could, of ordering

11   drugs, of a customer ordering drugs through one of these

12   websites.

13          Can you walk the jury through that process?

14   A.  The website would be found usually through an Internet

15   advertisements, such as a pay-per-click ad.  The person would

16   be brought to a page.  If they had searched, for example, by

17   hydrocodone, it would list information regarding the

18   medication.  And then there were different quantities and

19   prices.  And then right next to those quantities and prices,

20   there'd be a link that said "order now," or "order

21   consultation," or "buy now," and then clicking on to that and

22   going into our registration phase, where there's information

23   such as e-mail address, user name, first name last name,

24   birthdate, password, was first asked.  And following that there

25   would be other questions, such as a medical questionnaire,

1    which had several pieces of information.

2    Q.  Let me just cut you off there for a second.  When you first

3    started with the business, was that medical questionnaire

4    already there?

5    A.  Yes.

6    Q.  And can you explain the medical questionnaire as it existed

7    in early 2005?

8    A.  Sure.  It had general questions, such as your asking for

9    height, weight, and then what type of pain that the person was

10   experiencing, their history of that.

11        There was a pain scale orienting from 1 to 10 that

12   was a drop-down menu that could be chosen.

13        There's also questions such as what type of

14   medications are you currently using?  What are your allergies?

15   What type of medications worked best?

16        And those were text fields where they could be

17   entered.  And on one particular site, they're actually

18   suggestions, or examples, that would be entered in for

19   clarification.

20        And then further that, there were also yes or no

21   questions, do you smoke?  Yes or no.  And they were --

22   Q.  Okay.  When you say it was a drop-down menu for pain, how

23   did that work?

24   A.  It was a drop-down menu, which is where you click on.

25   Usually it's a little button with an arrow facing down on it,

1    and it had a list from 1 to 10.

2    Q.  And then there was a text box for description of condition;

3    is that right?

4    A.  Yes.

5    Q.  The text is, there's no choice, is that right, inside the

6    box?

7    A.  That's correct.

8    Q.  You have to free-type?

9    A.  Yes.

10   Q.  Okay.  Were there any suggestions next to the question

11   about the description of condition?

12   A.  On some of the sites.

13   Q.  Okay.  And do you recall what those choices or possible

14   answers were?

15   A.  A lot of the suggestions were N/A, not available.  And then

16   there were some like for example type of pain, prick, ache, et

17   cetera.  Those are the ones that I remember.

18   Q.  All right.  And you said there was also a text box to enter

19   the drug that had worked best in the past.  And you said that

20   on at least one website there were examples and suggestions.

21           Do you recall what those examples were?

22   A.  I don't.

23   Q.  And then after -- well, how long was this initial process

24   or the medical questionnaire, how long was that process?

25   A.  It probably would take about five to ten minutes to do.

1   Q.   What was the next step for the customer?

2   A.   Getting the shipping address and the billing information

3   and payment information.

4   Q.   And what was -- what were the choices, at least beginning

5   in early 2005, for payment?

6   A.   Credit card only.

7   Q.   Was insurance accepted on these websites?

8   A.   No.

9   Q.   And what happened after the customer would enter the

10  shipping and credit or payment information?

11  A.   A verification page would come up asking them to verify the

12  information they entered, and then there was terms and

13  conditions and disclaimer agreement and other affirmations that

14  were required to be checked off.   There were check boxes there.

15  Q.   And once that was done, what was the status of this

16  transaction?

17  A.   It would go into a payment processing mode for the

18  consultation.

19  Q.   So what's going on at this point is processing of credit

20  card payment for the consultation fee?

21  A.   Yes.

22  Q.   And can you describe how that occurred and what the costs

23  associated with that were?

24  A.   Sure.   After the registration was completed, the order

25  would be placed into a payment cue.   And the cost of

1    consultation ranged from about $130 to less, depending on if

2    you had to return to the site or if you're a new customer.

3             In this particular case, it's new customer.  So it

4    would probably be roughly between 120 to 130.

5             Following that, they would receive an e-mail stating

6    whether or not the transaction was approved or declined.

7             After their transaction was approved, they would

8    receive an e-mail with telephone number, days, and hours that

9    they could call in for their consultation.

10   Q.  All right.  And then when the payment was received from the

11   credit card companies, either 120 to 135, that went into whose

12   accounts?

13   A.  Into the company's account.

14   Q.  Okay.  And how much of that, if you know, typically would

15   the consulting physicians assistants or doctors received of the

16   120 or 135?  What would they get?

17   A.  Between $10 and $25.

18   Q.  And then you said an e-mail would go out to the customer

19   telling them times and a phone number to call for consultation;

20   is that right?

21   A.  Yes.

22   Q.  Are you familiar with the consultations as they were

23   occurring in 2005 and 2006?

24   A.  You mean the actual process?

25   Q.  Yes.

1   A.   No.

2   Q.   Okay.  Are you aware -- did you ever overhear the

3   consultations?

4   A.   I've walked in and out while a consultation was occurring,

5   but I didn't really pay attention to it.

6   Q.   Okay.  Who were -- who was conducting the consultations, if

7   you know?

8   A.   PA's.

9   Q.   What about doctors?

10  A.   Physicians assistants.

11  Q.   What about doctors, were they doing any of the

12  consultations?

13  A.   At this timeframe?  Dr. Ibanez would occasionally do it,

14  but it was primarily physicians assistants.

15  Q.   And so from the internal working perspective, what would

16  happen to this order at the point where the patient has to call

17  and go through the consultation?  What happens next?

