1              IN THE UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF MARYLAND/NORTHERN DIVISION

3    UNITED STATES OF AMERICA

4                                        CRIMINAL NO.

5     v.                                 L 06-0444

6    STEVEN SODIPO, ET AL                June 20, 2008

7                    Defendants

8    _____/

9                    TRANSCRIPT OF PROCEEDINGS

10         BEFORE THE HONORABLE BENSON E. LEGG,

11           UNITED STATES DISTRICT CHIEF JUDGE

12   APPEARANCES:

13   On behalf of the United States:

14   Andrea Smith, AUSA

15   Paul Budlow, AUSA

16

17

18   On behalf of the Defendants:

19   Kenneth W. Ravenell, Esquire

20   Kevin Jesse McCants, Esquire

21

22

23   Reported By:

24   Jacqueline Sovich, RPR, CMR, FOCRR

25   Official Court Reporter

1          (PROCEEDINGS)

2          THE COURT:  Are we ready to bring the jury in?

3          MR. BUDLOW:  We are.

4          THE COURT:  Good.  Thank you.

5          (Jury present)

6          THE CLERK:  Jurors all present.

7          THE COURT:  Thank you, Mr. Thompson.

8          Good morning, ladies and gentlemen.  Hope you had a

9    great week.  Apologize for the delay in getting started this

10   morning.

11          We're ready for our next witness.  Mr. Budlow?

12          MR. BUDLOW:  Your Honor, government calls Eric

13   Brantley.

14          THE COURT:  Good morning.

15          THE WITNESS:  Good morning.

16          THE CLERK:  If you'll raise your right hand.

17          (The Witness is sworn.)

18          THE CLERK:  Please be seated.  And if you would, sir,

19   first thing I need you to do is adjust the microphone to

20   yourself.

21          And then if you would state your name and then spell

22   your name for the record.

23          THE WITNESS:  My name is Eric, E R I C, Brantley, B R

24   A N T L E Y.

25          THE CLERK:  Thank you.

DIRECT EXAMINATION

1                    DIRECT EXAMINATION

2    BY MR. BUDLOW:

3    Q.  Good morning, Mr. Brantley.

4    A.  Good morning.

5    Q.  How old are you?

6    A.  I'm 40 years old.

7    Q.  Where do you reside?

8    A.  In Dublin, Ohio.

9    Q.  How are you employed?

10   A.  I'm employed with Cardinal Health.

11   Q.  And where is Cardinal Health located?

12   A.  In Dublin, Ohio.

13   Q.  And what is Cardinal Health?

14   A.  Cardinal Health is a supplier to the healthcare community.

15   We supply everything from the bedpans at the hospital to drugs

16   in a pharmacy.  I believe the core of our business would be

17   pharmaceutical distribution.  We sell prescription drugs as

18   well as over-the-counter drug to pharmacies and hospitals and

19   doctors.

20   Q.  Is Cardinal Health a drug manufacturer or just a

21   distributor?

22   A.  Just a distributor.

23   Q.  So you purchase them from the manufacturer and distribute

24   them to pharmacies and hospitals and such?

25   A.  Yes.

DIRECT EXAMINATION

1    Q.   How long have you been employed by Cardinal Health?

2    A.   Eight years.

3    Q.   And your current position is you're a director of

4    compliance, right?

5    A.   Yes.

6    Q.   Could you tell us what other positions you've had starting

7    from when you first started at Cardinal Health through

8    currently?

9    A.   Okay.  I started January of 2000.  I started in the

10   warehouse.  I was picking, packing, receiving, stocking.

11        In 2001, I was moved to inventory manager.  I started

12   working in the controlled substance cage.  The controlled

13   substance cage is where the controlled substances are stored in

14   our warehouse.

15        In 2002, I was promoted to compliance manager.  I was

16   responsible for our distribution center that we were in

17   compliance with all of the government bodies; FDA, DEA, OLSA,

18   DLT.

19        In 2005, I moved to Ohio, and I became quality and

20   control manager.  My responsibilities were in our anti

21   diversion efforts, reviewing spike reports, looking for

22   potential signs of diversion.  I was compliance manager.  My

23   job duties were to review spike reports, looking for potential

24   signs of diversion from customers.

25   Q.   And what was -- was that your position in 2005 through

1   2006?

2   A.   Yes.

3   Q.   Can you explain what diversion means?

4   A.   Diversion would be where a pharmaceutical, prescriptions

5   drugs would be acquired for purposes other than fulfilling a

6   legal prescription.

7   Q.   Okay.  And in that role, in 2005 through 2006, what were

8   your responsibilities?

9   A.   My responsibilities were reviewing again the spike reports

10   from our customers, purchasing, looking for suspicious activity

11   and actually conducting investigations of our customers.

12   Q.   And when did you begin that role, do you remember what

13   month you first reviewed these reports and started

14   investigations?

15   A.   Yes.  I started -- I started in November, 2005.  I reviewed

16   the first report mid, mid December, 2005.

17   Q.   Okay.  Can you explain for the jury what an Ingredient

18   Limit Report is?

19   A.   Yes.  An Ingredient Limit Report is a report that we

20   generate.  It shows all of our customers.  It's a report for

21   excessive purchases of any controlled substance.  It shows the

22   item.  It shows the number of pills in a bottle and the number

23   of bottles purchased as well as number of grams of ingredient.

24   And it lists all of our customers from hospitals to pharmacies

25   to doctors.

1   Q.  You said the number of grams, did you also say the number
2   of pills and tablets?
3   A.  Yes, the number of tablets.
4   Q.  For what period of time is the record, weekly, daily,
5   monthly?
6   A.  It is a monthly report that is generated by each of our
7   distribution centers.  We have about 22 distribution centers
8   across the country, and each distribution center generates a
9   report for each customer for that distribution center.
10  Q.  And so in Dublin, Ohio, you're essentially Cardinal
11  Health's main office?
12  A.  Yes.
13  Q.  And you're reviewing reports that review the data of all of
14  Cardinal Health's customers nationwide?
15  A.  Yes.
16  Q.  Prior to your reviewing this report in December of '05, was
17  -- were these reports being run at headquarters prior to that
18  time?
19  A.  The reports were generated by each distribution center and
20  distributed to a local branch of the DEA for each of our
21  distribution centers, yes.
22  Q.  Was there a review at headquarters prior to December '05?
23  A.  I was not reviewing them.
24  Q.  You started reviewing them in December '05?
25  A.  Yes.

DIRECT EXAMINATION

1    Q.  And was it part of a new program, or was it an existing

2    process?

3    A.  It was part of a new process for us.

4    Q.  I'd like to draw your attention to mid to late December,

5    2005, when you first reviewed an Ingredient Limit Report.  What

6    timeframe was that Ingredient Limit Report for?

7    A.  It was for the month of November, 2005.

8    Q.  And you stated earlier that was the first such report that

9    you had reviewed?

10   A.  Yes.

11   Q.  Can you explain, if you know, how large a company Cardinal

12   Health is?

13   A.  Cardinal Health is at the top 21 of the Fortune 500.  I

14   believe over 35,000 employees, roughly $80 billion revenues

15   international.  We have sites all over the world.

16   Q.  And do you know how many distribution or pharmaceutical

17   distribution centers Cardinal Health has in the United States?

18   A.  Yes.  In the United States, we have, I believe, 22 regional

19   centers across the country.

20   Q.  Tell the ladies and gentlemen of the jury what you learned

21   when you reviewed the Ingredient Limit Report for the November,

22   2005.

23          MR. RAVENELL:  Objection, Your Honor.  May counsel

24   approach?

25          THE COURT:  You may.

1          (At the bench)

2          MR. RAVENELL:  Your Honor, we object to the

3    government wants to introduce certain charts, and we have

4    stipulated to certain charts about, you know, the amount of

5    hydrocodone purchased by New Care from Cardinal Health, et

6    cetera.

7          The problem with having this witness testify about

8    something called an excessive ingredient report and suspicious

9    activities and linking those things to New Care is that the

10   jury now has before them this person from Cardinal Health

11   suggesting that the activities by our clients were suspicious,

12   you know, which is pretty -- you know, that's not the standard

13   of proof here.

14         The standard of proof is, did they commit a crime

15   beyond a reasonable doubt, as the Court will instruct the jury.

16   But to have this information about suspicious activity, or this

17   person deeming it such, is highly prejudicial, and is

18   irrelevant to what the jury would be required to find under the

19   law.

20         So we object to any such testimony being introduced

21   in this case.

22         THE COURT:  Mr. Budlow?

23         MR. BUDLOW:  Well, initially, my response is that my

24   most recent question was tell the ladies and gentlemen of the

25   jury what you learned after reviewing the report, and I suspect

1    an answer is going to be he learned the number of units that
2    New Care purchased for the month of November.  And then he's
3    going to explain after that, as a result of that, he looked
4    backward through June of '05 and learned similar numbers, and
5    opened an investigation.
6         My first response is Mr. Ravenell's objection doesn't
7    seem to be based on those responses.  It seems to be based on
8    the earlier and maybe some things down the line, which I'll
9    address.
10        THE COURT:  What's the name of the report that he
11   reviewed?
12        MR. BUDLOW:  It's called an Ingredient Limit Report,
13   also known as a Spike Report.  There's other types of Spike
14   Reports.  That's one type of Spike Report.
15        THE COURT:  My understanding is what Mr. Ravenell's
16   objecting to is the name of the report called Suspicious
17   Activity Report.
18        MR. RAVENELL:  Your Honor, there's something made
19   reference to what's called an Excessive Ingredient Report, as
20   well, that is in some of his, this witness's documents that
21   we've seen.  And they used the term "suspicious" as well in
22   some of communications, suspicious.
23        So I don't know when those questions are coming, so
24   it's pretty hard.  I don't want to wait until we get into that
25   before I'm raising the issue, because I see it coming.

1    MR. BUDLOW:  My expectation was not to ask the why,

2    which would naturally lead to those answers.  However, having

3    met with this witness and not been focused on that issue, I

4    can't say for sure that he -- I'm not representing to the Court

5    that he absolutely won't say that, unless we have a discussion,

6    but I wasn't planning on asking for him reasons.

7    THE COURT:  Why don't you tell him on the way back

8    that he should avoid the names of the reports of suspicious,

9    excessive ingredient or suspicious activity, but he certainly

10   can explain that the company keeps track of who's using what

11   hydrocodone and why.

12   But tell him to avoid the name of the report.  It's a

13   little bit like, you know, the name of some of the drug task

14   forces, in a trial, I'll have the police officers not mention

15   the name of the high crime arrested bad guys unit.  So if you

16   could just avoid the names of the reports.

17   MR. BUDLOW:  On a related topic, since we're here at

18   some point, I know I was planning on asking him, he's going say

19   again what the numbers were for November, they looked back, and

20   I want to ask him why he looked back for New Care and only New

21   Care.

22   And the proffer of his testimony would be because the

23   numbers were so large, not a name of a report, not going, and

24   I'll instruct him not to use the term suspicious or excessive

25   just sort of volume, but that's included in this discussion.

1      THE COURT:  You can do that.

2      MR. RAVENELL:  We object to that, but I understand

3  the Court's ruling.

4      THE COURT:  The objection is overruled.

5      MR. BUDLOW:  I need a moment to speak with Mr.

6  Brantley.

7      THE COURT:  Go right ahead.

8      (Pause.)

9      (Open court)

10  BY MR. BUDLOW:

11  Q.  When you ran the report for June, 2005, I'm sorry, jumped

12  ahead.

13      When you ran the report for November of 2005, what

14  did you learn?

15  A.  I learned that New Care purchased over 300,000 tablets of

16  hydrocodone during the month of November, 2005.

17  Q.  When you say New Care, you're referring to New Care Home

18  Health Services in Baltimore, Maryland?

19  A.  Yes.

20  Q.  And they were a client or purchaser of pharmaceuticals from

21  Cardinal Health; is that correct?

22  A.  Yes.

23  Q.  What did you do after running those numbers and learning

24  that the 304,000 units had been purchased in November '05?

25  A.  I ran a purchase history, a six-month purchase history.  I

1    also did license verification, and I contacted the sales force

2    to get additional information on the customer.

3    Q.  Did you do that for a number of customers at that time?

4    A.  What I'd done for all of the customers that would have a

5    prepared on the report that had purchased large quantities of

6    hydrocodone, yes.

7    Q.  But at that time, how many customers did you run the last

8    six months for?

9    A.  Just New Care.

10   Q.  And why is that?

11   A.  The numbers were pretty substantial.  That was a large

12   quantity of tablets.  So I want the purchase history to see if

13   that was pretty consistent with what they'd purchased

14   previously.

15   Q.  So when you ran the history from June '05, including

16   November '05, what did you learn?

17   A.  I learned that they had -- New Care had purchased large

18   quantities of hydrocodone for the previous six months as well.

19   Q.  So what did you do upon learning that information?

20   A.  Contacted the sales force, and we -- I questioned them

21   about additional information, and we set up a site visit to

22   visit the customer.

23   Q.  And did any of this go through any level of supervisors, or

24   did you make this decision on your own?

25   A.  I made this decision on my own.

1    Q.  And what did your initial investigation entitle?  You

2    already explained that.

3    A.  It entailed reviewing the purchase history, interviewing

4    our sales team, conducting an Internet search, doing a license

5    verification.  And I also did a D&B report on the company and

6    its principals

7    Q.  A D&B?

8    A.  Dun & Bradstreet report.

9    Q.  Thank you.

10            And when was the site visit?

11   A.  It was February 9, 2006.

12   Q.  Was it scheduled in advance?

13   A.  Yes.

14   Q.  And who attended from Cardinal Health?

15   A.  Myself, as well as the sales manager responsible for the

16   account, Patrick Barstow.

17   Q.  Where was he?

18   A.  Out of our Swedesboro Distribution Center.

19   Q.  And where's Swedesboro.

20   A.  Swedesboro, New Jersey.

21   Q.  Could you spell Swedesboro?

22   A.  Yes.

23   Q.  Okay.  Go ahead.

24   A.  S W E D E S B O R O.

25   Q.  Very good.  Do all of your investigations result in site

1    visits?

2    A.   No.

3    Q.   How many site visits do you think you have done?

4         MR. RAVENELL:   Objection, Your Honor, relevance.

5         THE COURT:   I missed the question.

6    Q.   How many site visits that has this witness done?

7         MR. RAVENELL:   Objection, relevance.

8         THE COURT:   I'll overrule the objection.

9    A.   12 to 15 site visits.

10   Q.   And do you have specific recollection of the site visit

11   that you conducted at New Care Home Health Services in

12   Baltimore?

13   A.   Yes.

14   Q.   And why is it that you have that recollection?

15   A.   It was one of the first site visits that I had conducted,

16   and I do recall the visit, because it was one of my first, and

17   the numbers of pills were so high.

18   Q.   So you said the site visit was on February 9, 2006; is that

19   right?

20   A.   Yes.

21   Q.   Can you explain to the ladies and gentlemen of the jury

22   what happened as you first arrived to -- even the parking lot

23   and moving from there?

24   A.   Okay.   I met Mr. Barstow, the sales manager, in the parking

25   lot of the facility.   We talked briefly in his vehicle.

1          Then we entered the facility, and we met with Mr.

2    Nwaehiri and Mr. Sodipo.  I hope I'm not mispronouncing that.

3          We then went to a conference table.  We exchanged

4    business cards, and I asked that I wanted to see the area where

5    the prescription drugs were stored.

6    Q.  Mr. Brantley, let me just cut you off there for a second.

7    A.  Yes.

8    Q.  You said you exchanged business cards.  I've put up on the

9    monitor government's exhibit 29 B.  Are those the business

10   cards that you received from the two owners of the business on

11   February 9, 2006?

12   A.  Yes.

13   Q.  Can you describe the two men that you met?

14   A.  Yes.  At the time I remember them both gentleman were

15   black, and they had accent.  And I do remember that Mr.

16   Nwaehiri was a tad bit slimmer than Mr. Sodipo.

17   Q.  And you mentioned, before I cut you off, that you asked --

18   before you really got going in the meeting, you asked to see

19   part of the pharmacy.

20          Can you tell the ladies and gentlemen of the jury

21   about that?

22   A.  Yes.  I asked to see the storage area where the

23   prescription drugs were stored.  When we went to the room, I

24   noticed numerous bottles of hydrocodone present.

25          After that, we went back to the conference table and

1   we started our discussions.  I had a few questions.

2   Q.  Okay.  And who from Cardinal Health led the meeting?

3   A.  I did.

4   Q.  And who from New Care was answering your questions?

5   A.  Both gentlemen answered the questions.  Mr. Sodipo, Sodipo,

6   I'm sorry, answered the majority of the questions.

7   Q.  And other than Mr. Barstow, other than Mr. Barstow and

8   yourself, and Mr. Nwaehiri and Mr. Sodipo, was -- was anybody

9   else present in the meeting?

10  A.  No.

11  Q.  And did any of the four of you leave the room at any time

12  during the meeting?

13  A.  I do not believe so.  I believe all four of us were present

14  the entire time.

15  Q.  And did the meeting proceed with you asking questions and

16  them giving you answers?

17  A.  Yes.

18  Q.  And did they tell you what type of customers they serve?

19  A.  Yes.  They stated they served as nursing homes and assisted

20  living facilities.

21  Q.  And did they tell you how many beds were being serviced by

22  those nursing home and assisted living facilities?

23  A.  Yes.  I asked the number of beds, and they replied 18,000

24  beds.

25  Q.  Did you ask them about their sales of hydrocodone?

1    A.  Yes.

2    Q.  What did they tell you?

3    A.  They told me that they serviced nursing homes and assisted

4    living facilities.  They also stated that they had in the past

5    serviced pain management clinics.  They said 40 percent of

6    their business was due to Internet activity.

7    Q.  And did they tell you how many prescriptions as a whole

8    they filled per week?

9    A.  Yes.  They said they filled roughly 4,000 prescriptions,

10   and that 40 percent of those were through Internet activity.

11   Q.  When they told you they were filling prescriptions through

12   an Internet business, did you ask them additional questions

13   about the Internet business?

14   A.  Yes.

15   Q.  What did you ask them?

16   A.  I asked the basis of the doctor/patient relationship.  I

17   specifically asked did the prescribing doctor examine the

18   patient.  The answer was they were not sure.

19          I then mentioned the guidance we received that the

20   prescribing doctor must physically examine the patient in order

21   for there to be a valid prescription.  It was then explained

22   that they --

23   Q.  When you say it was then explained, who was doing the

24   talking?

25   A.  Mr. Sodipo.

1   Q.   Okay.   So what were you told in response to your comment

2   about the DEA guidelines?

3   A.   I was told that they did a license verification on the

4   doctors to make sure that they were licensed in the state they

5   were prescribing.   And there --

6   Q.   Let me back you up.   You said you told them about the DEA

7   guidelines about an in-person visit, in-person consultation,

8   right?

9   A.   Yes.

10  Q.   And what was the first thing Mr. Sodipo said to you in

11  response to that he said?

12  A.   They did a verification of the doctors.

13  Q.   And did he explain what that meant, what he was verifying?

14  A.   Verifying that they were licensed in their state, that they

15  practiced.

16  Q.   Okay.   What else did they tell you about the Internet

17  business?

18  A.   They said that all of the medical records were sent in

19  along with a copy of identification, and that a phone

20  consultation was conducted, and then the drugs were shipped if

21  the script was written.

22  Q.   Okay.   Did they tell you anything about the number of

23  doctors they were dealing with?

24  A.   Yes.   They said they dealt with nine doctors in three

25  states; Ohio, Georgia, and Florida.

1   Q.   And did they tell you how many were in Florida?

2   A.   Yes.  I believe they said six was in Florida, but they said

3   80 percent of the business was conducted in Florida.   80

4   percent of the Internet business was in Florida.

5   Q.   Did they tell you, or actually did you ask them about where

6   they shipped their prescriptions to?

7   A.   Yes.

8   Q.   What were you told?

9   A.   I asked if they ship drugs out of state, and their response

10  was they shipped four or five states.

11          I then asked were they licensed in the states they

12  ship into, and they said no, they were not.  They were only

13  licensed in the State of Maryland.

14  Q.   Were you -- did you ask anything about the business at the

15  Internet sites?  In other words, who the companies were, who

16  the websites were owned by, anything like that?

17  A.   I did.  I did.  I had done research prior to the visit to

18  see some of the entities, and we did go over those entities.  I

19  believe IHE, they were in Florida, was I believe the parent

20  company, and it was --

21  Q.   Okay.  I just want to make sure we're clear.  I'm asking

22  only what you were told either by Mr. Sodipo or Mr. Nwaehiri at

23  the meeting relating to the business entities.

24  A.   Yes.

25  Q.   Okay.  Can you tell us about just that?

DIRECT EXAMINATION

1  A.  Yes.

2  Q.  What they told you?

3  A.  They gave the names of the entities and the fact that they

4  were in -- they were in Florida.

5  Q.  Do you recall if they gave you the name of any of the

6  entities?

7  A.  Yes.

8  Q.  Do you recall the name?

9  A.  I believe IHE was the parent company.

10  Q.  The parent company?

11  A.  Yes.

12  Q.  Did they explain to you who they had a contract with, if at

13  all?

14  A.  I do not recall that.

15  Q.  And did you discuss with them how many -- if it was only

16  one web site they were working with or only one web site?

17  A.  Yes.  There were multiple websites.

18  Q.  And did they explain what -- I think you sort of laid out

19  what they told you a little bit about the Internet protocol.

20  Did they explain to you at all how they get the prescriptions

21  and fill the prescriptions?

22  A.  The prescriptions were from the Internet.

23  Q.  At New Care?

24  A.  And they were then shipped to the customers.

25  Q.  And how were they shipped to the customers, were you told

1   how they were shipped to the customers?

2   A.  If I was told, I do not recall.

3   Q.  Did you discuss whether or not the pharmacy was filling

4   refills for any of the customers?

5   A.  Yes.

6   Q.  What --

7   A.  I did ask did they fill refills, and the answer was no,

8   they do not.

9   Q.  And what were they filling?  What did they say they were

10  filling if it wasn't refills?

11  A.  They were filling first time scripts, or the patient had to

12  have a new script with each order.  But they do not fill

13  refills.

14  Q.  Did you ask him whether or not they had been visited, or

15  inspected, or contacted by any DEA or administrative agencies?

16  A.  Yes.

17  Q.  What were you told?

18  A.  I asked were they visited by the DEA.  They replied, no,

19  they were not visited by DEA.

20          I then asked were you visited by any state agency?

21  They said, yes, they were visited by the state in December

22  2005.

23  Q.  Did you ask any follow-up based on that visit?

24  A.  I asked were there any observations, were there any

25  findings, and the response was no.

1    Q.  And how did the meeting end?

2    A.  The meeting ended with a brief recap.

3    Q.  You don't need to tell us what you said unless they

4    responded.

5            Other than recapping it, then, was there any

6    indication what kind of follow-up there would be on your

7    behalf?

8    A.  I stated again the doctor/patient relationship, that a

9    prescribing doctor needed to physically examine the patient,

10   and that was pretty much it.

11   Q.  After the meeting, did you write a report?

12   A.  Yes.

13   Q.  And did you write that report based on notes taken during

14   the meeting?

15   A.  Yes.

16   Q.  And your memory as well?

17   A.  Yes.

18   Q.  And did you submit that report to your supervisors?

19   A.  Yes, I did.

20   Q.  As a result of that report and its contents, in your

21   investigation, what, if any, action did Cardinal Health take?

22           MR. RAVENELL:  Your Honor, may counsel approach

23   briefly?

24           THE COURT:  You may.

25           (At the bench)

DIRECT EXAMINATION

1          MR. RAVENELL:  Good morning, Your Honor.

2          Your Honor, we object to any -- what happened, as

3     we've done with several other witnesses what they did, what

4     action Cardinal took, we object to that.

5          THE COURT:  And, Mr. Budlow, the answer will be?

6          MR. BUDLOW:  The answer will be that his -- that

7     Cardinal Health essentially ceased their business relationship

8     with New Care by refusing to sell them any more that he was

9     made aware of this, and that New Care was made aware of it.

10         THE COURT:  I will -- are you objecting to that?

11         MR. RAVENELL:  Yes, Your Honor.  We're objecting to

12    that the relevance of these people, Cardinal, particularly,

13    making a decision to just cease business.  Then we get into the

14    --

15         THE COURT:  He's not explaining the thought process.

16    He's simply explaining that they made a certain decision to

17    terminate selling to New Care and that he learned of that

18    decision, so I will overrule the objection.

19         MR. RAVENELL:  All right.  Thank you.

20         (Open court)

21    BY MR. BUDLOW:

22    Q.  After you submitted your report and your findings what, if

23    any, action did Cardinal take?

24    A.  Cardinal Health discontinued business with New Care in late

25    March of 2006.

DIRECT EXAMINATION

1   Q.   And you know if New Care was advised of that fact?

2   A.   Yes.

3   Q.   Before coming in to testify today, have you reviewed the

4   sales numbers for New Care's purchases of hydrocodone from June

5   2005 through the end of their relationship with Cardinal Health

6   in March 2006?

7   A.   Yes.

8   Q.   And from which site did New Care purchase their

9   hydrocodone?

10  A.   From our Swedesboro, New Jersey, distribution center.

11  Q.   Mr. Brantley, I'm showing you what's marked as government's

12  exhibit 29 E.  Do you recognize this chart?

13  A.   Yes.

14  Q.   Is this chart an accurate summary of the sales numbers or

15  the purchase numbers by New Care of hydrocodone from the

16  Swedesboro facility during that timeframe?

17  A.   Yes.

18  Q.   Could you just explain the chart to the ladies and

19  gentlemen of the jury, and just go through each section and let

20  us know what it says?

21  A.   Okay.  This chart represents the monthly purchases of

22  hydrocodone tablets by New Care.  It's broken down by the month

23  on the left column, and the right column would be the number of

24  pills purchased.

25           So in June of 2005, 108,400 pills were purchased of

1    hydrocodone.

2              In July, 2005, 304,900 pills were purchased of

3    hydrocodone.

4              August, 2005, 250,500 pills were purchased of

5    hydrocodone.

6              September, 2005, 454,400 pills were purchased of

7    hydrocodone.

8              October, 2005, 753,200 pills were purchased of

9    hydrocodone.

10             November, 2005, 303,000 pills were purchased of

11   hydrocodone.

12             December, 2005, 21,300 pills of hydrocodone, excuse

13   me, were purchased.

14             In January, 2006, 99,800 pills of hydrocodone were

15   purchased.

16             February, 2006, 281,800 pills of hydrocodone were

17   purchased.

18             And in March 2006, 714,400 pills of hydrocodone were

19   purchased.

20   Q.  And after March of 2006?

21   A.  Zero.

22   Q.  Court's indulgence.

23             (Pause.)

24             MR. BUDLOW:  May we approach, Your Honor?

25             THE COURT:  You may.

1          (At the bench)

2          MR. BUDLOW:  Your Honor, this is the next exhibit the

3     government was planning on introducing.  Do you want to hold

4     that?  And I knew that Mr. Ravenell might have an objection.

5     Before putting it on the screen, I thought we'd approach and

6     deal with it now.

7          MR. RAVENELL:  Your Honor, Mr. Budlow did provide

8     this to us a couple days ago.  We got the final draft

9     yesterday, the final version of this, and we do object to this

10    pie chart.

11          The government does have the numbers that have been

12    produced.  The indication -- and let me make sure I'm clear,

13    did you give us the backup on all of these?

14          MR. BUDLOW:  No.

15          MR. RAVENELL:  See, my recollection, Judge, is that

16    the information that the government has here we don't have the

17    backup information to check this.  This is all from the witness

18    testifying that these are the percentages.

19          It's one thing to put in the numbers that were sold

20    to New Care, which the government gave us the backup for.  But

21    I have no way of checking this information.

22          MR. BUDLOW:  Your Honor, this chart has been an

23    evolving chart based on the timeframes changed over time just

24    to verify the numbers.

25          The percentages actually improved in New Care's favor

1    as we've expanded it, so it doesn't misrepresent the

2    percentage.  They've had the chart for a long time.  It was

3    also subject of a motion in limine that the Court ruled in the

4    government's favor that the Court could use this chart as a

5    comparison.

6         The defense has never once until now stated as a

7    basis for the objection they didn't receive the backup for

8    this, nor have they ever requested the backup for the chart.

9         It's -- they've actually, in other contexts, been

10   given the position that the witnesses from Cardinal Health

11   could testify to the raw numbers.  And the example is 29 B,

12   which is I think is the chart I just went over the numbers.  We

13   never provided any backup or been requested to provide any

14   backup for the numbers on that chart.

15   I         have the backup.  I would have provided it to them

16   had I been asked, but it wasn't requested.  And, frankly, it

17   wasn't because my understanding was the issue here was a

18   relevance issue and not a foundational issue, and that's -- and

19   I don't believe the rules require that this be disclosed

20   without request.

21        MR. RAVENELL:  Actually, Your Honor, I think just the

22   opposite.  The rules allow for charts to be used and summary

23   evidence to be used particularly when the backup information is

24   in the record.  This is just opposite.  There's no backup

25   information.  And the fact that we agreed with and not object

1    to one document doesn't mean that there's somehow -- and we did

2    object to it, but the Court overruled us on certain points.

3    But the fact we did not object on a particular basis to one

4    document doesn't mean we're somehow limited to object on

5    different document, which the government seeks to introduce, or

6    they have not provided any of the backup information for the

7    Court or the defense, to determine that it's accurate.

8            We shouldn't have to request it.  The government is

9    the one seeking to introduce the document.

10           THE COURT:  Let me ask this, if I can see the

11   document?  This document is entitled Pharmacy Purchases

12   Hydrocodone from Cardinal Health from June 1, 2005 to March 31,

13   2006.

14           And the witness apparently is prepared to testify

15   that New Care, during that long period, purchased 3,363,700

16   dosage units, and that the other 1753 pharmacies that Cardinal

17   Health sold hydrocodone to purchased 14,985,290 doses; is that

18   correct?

19           MR. BUDLOW:  That is correct, Your Honor.

20           THE COURT:  And I assume that the witness pulled

21   together these figures by looking at his by Cardinal's business

22   records, or is this something that he knew?

23           MR. BUDLOW:  The witness reviewed records of Cardinal

24   Health, records that were pulled together specifically for this

25   purpose similar to what he reviewed in doing his initial

1    ingredient report and what he reviewed in preparing the exhibit

2    that just went in previously.

3         MR. RAVENELL:  And one of the things, Your Honor, I

4    think the Court will find, and we can look at the rules, when

5    it talks about using summary evidence, that the government has

6    to have available for the jury to consider as well the backup

7    information.

8         The jury should not be required to simply rely on a

9    chart without being able to actually review the evidence

10   themselves to determine what was there.

11        And the defense certainly should be able to have had

12   seen the backup information to determine, to be able to

13   cross-examine the witness about the accuracy of the

14   information.

15        You know, the suggestion that we have to come out and

16   ask the government for the evidence that they seek to introduce

17   I think is just wrong.  They have an obligation to provide it

18   to us.

19        MR. BUDLOW:  Your Honor, may I respond briefly?

20        THE COURT:  Well, the rule says, Rule 0006, the

21   contents of voluminous writings, recordings, or photographs

22   which cannot conveniently be examined in court may be presented

23   in the form of chart, summary, or calculation.  The originals

24   or duplicates shall be made available for examination and

25   copying or both by other parties at reasonable time and place.

1           So that's what the rule is, Mr. Budlow.

2           MR. BUDLOW:   Your Honor, two, two points on that.

3    One is I think the rule is clear that the backup documentation

4    does not have to go into evidence.  And, in fact, we offered to

5    put them -- it does not need to go -- it does not need to be a

6    disclosure.  They have to be available for inspection.

7           Maybe the government didn't send a letter in this

8    case to the defense saying this information is available.

9    However, they've had this chart, and it's very clearly a

10   summary or a chart of voluminous information.  They've had it

11   for a long time.

12          We did lengthy in limine motions dealing with every

13   conceivable basis of objection for known exhibits at that time,

14   and it wasn't raised.

15          And as the history in this case, the amount of

16   information and compliance that the government has given the

17   defense in every spread sheet, every server, all the data they

18   could have asked for, they got.  That's the first point.

19          The second point, this is covered in the stipulations

20   that we have signed by both defendants prior to trial.

21   Specifically, the stipulation 14.  And I will read that.  It's

22   fairly brief.  There's no objection to the testimony of Eric

23   Brantley of Cardinal Health Pharmaceuticals, who will present

24   data maintained to Cardinal Health.

25          There's also no objection to the business cards of

1    the defendants Sodipo and Nwaehiri in possession of Brantley

2    that he obtained from them.

3            The defendants do object to data and charts comparing

4    purchases by New Care purchases by other pharmacy supplied by

5    Cardinal Health.  This objection is on the basis of relevance.

6            THE COURT:  Now --

7            MR. BUDLOW:  So there's no indication of foundation.

8    There's --

9            THE COURT:  The rule is --

10           MR. BUDLOW:  They knew what was happening.

11           THE COURT:  The rule is clear that the contents may

12   be presented in the form of a chart.  This is a chart.  The

13   originals or duplicates shall be made available for examination

14   or copying both by parties at a reasonable time and place.

15           I will admit the document subject to -- with the

16   exception noticed subject to a motion to strike, and you're

17   required to provide the backup information to Mr. Ravenell.

18           If it turns out that the backup information does not

19   support the chart, then I'll strike the chart.  So I will admit

20   it in evidence with the requirement that you provide the backup

21   information subject to a motion to strike the document if

22   there's a serious dispute over the backup issue.

23           MR. BUDLOW:  Your Honor, I'd ask that if that occurs,

24   I don't expect there to be, once I disclose the information, I

25   don't expect there to be any form of objection at that point

1    based on the backup not supporting, but if there is an issue, I

2    would ask if Mr. Ravenell and Mr. McCants could notify the

3    government as soon as possible because this witness, after he

4    testifies today, is going back to Ohio, and if the government

5    believes they can respond to this challenge, we would want to

6    contact Mr. Brantley and possibly bring him back.  So that's my

7    only request.

8         THE COURT:  What we'll do is take it up at a break

9    but I have to have a time when you're going to provide the

10   information.

11        MR. BUDLOW:  Today.

12        THE COURT:  And then they need to have a specified

13   period of time to review it.

14        MR. RAVENELL:  Your Honor, just one last point, as

15   the Court's reading of the rule, I don't think it fairly means

16   that in the middle of trial you give the defendants the backup

17   information, so I would object to receiving the information in

18   the middle of trial after the document has been introduced.

19        THE COURT:  Good.  And that objection is noted.

20        MR. RAVENELL:  Thank you.

21        MR. BUDLOW:  Your Honor, may I?

22        THE COURT:  Yes.  Yes.  Go right ahead.

23        (Open court)

24   BY MR. BUDLOW:

25   Q.  Mr. Brantley, you stated that New Care purchased all their

1    hydrocodone from the Swedesboro facility; is that correct?

2    A.  Yes.

3    Q.  And have you reviewed a pie chart that reflects the total

4    sales of hydrocodone from that facility from June first, 2005

5    through March 31, 2006?

6    A.  Yes.

7    Q.  And are you aware of where the data comes from?

8    A.  Yes.  It comes from our system.

9    Q.  Okay.  Cardinal Health's business records?

10   A.  Yes.

11   Q.  Showing you government's exhibit 29 F, have you seen this

12   exhibit before today?

13   A.  Yes.

14   Q.  And is this exhibit a fair representation of the relative

15   purchases of hydrocodone between New Care at Swedesboro and all

16   of the other customers of Swedesboro?

17   A.  Yes.

18   Q.  Could you, starting with the header, review this pie chart

19   for the ladies and gentlemen of the jury?

20   A.  Yes.  This pie chart represents the purchases of pills of

21   hydrocodone from the Cardinal Health, Swedesboro, New Jersey,

22   facility from June 1, 2005 to March 31, 2006.

23          82 percent of the sales of hydrocodone pills went to

24   over 1,753 pharmacies.