18  A.   The patient would call in.  They would reach a physician

19  assistant, a PA, who would pull their information online.  They

20  would proceed with a consultation.  And then they would

21  prescribe something if something was necessary, and then

22  there's a check for like a verification of what they actually

23  selected for prescribing.

24         And then there was a finalization process.  And then

25  following that, if they had sent in their medical records --

1    actually, that's later on.

2              Initial medical records weren't required up front.

3    So that process when they finished prescribing would then go

4    into a billing mode for the medication.

5    Q.   The change of medical records was prior to January of '05,

6    right?

7    A.   Yes.

8    Q.   So as of January '05, what was the requirement about

9    medical records?

10   A.   The medical records were required up front.

11   Q.   So before the first prescription went out, the patient had

12   to provide something, some kind of medical records?

13   A.   That's correct.

14   Q.   Okay.  And so after the period where it's finalized, it

15   hasn't been to a doctor yet, does it go to a doctor?

16   A.   It goes to a doctor and if their medical records were not

17   approved, had to be reviewed, and then the doctor would either

18   approve or decline those particular medical records.

19   Q.   Did prescriptions go all the way through without ever being

20   affected in any way by a doctor?  Or did a doctor have to sign

21   off on all of the prescriptions?

22   A.   No.  There was a way that they could go out without a

23   doctor's seeing them if there was a reconsultation or a

24   reorder.

25   Q.   How about as to new consultations?

1    A.  No, a doctor had to review medical records.

2    Q.  So as to all initial consultations, a doctor's involved in

3    the process?

4    A.  Yes.

5    Q.  And the doctor can either approve or not approval, is that

6    right?

7    A.  That's correct.

8    Q.  And do you have any sense, or do you have any knowledge of

9    whether or not what percentage were approved or disapproved?

10         MR. RAVENELL:  Objection, Your Honor.

11         THE COURT:  Well, did you have a basis for knowing?

12   I'll overrule that question.  Do you have a basis for knowing

13   what percentage were approved?

14         THE WITNESS:  I don't know the percentages offhand.

15   Q.  Do you have a general sense of if most or not most were

16   approved?  Do you know?

17         MR. RAVENELL:  Objection.

18   Q.  Do you know, yes or no, not whether or not --

19   A.  Yes.

20         MR. MCCANTS:  Objection calls for speculation.

21   Q.  How do you know that?

22         THE COURT: Wait one second.  You don't know the

23   percentage that was approved, but you do know the percentage

24   was over 50 percent?

25         THE WITNESS:  Yes.

1          THE COURT:  Good.  Then I'll permit that.

2    BY MR. BUDLOW:

3    Q.  And how do you know that?

4    A.  Recent reports that I've seen.

5    Q.  Recent reports that you've even?

6    A.  Yes.

7          MR. RAVENELL:  Objection.

8    Q.  And so can you -- where did these reports come from?

9    A.  I made them.

10   Q.  And from what source?

11   A.  The databases that the sites have.

12   Q.  You were recently given access to the websites databases?

13   A.  Yes.

14   Q.  Based on those reports, that's your basis of knowledge?

15   A.  Yes.

16          MR. RAVENELL:  Objection.

17          THE COURT:  The review that you made was of the

18   company's datebase?

19          THE WITNESS:  Yes.

20          THE COURT:  So I'll overrule the objection.

21   BY MR. BUDLOW:

22   Q.  Can you, based on looking at those reports, in any way

23   quantify how many of the prescriptions were approved versus not

24   approved?

25   A.  Yes.

1   Q.   And can you do so?

2   A.   The majority of them were approved.

3   Q.   After the -- if a customer's request for prescription was

4   approved, what would happen next from a billing perspective?

5   A.   Their order would be put into a payment cue again to

6   process the medication payment.  And then following an approval

7   on that, their order would be routed to a pharmacy depending on

8   the shipping state, or the state of the shipping address.

9          And then from there it would be moved over to a cue

10  for that particular pharmacy.

11  Q.   How was the billing calculated?

12  A.   The billing was calculated with a fixed medication price,

13  plus shipping.

14  Q.   Okay.  What was the typical shipping cost?

15  A.   Ranging from $22 to $28.

16  Q.   So that's using an example of generic hydrocodone and a 90

17  pill count, what would the cost of that prescription be

18  including shipping?  What would be the total credit card

19  charge?

20  A.   About $115.

21  Q.   115?

22  A.   Yes.

23  Q.   And what about for name brand?

24  A.   Probably 230 or 250.

25  Q.   Okay.  After the credit card is approved, what's the next

1    step in the process?

2    A.  The order would be moved over to a routing system for the

3    pharmacy based on the state or the shipping address, and then

4    it would be moved over to a cue for that particular pharmacy.

5    Q.  Why did it matter which state the pharmacy was located in?

6             MR. RAVENELL:  Objection.

7             THE COURT:  Well, the question would be did it

8    matter?  Did it matter?

9             THE WITNESS:  Yes.

10            THE COURT:  And how do you know whether it mattered?

11            THE WITNESS:  The existing system for when I began

12   employment, there are specific states a third-party pharmacy --

13            MR. RAVENELL:  Objection, Your Honor.  May counsel

14   approach?

15            THE COURT:  You may.

16            (At the bench)

17            MR. RAVENELL:  Your Honor, the mere fact that a

18   witness may have read something doesn't make this witness

19   qualified to give such an answer.  We are now talking about

20   whether particular states have certain requirements about

21   certain doctors and certain pharmacies prescribing certain

22   drugs in certain areas.