25          New Care alone purchased 18 percent of all of the

DIRECT EXAMINATION

1   hydrocodone pills from our Swedesboro facility.  They purchased

2   over 3 million pills, as opposed to close to 15 million pills

3   from all of the other Swedesboro customers, which were again

4   1,753.

5   Q.  And so just to make sure that everybody understands, this

6   pie is 100 percent?

7   A.  Yes.

8   Q.  And the total number of dosage units from the Swedesboro

9   plant is somewhere around 18 and a half million?

10  A.  Yes.

11  Q.  And there are 1,754 pharmacies that purchased hydrocodone

12  from that plant during this time period?

13  A.  Yes.

14  Q.  And of all of those pharmacies, 18 percent of the total

15  purchases of hydrocodone were done by New Care Home Health

16  services in Baltimore?

17  A.  Yes.

18  Q.  Thank you, Mr. Brantley.

19          Your Honor, I have no further questions.

20          THE COURT:  Thank you, Mr. Budlow.

21          Mr. Ravenell, your witness, sir.

22          MR. RAVENELL:  Thank you, Your Honor.

23                  CROSS-EXAMINATION

24  BY MR. RAVENELL:

25  Q.  Good morning, Mr. Brantley.

1    A.   Good morning.

2    Q.   Good morning, ladies and gentlemen of the jury.

3         THE JURY:   Good morning.

4    Q.   Mr. Brantley, I believe you indicated that it was January

5    of 2000, I'm sorry, November of 2005 that you reviewed New

6    Care's orders; is that correct?

7    A.   No, it was December 2005.

8    Q.   December, 2005?

9    A.   Yes.

10   Q.   Okay.  So you first reviewed the reports in December of

11   2005, for New Care and other pharmacies; is that correct?

12   A.   Yes.

13   Q.   And how many pharmacies other than New Care did you review

14   in November, excuse me, December of 2005?

15   A.   In December of 2005, I reviewed the reports for each of our

16   22 distribution centers.

17   Q.   How many pharmacies?

18   A.   I do not know.

19   Q.   Well, you indicated on that pie chart that there were

20   17,000, something like that.  About 17,553 pharmacies that you

21   reviewed?

22   A.   1,753.

23   Q.   I'm sorry, 1,753 pharmacies?

24   A.   That's from the Swedesboro division alone.

25   Q.   Okay.

1    A.   From the other 21 distribution centers, I don't know the

2    total number of pharmacies run on report reports for all 22

3    distribution centers.

4    Q.   So far in excess of 1753 pharmacies --

5    A.   Yes.

6    Q.   -- that you reviewed from the 22 divisions?

7    A.   Yes.

8    Q.   Okay.  Now, you said you requested six months of New Care's

9    purchases; is that correct?

10   A.   Yes.

11   Q.   And you made a determination to cut the review to six

12   months?

13   A.   Upon reviewing the ingredient report for the month of

14   November, I went and reviewed the previously six months to get

15   an idea of the purchase history.

16   Q.   How long had New Care been a customer of Cardinal?

17   A.   I do not recall.

18   Q.   Okay.  You don't have any recollection today, of how long

19   they've been a customer; is that right?

20   A.   That is correct.

21        MR. RAVENELL:  May I approach the witness, Your

22   Honor, briefly?

23        THE COURT:  You may.

24   Q.   Let me show you a document and see if this refreshes your

25   recollection.

1            Just look at that document.  It would be marked as

2      defense -- see what our next number is.  I'll get a number in a

3      moment for identification for the next number.

4            I'm going to use an arbitrary number, I know we

5      haven't reached, make it 20 for identification.

6            THE CLERK:  Counsel, your next number is 13.

7      Q.  Look how good you are.  The man is great.

8            Defense exhibit 13 for identification.

9            Would you look at that document to refresh your

10     recollection as to how long New Care had been a customer of

11     Cardinal Health?

12     A.  Yes, according to the report February, 2004.

13     Q.  February of 2004?

14     A.  Yes.

15     Q.  All right.  Now, did you review New Care's purchases back

16     to 2004?

17     A.  No, I did not.

18     Q.  Okay.  You started to cut it off at six months; is that

19     correct?

20     A.  Yes.

21     Q.  And that was just a choice that you made, right?

22     A.  Yes.

23     Q.  All right.  Now, when you spoke, you said you spoke to some

24     higher-ups at some point; is that right?

25     A.  I spoke with the sales team responsible for the account.

1   Q.  Did you also communicate with people who would be
2   considered I think the term Mr. Budlow used was higher-ups, I
3   don't like that term particularly, but make sure we use that
4   term, higher-ups, if you understand what mean, did you speak to
5   anyone you consider higher-ups in your division or your
6   company?
7   A.  Yes.
8   Q.  Okay.  Did they ask you to go back and review the purchases
9   by New Care from, up to 2004, forward?
10  A.  No.
11  Q.  Okay.  Now, one reason you reviewed the New Care purchases
12  is because the DEA had indicated that any purchases over 5,000
13  dose units.  Or 5,000 tablets of hydrocodone a month, should be
14  flagged?
15  A.  Yes.
16  Q.  When did the DEA issue directive that anything over 5,000
17  tablets purchased a month by a pharmacy should be reviewed or
18  flagged?
19  A.  August of 2005 is when that was told to representatives of
20  Cardinal Health.
21  Q.  And the DEA actually told that information to
22  representatives of Cardinal Health?
23  A.  Yes.
24  Q.  Okay.  And prior to August of '05, did the DEA, to your
25  knowledge, have any particular number that you and other

1    distributors should flag of hydrocodone purchases?

2    A.  I do not know.

3    Q.  Okay.  Well, you work for the company, correct?

4    A.  Correct.

5    Q.  All right.  Have you done any investigations to see whether

6    there'd been any numbers since you were now in compliance, were

7    there any numbers DEA had indicated prior to August '05 of

8    purchases of hydrocodone that should be flagged?

9    A.  No.

10   Q.  All right.  Now, when you were told that a number was 5,000

11   pills that you should flag by the DEA, did you question the DEA

12   as to why that number 5,000 was the number to use?

13   A.  No, I did not.

14   Q.  Okay.

15        Now, if we have I think you said it was 5,000 -- let

16   me see if I have that right.

17        Let's turn this on.  Get this puppy running here.

18        All right.  So the DEA told you you should flag any

19   purchases of 5,000 tablets, anything purchased by any pharmacy

20   over 5,000 tablets per month; correct?

21   A.  Yes.

22   Q.  All right.  And based on that, because you are regulated by

23   the DEA, your company did it, correct?

24   A.  Yes.

25   Q.  All right.  Now, if we have 5,000 tablets divided by 90

1    pills as a prescription, each prescription had 90 pills in it,

2    5,000 divided by 90 pills per prescription, my math is about 56

3    prescriptions per month.

4              So if I understand you correctly, if there are 56

5    prescriptions written for by a pharmacy for 5,000, totaling

6    5,000 pills or so, DEA tells you to flag, correct?

7    A.   Any purchase over 5,000 pills a month we should flag, yes.

8    Q.   Okay.  All right.  Now, that was not a number that your

9    company came up with, and it was a number that the DEA came up

10   with, correct?

11   A.   Yes.

12   Q.   Did your company have a number different than the DEA

13   numbers or any number that you flagged prior to the DEA's

14   directive?

15   A.   I do not know what the policy was prior to the DEA's

16   directive.

17   Q.   So you're not aware whether there was ever -- there was any

18   number that your company would flag prior to the DEA's

19   directives, correct?

20   A.   I do not know.

21   Q.   All right.  Now, after you reviewed the six months of New

22   Care's purchases, you met with Anthony, is it D'Amore?

23   A.   That was a phone conversation.

24   Q.   Phone conversation.  Is that -- did I pronounce the last

25   name correctly?

1   A.   I believe so.

2   Q.   That's how you --

3   A.   D'Amore, yes.

4   Q.   Anthony D'Amore, he's a sales consultant who handles New

5   Care's account; is that right?

6   A.   That sounds correct.   I would have to review my notes.

7   Q.   Do you have your notes there?

8   A.   No, I do not.

9   Q.   Okay.   What notes do you need to review, do you know,

10   review your notes?   Tell me what you need.

11   A.   They would be handwritten notes that would have D'Amore's

12   name.

13   Q.   Okay.   Let me see if I can help you along.   I'll show you

14   again what is our 13 for identification.

15         May I approach the witness, Your Honor?

16         THE COURT:   You may.

17   Q.   Now, earlier you were asked by Mr. Budlow whether you wrote

18   a report when you finished your investigation; is that correct?

19   A.   Yes.

20   Q.   And the document that I have I'm showing you, is that the

21   report that you prepared?

22   A.   Yes, it is.

23   Q.   Okay.   Let me turn you to a page, I've highlighted this.

24         MR. BUDLOW:   Counsel, are you on the notes or report?

25         MR. RAVENELL:   The report, 13 will be the report.

1  MR. BUDLOW:  Page number?

2  MR. RAVENELL:  Page 2.

3  MR. BUDLOW:  Thank you.

4  Q.  I've highlighted written stuff by Mr. D'Amore, would you

5  read that and see if it helps answer the question I asked you

6  earlier about what role Mr. D'Amore played in relation to New

7  Care?

8  A.  Yes, Mr. D'Amore was the sales consultant for the account.

9  Q.  And before I walk away, do you know how long he'd been the

10  sales consultant for New Care without reviewing this report?

11  A.  Without reviewing the report, no, sorry.

12  Q.  All right.  Let me show you this again see if this helps

13  refresh your recollection how long Mr. D'Amore had been the

14  sales consultant to New Care?

15  A.  Since November 2005.

16  Q.  Okay.  So and that was -- when you had the conversation

17  with him, and again, let me ask you before I move on, do you

18  have a recollection of these dates without your report?

19  For example, how long he'd been the representative

20  and when you spoke to Mr. D'Amore?

21  A.  Without the report, no.

22  Q.  I'll stay here and ask questions so we don't go back and

23  forth.

24  You said that Mr. D'Amore had been the representative

25  since November 2005, sales consultant.  Was that -- when did

1   you have the phone conversation with Mr. D'Amore?

2           Can I approach?

3           THE COURT:  Go right ahead.

4           (Pause.)

5   A.  January third, 2006, according to my report.

6   Q.  Okay.  So Mr. D'Amore had been the sales consultant for New

7   Care Cardinal Health consultant for New Care for about two

8   months when you had your conversation with him on January third

9   of 2006; is that correct?

10  A.  Yes.

11  Q.  All right.  And you questioned Mr. D'Amore about his

12  relationship and information about New Care; is that correct?

13  A.  Yes.

14  Q.  And you wanted to factor that information into your

15  decision-making process, correct?

16  A.  Just trying to get background information, yes.

17  Q.  And you used information that you got from Mr. D'Amore to

18  create the report that you submitted to your higher-ups?

19  A.  Yes.

20  Q.  All right.  Now, one of the things that you learned from

21  Mr. D'Amore in questioning, he told you that New Care serviced

22  pain management clinics, correct?

23  A.  Yes.

24  Q.  All right.  Now, in addition to speaking to Mr. D'Amore,

25  you also spoke to a Stacey Alexander, who was also a sales

1    consultant, who handled New Care's account from July '05 to

2    November '05, correct?

3    A.   I would hate to have you walk back over here.

4    Q.   That's okay.  Exercise is good for me.

5              Page 2, Mr. Budlow.

6              MR. BUDLOW:  Thank you.

7              MR. RAVENELL:  Or page 3.

8              (Pause.)

9    A.   Yes.  Stacey Alexander was the sales consultant from July

10   2005 to November 2005.

11   Q.   All right.  And when did you have your conversation with

12   her?

13   A.   January 4, 2006.

14   Q.   You know what they say, walking is good for you, keeps you

15   slim.

16             All right.  Now, when you spoke to Miss Stacey

17   Alexander, you asked her also about her relationship with New

18   Care and information about New Care; is that correct?

19   A.   Yes.

20   Q.   All right.  Did you ask -- well, Miss Alexander also told

21   you that New Care had serviced pain management clinics;

22   correct?

23   A.   Yes.

24   Q.   Now, did you ask Mr. D'Amore whether he had made site

25   visits to a New Care during the time period of November '05 to

1   January '06?

2   A.   Yes.

3   Q.   Okay.  And do you know whether he made site visits -- I'm

4   coming back.

5   A.   Get some more exercise.

6   Q.   I'm not sure this is in it, but you may be able to find it.

7        (Pause.)

8   A.   Yes, he did made a site visit.

9   Q.   Okay.  When did he make the site visit to New Care?

10  A.   That is not in my report.

11  Q.   Okay.  Did Miss Alexander make any site visits to New Care

12  between July '05 and November '05?

13  A.   Yes.

14  Q.   And do you know when she made the site visit?

15  A.   It does not state that.

16  Q.   Okay.  Now, you told us that when you reviewed the report

17  for the report, the November '05 report for New Care, the

18  purchases, but you then went back six months, and you have a

19  chart in evidence about those six months that you went back to;

20  is that correct?

21  A.   Yes.

22  Q.   And when you spoke to Miss -- well, prior to speaking to

23  Miss Alexander on January fourth of 2006, and Mr. D'Amore on

24  January third '06, had either of those individuals sent you any

25  reports or about New Care that they were concerned about New

1    Care's purchases?

2    A.  I had received no reports, no.

3    Q.  Well, you reviewed New Care's file and information at the

4    company, correct?

5    A.  I reviewed a purchase history, conducted my own Internet

6    searches, and I questioned the sales force, yes.

7    Q.  Right.  But when you spoke to Miss Alexander and when you

8    spoke to Mr. D'Amore, they'd indicated they hadn't prepared any

9    report that suggested they were concerned about the purchases

10   that New Care was making, correct?

11   A.  They did not make mention of a report, no.

12   Q.  Okay.  In fact, you told us that this DEA directive came

13   out in August '05, about 5,000 purchases, correct?

14   A.  Yes.

15   Q.  And the purchases New Care made that is on the chart that

16   is in evidence the government introduced, dates back from June

17   '05 to March, up to March '06, correct?

18   A.  Yes.

19   Q.  So the purchases that were made, for example, in July '05,

20   August '05, September, '05, October, '05, before you became

21   involved, those purchase numbers would have been certainly

22   known to your sales consultants and people at your company,

23   correct?

24   A.  If the sales consultants had reviewed the information yes,

25   Q.  But it's there?

1    A.   They had access, yes.

2    Q.   They have access to it?

3    A.   Yes.

4    Q.   Okay.   In fact, you said reports are prepared monthly from

5    each division of what their sales amounts are?

6    A.   The report is generated from each division and then sent to

7    the local DEA office, yes.

8    Q.   We'll get to that in a minute.

9         Well, let's go there right now.   These reports, Mr.

10   Budlow, do you have the charts you introduced?

11        MR. BUDLOW:   I have one.

12        MR. RAVENELL:   Mr. Thompson?   Thank you.

13   BY MR. RAVENELL:

14   Q.   This report, or the numbers that we have on government's

15   exhibit 29 E, all right.   There we go.

16        Government's exhibit 29 E, the purchases that New

17   Care made in these months even before you looked at those

18   numbers in November or December '05, those numbers would have

19   been sent to a local DEA office by each, by your division,

20   correct?

21   A.   Yes.   A copy of the ingredient report was sent to the local

22   DEA.

23   Q.   The numbers that are represented here of New Care's

24   purchases would have been sent to a local DEA office, correct?

25   A.   Yes.   A report listing each transaction was sent to a local

1    DEA office, yes.

2    Q.   Okay.   So not only would the individual in your company,

3    the sales consultant, would have been aware of how much

4    hydrocodone New Care was purchasing in the months represented

5    here, but the DEA would have been aware of the amounts of

6    hydrocodone that New Care was purchasing on these months,

7    correct?

8    A.   Yes.   We issued them a report.

9    Q.   And not only did you issue reports for the months

10   represented here, but dating back to February of 2004, when New

11   Care first started purchasing narcotics, any drugs, from your

12   company, there would have been a report sent to the DEA laying

13   out each and every month what New Care purchased, correct?

14   A.   Yes.   I just -- I don't know for sure when the report

15   process was, when that began.

16   Q.   Okay.

17   A.   But, yes.

18   Q.   Now, the numbers that are here represented certainly for

19   each and every month that is represented here is well in excess

20   of 5,000 pills per month, correct?

21   A.   Yes.

22   Q.   And you're telling us that the DEA told your -- told you

23   and other distributors that anything over 5,000 pills per month

24   as of August '05 must be flagged, correct?

25             MR. BUDLOW:   Objection.

1          THE COURT:  I'll overrule the objection.  You may

2    answer.

3          MR. BUDLOW:  Your Honor, may we approach?

4          THE COURT:  Well, why don't we do this, it's 10:30,

5    let's take the mid-morning recess until 10:45, and I'll talk to

6    counsel when I come back.

7          (Recess.)

8          THE COURT:  Please be seated.

9          MR. RAVENELL:  We did discuss it.  I can rephrase the

10    question.

11          THE COURT:  My understanding from Mr. Shea is that

12    you had worked it out.

13          MR. RAVENELL:  I didn't know that had been

14    communicated.

15          THE COURT:  Thank you.

16          (Pause.)

17          MS. SMITH:  Your Honor, we'll take this opportunity

18    we provided to the defense, as well a copy to the Court, what

19    we believe is our new and improved final statement of the

20    expert testimony of Dr. Christo, and we intend to do the same

21    thing on Monday with Dr. Catizone, and then we'll be standing

22    by it and won't be adding anything else.

23          THE COURT:  Good.  Thank you.

24          (Pause.)

25          (Jury present)

1          THE CLERK:  Jurors all present.

2          THE COURT:  Thank you, Mr. Thompson.  Please be

3    seated.

4          Mr. Ravenell, whenever you're ready.

5          MR. RAVENELL:  Thank you.

6    BY MR. RAVENELL:

7    Q.  Mr. Brantley, we were looking at government exhibit

8    regarding the number of these purchases by New Care during the

9    six-month period that you reviewed, and I think I may have

10   asked you, it was August '05 that Cardinal Health received the

11   information from the DEA to flag purchases of hydrocodone by

12   any of its customers that was over 5,000 tablets; is that

13   correct?

14   A.  Yes.

15   Q.  Okay.  And I showed you the breakdown a moment ago, and

16   what I left off here 56 prescriptions per month, we have 5,000

17   thousand pills?

18          MR. BUDLOW:  I object, Your Honor, may we approach?

19          THE COURT: You may.

20          (At the bench)

21          THE COURT:  Yes, sir.

22          MR. BUDLOW:  Your Honor, I object to the written

23   calculation by Mr. Ravenell being shown to the witness.  He

24   actually attempted to do this earlier and showed it to the

25   jury.  And the witness was unable to answer his question

1    relating what the average numbers of pills and prescription

2    was.

3            He didn't answer the question, and now Mr. Ravenell's

4    using the same calculation again without any foundation being

5    laid.  If he knows what those numbers represent --

6            THE COURT:  Knows which number?

7            MR. BUDLOW:  I believe the calculation, Mr.

8    Ravenell's taking the 5,000 tablet limit, or 5,000 tablet

9    number given by DEA and dividing it by 90.  There's no

10   indication as to what the 90 means to this witness.

11           And then he has come up with an average number of

12   prescriptions of 90 pills per month.  He asked -- I'm sorry.  I

13   can't remember the exact question earlier, earlier question

14   after writing the calculation and the witness was unable to

15   answer anything relating to the number of prescriptions.  He

16   just answered in a different way, essentially, that allowed

17   these facts to be presented before the jury in a way that

18   they're not in evidence, they're still not in evidence, unless

19   there's some foundation for why the witness has knowledge of

20   the number of pills in a prescription, then it shouldn't come

21   in evidence through this witness.

22           MR. RAVENELL:  Your Honor, this is actually simple

23   math.  There has been testimony from DI Graumlich, in fact,

24   that 90 was a fair and accurate number of what the

25   prescriptions generally were for.

1          You heard that from Kaps and others we know 90.  The

2   jury has clearly before it 90.  It was generally what the

3   prescriptions were for.

4          All I've asked him if there was a 5,000 pill or

5   tablet number the that would DEA says to flag, if you divided

6   that by 90, you know, what the math was.

7          If government's objecting, I did the math, I'll give

8   the man a calculator.

9          THE COURT:  What you should do is ask him if he knows

10  what the average prescription is for hydrocodone.  If he says

11  to see whether he knows or not, but whether he knows or not,

12  you can break it down for the jury.  You can say assume that

13  it's 90 pills, how many prescriptions that is, and that way the

14  jury knows that he's not buying into the number.

15         MR. RAVENELL:  Thank you.

16         THE COURT:  But the document's not coming in

17  evidence.  Simply, they've been shown a calculation on the

18  screen.

19         MR. BUDLOW:  I'd ask if there's some sort of proffer

20  as to what the witness would testify to based on the

21  calculation.  It's not the calculation I object to.

22         If the only purpose is to put the calculation out to

23  the jury, then that's closing arguments.  If there is a

24  follow-up, there might be, that relates to the calculation that

25  is in this witness's bases of knowledge, then I wouldn't have

1    an objection.

2          THE COURT:  Well, my view is that the witness has

3    testified that the DEA set this 5,000 pill threshold, and Mr.

4    Ravenell said in a very short period of time is going to

5    illustrate what that means in terms of the 90 pill

6    prescription.

7          MR. BUDLOW:  Very well.  Thank you.

8          (Open court)

9    BY MR. RAVENELL:

10   Q.  Sir, do you know how many hydrocodone tablets there is

11   generally, generally there is in a prescription?

12   A.  Could you repeat question?

13   Q.  Yes.  Do you know how many hydrocodone tablets there

14   generally is per prescription, if a doctor gives one a

15   prescription for hydrocodone, do you know how many tablets

16   there is generally per prescription?

17   A.  Well, I don't know for sure.  I can say with my blood

18   pressure, it's 30.

19   Q.  Hydrocodone, I'm not asking you to speculate.  If you don't

20   know, you don't know.

21   A.  I don't know.

22   Q.  Okay.  Now, my blood pressure is 120, so that doesn't make

23   any difference, either.

24          But let me just show you this, if we have 5,000, I

25   think you told us the number that the DEA told you to flag was

1   5,000, correct?

2   A.  Yes.

3   Q.  All right.  And assuming that there is evidence that the

4   general prescription in this case was 90 pills, if you divided

5   that 5,000 by 90, with over 56 prescriptions per month, divide

6   that by 30 days in a month, by 1.9 -- 8.8 prescriptions per

7   day.  Now, did the DEA give you any information as to why the

8   5,000 was a number that you should be flagging?

9   A.  No.

10  Q.  Okay.  Now, you told us that these numbers on the

11  government exhibit were sent to the local DEA office by your

12  division.  Now, when you say the local DEA office, for example,

13  you told us that the division that was supplying New Care was

14  in Swedesboro, New Jersey?

15  A.  Yes.

16  Q.  All right.  So your company, Cardinal Health, the

17  Swedesboro division, would have sent these numbers to a local

18  DEA office in Swedesboro, New Jersey or somewhere in that

19  particular area?

20  A.  We would have sent to the local office a copy of the

21  report, yes.

22  Q.  Okay.  So it's not broken down numbers like this, but a

23  copy of the report.

24  A.  Yes.

25  Q.  A copy of the report that would show what New Care

1   purchased and what any other pharmacy purchased from Cardinal

2   for every month?

3   A.  A customer that exceeded a certain threshold, yes.

4   Q.  If they exceeded 5,000, for example, they would have gone

5   to the DEA?

6   A.  Not necessarily 5,000 pills.

7   Q.  Okay.

8   A.  The ingredient report is not broken down in pills.

9   Q.  Okay.  All right.  So what -- but these, however it was

10  said, these numbers would have gone to the DEA, you told us?

11  A.  The number of bottles and the number of pills, yes.

12  Q.  Okay.  Would have gone to the DEA, I guess I was going to

13  ask you the local DEA office, do you know whether that local

14  DEA office received these numbers regarding these numbers

15  whether it was Swedesboro or somewhere near by?

16  A.  I do not know where the office is that our Swedesboro

17  facility reports to.

18  Q.  Now, you told us you met with Mr. Sodipo and Mr. Nwaehiri

19  and Mr. Barstow, do you remember the date you met with those

20  two gentlemen?

21  A.  Yes.  February 9, 2006.

22  Q.  Okay.  And you told us that when you spoke to those

23  gentlemen, that they told you the DEA had not been out to see

24  them; is that correct?

25  A.  Yes.

1  Q.  All right.  And at the time you spoke to them February 9,

2  2006, the DEA would have had the numbers at least up to January

3  of 2006 from your company of what New Care had purchased,

4  correct?

5  A.  The January report would have been generated early to mid

6  February.

7  Q.  Okay.  So then we go at least up to December '05, that

8  report, those reports have been sent to DEA prior to your

9  meeting with the defendants on March 9th of 2006, correct?

10  A.  Yes.

11  Q.  Okay.  Now, prior to your going to March -- excuse me.

12  Prior to your visit with the defendants on March 9th 2006, did

13  you send to the -- excuse me -- send to New Care or any other

14  pharmacy that the DEA had told you your company to flag

15  purchases of hydrocodone over 5,000 pills?

16  A.  The visit was actually February 9th as opposed to March.

17  Q.  February 9th, I'm sorry?

18  A.  And I had not sent anything to New Care or another company.

19  Q.  So when you received this information, your company in

20  August '05 from the DEA, you didn't distribute anything to the

21  customer saying that the DEA has told us anything over 5,000

22  purchases of hydrocodone we have to flag?

23  A.  I did not.

24  Q.  Okay.  Now, you told us that when you -- well, when you

25  visited the visited New Care on March 9, I'm sorry, keep saying

1    March, February 9, 2006, you said you went there with Patrick

2    Barstow; is that correct?

3    A.   Yes.

4    Q.   Okay.  And prior to traveling to New Care, you actually

5    sent an e-mail to Mr. Barstow on January 23, 2006, and you told

6    him that you needed to visit the account, the account being New

7    Care, because of the DEA requirements; correct?

8    A.   I do not recall the contents of the e-mail without --

9    Q.   Okay.

10   A.   -- reviewing it.

11   Q.   All right.  May I approach?

12        Mr. Budlow this will be for identification 14.

13        (Pause.)

14   Q.   Let me show you what's been marked as defense 14 for

15   identification.

16        This is an e-mail that you sent to Mr. Barstow on

17   January 23, 2006?

18   A.   Yes.

19   Q.   All right.  And I have highlighted just a small portion of

20   it.  Does it make reference that you need to make a visit

21   account because of some DEA requirements regarding ingredient

22   reports?

23   A.   Yes.

24   Q.   Okay.  All right.

25        So when you and Mr. Barstow went to New Care on

1    January -- I keep getting these dates wrong.  February 9th,

2    2006, you said you met with Mr. Nwaehiri and Mr. Sodipo; is

3    that correct?

4    A.  Yes.

5    Q.  And when you met with those two gentlemen, they told you

6    that the names of the Internet companies that they dealt with,

7    correct?

8    A.  Yes, they did share I believe two names.

9    Q.  Well, they actually told you about IHE, correct?

10   A.  Yes.

11   Q.  They also mentioned PMS; do you recall that?

12   A.  If that's in my notes, yes.  I can't recall without

13   reviewing my notes again.

14   Q.  All right.  Well, let's see if I can help you with that.

15        May I approach, Your Honor?

16        THE COURT: You may.

17   Q.  Again, showing you what's been marked as defense exhibit 13

18   for identification, ask you to look at number five here, and

19   see if there is -- fresh your recollection that the defendants

20   told you about a company call PMS as well, Prescription

21   Management Service?

22   A.  I do not recall if they told me about these companies or if

23   I identified them on my own doing my research.  I can't tell by

24   my report.

25   Q.  You can't tell by the report, your report mentions PMS and

1    IHE, but you don't recall whether these gentlemen gave you the

2    names or whether you got them from doing further research?

3    A.   That's correct.  I do know they told me the name IHE.

4    Q.   Okay.  Now, you said they told you they were dealing with

5    nine doctors I think you said; is that correct?

6    A.   Yes.

7    Q.   And that six of the doctors were located in Florida?

8    A.   Yes.

9    Q.   And that there's a doctor in Georgia and Ohio?

10   A.   Yes.

11   Q.   And they told you that the clients, patients, submit to a

12   phone consultation and must be -- must send in their medical

13   records, correct?

14   A.   Yes.

15   Q.   All right.  And they told you that they have copies, they

16   being Mr. Nwaehiri and Mr. Sodipo, New Care, has copies of all

17   of the doctors' licenses, correct?

18   A.   They did say that they did a license verification to make

19   sure that the doctors were licensed.  I cannot recall whether

20   or not they stated they had copies of those licenses.

21   Q.   Okay.  Let me show you a document, see if this helps

22   refresh your memory.

23        Defense 15 for identification, Mr. Budlow.

24        Now, what I'm showing you -- tell me whether you're

25   familiar with this document, which is defense 15 for

1      identification.

2      A.   Yes.

3      Q.   And what is this document?

4      A.   These are my handwritten notes from the visit.

5      Q.   Okay.

6      A.   The site visit.

7      Q.   I've highlighted some here.  But review this highlighted

8      portion and see if it refreshes your recollection that Mr.

9      Nwaehiri and Mr. Sodipo indicated they in fact have copies of

10     the doctor's licenses?

11     A.   Yes.

12     Q.   Did they in fact tell you that?

13     A.   Yes.

14     Q.   Did you ask to see the doctors' licenses when they told you

15     they had copies?

16     A.   I do not recall.

17     Q.   Okay.  Well, would reviewing your notes help you determine

18     whether you in fact ever asked to see those documents, or

19     either your report?

20     A.   Yes, if it's in there.

21     Q.   I don't know if it's in there.  I'm just asking you if you

22     think it would help you to recall.

23          Let me show you both.  Your typewritten report and

24     your handwritten notes, and see if you can refresh your

25     recollection whether you ever asked to see the license of those

1   doctors?

2              (Pause.)

3   A.  This does not say whether or not I asked to see copies of

4   the doctors' licenses.

5   Q.  So you reviewed the typewritten report that you prepared as

6   well as your handwritten notes, and you don't see any reference

7   whether you ever asked Mr. Nwaehiri and Mr. Sodipo to actually

8   see the license of those doctors; is that correct?

9   A.  That is correct.

10  Q.  And you don't have any independent recollection about it?

11  A.  No.

12  Q.  All right.  Now, you later asked Mr. Barstow to get from

13  Mr. Nwaehiri and Mr. Sodipo the names of each doctor that wrote

14  the prescriptions, didn't you?

15  A.  Yes.

16  Q.  And Mr. Sodipo, in fact, provided to Mr. Barstow at your

17  request the names of each doctor that was prescribing for

18  Internet sales, correct?

19  A.  I did receive a list of the names of the doctors, yes.

20  Q.  And you received those from Mr. Barstow after you asked him

21  to get names from the defendants, correct?

22  A.  Yes.

23  Q.  All right.  And those names were sent to you by Mr. Barstow

24  on February 21st of 2006, correct?

25  A.  I do not recall without seeing my notes exactly when that

1    e-mail was sent to me or when those names were sent to me.  I

2    don't recall the date.

3    Q.  Let me show you what we'll mark as defense 16 for

4    identification.

5           Now, showing you defense 16 for identification, and

6    does this help you refresh your recollection what date was it

7    Mr. Barstow provided the doctors' names that he obtained from

8    Mr. Sodipo?

9    A.  Yes.

10   Q.  And what was that date?

11   A.  February 21st, 2006.

12   Q.  Now, you told us that you don't have a recollection of

13   actually asking Mr. Nwaehiri or Mr. Sodipo for the doctors to

14   see the license, but you were trying to determine whether those

15   doctors were doctors in good standing with the DEA, weren't

16   you?

17   A.  I was trying to determine that they had a license in the

18   state that they practiced, yes.

19   Q.  Okay.  And did you do anything after you received the names

20   from Mr. Barstow that Mr. Sodipo had given, did you make any

21   efforts to determine whether those doctors were in fact

22   licensed?

23   A.  I believe I did do a license verification of the doctors to

24   make sure they had a DEA registration, yes.

25   Q.  Okay.

1   A.  Or a state license, yes.

2   Q.  And do you remember how you did that?

3   A.  It would be over the Internet.

4   Q.  You said you made efforts to see whether those doctors had

5   DEA certification as well as state licenses; is that correct?

6   A.  Yes.

7   Q.  Now was why was it important for you to determine whether

8   those doctors had DEA certifications?

9   A.  To ensure that they had the ability to prescribe controlled

10  substances.

11  Q.  Okay.  And that's something that you rely upon in your

12  business in deciding whether those persons had the ability to

13  prescribe medication?

14  A.  Yes.

15  Q.  All right.  The DEA's stamp of approval, so to speak?

16  A.  It just shows that they are licensed, they do have a DEA

17  registration to write a prescription for a controlled

18  substance.

19  Q.  Let me show you what is marked as defense exhibit number 17

20  for identification.

21       Let me just have him identify.  May I approach?

22       THE COURT:  You may.

23  BY MR. RAVENELL:

24  Q.  Let me show you what's marked as defense exhibit 17 for

25  identification in just a moment, and tell me whether this is

1    information you pulled off the Internet regarding the doctors

2    that Mr. Barstow, the list of documents Mr. Barstow gave you he

3    obtained from Mr. Sodipo as to doctors who were filling

4    prescriptions for the Internet sites?

5              (Pause.)

6    A.   Yes.  This is verification that I conducted.

7              MR. RAVENELL:  Okay.  Your Honor, move defense 17

8    into evidence.

9              MR. BUDLOW:  No objection.

10             THE COURT:  It is received.

11             (Received in evidence.)

12             MR. RAVENELL:  May I publish, Your Honor?

13             THE COURT:  You may.

14   BY MR. RAVENELL:

15   Q.   Now, you were -- were you able to pull up some of the

16   doctors and actually do a background, get the background

17   information mainly looking I think you said for whether the

18   doctors are certified by the DEA and whether they're licensed

19   in their states; is that correct?

20   A.   I looked to verify that they have a DEA registration, yes.

21   Q.   All right.  Now, this is -- this packet that I have as

22   defense 17 are the names that you reviewed and verified

23   information; is that correct, from these doctors?

24   A.   Yes.

25   Q.   All right.  And I have highlighted and pointed here, this

1    says DEA number, do you see where I'm pointing?

2    A.   Yes.

3    Q.   And it says expiration date, 6-30-07; is that right?

4    A.   Yes.

5    Q.   Okay.  And do you understand that to be this is the date

6    that the DEA certification would expire for this particular

7    doctor?

8    A.   This is the date that the registration would expire, yes.

9    Q.   Okay.  And for next one is Dr. Brooks, with a DEA number

10   and an expiration date, correct?

11   A.   Yes.

12   Q.   And next we have Dr. Jose Cruz with a DEA certification and

13   expiration date of August '31, '06.

14        And Dr. Dratler, DEA number with a expiration date of

15   6-30'06.

16        Dr. Goodin, with a DEA number and an expiration date,

17   9-30-08.

18        And Dr. Lois Miles, with a DEA number and expiration

19   of 1-31-08.

20        A Dr. Robert Reppy with a DEA number and expiration

21   date of 4-30'06

22        Now, this expiration date, particularly of 4-30'06,

23   you were doing this investigation, or some time in February,

24   end of February of '06; is that correct?

25   A.   If you would move the sheet up, I can see the date, I'm

1   sorry.  Down.

2   Q.  February 22nd, is that it?  Are you here?

3   A.  Yes.

4   Q.  Okay.  You pulled this information off the website off the

5   Internet around February 22nd indicating that the expiration

6   date for a Dr. Reppy would have been April 30, '06, correct?

7   A.  Yes.

8   Q.  Now, did you ever go back after you ran this information on

9   2-22-06 to see whether the DEA recertified this gentleman after

10   4-30-06?

11   A.  No, I did not.

12   Q.  Okay.  And I think those are the ones that are in the

13   packets that you have.