23            This witness is far from qualified knowing what the

24   law is in particular states.  This guy is being, you know, set

25   forth as a person who may have had some conversations with some

1    individuals and a person who is a computer guy.  Now he's going

2    to tell the jury what states requires.

3              THE COURT:  Good.  Thank you.

4              Mr. Budlow?

5              MR. BUDLOW:  Your Honor, the witness is going to

6    testify as to how the operation was set up both from a computer

7    and other internal process, and why.  And, obviously, he's the

8    person that's creating the program that will determine which

9    pharmacies are the -- which -- where the particular

10   prescription is routed to, which pharmacies.  And he's going to

11   testify that it was sent to a particular pharmacy based on the

12   shipping address of the customer.

13             And that, typically, all of the pharmacies that they

14   dealt with told them that they could only ship to a particular

15   state and that they will ask the pharmacies ahead of time which

16   states they were allowed to ship to.

17             He will also testify that other pharmacies, such as

18   New Care, had given the information to the business that they

19   were allowed to ship to any state.  And so as a result of that,

20   New Care was routed orders for shipment addresses of all over

21   the country.

22             MR. RAVENELL:  Your Honor, the mere fact that this

23   witness may have set up a system that allowed drugs to be

24   shipped and where the drugs could be shipped doesn't mean he's

25   qualified.  He can certainly say what he set up, and that

1    certain things were routed to certain pharmacies.  That's one

2    thing, because he actually put that into place, but the why?

3         This man, we've been told that he's had -- you know,

4    this keeps happening.  It's very hard to try to speak to the

5    Court when I constantly hear one of the prosecutors talking,

6    you know, on the side, it's very loud.  And we have not done

7    that on this side of the table so far today.  It's been

8    happening continuously.  It's pretty hard to try to concentrate

9    when someone's talking.

10        What we have, Your Honor, we've been told that this

11   man has had no contact with New Care, has had no conversation

12   with members, with the defendants at New Care.  So the

13   suggestion that he is now willing to testify about what each

14   pharmacy could or could not receive pursuant to the State laws

15   of those, where those pharmacies were located, you know, I

16   think it's absolutely objectionable.

17        This witness is not someone that has the legal

18   understanding of what a pharmacy or pharmacy can or cannot do,

19   and unless he had a conversation with New Care when New Care

20   told him these things, New Care, which was represented to us

21   they never had such conversations, you know, then it's

22   improper.

23        THE COURT:  Well, here's what we can do.  He can

24   testify as to the system that he set up.  He can testify as to

25   the assumptions under which he set up the system.  But you need

1    to establish with him that he did not independently verify

2    those assumptions.

3         Though if the operating assumption was that a

4    pharmacy can only fill prescriptions in one state, he can say

5    that that's the way the system is set up.  If there was a

6    different operating assumption for New Care, he can say what

7    that was, and how the system worked with respect to New Care.

8         But you need to establish with him that he did not

9    check out himself the requirements of state law so that he was

10   in no position to say what those requirements are.  That way,

11   he's simply testifying about how this pharmacy operated or how

12   the business operated without claiming to have any expertise in

13   state law.

14        MR. RAVENELL:  The point is, Your Honor, the first

15   part of it I certainly understand what the witness says, I set

16   about to work this, and but an assumption, how does this

17   witness's assumption, why should that be before a jury that the

18   witness had an assumption of what the law was, for a particular

19   state?

20        I'm baffled by a witness that will tell the jury that

21   I assumed something.  I just don't understand how that could

22   ever be relevant.

23        Under what rule of law a witness is allowed to say

24   that this is my assumption?  Because how do we get -- how does

25   that where the jury can rely on this as some kind of probable

 1    inference of what the truth is, when this witness saying this

 2    is my assumption of what the law is?  I'm baffled.

 3            MR. BUDLOW:  Your Honor, just --

 4            THE COURT:  Only he's going to disclaim any knowledge

 5    of what the law is, and I'm going to tell, I can tell the jury,

 6    give them an instruction that he's not pretending to give a a

 7    statement as to what the law is, but he can certainly testify

 8    as to how this business model of his operations were set up and

 9    what the assumptions were, and as long as it's clear to the

10    jury that these assumptions are not to be taken as an accurate

11    statement of what the law is.  So I'll make sure that that

12    happens, so that he's not explaining the law.

13            MR. RAVENELL:  Your Honor, again I yield to the court

14    under the ruling, but my point was there has to be a rule of

15    law that allows the evidence in.  Just because the Court can

16    give a curative instruction doesn't mean that the first part of

17    the test has been met that there is a basis under the rules

18    that allow a witness just to say here's my assumption.

19            That's my part, how do we even get it in before we

20    get to the curative instruction?

21            THE COURT:  Because it's relevant as to why the

22    business model was set up the way it was.  So, in my view, it's

23    relevant.

24            (Open court)

25    BY MR. BUDLOW:

 1   Q.  Court's indulgence.

 2          (Pause.)

 3   Q.  Mr. Kaps, in terms of which deliveries were routed to which

 4   pharmacies, how was the system set up?

 5   A.  It was set up so that a pharmacy would provide a list of

 6   states that they were able to ship to, and then that would be

 7   put into the system as they were able to ship to, and then they

 8   were assigned that.

 9   Q.  And the system was -- was designed to send them only

10   shipments that were in their list of allowed states; is that

11   right?