14        Now, after you told us that was it March '06 when you

15   said that your company discontinued providing hydrocodone to

16   New Care?

17   A.  Yes.

18   Q.  All right.  March of '06?

19   A.  Yes.

20   Q.  Do you recall what date in March of '06?

21   A.  I do not recall the exact date.  It was toward the end of

22   March.

23   Q.  Okay.  So after you closed your account with New Care, your

24   company -- well, strike that.

25        You told us earlier in cross-examination, or direct

1    examination, that when you met with Mr. Sodipo and Mr.

2    Nwaehiri, that you told the defendants about the need for a

3    doctor to have an in-person -- strike that.

4              The need for a prescribing doctor to have an

5    in-person examination of the patient per the DEA's rules, do

6    you remember saying that earlier?

7    A.   Per DEA guidance, yes.

8    Q.   For the DEA guidelines.  Okay.  So if I understand you're

9    of the impression, under the impression that the DEA's

10   guidelines require there to be an inpatient -- in-person

11   examination by the prescribing physician of a patient; is that

12   correct?

13   A.   Yes.

14   Q.   All right.  Now, what DEA guidelines are you referring to

15   that says that?

16   A.   It is the guidance that we received in August of 2005, the

17   guidance that Cardinal Health received.

18   Q.   Was that guidance in writing?

19   A.   During the visit, there was a binder that was given us to.

20   Q.   Okay.  Now --

21   A.   But, excuse me, I was not present.

22   Q.   I was going to ask you that question.  So we're both

23   talking.  I'm sorry, you finish.

24   A.   I was going to say given to the Cardinal representatives

25   present during the meeting.

1    Q.  Now, the question I asked, though, where you say that the

2    DEA says that for there to be a doctor/patient relationship,

3    that there must be an in-person examination of the patient by

4    the prescribing physician; is that in writing in those

5    guidelines that you received?

6    A.  I don't recall whether that's in writing or verbal.

7    Q.  Well, you weren't there to get it verbally.  So if it was

8    given verbally, then it would be that someone told you that the

9    DEA has such a requirement, correct?

10   A.  Yes.

11   Q.  All right.  Now, and today, you don't have a recollection

12   whether that is in writing or whether it's just what someone at

13   Cardinal Health told you when you started that position,

14   correct?

15   A.  I'm trying to think of the binder.

16        (Pause.)

17   A.  I don't recall.

18   Q.  Okay.  So when you -- when you told the defendants back on

19   February of '06 that the DEA has guidelines that says there

20   must be an inpatient or in-person examination, you were going

21   off of your memory of whether someone told you or what you may

22   have read in a binder, correct?

23   A.  I was going off the information that I was provided, yes.

24   Q.  Okay.  And, again, we don't need to know how you were

25   provided information, something in writing that may be in a

1    binder somewhere, or someone telling you that, correct?

2    A.   Yes.

3    Q.   Okay.  Now, you -- let me look at these charts for a

4    moment.

5         (Pause.)

6    Q.   Let's go back to the chart.  Let's see what we have here.

7              Let's see if we can do some more math here.

8              Now, I told you earlier we used this example there if

9    we assume that these are 90 pills per prescription, let's kind

10   of do some of the math with these other numbers you have here.

11             For example, you show that there is 180,400 pills

12   that New Care purchased in June '05.

13             And if we divide that by 90 pills, 2004 prescriptions

14   per month, divide that by 30 days, equals 66 prescriptions per

15   day.

16             Now, let's go to October '05, you have 753,200 pills,

17   divided by 90.  8,368 prescriptions per month.  Divide that by

18   30.

19             MR. BUDLOW:  Excuse me.  Could I have a word?

20             MR. RAVENELL:  Yes.

21             (Pause.)

22             MR. RAVENELL:  278.

23             MR. BUDLOW:  Your Honor, may we approach?  I object

24   to the -- I haven't heard the question, I object to whatever it

25   is.

1        MR. RAVENELL:  I'll ask the question.

2        MR. BUDLOW:  I'd like to approach before.

3        THE COURT: You're almost finished the math?

4        MR. RAVENELL:  Yes.  Only one or two, and then I'll

5    finish the math.

6        THE COURT:  This is all illustrative.  So you're

7    going do the math to this number.

8        MR. RAVENELL:  I'm not going to do all of them, I'm

9    doing one other.

10        MR. BUDLOW:  The objection's on a different basis

11    than earlier.

12        THE COURT:  Okay.  If I could see counsel, please?

13        (At the bench)

14        MR. BUDLOW:  Your Honor, we're sort of allowing Mr.

15    Ravenell to make a lot of assumptions here that has not

16    discussed with the witness.

17        The first one was the number of pills per

18    prescription.  Now, it's that there are for some reason 30 days

19    of prescribing in a month.  And I think that sort of flies in

20    the face of logic.  Most doctors offices and most pharmacists

21    are open five days a week, occasionally six.  So to assume, to

22    use the number 30 is just not an accurate illustration.

23        THE COURT:  Well, the only thing I'm doing here is

24    permitting Mr. Ravenell briefly to make his point concerning

25    the math, which is why they now see what your methodology is,

1   so you can finish this one, but then the exercise is over,

2   because it really is closing argument.

3         But I thought it was fair to give you the opportunity

4   simply to show the jury what the math is, it puts some context

5   to the numbers.

6         MR. RAVENELL:  I appreciate that.

7         THE COURT:  But it's clear that the witness -- and

8   you can do this on redirect examination, is that the witness's

9   not as ascribing to many assumptions other than these random

10  mathematical calculations, so I'll overrule the objection.

11        MR. RAVENELL:  As I said, I did the highest number,

12  and I was going to do the lowest number, and then I'll be

13  finished.  I did one in the middle, one higher, and the lower

14  number, and then I'll be finished.

15        THE COURT:  Whatever it is, this is the last.

16        MR. RAVENELL:  Yes.  What I'm going -- I have one to

17  do and that would be the last one, yes.

18        THE COURT:  You're doing one now, and the one that

19  you're doing is going to be the last?

20        MR. RAVENELL:  I'm sorry.  I've already finished

21  that.  Well, actually, I'm not.

22        THE COURT:  278 per day and they can do the math

23  themselves.  Why don't you move on?

24        MR. RAVENELL:  All right.  Thank you.

25        (Open court)

1   BY MR. RAVENELL:

2   Q.  Now, the October '05 number that I have here, that was, if

3   I go back to the chart, is the highest number doses, or number

4   of tablets that New Care purchased during the six-month period

5   that you reviewed; is that correct?

6   A.  Yes.

7   Q.  And now, I did not do the math on December '05, but that

8   would be the lowest number that New Care purchased from you

9   during that six-month period review; is that correct?

10  A.  Yes.

11  Q.  Okay.  Now, after, you were also shown -- may I have the

12  pie chart?  Did you give that?

13          MS. SMITH:  He has it.

14          MR. RAVENELL:  May I approach?

15          THE COURT:  You may.

16  BY MR. RAVENELL:

17  Q.  You were also shown government exhibit 29 F, this pie

18  chart, I'll put this on the screen.

19          Now, you show here that New Care purchased 18 percent

20  of the hydrocodone that was sold by your Swedesboro, New Jersey

21  division; is that correct?

22  A.  Yes.

23  Q.  And you've told us earlier that there were how many, 22

24  divisions Cardinal Health has in the United States?

25  A.  22 distribution centers, yes.

1    Q.  Distribution centers, okay.  And what you have here is a

2    pie chart that shows what was purchased just from the

3    Swedesboro, New Jersey office, correct?

4    A.  Yes.

5    Q.  All right.  The other 21 are not represented by this chart?

6    A.  No.

7    Q.  Okay.  Now, you don't tell us on this chart, from this

8    chart, who purchased the second highest percentage of

9    hydrocodone from your Swedesboro, New Jersey division, correct?

10   A.  Correct.

11   Q.  And you don't tell us who purchased the third highest

12   percentage from your Swedesboro, New Jersey division, correct?

13   A.  Correct.

14   Q.  Now, how many of the pharmacies that are represented in

15   this number, 1,753, purchased more than 5,000 dosage units of

16   tablets of hydrocodone for the month for any particular month

17   that's represented on this chart?

18   A.  I don't know.

19   Q.  You have no clue?

20   A.  No.

21   Q.  Okay.  Thank you.

22          But you told us that the DEA told you to flag any

23   purchases over 5,000 tablets per month by any pharmacy, not

24   just New Care, correct?

25   A.  Correct.

1    Q.  All right.  And how many other pharmacists -- well, strike

2    that.

3             How many other pharmacies -- well, strike that

4    question.

5             How many of these 1,753 pharmacies were involved in

6    an Internet business, if you know?

7    A.  I don't know.

8    Q.  You have no clue?

9    A.  I have no clue.

10   Q.  Okay.  The company that would have been the second highest,

11   the pharmacy would have been the second highest, even though

12   it's not listed here, purchaser of hydrocodone from your

13   Swedesboro division, and you don't know whether that second

14   highest purchaser would have been an Internet-based company or

15   not?

16   A.  I don't know.

17   Q.  Or the third or fourth or any other number; is that

18   correct?

19   A.  That's correct.

20   Q.  Okay.  And you were asked by the government to produce

21   numbers regarding New Care; is that correct?

22            You were asked to give a breakdown only what New Care

23   purchased versus every other pharmacy from the Swedesboro, New

24   Jersey division?

25   A.  I don't understand the question.

1    Q.  Well, for example, you were asked to give us or give the
2    government of what New Care purchased and what percentage of
3    the pie New Care's purchased amounted to, correct?
4    A.  As far as the data, yes.
5    Q.  You were not asked by the government to give a pie chart
6    representation of what percentage the number two or second
7    highest purchaser of hydrocodone purchased from the New Jersey
8    Swedesboro division, correct?
9    A.  That is correct.
10   Q.  Okay.  Now, how many of these 1,753 pharmacies serviced
11   pain management clinics, if you know?
12   A.  I don't know.
13   Q.  Okay.  Now, after you terminated or closed your account
14   with New Care, you -- your company was -- well, strike that.
15         We certainly know that you were aware of the 5,000
16   dosage units that the DEA told you, you told us August of '05.
17   After you closed your account with New Care, you continued to
18   sell -- your company, not you personally, to sell to other
19   pharmacies doses amounts over 5,000 pills of hydrocodone per
20   month, didn't you?
21   A.  I don't know.
22   Q.  Okay.  Let me show you a document marked as defense exhibit
23   number 18.  Before I show you the document, I'll ask you
24   particularly, did your company continue to supply a company, a
25   pharmacy, called --

1           MR. BUDLOW:  Objection.

2   Q.  Phamily -- excuse me.  Phamily Pharmacy, P H A M I L Y,

3   Pharmacy prescription amounts over 5,000 dosage units into

4   February of 2007?

5           MR. BUDLOW:  Objection, asked and answered.

6           MR. RAVENELL:  I never asked the question.

7           MR. BUDLOW:  He said he's not aware of any.

8           MR. RAVENELL:  I'm asking a particular question, Your

9   Honor, of the witness, not a general question.

10          THE COURT:  You may.

11          Can you answer the question, sir?

12          THE WITNESS:  I don't recall the specifics around

13  that particular customer.

14  Q.  Thank you.  And did you in fact, your company, continue to

15  supply in excess of 5,000 dosage units of hydrocodone to a

16  company called IV RX Pharmacy up to August of 2007?

17          MR. BUDLOW:  Objection, Your Honor, may we approach?

18          THE COURT:  Well, your answer would be the same for

19  any of these pharmacies, correct?

20          THE WITNESS:  Correct.

21          THE COURT:  Good.  Then I'll sustain the objection.

22  Q.  Your Honor, may I approach the witness to refresh his

23  recollection?

24          Let me show you a document and see if it refreshes

25  your recollection of whether your company supplied Phamily

1   Pharmacy or IV RX, in dosage amounts over 5,000 tablets of

2   hydrocodone for Phamily Pharmacy up to February '07 and IV RX

3   pharmacy up to August '07, take your time.

4            Marked, Mr. Clerk, as defense exhibit 18 for

5   identification.

6            (Pause.)

7            MR. BUDLOW:  Your Honor, may we approach?

8            THE COURT:  You may.

9            (At the bench)

10           MR. BUDLOW:  With the exhibit as well?

11           Your Honor, I don't believe a proper foundation has

12  been laid in order to use this exhibit to refresh the witness's

13  recollection.

14           In order for an exhibit to be used to refresh a

15  recollection, the witness has to express testimony that he has

16  had a recollection and that he no longer has a recollection.

17  That hasn't happened.

18           He's basically said he has no knowledge of this.  He

19  has no knowledge of anything, he hasn't testified to any

20  knowledge of any of these individual pharmacies selling over a

21  certain amounts for a particular time period.

22           And, more importantly, I'd indicate, since it's clear

23  where we're going, this is defense exhibit number 18 is an

24  order to show cause and immediate suspension of registration

25  issued by the U.S. Department of Justice Drug Enforcement

1      Administration, dated December 7, 2007.

2              There's no indication that this witness has any

3      familiarity with this action as part of his job

4      responsibilities or otherwise.

5              And so given that there's been no recollection that

6      needs to be refreshed at this point, I don't believe this

7      exhibit should be shown to the witness.

8              MR. RAVENELL:  Your Honor, I'm sorry.

9              THE COURT:  Well, it can be shown to him to see if it

10     refreshes his recollection.  I'll instruct the jury that he can

11     only testify if he does have knowledge about this, and the

12     document has in fact refreshed his recollection.  I suspect his

13     answer will be that he never had any knowledge of that.  So

14     I'll ask those predicates.

15             MR. RAVENELL:  Your Honor, if I would, the witness

16     indicated that he didn't recall, and I asked the first

17     question.  I can then show him any document to attempt to

18     refresh his recollection.

19             If upon showing the witness a document he says it

20     doesn't refresh his recollection, I'm going to stop.  I'm not

21     going to go any further.

22             So I know how to do this, and I'm going to -- if he

23     tells me it doesn't refresh his recollection, I'm not going to

24     ask any further questions.  I don't think there needs to be an

25     instruction to the jury or any lead-up questions.

1     What I've now asked him is tell me us whether this
2  document refreshes his recollection.  If he says no, I'll move
3  on.
4          MR. BUDLOW:  I disagree with I don't recall is a
5  sufficient foundation in this context.  I don't recall has
6  become a term that people use all the time to correspond to I
7  don't know.  It might mean something more, but it's certainly
8  not the same I had that knowledge and I don't remember it any
9  more, which is necessary to refresh your recollection.
10         MR. RAVENELL:  I think -- I'm sorry.
11         THE COURT:  I think that we know what the ground
12 rules are.  You may continue.
13         MR. RAVENELL:  Okay.  Thank you.
14         (Open court)
15         MR. RAVENELL:  Should I restate the question, Your
16 Honor?
17         THE COURT:  Yes.
18 BY MR. RAVENELL:
19 Q.  Sir, I'm going to show you what's been marked as defense
20 exhibit 18.
21         THE COURT:  I think you've laid the foundation.
22 Q.  Continue to review the document and let me when you
23 finished reviewing it, and then I'll ask you a question.
24         (Pause.)
25         THE COURT:  Mr. Brantley, the way this works, let's

1    assume that a person once knew something, and because of the

2    passage of time, he's forgotten, counsel can show the witness a

3    document or any other object to see if it refreshes the

4    person's recollection.

5              If recollection is refreshed, you now recall, you can

6    testify.  But if you don't recall, then the answer is I either

7    don't recall or I never knew.

8              THE WITNESS:  Okay.

9              THE COURT:  So the question is, does this document

10   that you've been shown allow you to refresh your recollection

11   on this subject?

12             THE WITNESS:  Okay.

13             MR. RAVENELL:  I don't think he finished reviewing it

14   before.  Would we allow him to finish reviewing the document?

15             THE COURT:  Certainly.

16             MR. RAVENELL:  Thank you.

17             (Pause.)

18             THE WITNESS:  Can I ask what your question was again,

19   please?

20   Q.  That's why I was going to repeat it, if I may.

21             THE COURT:  Go ahead.

22   Q.  Yes.  Upon reviewing this document, does it refresh your

23   recollection or not whether Phamily Pharmacy continued to be

24   prescribe -- excuse me, continued to be sold by Cardinal Health

25   amounts of hydrocodone over 5,000 tablets per month, and does

1   it refresh your recollection whether IV RX Pharmacy continued

2   to be sold up to August 2007 by Cardinal Health hydrocodone in

3   the amounts of over 5,000 prescriptions, 5,000 tablets per

4   month, considering that you were in fact the compliance officer

5   and reviewed those purchases or sales?

6           THE COURT:  So the question is, it's just a yes or no

7   question.  Is your recollection now refreshed?  Yes or no.

8           THE WITNESS:  Is my?

9           THE COURT:  No.  It's a simple -- we're not asking

10  what your recollection is.  I'm simply asking do you now

11  remember something that you had forgotten?  Has this document

12  refreshed your recollection on this issue?

13          THE WITNESS:  Yes.

14          THE COURT:  Good.

15  Q.  Thank you.  And now that your recollection's refreshed, did

16  your company Cardinal Health continue to sell to a company

17  called Phamily Pharmacy prescriptions hydrocodone in excess of

18  5,000 tablets per month up to February 'of 07?

19  A.  What this document is tell me, it tells me what Cardinal

20  Health sold product to that company, that, because I reviewed

21  this document, it tells me what date Cardinal Health stopped

22  selling the drugs.

23  Q.  The other question was, does it help you, whether just

24  looking at numbers on here or not, help you recall whether as

25  of up to February '07 Cardinal Health was selling in excess of

1  5,000 tablets per month of hydrocodone to Phamily Pharmacy?

2  A.  According to this document, yes.

3  Q.  Well, you were in charge of the review of all these sales

4  by different pharmacies, Cardinal Health, and different

5  pharmacies, correct?

6  A.  I was reviewing the reports, yes.

7  Q.  Similar to the reports you reviewed as to New Care back in

8  '05?

9  A.  Yes.

10  Q.  And you said you -- and was your company Cardinal Health up

11  to February '07 selling in excess of 5,000 tablets per month to

12  Phamily Pharmacy?

13  A.  According to this document, yes.

14  Q.  And what was the amount that your pharmacy, your company,

15  was selling to per month to Phamily pharmacy up to February of

16  2007 per month?

17  A.  I don't know.  I can't tell from this chart.

18  Q.  Okay.  All right.  Now, IV RX Pharmacy, is it in fact

19  correct that your company, Cardinal Health, continued up until

20  August 2007 selling to IV RX hydrocodone tablets in excess of

21  5,000 per month?

22  A.  According to this document, yes.

23       MR. BUDLOW:  Objection, move to strike.

24       THE COURT:  I'll strike the answer.  Can I see

25  counsel, please?

1        (At the bench)

2        THE COURT:  There are two issues here.  The first is

3    whether the document refreshes a recollection, a personal

4    recollection of his.  It's pretty clear it does not.

5        MR. RAVENELL:  I know the Court --

6        THE COURT:  Let me finish, please.

7        MR. RAVENELL:  Sure.  I apologize.

8        THE COURT:  But the second question is, is this a

9    business record of Cardinal Health that he can vouch for that

10   shows how much whether they were selling hydrocodone in certain

11   amounts to certain companies.  So if it's a business record, he

12   can testify as to what the business record says.  So I'm

13   looking to see, is there some problem with this information?

14       MR. BUDLOW:  Well, I don't know that this answers

15   your question directly, but maybe I can shortcut this, if the

16   defense wants to move this in as a joint exhibit minus the

17   highlights, I have no objection.

18       I still don't believe this witness can testify to

19   things in it which he doesn't have a recollection of.  It's

20   very clear he doesn't.  I have no objection, in fact, I would

21   make a joint motion.

22       MR. RAVENELL:  We're not seeking to move the document

23   in.  That's why I'm asking the witness question, Your Honor.

24   But the Court may recall that there was a prior witness, Mr.

25   Kaps, who testified, and court allowed him to testify about a

1    business document, so to speak, a document that he reviewed,

2    and he didn't -- the government didn't even have, and I think

3    here this witness certainly, I'll go back to the first one, if

4    I may.  The witness certainly indicated when you asked the

5    questions and framed it that he had a recollection.  But I

6    understand the Court's concern whether he in fact does have

7    one, but he certainly does have one.

8             THE COURT:  It's pretty clear that he's testifying on

9    the basis of the document.  But whose document is it?

10            MR. RAVENELL:  It is a -- it is a consent decree

11   order of show cause sent from the Department of Justice, I'm

12   sorry.  I'm sorry.  Order of show cause, of immediate

13   suspension of registration sent by the Department of Justice on

14   December 7, '07 to Cardinal Health.  So it's not created by

15   Cardinal Health.  It's certainly something that is kept in the

16   ordinary course of business once they received it, but it's not

17   created by them.

18            So that's why we're not moving it in as a business

19   record.  It was not created by Cardinal Health as one of their

20   documents.

21            What it shows, in addition to New Care being -- or

22   having purchased amounts of drugs that have already been

23   indicated that up to February '07, Phamily Pharmacy was

24   purchasing it looks like up to 140,000 pills at least at the

25   peak per month, in February of '07, and that IV R X at its peak

1    was purchasing between 200 and 250,000 tablets up to August

2    '07.

3              So clearly, they're way in excess, in all the

4    purchases were in excess of 5,000, because the chart starts at

5    Phamily Pharmacy for 20,000 up to 160,000, and for IV RX, from

6    50,000 up to 250,000, and they're above those numbers

7    consistently.

8              So I think the information is there, but I wasn't

9    moving the document in, and I certainly think he can testify

10   about the information that is there in the document.

11             But if the Court finds otherwise, we'll deal with it.

12             THE COURT:  Let me ask, do you dispute these numbers?

13             MR. BUDLOW:  I'm not aware, I don't have a specific

14   dispute of the numbers, no.  I dispute the use of this exhibit

15   with this witness.  I also, frankly, although like I said,

16   we're willing to put this document in evidence, don't see the

17   relevance of this line of questioning in any sense as to what

18   other --  what Cardinal Health's actions or lack of actions

19   were with respect to other pharmacies, seems to be irrelevant.

20             Possibly Mr. Ravenell's attempting to go to the

21   credibility of this witness, since he apparently has no

22   recollection -- no knowledge of these things, it can't affect

23   his credibility at all.

24             THE COURT:  Well, the government has put into

25   evidence as to how much hydrocodone was sold by New Care and

1    other pharmacies, so the subject of how much hydrocodone did

2    the pharmacies sell is fair game.

3         But I need to clear up with this witness that he

4    doesn't recall, whether he recalls this or not.  If he's simply

5    reading the document, and simply reading the document, I'm

6    going to strike the answers.

7         Could you ask the witness to come around?

8         Yes, Mr. Brantley.

9         THE WITNESS:  Yes.

10        THE COURT:  I wanted to, this subject of refreshing

11   recollection is a difficult one, and we take courses on it in

12   law school, so it's not a simple topic.

13        Mr. Ravenell has shown you this document, which has

14   tables or graphs or information concerning sales of hydrocodone

15   by Cardinal to various pharmacies, correct?

16        THE WITNESS:  Yes.

17        THE COURT:  And what I'm looking to see is whether

18   you personally have any independent knowledge concerning that

19   subject or whether you're simply relying on the document.

20        THE WITNESS:  I am simply relying on the document.  I

21   do recall these two entities at one point just like New Care, I

22   did review the report, conduct an investigation, and we closed

23   business.  I do not recall how long we sold to them, the

24   quantities that we sold to them.  For that I'm using this

25   chart.

1        THE COURT:  Good.  So you can testify on the basis of

2    your recollection as refreshed that Cardinal is selling more

3    than 5,000 doses per month to three pharmacies, New Care, IV RX

4    and Phamily Pharmacy.

5        THE WITNESS:  I can testify to the fact that I don't

6    recall what month, but I found them on an ingredient report,

7    and I conducted investigation.

8        What I can't testify to without my files how much we

9    were selling to these customers per month.

10       THE COURT:  Do you know when you stopped selling to

11   the other two pharmacies?

12       THE WITNESS:  Yes, we did.

13       THE COURT:  And you stopped selling to them?

14       THE WITNESS:  Discontinued business with Phamily

15   Pharmacy as well as IV RX.

16       THE COURT:  And New Care?

17       THE WITNESS:  And New Care.

18       THE COURT:  Good.  Thank you.  You may step back,

19   sir.

20       So he knows what he knows.  So I mean the question

21   is, he's now testifying to certain facts that he doesn't know

22   about.  So I'll clear up the record.

23       This consent decree is not a business record of

24   Cardinal, but he has reviewed this, this record, so he knows

25   they were selling 5,000 doses per month to these three

1    pharmacies, but he's not sure when, and during what period of

2    time, and when they stopped, although he knows that they did

3    stop.  So that's what I'm inclined to do is to simply summarize

4    that with him for the jury, so that the record will be clear.

5                 Is there any objection?

6                 MR. RAVENELL:  I do object.

7                 MR. BUDLOW:  Not from the government.

8                 MR. RAVENELL:  I do object to the point they've

9    stopped.  I have not asked this witness any question as to

10   asked him when they last sold.  I never asked anything about

11   stopping selling.  I object to that.

12                MR. BUDLOW:  I'll be happy to handle it on redirect.

13                MR. RAVENELL:  If it's appropriate.  But the question

14   here --

15                THE COURT:  Good.  I'll simply --

16                MR. BUDLOW:  Your Honor, while we're here, also on

17   direct, I might as well hit one of these issues, if it's not

18   done soon, I think since the witness has used this document, or

19   actually the defense has used this document so extensively, the

20   jury should understand what is this document is, that he's been

21   testifying to, that it's a document from the DEA to Cardinal

22   Health order show cause and suspension of registration.

23                MR. RAVENELL:  Obviously, Your Honor, that's not

24   appropriate.  We don't get to tell the jury what document is

25   being used to refresh memory.  It's just that.

1          THE COURT:  The document hasn't been characterized.

2     They haven't been told what it is.  I will give the jury the

3     rules concerning refreshing recollection.

4          MR. RAVENELL:  And then I'll move from there.

5          THE COURT:  Thank you.

6          (Open court)

7          THE COURT:  Ladies and gentlemen, I'd like to discuss

8     with you an evidentiary point we learn in law school.

9          We all have the phenomenon that we can't remember

10    something.  We know we knew it.  For example, where you were

11    living when you were 12, what was the phone number there?  And

12    you know, you know you knew it once, but you can't remember it

13    now.

14         But there may be something that refreshes your

15    recollection.  You know you here when I was a kid, we had

16    exchanges like our exchange was Drexel.  So and my phone number

17    then was Drexel 7 7 2 1 0.

18         Let's assume I couldn't remember that, but I was

19    trying to remember it, and what was the telephone number that

20    we had in our house when I was 12, and I drove past Drexel

21    Street, Drexel Street would then remind me of the exchange, and

22    I would now remember my telephone number.

23         So the exercise is, is there something that refreshes

24    information, your recollection of information that you once

25    had?

1          And anything can refresh recollection, you know,

2    because it doesn't have to be some writing that memorializes

3    the information.  It can be some memory prompt.

4          So what we do in court is, if a witness says I once

5    had information, but I can't remember it, counsel are permitted

6    to show the witness anything.  It can be a document.  It can be

7    a water pitcher, it can be a sound.  It can even be a smell, to

8    see if that prompt brings back the recollection.

9          When a document or other thing is used to refresh

10   recollection, that recollection refreshing document or other

11   thing does not come into evidence.

12         The only evidence that comes in, is if the witness

13   says, yes, my memory is now refreshed, and the telephone number

14   was Drexel 7 7 2 1 0.

15         So let's assume the witness is shown, let's assume

16   counsel it would be permitted to do this, but let's assume

17   counsel says I now have a telephone directory from 1953.  And I

18   am now showing you the telephone directory from 1953, and I'm

19   showing you the entry for your parents.  And does that refresh

20   your recollection as, that your telephone number was Drexel 7 7

21   2 1 0?  If the witness says that does not refresh my

22   recollection, then none of the refreshing information is

23   evidence.  The fact that it was a telephone book is not

24   evidence.  The fact that the man was looking at an entry for my

25   parents is not evidence, and the resuscitation of telephone

1   number is not evidence.

2        So if the witness says I don't recall, then the

3   evidence in the courtroom where there's no evidence at all as

4   to a telephone number, if that makes sense.  Because remember

5   it's only the testimony from the witness on the stand that is

6   evidence.

7        Now, if the telephone directory were offered in

8   evidence, and received by me in evidence, then the telephone

9   directory could be considered by the jury for establishing the

10  number.

11       But in the hypothetical that I was giving, the

12  document, the telephone directory, was only used to refresh

13  recollection.  It was not introduced into evidence.  Therefore,

14  there's no evidence of the telephone number unless the witness

15  actually calls it.

16       What sometimes happens in court is that the witness

17  will look at the refreshing document and will start reading

18  from the refreshing document even though it doesn't refresh his

19  recollection.

20       If a witness will say, well, the document says that

21  telephone number was Drexel 7 7 2 1 0, so that must be it.

22  That's not the way refreshing recollection works.

23       So here Mr. Brantley testified that about sales of

24  hydrocodone to these other pharmacies, Phamily pharmacy and IV

25  RX.  And I believe when the witness was here at the stand, and

1    here at the bench, and we were talking to him, Mr. Brantley,

2    see if this is accurate.  That you, your recollection was

3    refreshed to the fact that Cardinal did for a period of time

4    sell more than 5,000 pills per month to both IV RX and to

5    Phamily Pharmacy; is that correct?

6              THE WITNESS:  Yes.

7              THE COURT:  But you do not have any recollection as

8    to the time period during which pharmacy was supplying

9    hydrocodone in those quantities to those two pharmacies,

10   correct?

11             THE WITNESS:  Correct.

12             THE COURT:  Good.  Thank you.

13             Mr. Ravenell?

14             MR. RAVENELL:  I'm sorry, Your Honor.  I was writing

15   something, and I didn't hear the Court's question.

16             THE COURT:  Take your time.

17             MR. RAVENELL:  No.  Could you repeat that question?

18   I didn't hear the Court's question.

19             THE COURT:  Oh.  I was simply establishing through

20   our witness that his recollection was refreshed to the effect

21   that Cardinal was selling more than 5,000 pills per month to

22   both Phamily Pharmacy and IV RX.

23             MR. RAVENELL:  All right.  Thank you.

24             THE COURT:  But that he does not recall the period of

25   time during which those monthly sales were being made.

1           MR. RAVENELL:  Right.

2    BY MR. RAVENELL:

3    Q.  Now, sir, do you know how -- well, strike that.

4           You told us earlier there when I showed you this pie

5    chart, that you don't know whether any of these 1753 pharmacies

6    that are listed here were selling 5,000, were receiving over

7    5,000 tablets of hydrocodone from the Swedesboro division per

8    month; is that correct?

9    A.  That's correct.

10   Q.  Okay.  So while you know that the two companies that we

11   mentioned, IV RX and the Phamily Pharmacy were receiving over

12   5,000 tablets per month for some period of time from Cardinal,

13   you don't know how many other pharmacies were receiving over

14   5,000 tablets of hydrocodone per month from the 22 divisions of

15   Cardinal in the United States, correct?

16          MR. BUDLOW:  Objection.  May we approach to clarify a

17   point, Your Honor?

18          MR. RAVENELL:  I don't think --

19          MR. BUDLOW:  I object to the question.

20          THE COURT:  Well, the witness has testified that

21   Swedesboro is only one distribution center, correct, Mr.

22   Witness?

23          THE WITNESS:  Yes.

24          MR. BUDLOW:  Your Honor, the government's objection

25   is there's an implicit fact in the question that's not in

1    evidence.

2              THE COURT:  Do you mean -- well, do you know whether

3    any of these other distribution centers are selling hydrocodone

4    to pharmacies in an amount in excess of 5,000 pills per month?

5              THE WITNESS:  I don't know which was selling to which

6    customer, what quantity.

7              THE COURT:  So you have no information concerning the

8    sales from these other distribution centers of hydrocodone to

9    other pharmacies?

10             THE WITNESS:  Not presently, no.

11             MR. RAVENELL:  That's all I was asking, Your Honor.

12             Your Honor, we have no further question, thank you.

13             THE COURT:  Good.  Thank you.

14             Mr. McCants, your witness, sir.

15                   CROSS-EXAMINATION

16    BY MR. MCCANTS:

17    Q.  Good afternoon, Mr. Brantley.

18    A.  Good afternoon.

19    Q.  Good afternoon ladies and gentlemen of the jury.

20             THE JURY:  Good afternoon.

21    Q.  Let me ask a couple questions regarding your visit to New

22    Care.

23             But even before getting there, let me ask you have

24    you ever visited Phamily Pharmacy or IV RX?

25             MR. RAVENELL:  Your Honor, may counsel approach

1    briefly?

2              THE COURT:  You may.

3              (At the bench)

4              MR. BUDLOW:  I object to the objection.

5              MR. RAVENELL:  May I have a moment?

6              (Pause.)

7              MR. RAVENELL:  Your Honor, may we have a five-minute

8    recess?  It's probably easier.

9              THE COURT:  Let's take a ten recess.

10             (Open court)

11             THE COURT:  Ladies and gentlemen, it's just a little

12   bit after noon.  Let's take a recess until 12:15, and then

13   we'll come back for more questioning of our witness.  Thank

14   you.

15             (Recess.)

16             THE COURT:  Please be seated unless you wish to stand

17   for the jury.

18             (Jury present)

19             THE CLERK:  Jurors all present.

20             THE COURT: Thank you, Mr. Thompson.  Please be

21   seated.

22             Mr. McCants, your witness, sir.

23                  CROSS-EXAMINATION

24   BY MR. MCCANTS:

25   Q.  Mr. Brantley, it's correct, sir, that you do not know or do

1   not recall how many of your -- how many of Cardinal customers

2   were involved in Internet medicine?

3   A.   That's correct.

4   Q.   Lastly, hydrocodone was not the only drug New Care

5   purchased from Cardinal; is that correct?

6   A.   I do not recall what was purchased.

7   Q.   You know they purchased some non CDS drugs, you do know

8   that?

9   A.   They purchased other items other than hydrocodone, yes.

10  Q.   So you don't know the total dollar amount they purchased in

11  either '05 or '06?

12  A.   No.

13          MR. MCCANTS:   Okay.   That's it.   Thank you, sir.

14          THE COURT:   Thank you, Mr. McCants.   Mr. Budlow, is

15  there any redirect?

16          MR. BUDLOW:   Yes, Your Honor.

17          MR. RAVENELL:   Your Honor, may counsel approach?

18          THE COURT: You may.

19          (At the bench)

20          MR. BUDLOW:   I didn't say anything yet.

21          MR. RAVENELL:   Your Honor, I'm going ask the Court to

22  inquire what the areas of redirect will be pursuant to the

23  Court's rules.

24          THE COURT:   I think it will speed things up.   Mr.

25  Budlow?

1   MR. BUDLOW:  Are you asking me if I agree it would

2   speed things up or are you asking me for a proffer?

3   THE COURT:  If you will tell me what you have in

4   mind?

5   MR. BUDLOW:  Sure.  First one relates to Mr.

6   Ravenell's cross-examination relating to information that Ms.

7   Alexander, who was a sales rep for a period time, and if there

8   was any information he got from Miss Alexander on writing his

9   report.  I don't know if he's going to remember or not, but

10  I'll attempt to refresh his recollection.

11  Miss Alexander told him, according to his notes, in

12  addition to purchasing their drugs from Cardinal Health, New

13  Care also purchased their drugs from McKesson at about a 50/50

14  split, which essentially gave him information in addition to

15  what he knew, there was double that amount being purchased by

16  New Care approximately on a monthly basis.

17  THE COURT:  Well, why isn't that hearsay?

18  MR. BUDLOW:  Because it's the same avenue that Mr.

19  Ravenell went down with respect to Mr. Brantley using the

20  information from Miss Alexander and relying on that in his

21  report and in his opinion to cut Cardinal Health off.