12   A.  Yes.

13   Q.  And did you have an understanding as to which states New

14   Care Pharmacy in Baltimore was allowed to ship to?

15          MR. RAVENELL:  Objection.

16          THE COURT:  Well, before, just to make a preliminary

17   point, I take it that you did not independently verify the

18   accuracy of any of these lists, correct?

19          THE WITNESS:  Correct.

20          THE COURT: So that you did not verify or take an

21   independent step to determine what states any particular

22   pharmacy was permitted to ship to, correct?

23          THE WITNESS:  Correct.

24          THE COURT:  And you also did not make any independent

25   investigation as to the legal standards around the country?

1                    THE WITNESS:  What do you mean by that?

2                    THE COURT:  Well, you didn't go out and research the

3      law or hire a lawyer to look, to tell you what the law was,

4      correct?

5                    THE WITNESS:  To some degree.

6                    THE COURT:  Okay.  Well, then let's say away from

7      that.

8                    But you're not in a position to give an opinion as to

9      what the law is with respect to what pharmacies can ship to

10     which states, correct?

11                   THE WITNESS:  Correct.

12                   THE COURT:  Good.  So that, ladies and gentlemen, Mr.

13     Kaps is simply testifying as to his company's business model,

14     why certain business decisions were made, and he is not giving

15     a legal explanation or an explanation as to the pharmacy law.

16                   So we're talking about business model here, and he's

17     not in a position to testify as to what the law is in this

18     area.

19     BY MR. BUDLOW:

20     Q.  Thank you, Your Honor.

21                   Mr. Kaps based on the way the system operated and was

22     set up, which states could New Care Pharmacy in Baltimore ship

23     to?

24     A.  I believe all of the shippable states

25     Q.  You say all of the shippable states?

1    A.   Yes.

2    Q.   And how many of them are there, if you know?

3    A.   I believe it was 43.

4    Q.   Once the prescription is routed to a pharmacy, can you

5    describe for the jury what goes on then from the pharmacy's

6    perspective?

7    A.   Yes.  The pharmacy had an interface on like a website that

8    they had access to, that they would log into, and then there's

9    an option for them to print out the prescriptions, and they

10   would either be printed on the local printer, or they would be

11   Faxed over.

12        And then once with the prescription was actually

13   printed out on the top of the prescriptions, there was a bar

14   code, which was used to keep track of that particular order.

15        Also, when the shipment -- or when the medications

16   were ready to be shipped, the bar code was able to scanned into

17   the interface, which will produce a shipping label.  And that

18   also reported back to the service, which updated the tracking

19   number for that particular order and would later send out

20   e-mails.

21   Q.   Where did the bar codes scanner and related equipment come

22   from?

23   A.   From a third-party company.

24   Q.   That was hired by who, from the business's perspective?

25   A.   He was hired by Barry Brooks, and they were in existence in

1    that company after an initial company that they were called.

2    Q.   What was the name of that third-party company?

3    A.   TCG Worldwide.

4    Q.   And can you describe what they provided for the pharmacies,

5    what kind of service they provided, and also what services they

6    provided for Barry's companies?

7    A.   For the pharmacy, they would send supplies.  They would

8    also send a thermal printer for the shipping labels and a bar

9    code scanner for the bar codes.

10            And if they -- any miscellaneous help in the setup of

11   that, they would also offer.

12            For Barry's companies, they managed the relationship

13   with the actual carriers, such as Fed Ex and DHL negotiated

14   rates, and they were paid a flat rate for the shipments and

15   then they make their money with the margin.

16   Q.   So TCG provided to the pharmacy the bar code scanner?

17   A.   Yes.

18   Q.   What about the shipping materials, that, too?

19   A.   Yes.

20   Q.   What about a printer?

21   A.   Yes.

22   Q.   And what was the printer used for?

23   A.   To print out shipping labels.

24   Q.   So once, if the pharmacy filled the prescription, packaged

25   the prescription into the shipping label, they would scan in a

DIRECT EXAMINATION

1    bar code; is that correct?

2    A.   That's correct.

3    Q.   And then what did that cause to happen in terms of

4    communication within the system?

5    A.   That would record that action and also the tracking number

6    that was associated with that shipping label.

7    Q.   And what would happen, from the customer's perspective, at

8    that point?

9    A.   Later in the evening, there would be a process, and the

10   customer would be e-mailed a tracking number and the status of

11   that.

12   Q.   And what would the status of their order be at that time?

13   A.   It would be classified as "in shipping."

14   Q.   And then what's the pending order completion step?

15   A.   That step would be after all the refills for a prescription

16   were processed and the order was waiting to be closed.   And

17   when that order would close, they'd be sent -- a customer would

18   be sent an e-mail that would say you're ready to have another

19   consultation, and invite them back.

20   Q.   All right.   I'm sorry, I jumped you up a little bit.

21            Let's go back the first prescription, did they always

22   come with refills?

23   A.   Yes.

24   Q.   And how many refills were included with an initial

25   prescription?

1    A.   During this time period, two.

2    Q.   Now, I said what always come with, the customer didn't get

3    two packages or three packages of drugs, did they?  They were

4    just authorized to get a second prescription?

5    A.   That's correct.

6    Q.   And after the first order is shipped out and the customer

7    receives it, what's the next contact they would receive from

8    the website?

9    A.   They would receive an e-mail reminder stating in ten or

10   seven days that they have a refill coming, and they needed to

11   authorize it by logging into their account manager, and

12   clicking a button that says "I authorize the refill."