22  I believe he asked her, he elicited a lot of probably

23  hearsay information from Miss Alexander on cross-examination,

24  such as did Miss Alexander state that she -- did she state that

25  New Care told her that they serviced pain management clinics.

1    He was asked that question, clearly hearsay, he said yes.

2         He also asked her if she had conducted a site visit,

3    and Mr. Brantley testified, yes, Miss Alexander told me she had

4    conducted a site visit.  So and also did Miss Alexander

5    indicate whether or not there were any problems associated with

6    New Care's account, she said no, or she didn't.

7         All of these things are probably hearsay, but given

8    the benefit of the doubt offered to sort of show the basis for

9    Mr. Barstow's actions and his report so the government asks to

10   elicit the same type of information as to other questions he

11   asked relating to who else they were purchasing drugs from.

12        MR. RAVENELL:  Your Honor, Mr. Budlow seems to

13   suggest that he believes the questions I asked were hearsay

14   that he didn't object to, but I am objecting to his asking the

15   question of this witness about the 50/50 split.

16        More importantly, Judge, Mr. Budlow's going to be

17   able to get this information from McKesson on Monday, of what

18   they were supplying.  So having Miss Alexander, you know, rely

19   on a guesstimate of 50/50, he's going to, from what the Court

20   has already ruled, he's going to be able to get Gary Adams on

21   Monday to testify as to what McKesson supplied.

22        THE COURT:  I think I understand.

23        What's next, Mr. Budlow?

24        MR. BUDLOW:  The next point relates to the defense's

25   questioning.  I'm sorry.  Going over my notes this quickly,

1   that sort of the implying or maybe directly stating that Mr.

2   Brantley only investigated New Care of all of the 1700

3   pharmacies that he chose to, the government asked him to bring

4   in charts and diagrams that showed only New Care.

5          So I'm going ask him whether or not had he found

6   spikes or similar numbers of other pharmacies, would he have

7   investigated those additional pharmacies as well because the

8   implication is they're sort of targeting New Care based on the

9   government's request in this case.

10          MR. RAVENELL:  We'd object.

11          THE COURT:  What was his decision?  Why did he decide

12   that he was going to investigate these pharmacies and terminate

13   them?

14          MR. BUDLOW:  Just at this point just speaking about

15   New Care, because for the time period involved, it was only New

16   Care that was investigated.

17          So what I expect his testimony to be is that I looked

18   backward at New Care and the reason that the chart doesn't show

19   others is because there were no other spikes, and there was no

20   one else to investigate based on the information I had at that

21   time.

22          THE COURT:  Well, did he decide to investigate New

23   Care, or is he talking about, or are you talking about what you

24   asked him to do in terms of preparing the chart?

25          MR. BUDLOW:  Well, I think the way the

1   cross-examination went sort of blurred those two subjects.   And

2   I think so it's important to show the jury that the chart may

3   have only been showing New Care, but that's because only New

4   Care had spikes and needed to be investigated based upon his

5   determination.

6        MR. RAVENELL:   If I may respond, Your Honor?

7        THE COURT:   He prepared the charts based upon what

8   you asked him to do, correct?

9        MR. BUDLOW:   That's correct.   But then when he was

10   asked the next, the following questions, well, how many, who's

11   number two, who's number three, how many are doing Internet,

12   and so what they did was they tied those two things.

13        The first issue being the government asked you to do

14   the chart and then asked you about question about pharmacy, two

15   and three and possibly doing on the list.

16        Government wants to elicit there weren't any that

17   were noticeable.

18        THE COURT:   I understand.

19        MR. BUDLOW:   The next relates to questioning relating

20   to IV RX and Phamily Pharmacy.   I simply want to ask him a

21   number of followup questions based on that.   That's an area

22   that was not touched on any way in direct examination.   I would

23   include questions relating to where the -- I'm sorry.

24        Information about where IV RX and Phamily are

25   located, the area that the Swedesboro plant covers to show

1    where these two would be.

2           If I could just back up to the pie chart, one

3    briefly, which is that the defense specifically asked the

4    witness if number two and number were three were on the chart.

5    I think it is that much more relevant for the government to say

6    why weren't they on the chart.

7           MR. RAVENELL:  That's not what I asked, Judge.  What

8    I asked the chart doesn't show who number two and three was,

9    that's what I said.

10          THE COURT:  Do you want to ask him about there's been

11   some testimony about these 22 and 23 different distribution

12   centers and you can find out what geographic area.

13          MR. BUDLOW:  Swedesboro is.  Right, back to the IV RX

14   family pharmacy, what area does Swedesboro cover, whether or

15   not he took any action based on what he now remembers about

16   Swedesboro.  Did he notice the numbers?  Did he investigate

17   like he did with New Care?  And what, if any, action did

18   Cardinal Health take?

19          THE COURT:  You mean what did they do with respect to

20   IV RX?

21          MR. BUDLOW:  Right.  The two pharmacies the defense

22   elicited the high, sort of over 5,000 numbers for a period of

23   time.

24          I also, while doing that, will make a distinction the

25   pie chart was used with this witness asking questions about the

1    IV RX.  I want to show the jury the pie chart only goes to the

2    end of 2006 while the numbers for, and the cutting off of IV RX

3    and Phamily based entirely on actions that occurred after New

4    Care was cut off.

5           THE COURT:  Why is it relevant the cutoff IV RX and

6    Phamily Pharmacy?

7           MR. BUDLOW:  Because it's already been presented to

8    the jury IV RX and Phamily essentially Cardinal didn't do

9    anything.  The implication is Cardinal Health had all these

10   other pharmacies violating this DEA guidance and did nothing

11   about it.  And certainly the government should be entitled to

12   say that something did occur, and once we learned about it, we

13   took identical action.

14          So it seems to be a fair response to that.  And it's

15   all occurred after the date.

16          MR. RAVENELL:  Two things.  One is that the purpose

17   of asking the question about whether there were other people

18   pharmacies of 5,000 or more is because this witness has

19   testified that those kind of numbers that had been sent to DEA

20   would be about what whether the DEA took action.  We've never

21   asked this witness about whether he took actions.

22          It's interesting the government has filed a motion

23   asking the Court, you know, to preclude this kind of evidence,

24   and now they're saying let's get it in.

25          I don't know if the Court had a chance to review

1    government's motion they filed yesterday or not.  Did you get a

2    chance to review that?

3              THE COURT:  Just briefly.  But --

4              MR. RAVENELL:  They filed a motion to exclude this

5    kind of evidence.  And now they're saying, well, let's get in

6    it, what happened after you know, after the defendants were

7    arrested in '06, what happened with these other companies being

8    closed in August and February of '07.

9              As the Court said, what is the relevance?  Their

10   position is it's not relevant in the papers they filed just

11   yesterday, but now they're arguing that it is relevant.

12             MR. BUDLOW:  Now I'm arguing that it's a fair

13   response to what the defense is raising in cross.

14             THE COURT:  With respect to Phamily pharmacy and IV

15   RX, I thought during the cross-examination you were

16   establishing that there were -- let's go back one step.

17             The government in its pie chart is seeking to

18   establish that New Care was selling more hydrocodone than

19   anybody else is, so it was a comparison, and you pointed out

20   that the pie chart doesn't include information concerning other

21   pharmacies or fill prescriptions for pain clinics and also

22   doesn't show how much hydrocodone was being sold, et cetera.

23             MR. RAVENELL:  Exactly.

24             THE COURT:  I thought that you also pointed out that

25   he did not terminate, that there was a period of time during

1     which these other pharmacies were selling more than 5,000 a

2     month, and that company didn't do anything essentially giving a

3     sort of the stamp of approval from the company's perspective on

4     the these other two pharmacies.

5          MR. RAVENELL:  No.  All I asked is were there

6     companies, whether they continued to distribute to other

7     companies after the defendants, after they terminated the

8     defendant, over 5,000.

9          And in fact, he said he doesn't know whether of the

10    1753 whether how many of those were distributing over 5,000.

11    But that he knows that these two particular, that they were

12    distributing over 5,000.

13         So the question was whether, mainly, whether the

14    company distributed to other pharmacies after the visit to New

15    Care in March, when they terminated New Care 5,000 or more.

16    It's not about --

17         THE COURT:  And what does that prove?

18         MR. RAVENELL:  That those reports, as he's indicated

19    would have gone to the DEA, and that the DEA would have had the

20    information about other pharmacies.

21         You may recall one thing the government points out is

22    that the defendants, for example, were aware other pharmacies

23    were involved in the Internet, that it's important to have

24    other pharmacies involved as well in this group.

25         The fact that the DEA is receiving the monthly

1    reports showing that there were other pharmacies that are

2    receiving more than 5,000 dose, their cutoff number, and no

3    action being taken by the DEA, we would argue, not this

4    company, is relevant to the defendants to rely upon the DEA's

5    lack of actions against on the pharmacies similarly situated to

6    the defendants.

7          It's the DEA action or inaction, is what I intend to

8    argue at some point to the jury.

9          THE COURT:  Well, that action or lack of action from

10   DEA is open for discussion simply by the government's motion.

11   What I see from the case is here that the cases have said what

12   is relevant includes the danger signs or flags, we'll call them

13   flags.  And one flag is was the doctor or was the pharmacy cut

14   off by the supplier?

15         And so if the company was, if the pharmacy was cut

16   off by a supplier, and went out and rounded up another

17   supplier, that's a danger flag, and the government can seek to

18   establish.

19         Then what about the flip side of that?  The fact that

20   you weren't cut off by your supplier?  And I don't know, I

21   haven't figured out how to analyze that.

22         MR. RAVENELL:  We prepared a memorandum that you

23   should, you have now, we filed, hopefully by how.

24         THE COURT:  But the issue is, if the subject is were

25   the pharmacies cut off or not cut off, if that's the general

1    subject, then the government's right that the witness can be

2    allowed to testify in due course these other two pharmacies.

3            Now, in closing argument, are you going to argue that

4    these other two pharmacies were not cut off?

5            MR. RAVENELL:  No.  No intention.  Aside, my point

6    was, how the DEA receives these reports, and how the DEA takes

7    action.

8            We have no intention of arguing these particular

9    pharmacies weren't cut off.  In fact, I didn't even elicit it,

10   so I couldn't argue that.  It's not in evidence.

11           MR. BUDLOW:  After today.

12           THE COURT:  Now, it's possible that the evidentiary

13   ruling may be in this case that if New Care was cut off, then

14   that is something that goes to prove the requisite mens rea.

15           Now, the defendants I assume will get up, I was

16   thinking about this over the last two days, the defendants

17   could say we thought everything was all right, the

18   prescriptions were valid, the DEA blessed us because we knew

19   there were three other pharmacies were doing the same volume

20   that we did, and they weren't cut off, so we figured this gave

21   us -- now, that's something that may be relevant.

22           The problem here is I have no idea what their proffer

23   as to whether or not Mr. Sodipo and Mr. Nwaehiri knew or didn't

24   know that these other pharmacies were selling more than 5,000

25   prescriptions and had or had not been cut off.

1      MR. RAVENELL:  That's my point, Your Honor, not only

2   that, there's no evidence these two pharmacies were Internet

3   pharmacies, unlike Elite.

4      THE COURT:  As part of the defense are you going to

5   put on evidence these other two pharmacies weren't cut off and

6   that the defendants knew they hadn't been?

7      MR. RAVENELL:  Judge, I don't know anything about

8   these two pharmacies other than the report.  Let me make it

9   very clear, if that's the concern, I don't know anything about

10   the pharmacies other than what's this witness has testified.

11      Now, I will tell you certainly there's evidence about

12   other pharmacies like Elite and Florence, but those pharmacies

13   we know were part of the same group.  That certainly is

14   something that we thought was relevant, and the government

15   apparently did, took because they asked questions of Elite of

16   their witnesses as we did.  But these pharmacies don't fall in

17   that group.  They're not part of this group.  So the fact that

18   they were cut off by Cardinal is total irrelevant.  That's why

19   I didn't go into it.

20      MR. BUDLOW:  Your Honor, can I be heard briefly?

21      THE COURT:  I'm going have end this, so I understand

22   I understand both sides.

23      In my view, the --

24      MR. BUDLOW:  I have couple other points, too.  I

25   don't know if you want to hear them.

1      THE COURT:  Go ahead.

2      MR. BUDLOW:  The next point relates to an e-mail that

3  Mr. Ravenell used to refresh the recollection of the witness

4  that was from the witness to Patrick Barstow.  And it was used

5  in a way to explain his reasons for needing the site visit and

6  doing a further investigation.

7      The government's position is that the portion that

8  was used to refresh his recollection didn't show the entire

9  reason.  I would like to show the witness the full e-mail and

10  ask him to review certain portions of that to refresh his

11  recollection as to the full reasons for the investigation.

12      MR. RAVENELL:  Your Honor, if I may, and I apologize

13  for laughing, but if I use a document in a part of something to

14  refresh the witness's recollection and it is refreshed, then

15  it's refreshed.

16      The government doesn't now get to say, well, let me

17  refresh an already refreshed recollection, or already refreshed

18  mind, by just I'll by showing him the document to get in other

19  parts of the e-mail that comes in.  It's not the e-mail that

20  comes in, it's his testimony that comes in.  All I did was show

21  him a portion to refresh the recollection.

22      THE COURT:  Let me ask this, the subject is site

23  visit, did he conduct a site visit at New Care, so the question

24  is why did he conduct the site visit at New Care?

25      MR. RAVENELL:  Which is what he already testified to.

1      THE COURT: And so he was asked about it on direct.

2  He was asked about it on cross, and now Mr. Budlow wants to

3  complete the reasons as to why he did a site visit.

4      MR. BUDLOW:  Yes, because additional reasons were

5  brought up on cross that were given to him by a particular

6  witness and the government's point, as you know, I've confused

7  two issues.  What you said was right.

8      THE COURT:  Why is it germane?  I can see why the

9  site visit conducted for what Mr. Nwaehiri and Sodipo told him,

10  but why is it relevant for the jury to know the reasons why

11  they wanted to conduct a site visit?

12      MR. BUDLOW:  The reason is because the government's

13  position is that the defense by having the witness read simply

14  the highlighted portion, he didn't read the entire thing, he

15  said read the highlighted portion, gave an incomplete reason.

16  And that now the jury has essentially been given a reason

17  that's not the complete reason, and that the complete reason

18  includes additional information.

19      So I may have had him testify to in general the

20  reasons.  Mr. Ravenell very specifically said read this

21  sentence and sentence he had him read related to the Ingredient

22  Limit Excessive Purchase reports.

23      The implication from the testimony was this was the

24  primary basis for the investigation per the DEA, which is sort

25  of what the defense was saying.  Because the DEA has said based

1    on the numbers Ingredient Limit Report, you have to do the

2    investigation.  And he just testified to that specific idea.

3              But the next, the very two sentences later, it's very

4    clear what the full reasons are.  It says site visit with full

5    disclosure of purchase and sales records for these items is

6    necessary to ensure product is being used for the purpose it

7    was intended.

8              So it wasn't just that the DEA said do this, this is

9    the reasons they're doing the visit.  I think the jury's left

10   with the wrong impression without being given the full reasons.

11             THE COURT:  Why is it relevant?  Why are the reasons

12   that this company is conducting the site visit relevant?

13             MR. BUDLOW:  The defense made it relevant by asking

14   the specific questions to the witness on cross-examination.  I

15   found it interesting a number of times that's been our

16   discussion here.

17             The point's clearly made by the defense on cross that

18   the government wants to respond, they have maybe tenable

19   relevance, but the government has to be able to respond when

20   clear inferences are brought up from the defense's

21   cross-examination.

22             This was an inference that wasn't complete.  So it

23   maybe wouldn't have been the most relevant, but I think

24   certainly relevant now based on cross-examination.

25             THE COURT:  My understanding of why they elicited the

1   testimony is the reason they did the site visit to see the

2   reasons were why they were selling hydrocodone and there were

3   DEA guidelines that said if these people are selling a lot of

4   hydrocodone, you've got look in on them.

5          MR. BUDLOW:  I think it gives it a fuller

6   understanding not just look into, the reason they were doing an

7   Internet business, but this makes it more understandable, not

8   just find out why they're doing it, but what's behind that, is

9   this a really legitimate use of the product.

10          MS. SMITH:  And not just cut them off without

11   investigation.

12          THE COURT:  What else?

13          MR. BUDLOW:  And do you have my pad?

14          Lastly, I'd like to ask questions clarifying what

15   exactly the DEA guidance was.  I think Mr. Ravenell has asked a

16   lot of questions relating to the 5,000 limit of DEA guidance

17   but never brought out exactly what the DEA instructed them and

18   what they didn't instruct them to do.

19          I think the implication from cross-examination has

20   been, well, the DEA said 5,000, you should cut him off.  They

21   didn't say that, but that's the implication.  You need to take

22   immediate action.  I want to clarify with the witness what

23   guidance was and what it wasn't.  And that, I guess, let me

24   make sure I get it all.

25          THE COURT:  So the guidance to the drug company?

1    MR. BUDLOW:  By the DEA that Mr. Brantley has

2    testified to extensively on cross, I want him to explain what

3    the guidance was and whether or not it gave them guidance

4    implied by the defense's cross.

5    THE COURT:  Well, what was the guidance?  If there's

6    more than 5,000 per month they have to look into?

7    MR. BUDLOW:  That's my understanding as well.  That's

8    clearly not the point brought out by Mr. Ravenell.  I'll give

9    an example of that, when questioning the witness relating to

10   the report, about IV RX and Phamily, it was did you continue to

11   sell 5,000 or more?  The implication is you should not have,

12   but you did it anyhow.

13   And I'm sure the defense will articulate an

14   additional reason for many of these pieces of evidence.  But

15   they can't escape the fact of the clear inference that's raised

16   in the mind of Your Honor and everyone else that's watching

17   this just because they say they're not going to argue.

18   If that's the clear inference raised, then the

19   government should be entitled to respond.

20   THE COURT:  So you want to establish that if the DEA

21   did not direct that any pharmacy selling 5,000 pills or more be

22   cut off?

23   MR. BUDLOW:  Right.  And what they did direct him, we

24   don't have to have him explain what that.  They were to look

25   into it further.

1        MR. RAVENELL:  That's pretty clear, I think, Judge.

2    That's what the Court said the 5,000 they have to investigate.

3    I don't think I ever asked any question of the witness that

4    suggested that the 5,000 means that you have to stop selling.

5    That's not been asked by me at any point.

6        In fact, I asked him where the 5,000 came from, asked

7    him if he knew the origin of the 5,000, why the DEA set the

8    5,000.  I asked him do you know why they set the limit at

9    5,000, he said no.

10        THE COURT:  Counsel, here are my rulings on redirect

11    examination.  I will sustain the objection with respect to

12    questions concerning Miss Alexander, because that's all

13    hearsay.

14        Two, you can ask, reiterate what it was that you

15    asked him to do in making the charts.

16        But not that there were --

17        MR. BUDLOW:  I'm sorry.  I thought that there was --

18    I didn't understand what you said, Your Honor.

19        THE COURT:  Not that there was nobody else selling

20    this amount, it's just you asked him what did you do

21    mechanically in preparing this chart just so that's clear.

22        You can ask about the distribution centers and what

23    areas they serve.

24        I'm going to sustain the objection concerning the

25    fact that IV RX and Phamily pharmacy were cut off.

1     I think we've covered the e-mail enough I'm going to

2     sustain the objection to that.

3     I'm somewhat leery about the whole idea of why they

4     conducted the investigation, what is relevant is the

5     investigation they conducted, why they conducted it only comes

6     in to show the reason why they conducted the investigation.

7     DEA's thinking about what's legal or illegal is not of any

8     particular relevance.

9     MR. BUDLOW:  The government's not intending on asking

10    that, nor have I asked that.  It's just what their guidance

11    was, what to do with the information, how to respond.

12    THE COURT:  Well, you've already gotten the fact that

13    they wanted to go, you know, DEA gave them some guidance, they

14    went and conducted the investigation, here's the investigation,

15    so I believe that's all complete.

16    The 5,000 pill limit you can get into the fact just

17    establish the fact that the DEA directed but did not say you

18    have to terminate someone who is selling more than 5,000 a

19    month.

20    MR. BUDLOW:  You said I can get into?

21    THE COURT: You can, but just establish that bare

22    fact.  Good.

23    MR. BUDLOW:  Okay.  Thank you.

24         (Open court)

25         REDIRECT EXAMINATION

1  BY MR. BUDLOW:

2  Q.  Mr. Brantley, good afternoon.

3  A.  Good afternoon.

4  Q.  A couple quick questions.

5       Maybe only one question, if I can word it all

6  together really long.

7       What -- you testified about the 5,000 number that the

8  DEA gave you some guidance about.

9  A.  Yes.

10 Q.  Did the DEA, was the DEA's guidance if a particular

11 pharmacy --

12      MR. RAVENELL:  I apologize.  I stopped your train of

13 thought.

14 Q.  Did the DEA guidance include or say that if a particular

15 pharmacy purchased over 5,000 units in a one-month period that

16 Cardinal Health should shut that pharmacy down and stop selling

17 hydrocodone to that pharmacy?

18 A.  No.

19      MR. BUDLOW:  Thank you.  I have nothing further.

20      THE COURT:  Thank you.

21      MR. RAVENELL:  Judge, I have about 30 questions based

22 on that.  No, I'm just kidding.

23      THE COURT:  Good. Thank you.  Mr. Brantley, thank you

24 very for coming.  You are excused, and you may return home and

25 have a very pleasant weekend.

1          THE WITNESS:  Thank you.  You too.

2          THE COURT:  Ladies and gentlemen, it's about ten

3     minutes of one, so rather than put on another witness, why

4     don't we break for lunch now and come back at, why don't we

5     come back at five minutes of two, and we will resume.  And I'm

6     going to stay here with counsel.  Please have a pleasant lunch.

7     Five till two it is.

8          (Jury recessed)

9          THE COURT:  Please be seated.  Mr. Budlow, who's

10    coming next?

11         MR. BUDLOW:  Patrick Barstow, who is another employee

12    of Cardinal.

13         THE COURT: Good.  What we'll do is at the end of the

14    day we'll talk about and have some preliminary argument

15    concerning the government's motion in limine.  This is a tricky

16    area because, unlike a case involving distribution of crack

17    cocaine, all distribution of crack cocaine is illegal.  But in

18    this case, the distribution of hydrocodone is only illegal if

19    the distribution is pursuant to an invalid prescription and the

20    pharmacist knew or was willfully blinded of their fact.

21         So that, in a unique way, the regulatory landscape is

22    germane in a sense.  And if we look at the cases that have,

23    that I discuss in the memorandum, the regulatory landscape can

24    supply certain warning facts.

25         So let us assume, and I'm just thinking out loud

1    here, let's assume that there's a pharmacist who is aware of

2    what's going on in the broader world, and the pharmacist is

3    filling Internet prescriptions and he is cut off by his

4    supplier.

5              According to the case law, that can be a warning

6    flag.

7              Two, he gets a letter from the DEA that's titled

8    Warning Warning Warning, if you are filling Internet

9    prescriptions, then here's what you have to do.  And here's

10   what steps we consider to be insufficient.

11             Now, a warning letter like that is not a statement of

12   the law.  But it certainly does put a pharmacist on a certain

13   type of notice.

14             Let's assume that another warning.  Let's assume that

15   the pharmacist is doing business with a certain website, and

16   the pharmacist learns that the DEA has shut down the website.

17   That can be a warning signal.

18             Let's assume that a pharmacist is doing business with

19   a website and that the website employs five doctors, filling

20   prescriptions for it, and all the doctors are arrested and

21   successfully prosecuted.

22             The flip side of that is let's assume that the DEA is

23   visited or visits the Internet website and says we have some

24   question about what you're doing is illegal, why don't you talk

25   to us and let's look at your books and records.  So that the

1    DEA comes over, with five or six agents, and they thoroughly

2    review all of the pharmacy's, the prescriptions that the

3    pharmacy has received, interviews all the employees, looks at

4    all their books and records, talks to the pharmacist about what

5    they require and what they don't require, and the DEA agents

6    say sounds pretty good, this all, none of this gives us a

7    problem.  They leave and six months later the DEA swoops in and

8    prosecutes or initiates a prosecution.  That also seems to be

9    relevant as a counter danger sign.

10          So there are some unique evidentiary problems in this

11   case that we need to sort out.  Because the government is

12   right, in the normal case, it's who the government, the FBI or

13   DEA has chosen to investigate, and who has chosen to prosecute

14   and who they have chosen to arrest is not relevant.

15          But in this case, that evidence may be relevant so we

16   need to establish the ground rules.

17          Good.  Thank all look forward to seeing you at five

18   of two.

19          MR. RAVENELL:  Your Honor, as we said, we did file

20   today --

21          THE COURT:  Yes, I do have.

22          MR. RAVENELL:  -- a response to the government's

23   memorandum.

24          (Recess.)

25          THE COURT:  Please be seated unless you wish to stand

1    for the jury.

2              (Pause.)

3              (Jury present)

4              THE CLERK:  Jurors all present.

5              THE COURT:  Thank you, Mr. Thompson.

6              Welcome back, ladies and gentlemen.

7              Mr. Budlow or Miss Smith, if you would call your next

8    witness, please?

9              MR. BUDLOW:  Thank you, Your Honor.  The government

10   calls Patrick Barstow.

11             THE CLERK:  If you'll raise your right hand.

12             (The Witness is sworn.)

13             THE CLERK:  Please be seated.  Sir, if you would,

14   first thing I need you to do is adjust that microphone to

15   yourself.

16             THE WITNESS:  Okay.

17             THE CLERK:  And then I need you to state your name

18   and then spell your name for the record.

19             THE WITNESS:  Patrick Barstow, B A R S T O W.

20             THE CLERK:  Thank you.

21                       DIRECT EXAMINATION

22   BY MR. BUDLOW:

23   Q.  Good afternoon, Mr. Barstow.

24   A.  Good afternoon.

25   Q.  How old are you?

DIRECT EXAMINATION

1   A.   44 years old.

2   Q.   And where do you reside?

3   A.   Pylesville, Maryland.

4   Q.   What is your educational background?

5   A.   Bachelor of Science in Finance, University of Maryland

6   College Park.

7   Q.   How are you currently employed?

8   A.   By Cardinal Health.

9   Q.   What do you do for Cardinal Health?

10  A.   I'm an on-site project manager.

11  Q.   For what area?

12  A.   A dedicated customer resource for Health Systems in

13  Washington, D.C. and Baltimore, Maryland.

14  Q.   And how long have you been employed by Cardinal Health?

15  A.   Seven and a half years.

16  Q.   And what other positions have you held during that time?

17  A.   Sales consultant, region value manager, and alternate care

18  manager.

19  Q.   Are you familiar with the Swedesboro distribution center in

20  New Jersey?

21  A.   Yes, sir.

22  Q.   And did you used to work servicing that distribution

23  center?

24  A.   Yes, sir.

25  Q.   When was that?

1    A.  Starting in August of 2001 through October, 2005.  I'm

2    sorry, October, 2006.

3    Q.  And were you still living in Maryland and able to work

4    servicing that center?

5    A.  Yes, sir.

6    Q.  What, if you know, what area of distribution does the

7    Swedesboro, New Jersey distribution center cover?

8    A.  The State of New Jersey, eastern portion of Pennsylvania,

9    the State of Delaware, the State of Maryland, the District of

10   Columbia, and Northern Virginia.

11   Q.  And when you were working out at the Swedesboro region,

12   what area did you cover?  What was your territory?

13   A.  Well, officially, the Baltimore metropolitan area and later

14   the entire region.

15   Q.  And your job had changed, I guess that led you to do the

16   entire region?

17   A.  Yes, sir.

18   Q.  Were you the sales consultant for New Care Home Health

19   Services in Baltimore, Maryland?

20   A.  Yes.

21   Q.  And during what timeframe?

22   A.  From approximately March, 2001, through August of 2004, as

23   the sales consultant.

24   Q.  And then did you later, when you were -- you had the entire

25   region, did you also deal with New Care Home Health Services in

1   a different capacity?

2   A.   Yes, sir, as the alternate care manager.

3   Q.   And what is alternate care?

4   A.   It's the class of trade that works with long-term care

5   pharmacies, mail order pharmacy, home infusion pharmacies, and

6   state government.

7   Q.   Do you recall what time you were alternate manager and had

8   New Care Home Services in your territory?

9   A.   Yes, October 2005 through October, 2006.

10   Q.   And when you were a sales consultant, what, if any, types

11   of monitoring of your clients of purchasing did you do?

12   A.   I received a monthly report of net sales for every

13   customer.

14   Q.   And was it part of your job to review how much of a

15   particular drug the customer was purchasing?

16   A.   No, sir.

17   Q.   Just the total volume?

18   A.   Correct.

19   Q.   And what was the purpose of this review?

20   A.   Just to see general sales trends for your territory.

21   Q.   Was it -- did it include a dollar figure?

22   A.   Yes, sir.

23   Q.   And did the dollar figure affect your commission and your

24   income?

25   A.   Yes.

1    Q.  And were you the alternate care manager for New Care in

2    February, 2006?

3    A.  Yes, sir.

4    Q.  Did you receive a call from Eric Brantley in relation to

5    New Care in that time, February, 2006?

6    A.  Yes, sir.

7    Q.  As a result of the call, what did you do?

8    A.  I placed a call with New Care and requested that we set up

9    an appointment to meet with them.

10   Q.  Okay.  Prior to that call, were you familiar with the

11   owners of New Care?

12   A.  Yes, sir.

13   Q.  And by what names did you know them?

14   A.  Cali, or Mr. Nwaehiri, and Steven, or Mr. Sodipo.

15   Q.  And prior to this February, 2006 call, how many times would

16   you estimate you had spoken in person or on the phone with Mr.

17   Nwaehiri and Mr. Sodipo?

18   A.  Initially, on a weekly basis, as their account was set up,

19   perhaps monthly.

20   Q.  And did they know you by name?

21   A.  Yes, sir.

22   Q.  On what date did you call to set up the site visit?

23   A.  February first, 2006.

24   Q.  And who did you speak to?

25   A.  Mr. Nwaehiri.

1   Q.  And is that the same person you referred to earlier as

2   Cali?

3   A.  Yes, sir.

4   Q.  Did you ask Mr. Nwaehiri any questions about the company's

5   business operations?

6   A.  Yes, I did.

7   Q.  And did he confirm that New Care was in fact filling

8   prescriptions through websites?

9   A.  Yes, he did.

10  Q.  Did you ask Mr. Nwaehiri for the names of the websites?

11  A.  Yes, I did.

12  Q.  And what did he tell you?

13         MR. RAVENELL:  Objection, Your Honor.  Leading nature

14  of the questions, Judge.

15         THE COURT:  I'll overrule the objection.

16  Q.  What did Mr. Nwaehiri tell you when you asked him the names

17  of the website?

18  A.  He would not share the information with me at that time.

19  Q.  Did you ask Mr. Nwaehiri any questions about the number of

20  sites his company supported?

21  A.  Yes, I did.

22  Q.  And what did he say to you when you asked him how many

23  sites his company supported?

24  A.  He said it was just one site.

25  Q.  Did Mr. Nwaehiri give you any additional information about

1    the websites during that call?

2    A.  No, sir.

3    Q.  Have you reviewed your notes from your February first, 2006

4    call with Mr. Nwaehiri?

5    A.  Yes.

6    Q.  And at the bottom of the notes, in addition to the

7    information you've testified about, aren't there two phone

8    numbers at the bottom?

9    A.  Yes.

10   Q.  One says "customer service," and the other is

11   "consultation" number for both websites?

12   A.  Correct.

13   Q.  When did you obtain that information?

14   A.  At a subsequent meeting that I held with Mr. Brantley and

15   Mr. Nwaehiri and Mr. Sodipo.

16   Q.  And so subsequent to the February first telephone call

17   conversation?

18   A.  Yes, sir.

19   Q.  Thank you, Mr. Barstow.

20           I have no further questions, Your Honor.

21           THE COURT:  Thank you.  Mr. Ravenell, your witness,

22   sir.

23           MR. RAVENELL:  Thank you, Your Honor.  Just briefly.

24                   CROSS-EXAMINATION

25   BY MR. RAVENELL:

1   Q.  Sir, when you spoke to Mr. Nwaehiri, on at least in

2   February 1 of 2006, you said he would not share with you the

3   name of the company that he was working with in the Internet;

4   is that correct?

5   A.  Yes, sir.

6   Q.  And did you ask him why?

7   A.  Yes.

8   Q.  All right.  Did he tell you why?

9   A.  He said he didn't feel it was necessary to share that

10  information with me.

11  Q.  Okay.  And did you ever ask him whether there were any

12  particular contracts he had regarding the confidentiality with

13  the companies he dealt with?

14  A.  No, sir.

15  Q.  Thank you.

16          Now, you said you did in fact meet with Mr. Nwaehiri

17  and Mr. Sodipo on 2-9'06, correct?

18  A.  Yes, sir.

19  Q.  And at that time you were given the names of several

20  Internet sites?

21          MR. BUDLOW:  Objection, Your Honor, could we

22  approach?  Scope.

23          THE COURT:  You may.

24          (At the bench)

25          MR. BUDLOW:  Your Honor, the witness had actually did

1    not testify to anything about the meeting other than set it up,

2    and any questions about the meeting or about what occurred at

3    the meeting or what was said at the meeting would be far beyond

4    the scope of direct examination, and the government objects

5    based on that.

6         THE COURT:  This is a meeting at New Care?

7         MR. BUDLOW:  It is a meeting at New Care that Mr.

8    Brantley testified earlier that this witness did attend.  He

9    was present.

10        THE COURT:  Now, he did ask Mr. Sodipo what websites

11   he was filling prescriptions for, was that at the same meeting?

12        MR. BUDLOW:  No.  On February first, he asked Mr.

13   Nwaehiri which websites he was filling prescriptions for.  Mr.

14   Nwaehiri, on February first, 2006, according to the testimony,

15   refused to give him the information.

16        The meeting occurred a little ever a week later on

17   February 9th, 2006, so there would be no sort of issue of

18   completeness, since it was a two totally separate meetings or

19   discussions.

20        And it was -- again, it was Mr. Nwaehiri on the phone

21   that gave the information.  The meeting was both Mr. Nwaehiri

22   and Mr. Sodipo with Mr. Brantley and Mr. Barstow.

23        THE COURT:  And Mr. Ravenell?

24        MR. RAVENELL:  Your Honor, I thought, A, the

25   government wants to basically give the jury a view to suggest

1   that Mr. Nwaehiri withheld information from him.  Just a week

2   later, he gave them detailed information about the websites.

3   There would be, to say the least, that would be leaving a false

4   impression with the jury that Mr. Nwaehiri withheld information

5   and would not give certain information when they know just a

6   week later, even as Mr. Brantley has testified, they got

7   detailed information about websites.

8          Additionally, as the Court has said to us, we have to

9   get these question now or we can't call the witness back later.

10  All I would end up doing is calling the same witness in my

11  case-in-chief to ask the same question.

12         THE COURT:  So you're going to ask him about who said

13  what in the second meeting?

14         MR. RAVENELL:  Yes.

15         MR. BUDLOW:  Your Honor, on the scope issue, I

16  believe the discussion earlier was when we've got out of town

17  witnesses, when it makes sense for both parties to proceed that

18  way.  This is not an out-of-town witness.  He lives near

19  Annapolis.  He can come in at any time.

20         The government does not want to agree to allow a

21  direct examination at this point that's clearly beyond the

22  scope.  As to leaving the false impression as Mr. Ravenell just

23  stated, Mr. Brantley was very clear that he got lots of

24  information at the meeting.  So there's no indication that at

25  the meeting they were in any way withholding information,

1    although some indication that they were not completely

2    truthful.

3         So the fact that -- the truth is Mr. Nwaehiri did

4    withhold information, and this is a total separate hearing, and

5    the charges there being sort of any misinterpretation, again,

6    Mr. Brantley's already testified.  So the government can call

7    its case in the order that it chooses and limit its witnesses

8    in the way it chooses, and this is beyond the scope.

9         MR. RAVENELL:  Your Honor, I never understood the

10   Court --

11        THE COURT:  So what do you want to ask, does he want

12   to talk to him about the second meeting?