13   Q.   What would happen once they clicked the button that says "I

14   authorize the refill"?

15   A.   A setting to be stored inside the datebase for that order

16   and when that refill date, the order would be processed for the

17   medication payment, and proceed like it just did.

18   Q.   When you say "processed for payment," how much would that

19   prescription cost the customer?

20   A.   The same amount as the previous medication payment.

21   Q.   Okay.  And then after the refills were all used and

22   ordered, you were talking about the pending order completion,

23   would there then be another e-mail that was sent to the

24   customers?

25   A.   Yes.

1    Q.   And what did that e-mail state?

2    A.   It would state that they're ready for a reconsultation or

3    another order.

4    Q.   And were there any discounts associated with those e-mails?

5    A.   On some of the sites, the second or third or even the fifth

6    order was discounted in progression, or all at once.

7    Q.   Was it -- what would you mean by in order?

8    A.   Meaning the second order would be 10 percent off, the third

9    order would be 30 percent off, or something similar to that.

10   Q.   Is an order a prescription with free refills, or is an

11   order a single prescription?

12   A.   An order is a prescription with refills.

13   Q.   And the consultation as well?

14   A.   Yes.

15   Q.   Earlier you mentioned medical records being required to be

16   provided by the customers before they would get their first

17   prescription.

18            Do you know in what form they were able to send in

19   their medical records?

20   A.   By Fax.

21   Q.   And strictly prior to October the 10th, 2006, did the

22   pharmacies have access to these medical records?

23   A.   They did not.

24   Q.   To your knowledge, did the pharmacies ever request to see

25   the medical records?

1              MR. RAVENELL:  Objection.

2              THE COURT:  Do you have a basis for knowing that?

3              THE WITNESS:  Yes.

4              THE COURT:  And what's the basis?

5              MR. RAVENELL:  Objection.  May counsel -- may we

6       approach, Your Honor?

7              THE COURT:  Did you look at database?

8              THE WITNESS:  The staff that were -- the general

9       contact, the day-to-day operations for contact people for the

10      pharmacies made a comment to me.

11             THE COURT:  Why don't I see counsel at the bench,

12      please.

13             (At the bench)

14             THE COURT:  So the issue is whether the pharmacies

15      ever routinely regulated, seldom to what degree pharmacies

16      would request what medical records?

17             MR. BUDLOW:  That's correct, Your Honor.  And one of

18      the basis for this evidence is that the defendants in this case

19      had represented, the government's going to put this in evidence

20      in our case-in-chief, they've made statements that they

21      routinely requested the medical records.  And this witness,

22      I'll proffer, is going to testify that, to his knowledge, from

23      being in the business day-to-day, he's not going to say that he

24      heard every phone call that came in, but he would say when

25      pharmacies did make requests like this, he heard about it

1    typically.  And that it was extremely rare, he would say.

2              THE COURT:  No comment, please.

3              MR. RAVENELL:  I have not made a comment, Your Honor.

4              THE COURT:  No, but you're laughing.

5              MR. RAVENELL:  I do not laugh.

6              MR. MCCANTS:  That was me, I apologize.

7              MR. RAVENELL:  I did not do anything.

8              MR. BUDLOW:  I promise to finish while I'm up here at

9    some point.  He'll the testify that it was once every three to

10   four months and it was a specific pharmacy that was not New

11   Care.  That's his basis of knowledge.

12             THE COURT:  So the question is, did pharmacies ever

13   request medical records?  And how would he know whether they

14   requested them or not?

15             MR. BUDLOW:  He would have conversations with

16   pharmacy contacts, which is I think a term of art.  That's name

17   of the position that the individuals had to deal with

18   day-to-day, that dealt with the pharmacy, the pharmacy needed

19   something, they would call their pharmacy contact.

20             This pharmacy contact sometimes was the person that

21   recruited them, but that's who they were contact.  And he had,

22   as evidenced by the government's wiretap calls, he had

23   conversations with these individuals, and he would hear about

24   these requests for medical records.

25             THE COURT:  Just one second, please.  Request for

1    medical records.

2           MR. BUDLOW:  The contacts that he'll mention, not

3    necessarily in this specific context, will be Nick Cammarata,

4    Rick Shipp, and Jason Green.  There were others.

5           THE COURT:  This evidence is being elicited to show

6    that the pharmacies in those companies that were affiliated

7    with the website did not request medical records except in

8    exceptional circumstances, correct?

9           MR. BUDLOW:  Correct.

10          THE COURT:  So he would have to have the basis for

11   being able to testify then.  He would have to say that somehow

12   business model, that if a request was made, that it was brought

13   to his attention?

14          MR. BUDLOW:  He'll testify -- I'm sorry.

15          THE COURT:  That it could have been brought to

16   somebody else's attention like Mr. Brooks?

17          MR. BUDLOW:  He'll testify it's the type of thing, if

18   it were made, he would have heard about it.

19          THE COURT:  But how?

20          MR. BUDLOW:  Through conversations with the pharmacy,

21   whatever that title is, contact.

22          In other words, the request would be made to the

23   pharmacy contact, and that that person would mention it to him

24   in the normal course of his activity, not necessarily because

25   they need to tell him, but these were conversations that were

1    had around the business regularly.  And in fact when they did

2    happen, these individuals did mention it to him, and then he

3    knew about it.

4            THE COURT:  What we'll do is, let's do this, it's

5    almost 5:00.  Let's let the jury go.