13        MR. RAVENELL:  Yes.

14        THE COURT:  And what about the second meeting?

15        MR. RAVENELL:  That at the second meeting he did in

16   fact speak to Mr. Nwaehiri and Mr. Sodipo, and they shared with

17   them the names of the sites that they were dealing with,

18   Internet sites.

19        THE COURT:  And what else do you wish to establish

20   with the witness?

21        MR. RAVENELL:  I actually don't have a lot of

22   questions, Judge.  Your Honor, I'm going to ask him about the

23   2-9 meeting that Mr. Sodipo gave him a list of the licenses for

24   the prescribing physicians, and that he was told that the state

25   inspector had been in to see them on December '05, and the

1    defendants told them that they wrote the -- the doctors wrote

2    for several different Internet sites, and those are probably

3    the only questions I have.

4            THE COURT:  And what about the state inspector, that

5    comes in to prove what?

6            MR. RAVENELL:  Your Honor, actually, you may recall

7    that the government asked Mr. Brantley about what the defendant

8    said about the state inspectors, and I think the testimony from

9    Mr. Brantley was similar, that the defendants said that the

10   State inspector had come in in December '05.  So this is just

11   confirming that information Mr. Brantley has testified.

12           Also, that the defendants told him that the state

13   inspector came in, December '05, which we all know, Ms.  Nomoto

14   toe came in December '05.

15           MR. BUDLOW:  Everything Mr. Ravenell has stated was

16   already testified to by Mr. Brantley.

17           THE COURT:  Well, it seems to me to prevent him from

18   having to come back again, I will permit it.  Mr. Ravenell

19   doesn't have a lot, what do you have, ten minutes?

20           MR. RAVENELL:  Less than that I would think.

21           THE COURT:  Good.  Then I will permit it.

22           MR. BUDLOW:  Your Honor, may I, in a related note,

23   request the Court instruct the defense that he not be permitted

24   to lead any of these questions since they are clearly beyond

25   the scope, and this would essentially be a direct examination.

1        THE COURT:  Well, that is true.  So you'll have to --

2        MR. RAVENELL:  Fine, Judge.

3        THE COURT:  -- ask direct questions.

4        MR. RAVENELL:  I have no problem with that.

5        (Open court)

6   BY MR. RAVENELL:

7   Q.   Now, sir, I'd asked you when you met with Mr. Sodipo and

8   Mr. Nwaehiri on 2-9-'06, did you ask whether -- for the names

9   of the Internet sites that they were in fact involved with?

10  A.   Yes, sir.

11  Q.   And did they give you the names of the Internet sites?

12  A.   Yes, sir.

13  Q.   What name did they give you?

14  A.   Internet Health Enterprise.

15  Q.   Okay.  And that was your first time that you'd spoken to

16  Mr. Sodipo and asked him questions about the Internet sites?

17  A.   Yes.

18  Q.   Okay.  I think you said you spoke to Mr. Nwaehiri on

19  2-1'06, not Mr. Sodipo; is that correct?

20  A.   Yes.

21  Q.   All right.  And when you spoke to Mr. Sodipo and Mr.

22  Nwaehiri on 2-9'06 with Mr. Brantley, did you ask whether they

23  in fact had the list of the licenses for the prescribing

24  physicians?

25  A.   Yes, sir.

1   Q.  And did they in fact tell you they had a list of the

2   licenses, actual licenses, for the prescribing physicians?

3   A.  Yes, sir.

4   Q.  And did you -- when you asked, they told you they in fact

5   had the list or did not have the list?

6   A.  They had a list, and they showed it to us.

7   Q.  And they did show it to you?

8   A.  Yes, sir.

9   Q.  Okay.  Did you ask the defendants whether there'd been an

10  inspection by the state, prior to the State of Maryland, prior

11  to your meeting with them on February 9th '06?

12  A.  I don't believe we asked them, but they did supply that

13  information that they did have a state inspection.

14  Q.  And did they tell you when that state inspection was?

15  A.  Yes, sir.  I believe they said it was December, 2005.

16  Q.  Did you ask the defendants when they gave you the list of

17  the doctors that they had licenses for, did you ask them

18  whether those doctors wrote prescriptions for one or more

19  Internet sites?

20  A.  Yes, sir.  And they didn't provide the list.  They showed

21  us a list.  And --

22  Q.  Okay.

23  A.  And then they said that the same doctor writes for more

24  than one Internet site.

25  Q.  Okay.  And did they list the names of the Internet sites

1    other than IHE Internet site?

2    A.  They mentioned one other one, I believe it was Pain

3    Management Service or something of that nature.  They said they

4    didn't use it very much.

5    Q.  Did they mention on scripts, online scripts?

6    A.  They mentioned online scripts, which they explained was

7    sounded like it was part of IHE, or Internet Health Enterprise.

8    Q.  Now, you said that you became the alternate care manager

9    after being the sales consultant for New Care, not just New

10    Care alone, from 3-01 to 8-04; is that correct?

11    A.  I was a sales consultant, and then I was a region value

12    manager, and then I was alternate care.

13    Q.  Let me make sure I have it correct.  You were sales

14    consultant from March '01 to August '04?

15    A.  Yes, sir.

16    Q.  All right.  And then your position became what?

17    A.  Region value manager.

18    Q.  How long were you the reason value manager?

19    A.  Region value manager, July '04 through October '05.

20    Q.  Okay.  And you became the alternate care manager from

21    October '05 to October '06?

22    A.  Yes, sir.

23    Q.  And New Care was a customer during that time period?

24    A.  Yes, sir.

25         MR. RAVENELL:  Okay.  All right.  Nothing further,

1        Your Honor.

2                    THE COURT:  Thank you, Mr. Ravenell.  Mr. McCants?

3                    MR. MCCANTS:  Yes, Your Honor, just a couple

4        questions.

5                              CROSS-EXAMINATION

6        BY MR. MCCANTS:

7        Q.  Good afternoon.

8        A.  Good afternoon.

9        Q.  What led you to ask Mr. Nwaehiri about New Care's

10       connection to telemedicine or Internet site?

11       A.  I believe it was a conversation with Mr. Brantley.

12       Q.  Okay.  Without asking you -- I'll withdraw that.

13                   Did Mr. Nwaehiri tell you in fact that New Care had a

14       contract with IHE?

15       A.  He did.  The two of them did at our February 9th meeting,

16       yes, sir.

17                   MR. MCCANTS:  Okay.  No further questions, Your

18       Honor.

19                   THE COURT:  Thank you.

20                   Mr. Budlow?

21                   MR. BUDLOW:  Yes, thank you, Your Honor.

22                             REDIRECT EXAMINATION

23       BY MR. BUDLOW:

24       Q.  Mr. Barstow, you were present on the meeting on February

25       9th being led by Mr. Brantley?

1    A.  Yes, sir.

2    Q.  And did you hear whether or not Mr. Brantley asked Mr.

3    Nwaehiri and Mr. Sodipo about the existence of a doctor/patient

4    relationship?

5    A.  Yes, sir.

6    Q.  And did Mr. Nwaehiri say that he verifies that the

7    doctor/patient relationship exists?

8    A.  Yes, sir.  He said he verified that.

9    Q.  Did Mr. Nwaehiri also say that he wasn't sure whether or

10   not the examination occurs in person or not?

11             MR. RAVENELL:  Objection, Your Honor.

12             THE COURT:  I'll overrule the objection.  You may

13   answer.

14   A.  Yes, sir.  He explained that he did not know how the

15   examination occurred, for example, he didn't know if it was a

16   an in-person examination.

17   Q.  Were Mr. Nwaehiri and Mr. Sodipo asked about whether or not

18   they do refills for the Internet business?

19   A.  Yes, they were.

20             MR. RAVENELL:  Objection Your Honor.  May counsel

21   approach?

22             THE COURT:  You may.

23             (At the bench)

24             MR. RAVENELL:  Your Honor, objection, way beyond the

25   of any questions we asked this witness on our direct

1    examination of him on these limited points.

2              THE COURT:  My understanding is that you're talking

3    about the February 9th meeting?

4              MR. BUDLOW:  That's correct.

5              THE COURT:  So the general topic was opened as to

6    what Mr. Sodipo and Mr. Nwaehiri said during the February 9th

7    meeting to him, or to Mr. Barstow about the prescribing of

8    hydrocodone.  So it's a subject that was opened up on your

9    quote unquote direct examination, so I will permit it.

10             MR. RAVENELL:  Thank you.

11             (Open court)

12   BY MR. BUDLOW:

13   Q.  What were you and Mr. Brantley told about whether or not

14   they filled refills for the websites?

15   A.  They explained that they did not fill refills, that each

16   order had to be a new order each time.

17   Q.  And lastly, were you -- did you hear Mr. Brantley ask Mr.

18   Nwaehiri and Mr. Sodipo how many beds were serviced by their

19   long-term care facilities?

20   A.  Yes, sir.

21   Q.  And how many beds they said were served?

22             MR. RAVENELL:  Objection to the "they."

23   Q.  What was their response?

24             THE COURT:  Well, this would be --

25             MR. RAVENELL:  Objection.

1          THE COURT:  If you could break it up whether it's Mr.

2    Sodipo or Mr. Nwaehiri?

3    Q.  First, did you hear the answer?

4    A.  Yes, sir.

5    Q.  Do you recall who answered Mr. Brantley's question?

6    A.  No, I do not.

7    Q.  Okay.  Were both Mr. Nwaehiri and Mr. Sodipo present at the

8    time of the answer?

9    A.  Yes, sir.

10   Q.  Did the one that did not respond react in any way to the

11   answer?

12   A.  No, sir.

13   Q.  What was the answer that was given?

14   A.  About 18,000 beds.

15          MR. BUDLOW:  Thank you.  Nothing further, Your Honor.

16          MR. RAVENELL:  Just briefly, Your Honor.

17          THE COURT:  Go right ahead.

18                    RECROSS-EXAMINATION

19   BY MR. RAVENELL:

20   Q.  Now, sir, when you met with Mr. Sodipo and Mr. Nwaehiri on

21   2-9'06, did you ask whether the patients can just go online and

22   get refills or whether the patients have to go back through the

23   Internet system to get the refills?

24   A.  I don't know if we asked the question, but they did share

25   that patients cannot just go online and get refills.

REDIRECT EXAMINATION

1    Q.  All right.  So they told you that the patients have to go

2    back through the Internet site before the prescriptions are

3    refilled?

4    A.  Yes, sir.

5    Q.  Thank you.  And did you in fact check to verify whether

6    that's how the Internet system worked, what they told you?

7    A.  No, sir.

8    Q.  All right.  The information, you said they told you that

9    they were filling for Internet sites; is that correct?

10   A.  Yes, sir.

11   Q.  All right.  Did you in fact do anything to verify whether

12   they in fact were connected with the Internet sites other than

13   what they told you?

14   A.  I did not, no, sir.

15            MR. RAVENELL:  Okay.  Nothing further, Your Honor.

16            THE COURT:  Thank you.  Thank you.

17            Mr. McCants, anything further?

18            MR. MCCANTS:  Nothing, Your Honor.

19            THE COURT:  Good.  Thank you.  Thank you very much

20   for coming, sir.  You are excused.

21            MS. SMITH:  Your Honor, the government calls D'Andra

22   Kelly to the witness stand.

23            THE COURT:  Thank you.

24            Good afternoon.

25            THE WITNESS:  Good afternoon.

1          THE CLERK:  If you'll raise your right hand.

2          (The Witness is sworn.)

3          THE CLERK:  Please be seated.  Ma'am, I need you to

4    adjust that microphone to yourself.  It bends at the top.

5          There you are.

6          And then I need you to state your name and then spell

7    your name for the record.

8          THE WITNESS:  D'Andra Kelly, D apostrophe capital A N

9    D R A, last name K E L L Y.

10         THE CLERK:  Thank you.

11                    DIRECT EXAMINATION

12   BY MS. SMITH:

13   Q.  Thank you.  Ma'am, speak loud and clear into that

14   microphone.

15         Let me ask you, ma'am, what is your educational

16   background?

17   A.  I'm currently in college completing my degree in

18   psychology.

19   Q.  And where did you grow up?

20   A.  I grew up in Newark as a child.  But I grew up as an adult

21   in Los Angeles, California.

22   Q.  When did you move to Maryland?

23   A.  About six years ago.

24   Q.  And are you currently employed?

25   A.  I am.

1   Q.   What kind of work do you do?

2   A.   I'm the executive assistant to the department of

3   transportation federal highway in their civil rights division.

4   Q.   Let me ask you, ma'am, did you at one time work for New

5   Care in Baltimore, Maryland?

6   A.   Yes.

7   Q.   And where were they located when you worked for them?

8   A.   On Sinclair Lane.

9   Q.   And do you recall now the dates from about when to when you

10  worked for New Care?

11  A.   '04 to '06.  I'm not exactly certain of the months.

12  Q.   Okay.  Well, let's start with '04.  Generally, what time of

13  year do you think you started working there, if you recall?

14  A.   Somewhere between May and June.

15  Q.   Okay.  And when did you leave there?

16  A.   June of '06.

17  Q.   And what was your position, or title, at New Care, ma'am?

18  A.   I was the office manager.

19  Q.   And what did that mean?

20  A.   Basically overseeing the administrative part of the

21  business of New Care.

22  Q.   And let me ask you something, tell us about New Care.  What

23  type of business was it when you got there in 2004?

24  A.   A pharmaceutical company basically serving the community,

25  such as nursing homes, group homes.  We didn't have really

1  walk-in customers, or walk-in clients.

2  Q.  All right.  Did you ever hear the term "closed door"

3  pharmacy?

4  A.  Yes, closed door pharmacy is what it was.

5  Q.  Okay.  And were there any other businesses being operated

6  under the title New Care?

7  A.  We had a nursing care where we assisted homebound

8  individuals that needed assistance.  We had nursing assistants

9  that went out to assist these individuals.

10  Q.  And this was separate and apart from the pharmacy that

11  serviced assisted living facilities?

12  A.  Yes, yes.

13  Q.  Okay.  And who ran -- by the way, who ran the business of

14  New Care beside you as the office manager?

15  A.  There were different departments.

16  Q.  Okay.

17  A.  Manufacturing, pharmaceutical, home care, so there were

18  different directors supervising the departments.

19  Q.  All right.  Well, beginning with the pharmacy, who

20  supervised the pharmacy?

21  A.  Mr. Cali and Mr. Sodipo.

22  Q.  Okay.  And Mr. Cali, do you know his full name?

23  A.  I never could pronounce Mr. Cali's name.

24  Q.  Okay.  Mr. Nwaehiri?

25  A.  Nwaehiri, yes.

1    Q.  Do you see him here in the courtroom today?

2    A.  Yes.

3    Q.  Okay.  Gentleman wearing the red tie?

4    A.  Yes.

5    Q.  Okay.  And Mr. Sodipo, you said, is he also here in the

6    courtroom?

7    A.  Yes, he is.

8    Q.  Okay.  And he's wearing, looks like a blue suit?

9    A.  Correct.

10   Q.  And what about the nurses, the home care part of the

11   business, who was in charge of that?

12   A.  Nannette Patterson.

13   Q.  Okay.  And did she have an assistant or somebody she worked

14   closely with, if you recall?

15   A.  Not really.  The administrative staff assisted her when

16   necessary.

17   Q.  Okay.  And what other business were run out of the facility

18   at Sinclair Lane, if you recall?

19   A.  We had a manufacturing that developed cosmetics and

20   different creams.

21   Q.  And who was in charge of that?

22   A.  If you ask me names, I can't pronounce really.

23   Q.  Do you remember a first name?  All right.  We'll come back

24   to that.

25   A.  Yes, that's something else.

1   Q.   And what other businesses, if you recall?

2   A.   We had home builders.

3   Q.   And what was the name of that business, if you know?

4   A.   Custom Home Builder, New Care's Custom Home Building, I

5   believe.

6   Q.   And do you remember today the name of the person that ran

7   that?

8   A.   Mr. Dual.

9   Q.   Mr. Dual?

10  A.   Uh-huh.

11  Q.   Was that his first name or his last name?

12  A.   Dual Belnavis.

13  Q.   Dual Belnavis?

14  A.   Yes.

15  Q.   Okay.  To your knowledge -- well, let me -- let me, let me

16  begin by asking you when you worked there, approximately how

17  many employees were there?

18  A.   I'm going to guess, somewhere between 15 and 20 when I

19  started.

20  Q.   This is 39 C.

21       Miss Kelly, I'm going to put in front of you an

22  exhibit for identification only at this time, 39 C,

23  government's 39 C, and ask you to look at that for a minute,

24  and ask you, does that refresh your recollection some of the

25  names of the people who you'd been trying to remember for me

1   today?

2   A.   Yes.

3   Q.   Okay.  So tell me, if you will, do you remember now the

4   name of the person that ran the manufacturing operation?

5   A.   I'm looking for the name now.

6   A.   Justina.

7   Q.   Okay.  And how do you spell her last name?

8   A.   I K P I M.

9   Q.   All right.

10        MR. RAVENELL:  Your Honor, objection.  May counsel

11   approach briefly?

12        THE COURT:  You may.

13        (At the bench)

14        MR. RAVENELL:  Your Honor, I guess taking off the

15   government's objection regarding Mr. Brantley, Miss Smith has

16   put a document in front of the witness, and what she's having

17   her do now is read the names.  There's no indication she has a

18   recollection of it.  What she's doing, because she can't

19   remember the names, is reading off the sheet that tells her the

20   names and what the people did.  That doesn't indicate refreshed

21   recollection.

22        THE COURT:  So is she reading from the document?

23        MS. SMITH:  I asked her who ran the manufacturing

24   company about three minutes ago, and she couldn't remember the

25   name.  I gave her the document.  She looked at it, and she said

1  now she remembers the name is Justine.  I asked her to spell

2  the last name for me, which she read off the document.

3       THE COURT:  What you might do is just ask her to put

4  the document down and if she needs to refer to it, to refer to

5  it, but to let everyone know that's what she's doing.

6       MS. SMITH:  Okay.  If she doesn't have a recollection

7  of these things, she's not supposed to just read it off the

8  document?

9       THE COURT:  That's correct.

10       MS. SMITH:  I will tell her.

11       THE COURT:  Certainly she's at liberty to refresh her

12  recollection by looking at the document, but she needs to let

13  us know that that's what she's doing, and she also needs to say

14  whether she now remembers.

15       MS. SMITH:  Okay.

16       MR. RAVENELL:  Thank you.

17       (Open court)

18  BY MS. SMITH:

19  Q.  The witness is reviewing the document which is -- and do me

20  a favor, as you answer my questions, don't look at the

21  document.  It is important that the document refresh your

22  recollection, but not tell you something you never knew --

23  A.  Exactly.

24  Q.  -- okay?

25       So do you remember, Miss Ikpim?

1   A.  Yes, I remember Miss Ikpim.

2   Q.  And that's how --

3   A.  That's how I recall.

4   Q.  And do you remember in addition to these four departments,

5   if you will, who was the CEO or the boss of the entire

6   business?

7   A.  Mr. Sodipo oversaw all departments.

8   Q.  Okay.  And was his title, the Chief Executive Officer?

9   A.  That was my understanding, yes.

10   Q.  Okay.  And do you recall, did Mr. Nwaehiri, in addition to

11   being in charge of the pharmacy, did he have a title similar to

12   that, if you recall?

13           MR. RAVENELL:  Objection, leading.

14           THE COURT:  I'll overrule the objection.  This is

15   you're asking, whether Mr. Sodipo had a title?

16   Q.  Mr. Nwaehiri --

17           THE COURT:  Mr. Nwaehiri.

18   Q.  -- if he had a title?

19   A.  I don't recall his title.  I just know he was Mr. Sodipo's

20   assistant.

21   Q.  And let me ask you, in the pharmacy, do you know what kind

22   of staff made up the personnel in the pharmacy?

23   A.  The pharmacist and the technicians.

24   Q.  And do you remember any of the pharmacists or any of the

25   technicians?

1   A.   I remember Mr. Cali, Mr. Sodipo, Miss Ruth, Miss Jones, Mr.

2   Barbow, Barbake I think that was his name.

3   Q.   Okay.

4   A.   Those were the pharmacists.  And then you had technicians,

5   Miss Hanes.

6   Q.   And in 2004, approximately how many pharmacists would work?

7   A.   In 2004, when I came, they may have had maybe three or four

8   pharmacists and maybe about five technicians.

9   Q.   Did you know Babu Abraham?

10  A.   Yes, Mr. Babu.

11  Q.   Was that the name you were trying to pronounce?

12  A.   I was trying to pronounce, yes.

13  Q.   And did you know someone named Takia Taylor?

14  A.   I wasn't familiar with her, no.

15  Q.   Okay.  You said Miss Ruth?

16  A.   Yes.

17  Q.   Do you remember, what position did she hold?

18  A.   That was a pharmacist.

19  Q.   And do you remember Miss Ruth's last name?

20  A.   No.  Not right off.  I'm not sure of her last name.  We

21  didn't really use last names.  We called everyone miss by their

22  first names.

23  Q.   Okay.  And did you know a Kenneth Hartwill?

24  A.   I did.

25  Q.   What was his position?

DIRECT EXAMINATION

1   A.   He was also a part-time pharmacist.

2   Q.   Okay.  And there was a Latia Jones, is that the Miss Jones?

3   A.   Yes.

4   Q.   Did you know -- actually, I'll -- was there someone that

5   worked at New Care named GD?

6   A.   Yes.

7   Q.   Who is GD?

8   A.   GD Sodipo was Mr. Sodipo's nephew.

9   Q.   And what type of job did GD do, if you know?

10   A.   He also worked at the pharmacy.

11   Q.   What kind of job did he work, was he a pharmacist?

12   A.   No.  He did more of the technician type work.

13   Q.   Okay.  And did you know what technicians do?  You don't

14   have any pharmacy training?

15   A.   No, I don't.

16   Q.   Okay.  What did you understand that technicians did?

17   A.   To assist with filling prescriptions or preparing the meds

18   by putting them in containers and labeling contains, things of

19   that sort.

20   Q.   Okay.  And did you know someone named Ahmed Abdulrazaak?

21   A.   Yes.

22   Q.   And what position, if any, did he have at New Care?

23   A.   He was of the accounting department.

24   Q.   And say that again?

25   A.   The accounting department.

1    Q.   You said something else about the account?

2    A.   I said he was over the accounting department.

3    Q.   He was director of accounting?

4    A.   Yes.

5    Q.   Tell us a little bit about the day-to-day operations at New

6    Care.  Who answered the telephones?

7    A.   At the time that I was hired, myself and an assistant

8    administrator Robin Benta, we were in charge of the front

9    office on the phones.  So between her and myself, we answered

10   the phones.

11   Q.   And may I assume there was a switchboard, and you would

12   just transfer the calls wherever they had to go?

13   A.   Yes.

14   Q.   And what about the incoming mail?

15   A.   Incoming mail was picked up by whomever Mr. Sodipo, you

16   know, assigned to pick up the mail.  It came into to Miss

17   Benta, who was assigned there to in, we had a log in for all

18   the mail came in.

19   Q.   And what would happen with the mail after it was logged in?

20   A.   It was given to Mr. Sodipo.

21   Q.   What if it was a personal letter, for example, for Miss

22   Benta?

23   A.   From my understanding, the way I handled the mail, all mail

24   was to be logged in and given to Mr. Sodipo or he was to be

25   notified the mail that came in.

1   Q.  Did that include what we might include typically junk mail?

2   A.  No.  He didn't care about junk mail.  We could discard

3   that.

4   Q.  What about packages that came in?

5   A.  He was notified of everything that came in, it was logged

6   so, if necessary, he it could go back and be tracked if

7   something was not able to be located.

8   Q.  How about visitors at New Care?  Was there any kind of sign

9   in?

10  A.  We did have sign in for visitors.  Also for the employees.

11  We always supposed to sign in and, you know, clock in so all

12  visitors, anyone coming and going supposedly had some way of

13  signing in, let us know who was in the building.

14  Q.  Now, after hours, who answered the telephone?

15  A.  We had an answering service.

16  Q.  And did you ever have occasion to have any conversations

17  with anyone at the answering service?

18  A.  Just on Fridays I would have to call them to that let them

19  know who was on call or for weekend, meaning what pharmacist

20  should be contacted in case of an emergency or someone needed a

21  prescription filled, you know.

22  Q.  And was there any one person you would speak to when you

23  would call the answering service?

24  A.  I wasn't any one person, just whomever answered the calling

25  service.

1    Q.   Okay.   And how would the messages -- if there was a phone

2    call in the night, how would the messages be received, if you

3    know?

4             How would New Care know there'd been phone calls?

5    A.   Well, the answering service sent a log, a call-in log, that

6    we were able to keep track of, and we usually kept those in a

7    notebook, you know, just for purposes of knowing what calls

8    came in.

9    Q.   Let me show you government's exhibit 19, take a look at

10   this and tell me if you recognize it.

11   A.   That -- this was the Fax from the tele-service.   They would

12   Fax over the results from the day, from the prior day.

13   Q.   And they would come in you said through the Fax?

14   A.   Yes.

15   Q.   All right.   And they're sort of divided by month?

16   A.   Yes.

17   Q.   And what appears to be written at the top of a lot of the

18   pages?

19   A.   Signature and date.

20   Q.   Do you know whose signature that?

21   A.   Wanda Gasque.

22   Q.   Who is Wanda?   What did she do?

23   A.   She worked at the pharmacy, also, as a technician.   And she

24   picked up a lot of the messages as they came in over the Fax

25   machine, since the Fax machine was located in the pharmacy.

1   Q.  And do you have any idea what the indication what her

2   signature on the --

3          MR. RAVENELL:  Objection.  May counsel approach?

4          THE COURT:  You may.

5          (At the bench)

6          MR. RAVENELL:  Judge, I keep forgetting this local

7   rule thing that we have, and I'm not sure whether Miss Smith is

8   leading up just to have the witness identify something or

9   whether she's actual moving government's 19 N.  So I'm

10  objecting to the document going in.  It sounds like she's

11  leading up by asking information about Wanda Gasque, et cetera,

12  but I'm not sure.

13         We kind of -- what the local rule identifying certain

14  documents.  As you've seen, I've presented certain documents

15  the witness asked me to identify and having them moved in and

16  assumed because they show any document that it goes in, I don't

17  think some of them should go in, because I show it to a

18  witness.  And so I'm kind of in a quandary.

19         I'm objecting to this document going in through this

20  witness.  I don't think there's any foundation for it, but

21  maybe I want to inquire what the government is seeking

22  introduction or setting ground work for later introduction.

23         THE COURT:  The way the local rule works is if the

24  document were shown to the witness and identified, can you

25  identify government exhibit 16, the document is then admitted

1    unless there's an objection to it.

2         MR. RAVENELL:  We're objecting, Judge.

3         MS. SMITH:  And, Your Honor, I should apologize.  I

4    did not walk over and say look, look, before I approached the

5    witness.  I had done that the exhibit before, but I did not do

6    that with this exhibit.  So I might have caught them off guard.

7         MR. RAVENELL:  We're appreciate it.  Object to this

8    particular document coming in through this particular witness.

9         THE COURT:  The document is what?

10        MR. RAVENELL:  It's a book of phone -- of Faxes from

11   Chesapeake Answering Service overnight evening calls to the

12   pharmacy for New Care.  And I don't know that this witness can

13   identify those hundreds, maybe a couple hundred pages as being

14   what they are, purportedly.

15        THE COURT:  What has she said about the book?

16        MS. SMITH:  She said it is the notebook where they

17   collected the overnight messages, and I could make the point

18   clearer.  I can ask her does she specifically remember this.  I

19   mean, I asked her did she recognize it, and she said yes, this

20   is the notebook.  This is I believe one of the subjects that we

21   did cover in the motion in limine.  I don't intend to ask a

22   whole lot of questions about the document right now.  It was

23   recovered at New Care in the search, and we do have a witness

24   from Chesapeake Telephone coming in.

25        Altogether, the Court has already ruled that this

1    evidence is all admissible.

2        MR. RAVENELL:  The Court has ruled that it's

3    admissible-type evidence, not that it gets to come in just by

4    having any person sponsor it.  And right now all I have, we

5    have a person who worked at New Care who's looking at a white

6    notebook and the government is saying is this it?  There's no

7    way she would know this white notebook from any other white

8    notebook in the world.  And I think it would be really highly

9    unlikely.  I could present her ten white notebooks and there's

10   no issue this is the white book versus one that was in New Care

11   back in 2006 when she last worked there.

12       THE COURT:  So you're not going ask her about the

13   contents of the messages?

14       MS. SMITH:  Not right now, no.  And it does have a

15   title on the cover that says Chesapeake Telephone.

16       THE COURT:  So what you should do is go through the

17   authenticity --

18       MS. SMITH:  I'll do that.

19       THE COURT:  -- that you need to that authenticate the

20   notebook.  Have it marked for identification, what you have,

21   but lay the foundation, and then I'll decide whether it comes

22   into evidence or not after I hear from the representative,

23   representative from Chesapeake.

24       MS. SMITH:  All right.

25       THE COURT:  So we'll establish that something that

1    came into --

2              MS. SMITH:  Very well.

3              THE COURT:  That came into New Care, she knows

4    because she saw it and she can identify it.

5              MS. SMITH:  Your Honor, I think as office manager it

6    was something within the purview of her job to take care of,

7    but it doesn't need to be in evidence before the other witness,

8    so I'm not going to fight about it.

9              THE COURT:  Just lay the foundation.

10             MS. SMITH:  I will.

11             THE COURT:  She's the office manager, and this is a

12   document that she can vouch for.

13             MS. SMITH:  Okay.

14             MR. RAVENELL:  Mr. Budlow, Your Honor, would I be

15   able to voir dire, then?

16             THE COURT:  Well, it's not expert testimony.  You can

17   cross-examine her on this issue.  The document's only being

18   marked for identification at this point so you can do that

19   during your cross-examination.

20             MR. RAVENELL:  Thank you.

21             (Open court)

22   BY MS. SMITH:

23   Q.  I asked you before about who handled the calls at night on

24   weekends?

25   A.  Yes.

1  Q.  And you testified you would call the answering company to

2  let them know who was on call?

3  A.  Yes.

4  Q.  Do you remember the name of the company?

5  A.  Chesapeake Answering Service.

6  Q.  Okay.  Do you have any idea where they were located?

7  A.  No, I do not.

8  Q.  Okay.  And who would be on call?  What were the choices?

9  A.  It would rotate.  One week, it would be Mr. Sodipo.  One

10  weekend, it would be Mr. Cali.

11  Q.  What about any of the other pharmacists?

12  A.  I never had permission to, you know, put them as the person

13  on call.

14  Q.  So in the time that you were there, approximately two years

15  --

16  A.  Yes.

17  Q.  -- it was always either Mr. Cali or Mr. Sodipo?

18  A.  Mr. Sodipo, yes.

19  Q.  And did you ever have occasion to look at the Faxes that

20  would come in from the answering company?

21  A.  Occasionally.

22  Q.  Okay.  Would they come in once a week?  Would they come in

23  once a month?  When would they come in?

24  A.  From what I can recall, they were supposed to come in

25  whenever the answering service took messages for us, they Faxed

1    those over to us.

2    Q.  Even in the middle of the night?

3    A.  Yes, from what I understood in the Faxes we got, yes.

4    Q.  Okay.  So and did you ever look at them?

5    A.  Seldom.  I didn't really study them.  I would know what

6    they were, and I would sign off on them if I picked them up and

7    put them in the book.

8    Q.  And why were they being put in the book?

9    A.  It was for reference so if Mr. Sodipo or anyone from the

10   pharmacy wanted to go back to check to see if any calls of

11   importance came in, they could do that.

12   Q.  As office manager, was that part of your responsibility to

13   make sure that got done?

14   A.  Yes.

15   Q.  And the few times that you might have looked at them, do

16   you recall what kind of information was contained on these

17   Faxed pages?

18          MR. RAVENELL:  Objection.

19   Q.  Generally?

20          MR. RAVENELL:  Objection.

21          THE COURT:  Well, these would be -- would this be a

22   resuscitation of what the caller was calling about?

23          THE WITNESS:  It would be a message from a caller

24   that may have needed medications over the night.

25          MR. RAVENELL:  Objection.  Objection, Your Honor.

1    May counsel approach?

2         THE COURT:  Well, just one second.  This would be

3    whatever the caller called about?

4         THE WITNESS:  Yes, whatever they called about.

5         THE COURT:  They would take a message?

6         THE WITNESS:  Yes.

7         MR. RAVENELL:  Thank you, Your Honor.

8    BY MS. SMITH:

9    Q.  And they would leave their name and their phone number?

10        MR. RAVENELL:  Objection, leading, testifying,

11   everything else.

12        THE COURT:  Well, I'll sustain the objection, but

13   whatever they are.

14        THE WITNESS:  It was on that --

15        THE COURT:  It's on the sheet?

16        THE WITNESS:  Yes.

17   BY MS. SMITH:

18   Q.  And who directed you to make sure that they got collected

19   every day and put in a notebook, or who directed you to make

20   sure someone --

21   A.  Mr. Sodipo.

22        MS. SMITH:  Your Honor, at this time, it's just for

23   identification only.

24        THE COURT:  Marked for identification.

25        (Marked for identification.)

1    BY MS. SMITH:

2    Q.  To your knowledge, did either Mr. Sodipo or Mr. Nwaehiri

3    look at these documents as part of their role as pharmacists in

4    the pharmacy?

5                    MR. RAVENELL:  Objection.

6                    THE COURT:  Well, why don't we amend the question?

7    Did they ever look at them?

8                    THE WITNESS:  Yes.

9    Q.  And how often would you see them look at them?

10                   MR. RAVENELL:  Objection.

11                   THE COURT:  I'll overrule the objection.

12   A.  I've only seen -- I only see Mr. Sodipo look at them maybe

13   twice.  I don't know if anyone else looked at them, but I saw

14   personally Mr. Sodipo looking at them maybe twice.

15   Q.  Okay.  So not Mr. Nwaehiri?

16   A.  No, I never saw Mr. Nwaehiri.

17   Q.  And when Mr. Sodipo looked at them, did you have any

18   conversation with him about the contents of the notebook?

19   A.  No, I did not.

20   Q.  I am going to show you a document, and it's going to

21   confuse everybody.  Government's 16, gentlemen, floor plan?

22   And I also have, for everybody's benefit, a larger one.  I

23   don't have an easy -- we could just move the table up.

24                   MR. BUDLOW:  Your Honor, may I get an easel from the

25   back room?

1          THE COURT:  Certainly.

2          (Pause.)

3          MS. SMITH:  And what I intend to do, the large one is

4    government's 16 A, it's just a blow-up of 16, and what I intend

5    to do, we have some photographs and this way, I don't have to

6    keep switching things, we can see where it is in the -- on the

7    big chart while looking at the picture.

8          (Pause.)

9          MS. SMITH:  I know this wasn't the easiest thing to

10   look at.  But take a moment and sort of try to get your

11   bearing, if you will.  Let me see if I can make it a little

12   closer, and we'll start with one area.

13         (Pause.)

14         MS. SMITH:  I guess right in the middle of the room.

15   It's for the jury to see.  I know defense have a copy of

16   exhibit 16 at their disposal.  If you would just place that up

17   there?

18         (Pause.)

19   BY MS. SMITH:

20   Q.  Now, the other thing I need to tell the witness, if you

21   touch that screen, it will make a mark on the screen, which is

22   okay.  It's a good thing.  You can point to things and tell me

23   where they are, and you can actually use a line and walk down a

24   hallway and things of that nature.

25   A.  Okay.

1    Q.  Can you tell, do you have your bearings on what we're

2    looking at here?

3    A.  Yes.

4    Q.  Okay.  Can you tell me where the entrance was to New Care

5    in this diagram?

6    A.  Us the entrance was coming in through the side door, in

7    here, and this was my area.

8    Q.  Okay.  So your area is marked as what on that chart?

9    A.  Admin office.

10   Q.  Okay.  And you sat in there?

11   A.  Yes.

12   Q.  Okay.  And whose office was in there with you?

13   A.  Mr. Sodipo's office.

14   Q.  And if you would touch that, please?  Okay.  And the

15   offices in this area, in this whole general area through here,

16   what were these used for?