6            MR. RAVENELL:  I was just saying.

7            THE COURT:  Let's let the jury go, because I'd like

8    to ask, or deal with it things.  I'd like to ask him some

9    preliminary questions.  Good.

10           (Open court)

11           THE COURT:  Ladies and gentlemen, we're going to end

12   the Court day, at least as far as you're concerned, about now.

13   It is just about 5:00, so it's time for you to go anyway.  And

14   I look forward to seeing you tomorrow at 9.  And we have a

15   slight change in schedule.  We're going to start at the normal

16   time on Friday instead of later in the day.  So Mr. Thompson is

17   going to pass out the new schedules once you're back in the

18   jury deliberation room.

19           I look forward to seeing you tomorrow morning at

20   9:00, and remember not to discuss the case with anyone at home

21   or among yourselves.

22           If somebody asks what kind of case it is, you can

23   just say it's an interesting case, and that you'll be happy to

24   discuss it with them when the case is over.

25           If you happen to hear or see anything about the case

1    in the media, stop looking, stop listening, report the fact to

2    Mr. Thompson tomorrow.

3           And remember not to conduct any independent research

4    on any issues connected with the case.

5           Good.  Thank you.  I look forward to seeing you

6    tomorrow at 9:00.  I'm going to stay here with counsel.

7           (Jury recessed)

8           THE COURT:  Good.  Please be seated.  The record will

9    reflect the jury has now retired to the jury deliberation room.

10          Sir, let me just ask you a couple of questions.  The

11   issue is whether or not pharmacies would ask your organization

12   for medical records before filling prescriptions, and do you

13   know whether they would, would not, how frequently if they did,

14   and what's the source of your information?

15          THE WITNESS:  They would normally not ask, ask for

16   the medical records.

17          Occasionally, the question would come up, and the

18   pharmacy contact would bring it to my attention, and then it

19   would be asked to Dr. Ibanez whether or not he would release

20   that information.

21          And during this time period up until, well, 2007, the

22   answer was always no.

23          THE COURT:  Then he would not release the medical

24   records?

25          THE WITNESS:  Correct.  He said it was a violation of

1    HIPAA.

2             THE COURT:  Now, why were you involved in this issue?

3             THE WITNESS:  The staff that worked for me, for my

4    company, were outsourced to Barry's companies.  And so they

5    would report to me, and then I would either have them report to

6    Dr. Ibanez, or I would contact Dr. Ibanez.

7             THE COURT:  So that would it be fair to say that it

8    was the business model was set up so that, if a pharmacy did

9    request medical records, that that request would come to you?

10            THE WITNESS:  Either to me or to Dr. Ibanez,

11   eventually ending up with Dr. Ibanez.

12            THE COURT:  And what I am looking for is if the

13   inquiry could go either to you or to Dr. Ibanez, how could you

14   know how frequently or infrequently your request was made?

15            THE WITNESS:  I have the staff do -- I call them

16   daily reports, and so there were reports generated every day of

17   activities.

18            THE COURT:  So that if a request for medical records

19   was made and that request went directly to Dr. Ibanez, that

20   request would show up in the daily report?

21            THE WITNESS:  If the employee put it in their report,

22   which most of the time, they did.

23            THE COURT:  And were they supposed to?

24            THE WITNESS:  They're supposed to put in anything

25   that was out of the ordinary.

1              THE COURT:  Good.  Thank you.

2              Mr. Budlow, anything else, sir?

3              MR. BUDLOW:  No, Your Honor.

4              THE COURT:  Mr. Ravenell?

5              MR. RAVENELL:  No, Your Honor.

6              THE COURT:  Mr. McCants?

7              MR. MCCANTS:  No.

8              THE COURT:  Good.  Thank you.  Good.  Then I look

9    forward to seeing you tomorrow at 9:00.

10             Counsel is there anything more that we need to

11   discuss this afternoon?

12             MR. RAVENELL:  Yes, Your Honor, looked for the court

13   to give us a ruling on this issue.

14             THE COURT:  Oh.  This issue is, if he testifies the

15   way he testified just now, that that is admissible because it

16   was part of their regular business practice to have this kind

17   of information report to him from the pharmacy contacts.

18             MR. RAVENELL:  Your Honor, I'd like to be heard

19   outside the presence of the witness.

20             THE COURT:  Certainly.  You may be excused.  And I

21   look forward to seeing you tomorrow.

22             MR. BUDLOW:  Your Honor, may I have a moment to

23   consult with the witness about scheduling --

24             THE COURT:  Yes.

25             MR. BUDLOW:  -- before he leaves?  Thank you.

1          MR. RAVENELL:  Actually, Your Honor, is this yours?

2          MS. SMITH:  It's Mr. Budlow's.

3          MR. RAVENELL:  Actually, I may have a couple

4    questions for the witness, Your Honor, if I may bring him back.

5                    (Witness resumed the stand)

6    BY MR. RAVENELL:

7    Q.  Sir, the time period that you referred to when you said

8    that the Court was asking you a question about as to medical

9    record, what time period are you referring to when you give

10   your answer regarding medical records being requested or not

11   being requested by pharmacies?

12   A.  January first, 2005 to October, 2006.

13   Q.  Okay.  Now, how did you determine that date, that time

14   period, January '05 to October '06?

15   A.  That was a time period I was given for reports regarding

16   New Care.

17   Q.  I'm sorry, say that again?

18   A.  That was a time period I was given for reports for New

19   Care.

20   Q.  When you say you were given reports --

21   A.  I was given -- requested to produce reports for, or based

22   off of New Care for the databases that I was given access to.