17   A.  As you can see, the conference area is where our conference

18   room was.

19   Q.  Okay.

20   A.  I do believe this was our supply room here.

21   Q.  All right.

22   A.  This was a lounge or guest area when we had people coming

23   into the area.  And this was just an office.  We didn't really

24   use that for anything.  This was our file room here.

25   Q.  Okay.  I'm going to push this up a little bit.  And

1    continue, if you will, to give us a tour.

2    A.   Uh-huh.  As I said, this is the powder room here.  This is

3    the gym area, we made into a gym area.  And behind that was

4    storage.  And then this hall could actually take you out

5    through the back to the parking lot.

6    Q.   Okay.  Was there a loading dock in there somewhere?

7    A.   Yes.  Somewhere around in here, I'm -- out this way.

8    Q.   Okay.  And Mr. Nwaehiri's office?

9    A.   Is here.

10   Q.   All right.  Now, going in the other direction, across the

11   hall from the administrative offices, if you were sitting at

12   your desk, how would you get to the pharmacy?

13   A.   Out the door, down the hall, in here.

14   Q.   Okay.  And this was the pharmacy?

15   A.   Yes.

16   Q.   And contained within the pharmacy, there are a number of

17   side offices?

18   A.   Yes.  Computer area, another office I never knew what was

19   really there.  Out here basically were the technicians.  And I

20   think we had like a sink or something back in here.  And just

21   some of the other offices I wasn't really sure what they did.

22   Q.   Okay.  And then you had testified before about Miss

23   Patterson and Mr. Abdulrazaaq, if you could just tell us where

24   the other side here the offices were?

25   A.   Down the hall, we would go and this would be the accounting

1    area here and Mr. Ahmed's office.  I do believe the Home Care,

2    it was over here and the nursing area was there.

3    Q.  Okay.  And Miss Patterson's office?

4    A.  Miss Patterson's office was over in here.

5    Q.  And just so we can all get a scale of this, how big is this

6    place?

7    A.  I have no idea.  Huge.  I have no idea.

8             MS. SMITH:  One moment, Your Honor.

9             THE COURT:  Take your time.

10            (Pause.)

11            MS. SMITH:  Counsel, I'm going to view some

12   photographs.  Do you want to take a quick look at these?

13            MR. RAVENELL:  Yes, please.

14            (Pause.)

15            MS. SMITH:  Now let's see what we're going to do

16   here.  All right.

17            Mr. Budlow, would you try to put the rest of these in

18   order while I start?  Thanks.

19            Let me just show you a few photographs, and if you

20   can identify what we're looking at?

21   A.  This is the sign that would be in front of New Care.

22   Q.  Okay.  And this for the record is 17 1, government's

23   exhibit 17 1.

24            And do you know what street this is, ma'am?

25   A.  That's Sinclair, Sinclair Lane.

1    Q.   Okay.

2    A.   On the side.

3    Q.   And directing your attention to 17-2, again, similar view?

4    A.   New Care's building.

5    Q.   Show you 17-3.  Now, what is that a picture of?

6    A.   That's the front upstairs entrance, in which usually where

7    we had guests, they would use that entrance.

8    Q.   Okay.  So let me go back to this in a minute like I said I

9    would do, and where is that entrance on this diagram?

10   A.   From this diagram, I believe this is just the downstairs

11   print layout.

12   Q.   Okay.

13   A.   I don't see the upstairs.

14   Q.   I think I failed to establish that.  How many stories was

15   this building?

16   A.   It is two stories.

17   Q.   Okay.  And this picture, 17-3, is the upper level?

18   A.   Upper, yes.

19   Q.   And does it face Sinclair Lane?

20   A.   Yes, the door does.

21   Q.   And is it street level?

22   A.   Yes.

23   Q.   So the downstairs was underground?

24   A.   Right.  The downstairs from the side, yes.

25   Q.   Okay.  And 17-4?

1    A.   Just a sign, I guess, just basically telling you what

2    offices and businesses are ran from New Care, the pharmacy,

3    manufacturing, and our custom builders.

4    Q.   Those were the different businesses that you were talking

5    about?

6    A.   Right.

7    Q.   17-5.

8    A.   That's the side entrance.  Usually, the employees use that

9    entrance for coming and going.

10   Q.   Okay.  And up here, it says --

11   A.   New Care.

12   Q.   Okay.  And what is this?  It says Haas Taylor?

13   A.   I think that was a former owner that used this building

14   from what I understand.

15   Q.   And how does this door relate to the door that you had

16   described over here as the one you go in?

17   A.   Actually, coming in from here and going down the stairs,

18   this is, that this actual area.

19   Q.   That's the door?

20   A.   Right.

21   Q.   Okay.  So that's what it looked like.

22           MR. RAVENELL:  Your Honor, may I have a moment with

23   Miss Smith on a matter?

24           THE COURT:  Certainly.

25           (Pause.)

1          MR. RAVENELL:  Thank you, Your Honor.

2     Q.  And directing your attention to -- all I did was put more

3     marks on the screen.  There we go.  Thank you.

4          And directing your attention to 17-6, if you can

5     identify what that is a picture of?

6     A.  The parking area where the employees parked and deliveries

7     and pickups were made.

8     Q.  And where is that parking area in relationship to Sinclair

9     Lane?

10    A.  It's behind.  It's on the back side of the building.

11    Q.  Okay.  Directing your attention to 17-7, who is this?

12    A.  That's an area on the Sinclair Lane side, which we never

13    used it while I was there, so I don't really know what's the

14    purpose.  I don't know what it's for.

15    Q.  Okay.  And what is this a picture of?

16    A.  One of the New Care delivery cars where we deliver meds.

17    Q.  And who -- what would those cars be used for?  You said

18    deliver meds, who would you deliver them to?

19    A.  Nursing homes, group homes, some at home patients that we

20    serviced.

21    Q.  And for the record, this is 17-8.  And who drove those

22    cars?

23    A.  The drivers we had drivers designated to deliver meds.

24    Q.  Okay.  And 17-9 and that's a different?

25    A.  Right.  The van, for the larger items.

1   Q.  Okay.  Same purpose?

2   A.  Yes.

3   Q.  Okay.  Now, I'm going to show you what's been marked as

4   government's exhibit 17-10, and see if you get your bearings.

5   Where are we?

6   A.  This is the hall on the basement level on the bottom level.

7   Q.  Okay.  So when you testified before that you came into the

8   building, you came down a set of stairs?

9   A.  Yes.

10  Q.  Where would you end up?

11  A.  Down by the table back here.

12  Q.  And where in relationship to coming in there is the

13  administrative offices?

14  A.  Where you see the windows on this side, that door there is

15  the door to admin area.

16  Q.  And where's the pharmacy?

17  A.  Actually, you can't see it from this page, from this view.

18  Q.  Is there a wall, though, that the pharmacy's on the other

19  side of?

20  A.  It's on the right-hand side.  It is on this side, you know,

21  the door is --

22  Q.  But the door is not in the picture?

23  A.  I don't see the door.  I believe this is the rest room that

24  I'm looking at here.

25  Q.  Okay.  All right.

1              And let me show you -- I'm just covering up some of

2      the labels.  What do we --

3      A.   Here is the admin area.

4      Q.   Okay.  Now, looking at this picture, who used this area?

5      A.   Myself, Miss Benta, and Mr. Sodipo.

6      Q.   Okay.  And where did you sit?

7      A.   This was my desk.  This is Miss Benta's desk.

8      Q.   And who used this one over here?

9      A.   It was not assigned to anyone.  It was just kind of a free

10     office that can be used whenever.  This area was the supplies.

11     Q.   And this little area right here is an office?

12     A.   It's an office with supplies, yes.

13     Q.   Okay.  And where in relationship to all of these things is

14     Mr. Sodipo's office?

15     A.   Right next to the supply, we have to make a left into his

16     office.

17     Q.   Okay.  So is it behind a wall that we can see?

18     A.   It's behind this wall.

19     Q.   For the record, this is 17-11.  And so we're just clear on

20     where we are, the view of this picture, where are you standing?

21     Where are you standing?

22     A.   This is the admin area.

23     Q.   Okay.

24     A.   This is a wall that I was saying hides Mr. Sodipo's office,

25     and then this is the supply area, and you would make the left

1    into his office.

2    Q.   Okay.   And directing your attention to 17-12, what is this

3    a picture of?

4    A.   That's Mr. Sodipo's office.

5    Q.   And that's taken from the door?

6    A.   Yes.

7    Q.   That would be the view, the angle?

8    A.   Yes.

9    Q.   And that's 17-12, for the record.

10            17-13 for the record.

11   A.   The supply room, but it sits next door to Mr. Sodipo's

12   office.

13   Q.   17-14?

14   A.   It looks like our conference room where we usually have our

15   staff meetings.

16   Q.   All right.   And, again, looking at this, if you could just

17   take a minute and tell us where is that conference room in

18   relationship to where you sat?

19   A.   Here.   And this is my area that I sat in.

20   Q.   Okay.   Can you recall today whose office that was, or can

21   you read it?

22   A.   I'm not sure whose office that is, Mr. Cali's office.

23   Q.   Okay.   Do you recognize it?

24   A.   I recognize it.   I wasn't in his office nearly as much, so

25   I don't really know his office as well.

1    Q.  Okay.

2              MR. RAVENELL:  Your Honor, may counsel approach

3    briefly?

4              THE COURT:  You may.

5              (At the bench)

6              MS. SMITH:  You're not allowed to object.  This is

7    boring.

8              MR. RAVENELL:  No, it's not boring.  I did bring to

9    Miss Smith's attention earlier, and she dealt with that, you

10   know, all of these photos tells you what it is.  So it's kind

11   of unfair to have the witness have the information in front of

12   her.  The objection of what does happen when the witness says

13   she's not sure, kind of zooming in on the name plate, so it's a

14   little suggestive, Judge.

15             If the witness can't recall the office I think is one

16   thing, but I don't think we get to show them a name plate.  And

17   these are not major -- they're photographs.  We're not

18   disputing that.  We want to be careful.  We're not leading the

19   witness too much by suggesting information, that's all.

20             THE COURT:  Point well-taken.  You can ask, if she

21   zooms in and asks.

22             MS. SMITH:  Refreshes.

23             MR. RAVENELL:  Refreshes recollection again, these

24   are not major points.  These are photographs, and I don't --

25             MS. SMITH:  And the agent could put them in.

1        MR. RAVENELL:  It's certainly not a big deal, just

2    trying to be careful.

3        THE COURT:  All right.  Thank you.

4        (Open court)

5    BY MS. SMITH:

6    Q.  Showing you what has been marked as government's exhibit 17

7    16.  And can you give us an idea of what we're looking at here?

8    A.  This is the pharmacy.  The pharmacy.

9    Q.  And is -- okay.

10       As the office manager, what kind of work did you do

11   specifically for Mr. Sodipo?

12   A.  Anything pertaining to letters, documents, making sure that

13   every department had what they needed as far as all but the

14   pharmacy, I didn't really deal with the pharmacy, but the other

15   departments, whatever clerical they needed basically, that was

16   my responsibility.

17   Q.  Did you have any computer skills, for example, or any other

18   skills that were used from time to time?

19   A.  Yes, I have pretty good computer skills.

20   Q.  Okay.  At the time did you have better computer skills than

21   anyone else?

22   A.  Yes.

23   Q.  So were you called upon to make signs, or graphics, or

24   anything like that?

25   A.  I did.  I was.

1    Q.   Okay.   Was there a use of signs at the pharmacy marking the

2    walls, telephone numbers, things of that nature?

3    A.   They did have some signs up there.

4    Q.   Okay.   And who would prepare those?

5    A.   I have prepared signs.   Theresa prepared, clerical people

6    prepared signs.

7    Q.   And did you supervise the clerical people?

8    A.   Yes.

9    Q.   Directing your attention to government's exhibit 17-24, and

10   this is just a yes or no, does this sign look familiar to you?

11   A.   Yes.

12   Q.   Okay.   And how is it that it looks familiar to you?

13   A.   Myself or Miss Benta prepared this.

14   Q.   Under whose direction?

15   A.   Mr. Sodipo.

16   Q.   Okay.   And where would this sign have been?

17   A.   We had one in the administrative area, and I think several

18   in the pharmacy area.

19   Q.   If you know, 17-27, if you know, ma'am, what is this a

20   picture of?

21   A.   I'm not real sure.

22   Q.   Okay.   And do you recognize what office this is?

23   A.   It looks like part of accounting, but I'm not sure.

24   Q.   Okay.   Directing your attention to 17-37.   When you worked

25   at New Care, did you ever see this room?

1   A.  I believe this is in the accounting area, but it was used

2   for storing files.

3   Q.  Okay.  Any particular kind of files?

4   A.  Well, for me, it was clerical, and Home Care files that we

5   stored in there.  I believe there were some files, maybe from

6   pharmacy, but I didn't have anything to do with those.

7   Q.  Okay.  Just a few more.  That is a picture of?

8   A.  That's our gym.

9   Q.  17-44 for the record.

10          Were you familiar with this area, 17-45?

11  A.  That's the nursing area.  There were classes held

12  occasionally for our CNA's, and this is the area that they

13  would take the classes.

14  Q.  Okay.  And let me ask you if you recognize government's

15  exhibit 17-47.

16  A.  This looks like the warehouse that that we stored, you

17  know, things that were not being used, we kept in the

18  warehouse.

19  Q.  What, if anything, else was the warehouse used for besides

20  storage?

21  A.  We had some supplies for manufacturing, the large equipment

22  was kept in the warehouse area.

23  Q.  And showing you government's 17-48, what is that a picture

24  of?

25  A.  It looks like a part of the warehouse, or either it's the

1    manufacturing, I can't tell by the way it is, but I can see the

2    equipment for manufacturing in there.

3    Q.   Okay.  And showing you two more.  17-49, what is that a

4    photograph of?

5    A.   The lobby area of the upstairs of New Care.

6    Q.   Okay.  Is that the opposite view of the one that I had

7    shown you before?

8    A.   Yes.  That faces Sinclair Lane.  That's the entrance, I

9    guess, for the guests that comes in.

10   Q.   Okay.  And this is 17-3, that's the office view of that?

11   A.   Yes.

12   Q.   And, finally, 17-59, can you identify what that is?

13   A.   It's the banquet area on the level where the guests are

14   usually taken.  And this area is used for dinners, banquets,

15   you know, things of that sort.

16   Q.   Okay.  And during the time you were at New Care, were there

17   banquets?

18   A.   We had one major banquet or dinner.

19   Q.   And do you remember approximately when that was?

20   A.   I'm guessing '05.

21   Q.   Okay.  And tell us what the dinner was for, what it was

22   related to?

23   A.   We had distinguished guests from Africa coming to visit

24   with New Care for a business meeting, and we entertained and

25   served them dinner in this area.

1   Q.   And how long was the business meeting?

2   A.   I believe it lasted about a week.

3   Q.   And how many people were in attendance at this meeting?

4   A.   I can't remember the number.  It varied depending on what

5   day or what was going on on that particular day.

6   Q.   What kind of meetings were they, if you know?

7   A.   Pertaining to the pharmaceutical business.

8   Q.   Okay.  And based -- in your position as office manager and

9   working directly with Mr. Sodipo, were you familiar with what

10  it was New Care was working on in terms of the pharmaceutical

11  business and Africa?

12          MR. RAVENELL:  Objection, Your Honor.

13          THE COURT:  I'll overrule the objection.  You may

14  answer.

15  A.   It was pertaining to an expansion project that they were

16  hoping to start in Nigeria.

17  Q.   Okay.  And did that involve a lot of correspondence with

18  officials in Nigeria?

19  A.   It did.

20  Q.   Were you involved in any of that?

21  A.   I was.

22  Q.   Okay.  Did you help with the arrangements to bring people

23  from Africa?

24  A.   I did most of the letters of invitation, inviting them to

25  come, setting up with dates, and accommodations for their

1   staying.

2   Q.  Were also -- or were there other people there that were

3   from the United States?

4   A.  Yes, there were local people.

5   Q.  And what was the nature of the local people that attended?

6   A.  All in pharmaceutical in some aspect.

7   Q.  And do you know when this plan was to take effect?

8   A.  I'm not sure when the plan was supposed to actually have

9   gone into effect, no.

10  Q.  Can you tell me who was actually involved in the planning

11  with Africa?  I mean, for example, Miss Justina, did she have

12  anything to do with that?

13  A.  Very little.

14  Q.  Okay.  Who were the principals that were involved?

15  A.  Mainly Mr. Sodipo, Mr. Cali, myself.  We mainly worked on,

16  you know, setting up things, getting things arranged for the

17  visit.

18  Q.  Were the any partnerships with any outside companies in the

19  United States also involved in that?

20  A.  Say that again.

21  Q.  Any partnerships with outside companies?

22  A.  We work with a Mr. DeFlavor.

23  Q.  And where was Mr. DeFlavor from?

24  A.  I believe he was from Florida.

25  Q.  Okay.  What did he bring to the table?

1    A.  He was also in pharmaceuticals.  I'm not exactly how he fit

2    into the plan, but he was a partner, yes.

3    Q.  Now, I'm just going to take another quick minute and show

4    you a few items, and ask you if you recognize these items.

5    This is government -- actually, let me bring it up to you for a

6    minute.  Government's exhibit 40 A, and it's two sides.  If you

7    recognize that?

8    A.  Yes.

9    Q.  And what is 40 A?  Look at the back, too, please.

10   A.  Yes.  These were notes that my assistant kept so that we

11   had contacts for people for the online scripts that we were

12   working on.

13   Q.  And let me show you 40 B.  Do you recognize any of that?

14   A.  Yes.

15   Q.  And what is 40 B?

16   A.  These are also notes, numbers of contacts for online

17   scripts.

18   Q.  Okay.  And on the back, I think that's a separate number,

19   is that 40 C?  No, it's still 40 B.  And what is that?

20   A.  This is -- these were actually the online, I will say

21   companies that we worked with or were part of the online

22   scripts that we did.

23   Q.  And very, very briefly, 40 A, these appear to be Rolodex

24   cards, they go in one of those address type things?

25   A.  Yes.

1   Q.   Okay.   And the names that are on these cards?

2   A.   Yes.

3   Q.   Did you ever speak to anyone named Cordell?

4   A.   No.   I spoke with Rick on several occasions.

5   Q.   Okay.   And then the other name on here is Jack Kennedy, did

6   you ever speak to somebody named Jack Kennedy?

7   A.   No.

8   Q.   And 40 B, did you ever talk to anybody named Nick?

9   A.   I spoke with Nick maybe a couple of times, but I mainly

10   spoke with Rick more times than anyone.

11   Q.   And how about Jason?

12   A.   I talked with Jason a couple of times, yes.

13   Q.   And is this one of the signs that you were talking about

14   before?

15   A.   Yes.

16   Q.   Now, let me direct you back to when you began there, in

17   2004, did there come a time when the nature of the pharmacy

18   business changed?

19   A.   When you say nature, what do you mean?

20   Q.   Did there come a time when the business -- you testified in

21   2004 there were long-term care facilities, things of that

22   nature.   Did there come a change after that?

23   A.   When we started with the online scripts, yes.

24   Q.   Okay.   And were you there when it happened?

25   A.   Yes.

1   Q.   Okay.   How was the business set up?   How did it get

2   started, if you know?

3   A.   As far as I can, as clearly as I can remember, I was asked

4   by Mr. Sodipo to talk with Rick in getting the computers set up

5   or getting the online center set up so we do the online

6   scripts.

7   Q.   Okay.   What did the setup require?

8   A.   Basically being able to log in.   It was a software that had

9   to be loaded on, and the software would allow you to log on and

10   be able to go online to pull down prescriptions or to fill

11   prescriptions.

12   Q.   Okay.   And did you set that up?

13   A.   I did.

14   Q.   Did you get guidance from Rick?

15   A.   I got guidance from Rick.

16   Q.   Okay.   Did you know at that time or did you come to learn

17   what the source of these prescriptions were, who was sending

18   them?

19   A.   I was never really clear where the prescriptions or the

20   scripts came from.

21   Q.   And was there a new daily procedure with this new Internet

22   business?

23   A.   Well, every day I was to come in at the beginning every

24   day, I was to come in and check, log on and check what they

25   call a cue.   And in the cue would be so many scripts or

1   prescriptions that we were supposed to fill.

2   Q.  And who directed you to do that when you came in every day?

3   A.  Mr. Sodipo.

4   Q.  If you didn't get to it every morning, who took care of it?

5   A.  He sometimes did it.

6   Q.  Okay.  And so you said you would log on, was there a pass

7   code?

8   A.  It was.

9   Q.  And once you print out the prescriptions --

10          MR. RAVENELL:  Your Honor, if I may, if Miss Smith is

11   finished?

12          MS. SMITH:  Yes, we can move that.  That's fine.  I

13   was standing over there, because I couldn't see through it,

14   either.

15          (Pause.)

16   BY MS. SMITH:

17   Q.  So you testified you log on, you use the pass code, you go

18   to the cue, and you download.  What does that mean to download?

19   A.  Actually, to print out the scripts that were in the cue.

20   Q.  And then what did you do with the scripts once they were

21   printed out?

22   A.  I would have to -- actually, it was data entry, you would

23   have to put certain information, name, date of birth, different

24   things that were on the script had to go in a database.

25   Q.  And do you know, did you know, whether the information you

1    were entering, was that just within New Care's system, or was

2    it something you were also sending back to where those

3    prescriptions came from?

4    A.  I did not know.

5    Q.  So you're putting this information in?

6    A.  Yes.

7    Q.  Were you given instructions on how many prescriptions to

8    take when you logged on in the morning?

9    A.  I was just told to take what was in the cue.

10   Q.  Okay.  How often -- how often did you check the cue other

11   than in the morning?

12   A.  Several times throughout the day, either myself or Mr.

13   Sodipo, or someone in the pharmacy would.

14   Q.  What's the most number of times during a day you would

15   check the cue and find prescriptions?

16   A.  Any time in the day you could check the skew, there were

17   some prescriptions in there unless someone else had just

18   printed them out.

19   Q.  Okay.  Who would that someone else have been?

20   A.  Myself, Mr. Sodipo, someone in the pharmacy.

21   Q.  Okay.  Did anyone ever explain how why you would take

22   everything that was in there and not just take like a hundred

23   at a time?

24   A.  From what I understood --

25          MR. RAVENELL:  Objection.

1    Q.   Who told you?

2    A.   Mr. Sodipo.

3    Q.   Okay.  What did he tell you?

4    A.   He explained that if we didn't take what was in the can, I

5    guess others had access to those --

6              MR. RAVENELL:  Objection to guessing.

7    A.   If we didn't take those, on the pharmacy --

8              THE COURT:  Ma'am, there's been an objection.

9              MR. RAVENELL:  Thank you.

10             THE WITNESS:  Oh, I'm sorry.

11             THE COURT:  Are you testifying as to what you recall

12   Mr. Sodipo told you?

13             THE WITNESS:  Yes.

14             THE COURT:  Good.  You may answer.

15             MR. RAVENELL:  I thought she said she guessed.

16             THE WITNESS:  I was told that --

17             MR. RAVENELL:  Your Honor, would you instruct the

18   witness when I'm speaking to you that she's not to speak back?

19             MS. SMITH:  I didn't know --

20             MR. RAVENELL:  I was speaking to the Court.

21             THE WITNESS:  I didn't know, either, I'm sorry.

22             THE COURT:  I thought you were finished.

23             Ma'am, you can only testify as to what you recall Mr.

24   Sodipo told you on the subject.

25             THE WITNESS:  Okay.

1          MR. RAVENELL:  Thank you, Your Honor.  Appreciate it.

2     BY MS. SMITH:

3     Q.  And what do you recall that Mr. Sodipo told you?  Don't

4     guess.  Don't assume.  Tell us what he told you about why you

5     had to take all the prescriptions out of the cue?

6     A.  What we didn't take, another pharmacy could take those, and

7     we would not be able to fill those.

8     Q.  Now, did you ever get calls from anyone outside the

9     pharmacy about what was waiting inside the cue, any

10    instructions, other than Mr. Sodipo directing you to do

11    something or not do something with what was in the cue?

12    A.  Yes.  Gentleman Rick that I said assisted me with setting

13    up, called several times and would say their --

14         MR. RAVENELL:  Objection to what Rick would say.

15         THE COURT:  I'll overrule the objection.

16    A.  Rick told me --

17         THE COURT:  You may answer.

18         MR. RAVENELL:  May counsel approach?  It would be

19    easier if we tried to do it this way.

20         (At the bench)

21         THE COURT:  The objection is to what, hearsay?

22         MR. RAVENELL:  Yes, Your Honor.  But also, there's a

23    problem I see we're going to have.  We have a witness who may

24    have agenda or just likes to talk.

25         I'm trying to make this not a debate between the two

1    of us.  When I object, I make a comment and she makes a comment

2    in response.  If I make a comment to the Court --

3              MR. MCCANTS:  The jurors are signaling Mr. Thompson.

4              THE CLERK:  One of the jurors need a bathroom break.

5              THE COURT:  Why don't we take a break until quarter

6    of and we'll solve this when we come back.

7              (Open court)

8              THE COURT:  Ladies and gentlemen, it's 3:30.  Let's

9    take a 15-minute recess, and then we'll come back.  Thank you.

10              (Recess.)

11              THE COURT:  Please be seated.  If I could ask our

12    witness, if you could step out for a minute, we need to talk

13    about an evidentiary point.  Thank you.

14              Good.  The record will show that our witness has

15    stepped out.  I will remind the witness that if there's an

16    objection that's lodged, that she should stop, wait, I'll

17    handle the objection, then give her instruction as to how the

18    questions should be answered.

19              With respect to Mr. Cammarata, your objection is, Mr.

20    Ravenell?

21              MR. RAVENELL:  Your Honor, as to Mr. Cammarata,

22    again, what we have is hearsay from this particular witness.  I

23    know the Court has addressed on some occasions, you know, the

24    topic of co-conspirator statements, and those issues that we

25    still have not resolved, but here we have a witness who's given

1    -- talks about Mr. Cammarata.  It doesn't appear it was much

2    more than where they left it.  I'm not sure the government's

3    going further with Nick Cammarata at this point other than

4    what's been addressed.

5              MS. SMITH:  Actually, it was Rick, Rick Shipp.

6              MR. RAVENELL:  She mentioned both.

7              MS. SMITH:  Well, but what she was trying to answer

8    when we had the whole meltdown was that he would call her and

9    tell her that the prescriptions were backed up in the cue and

10   direct her to take them.

11             The government submits it's 801(d)(2)(E).  He is a

12   co-conspirator, and his instructions to her are in furtherance

13   of the conspiracy.  And it is consistent with what Mr. Sodipo

14   said to her was to take them all.

15             MR. RAVENELL:  Your Honor, if I may, the Rick Shipp,

16   I don't know if there was even much said about Rick Shipp.  I

17   thought the Court was keeping a list.  There is really nothing

18   much other than Mr. Kaps said that Mr. Ship was, you know, one

19   of the contacts with New Care, that's the evidence that we have

20   about Mr. Shipp, is that he was a -- he was one of three

21   individuals who for a time was a person who was a pharmacy

22   contact for New Care.  And that's the gist of it.

23             And if that alone makes one a co-conspirator, then I

24   guess just being, working for the company makes you a

25   co-conspirator.  There's nothing else offered by Mr. Kaps, by

1    Rick Shipp other than that he at some point was one of three.

2    He doesn't even know what time period Rick Shipp was, other

3    than he thought he was maybe the first one I think is what he

4    said, who had some contact with a pharmacy contact for New

5    Care.  And that's it.

6         THE COURT:  Good.  Thank you.  The testimony will be

7    that Mr. Shipp told the witness to take all of the

8    prescriptions from the cue and do what?

9         MS. SMITH:  Well, he would call her from time to time

10   and say the cue is filling up, you all need to get those

11   prescriptions out.  And it was just the fact that these calls

12   would come in reminding them to take the prescriptions out,

13   because they were waiting.  There were people waiting for their

14   prescriptions.

15        In addition to taking them every morning and checking

16   it every two or three hours, every now and then, he would call

17   and say you know you guys are slacking, what are you doing?

18   And she also --

19        THE COURT:  Is this in a sense that Shipp was telling

20   New Care that they had to fill them or just that the cue was

21   filling up?

22        MS. SMITH:  Well, I think it's the same thing, Your

23   Honor.

24        I also want to add that Mr. Shipp -- Rick, who she

25   just identified was the man that talked her through the set up

1       of the whole computer system so they could get up and running.

2              So it's more than just what Mr. Kaps said.  There is

3       what this witness said about who Rick is.

4              MR. RAVENELL:  Your Honor, all that witness says is

5       that Rick told her that there was the software and how to log

6       into a computer.  How does that make one a co-conspirator

7       because the person works for the company?

8              THE COURT:  Well, I will overrule the objection.

9       Shipp is down on my list as a potential co-conspirator.  Plus,

10      this is really, this comes in to show the interaction between

11      IHE and New Care, and not so much for the truth of the matter

12      asserted.  It's coming in to show the interaction between the

13      two companies, and it's not essential to show that the cue was

14      in fact filling up.

15             So I will overrule the objection and permit it.

16             MR. RAVENELL:  Your Honor, if just one point, I won't

17      belabor the point, but the government is arguing just the

18      opposite.  They do in fact intend to use that information so

19      that Rick was directed New Care people that they had to fill

20      these prescriptions.

21             THE COURT:  That hasn't come out yet.  But even if it

22      was, it shows the relationship between the two companies, the

23      business relationship, the flow of information, the flow of

24      instruction.  My view is that Shipp qualifies as a

25      co-conspirator, but even if he didn't qualify as a

1    co-conspirator, or it shows how these two companies interacted.

2    So I would permit it in that event.  Good.

3              MR. RAVENELL:  Your Honor, did you say that Rick

4    qualifies, or are you saying at is this point he's on the list?

5              THE COURT:  At this point.

6              MR. RAVENELL:  Okay.  Just wanted to make sure.

7              THE COURT:  Potential.

8              MR. RAVENELL:  Right.  Thank you.

9              THE CLERK:  Ready?

10             THE COURT:  Please.

11             MS. SMITH:  Your Honor, we did remind the witness

12   when there's an objection she needs to just stop, we did tell

13   her that during the break.  And we told Mr. Ravenell that we

14   told her that.

15             THE COURT:  Good.  Thank you.

16             (Open Court)

17             (Jury present)

18             THE CLERK:  Jurors all present.

19             THE COURT:  Thank you, Mr. Thompson.

20             Welcome back, ladies and gentlemen.  Please be

21   seated.

22             Miss Smith, whenever you're ready.

23             MS. SMITH:  Thank you, Your Honor.

24   BY MS. SMITH:

25   Q.  Before we get back to what we were talking about, I had

1    missed one item.  I want to show you, Miss Kelly, what's been

2    marked as government's exhibits 18 A through 18 E.  Tell me if

3    you recognize those.

4    A.  Yes.  These are the pay files.

5    Q.  And who made those files, if you know?

6    A.  Well, they were started before I came.  And once I got

7    there, I kind of updated them and kept them, you know, in a

8    file away from the other files.

9    Q.  And what kind of information is contained in the employee

10   file?

11   A.  Should be the application, license, employee file -- any

12   permits or performance approvals, any write-ups or, you know,

13   disciplinary actions should be in your files.

14   Q.  Did every employee have one of those?

15   A.  They should have had.  I can't say that everyone had one.

16   But everyone should have had one.

17   Q.  You didn't do a count?

18   A.  No.

19   Q.  Did you have occasion to use those file things in them,

20   have any contact with those?

21   A.  Yes.  Yes.

22   Q.  And what was the nature of your contact with them?

23   A.  Well, I set up the files and put the binders in them so

24   that we could locate different documents in here more easily.

25   Q.  Instead of just a folder?

1    A.  Right.  Uh-huh.

2    Q.  And who are those five personnel files for, if you will, 18

3    A is?

4    A.  Mr. Sodipo, Mr. Cali, Miss Benta, Mr. Ahmed, and Miss

5    Burston.

6    Q.  And were all employees when you were there?

7    A.  Yes.

8    Q.  Okay.  And those are in that order, 18 A through 18 E, at

9    this time, I'm going to offer them into evidence.  And I'm not

10   going to --

11               MR. RAVENELL:  Objection.  May counsel approach?

12               THE COURT:  You may.

13               (At the bench)

14               THE COURT:  These are personnel records?

15               MR. RAVENELL:  Yes, Your Honor.  We raised objections

16   earlier during the, I'm sorry, pretrial motions, and I'm

17   renewing the objection that we made previously about the

18   introduction of personnel files that the Court has ruled on in

19   the past.

20               THE COURT:  And the personnel records are coming in

21   to show what?

22               MS. SMITH:  Your Honor, this has to do with the way

23   the defendants were paid every two weeks.  The government's

24   position is that they're employees, and their position was that

25   they were contractors.  And what's very interesting is that

 1    their files are exactly the same as your clerical workers.  And

 2    there are even annual evaluations in there.

 3         And just I just think it's an observation that the

 4    jury can make and can draw their own conclusions, and this is

 5    the witness that I would put them in through on a discussion

 6    down the line.

 7         I think it also goes to Mr. Sodipo's overarching

 8    organizational input into the business, every, everything was

 9    organized.  You know, incoming mail was logged in.  Everything

10    was very organized.

11         THE COURT:  But the personnel files that we have that

12    are coming in now are Mr. Sodipo and Mr. Nwaehiri and several

13    other individuals?

14         MS. SMITH:  Yes.  Miss Benta, who was her assistant,

15    the clerical staff.

16         THE COURT:  Well, I don't recall an objection to

17    these documents pretrial.

18         MR. RAVENELL:  Your Honor, maybe this was just -- I

19    may be wrong.  Maybe it was a discussion we had with the

20    government.  We did discuss some of these before, so it may be

21    my mistake that we hadn't broached it.  But I know we had, so

22    let me make it clear, whether I objected in the past or not,

23    there is an objection, so I'm preserving that issue.

24         Our point is the relevance of these personnel files

25    coming into evidence at this point.  And I don't -- what I've

1    heard so far from the government I don't believe establishes

2    the relevance.

3         THE COURT:  I will overrule the objection because,

4    based upon government's proffer, they appear to be relevant to

5    the tax counts, so I will overrule the objection now.  They're

6    coming in evidence now or simply marking them for

7    identification?

8         MS. SMITH:  Well, I'm moving them into evidence

9    because they've been fully identified.  I don't intend to ask

10   this witness any further questions.  But they're in evidence

11   for use later.

12        MR. RAVENELL:  If I may address the tax count, the

13   tax count is they filed a false return.  They filed a false

14   return, is what my recollection is, in the counts, and that

15   there's a false return in regard to these defendants

16   themselves, not declaring certain dollar figures, et cetera.  I

17   don't recall that under this particular count the government's

18   obligation is -- the defendants held themselves out to be

19   employees versus independent contractors.  I thought that

20   applied more as to the counts that you severed.

21        MS. SMITH:  Your Honor, I'm asking Mr. Budlow to pull

22   the stipulation file, because I believe there was a stipulation

23   to this.  And the only discussion left was whether there was

24   403 information inside of these files that needed to be

25   redacted for the protection of the privacy of the people

1    involved.  I've asked him to pull the stipulation.

2         MR. RAVENELL:  I'll take a look at it.

3         I don't have the recollection, just like I didn't

4    have the recollection I thought we had litigated the issue, I

5    could be wrong.  I'd be happy to review it.

6         (Pause.)

7         MS. SMITH:  I could be wrong, too.

8         (Pause.)

9         MS. SMITH:  The defendants are not objecting to the

10   admission of employee records for Steven Sodipo, Nwaehiri,

11   Abdulrazaaq, Benton, and Burston.  The defendants have reserved

12   the right to make 403 objection to items or entries within the

13   files and promises to notify the government of said objections

14   by a certain date.

15        In the event the parties cannot agree on the

16   redactions, these matters will be brought to the Court's

17   attention.