23   Q.  And who asked you to make that -- who made that request of

24   you?

25   A.  The state attorney.

 1   Q.  Okay.  So did Mr. Budlow ask you to and go back and check

 2   for inquiries by pharmacists regarding medical records?

 3   A.  No.

 4   Q.  So did you look at any documents, for example, you

 5   indicated that they were daily reports, did you review any

 6   daily reports since you were given this access to the computers

 7   from the companies to review whether there were any requests

 8   for medical records and how many of them were made?

 9   A.  I was given access to the database.  And no, I did not look

10   up for that information.

11   Q.  Would that information be on the database?

12   A.  It would not be on the database.

13   Q.  Okay.  Now, the reports that you made reference to, you

14   said they were daily reports, were those hard copy reports that

15   were someone wrote a report and printed out?

16   A.  They were e-mails or they were through a web application.

17   Q.  So if they were e-mails, they would be stored in some

18   computer somewhere?

19   A.  Yes.

20   Q.  Okay.  Where would that be stored?

21   A.  That data the DEA has.

22   Q.  I'm sorry?

23   A.  The DEA has that information.

24   Q.  When you say the DEA, what DEA?

25   A.  DEA.

1   Q.   DEA?

2   A.   Sorry.

3   Q.   So the DEA seized that information when they searched your

4   place of business?

5   A.   They have copies of my e-mail server, which would contain

6   the e-mails, and they also have a copy of the database that the

7   web application would have that information on.

8   Q.   Okay.  And have you been asked to go back and review those,

9   those actually through electronic e-mails that you indicated

10   would be stored and the material that the DEA actually has in

11   his possession?

12   A.   No.

13   Q.   Now, so what you're telling us is that, from your

14   recollection that you would ask -- well, strike that.

15          You would have -- you would ask individuals that

16   worked for you to create a daily report; is that correct?

17   A.   Yes.

18   Q.   And I think you said, in response to one of the Court's

19   questions, the information would be there if the person chose

20   to write it in?

21   A.   Yes.

22   Q.   For example, that a doctor or a pharmacy asks for certain

23   medical records?

24   A.   Not specifically that information, but anything other,

25   other than day-to-day operations.

1    Q.   So you never asked the people who worked for you to note in

2    any of those daily reports whether a pharmacy asked for medical

3    records, would that be correct?

4    A.   Not specifically like that.

5    Q.   When you say specifically, did you ever ask anyone who

6    worked for you, or did you instruct them, if you in fact

7    received a request for medical records, you should note that in

8    a daily record?

9    A.   No.

10   Q.   Or daily report?

11   A.   I did not.

12   Q.   So it was discretionary, then, for those individuals to

13   decide what to put in the daily report, particularly something

14   such as whether a pharmacy made a request for medical records.

15                 MR. BUDLOW:   Objection.

16                 THE COURT:   Overruled.   You may answer.

17   A.   Can you restate it?

18   Q.   Yes.   You never gave anyone any of those individuals who

19   worked for you direction that they should include in a daily

20   report whether a pharmacy asked for medical records, correct?

21   A.   Correct.

22   Q.   So you left it to the individuals who worked for you to

23   decide whether they would put such a request in a daily report,

24   correct?

25   A.   Yes.

1    Q.  All right.  And on occasions when you in fact did learn

2    from individuals who worked for you that they had received

3    requests for medical records, you didn't then, you didn't say

4    from now on, whenever there is such a request, I want you to

5    note it in a daily report, did you?

6    A.  No.

7    Q.  Okay.  You also indicated that there were times that the

8    person, if there was a request for medical records, it could

9    come to you, or it could go to Dr. Ibanez; is that correct?

10   A.  That's correct.

11   Q.  And really, the person that it should end up with would be

12   Dr. Ibanez because he's the one who would make the

13   determination whether or not the medical records would be

14   released or not?

15   A.  That's correct.

16   Q.  The only way you would know about it is if someone who

17   worked for you either told you verbally, or you happened to see

18   it on a daily report; is that correct?

19   A.  That's correct.

20           MR. RAVENELL:  All right.  Nothing further, Your

21   Honor.

22           THE COURT:  Good.  Thank you.

23   BY MR. BUDLOW:

24   Q.  Just one question, maybe, I shouldn't say that.  Couple

25   questions.

1            Mr. Kaps was a request for medical records by a

2    pharmacy considered out of the ordinary?

3    A.  Yes.

4            MR. RAVENELL:  Objection.

5    Q.  Did you --

6            THE COURT:  Overruled.  But if you would stand up to

7    make life easier for our court reporter, please?

8    Q.  And what did, did you ever any discussions with Dr. Ibanez

9    prior to the change in policy relating to giving medical

10   records to pharmacies prior to that change, did you have any

11   discussions with Dr. Ibanez about the disclosing of medical

12   records to pharmacies?

13   A.  Yes.

14   Q.  And what did Dr. Ibanez tell you?

15   A.  He said it was a violation of HIPAA.

16   Q.  And did he tell you whether or not he was giving -- was

17   agreeing to give medical records to pharmacies?

18   A.  Yes.

19   Q.  And what did he say, yes or no, he wasn't?

20   A.  He said no.

21           MR. BUDLOW:  Nothing further, thank you.

22           THE COURT:  Good.  Thank you.  You may now step down,

23   thank you.