18        I think Mr. Ravenell has waived his objections to

19   these documents on any grounds.

20        MR. RAVENELL:  I think that Miss Smith has certainly

21   refreshed my recollection, Judge.

22        THE COURT:  Refreshed his recollection.  Now, the

23   counts, the 1099 counts have been severed, but we still have

24   the failure to pay income tax counts, which the gravamen is

25   that the defendants, Mr. Sodipo and Mr. Nwaehiri, were

1    employees and they were paid as employees, that they took money

2    out of the company, it should have been reported.  So in view

3    of the 1099 counts that have been severed, the government still

4    has to show that they are employees and their status in the

5    company and the theory that taking money out of the company

6    through these bank accounts was disguised.  So I believe

7    they're relevant --

8              MS. SMITH:  Thank you.

9              THE COURT:  -- on that ground.

10             MR. RAVENELL:  Thank you, Your Honor.

11             MS. SMITH:  Thank you.

12             (Open court)

13             MR. RAVENELL:  Thank you, Your Honor.

14             THE COURT:  Welcome.

15                  (Received in evidence.)

16   BY MS. SMITH:

17   Q.  Now, getting back to where we were before that, you

18   testified earlier that you were directed every morning to take

19   the prescriptions out of the cue and you were directed to check

20   them every two to three hours?

21   A.  Yes.

22   Q.  And who did you tell us gave you those directions?

23   A.  Mr. Sodipo.

24   Q.  Did Mr. Nwaehiri ever speak to you about that topic?

25   A.  I never really dealt with Mr. Cali much regarding the

1   online scripts.

2   Q.  Okay.  Did anybody else ever direct you to check the cue?

3   A.  Rick, the gentleman that assisted me in setting up the

4   online scripts, called several times to tell me that there were

5   scripts in the cue that I should download or print out.

6   Q.  Okay.  And what was his tone, if you recall?

7   A.  Excuse me?

8              MR. RAVENELL:  Objection.

9              THE COURT:  I'll overrule the objection.  You may

10  answer.

11  Q.  What was his tone?  What was his --

12  A.  A little agitated because they'd been in the cue for a

13  while.

14  Q.  And he would communicate that to you?

15  A.  Yes.

16  Q.  Okay.  Now, how much of your day was used downloading,

17  printing, and data entry?

18  A.  In the beginning, most of the day.

19  Q.  Okay.  How long did it go on for most of the day?

20  A.  I would say for about two months, maybe a little more

21  before it was changed over and became the responsibility of the

22  pharmacy.

23  Q.  Okay.  And how many times would you say during the period

24  that you were at New Care how often would Rick call to tell

25  someone to check the cue?

1   A.  Rick would call regularly.  I only talked with him maybe

2   three or four times.  Miss Benta handled more calls from Rick

3   than I did.

4   Q.  Okay.  On the times when he directed you to check the cue,

5   did you ever communicate this to either Mr. Sodipo or Mr.

6   Nwaehiri?

7   A.  No.  I would just check the cue and print them out.

8   Q.  Okay.  And after two or three months, the procedures

9   changed?

10  A.  Yes.

11  Q.  And why did they change?

12  A.  It became too much just for the clerical staff, you know,

13  myself and Miss Benta, excuse me, myself and Miss Ryan, which

14  was another clerical person.

15  Q.  Was she before Miss Benta?

16  A.  No.  She came after Miss Benta.

17  Q.  Okay.  Did Miss Benta come back again, if you know?

18  A.  Yes, she did.

19  Q.  Okay.  So it became too much, you couldn't get your other

20  work done?

21  A.  Correct.

22          MR. RAVENELL:  Objection, leading.  Objection,

23  leading.

24          THE COURT:  The last statement by Miss Smith was

25  really a comment rather than a question, so I'll strike it.

DIRECT EXAMINATION

1   Q.  Thank you.

2       Were you involved at all with any billing connected

3   to the Internet business?

4   A.  I did not deal with the money.  All I did was make a list

5   of how many are the online script companies that we were

6   working with in the beginning.  I just made a note or kept a

7   roster, so to speak, of how much we had done for that date in

8   the beginning.  And Mr. Sodipo would actually handle money.  I

9   never had to handle invoices or billing or anything like that.

10  Q.  Tell me what you remember about this count that you kept?

11  What were you counting?

12  A.  In the beginning, they were counting and keeping logs of

13  the scripts, but it became too much after a while.  So we

14  stopped, or I should say clerical stopped, and it became a

15  pharmacy thing.

16  Q.  Okay.  But you were counting the number of prescriptions?

17  A.  Not necessarily the number of prescriptions, more of some

18  of the prescriptions came in, and they were being charged to

19  credit cards or different things of that sort.  We were kind of

20  keeping a log of what was being done and what was being owed to

21  New Care.

22  Q.  Okay.  Now, who was sending in credit card information?

23  A.  Some of the clients would send credit cards, but we were

24  not handling credit cards.  That was not what we did.

25  Q.  Okay.  And they were sending in credit cards, or credit

1   card information for what?

2   A.  To pay for their prescriptions.

3   Q.  Okay.  And were you given any instructions on how to direct

4   them or what to do about that?

5   A.  That was Rick.  I was told by Mr. Sodipo that Rick was

6   handling that.  We didn't do the prescriptions with credit

7   cards.

8   Q.  Did you ever learn through that process how much people

9   were paying for their drugs?

10  A.  A couple of times I had calls come in and the client, or

11  the patient would say I was charged $102 or $110 for a

12  prescription, and I don't know why, you know, but because it

13  was not my area, I would refer them back to Rick.

14  Q.  And did they ever talk to you about anything else they had

15  paid for?

16  A.  Consultation, consultation, or, you know, having a talk

17  with a physician.

18  Q.  So at some point in time, your best recollection after two

19  or three months, the pharmacy took over this?

20  A.  Yes.

21  Q.  Okay.  And how many people were working in the pharmacy at

22  that time?

23  A.  I'm going to guess, about seven techs at a time.

24  Q.  Was that before or after the business moved to the

25  pharmacy?

1    A.  Say that again now?

2    Q.  Was that before or after you shifted what were you doing

3    into the pharmacy?

4    A.  That was before.

5    Q.  Okay.  And was there any changes once the pharmacy took

6    over everything?

7    A.  We, Mr. Sodipo hired a few more techs and part-time

8    pharmacists.

9    Q.  And what about the hours?  What were the hours of your job?

10   A.  Basically, they were just 8 to 5.  As the scripts grew and

11   the demand grew, weekend hours were added for the technicians.

12   Q.  So 8 to 5 what days of the week?

13   A.  Monday through Friday.

14   Q.  And when you started there, that was everybody?

15   A.  Yes.

16   Q.  And then tell us how that changed.

17   A.  The technicians were then scheduled to come in on

18   Saturdays.

19   Q.  And once the Internet prescriptions started at that point

20   in time, were you still answering the phones for the company?

21   A.  Yes.  For a while, yes.

22   Q.  Did you notice any changes, and this is just yes or no, in

23   the nature or the volume of the calls?

24   A.  Yes.

25   Q.  Okay.  And these changes to the nature and the volume of

1   the calls, did you communicate any of this to Mr. Sodipo?

2   A.  Yes.

3   Q.  Did you communicate any of this to Mr. Nwaehiri?

4   A.  No.

5   Q.  And tell us what you noticed about the volume of the calls?

6   A.  They increased drastically.

7   Q.  Okay.  Do you know how many incoming lines there were, do

8   you recall, at New Care?

9   A.  I believe we had four to six lines that were actually

10  active lines.

11  Q.  Okay.  And based upon those four to six lines, what was

12  difference in volume, if you recall?

13  A.  Basically that the calls came into the main line, which was

14  answered by the administrative staff.

15          We could then transfer them to the pharmacy or home

16  care, wherever they needed to go.

17          As the online scripts grew, the calls were just

18  really too much to be handled just by the administrative staff,

19  because we spent all day answering the phones.

20  Q.  And is this a problem that you communicated to Mr. Sodipo?

21  A.  Yes.

22  Q.  And what was done to make your day easier or so that you

23  could get other work done?

24  A.  The online scripts, everything was shifted to the pharmacy.

25  Q.  So this --

1    A.   The calls, everything, yes.

2    Q.   So this was about the same time?

3    A.   Yes.

4    Q.   Okay.  And what, if anything, did you notice about the

5    nature of the calls?

6              MR. RAVENELL:  Objection.

7    Q.   And you've already testified you noticed a change to the

8    nature --

9    A.   Yes.

10   Q.   -- and I only want to hear --

11             THE COURT:  I'll overrule the objection.  You may

12   answer.

13   Q.   I want you to describe one at a time but begin, but only

14   tell us the ones that you communicated to Mr. Sodipo that's

15   sort of --

16             MR. RAVENELL:  Objection.

17   Q.   -- what types of what the nature of the call, one at a

18   time?

19             MR. RAVENELL:  Objection, assumes facts not in

20   evidence.

21             THE COURT:  Well, the ground rules are two things.

22   One, there had to have been a telephone call.  And second that

23   you would have had to relay to Mr. Sodipo the nature of the

24   telephone call.

25             THE WITNESS:  Okay.  Do I answer that?

1        THE COURT:  Yes, ma'am.

2        THE WITNESS:  The call that I relayed to Mr. Sodipo

3   was pertaining to a woman that called hysterically accusing us

4   --

5        MR. RAVENELL:  Objection.  May counsel approach, Your

6   Honor?

7        THE COURT:  You may.

8        (At the bench)

9        THE COURT:  Yes, sir.

10        MR. RAVENELL:  Your Honor, the Court has indicated to

11   us that when these areas come up again, the Court is going to

12   reconsider, or we should bring this to the Court's attention.

13   We filed a motion to preclude any references to death, and the

14   Court has ruled on a couple occasion about death should be kept

15   out of the case with Adam Kaps and others.

16        And my understanding, from reviewing the Grand Jury

17   testimony of this witness, is that she suggested someone called

18   and said their son had been killed by New Care, for

19   prescriptions and we objected to this kind of questioning and

20   ask the Court to reconsider this area about these deaths, which

21   the Court had not yet gone into before this kind of testimony

22   is allowed.

23        THE COURT:  Well, there are two counts in the case,

24   two of the substantive counts involve individuals who died.  I

25   take it that the witness's testimony does not involve those two

1    counts; is that correct?

2              MS. SMITH:  No.

3              THE COURT:  Will she be talking about what Mr.

4    Ravenell described referring to deaths?

5              MS. SMITH:  I'm sorry?

6              THE COURT:  Reports of a death or deaths?

7              MS. SMITH:  She has told me several events.  One of

8    them is my child was addicted to drugs, why are you selling

9    drugs to him?

10             Another one is my child had an overdose, New Care

11   killed my child.  Both of these she has told me, in trial prep

12   that she reported to Mr. Sodipo.  She told him about other

13   people calling about their pills, their prescriptions being

14   late.  One person called wanted to know how to find their

15   doctor.

16             All of this information she related to Mr. Sodipo,

17   and he always told her to tell them that he was unavailable and

18   to take a number.  I think --

19             THE COURT:  What you should do is, well, all of that

20   is appropriate testimony and is consistent with my pretrial

21   order with one caveat.  I'm going to exclude the statements

22   about the son who died.  So if you would instruct the witness

23   that when she's describing the telephone call, she can say that

24   a woman called to say that her son had an overdose, but she

25   should not say that you killed my son or that the son died.

1   I'll exclude that under Rule 403.

2           MR. RAVENELL:  Would you mind bringing the witness up

3   here to tell the witness that.

4           THE COURT:  Well, I will have Mr. Budlow and Miss

5   Smith can do it on the way back to counsel table, that will

6   save some time.

7           MR. RAVENELL:  Okay.  Can we put one matter on the

8   record.  I don't want it to be taken, Your Honor, because I

9   didn't comment after the Court's ruling that, you know, we

10  didn't take exception.  We take an exception to the other parts

11  of the Court's ruling, because I am taking exception to the --

12          THE COURT:  Certainly.  The exception is noted.

13          MR. RAVENELL:  Thank you.

14          (Open court)

15          MR. RAVENELL:  Thank you, Your Honor.

16          THE COURT:  You're welcome.

17  BY MS. SMITH:

18  Q.  The topic was the nature of the calls that came in and some

19  of the things that these people said that you would then

20  communicate to Mr. Sodipo.

21          Can you generally tell us what some of these things

22  were?

23  A.  A mother calling hysterically saying her son had overdosed

24  on some meds that he got off line from New Care.

25  Q.  Okay.  Anything else that you recall people calling about,

1    what was the nature of those conversations?

2    A.   Either angry because they did not get the correct count of

3    meds, you cheated me out of six pills, things of that sort.

4             I didn't get my meds.  You know, just complaints,

5    basically.

6    Q.   You relayed this information to Mr. Sodipo?

7    A.   Yes.

8    Q.   Okay.  Were there any specific questions about the doctors?

9    A.   I asked who were they?  Where did they come from?

10   Q.   Beginning with the people that called in, did they have any

11   questions about the doctors?

12   A.   They asked how to get in touch with a particular doctor,

13   that did I have a phone number for a particular doctor, and I

14   didn't.

15   Q.   Okay.  Now, this person that's calling, let's make sure,

16   this is -- this is who?

17   A.   This is a client or someone trying to get online

18   information for a prescription, and wanted to know who this

19   doctor was and how to get in touch with this particular doctor,

20   and I didn't have any information for them.

21   Q.   And did they say who this doctor was in relationship --

22   A.   Sometimes they would have a name.

23   Q.   Okay.

24   A.   But I didn't have any information for the doctors at all.

25   Q.   Okay.  And but do you know why they were looking for the

1    doctor, did they say?

2              MR. RAVENELL:  Objection, Your Honor.

3    Q.  Did they say?

4              MR. RAVENELL:  Objection.

5              THE COURT:  I'll -- well, let's see.  I will sustain

6    the objection.  But I understand the question's been reframed

7    to did they say why they were calling, and that question I will

8    permit.

9              THE WITNESS:  Okay.  Several were asking to have

10   prescriptions refilled, and wanted to know who the doctor was,

11   how to get in touch with the doctor for a refill.

12   Q.  Did you communicate that to Mr. Sodipo?

13   A.  Yes.

14   Q.  Did they have any questions about payment?

15   A.  Yes.

16   Q.  What kind of questions were you asked by these customers?

17   A.  What credit cards do we use?  How do they make their

18   payments, things of that sort.  But again we did not handle

19   payment of monies.

20   Q.  Did any of these callers tell you where they were calling

21   from?

22   A.  Sometimes they would tell me.

23   Q.  And do you recall any of locations?

24   A.  Kentucky, Massachusetts, I mean, they were from all over.

25   Q.  And can you describe the demeanor of some of these callers,

1   what you noticed?

2          MR. RAVENELL:  Objection, relevance.

3          THE COURT:  I'll overrule the objection.

4   A.  Anxious, angry.

5   Q.  And the mother that called?

6   A.  Hysterically angry.

7   Q.  Is it your testimony that you gave these messages to Mr.

8   Sodipo?

9   A.  Yes.

10  Q.  Did you ever offer him a phone when the people were on the

11  phone?

12  A.  No.  He was usually not in our area when the calls were

13  coming in.

14  Q.  Okay.  And so what information would you provide him, would

15  you tell him about them, or what would you do?

16  A.  Yes.  I would tell them about him and ask for suggestions

17  what should I do.

18  Q.  Okay.  And what did he tell you?

19  A.  Depending on the situation, if was about a credit card or

20  payments, tell them we don't handle this.

21          If it was like the hysterical mother or angry

22  clients, he would say, you know, that's not -- that's not our

23  department.

24  Q.  Okay.  Did he ever ask to you take messages?

25          MR. RAVENELL:  Objection, leading.

1           THE COURT:  I'll overrule the objection.

2    A.  No.  Sometimes I would, and I would let him know.

3    Q.  And would you give those messages to him?

4    A.  Yes.

5    Q.  Do you have any information at all whether he called any of

6    these people back?

7    A.  I do not know.

8    Q.  Okay.  Were there calls from anyone else about this

9    business other than customers?

10   A.  Yes.

11   Q.  From whom?

12   A.  Couriers.

13   Q.  And what do you mean by couriers?

14   A.  Fed-Ex.

15   Q.  And did you communicate these conversations to Mr. Sodipo?

16   A.  Yes.

17   Q.  And what conversations did you have with couriers?  What

18   did they say to you that you communicated to Mr. Sodipo?

19           MR. RAVENELL:  Objection.  May counsel approach, Your

20   Honor?

21           THE COURT:  You may.

22           (At the bench)

23           THE COURT:  Good.  Now, this line of inquiry is about

24   couriers?

25           MS. SMITH:  Fed-Ex.  And I would proffer that her

1   testimony is that Fed-Ex called her and told her, asked her

2   what kind of, what are you sending, we have addicts breaking

3   into our hubs.  This is really a problem for us.  We need to

4   deal with it.  And she communicated that to Mr. Sodipo.  It's

5   just more of the same.

6          MR. RAVENELL:  More of the same.  Your Honor, I think

7   that's the point, and the government said it well, more of the

8   same.

9          Your Honor I think that there are two problems with

10  this.  One is we raised before, I don't know if the government

11  raised the Fed-Ex question before.  I don't think we had the

12  Fed-Ex issue before you during the motions in limine.

13         But we certainly raised an objection the issue of

14  relevance and certainly on the issue of 403 grounds, Judge,

15  that you know this is, as the government said, more of the

16  same.

17         You know, we just continue to go down the line the

18  government may introduce, you know that someone allegedly makes

19  a comment about Fed-Ex, and the defendant is supposedly told

20  about it, and we are basically trying these mini trials where

21  the only information we have is this witness suggests that

22  these things occurred.  Nothing else.

23         And we're basically going to go down to the situation

24  of mini trials.  It's totally collateral in that regard,

25  because the relevance certainly is so outweighed -- the

1    relevance of the probative value is outweighed by prejudice

2    under a 403 analysis when we continue to say here we go

3    beginning the government's comment, when is enough enough?

4         THE COURT:  I'm going to overrule the objection for

5    the reasons that I stated in my opinion.

6         But I should give an instruction concerning notice.

7         Now, these telephone --

8         MR. RAVENELL:  I'm sorry.

9         THE COURT:  Concerning notice.

10        Now, the telephone calls that have come from mothers,

11   from patients, from Fed-Ex, these only come in on the issue of

12   notice.  They don't come in to prove the truth of the matter

13   asserted, meaning that people were actually were breaking into

14   the company, but any way they only come in, they don't come in

15   to prove the truth of the matter asserted, but they only come

16   in for notice.

17        Now, the question, then, is notice of what?  And it

18   seems to me that can be a subject of argument.  I don't think I

19   should instruct jury as to what the notice that it comes in

20   for.  It's simply information that's coming in.  Notice that's

21   coming in and then related to Mr. Sodipo.

22        So I would simply propose simply giving them a notice

23   instruction telling them what the testimony is coming in for.

24        MR. RAVENELL:  And, Your Honor, I guess that's what I

25   am saying.  The Court's said you're not going to go into what

1    the notice is, other than that Mr. Sodipo, well -- let me make

2    sure we're clear.

3            That the government is introducing this evidence, and

4    their -- oh, instead of me trying to rephrase it, could the

5    Court tell me again how, what the purpose would be, or what the

6    instruction would be briefly?  I'm trying to rethink it.

7            THE COURT:  At some point, I'll be giving the jury an

8    instruction on the idea of knowledge including the idea of

9    willful blindness, which then, which implicates the information

10   that's come into the mind of Mr. Nwaehiri and Mr. Sodipo

11   concerning the entire operation, including the patients who

12   were receiving these drugs.

13           The government's argument, I take it, is that these

14   telephone calls, like the call center records, indicate that

15   there were problems with the people who were receiving the

16   drug, that they're addicts, and a lot of this information

17   indicates addiction.

18           So what I would tell the jury is that this testimony

19   of calls comes in not on the issue as to whether there was a

20   person whose pills were refilled for the son who's relative is

21   an addict, they come in to demonstrate the quality and nature

22   of the calls received.

23           MR. RAVENELL:  That's fine.

24           MS. SMITH:  And provided, and provided to Mr. Sodipo.

25           MR. RAVENELL:  That's a --

1        THE COURT:  That's just the nature of the calls.

2        MS. SMITH:  Got it.

3        (Open court)

4   BY MS. SMITH:

5   Q.  Miss Kelly --

6        THE COURT:  If I could just one minute, please, I'm

7   thinking about the instruction.

8        MS. SMITH:  I'm sorry.  Thank you, Your Honor.

9        (Pause.)

10       THE COURT:  Good.  Ladies and gentlemen, I wanted to

11  give you just a brief instruction.  It's one that I will

12  reiterate later in the case and that I will give in greater

13  detail.  But I wanted to talk to you a little bit about the

14  concept of hearsay, and I'm sure that hearsay is a term that is

15  familiar to all of us from all the courtroom shows that we see

16  on television from time to time.

17       Well, what is hearsay?  And let me start with an

18  explanation of what is direct evidence.  Let's assume that a

19  person comes into the courtroom, is a witness, swears to tell

20  the truth, takes the stand, and then is asked the following

21  question:  Do you know how hot it is outside?  And the witness

22  says, yes, I was just outside five minutes ago, and I can tell

23  you from my own personal observation that it's 85 degrees

24  Fahrenheit outside as of five minutes ago.

25       That testimony would be direct evidence of how hot it

1    was outside because that person was outside, experienced the

2    heat, and then has testified to it here in trial.

3          Let's assume the witness takes the stand, raises his

4    or her right hand, sworn to tell the truth, and is asked do you

5    know how hot it was or it is outside now?

6          The witness says, well, I don't know myself because

7    I've been sitting in the anteroom waiting to testify for the

8    last five hours.  So I haven't been outside.

9          But I did talk to one of the court security officers

10   who was making his rounds, and the Court security officer told

11   me that it was 85 degrees outside.

12         And so that's what it is.  85 degrees.  Now, that

13   testimony would not be permitted because it was not based on

14   firsthand information.  It was based upon what somebody else

15   said.

16         And the person who made the direct observation, the

17   Court security officer, isn't here to testify.  So generally

18   speaking, when what is at issue is a fact, how hot it is

19   outside, the only person who can testify to that fact is

20   somebody who actually experienced it.  Hearsay evidence doesn't

21   count.

22         Here we have had a number of, we've had a segment of

23   testimony concerning telephone calls received by our witness

24   from people who called in from the outside.

25         So that our witness was testifying that she was

1    sitting in New Care by the phone.  The phone rang.  She picked

2    up the phone.  And a voice said I am a customer, and I have

3    looked at my bottle of prescription pills, and I'm supposed to

4    have 50 pills in the prescription but I only have 45, and I'm

5    angry about it.

6         The testimony of our witness would be inadmissible to

7    prove that there were only 45 pills in the bottle, because the

8    only way that our witness knows if there were 45 pills in that

9    bottle is what she was told by somebody who called up from the

10   outside.

11        So the testimony about the number of pills is hearsay

12   and inadmissible to prove the number of pills.

13        But her testimony, our witness's testimony, is

14   admissible as it bears on the number of calls coming in from

15   the outside, the kind of questions that were being asked.  The

16   kind of concerns that were raised.  And they are sort of the

17   emotional content or emotional tenor of the conversations.

18        So that the testimony is direct evidence not of how

19   many pills there were of the bottle, in the bottle, but the

20   kind of calls that were being received where they -- were the

21   people upset?  Were they not upset?  What kind of concerns were

22   they raising?

23        So this testimony is being received to show the tenor

24   of the calls being received, if that makes sense to you.  I

25   hope that was clear.

1        Miss Smith?

2        MR. RAVENELL:  Your Honor, may counsel approach

3   briefly?

4        THE COURT:  You may.

5        (At the bench)

6        MR. RAVENELL:  I will just ask the Court to instruct

7   the jurors that what you've indicated is not suggesting that

8   the testimony is accurate, that it would be for the jury at

9   some point to decide what to believe for this witness or any

10  other witness, whether to accept part, some, or none of the

11  testimony.  I don't want this as left with a suggestion to

12  suggest that the testimony is accurate.  I don't want it to be

13  left where the Court is vouching for the credibility of the

14  testimony.  And I think it can be done as a blanket, but at

15  some point I ask the Court to give an instruction that the jury

16  will be able to consider and decide and accept as to any

17  witness, not just this witness some, parts, or, et cetera, of

18  the testimony.

19       THE COURT:  Good.

20       MS. SMITH:  Your Honor, the government thought that

21  the Court was going to say that the information was being

22  admitted to show notice.

23       THE COURT:  Well, in thinking about it, I thought

24  that I did that, because what it does is --

25       MS. SMITH:  Okay.

1          THE COURT:  The testimony comes in to show the

2     character of the calls.  And then the character of the calls

3     are then characterized by the witness relayed to Mr. Sodipo.

4     So I think the explanation is accurate, and I don't think it

5     has to be expanded, because I've told them it doesn't come in

6     for the truth of the matter asserted, but only to describe the

7     character of the calls.  So I think that's a better

8     explanation, actually.

9          MR. RAVENELL:  Your Honor, will the Court give that

10    instruction?

11         THE COURT:  Yes, I will.

12         (Open court)

13         THE COURT:  So to summarize, the testimony is

14    competent, meaning the witness can testify concerning the

15    character and nature of the telephone calls that she is

16    testifying about.

17         Of course, it is entirely up to the jury to decide

18    with respect to any testimony whether you will accept or reject

19    the testimony in whole or in part.

20         I'm simply ruling that the testimony can be received

21    by you bearing on the subject of the calls themselves.

22         MS. SMITH:  Thank you, Your Honor.

23    BY MS. SMITH:

24    Q.  Going back to Fed-Ex, what, if anything, did Fed-Ex have to

25    do with the Internet prescriptions?

1  A.  They were the courier that would pick up the prescriptions

2  that were being mailed out from the online prescriptions.

3  Q.  And how many times a day, if you know, did they pick up?

4  A.  Anywhere from two, three a day.

5  Q.  And did you ever see how many packages they would be taking

6  out?

7  A.  Yes.  I can't count or tell you exactly how many.  Fed-Ex

8  told me that we filled up one of their trucks so that we were

9  like the only stop for them.

10        MR. RAVENELL:  Objection, move to strike.

11  Nonresponsive.

12        THE COURT:  I'm sorry, I missed that.  I thought we

13  were on how many times they came by.

14  Q.  They came during the day.  And then I was asking if she

15  observed how many packages, what were they contained in?

16        MR. RAVENELL:  Objection, move to strike the

17  statements.

18        THE COURT:  Well, so what we've gotten to, ladies and

19  gentlemen, is that Fed-Ex the testimony is Fed-Ex came two or

20  three times to pick up something from New Care.

21        MR. RAVENELL:  Actually, may counsel approach?

22  briefly, may I?

23        THE COURT:  Certainly.

24        (At the bench)

25        MR. RAVENELL:  I'm not sure if the Court heard the

1    yesterday of what the witness said, but the witness went on

2    beyond that, Miss Smith asked the question, which was did she

3    see what was picked up and she kind of blurted out Fed-Ex told

4    me that it filled up one of their trucks, which is clearly not

5    responsive to Miss Smith's question.  And that's why I asked

6    the Court to tell the jury to ignore the last part of what she

7    said.  It's not responsive.

8         THE COURT:  Well, I was backtracking just to avoid

9    that objection to establish that she testified that the Fed-Ex

10   would come two or three times a day and pick something up and

11   then to start Miss Smith's questioning about what were they

12   picking up and what did it look like.

13        MR. RAVENELL:  I would just ask the Court to instruct

14   the jurors they are to ignore anything the witness said beyond

15   they picked up two or three times a day, because that shouldn't

16   be in the record.

17        THE COURT:  The comment about filling up the truck?

18        MR. RAVENELL:  Yes, that they told her it filled up a

19   truck.

20        MS. SMITH:  I don't think we need to reference it,

21   but if the Court just says that everything the witness says

22   after that topic is stricken, I think the jury will get it.

23   Anything that Fed-Ex told her.

24        THE COURT:  All right.

25        (Open court)

1        THE COURT: Ladies and gentlemen, the testimony has

2    been that Fed-Ex would come two or three times a day, that's

3    competent evidence, can be considered by you, and I will strike

4    the statement as to what Fed-Ex told our witness.

5        MS. SMITH:  Thank you.

6        THE COURT:  Miss Smith?

7    BY MS. SMITH:

8    Q.  What were the packages contained in as they went out the

9    door with Fed-Ex?

10   A.  I didn't understand you.

11   Q.  Were they in a box or in the cart?  How were the packages

12   taken out the door to the Fed-Ex truck?

13   A.  Some were in boxes, some were in padded envelopes.  It just

14   depended how much and what type of meds it was.

15   Q.  And you had begun to describe before a phone call from

16   Fed-Ex you got, that you communicated to Mr. Sodipo.

17   A.  Yes.  Fed-Ex called several times requesting information

18   about the nature of the business.  We -- I called Fed-Ex to

19   request packaging so that we could package the meds to send

20   out.

21        And they wanted to know why we needed so much, you

22   know, so much supplies for New Care.

23        And they wanted to come in and actually see the

24   facility, talk to Mr. Sodipo.  And I relayed that information

25   to Mr. Sodipo.

1   Q.   And did they relay anything else to you about what they

2   were dealing with?

3               MR. MCCANTS:   Objection, leading, Judge.

4               THE COURT:   I'll overrule the objection.   You may

5   answer.

6   A.   I received a call from Fed-Ex, one of the drivers from

7   Fed-Ex told me that we should be more concerned about the area

8   in which we are sending meds.   She said that they were having

9   problems with burglary and people complaining and coming to the

10  hubs of Fed-Ex to pick up meds because they were not able to

11  deliver it.   And we were delivering to drug-infested areas.

12  Q.   Did you communicate that information to Mr. Sodipo?

13  A.   Yes.

14  Q.   Okay.   Did you have any conversations with Mr. Sodipo about

15  all of these calls in general that you have described?

16  A.   Yes.

17  Q.   Okay.   What was the conversation that you had with him?

18  A.   Especially the one where Fed-Ex was requesting to come to

19  the facility to see our facility and what we actually did

20  there.   I believe, I know for fact they came into to meet with

21  Mr. Sodipo, and I wasn't at the meeting, so I don't know what,

22  you know, transpired there.

23  Q.   Did you -- did you ask him just -- did you express any

24  concerns to him about just all of these calls?

25  A.   Yes.

1   Q.  And tell us about that conversation.

2   A.  I was concerned with the calls, with these clients or the

3   patients being upset about.

4           MR. RAVENELL:  Objection, Your Honor, move to strike.

5           THE COURT:  I'll strike that preamble.

6           Ma'am, if you would simply say what you told Mr.

7   Sodipo?

8   A.  I told Mr. Sodipo I was concerned about the calls of the

9   patients, or clients complaining about medicine being sent to

10  their children.

11          I was concerned about the call I received from Fed-Ex

12  about us delivering medicine to the drug infested areas.  I

13  relayed that to Mr. Sodipo.

14  Q.  And what, if anything, did he tell you?

15  A.  He will take care of it.

16  Q.  Okay.  Did there come a -- what, if anything, did you have

17  to do or were you involved in with the actual bottles

18  themselves that the drugs went out in?

19  A.  Clerical, myself included, we typed up a lot of labels to

20  put on the bottles of medicine that were being filled and sent

21  out.

22  Q.  And how many labels would you say you would prepare every

23  day?

24  A.  Wow.  Let me guess.  Over 90 a day, a lot.  Just a lot.  I

25  don't know how many.

1    Q.   And what were these labels for?

2    A.   Different meds.  They would be the name of the meds and the

3    quantity.

4    Q.   And was there one med in particular that you saw more than

5    others?

6    A.   Yes.  I believe it's hydrocodone.

7    Q.   Okay.

8    A.   I think that's --

9    Q.   Did you have any conversation with Mr. Sodipo about the

10   labels and the hydrocodone?

11   A.   I asked him why so?  I asked him was that the only meds we

12   actually sent out?  And he said no, we do others.

13   Q.   Do you know who the pharmacists were that were working in

14   the pharmacy?

15   A.   Miss Jones.  Miss Ruth.  Mr. Babu.  Mr. Kenneth.

16   Q.   Now, let me ask you something.  When you stopped answering

17   the phones, did you stop answering them completely, or did you

18   stop dealing with the people on the phone?

19   A.   I stopped dealing with the people on the phone.

20   Q.   So who was responsible for taking those calls?

21   A.   We transferred them to the pharmacy.

22   Q.   Every single one of them?

23   A.   Yes.

24   Q.   So at some point in time, you no longer took the calls that

25   you have described, the nature of the calls?

1    A.   Yes.

2    Q.   Okay.  And who in the pharmacy answered those calls?

3    A.   Whomever picked up, the technician or whomever picked up

4    the phone.

5    Q.   Okay.  And did you ever have any conversations with any of

6    the pharmacists about the Internet pharmacy?

7    A.   Yes.

8    Q.   And did you ever communicate to Mr. Sodipo these

9    conversations that you would have with the individual

10   pharmacists?

11   A.   I'm not sure if I relayed them to Mr. Sodipo.  But I had

12   several conversations with --

13            MR. RAVENELL:  Objection, Your Honor.

14            THE COURT:  At this point, you should confine

15   yourself just to conversations that you had either with Mr.

16   Sodipo or Mr. Nwaehiri, and if --

17   A.   Okay.

18            THE COURT:  Be careful to say the name which one.

19            THE WITNESS:  Okay.

20   Q.   Okay.  I think my question was did you have any

21   conversations with pharmacists, and this is just yes or no.

22   A.   Yes.

23   Q.   Okay.  Did you communicate, again yes or no, any of these

24   conversations with Mr. Sodipo?

25            MR. RAVENELL:  The witness already answered no, she's

1   not sure.

2           THE COURT:  Well --

3           MS. SMITH:  It's a yes or no, Your Honor.

4           MR. RAVENELL:  Asked and answered.

5           MS. SMITH:  I'm stepping very carefully.

6           THE COURT:  Well, I'm going to overrule the

7   objection.  You may answer.

8   A.  What was my question?

9   Q.  Do you recall if you communicated any of those

10  conversations that you had with the pharmacists to Mr. Sodipo?

11          MR. RAVENELL:  Objection, Your Honor.  The witness

12  already testified that she was not sure.

13          THE COURT:  Well, I'm going to permit it to clear

14  things up.

15          Can you answer the question, please?

16  A.  No, I didn't.

17  Q.  Did any of the conversations that you had with any of the

18  pharmacists include a communication to you that they had talked

19  to Mr. Sodipo?

20          MR. RAVENELL:  Objection, Your Honor.  It's double

21  hearsay.

22          THE COURT:  Well, that would be either, if you could

23  just answer that, can you answer that yes or no?

24          THE WITNESS:  Yes.

25          THE COURT:  Good.  I could see counsel, please?

1          (At the bench)

2          MS. SMITH:  Your Honor, I don't believe there's any

3    legal difference in proving notice if she has been made aware

4    that people have complained to Mr. Sodipo.  And I don't mean

5    just generally.

6          For example, there will be testimony that Mr.

7    Hartwill was complaining.  And after he complained for a while

8    about the Internet prescriptions, he was moved to another part

9    of the pharmacy.  And he will testify to that.

10         But people came to her and asked her to speak to Mr.

11   Sodipo about the different problems and issues that they were

12   having.  She knew when she was there that there were growing

13   concerns in the pharmacy.  And I think it is part of proving

14   the environment just what was going on in the pharmacy.

15         I should also add that the government submits that

16   the pharmacists are co-conspirators.  The pharmacists are also,

17   in the government's view, the people with whom the defendants

18   operated in concert with in the CCE count.  And it is the

19   knowledge by those people and the fact that they continued to

20   fill prescriptions that is also relevant.