24           MR. BUDLOW:  Now, prior to any argument may I just

25   deal with logistics?

```
 1                    THE COURT:  Certainly.

 2                    (Pause.)

 3                    MR. BUDLOW:  Thank you, Your Honor.

 4                    THE COURT:  You're very welcome.

 5                    Mr. Ravenell, whenever you're ready, sir.

 6                    MR. RAVENELL:  Thank you, Your Honor.

 7                    Your Honor, obviously, you've heard the testimony.

 8     I'm not going to belabor it, but you have a witness that says

 9     to him it was unusual for the request to be made.  Now, whether

10     a Dr. Ibanez in fact told this witness -- and again we get into

11     this whole issue of whether that comes in, because he says

12     Ibanez told him that, and we'll certainly continue with the

13     801(d)(2)(E) concerning issue we were having so far, but before

14     we can get to that, you have a witness that says there is no

15     policy requirement by him that these people who work for him,

16     these pharmacy contacts, give him any such information about

17     whether a doctor asks for -- a pharmacy asks for medical

18     records or not.

19                    Even when there were such requests, he did not,

20     require him to make any notation.  He doesn't have those

21     records before him.

22                    But what we know is he can say on the occasions that

23     I have heard it, it seemed to be unusual to me.  Well, that

24     certainly doesn't make this witness able to testify whether

25     there was a policy in place that no record should be turned
```

1    over other than this reliance again on Dr. Ibanez.  And

2    certainly the 801(d)(2)(E) question, that continues to be a

3    problem in this case, Judge.

4         THE COURT:  Good.  Thank you.  Mr. Budlow?

5         MR. BUDLOW:  For the record, Your Honor, I don't

6    believe there's a problem with the 801(d)(2) B, whatever it is,

7    Mr. Ravenell seems to have a problem with it, but we seem to be

8    having the same conversation over and over at the bench.

9         I think there's two parts of evidence here that Mr.

10   Kaps's testimony is being objected to.  I don't know that it's

11   been sort of framed that way.

12        One is that the witnesses testified that it was

13   unusual, or the infrequency, if you will, of the number of

14   requests, and the second is the statement of Dr. Ibanez that,

15   regardless of the number, type, or source of the request, he

16   wasn't giving up those medical records.  I think they're two

17   different things.  The second, Dr. Ibanez is a statement of a

18   co-conspirator in furtherance of the conspiracy.

19        The first is is clearly, Mr. Ravenell says there was

20   no policy.  There was a policy.  The witness testified that his

21   the people that worked under him were to write a report and

22   they were supposed to mention anything that was out of the

23   ordinary, and that they did just that.  And that when this

24   occurred, when it did occur, when a pharmacist did make a

25   request, he got the report, because it was out of the ordinary.

1        Mr. Ravenell wants to attack sort of the weight of

2   the matter in front of the jury that not every single person

3   that worked for him followed the procedures of the business on

4   every single occasion, cakes he can certainly do that.

5        But the witness is clear, these gentlemen worked for

6   him.  They were required to report things that were out of the

7   ordinary.  It was his understanding it was out of the ordinary.

8   It was reported to him when it happened, and so it's therefore

9   admissible.  Thank you.

10        THE COURT:  Thank you.

11        Mr. Ravenell, in rebuttal?

12        MR. RAVENELL:  Nothing further, Your Honor.

13        THE COURT:  Good.  Thank you.

14        With respect to the second issue involving Dr.

15   Ibanez, I refer again to the Fourth Circuit Criminal Handbook

16   2007 Edition, District Court may conditionally admit purported

17   statements of co-conspirators before the evidentiary foundation

18   is laid so long as the evidence finally admitted supports the

19   required showing.  See Blevins 960 Fed. 2nd at 12 56.

20        And here based upon my familiarity with the evidence

21   in the case through the pretrial rulings, Dr. Ibanez clearly

22   falls within the ambit of purported co-conspirators, and I will

23   permit the testimony concerning his views on whether he would

24   or would not release authorize or release of the medical

25   records.

1          With respect to the testimony concerning the
2   pharmacists, the general inquiry is in your business, did
3   pharmacies request medical records?  Was this a usual or
4   unusual occurrence?
5          The witness is prepared to testify that it was an
6   unusual occurrence.  Well, how would he know it was usual or
7   unusual?  He said that in his business there were individuals
8   who worked as pharmacy contacts, that point of interaction
9   between the website and the pharmacies, that if a request for
10  medical records came in, that it was an unusual occurrence for
11  him for that request to go to him directly or to go to Dr.
12  Ibanez.
13         He said that if the request were to go to Dr. Ibanez,
14  that he would usually know about it, because it would end up in
15  a report, "incident report" or unusual transaction report.
16         Mr. Ravenell made the point through the witness that
17  there were no formal explicit instructions that such a request
18  would have to be in the report, and the witness can't testify
19  that every such request ended up in a report.
20         These are matters that can be taken up in
21  cross-examination with the witness, but in my view there's
22  enough of a business practice here so that can he testify what
23  customarily happened in the business.
24         Good.  I look forward to seeing you all tomorrow then
25  at 9:00.  Thank you.

1                    (Proceedings adjourned)

2

3            I, Jacqueline Sovich, RPR, CM, do hereby certify
that the foregoing is a correct transcript from the
4   stenographic record of proceedings in the above-entitled
matter.

5

6      _____

7      Jacqueline Sovich                          DATE
       Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1

2                     I N D E X

3    WITNESS            DIRECT    CROSS    REDIRECT    RECROSS

4    Linda Tur-Rojas        84       98         104

5    Adam Kaps             105

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25