21         THE COURT:  You're going to have -- aren't you going

22   to have these pharmacists, or at least some of them --

23         MS. SMITH:  Yes.

24         THE COURT:  -- come in and testify about the --

25         MS. SMITH:  Yes.

1          THE COURT:  -- concerns they voiced to Mr. Sodipo?

2          MS. SMITH:  Yes.

3          THE COURT:  Well, that certainly is competent

4    evidence.  But here this is too removed because when she

5    characterizes the telephone conversation, she's actually

6    characterizing to Mr. Sodipo something that she experienced,

7    namely, the telephone conversation.  Here this is further

8    because the pharmacists were telling the witness that they had

9    complained to Mr. Sodipo.  So she doesn't have any firsthand

10   knowledge about the complaints --

11         MS. SMITH:  Okay.

12         THE COURT:  -- passing along a complaint to Mr.

13   Sodipo, so I will sustain the objection.

14         MS. SMITH:  Okay.  Thank you.

15         (Open court)

16         MR. RAVENELL:  Thank you, Your Honor.

17   BY MS. SMITH:

18   Q.  Did Mr. Sodipo ever tell you about changes in the personnel

19   in the pharmacy?

20   A.  Can you elaborate on that?

21   Q.  Reassignments, anything of that nature?

22   A.  I don't think I am clear on what you're asking me.

23   Q.  Where was Mr. Hartwill assigned in the pharmacy, if you

24   know?

25   A.  He was a part-time pharmacist.

1   Q.  And what part of the pharmacy business did he work, if you

2   know?

3   A.  For what I was told --

4   Q.  By, by who?

5   A.  By Mr. Hartwill.

6   Q.  Okay.  Only by Mr. Sodipo.

7   A.  No, then I don't know.

8   Q.  Okay.  Fine.

9            What, if any, conversation did you have with Mr.

10   Sodipo about doctor/patient relationships?

11   A.  Elaborate.  I'm not sure I know what you mean by

12   doctor/patient relationship.

13   Q.  Did you ever ask Mr. Sodipo about the doctor/patient

14   relationships with these Internet pharmacies?

15   A.  What I asked Mr. Sodipo was who were these doctors, and how

16   did they relate to the online prescription?  And he said it was

17   just different ones that, you know, fill prescriptions.  Never

18   really went into detail about it.

19   Q.  Did you ever ask him if they saw each other?

20            MR. RAVENELL:  Objection, Your Honor, leading.

21            THE COURT:  I'll sustain the objection.

22            MS. SMITH:  Your Honor, one moment.

23            (Pause.)

24            MS. SMITH:  It's going to take me a moment to find

25   it, Your Honor, but I'm going to refresh the witness's

1   recollection.

2          MR. RAVENELL:  Your Honor, may counsel --

3          THE COURT:  There's nothing to refresh at the present

4   time.  The question was whether you had any conversations with

5   Mr. Sodipo concerning the relationship between the patients and

6   their doctors so that's --

7          MS. SMITH:  Your Honor, the question was did she ever

8   ask Mr. Sodipo if the doctors saw the patients.

9          MR. RAVENELL:  Objection, may --

10          MS. SMITH:  There was an objection because it was

11   leading.

12          THE COURT:  Right.

13          MS. SMITH:  And --

14          THE COURT:  So if you could just rephrase in a non

15   leading question, please?

16   BY MS. SMITH:

17   Q.  What, if anything, else did you ask Mr. Sodipo about the

18   doctors and patients?

19   A.  When did they see the patients, or how did the patients see

20   the doctors that names were on these prescriptions.

21   Q.  And what, if anything, did Mr. Sodipo tell you?

22   A.  He never went into details with me about it.

23   Q.  Did you have any conversations with Mr. Sodipo about the

24   prescription process, how many refills, or anything that like

25   that?

1          MR. RAVENELL:  Objection, Your Honor.  May counsel

2   approach?

3          THE COURT:  You may.

4          (At the bench)

5          MR. RAVENELL:  Your Honor, this is all just leading,

6   and the government is doing is picking and choosing areas to

7   just lead the witness down the path.  I mean, it's leading.

8   Every one of these questions have been leading.

9          THE COURT:  Well, the way the questions usually start

10  off is in a non leading form, but then it's sort of the

11  tagalong.

12         For example, if she has a problem and needs to be

13  directed, she can be directed.  But if you would start off with

14  did you ever talk to Mr. Sodipo about how prescriptions were

15  filled, go through the prescription process, and see what she

16  what she says.

17         She was able to get through it on the doctor/patient

18  relationship and then she would probably be able to get through

19  on this, too.

20         MS. SMITH:  Your Honor, for the record, the witness

21  is not recalling certain information that she testified to in

22  Grand Jury, very specific details.  My outline was prepared

23  from her Grand Jury testimony.

24         I am prepared to impeach the witness with her prior

25  testimony if she doesn't recall it or says no because she

1   doesn't recall it, but doesn't remember that she doesn't recall

2   it.

3              THE COURT:  What hasn't she recalled so far?

4              MS. SMITH:  A number of things, Your Honor.

5              How do people relate to their doctors?

6              How do the doctors determine what prescription to

7   give a patient?

8              How do they actually get to go in and see the doctor?

9              Mr. Sodipo said I think some of them do see their

10  doctors, but a lot of them they're just refills, you know,

11  these doctors already know these people.

12             THE COURT:  What you can do is go back and ask her --

13  we only have about five more minutes, ask her about the

14  relationship, did you ever have a conversation with Mr. Sodipo

15  concerning the interaction relationship between the doctors and

16  the people for whom these drugs were prescribed, and then if

17  answer is yes, then ask her what did Mr. Sodipo say.

18             MS. SMITH:  If she can remember what he said.

19             THE COURT:  And see what she says, and then do you

20  remember anything else?  Do you remember anything else, see how

21  much you get.

22             MS. SMITH:  Okay.

23             THE COURT:  And then we'll see whether you need to

24  impeach her.

25             MS. SMITH:  Or refresh her recollection at that

1    point.

2              THE COURT:  Or we'll have to talk about that.

3              (Open court)

4              MR. RAVENELL:  Thank you, Your Honor.

5    BY MS. SMITH:

6    Q.  Miss Kelly, did you have any conversations with Mr. Sodipo

7    about the interaction between the doctors and the patients?

8    A.  I did.

9    Q.  Okay.  Do you recall today what the conversation was

10   specifically what he told you about the interaction?

11   A.  I don't really remember.  But I do recall asking him how

12   and, you know, where did the doctors come from, you know, these

13   online doctors and how did the patients find them and that kind

14   of thing.

15   Q.  Do you recall -- do you recall testifying --

16             THE COURT:  Well, why don't we do this ladies and

17   gentlemen, it's five minutes of five.  Now might be a good time

18   to break for the weekend.

19             Let's start on -- my computer is down, but I believe

20   we're starting at Monday.

21             THE CLERK:  9:00.

22             THE COURT:  Monday at 9:00.  Why don't we start at

23   9::30 a.m. on Monday.  So we'll break for the day, and remember

24   the standard admonitions.  Don't talk about the case with

25   anyone at home or at work or anywhere else.

1          Don't conduct any independent research or

2     investigation.

3          If you happen to hear or see anything about the case

4     in the media, stop looking, stop listening, and advise Mr.

5     Thompson on Monday.

6          And have a very pleasant weekend, and I look forward

7     to see you on Monday at 9:30 a.m.

8          (Jury recessed)

9          THE COURT:  Good.  Please seated.  The record will

10    show that the jury has retired.

11         Miss Kelly, you are excused for the weekend.  Look

12    forward to seeing you Monday at 9:30.

13         Because you are on direct examination, you are not

14    permitted to talk about your testimony with anyone, although

15    you're certainly entitled to talk to your counsel about

16    scheduling matters, but don't talk about your testimony with

17    anybody at home or your family.  So that that's the general

18    rule.  Thank you.

19         THE WITNESS:  Okay.  Thank you.

20         THE COURT:  Good.  The record will show that the

21    witness has left the courtroom.

22         So that the proposal would then be that you put the

23    Grand Jury testimony in front of her, and then you ask her if

24    that refreshes her recollection as to any other conversations

25    or topics of conversation that she had with Mr. Sodipo

1      concerning the doctor/patient relationships.

2            MS. SMITH:  And the interaction, yes, Your Honor.

3            THE COURT:  Good.  Mr. Ravenell, is that fair or

4      foul?

5            MR. RAVENELL:  Actually, Your Honor, I get to make a

6      ruling?  No, I think that's proper, Judge.

7            THE COURT:  Good.  And then you can point out that

8      she couldn't remember and she had to her recollection

9      refreshed.

10           But now, when you're refreshing the recollection,

11     you're just showing her a document, and does this document

12     refresh her recollection and review it.  She then stops

13     reviewing and then she has to testify based upon refreshed

14     recollection and not simply parroting what's on the document.

15           Now, Mr. Ravenell, do you want to get -- you can

16     certainly get into the refreshing document, do you want to

17     establish that that was part of her Grand Jury testimony?  Or

18     just leave that alone?

19           MR. RAVENELL:  No.  I think I thought Miss Smith was

20     going to mention the Grand Jury.

21           MS. SMITH:  Only if it's okay with you.

22           MR. RAVENELL:  No, Your Honor.  I have no problem

23     with that, because I'm sure I'll be asking her questions about

24     her Grand Jury testimony at some point during the

25     cross-examination.

1          MS. SMITH:  We can mark it for identification, Your

2     Honor, it has a tag on it.

3          THE COURT:  Thank you.  Normally the refreshing

4     document is not identified to the jury.

5          MR. RAVENELL:  Right.

6          THE COURT:  In this case, would you rather have the

7     refreshing document identified so that the jury will know what

8     it is?

9          MR. RAVENELL:  Your Honor, I don't think it's proper

10    to identify it for the jury.  I'm saying at some point it may

11    be identified later on, either it may become relevant to be

12    identified by Miss Smith or by me, but I don't think it's

13    relevant on that question.

14         THE COURT:  Good.  So that the document will be

15    marked for identification.  In questioning the witness, Miss

16    Smith will not characterize the document as Grand Jury

17    testimony.

18         On cross-examination you can characterize it as Grand

19    Jury testimony, if you wish to do so.

20         And the document would not come into evidence in any

21    event, but will be marked for identification.

22         MS. SMITH:  Your Honor, I can represent to the Court

23    that over the last hour, end of the day everyone's tired, her

24    memory was clearly lapsing.

25         I was near the end of my direct with her.  I'm going

1    to go back and see the there's anything else I thought she

2    forgot, and I will use this procedure, but I don't anticipate

3    being more than another 15 minutes with her on Monday morning.

4              Can we find out how long Mr. Ravenell will be so we

5    know how to line up our witnesses?

6              MR. RAVENELL:  A few hours.

7              THE COURT:  A few hours?

8              MR. RAVENELL:  Yes.

9              THE COURT:  Mr. McCants?  A few hours, is that a real

10   estimate.

11             MR. RAVENELL:  No, it's a real estimate.

12             THE COURT:  Real estimate.

13             MR. MCCANTS:  15 minutes, Your Honor.

14             THE COURT:  Good.  Thank you.

15             Now, on the warning flags, why don't we discuss that

16   just briefly?

17             Part of the government's theory of the case is that

18   the defendants ignored certain warning flags or purported to

19   ignore them, and that these warning flags either bear upon

20   actual knowledge that the prescriptions being filled were

21   invalid or conscious avoidance of the truth, willful blindness,

22   in other words.

23             And I was looking to see what are the categories of

24   evidence that the government contends falls under this sign

25   post?

1          The first would be the DEA warning letter.  The
2     second would be the Maryland Board of Pharmacy newsletters.
3          The third would be the fact that New Care was cut off
4     by a reputable drug manufacturer.
5          The fourth would be -- and I believe this is accurate
6     -- that doctors who were prescribing for the Internet websites
7     lost their licenses.
8          The next would be that the DEA issued subpoenas for
9     documents on certain websites and doctors or initiated
10    prosecutions against websites or doctors.
11         So I wanted to find out from the government whether
12    all of those items are on your willful blindness list and
13    whether there are other items.
14         Mr. Budlow?
15         MR. BUDLOW:  Thank you, Your Honor.
16         Unfortunately, I didn't know this was coming.
17         THE COURT:  Well, we're just talking at this point.
18         MR. BUDLOW:  Thank you.  I appreciate that.  The
19    first three DEA warning letters, Board of Pharmacy newsletters
20    New Care cut off by McKesson, clearly, yes, that's definitely
21    the government's theory of admissibility to those three.
22         May I inquire of the Court, the next three that the
23    Court issued, Internet doctors lost their licenses, DEA issued
24    subpoenas, and that DEA initiated or there was some
25    prosecutions versus websites and doctors.

1      Is the Court referring to what we've termed earlier

2  as the DEA online information that was recovered from Mr.

3  Sodipo's office?

4      THE COURT:  No.  That would be in a separate

5  category.  So let me write that down.  The DEA online but what

6  --

7      MR. BUDLOW:  What you were referring to in those

8  three I just mentioned.

9      THE COURT:  Pardon?

10      MR. BUDLOW:  I'm not sure which evidence, through

11  what sources of evidence you're referring to with the last

12  three that I mentioned.

13      THE COURT:  Well, that was simply running through

14  what kind of information might fall into this category.  So I

15  wasn't stating that you had to put the evidence in these

16  categories or that, but trying to find out what I know about

17  the case so far might fall into this willful blindness

18  category.

19      Then I can look at it to see whether it's good

20  evidence or bad evidence.

21      MR. BUDLOW:  That helps.

22      THE COURT:  I was thinking primarily the testimony of

23  Mr. Kaps, who testified that certain of the Internet doctors

24  either lost his license or lost their licenses, or that the

25  doctors were swooped down upon by the DEA, and either served

1   with a deposition subpoena or were prosecuted.  You have the

2   fact that the DEA itself paid the visit on Mr. Kaps.  I thought

3   they came to see him twice.  And my recollection is at least

4   once.

5        MR. RAVENELL:  It was twice, Your Honor, '03 and '07.

6        THE COURT:  So that there's two things going to work.

7   The first is if you are running a business, and you're trying

8   to stay on the right side of the law, it would be relevant to

9   you that your business partners and affiliates were all being

10  prosecuted and put in jail or were having the authorities taken

11  an active interest in.  That might give you pause.

12        The flip side of that is that the views of the DEA as

13  to whether New Care and the Internet websites were engaged in

14  illegal business is irrelevant and would not be permitted in

15  this case.

16        So that, for example, a DEA agent could not come in

17  and say, well, we thought that we conducted an investigation,

18  and we came to the conclusion ourselves that New Care was

19  writing invalid prescriptions, and that Mr. Sodipo and Mr.

20  Nwaehiri were violating Section 841 -- Section 846.  That

21  wouldn't be permissible.

22        But this kind of, these sort of artifacts of the

23  investigation and the signals that they might send to somebody

24  who is in the pharmacy or Internet business might be relevant

25  to the willful blindness issue.

1       So I was looking to see what kind of evidence you

2   wanted to put on for the willful blindness point and whether it

3   would be admissible or not.

4       MR. BUDLOW:   Okay.   Thank you, Your Honor.   I

5   appreciate you clarifying that.   Your Honor, it brings -- I'm

6   getting, if I understand right, you're not looking for argument

7   at this point.

8       THE COURT:   No, just looking to see how --

9       MR. BUDLOW:   What the parts of evidence are for this

10  point?

11      I want to point out I briefly skipped through the

12  defense response, and I notice they mention the government

13  using a lot of evidence along these same lines, and what they

14  did was they confused two areas of the government's evidence

15  and said that it was being used for one purpose, and this is

16  illustrative of that fact.   And I just want to illustrate the

17  point.   I will give the example I think was in the memo, I'm

18  not sure, I believe defense said, for example, the government

19  is using evidence of what Jim Cloud testified to, or they

20  mention Steve Holtel as things that show willful blindness.

21      And, in fact, that's sort of the whole second area of

22  the case where the government is showing a lot of evidence, as

23  well as much of Mr. Kaps's evidence, to show either that the

24  prescriptions were issued outside the usual course of medical

25  practice, or they're being admitted to show the state of mind

1     or the guilt of the co-conspirators.

2             Not necessarily, we're not bearing directly on the

3     knowledge of the defendants.

4             What we're discussing now I think what's relevant now

5     is evidence that the government is showing that either the

6     defendants knew about or were willfully blind to.

7             And so the DEA letter that the Board of Pharmacy

8     newsletter, the fact that they were cut off, all clearly

9     relevant in the government's point of view on the issue of

10    actual knowledge, that they should have known there was

11    something wrong, for lack of an easier way to say it.

12            I know that in our memo on the motion in limine, at

13    least as to all of the contested issues that were known at the

14    time, the government memo sort of listed out a number of pieces

15    of evidence that went to willful blindness, consciousness of

16    guilt, things that either the defendants knew, arguably should

17    have known, not that that's the standard, but it's evidence

18    they had access to or they lied about.

19            All of those items mentioned in that section would be

20    things that the government is intending and has already put

21    into evidence on this issue.

22            The testimony of Mr. Kaps at this -- hold on.

23            Court's indulgence for one moment.

24            (Pause.)

25            MR. BUDLOW:  The government is not --

1        THE COURT:  If I could just interrupt for one moment?

2        MR. BUDLOW:  Yes.

3        THE COURT:  The items that I have been going through

4   are either are in the categories of official action, that is,

5   the DEA sent a warning letter, that the Board of Pharmacy sent

6   a newsletter.  Well, I guess it would be being cut off by a

7   reputable drug manufacturer, so I guess it is mixed.

8        The things that you're talking about are, for

9   example, knowledge that one's customers are drug addicts,

10   stealing drugs, or that sort of thing, correct.

11        MR. BUDLOW:  I mean, I guess I've mixed those issues.

12   I guess I was pointing out to that those, the issues the

13   Court's asked about are in that section of our memo.  There's

14   other evidence that we're going to introduce that relates to

15   willful blindness.

16        THE COURT:  I guess what this really relates to is

17   official agency action and how that factors into the case,

18   because what I'm understanding correctly, one of the official

19   agency actions could go to show willful blindness.

20        For example, if all of the one's business partners

21   are investigated, prosecuted, put in jail, that could be argued

22   to go to knowledge that what I'm doing and what our enterprise

23   is doing is illegal, or I should investigate it further?

24        The flip side of the coin is that, and I think this

25   is where it comes in primarily, is that the defense appears to

1    be building an argument that the DEA had certain knowledge of

2    the operation of the Internet websites and of New Care, but did

3    absolutely nothing to stop the websites or to stop New Care.

4         And it's likely, it's likely the willful blindness,

5    there's a certain logic to that.  It's sort of like asking for

6    and getting a no action letter from the SEC, official agency

7    from the government, has this information about what you're

8    doing, they let you do it, they don't try to shut you down.

9         Now, there are two ways that evidence might come in

10   before the jury.  The first would be that Mr. Ravenell would

11   stand up in closing argument and say, ladies and gentlemen of

12   the jury, you heard from these witnesses from New Care and from

13   the websites, that they told the DEA and Maryland Board of

14   Pharmacy the following facts about how the website operated and

15   how prescriptions were filled.

16        And there was absolutely no response from the DEA.

17   They didn't say have any follow-up questions. They didn't tell

18   us not to do it.  They didn't say we ought to think about not

19   doing it.  They just let us go about our merry way for a year

20   and a half.  And then, all of a sudden, they were arrested one

21   day and prosecuted without any kind of warning.

22        The second kind of argument would be that it would be

23   coupled with testimony from one of the two defendants, which

24   will be that my knowledge is at issue.  I had these

25   conversations with the DEA and Maryland Board of Pharmacy, and

1    this is what I told them about my operation, and they say thank

2    you very much and went on their way.  I took that as the stamp

3    of approval that what we were doing is legal.

4         The first argument just by Mr. Ravenell would

5    presuppose that the defendants themselves do not testify, and

6    the second argument would be that, as my client told you, he

7    thought all of this was legal because the DEA never said

8    anything about it.

9         So the question is whether either of those two

10   arguments is a valid argument on the issue of knowledge.

11        And, if so, does that then bring into the ambit of

12   testimony what the DEA was told and their reaction to it?

13        Because I know this is rambling, but it seems to me

14   there are two ways of looking at it.  One is through the lens

15   of Mr. Sodipo.  I told the DEA, DEA came to see me.  I told

16   them this, they told me that I thought everything was all

17   right.

18        MR. BUDLOW:  Your Honor, could I interrupt,

19   apologize, to clarify one point.  There hasn't been any

20   evidence, unless I'm mistaken, there won't be any evidence that

21   the defendants had any way of direct communication with the

22   DEA, that they ever explained any of their business practices

23   to the DEA, and that they were relying on the DEA's implicit

24   approval based on their representation of their business model

25   to the DEA.  I don't think we're going to say that.

1          THE COURT:  Well, that may be the case, but there was

2   a conversation with the Maryland Board of Pharmacy.

3          MR. BUDLOW:  That's correct.

4          THE COURT:  And there's also substantial -- I was

5   spinning out a hypothetical, there may not have been a direct

6   meeting with the DEA, but there's substantial evidence about

7   information concerning New Care or there is evidence.

8          Let me backtrack.  I'll take out the words

9   substantial.  There's evidence about New Care and the websites

10  that ends up going to the DEA.

11         MR. BUDLOW:  I think there's going to be evidence

12  that the DEA was -- well, I don't know that I agree with that.

13  There's going to be evidence that DEA was aware of New Care's

14  numbers, that they had them in their data, not that they were

15  expressly aware of it.

16         And there's evidence that the DEA was investigating

17  the websites and their co-conspirators.  That's all true.  I

18  don't know there's going to be any evidence that the defendants

19  were aware of that.

20         I mean, we're sort of getting ahead of ourselves.

21  But if I could just --

22         THE COURT:  Let's assume that they, I guess, then two

23  situations.  The first is that the defendants are aware of the

24  investigation, and the second is that the defendants are not

25  aware.

1         And if we assume that they're aware, can't the

2    defendants say here's what we knew, the DEA and the Maryland

3    Board of Pharmacy knew about our operation and about the

4    websites?

5         And because we knew they were aware, we figured that

6    they had given us the stamp of approval.  So we were really

7    shocked that they shut us down, you know, a year and a half

8    later.

9         The second scenario would assume that the defendants

10   are not aware of the DEA investigation, and the argument really

11   is we now know because the investigation has come to light

12   through the trial that the DEA knew all about our operation.

13   They knew all about the Internet websites.  They never gave us

14   any warning.  And that's just simply unfair.  That the

15   government somehow -- it's not an entrapment defense, but that

16   they sort of let us go on our merry way, and that should not be

17   tolerated in a free society.

18        So why don't you think about those over the weekend

19   and --

20        MR. BUDLOW:  Could I clarify the first question Your

21   Honor asked?  I think I got things off tangentially, and I

22   apologize.

23        I think that you wanted to know about the items you

24   listed and if the government was using them in a way that

25   impacted on this decision.

1          THE COURT:  Right.

2          MR. BUDLOW:  As to the fourth, fifth, and sixth, the

3   information that hasn't come out directly or that you --

4   doctors' licenses, license, DEA issue subpoenas, DEA initiating

5   prosecution versus the websites, the government is not and

6   never has intended to use those types of evidence as a way of

7   showing that the defendants had knowledge or willful blindness.

8          To the extent that Mr. Kaps testified to those items,

9   it all went to the state of mind of the co-conspirators.  And

10  so we're going to argue that they should have known that

11  information or that in fact they did know it.

12         So in terms of our use of those items, I think you

13  can assume that we will not be using those for that purpose,

14  with this caveat, to the extent that information was in -- or

15  similar information was in the DEA online data, or printouts

16  that were recovered from Mr. Sodipo's office on October 9th,

17  2006, October 10th, so but for that limited extent, we would

18  use a similar argument.

19         THE COURT:  Good.  And your view with respect to the

20  arguments Mr. Ravenell can make if the defendants are aware of

21  the investigation and not aware of the investigation, let's

22  assume they're aware of the investigation.

23         What's your preliminary take on the arguments they

24  could make?

25         MR. BUDLOW:  Well, I guess there's our motion dealt

1  with both arguments and evidence, so it would depend on the

2  piece of evidence that we're talking about.  I think that the

3  defendants, for every piece of evidence they want to put in to

4  say they relied upon, they have to show some knowledge, some

5  connection to that.

6       So if they don't have knowledge of a particular piece

7  of evidence, for example, or a particular pharmacist was

8  involved and then that person was investigated or not, if they

9  don't have knowledge of that, they could not have relied on

10 that.

11      So the government would be objecting to them

12 introducing the evidence, and we would be objecting to them

13 arguing based on that inference or evidence in any way.  So I

14 think it's sort of a piece of evidence at a time.

15      If the Court's saying that the defense might stand up

16 and say that we were aware of a criminal investigation that was

17 targeting us, and we weren't yet indicted and, therefore,

18 that's a defense, I mean, I don't think that's a valid defense,

19 and I'd say go ahead and make the argument.  That's -- go

20 ahead.  I don't know how compelling that would be.

21      But if that's what they want to say, we knew we were

22 under investigation, but since it took so long to indict it, we

23 thought it was all good, so be it.

24      If they're not aware of the investigation, and they

25 want to introduce evidence of particular items, they have to

1    that show a connection or it's not consistent.  I think the

2    Court's last point was, well, maybe this is just sort of

3    manifestly unfair, then it turns out the DEA knew all the time

4    and didn't do anything.

5         This is a very, this is a hybrid case, but it's

6    probably more like any other white collar case.  This wasn't

7    that long of an investigation for a white collar case.  We've

8    seen cases takes three years, four years, eight years, it

9    happens.  They take a long time.  Defendants can't rely on the

10   fact they were being investigated or I mean they can't point to

11   the length of an investigation and say it's unfair, and they

12   didn't even know the investigation was going on.  That's not a

13   defense.

14        They shouldn't be allowed to introduce evidence that

15   they didn't know.  They shouldn't be allowed to argue that to

16   the jury at all.

17        THE COURT:  So that you drew the line at the

18   unfairness argument, but your preliminary -- and I'm not asking

19   you to take a firm and fast position, but you would have a lot

20   less angst over the following argument, that we were aware from

21   several sources over a substantial period of time that the DEA

22   was investigating Internet pharmacies, IHE, and we believed

23   that they had amassed substantial information concerning our

24   operation and had found it to be unobjectionable.

25        Is that valid?  When you think about it for next

1   week, whether that's a valid argument.  Sort of they knew what

2   we were doing and never complained about it.

3          MR. BUDLOW:  When you say valid, you mean

4   permissible?

5          THE COURT:  Permissible.

6          MR. BUDLOW:  From our perspective?

7          MR. RAVENELL:  Obviously, the Court hasn't asked me,

8   I'll be happy to weigh in when the Court wishes to hear from us

9   Monday or whenever the Court wishes, do you wish to hear from

10  me now?

11         THE COURT:  If you could just give me your five

12  minute view on it so I can start thinking about this, because

13  if you don't want to make that argument, I don't have to worry

14  about it.

15         MR. RAVENELL:  Here's where we are, Your Honor, one

16  of the things that we are not making is an argument that, you

17  know, this is discriminatory prosecution that the government

18  seems to argue in their papers.

19         What we have, I think we've stated pretty clearly

20  what our position is, which is that if the government is

21  allowed to show that there are these red flags on this willful

22  blindness argument, the defendant has to be allowed to show

23  there were other things that the defendant either knew or were

24  readily available to the defendants.

25         The government seems to say right now that, well, I

1    just heard them say Mr. Budlow say it, well, if the defendants

2    didn't know it, then they can't have relied upon it.

3         When the Court has already allowed into evidence

4    things where the Court has clearly said there's no direct

5    evidence the defendants knew about these things, but just as a

6    fair inference, maybe they knew about it.

7         THE COURT:  Like the warning letter?

8         MR. RAVENELL:  Exactly.  The government can't

9    introduce any evidence that the defendants knew about the

10   warning letter found in the accounting department, that the

11   defendants knew about a piece of paper found in the trash.

12        There's just not one scintilla, as we see it, of

13   evidence, but the Court has found that there is a fair

14   inference they could have known about it.

15        And what we're saying when you take similar evidence

16   that we think is even more direct that the defendants should be

17   allowed to produce that evidence before the jury, so the jury

18   decides whether this was willful blindness or not.

19        For example, DEA certification of the doctors.

20        THE COURT:  Right.  That was the first one on the

21   list.  Doctors were certified.  But in terms of the DEA

22   investigation --

23        MR. RAVENELL:  The DEA investigation, the fact they

24   went to Brooks's business on several occasions and did nothing

25   with Mr. Brooks, the main target.

1          The government has already introduced, for example,

2    Brooks was indicted in '07, December '07.  And so Ibanez as

3    well.  Certainly we should be allowed to able to argue to the

4    jury that in fact the DEA knew about Brooks, knew about Ibanez

5    for three years, even didn't do anything to stop them, for

6    example, the government brought out through Detective or DI

7    Graumlich that the DEA can administratively shut down any

8    doctor any time by simply pulling the certification, and they

9    pointed out that the DEA pulled Dr. Dominique's certification.

10   Miss Smith brought this evidence out.

11         Certainly it is relevant that the DEA didn't pull

12   Ibanez's certification.  In fact, certified him 12 days after

13   they met with him and recorded him where he told them exactly

14   how he ran the operation.

15         Certainly it's relevant that the DEA didn't pull the

16   certification of those other nine doctors who were prescribing

17   drugs for three years.

18         Certainly it's relevant that some of those doctors,

19   and I pointed out with Mr. Brantley today, that one of the

20   doctor's certification was due to expire April '06 and another

21   June '06.

22         Those doctors continued to fill prescriptions beyond

23   those dates of April and June for the same website.

24         Certainly it's relevant that the DEA had the numbers

25   from Cardinal about what the defendants were filling since at

1    least what we know, we know at least June '05, that those

2    numbers were sent to DEA's office.

3         When the DEA has all that information, and the DEA

4    does not act upon it, and why is it not relevant for the jury

5    to consider those things in deciding whether the defendants

6    were willfully blind?  Particularly when you have the

7    distributors going to the defendants and saying that the DEA

8    has required us to do these things.

9         For example, McKesson you'll hear, these witnesses

10   will say, at least based on the discovery we've seen, that they

11   told the defendants that the DEA was monitoring what they were

12   doing.  Hence, they came to see the defendants.

13        THE COURT: I think I understand.

14        In order to mount this argument, do you need to put

15   on Mr. Sodipo to say I knew that Dr. Ibanez had to be

16   certified, and I knew that the DEA had continued to certify

17   him?

18        MR. RAVENELL:  No, Your Honor.  In fact, the

19   testimony's in the record from Mr. Kaps that every defendant,

20   or every pharmacist received the DEA, the licenses and

21   certifications of each doctor.

22        THE COURT:  So you could then argue that in this

23   world, pharmacists generally know, or know that in order to

24   prescribe hydrocodone, one must be DEA certified and

25   pharmacists get the DEA certifications, and my client would

1    have, as pharmacist would have that information in front of

2    him?

3              MR. RAVENELL:  Even better, Your Honor.  In this case

4    we know that the defendants actually had the licenses and the

5    DEA certification for each doctor.

6              In fact, you just heard Mr. Barstow testify that it

7    was shown to them.

8              THE COURT:  I understand.  If go on to another one,

9    let's say Brooks, that the DEA had come down and served a

10   search warrant on Brooks's operation, would you need testimony

11   that Mr. Sodipo was aware of that, the DEA had investigated

12   Brooks but not shut him down and that that was something that

13   he took into consideration?  Or can you simply argue that

14   that's something that you would have known?

15             MR. RAVENELL:  I think, Your Honor, it's similar to

16   what the Court has allowed from the government, which is it is

17   likely the defendant would have that kind of information, that

18   information would be available to him.  We know that the

19   defendant in September of '06, according to Miss Jones, when

20   Miss Jones said these doctors are bogus doctors, the defendant

21   and Miss Jones went to the computer, pulled up all the doctors

22   to confirm that the doctors were still certified.  And Mr.

23   Sodipo pointed out to Miss Jones those doctors who worked for

24   that same Internet site were still active.

25             This is as of the end of September '06.  So I don't

1   think we need to have testimony from Mr. Sodipo to say that I

2   was aware of everything that happened with Barry Brooks for us

3   to make a cogent argument that this information that was

4   relevant, not -- excuse me, available to the defendants, and

5   that, for example, that, give another example that their

6   distributors were allowed to continue to distribute to them

7   even after the DEA knew about the numbers the defendants were

8   receiving.

9        I don't think we have to have -- and I rely on the

10  Court's earlier rulings, I think what's good for the goose is

11  good for the gander, you don't need to have the direct evidence

12  that the defendants saw it, read it, knew it, as Mr. Budlow

13  argued about the newsletter and the BOP letter, Mr. Ravenell

14  says the defendant has to see and it and read it, and well,

15  what's good for the goose is good for the gander.

16       THE COURT:  Let me ask this, you will be arguing that

17  there's no direct proof that Mr. Sodipo ever saw the warning

18  letter or from Maryland Board of Pharmacy newsletters?

19       MR. RAVENELL:  Certainly that will be available to

20  us, yes.  I'm not sure how we'll argue, yes.

21       THE COURT:  That's an argument that certainly

22  available to you.

23       MR. RAVENELL:  Yes.

24       THE COURT:  Now, so that you can argue without

25  putting on your client on the stand that there's no evidence

1    that your client was available or knew about these red flags.

2                MR. RAVENELL:  Correct.

3                THE COURT:  We're now into the green light, green

4    flag, green light area.  Your argument is that you should be

5    able to argue that there are green flags and that your client

6    as a pharmacist would likely or would have been aware of.

7                MR. RAVENELL:  Yes.

8                THE COURT:  Now, can the government then in closing

9    argument point out that Mr. Sodipo never took the stand and

10    told you that he relied upon them so, therefore, there's no

11    evidence that he ever knew about the green flag or relied upon

12    it in any way?

13                MR. RAVENELL:  Obviously -- I shouldn't say

14    obviously, certainly we don't agree they can comment on lack of

15    testifying.  I think they certainly can argue there's no

16    evidence that the defendants knew about it, something of that

17    nature, similar to my argument there's no evidence that they

18    saw the letter.  I think that would be fair.

19                But I don't think they could comment on the

20    defendants not taking the stand.  That would be a violation.

21                THE COURT:  All right.  So that that could be skirted

22    by anything.

23                MR. RAVENELL:  Yes.

24                THE COURT:  There's no evidence they knew about this

25    at all.

1      MR. RAVENELL:  Yes.  I think that would be a fair

2  argument for the government to make.

3      THE COURT:  Well, that helps me understand this

4  point.  So that you would not be arguing that the DEA

5  investigation was defective or that ambivalent or suggestive,

6  that they didn't really think that your client was doing

7  anything wrong, it's simply that the effect of that

8  investigation and the details of it upon the state of mind of a

9  pharmacist.

10      MR. RAVENELL:  Yes, Your Honor.  Yes.  And certainly

11  the DEA, we will point out, as I said, the DEA can take certain

12  actions as they did with Dr. Dominique.  They can take certain

13  actions with Dr. Ibanez.  But we're not going to argue the

14  point the Court just made, yes.

15      THE COURT:  But you would like to argue that, ladies

16  and gentlemen, you've heard that the DEA can shut somebody

17  down, do a summary enforcement action, and that's something a

18  pharmacist would know about.

19      MR. RAVENELL:  Right.

20      THE COURT:  And his business partners weren't

21  summarily shut down.

22      MR. RAVENELL:  Yes.

23      THE COURT:  We don't have to argue this now, but I

24  think I understand it a lot better.

25      MR. RAVENELL:  Thank you, Your Honor.

1          THE COURT:  Good.  Thank you, and see you on Monday

2     at 9:30.

3                    (Proceedings adjourned)

4

5          I, Jacqueline Sovich, RPR, CM, do hereby certify
      that the foregoing is a correct transcript from the
6     stenographic record of proceedings in the above-entitled
      matter.

7

8     _____

9     Jacqueline Sovich                          DATE
      Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1

2                        I N D E X

3        WITNESS            DIRECT    CROSS    REDIRECT    RECROSS

4        Eric Brantly            3       34         114

5        Patrick Barstow       119      125         134

6        D'Andra Kelly         139

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```