1                     IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MARYLAND/NORTHERN DIVISION

3        UNITED STATES OF AMERICA

4                                            CRIMINAL NO.

5           v.                               L 06-0444

6        STEVEN SODIPO, ET AL               July 7, 2008

7                     Defendants

8        _____/

9                          DAY SEVENTEEN

10                     TRANSCRIPT OF PROCEEDINGS

11              BEFORE THE HONORABLE BENSON E. LEGG,

12                UNITED STATES DISTRICT CHIEF JUDGE

13       APPEARANCES:

14       On behalf of the United States:

15       Andrea Smith, AUSA

16       Paul Budlow, AUSA

17

18       On behalf of the Defendants:

19       Kenneth W. Ravenell, Esquire

20       Kevin Jesse McCants, Esquire

21

22

23       Reported By:

24       Jacqueline Sovich, RPR, CMR, FOCRR

25       Official Court Reporter

1           (PROCEEDINGS)

2           THE COURT:  Mr. Thompson, we're still waiting for a

3    juror; are we not?

4           THE CLERK:  Yes.

5           THE COURT:  My understanding is there are three

6    issues that counsel wish to take up.  The first has to do with

7    the proposed stipulation concerning whether RC and RH

8    hydrocodone abusers and who are unavailable.  The second is a

9    motion in limine regarding Dr. Catizone, and the third is a

10   motion for reconsideration of a court's denial of the

11   defendant's motion for a mistrial.  Neither the government nor

12   I have had an opportunity to look at the last of the three

13   motions so we'll take up the first two.

14           Mr. Ravenell, I'd be happy to hear from you on the RC

15   and RH issue.

16           MR. RAVENELL:  Thank you, Your Honor.  Your Honor, I

17   think we've laid out in the matter pretty well in the letter.

18   I'm not sure the Court has reviewed the letter.

19           THE COURT:  I have.

20           MR. RAVENELL:  We sent it before the weekend.  And I

21   think, Your Honor, we wanted to discuss this with the Court

22   obviously was traveling and was unable to do that last week.

23   The Court's suggestion we think puts us in a conundrum to

24   basically agree to some facts that we just don't know to be

25   true, first of all.

1          We certainly, as I've indicated to the Court, have no

2     problem with stipulating that or having the Court tell the jury

3     that these two individuals are unavailable to both parties, and

4     the Court indicated that, and that was fine.

5          When the Court came back later, though, and suggested

6     that there was an additional point that the parties would need

7     to stipulate to, the defendants, we asked the Court to give us

8     a chance to think about it.  And, obviously, the day after none

9     of us took up the issue, and it got away from all of the of us,

10    with the testimony of Dr. Christo lasting all day.

11         But the point, Your Honor, we're asking at this

12    point, Your Honor is, asking the defense to stipulate that

13    these people were abusers, as I would point out the first thing

14    we don't know they were abusers.  What we do know is that they

15    in fact received prescription amounts of hydrocodone on some

16    occasions from New Care and other places.  None of these were

17    received, prescriptions just from New Care, but New Care and

18    other places over a period of time.  Those individuals being RC

19    and RH.

20         And if I may grab a document, there was -- let me

21    pull this out so I can give you the views.  I'm trying to find

22    the chart the government has proposed to introduce regarding

23    those two individuals, with Mr. Short, with their witnesses,

24    and now that I have those, the government has a proposed

25    exhibit that has the dates that Mr. Hackett received

1    prescription from different pharmacies on the website.  And if

2    I look at it I see two, looks like --

3            THE COURT:  My notes say October 24th.  October 25th,

4    15th, October 24th, October 5th and October 13th, and New Care

5    I think was the 5th and then there was the Elite Pharmacy on

6    the 13th.

7            MR. RAVENELL:  Correct.

8            THE COURT:  So that there was --

9            MR. RAVENELL:  Well, those are not the only dates

10   that he received prescriptions.  He received prescriptions, Mr.

11   Hackett on many other dates, in addition, but the dates the

12   Court has certainly are the 10-5 or the I think it's 10-6

13   according to this document, we were told 10-5.  It's either

14   10-5 or 10-6, that the person received prescriptions, Mr.

15   Hackett from New Care, and then received on 10-13 from Elite.

16           And there appear to be at least 20 or so occasions,

17   and I haven't countered them that he in fact received

18   prescriptions.  Actually, the government says 48 on their

19   chart, and I haven't counted the number.

20           And then as to Mr. Chartrand, there appears to be a

21   11 times that he in fact received prescriptions.

22           In my review of the prescriptions that were received

23   by these men, they're all generally within the time period of a

24   25 days or so time period that they received prescriptions.

25           From what I observed, there wasn't any overlap in

1    time when they were receiving prescriptions maybe one or two,

2    if I look at Mr. Chartrand back to '05 that do not come from

3    New Care.

4              But what we basically have two men like many of the

5    individuals who are involved who are patients of the websites

6    received numerous shipments of hydrocodone over a period of

7    time.

8              And for us to agree that these individuals were

9    abusers of hydrocodone merely because they in fact did receive

10   prescriptions and because these two individuals died, unlike

11   the others, we don't have any facts to know that they were in

12   fact abusers.

13             What we do know on this particular occasion they

14   died, and they in fact had in their system hydrocodone.  We

15   don't know that the hydrocodone in fact came from New Care that

16   was in their system, one of the reasons we -- for all the

17   reasons we talked about.

18             But to ask us to stipulate, Your Honor, these people

19   were abusers, what it has, the jury then able to conclude is

20   that while the defendants are agreeing that those individual

21   were hydrocodone abusers, if we look at the 26,000 patients,

22   and we look at the records for all of them, others received the

23   same amount or a similar amount of shipments of hydrocodone,

24   then the defendants must know that those people were abusers as

25   well.

1        And we should not be on that kind of going to the

2   limit as trying to argue all 26,000 were not abusers because we

3   have stipulated that these were, individuals were, when we just

4   don't have those facts.

5        It would be unfair to have the defendants be in a

6   position to basically tell the jury we're concluding that

7   anyone who receives the amounts of hydrocodone that these two

8   men received, and if you look at Mr. I think it was Mr. Hackett

9   or Mr. Chartrand, he received I think about 11 shipments.

10  There will be many people who received more than 11 shipments.

11  If we're stipulating that he was a hydrocodone abuser, how do

12  then we argue to the jury that the other people were not also

13  hydrocodone abusers?  It just puts us in a position that we

14  should not be in, particularly where the Court has found that

15  the evidence of the defense are too prejudicial to be

16  introduced.

17       Additionally, to have the proposed testimony of

18  doctor, or Mr. Catizone, that the combinations are somehow

19  exceptionally dangerous would basically tell the jury the same

20  thing, these individuals, who have used these drugs, that it's

21  exceptionally dangerous, and they're now unavailable, that the

22  likelihood is that they're dead.

23       We don't know, Judge, whether these people, for

24  example, were attempting to commit suicide when they used these

25  drugs on the dates in question.  We have no clue about that.

1   The government has not proffered any such information.  So for

2   us to say that we can conclude that they were abusers because

3   on this particular occasion they died when they had these drugs

4   in their system, is we think very unfair to us, to ask us to do

5   that just to keep out information that the Court has found

6   should not be before the jury because of the prejudicial effect

7   outweighing the probative value.

8        What we have suggested is that we will not argue to

9   the jury that these people are in fact not abusers.  We will

10   not take a position before the jury at any point during closing

11   argument about these particular individuals.  And the

12   government can certainly stand up and argue under that scenario

13   much as they wish that they were abusers, and if they can

14   somehow make the argument from those facts that the defendant

15   should have known, I don't think there's any evidence that the

16   defendants would have had knowledge, whether they were abusers

17   or not, but they can make the argument they wish.  We would not

18   argue anything against that.

19        But I don't think we should have to stipulate that

20   they're in fact abusers and for other reasons set forth in our

21   papers, Your Honor.

22        THE COURT: Good.  Thank you, Mr. Ravenell.

23        Miss Smith or Mr. Budlow, I'd be happy to hear from

24   you.

25        MS. SMITH:  Good morning, Your Honor.

1          THE COURT:  If you be so kind to use the podium so

2     your voice will be properly amplified.

3          MS. SMITH:  Yes, sir.

4          Just one point of clarification, I don't believe the

5     Court's requested stipulation is asking that the defendants

6     includes the fact that the defendants knew it.  I think that's

7     a stretch.

8          THE COURT:  Well, if I could just interrupt for a

9     second, there would be no stipulation that the defendants knew.

10    There would simply be to sort of the price to pay for avoiding

11    the evidence of the death of RC and RH, would be twofold.  The

12    stipulation that they were unavailable.

13         And, two, that they were hydrocodone abusers.  But

14    there would be no stipulation concerning knowledge.

15         MS. SMITH:  And I agree with the Court that this is a

16    compromise position.  So for the defendants to say that there's

17    no evidence that they were abusers, first of all, I disagree

18    with that, but even for the moment if that were true, this is a

19    compromise being offered by the Court.

20         Yes.  There's evidence that they were abusers.  The

21    toxicology report, their history of ordering.  And if Dr.

22    Catizone were permitted to testify to what is obvious to him

23    when he looks at these orders, of course, that would establish

24    that they were abusers.

25         But I think you know if that is really the

1    defendant's complaint, and I do this at a risk to my own case,

2    because you know the government wants to present this evidence,

3    but if that's really the defense's concern, then the second

4    stipulation can state something like based upon evidence

5    evaluated by the parties which will not be brought and

6    discussed in court, it is stipulated that these men were

7    hydrocodone abusers, and it is not a stipulation that the

8    defendants knew it at the time.

9         I mean if that's really what their concern is, that

10   would take care of it.

11        Again, the government stands by its belief that this

12   evidence is thoroughly admissible.  It reflects that these

13   prescriptions were not valid and so forth.  I won't repeat all

14   of it.

15        THE COURT:  Good.  Thank you.

16        Mr. Ravenell, do you have anything in rebuttal, sir?

17        MR. RAVENELL:  Yes, Your Honor.  Your Honor, if the

18   government is correct that there's evidence that these men were

19   abusers and will present that evidence and have already

20   presented it, then why should the defendants be required to

21   stipulate to what they can argue without the defendants arguing

22   against it?

23        I think, then, if that is the government's position,

24   if they have the evidence that they were abusers and that --

25   and we do not argue against it, then why is there a necessary

1    stipulation?

2          In fact, often what happens, and where the parties
3    don't want to want to stipulate, the parties will simply say I
4    will allow to you move the evidence in and make no comment.  It
5    happens all the time.  We just don't comment on the evidence
6    the government moves in.  And it's not done with a stipulation.

7          Similar to this, the government moves into evidence,
8    they introduce their evidence, whatever evidence they have
9    before the jury, they argue it, we don't comment on it.

10          Why should we have to stand before the jury and say
11    we stipulate to it at the risk that even if the Court doesn't
12    tell the jury that the defendants have knowledge, that the jury
13    in fact may conclude that the defendants had knowledge because
14    the defense attorney is stipulating that they were abusers.

15          We can't control how the jury perceives this.

16          THE COURT:  Good.  Thank you.

17          Here's my view of it.  The government is required to
18    show that the prescriptions were invalid, meaning that they
19    were not for legitimate medical purpose, evidence that RC and
20    RH were hydrocodone abusers is probative on the validity of the
21    prescriptions as tending to show the prescriptions were not for
22    legitimate medical purpose.

23          The fact that the two men died with this cocktail of
24    different drugs in their system is evidence of hydrocodone
25    abuse and the illegitimacy of the prescription.  So my view was

1    that the government should not be deprived of that kind of

2    evidence unless there was a stipulation that these two people

3    were hydrocodone abusers.

4         And the defense, and for perfectly understandable

5    reasons, is unwilling to enter into that kind of stipulation.

6    So that means that the compromise has been rejected, and the

7    government can put in the evidence of the death.

8         There are a couple of factors that draw the sting in

9    a 403 sense from this evidence.  First of all, even if there

10   were direct evidence that the New Care hydrocodone was what

11   caused the death, my view would be that, absent the

12   stipulation, that this evidence would be admissible under Rule

13   404 and Rule 403.  But there are a couple of points that draw

14   the sting of the fact these two men died.

15        The first is that you have this intervening

16   prescription from Elite Pharmacy on October the 13th.  So based

17   upon the testimony of the two hydrocodone abusers that we've

18   had, Mr. Ravenell has a very good argument that he can make to

19   the jury that the hydrocodone that came from New Care on the

20   fifth was probably long gone by the time Mr. Hackett died.

21        And the same argument can be made for RC, because my

22   understanding is that he died on the 19th, and the New Care

23   prescription was on the 31st.  So that makes it either unlikely

24   or the defense can certainly argue that there's no evidence,

25   the evidence does not point to the New Care prescriptions being

1    prescriptions that caused death.

2           You also have the testimony of Dr. Christo that he

3    believes that hydrocodone abusers or drug abusers have been

4    able to get drugs from him.  So the government, the probative

5    value of this evidence is that it's hydrocodone, these people

6    are hydrocodone abusers, invalid prescription, and the fact and

7    circumstances of death tend to prove that they were hydrocodone

8    abusers.

9           So, in my view, the evidence, toxicology report, and

10   the fact of death are properly admissible under 403, and the

11   defendants are certainly entitled to an exception from my

12   ruling.

13          Let's then move on to Dr. Catizone.  The defendants

14   have filed a motion in limine which seeks to exclude the

15   testimony from Dr. Catizone concerning, one, the dangers of

16   combining hydrocodone Alprazolam and carisoprodol the drug that

17   RH and RC bought from New Care and were in their systems when

18   they died.

19          Two, the references listed on the disclaimer that

20   appeared on the prescriptions produced by the Florida websites

21   cites.

22          And, three, the general retail price of hydrocodone.

23          Mr. Ravenell, I'd be happy to hear from you on all

24   three of those issues.  To me, if I could just, it's primarily

25   a notice issue, they didn't give you notice of these at least

1    two of these three things, the dangers of combining the

2    references, the disclaimer, then they may not come in now

3    because there's not enough notice.  They might come in on

4    rebuttal, but they wouldn't come in now.  The general retail

5    price of hydrocodone that seems to be more a fact than expert

6    conclusion, but I'd be happy to hear from you on all three.

7                MR. RAVENELL:  Your Honor, I think the Court

8     certainly hits the nail on the issue, it's mainly the issue of

9     notice and the Court indicated on this trial at least three

10    occasions now, government has given us late notice as to Mr.

11    Cloud, Mr. Mouli, and now this, and Dr. Christo and now again

12    with Dr. Catizone.  The Court is aware we'd point out on June

13    25 we got a letter from the government essentially telling us

14    they gave Dr. Catizone this prescription, defense 2, to review.

15                THE COURT:  You mean the disclaimer?

16                MR. RAVENELL:  The disclaimer, excuse me.  The

17    prescription that has the disclaimer on it to review.  And that

18    is all that we had.

19                On July 1 the Court is aware we got the letter

20    regarding Dr. Christo and then on July 2 leaving here basically

21    we get this information, here we are, we're going to seek this

22    information from Catizone.

23                After the Court had said we have this conversation

24    with the government's deadline, the Court made it clear that

25    you would not allow, you know, the late introduction of this

1    kind of information, where the defense has not had a chance to
2    prepare for it and have not had a chance to prepare proper
3    cross-examination.
4         We've cited to the Court for all the reasons why we
5    have not had a chance to prepare one main reason is that our
6    expert is out of the country, I believe in Shanghai or
7    something.  He's due back, you know, this week.
8         THE COURT:  We hope he's due back.
9         MR. RAVENELL:  I hope he's back, Judge.  He's due
10   back this week.  We can't even communicate with him to follow
11   up on these particular issues.  And it is so clear that this is
12   in violation of Rule 16(a)(1)(G) and also the violation of the
13   Court's order that you can't give late disclosures.  We don't
14   think information where the Court says it's factual testimony,
15   we still don't know what that is, Judge.  He's expected to
16   testify to the price, to the customer, retail generic
17   hydrocodone.  I have no clue what that means.
18        And we should not be, you know, have to wait until
19   the witness testifies.  He's being called as an expert not as a
20   fact witness.  This witness does not have any information about
21   the facts of this case.  He's been called as an expert.  So as
22   far as we're concerned, all this testimony is based as an
23   expert before a jury, and that it's based on his experience and
24   expertise that he would have knowledge about the generic
25   pricing.  It's not something that the jury would know.  And,

1   therefore, it's based on his experience and expertise and

2   training, and he's going have training experience and expertise

3   in the field that he would even know the distinction how to

4   gauge those prices.

5          So without obviously all the reasons we've set forth

6   in the paper relying on all of those, we think this should be

7   excluded.

8          If the Court finds at some other time in the case it

9   may become admissible, we'll deal with that at that time.

10          THE COURT:  Good.  Thank you, Mr. Ravenell.

11          Miss Smith?

12          MS. SMITH:  Thank you, Your Honor.

13          Your Honor, I just got this motion this morning.  I

14   haven't had time to digest it all, but let me just put a few

15   facts on the record.

16          We notified the defense as early as June 23rd that we

17   had given defendant's exhibit number 2 to Dr. Catizone, a

18   prescription.  Let me back up.

19          Actually, maybe Mr. Ravenell was right.  Maybe it was

20   the 25th.  But we did advise, it would seem to me, just like

21   Dr. Christo, that Dr. Catizone can talk about whether he'd ever

22   seen that, and what, if any, meaning it has to him.

23          He has also, he will also, he has already been

24   identified as someone that is familiar with the laws, federal

25   and state, and he can talk about the references within that

1   certification as to what they mean or what relevance they might

2   have to either a doctor/patient relationship or to a

3   prescription.

4            To me I think I agree with the Court it's more of a

5   factual determination.

6            With regard to retail prices, the government does not

7   intend to go there.

8            Finally, with regard to alprazolam and those

9   combinations, we provided this information to the defense on

10  Thursday, which was July second.

11           As the Court will recall, we provided similar notice

12  to the defense with regard to Dr. Christo's testimony on July

13  first.  The Court ruled that was late considering the testimony

14  was July second.

15           The government turned around and provided this

16  information five days ahead of time, not one day ahead of time.

17  I realize it was a holiday weekend, but I can tell the Court

18  that I was exchange e-mails with defense counsel through most

19  of the weekend.

20           I also have a hard time believing that these

21  documents that were handed to us this morning were prepared in

22  the last hour of Thursday night or the first hour this morning.

23  So to say they didn't have five days to ask us question, to

24  register this information, is just not correct.

25           I don't think it's late the way the disclosure was

1   with Dr. Christo.  I also believe that it's perfectly relevant

2   testimony.  It goes to the government's burden of proving the

3   validity of these prescriptions and what a pharmacist should

4   have noticed about these prescriptions.

5            And I think that's all the points I care to make.

6            THE COURT:  Thank you.

7            MR. RAVENELL:  Do you wish to hear from me further?

8            THE COURT:  No, thank you.

9            My view is that, well, let's see.  The retail prices

10   is off the table.

11            My view is that in order to give proper notice, the

12   government has to say that these references on the

13   prescriptions are irrelevant and meaningless because so we need

14   both things, that they're meaningless, and they're meaningless

15   because, and that that will require proper notice.  You can

16   bring back your Dr. Catizone on rebuttal.

17            But there have to be two prongs.  One meaningless,

18   two, because and the meaningless can because can either be that

19   no such reference could ever be meaningful or it could be that

20   it's meaningless because these don't have any significance

21   within the canon of documents that define the standard for

22   pharmacy, or because they deal with Florida or because they

23   don't say what -- they don't support proposition that these

24   prescriptions are valid.

25            But there has to be some content provided to the

1  defense, and with respect to the hydrocodone, these other two

2  drugs, we need to -- we have to have -- it's not only that they

3  are dangerous when combined, but because --

4      MS. SMITH:  There is a because, Your Honor.

5      THE COURT:  Pardon?

6      MS. SMITH:  There is a because.  It says because of

7  the synergistic effect.  That is precisely why they're

8  dangerous.

9      THE COURT:  Now, the synergistic effect is pretty

10 general, but they need to have it more than this.  So if you

11 can give them more medicine for the synergistic effect, then I

12 will be happy, if you think you might want to have Catizone

13 back on redirect excuse me, back on rebuttal case, out of the

14 presence of the jury, you can ask him why can't these three

15 drug be combined, and what do you have to say about the

16 reference?  And then he can do it here in real time, it would

17 be out of the presence of the jury.  Mr. Ravenell would know

18 the reasons.  Mr. Ravenell doesn't have to cross-examine on

19 these points.  And the that burden would probably be filled,

20 and then you could bring him back on rebuttal.

21     But I think that there has to be a meaningful, these

22 are my views, these are why I hold the views.  There doesn't

23 have to be as extensive in a criminal case as in a civil case

24 but he those, at least some content.

25     MS. SMITH:  Is the Court saying I can't elicit

1    factual information from him as opposed to opinion information?

2            THE COURT:  Well, you can ask him have you ever seen,

3    just with Christo, have you ever seen a disclaimer like this

4    before on a prescription?  And he can say I've never seen one

5    before.

6            MS. SMITH:  I can ask him if he's familiar with the

7    information that is contained in it and what he understands it

8    to be, but not ask him the next opinion, what is his opinion

9    about it.

10           THE COURT:  Well, in other words, you would ask him,

11   have you read these references.

12           MS. SMITH:  Yes.

13           THE COURT:  And he would say, yes, I've read the

14   references, but he's not going to be able to say whether he

15   thinks the references are good or bad.

16           But what he can't do at this point is give an opinion

17   as to the legal or pharmaceutical professional effect of the

18   disclaimers.  But he can say I've never seen anything like this

19   before.

20           MS. SMITH:  Okay.  The government also would intend

21   to ask him about the synergistic effect in an abstract fashion

22   not in relationship to any of the particular facts of this

23   case.  I mean, again, as an expert, that's part of his

24   expertise.

25           THE COURT:  Well, you can ask him about the perils of

1    combining drugs, but the problem here is, with respect to these

2    specific, three specific drugs, but it's within his belief to

3    say as, you know, one of the dangers of any prescription

4    including hydrocodone is you have to have a handle on what the

5    patient was taking with hydrocodone.

6           MS. SMITH:  Very well.

7           THE COURT: And that can include alcohol and

8    everything else.  But it's these drugs that were found in the

9    blood stream of I forget it's RC or RH, that you would need,

10   that he can't opine about, but he can disclose here and come

11   back later so long as they have meaningful information about

12   what to expect.

13          So, Pete, do you want to see if they're ready?

14          (Pause.)

15          THE COURT:  Miss Smith, are we going to start off

16   with Mr. Short who's going to be brief?

17          MS. SMITH:  No.  Actually, we're going to start off

18   with Dr. Catizone.

19          THE COURT:  Good.

20          (Pause.)

21          THE COURT:  What we'll do is the same procedure,

22   we'll go through his qualifications, proffer as to any general

23   and specific expertise, and then I'll ask whether you wish to

24   voir dire and you can certainly reserve.

25          MR. RAVENELL:  Thank you.

1        THE COURT:  And the same thing for Mr. McCants.

2        MR. MCCANTS:  Thank you, Your Honor.

3        MS. SMITH:  Your Honor, I would -- I will state that

4   a long time ago I did disclose to the defense the initial

5   charts that Mr. Short had put into evidence.  It included a

6   list of all the other drugs that were prescribed.  I did intend

7   to show him that list, and ask him what some of those drugs

8   were.  Again, in an anesthetic setting, if you will.

9        And I just wanted to let the Court know because I'm

10  sure, once I get there, there will be an objection and if we

11  can avoid a bench conference, that would be great.

12       THE COURT:  So drugs prescribed by New Care?

13       MS. SMITH:  Prescriptions filled by New Care.  It's

14  one of Mr. Short's charts.  It includes the list of all the

15  other type of drugs.

16       THE COURT:  What are they?

17       MS. SMITH:  What is this?  This what is it for, what

18  does it do?  And I think that's again within his expertise.

19       (Jury present)

20       THE CLERK:  Jurors all present.

21       THE COURT:  Mr. Thompson, thank you.  Ladies and

22  gentlemen, good morning.

23       THE JURY:  Good morning.

24       THE COURT:  I hope you had a wonderful weekend.

25  Sorry to detain you.  But we are ready, and the government will

1  now call its next witness.

2          MS. SMITH:  Thank you, Your Honor.

3          THE COURT:  Miss Smith?

4          MS. SMITH:  At this time the government calls Dr.

5  Carmen A. Catizone.

6          THE COURT:  Good morning, sir.  If you would step

7  forward, please?

8          THE WITNESS:  Good morning.

9          THE CLERK:  Raise your right hand.

10         (The Witness is sworn.)

11         THE CLERK:  Please be seated.

12         THE COURT:  If I could ask you, I thought when were

13  you buttoning your jacket, I might have seen a cell phone.  If

14  you could turn that off, it would be great.

15         THE WITNESS:  I did.

16         THE COURT:  Oh, great.  Thank you.

17         THE CLERK:  If you would first adjust that microphone

18  to yourself?

19         Good.  State your name and then spell your name for

20  the record.

21         THE WITNESS:  Carmen Catizone, C A R M E N, C A T I Z

22  O N E.

23                     DIRECT EXAMINATION

24  BY MS. SMITH:

25  Q.  Good morning, Dr. Catizone.

1    A.   Good morning.

2    Q.   Sir, can you tell us what is your current occupation?

3    A.   I'm a pharmacist and the Chief Executive Officer of the

4    National Association of Boards of Pharmacy.

5    Q.   And tell us what is the National Association of Boards of

6    Pharmacy?

7    A.   The National Association of Boards of Pharmacy, or NABP,

8    was founded in 1904 to assist the states in protection of

9    public health.  We provide the national licensure exam for

10   pharmacists that the states require to determine if a

11   pharmacist is competent.

12          We also handle the transfer of license from state to

13   state for pharmacists, whereby we review disciplinary history,

14   competency, and practices of the pharmacists, and then provide

15   recommendations to the states on whether or not the person is

16   qualified to transfer a license.  And then we work with the

17   states on every issue that affects the regulation of pharmacy

18   practice and what pharmacies should be doing as pharmacies.

19   Q.   And who makes up the membership of the NABP?

20   A.   Our members are the state agencies that regulate the

21   practice of pharmacy.  No individual pharmacists are members.

22   No pharmaceutical companies, no pharmacy organizations.  You

23   have to be a state agency empowered by the legislature to

24   regulate the practice of pharmacy.

25   Q.   Okay.  And is this a nonprofit corporation?

1    A.   Yes, it is.

2    Q.   Okay.  And you've probably said as much, but the objectives

3    of the NABP?

4    A.   The objective is to assist the state boards in protecting

5    public health.

6    Q.   How long, sir, have you been the director?

7    A.   I joined the association in 1985 as the Testing Director

8    and became the Executive Director in 1988.

9    Q.   That's about 20 years?

10   A.   Yes.

11   Q.   And what are the qualifications for director of the NABP?

12   A.   You have to be a pharmacist.  You have to hold an advanced

13   degree in pharmacy administration or pharmacy law.  And you

14   have to be knowledgeable and experienced in the practice of

15   pharmacy and the regulation of pharmacy practice.

16   Q.   And can you tell us, sir, what your duties are as Executive

17   Director of the NABP?

18   A.   I oversee the operations of the association on behalf of

19   the State Boards of Pharmacies, making sure the programs and

20   services provide the types of results that the states are

21   requiring, and also that the association is functioning

22   appropriately.

23   Q.   Sir, I'm going to show you what has been marked as

24   government's exhibit 94 A, it's entitled "Vitae." If you could

25   identify that, please?

DIRECT EXAMINATION

1    A.   This is my current resume or vitae.

2    Q.   Okay.   I'm just going to put that there.   You hold on to

3    that.

4              And when was that prepared, if you know?

5    A.   It's updated on a regular basis, so this was probably last

6    updated just a few weeks ago.

7    Q.   Okay.   Has anything changed recently on that?

8    A.   I had two recent media appearances one on Fox Television to

9    talk about Internet pharmacies.   One on CNN again to talk about

10   the dangers of Internet pharmacy.

11   Q.   Sir, can you tell us your educational background, which I

12   believe appears on the first paper of your CV?

13   A.   Bachelor of Science Degree from University of Illinois.

14   Also a Master of Science Degree from the University of Illinois

15   in Pharmacy Administration and Pharmacy History.

16   Q.   Is that your professional experience outlined in your

17   vitae?

18   A.   Yes, it is.   I've practiced as a pharmacist in all

19   settings, retail, for a chain pharmacy that I worked for 14

20   years, hospital pharmacy I worked there for 12 years, and

21   institutional long-term care nursing setting that I worked for

22   five years.

23   Q.   And the rest of your professional experience, pages two and

24   three, you were a research assistant?

25   A.   While I was in graduate school, I worked with the Food and

1  Drug Administration to conduct studies on medications as well

2  as on the pharmacy.

3  Q.  You were a teaching assistant?

4  A.  Yes, I was.

5  Q.  And you've already indicated you are a registered

6  pharmacist.

7        You have also been involved as an expert witness in

8  litigation?

9  A.  Yes.

10  Q.  What kind of litigation?

11  A.  I've testified in federal criminal cases involving Internet

12  pharmacies, as well as in DEA hearings regarding the

13  registration of pharmacies, pharmacists, and physicians.

14  Q.  Have you testified in any state disciplinary actions?

15  A.  I've appeared before just about every state board of

16  pharmacy with the exception of Alaska to testify on issues, but

17  not in any hearings.

18  Q.  Now, let me ask you, sir, your honors and awards are listed

19  on page one?

20  A.  Yes.

21  Q.  Can you tell us, there's at least, there's approximately

22  eight of them, two are from the Food and Drug Administration.

23  Could you tell us what those are?

24  A.  The Food and Drug Administration awarded two awards for

25  distinguished service in assisting the FDA.  One was I think in

1   2004.  And other I think was some time in 1998 or so.

2   Q.  Now, also on your vitae are publications and chapters of

3   books, for example, I think that's on page 4.

4        Is that correct, sir?

5   A.  Yes.

6   Q.  And the last one listed here, is called VIPPS, V I P P S,

7   creating a new regulatory model for the Internet age.

8        Can you tell us generally what was that chapter about

9   and what kind of book?

10  A.  Sure.  The chapter was about a program that we started in

11  1997 to help consumers learn about Internet pharmacies and

12  empower consumers to make decisions about what Internet

13  pharmacies they should use for their prescription medicines and

14  standards for verified Internet pharmacy practice, and it was

15  launched in 1999, and it researches and distinguishes a legal

16  Internet pharmacy from rogue or illegal sites.

17       That book is a pharmacy law reference that pharmacy

18  students utilize in preparing for practice and for their

19  national or state law examinations.

20  Q.  And directing your attention to page 8 of your vitae,

21  there's an additional 10 articles written, or 10, it says

22  publications.  There's approximately 10 of them are these

23  articles in magazines?  What are these?

24  A.  They represent a whole variety of either they're magazine

25  articles, articles that have appeared in the Wall Street

1    _Journal_ or other publications and also on refereed journals

2    reviewed by somebody to make sure they're accurate and the

3    material presented is unbiased.

4    Q.   And directing your attention, sir, between pages and five

5    and seven, there are approximately 70 media appearances?

6    A.   Yes.

7    Q.   And what are those, sir?

8    A.   Those are appearances on various television programs,

9    either national or local, to talk about the practice of

10   pharmacy and more specifically most recently Internet

11   pharmacies.

12   Q.   Okay.  And are some of these repeats, if you will, some of

13   these presentations?  Like there's maybe a film that goes with

14   it and the same film is shown and then you're asked questions?

15   A.   There's been a recurring theme on these media

16   presentations, and it's been to try and help consumers identify

17   what may be illegal Internet sites and things consumers should

18   do in protect themselves in selecting or using an Internet

19   pharmacy.

20   Q.   Okay.  And just noting a couple of these media appearances,

21   ABC Nightly News; is that correct?

22   A.   Yes.

23   Q.   CNN Money Line?

24   A.   Yes.

25   Q.   Maryland Public Television?

1    A.   Yes.

2    Q.   Okay.   Several others?

3    A.   Yes.

4    Q.   Okay.   And then finally with reference to your vitae, you

5    have listed presentations, from page 9 to the end, and again

6    this document's approximately 22 pages?

7    A.   Yes.

8    Q.   Okay.   And what generally comes under the topic of

9    presentations?

10   A.   Generally, again, it's the practice of Internet pharmacy,

11   the distinctions between legal and illegal sites and then

12   advice for pharmacists, doctors, or consumers on how to become

13   more knowledgeable about Internet pharmacies and how to

14   distinguish between legal and illegal Internet pharmacies.

15   Q.   I note, sir, the earliest presentation is 1992 on here?

16   A.   Yes.

17   Q.   And moving forward in your CV, to page -- let me stop at

18   page 14.   On August second, 1996, you did a presentation of the

19   American Association of Pharmacy Technicians, National

20   Conventions.   The presentation was called the "Regulation of

21   Pharmacy Technicians, Certification versus Registration."

22           What was that about, sir?

23   A.   Besides Internet pharmacies, we're involved in any aspect

24   that the State Board of Pharmacy might be to regulate the

25   practice of pharmacy.   So any entity or any person regulated by

1    a state board of pharmacy, a pharmacist, a pharmacy technician,

2    a wholesale distributors, we are involved in all of those

3    activities, and we provide guidance to the states on what types

4    of laws, what types of regulations should be in place, and

5    technicians is one of those persons that state boards regulate

6    and that we're very much involved with in working with the

7    states to decide safe regulations for consumers.

8    Q.  Okay.  And on page 15, there was a presentation called "New

9    Challenges in the Future of Pharmacy Practice."  And it was the

10   Drug Enforcement Administration Conference on controlled and

11   diversion of controlled substances and chemicals.

12           What was your talk about that there?

13   A.  It was an opportunity to share with the DEA representatives

14   personnel and stakeholders from across the country what we saw

15   in new trends in pharmacy practice, Internet pharmacy,

16   electronic transmission, all of the new things we thought might

17   be appearing on the horizon and what might be needed to

18   regulate these.

19   Q.  And for the record, I don't know if I said it, it was in

20   March of 1998?

21   A.  Yes.

22   Q.  Direct your attention to page 16, you appeared in July of

23   1999 the before the Subcommittee on Oversight and Investigation

24   Committee on Commerce, U.S. House of Representatives.

25           Do you recall, sir, what you were talking to them

1    about?  There's no title for the statement.

2    A.  We were asked to testify at that time about the dangers of

3    Internet pharmacy, what our association was doing in

4    identifying rogue and illegal sites, and that what Congress and

5    the Senate could do to pass federal legislation or put in place

6    resources for the states to deal with this issue.

7    Q.  Lower down on that page, you testified or you were at a

8    workshop presentation on cyber drugstores and Internet savvy

9    customer in 1999; is that correct?

10   A.  Yes, it is.

11   Q.  But was the topic the same?

12   A.  Yes.

13   Q.  And again in '99, in August, Internet Pharmacy Program of

14   presentation at NACDS, what is NACDS?

15   A.  NACDS is the association for chain drug stores, National

16   Association of Chain Drug Stores.  Its members consist of the

17   Walmarts, Rite Aids, Giants, CVS's and a number of local

18   smaller chains.

19   Q.  On page 17, you had a presentation on Internet pharmacies

20   in Canada in Toronto, Ontario Canada, February of 2000.

21              What was going on there?

22   A.  Our membership includes not only the state jurisdictions,

23   but also Canada, South Africa, New Zealand, and Australia.  So

24   we share information with Canada and with those other foreign

25   jurisdictions.  And Canada was experiencing the same problems

1    that the United States was in regard to Internet pharmacies.
2    And they asked us to come up and speak about that issue and
3    share information on what we've learned here as well to learn
4    from them what was happening in Canada.
5    Q.   In March of 2000, you gave a prepared statement before the
6    Committee on Health Education Labor and Pension at the U.S.
7    Senate, the topic was e-drugs, who regulates Internet pharmacy.
8    What was the purpose of your appearance there, sir?
9    A.   Again, it involved Internet pharmacy, dangers and what
10   Congress or the Senate could do to assist the states.
11   Q.   In August of 2000, you were in Baltimore, and you gave a
12   presentation called "VIPPS or not to VIPPS."  And what was that
13   about?
14   A.   It was a question about the VIPPS program that I mentioned
15   earlier and whether or not a pharmacy should be VIPPS, and
16   again what the values of the program were, and how consumers
17   could use that program, and how the states could use it so
18   people could buy medication safely online.
19   Q.   I direct your attention on the next page, page 18, to an
20   appearance in Tokyo, Japan, "Licensure of Pharmacists in the
21   United States, History, Process, and Qualification."
22        What brought you to Tokyo, Japan, sir?
23   A.   Because our association and the United States system for
24   licensure of pharmacists and transfer of license is quite
25   unique, and in my opinion probably the best in the world, other

1    countries and other governments invite us over from time to

2    time to talk about our system and try to assist them in

3    developing a similar system.

4            So I was invited by the Japanese government to go

5    over there and explain to them what we do to assist competence

6    of pharmacists and how our system can be put in place in Japan

7    to achieve the same results we have here, which is significant

8    protection of the public.

9    Q.   And I see in 2002, you gave a prepared statement to the

10   Federal Trade Commission; is that right?

11   A.   Yes.

12   Q.   Okay.  In 2003, you gave a presentation, the domestic sale

13   of prescription drugs over the Internet.  It was a prepared

14   statement for the Committee on Government Reform, U.S.

15   Congressional hearing --

16   A.   Yes.

17   Q.   in Washington?

18           Again, was that the same topic?

19   A.   Yes, the FTC presentation concerned problems that they were

20   seeing with Internet sites that were making false claims and

21   false allegations about medications and about what the sites

22   could or couldn't do.  So the FTC was analyzing a research

23   issue and asked us to send in and provide some background.

24   Q.   You've appeared before the Food and Drug Administration?

25   A.   Yes, I have.

1    Q.  Okay.  Again, another statement before the Senate Committee

2    on Commerce Science and Transportation in November '03?

3    A.  Yes.

4    Q.  You've also appeared before some state senates; is that

5    correct?

6    A.  Yes.

7    Q.  Different state legislatures?

8    A.  Yes, it is.

9    Q.  In March of 2004, sir, you gave a prepared statement for

10   the U.S. House of Representatives on Internet Pharmacy Consumer

11   Protection Act?

12   A.  Yes.

13   Q.  And National Conference of State Legislatures in April of

14   '04, "E-pharmacies Consumer Protection and Regulatory

15   Challenges"?

16   A.  Yes.

17   Q.  A prepared statement before the Secretary's Task Force on

18   importation, U.S. Surgeon General, in '04?

19   A.  Yes.

20   Q.  Again, in 2004, in July, you gave a prepared statement

21   called "Electronic Transmission of Prescription Medications and

22   State Regulation of the Practice of Pharmacy and its Impact on

23   Patient Safety" before the National Committee on Vital and

24   Health Statistics Subcommittee on Standards and Security"?

25   A.  Yes.  And all of these statements before these government

1    and house committees were at their request, because NABP

2    doesn't have involvement in lobbying or campaigning.

3    Therefore, we appear when the house, senate, or various

4    committees or the Surgeon General requests us to come.

5    Q.  And coming to the end of your excess of 150 presentations,

6    did you give testimony in March of '06 before the Maryland

7    House, Health, and Government Operations Committee?

8    A.  Yes.

9    Q.  And in July of '06, was there a prepared statement and

10   testimony before the Subcommittee on Criminal Justice Drug

11   Policy and Human Resources Regarding Pharmaceutical Supply

12   Chain Security?

13   A.  Yes.

14          MS. SMITH:  Okay.  Your Honor, at this time, I'd

15   offer Dr. Catizone as specifically as an expert in the field of

16   pharmacy practice, pharmacy regulation, pharmacy legislation,

17   and Internet pharmacy practices, both legal and illegal.

18          THE COURT:  So if you could say again, pharmacy

19   practice, pharmacy regulation?

20          MS. SMITH:  Pharmacy legislation and Internet

21   pharmacy practices, both legal and illegal.

22          THE COURT:  Good.  Is there any voir dire on

23   credentials, Mr. Ravenell?

24          MR. RAVENELL:  Yes, Your Honor.  Thank you.

25          THE COURT:  Good.  Thank you.  If I could just

DIRECT EXAMINATION

1   explain briefly to the jury what we're doing.

2          Dr. Catizone has been called by the government as an

3   expert witness, and you'll remember in the case I explained the

4   difference between a fact witness and an expert witness.  The

5   part of the process is evaluating whether or not any proposed

6   expert has the requisite experience, knowledge, training, and

7   education to state an opinion on the topics which have been

8   proposed.

9          And it's customary for the other side to have an

10  opportunity to examine the expert on his qualifications, or her

11  qualifications, and that's what Mr. Ravenell is doing.

12         Go right ahead, sir.

13                     CROSS-EXAMINATION

14  BY MR. RAVENELL:

15  Q.  Thank you, Your Honor.

16         Good morning, sir.

17  A.  Good morning.

18  Q.  Mr. Catizone, you're aware that, in this particular case,

19  the two defendants who are on trial were active practicing

20  pharmacists?

21  A.  Yes.

22  Q.  Okay.  And you're aware of that from information provided

23  you by the government?

24  A.  Yes.

25  Q.  Now, from reviewing your resume, or vitae, am I correct

1    that you only -- you were only employed as a full-time

2    pharmacist for three years, from 1983 to 1986?

3    A.  Yes, sir.

4    Q.  All right.  And that was well before the Internet age,

5    correct?

6    A.  Yes, sir.

7    Q.  On your resume you have something listed as a DPH.  What is

8    a DPH?

9    A.  It's a designation from the State of Oklahoma of the Doctor

10   of Pharmacy Practice.

11   Q.  Okay.  And you have a DPH; is that correct?

12   A.  Yes.

13   Q.  And that DPH is honorary, correct?

14   A.  Yes, sir.

15   Q.  And when did you receive the DPH, honorary DPH?

16   A.  From the State of Oklahoma, sir.

17   Q.  You didn't complete any course work to earn that honorary

18   degree, correct?

19   A.  It was awarded by the state for my activities.

20   Q.  You didn't complete any course work --

21   A.  No, sir.

22   Q.  -- to that earn that honorary degree, correct?

23   A.  No, sir.

24   Q.  And you said that degree was given to you, honorary degree,

25   by the Oklahoma State Board of Pharmacy?

1  A.  I said it was an honorary designation, sir, by the State of

2  Oklahoma.

3  Q.  So it's not even a degree?

4  A.  No, sir.

5  Q.  It's just a designation by the Board of Pharmacy?

6  A.  By the State of Oklahoma, the powers of the Board of

7  Pharmacy.

8  Q.  But it's actually Oklahoma State Board of Pharmacy, not the

9  State of Oklahoma, such as the governor, who gave that

10  designation, correct?

11  A.  Yes, sir.

12  Q.  All right.  And you received that designation in 2001?

13  A.  Yes, sir.

14  Q.  And the Oklahoma State Board of Pharmacy is not an

15  institution of higher learning, correct?

16  A.  No, sir.

17  Q.  You do not have a doctorate, correct?

18  A.  Yes, sir.

19  Q.  Yes, what?  You do or do not?

20  A.  Yes, I said it's correct, I don't have doctorate.

21  Q.  Okay.  I noticed that the DPH, that you talked about that's

22  on your resume, you're aware of something called a Doctor of

23  Pharmacy Degree, correct?

24  A.  Yes, sir.

25  Q.  And what is a Doctor of Pharmacy Degree?

DIRECT EXAMINATION

1    A.   It is the educational requirement for pharmacists now to

2    become licensed in the states.

3    Q.   And you have never completed a doctor or earned a Doctor of

4    Pharmacy Degree, correct?

5    A.   No, sir.  Or, correct, yes.

6    Q.   If I understand you correctly, you did not go to medical

7    school, correct?

8    A.   No, sir.

9    Q.   And you're not an MD?

10   A.   No, sir.

11   Q.   And you can't practice medicine, correct?

12   A.   Correct.

13   Q.   You can't write a prescription for a patient, correct?

14   A.   Correct.

15   Q.   And, in fact, you have never written a prescription for a

16   patient, correct?

17   A.   No, sir, I have.

18   Q.   You say you have?

19   A.   Yes.

20   Q.   All right.  So while you're not a doctor, you've written a

21   prescription for a patient?

22   A.   Yes.

23   Q.   And is that acting under a doctor?

24   A.   Yes.

25   Q.   So you were working for a doctor?

1   A.   I was working in collaboration with a doctor.

2   Q.   Okay.  And you wrote a prescription because a doctor told

3   you to write the prescription?

4   A.   The doctor consulted with me, and we jointly wrote the

5   prescriptions.

6   Q.   Okay.  And you don't hold a law degree, correct?

7   A.   Correct.

8   Q.   Have you ever taught law?

9   A.   No, sir.  Yes, I have taught classes at Midwestern

10   University, University of College Pharmacy as a guest lecturer.

11   Q.   As a guest lecturer?

12   A.   Yes.

13   Q.   But you were not on the faculty?

14   A.   I was adjunct faculty.

15   Q.   When is the last time you filled a prescription?

16   A.   Last time I filled a prescription was ten years ago.

17   Q.   And you indicated that you're with the National Association

18   of Boards of Pharmacy, correct?

19   A.   Yes, sir.

20   Q.   And that has been in existence for how long?

21   A.   Since 1904, 104 years, sir.

22   Q.   And your role is, as executive director, and you've been in

23   that position for the last 20 years, correct?

24   A.   Yes, sir.

25   Q.   And before that you served in another position with the

1    NABP?

2    A.  Yes, sir.

3    Q.  And what was that position?

4    A.  I was test and measurements director, oversaw the licensure

5    examinations.

6    Q.  How long did you serve in that position?

7    A.  Three years.

8    Q.  So you've been an administrator for the last 23 years?

9    A.  Yes, sir.

10   Q.  All right.  Now, on your CV or your resume, you have an

11   unusual section entitled "Expert Witness Litigation."

12          How many times have you testified against pharmacists

13   or pharmacies?

14   A.  In hearings or?

15   Q.  Hearings, courtrooms, how many times?

16   A.  Three in federal cases, and three DEA hearings.

17   Q.  I'm sorry?

18   A.  A total of six, sir.

19   Q.  And tell the jury what you list on your CV as your expert

20   witness litigation experience?

21   A.  Is there a particular page, sir, you're referring to?

22   Q.  Yes.  Page three, at least my copy's page three, seems like

23   Miss Smith may have a different copy.

24          MS. SMITH:  No.

25   A.  Drug Enforcement Administration Trinity Healthcare, May 31,

1    2006.

2              U.S. Attorney's Office, District of Minnesota,

3    November 15, 2006.

4              Drug Enforcement Administration, April 10th, 2007.

5              Drug Enforcement Administration Grand Pharmacy, April

6    16th, 17th, 2007.

7    Q.  And are there others that did you not list on your resume

8    where you testified for the government?

9    A.  Yes, sir.

10   Q.  And how many others?

11   A.  There's two others, I believe.

12   Q.  Okay.  I don't see on that resume that you ever testified

13   for a pharmacy or pharmacist?

14   A.  Correct.

15   Q.  Have you ever done so?  Have you ever testified for a

16   pharmacy or pharmacist?

17   A.  Your Honor, just, I'm trying to understand the scope of the

18   question.  I've testified for pharmacists and pharmacies, but

19   not in regard to Internet.

20   Q.  All right.  As to the Internet, have you ever testified --

21   A.  No.

22   Q.  -- for a pharmacy or pharmacist?

23   A.  No, sir.

24              MR. RAVENELL:  Now, may counsel approach, Your Honor?

25              THE COURT:  You may.

1          (At the bench)

2          MR. RAVENELL:  I object to this witness being called

3     as an expert, first in the area of Internet pharmacy practice,

4     legal and illegal.

5          I have reviewed this witness's testimony from prior

6     trials, and what he tends to do is throughout his testimony he

7     determines that, you know, Internet sites are legal or illegal,

8     and it runs throughout his testimony.  It is just rank and

9     improper testimony.  I don't think any witness is an expert in

10    illegal or legal pharmacies.  And Internet pharmacy being

11    practices legal or illegal, that it's going to be a question

12    for the jury to decide at some point whether this particular

13    Internet site was legal or illegal.

14         There's been nothing that this witness has given in

15    his voir dire that suggests that he is an expert and whether a

16    pharmacy is illegal or legal, or he has in fact indicated that

17    he has appeared on TV shows and talked about whether certain

18    pharmacy, the whole issue of Internet pharmacy because he's

19    involved in this VIPPS certification process with the NABP.

20    It doesn't make him an expert that he's called to speak on TV

21    about it.

22         There's been no course that he's taught on Internet

23    pharmacy and whether it's illegal or legal.

24         He's done presentations.  He's not held any position

25    with any university where he's given any such information.

1          So we strongly object to this witness giving

2     information and being designated as an expert in Internet

3     pharmacy practice, legal and illegal.

4          We obviously object to him being designated in

5     pharmacy legislation.  The fact that he has been asked to

6     testify before various house or senate committees does not make

7     him an expert in that area.  He's mainly a person who has given

8     information to the house, but it doesn't make him an expert,

9     and there's nothing that he said that would indicate that he is

10    more expert than anyone else who is asked to give information.

11    The voir dire in fact does not establish that.

12         The issue of pharmacy practice, while certainly the

13    jury will be able to determine whether he's an expert in that

14    area based on his lack of any real pharmacy practice in the

15    last 20 something years and as a pharmacy regulation, I'm not

16    even sure what that means, pharmacy regulation.  So I'd ask for

17    a proffer on what that means before the Court can somehow rule

18    that he's an expert.

19         THE COURT:  Good.  And do you adopt that argument?

20         MR. MCCANTS:  I do.

21         THE COURT: Good.  My view is that I haven't heard

22    from the government yet, but there is no subspecialty

23    concerning Internet pharmacy practice whether it's legal or

24    illegal and pharmacy legislation as I understand it.

25         There are two issues.  One is what are the standards

1    pharmacy practice, and the standards of pharmacy practice

2    encompass pharmacy regulation because pharmacists fill

3    prescriptions who are doing a matrix of both state and federal

4    laws so you have to know what the law is in order to be a

5    pharmacy practioner.

6          So plus the government has stated that the same

7    standards that apply to all pharmacists when filling

8    prescriptions also apply to Internet prescriptions being

9    filled.  So he can talk about the Internet, and ins and outs of

10   the Internet.  But I don't believe that he can accept somehow

11   as an Internet pharmacy here, because I don't think -- that's

12   not a recognized discipline.  But he certainly can talk about

13   pharmacy practice, pharmacy regulation, that encompasses

14   everything.

15         MS. SMITH:  Your Honor, two things.  I can certainly

16   develop his expertise in the VIPPS field, how he created

17   program and what it's all based on.  And I was saving that for

18   his testimony, but if the Court needs it to see that he is an

19   expert in Internet pharmacy, Internet pharmacy as the

20   defendants have argued many, many, times, is the wave of the

21   future, and presents new wrinkles.  It is a specialty.  I think

22   that has been the defendant's argument is that everyone just

23   doesn't understand, and I would like the opportunity to voir

24   dire him a little bit more on that topic and then have the

25   Court make that decision.

1          THE COURT:  If I could just --

2          MR. RAVENELL:  I'm sorry.

3          THE COURT: He can testify about Internet pharmacy and

4     the wrinkles of it.

5          MS. SMITH:  All right.

6          THE COURT:  And the challenges and how the pharmacy

7     should regulate under the Internet, but my understanding is

8     that the government's position has always been that somehow

9     that they were filling prescriptions generated over the

10    Internet is subject to the same standards as filling a

11    prescription when somebody walks into a Rite Aid.  It's the

12    same inquiry, and there is not a separate standard that applies

13    to the Internet, but that all pharmacists are bound by the same

14    requirements to fill valid prescriptions.

15         So and the government's argument has been that the

16    Internet needs to operate the way the rest of the world

17    operates.

18         MS. SMITH:  Very well.

19         THE COURT:  So I will accept him in pharmacy practice

20    and pharmacy regulation, which includes the legislative wrinkle

21    in which pharmacies exist, and he can certainly testify as to

22    how pharmacies should exist in the Internet.

23         And I've reviewed, simply incorporate by reference

24    the categories that I've discussed with counsel earlier as to

25    what I consider to be appropriate.

1            Why don't we do this, let's just take a recess until

2      11:00 and then we'll plow on.

3            MR. RAVENELL:  Thank you, Your Honor.

4            MS. SMITH:  Thank you, Your Honor.

5            (Open court)

6            THE COURT:  Good.  Let's take a recess, ladies and

7      gentlemen, until 11:00, and then we'll continue.

8            (Recess.)

9            THE COURT:  Please be seated, unless you wish to

10     stand for the jury.

11           (Pause.)

12           (Jury present)

13           THE CLERK:  Jurors all present.

14           THE COURT:  Thank you, Mr. Thompson.  Please be

15     seated.

16           Ladies and gentlemen, I have will accept Mr. Christo

17     as --

18           MS. SMITH:  Dr. Catizone.

19           MR. BUDLOW:  It's not just me.

20           THE COURT:  It was a long weekend.

21           MR. RAVENELL:  Your Honor, may counsel approach just

22     briefly?

23           THE COURT:  Yes, you may.

24           (At the bench)

25           MR. RAVENELL:  Your Honor, I'm sorry.

1          THE COURT:  It is Mr. Catizone.

2          MR. RAVENELL:  I was going to say that.

3          MS. SMITH:  All right.  That's fine.

4          THE COURT:  Because he doesn't have a doctorate, just

5     has --

6          MS. SMITH:  Very well.

7          MR. RAVENELL:  That's why I was approaching.

8          (Open court)

9          THE COURT: Ladies and gentlemen, I'm accepting Mr.

10    Catizone as an expert in the fields of pharmacy practice and

11    pharmacy regulation.

12          I anticipate that Mr. Catizone will discuss the laws

13    and state opinions about the laws that govern the practice of

14    pharmacy.

15          At the end of the case, I will be instructing you as

16    to the law that will govern your deliberations, and you will

17    match up the law with the facts as you find them.  So the law I

18    give you will match the law with the facts as you find them and

19    then you'll reach a verdict.

20          The reason that I will permit an expert witness to

21    discuss the law is that the practice of a regulated field, such

22    as pharmacy, the pharmacy is practiced in a regulatory matrix,

23    so the jury needs to understand what that matrix is.

24          You must still evaluate whether you will accept or

25    reject the testimony of any expert in or in part, and if when

1    it comes to the law, if I were to instruct you at the end of

2    the case in a way that's inconsistent with the testimony of an

3    expert, then you must be bound by my instruction as to what the

4    law is.

5            So if there's -- it's a long way of saying that

6    pharmacy's a regulated activity.  The jury needs to understand

7    the regulations.  I'm going to permit the experts to testify as

8    to those regulations.  You must weigh and assess the testimony

9    of the expert and decide whether you accept it or reject it.

10           And since I'm the ultimate arbiter of the law, if the

11   expert were to testify in a way that conflicts with my

12   statement as to what the law is, then you're bound by what I

13   say.

14           Good.  Miss Smith?

15           MS. SMITH:  Thank you, Your Honor.

16   BY MS. SMITH:

17   Q.  Sir, let me just ask you, you were asked moments ago when

18   the last time you practiced full-time as a pharmacist?

19   A.  Yes.

20   Q.  And when was that?

21   A.  It was about ten years -- I was on a three-year period but

22   I practiced as a pharmacist part-time up until ten years.  Part

23   of my requirements a testing director was to work as a

24   part-time pharmacist to stay active in the field of pharmacy.

25   Q.  And let me also ask you, you were asked about your

1    testimony in other matters.  Have you always only represented

2    the government or the state board authority that is prosecuting

3    or bringing the action?

4    A.   No.  We've testified against boards of pharmacy even

5    against states when we felt the regulation was unfair or the

6    regulation did not hold the pharmacist to the scope of

7    responsibility or the pharmacist wasn't properly regulated.

8    Q.   And what other activity have you been involved in, in terms

9    of litigation where you've taken a position against a state

10   board or a federal board?

11   A.   Over the years, numerous hearings where we've opposed the

12   action of a state board of pharmacy or if a state board of

13   pharmacy has disciplined a pharmacist, we've spoken on behalf

14   the pharmacist, if we felt that the pharmacist was wrongly

15   disciplined or if the regulation was unfair.

16        We've also submitted amicus briefs, or friends of the

17   Court, in litigation in which the Board of Pharmacy we felt

18   didn't take the appropriate steps or the regulation wasn't

19   appropriate to protect the public.

20   Q.   And amicus brief or friends of the Court, Your Honor, I

21   would just like to establish for the record that it's a legal

22   paper filed by someone who's not a party to litigation who

23   chimes in on their opinion to the extent a Court would want to

24   hear from them.  Is that a nice inartful way of saying that?

25        THE COURT:  That's essentially correct.

1              Ladies and gentlemen, if there is an issue that's

2       before the Court, and it usually happens either before one of

3       the appellate courts or before the Supreme Court, then any

4       interested group can file what is called a friend of the Court

5       brief.  It is usually not a brief that is solicited by the

6       Court.  It's usually a brief that is filed by somebody with an

7       interest in the outcome, and the Court can accept the brief and

8       read it, and give it whatever weight the Court feels it's

9       justified.

10              MS. SMITH:  Thank you, Your Honor.

11      BY MS. SMITH:

12      Q.  Sir, let me ask you, tell us a little bit about the history

13      of pharmacies, when did they first start?  Where did they come

14      from?

15      A.  In the prior to the 1800, pharmacy was practiced like most

16      other trades.  You simply found somebody that was making

17      medications who worked under an individual as an apprentice.

18      As you learn how to prepare medications, you worked and

19      dispensed those or gave those to patients.  There was no formal

20      regulation.  There was no system.  There was no checks or

21      balances on whether or not medication was right or even wasn't

22      harmful.

23      Q.  And I remind you to keep your voice up.  And who were

24      typically the people that were dispensing medications?

25      A.  Typically the people dispensing were either the barbers or

1   doctors, because back in those times, barbers performed

2   surgery, and they needed some sort of medications for that

3   process, and these were the primary people who gave medications

4   to people.

5   Q.  And it may seem obvious, but why did it change?

6   A.  There was so much problems with that, and they needed a

7   check and balance system, and they needed to make sure that the

8   people that were dispensing medicines weren't simply dispensing

9   snake oil medicines or something that was actually harmful to

10  people.

11  Q.  So when were some of the earliest regulations?

12  A.  In the late 1800s, Louisiana was the first state to

13  actually regulate and require pharmacists to go through some

14  sort of formal training and distinguish and separate barbers

15  and doctors and pharmacists and say these are the individuals

16  to be responsible and they need to be competent in order to

17  dispense those meds.

18  Q.  Has the purpose, the goal of the regulations and the laws

19  involving pharmacy, has it always been the same?

20  A.  The goal has always been the same, to make sure the patient

21  is protected and to make sure that the pharmacist serves as a

22  gatekeeper in that process.  That's the last check before that

23  patient gets the medication so the pharmacist is there to make

24  sure what the doctor is writing is correct and won't harm the

25  patient, and to make sure that the patient takes the medication

1    as they should.

2    Q.  Now, directing your attention, sir, to the 21st century.

3    Are you familiar with both the federal and Maryland laws as

4    they exist with regard to pharmacy?

5    A.  Yes.

6    Q.  Or actually with regard to controlled substances?

7    A.  Yes.

8    Q.  Okay.  Now, specifically, the Controlled Substances Act is

9    the federal law that regulates controlled substances?

10   A.  Yes.

11   Q.  Okay.  And that is Title 21 841?

12   A.  Yes.

13   Q.  And do you recall, sir, generally, I'm not asking you

14   specifically, how that statute begins and what it says?

15   A.  It's to protect people from narcotics and controlled

16   substances.

17   Q.  Okay.  But do you recall the opening language?

18   A.  No, I don't, I'm sorry.

19   Q.  Okay.  And the Maryland statute, are you familiar with

20   criminal statute Maryland 5-902?

21   A.  Yes.

22   Q.  And you've had an opportunity to look at that?

23   A.  Yes, I have.

24   Q.  Okay.  What observations have you made about the Maryland

25   statute and the federal statute?

1    A.   Two observations.  One, the Maryland statute is almost

2    exactly the same as the DEA statutes.  In fact, it's

3    word-for-word verbatim the same language.

4    Q.   Okay.  Now, specifically, what is the difference between a

5    statute and a regulation?

6    A.   A statute is generally what's passed by the legislators in

7    a state.  It's a law that's passed and says we're going to

8    regulate this area or this is something that we need to look at

9    as a state and for people to then be protected or to assist

10   people in that state, a regulation that is charged to a Board

11   of Pharmacy or some other state agency to implement that law,

12   and to design the parameters in how that should be regulated.

13   Q.   Sir, I'm going to ask you to look at -- this is the

14   Maryland pharmacy laws.  And I'm going ask you to look at

15   5-902, and if you just look at the opening language of that

16   statute, do you recall that?

17   A.   Yes, I do.

18   Q.   And what is the opening language?

19            MR. RAVENELL:  Objection, Your Honor.

20            THE COURT:  I'll sustain the objection.

21            MR. RAVENELL:  May counsel approach?

22   Q.   Do you recall, sir, specifically between the federal

23   statute and the Maryland statute the similarities and the way

24   they are structured?

25            MR. RAVENELL:  Objection, Your Honor.  May counsel

1    approach?

2            THE COURT:  You may.

3            (At the bench)

4            THE COURT:  Yes, sir.

5            MR. RAVENELL:  Your Honor, this witness is -- to have

6    the witness do your job, to advise the jury what the law is.

7    It is one thing for this witness to testify about his

8    experience and expertise, but to have the witness basically, A,

9    as the Court, wanted to read the statute and now to basically

10   interpret the statute is just not proper for this witness.  The

11   Court's going to at some point read the law.

12           THE COURT:  I'm looking at the list of what Mr.

13   Catizone can testify to, his background, training, and

14   experience, what the law requires of a pharmacist when he fills

15   a prescription.

16           He's got to follow both state and federal law.  The

17   definition of the doctor/patient relationship, the definition

18   of a scope of professional medical practice.

19           What actions fell outside the scope.  What

20   constitutes a legitimate medical purpose within the medical

21   community.  Standard practices within the pharmacy industry.

22           Things pharmacists generally look for when attempting

23   to verify legitimacy of prescriptions.

24           The significance of receiving a large number of calls

25   from agitated patients.

1            The significance of other flags of illegitimacy,

2       doctor/patient or his doctor, the flag of legitimacy and

3       geographic distance, et cetera.

4            The actions of pharmacist can take to verify a

5       prescription about what he has concerns.

6            Whether a type of claim that the Florida website

7       companies placed on the prescriptions were typical or atypical,

8       whether in his opinion a prescription is filled is so valid.

9            Whether a reasonable pharmacist would have known that

10      the prescriptions filled in this case were valid.

11           He may not testify about his personal practices

12      unless he'll testify that the practice is representative of the

13      industry standard.

14           And he can't testify about whether Mr. Sodipo and Mr.

15      Nwaehiri individually should have known that the prescriptions

16      that they were filling were valid.

17           My understanding was that Mr. Catizone would talk

18      about the law as it relates to the facts, incidentally as to

19      the facts, and then wouldn't be going through legislation and

20      describing the legislation.  He can testify that the general

21      purpose of the law is to protect the citizens and make sure

22      that they're getting the right medicine and this and that, and

23      I think it's inappropriate to have him go through the law and

24      read the language.

25           He can testify to the law because it's essential for

1    him to say what the legal effects of certain facts are, but

2    he's not to give a legal discourse.

3         MS. SMITH:  I wasn't going to ask him for a legal

4    discourse, Your Honor.  I was asking him to explain both the

5    Maryland and the federal statutes before we -- one question

6    before we move to the regs is that they are statutes of

7    prohibition.  Nothing is allowed.  They both start unless

8    authorized by law.

9         And so that authorization is then found in the

10   regulations.  This is purely mechanical.  And I believe it is

11   -- I mean, I can do it in this order or go back to it after

12   he's testified to something.  Then I can go back and have him

13   explain how he arrived at that.

14        But it just seems a little bit more orderly to just

15   do it in this order.  That's all I'm doing.

16        And I'm going to discuss 1306.4, which is the federal

17   regulation, the CFR, which is identical in language to the

18   Maryland regulation.  And I was going to have him establish

19   that, you know, essentially what one means the other means.

20   And that's all I'm doing.  I'm not going to ask him for an

21   overview on the law.

22        MR. RAVENELL:  Your Honor, having the witness say

23   that the statute is one of prohibition is a legal conclusion

24   that this witness should never be telling the jury.  In fact,

25   when the Court instructs the jury, the Court doesn't say this

1    is a statute of legal prohibition.  When you give the law,

2    you're not going to even use that term there.  I don't know

3    I've had a court ever say the statute is of legal prohibition.

4    The Court tells the jury what the law is.

5         Now this witness is going beyond what the courts even

6    tell the jury about the law.

7         MS. SMITH:  I don't know, Your Honor, how I can

8    explain what the obligation of the pharmacist is without just

9    very superficially starting with the statute, moving to the

10   regs and then moving to the facts.

11        THE COURT:  Well, he can testify, but you have to

12   follow the law, state law, you have to follow the federal law.

13   You have to follow the regulations, that you must fill a

14   prescription within the confines of the law.

15        MS. SMITH:  And he can't tell them what the law --

16        THE COURT:  Yes.  You have to have a legitimate

17   medical purpose.  It has to be within the scope of professional

18   medical practice, and it has to be that the doctor/patient

19   relationship.  But he can't testify that it's, you know, a

20   statute of prohibition.  But he can certainly define these

21   terms.  He's got to -- a pharmacist has to follow federal law,

22   state law, and then we're going to get into the terms it has to

23   be a valid medical prescription.  What's a valid prescription.

24        MS. SMITH:  All I'm seeking to do is give a framework

25   for that testimony.

1          THE COURT:  But I would prefer if you just went right

2     into it without having him talk about reading the statutes and

3     talking about the statute of prohibition.  My understanding is

4     there are terms that he must establish, so I think you need to

5     go right to it.

6          (Open court)

7     BY MS. SMITH:

8     Q.  I don't remember if I asked you the difference between a

9     statute and a regulation.

10    A.  Yes, you did.

11    Q.  Okay.  And what did you tell us?

12          MR. RAVENELL:  Your Honor, the witness has already

13    testified.

14          THE COURT:  Well, we're getting back into it, so I'll

15    permit it.

16          Go ahead, Miss Smith.

17    A.  The statute is a law that's passed by the legislature very

18    similar to if a state the speed limit on expressways or

19    highways is 55 miles an hour, the regulations are the

20    implementing requirements for that law or regulation, so that

21    if there was construction on a highway and the speed limit had

22    to be less than 55, there's a state agency empowered by the

23    legislature to put those requirements into place and to amend

24    that and make those changes so it's safe for the public.

25    Q.  Now, are you familiar with the federal, the Code of Federal

1   Regulations, CFR 1306.4?

2   A.  Yes, I am.

3   Q.  And how does that regulation relate to the controlled

4   substances laws?

5   A.  That regulation is the controlled substances law.

6   Q.  Okay.  How does it relate to the statute itself, the actual

7   statute as opposed to the regulation?

8   A.  Those are the implementing regulations for the federal

9   statute.

10  Q.  Okay.  And in Maryland is there a similar regulation?

11  A.  Yes, there is.

12  Q.  And would that be Code of Maryland regulations 10.19.03.07?

13  A.  Yes, it is.

14  Q.  Okay.  And have you had an opportunity to look at those

15  statutes?

16  A.  Yes, I have.

17  Q.  Okay.  I'm marking for identification only, I need to put

18  up on the screen, this is 94 B.

19          MR. RAVENELL:  Your Honor, may counsel approach?

20  It's for identification only and it's on the screen.

21          MS. SMITH:  I was going to have him identify it and

22  then move it in.  May counsel approach?

23          THE COURT:  You may.

24          (At the bench)

25          THE COURT:  I think that what you should do is just

1       ask him about this rather than put it up on the screen.  If you

2       put it up on the screen, you're going to unduly emphasize,

3       you're going to ask him about, you know, the different points.

4               Is that your objection?

5               MR. RAVENELL:  Yes, Your Honor.  It should not be in

6       evidence.  And, secondly, again I'll see what the next question

7       is and I'm not sure where Miss Smith is going with this, I

8       think the witness has already indicated that COMAR and CFR, are

9       identical and the witness has testified.  I think the Court

10      indicated that she'd be moving into the areas of witnesses

11      discussions that relate to this particular case.  Not that

12      we're going to give the jury the law, either on paper or the

13      witness stating it, because, again, at some point, you're going

14      to tell the jury what the law is.

15              The other problem is that it is so misleading to tell

16      this jury that the COMAR and CFR are the laws.  It is not the

17      law.  It is a regulation.  The law is what is in the CSA, the

18      law is what in Section 5, and the Court's going to be

19      instructing about what the law is, and the Court will certainly

20      use some of the terms that it's in COMAR when you talk about

21      the standards for this particular case.

22              But that doesn't mean that this COMAR regulation

23      comes into evidence.

24              MS. SMITH:  Your Honor, it's a demonstrative exhibit.

25      That's all it is.  I want to be able to show the jury that it's

1    word-for-word, the only difference Maryland calls it controlled

2    dangerous substances, and the Feds called it controlled

3    substances.

4          Then I was going to read the first paragraph and have

5    him explain what the terms in that paragraph mean.  I don't see

6    the harm.  This is the law.  I disagree with Mr. Ravenell.

7          And if it is the law, and the Court's going to

8    instruct on the law, I don't see what the harm is if this

9    witness does it.

10         THE COURT:  Well, the other thing is that it's highly

11    leading to show him this thing and then just ask him -- he's

12    already said that the CFR is the same as or similar to the

13    Maryland statute and just ask him, you can ask him what is a

14    prescription, and whose responsibility is it, and when is a

15    prescription valid and when is it invalid, just go through and

16    ask in general non leading question.

17         But I don't think you can put the -- I'm somewhat

18    uncomfortable anyway about having an expert who's going to tell

19    the jury what the law is, and I thought that he was going to do

20    it in terms of defining a doctor/patient relationship, when is

21    a prescription valid, what is the scope of professional medical

22    practice.  So I'm going to get into it that way and not by

23    going through the two statutes.

24         MS. SMITH:  Your Honor, the defense asked Dr. Christo

25    where is it written, and he said it's not in the law.  I mean,

1   this is directly in response to where is it written.  Is the

2   Court telling me I can't read the paragraph and then ask him to

3   define the terms that are in it?

4          THE COURT:  Yes.  Just go, ask him, you've

5   established that there is a writing and what does the writing

6   provide to pharmacists, specifically what's a doctor/patient

7   relationship, scope of professional medical practice,

8   legitimate medical purpose, under what circumstance may a

9   doctor validly issue a prescription, whose responsibility is

10  it?

11         If you do it that way, you'll get all of it, if he's

12  going to testify to it.

13         (Open court)

14  BY MS. SMITH:

15  Q.  Sir, I've asked you did you compare word-for-word CFR

16  1306.04, the federal regulation with COMAR, 10 19 0 3 0 7, the

17  Maryland regulation?

18  A.  Yes.

19  Q.  Are there any differences between that, those two

20  regulations as written?

21  A.  No significant differences except that the Maryland

22  regulations define controlled substances as controlled

23  dangerous substances, that's the only major difference.

24  Q.  Are there any other differences?

25  A.  Not that I could detect.

1    Q.   Okay.  So it's not just a major difference, it's the only

2    difference?

3    A.   Correct.

4    Q.   Now, what is a refusal to dispense regulation?

5    A.   Under the law, and under the standards of practice, a

6    pharmacist has a legal responsibility not to dispense a

7    prescription when that prescription can cause harm to the

8    patient or when the pharmacist feels that that prescription

9    wasn't the right prescription for that patient even though the

10   doctor wrote that prescription, or when they believe that

11   prescription was provided or gained through fraudulent means,

12   somebody trying to buy medications they shouldn't buy, to sell

13   those drugs, or that there's something else that's not right

14   with that prescription, a pharmacist is supposed to refuse to

15   dispense that.

16   Q.   Now, going back to the regulation that I just talked about,

17   the Maryland one that is identical to the federal one, how many

18   states, sir, have such a regulation?

19   A.   All states have a refuse to dispense regulation.

20   Q.   Okay.  But I'm talking about the one before it.  The one

21   where it is the one we were talking about, CFR 13.0604, and the

22   one that Maryland has it has identical, how many other states

23   have a regulation like that?

24   A.   All of the states have a regulation on two basic areas.

25   One, every state says you must be in compliance with all state

1    and federal acts, and they check pharmacies to make sure

2    they're in compliance with all the federal acts.  And as

3    Maryland has, other states have incorporated specific language

4    into their state practice acts to mirror or be identical to the

5    federal regulations or federal laws.

6    Q.  And the refusal to dispense regulation, how many states

7    have that?

8    A.  All of the states have that.

9    Q.  Okay.  And generally, what is refusal to dispense

10   regulation?

11   A.  That's the pharmacist's legal obligation not to dispense a

12   prescription that would do harm to the patient or a

13   prescription that was fraudulent or based upon a fraudulent

14   interaction between a prescriber and a patient.

15   Q.  And going back to the one before that, that we were talking

16   about, what generally is that statute?

17   A.  The controlled substance statute?

18   Q.  The 13 -- CFR 13.0604, what is the directive again very

19   generally in that regulation?

20   A.  The directive is to allow the use of narcotics and highly

21   addictive medications for the treatment of diseases and

22   symptoms in a way that protects the patient.  So these

23   medications require special safeguards and special

24   recordkeeping and special verifications that are outside the

25   normal medications or usual medication like for diabetes or

1    high blood pressure.

2    Q.  Mr. Thompson, can I have defendant's exhibit number 1?

3            Can you tell me, sir, how many states require an

4    out-of-state pharmacy to be licensed in that state before

5    sending drugs into that state?

6            MR. RAVENELL:  Objection, Your Honor.  May counsel

7    approach?

8            THE COURT:  You may.

9            (At the bench)

10           THE COURT:  Yes, ma'am.  What was the question?  I

11   lost it.

12           MS. SMITH:  How many state regulations require that a

13   pharmacy be licensed in a state where they are sending drugs.

14           MR. RAVENELL:  Your Honor, we would point out to the

15   Court before that the defendants are not charged with such

16   crime.  The Court indicated you were going to let Agent

17   Brashier with information before the jury.  It's now before the

18   jury.  And the Court indicated that it would not be harmful to

19   have this witness tell the jury that, now to have another

20   witness talk about a state's required pharmacies to be licensed

21   in the state, when that is not in issue before this jury, this

22   jury, and the Court has already indicated what the standards

23   are that defendants have to be held to, what the law is they're

24   on trial for.  To have the jury believe that the defendants

25   have committed a separate and distinct crime by somehow

1    violating the law in each of the states that they in fact sent

2    drugs to is highly prejudicial and irrelevant to the facts of

3    this case.

4          The Court is going to instruct the jury as to what

5    the standards the defendants must meet under the law for

6    alleged violation of the Controlled Substance Act.  There is no

7    element in the Controlled Substance Act that deals with whether

8    the defendants sent narcotics or used drugs outside the states,

9    it's just not, not there.

10          And all it has done is going to additional facts the

11    government wants the jury to have that's something bad, it is

12    not relevant.

13          THE COURT:  Now, did they ship to states?  By they,

14    did defendants ship hydrocodone to states where they were

15    unlicensed in and those states required them to be licensed in

16    order to issue ship prescriptions to those states?

17          MS. SMITH:  Yes, Your Honor.  I would also point out

18    that the next question was going to be how many states require

19    doctors to be licensed in states where the patients are being

20    provided prescriptions.  That is something a pharmacy would

21    have checked online to make sure that a doctor in Florida who

22    is sending drugs to a patient in Texas, if he's not licensed in

23    Texas, he's practicing law without a license in Texas.  It goes

24    to the geography factor.  It also goes to this witness's

25    testimony to the similarity of all the states and the unified

1    attitude in the laws of all the states and the federal

2    government.  And it goes to the basis of his knowledge of his

3    testimony.

4         We're not -- I wasn't going to follow up by asking

5    whether New Care was licensed in any states.  This is overview

6    and yet it is relevant.

7         THE COURT:  Why don't we do this, is there going to

8    be evidence that New Care was not licensed in some of these

9    states where they were shipping drugs?

10        MS. SMITH:  I think there's already been some

11   evidence of that.  I know through agent Brashier, there was

12   some evidence of that.

13        What there is, it goes to the knowledge of the

14   pharmacy whether the doctors are licensed in the other states.

15        There has also been questions of Dr. Christo about

16   what Maryland regulates vis-a-vis what goes on in other states.

17   The defense brought that up.  And it was, yes, it was beyond

18   the scope of direct.  It was allowed in cross-examination, the

19   implication being is that Maryland thinks it's all great, do

20   what you want in any other state.

21        And the point is each state regulates what goes on

22   within its own borders.  And that impression was made by the

23   defense.  I'm just trying to clear that up.

24        THE COURT:  In order for it to be relevant, it has to

25   be -- it has to -- the testimony has to prove that the

1    prescriptions filled by New Care were invalid, which would mean

2    that there has to be a standard, that the standard requires the

3    pharmacist to be licensed in these different states, and that

4    standard is that the doctors must be licensed in the states

5    where the prescriptions are going.

6          Then the second part has to be that the standard

7    requires that pharmacists to know that.

8          MS. SMITH:   Uh-huh.

9          THE COURT:   So the standard, under that the

10   prevailing pharmaceutical standards, the pharmacist must know

11   that he can only ship to a state where he's licensed and that

12   the doctor can only prescribe for patients in states where the

13   doctor is licensed.

14         MS. SMITH:   And that pharmacist would know that, too,

15   right.

16         THE COURT:   That's correct.   And then the third point

17   would be that these defendants, Mr. Sodipo and Mr. Nwaehiri,

18   were shipping to states where they had no license, and that

19   they knew or should have known that the Internet doctors were

20   prescribing for patients in states where the doctors were not

21   licensed.

22         MS. SMITH:   Your Honor, I don't know under the

23   Court's ruling if there's a witness that exists, that I can put

24   a witness on the stand to say what the defendants knew or

25   should have known.   That's off limits.

1      THE COURT:  Willful blindness.

2      MS. SMITH:  I think I've proven that, Your Honor.

3  Mr. Budlow reminds me the topic of shipping to other states

4  came up with Mr. Cloud, also.  He testified that his pharmacy

5  is licensed in 38 states.  I'll be happy to establish that this

6  is something pharmacists should know.  And I will be happy --

7      THE COURT:  Just go back for a minute.

8      He has to show what the standard is, is the standard

9  requires the pharmacist only to ship and that pharmacists must

10 know what the standard is.

11     MS. SMITH:  Okay.

12     THE COURT:  And then the pharmacist then the same

13 syllogism with respect to doctors.  Then you've got to tie it

14 into this case, that Mr. Sodipo and Mr. Nwaehiri were shipping

15 to places where they should not have shipped because they

16 weren't licensed or because the doctors weren't licensed.

17     MS. SMITH:  Okay.

18     THE COURT:  If you're not -- if you can't show that

19 the third step, then it is just irrelevant.

20     MS. SMITH:  Your Honor, the evidence is already in

21 the doctors were not licensed in any other state.  It was the

22 evidence that was recovered at New Care showing in which state

23 each of these doctors was licensed.

24     I will be happy to find a way before I rest my case

25 to prove that New Care was only licensed in Maryland.

1          THE COURT:  Well, you have to fast forward to the

2     closing.  And I assume, from what you've told me, that you are

3     going to argue that these prescriptions were invalid because

4     the pharmacists were shipping to states in which they were not

5     licensed and because the pharmacists were filling prescriptions

6     for patients in states where the Internet doctors were not

7     licensed, and that a competent pharmacist operating under the

8     prevailing standards would not have filled those prescriptions

9     because he would know where he could ship, and he would know

10    where the doctors must prescribe.

11         Which means that you have to nail down those facts.

12    And I don't remember, did somebody tell me, one of these

13    experts that it was illegal under the prevailing state law for

14    Sodipo and Nwaehiri to have filled prescriptions in states in

15    which they were not licensed?

16         MS. SMITH:  That's the point.  It is not illegal in

17    Maryland to send a prescription to Virginia if you're not

18    licensed in Virginia.  It's illegal in Virginia.  And the

19    question, that's exactly the point that Mr. Ravenell made when

20    he was cross-examining Dr. Christo, well, it's not illegal in

21    Maryland, is it?

22         THE COURT:  Just if it's illegal.  So is he going to

23    testify that it was illegal for Sodipo and Nwaehiri to have

24    filled prescriptions in these other states other than Maryland?

25         MS. SMITH:  I wasn't going to ask him directly if it

1    was illegal for them.  I was going to ask him -- well, he's

2    already established, I think he already answered that every

3    state -- one moment, Your Honor.

4              (Pause.)

5              MS. SMITH:  Where was I?  I'm sorry, Your Honor, you

6    asked me a question?

7              THE COURT:  It's here in this case we have red flags

8    and green flags.  So the evidence is relevant if it relates to

9    a red flag.

10             One red flag would be that these doctors, these

11   pharmacists, were mailing prescriptions to states in which it

12   was illegal for them to fill prescriptions and that they either

13   knew, either prove that they knew it was illegal for them to

14   send hydrocodone to those states, or they were willfully blind

15   by the fact.  And the same analysis with respect to the

16   doctors.

17             MS. SMITH:  Uh-huh.

18             THE COURT:  So in order to show that, it can't be

19   sort of innuendo or half done.  You have to have somebody

20   testify that it was illegal under the prevailing state law for

21   Mr. Sodipo and Mr. Nwaehiri to have sent these prescriptions to

22   Utah, these prescriptions to Virginia, these prescriptions to

23   Hawaii.

24             MS. SMITH:  He can do that.  He can testify that the

25   laws in all of those states require registration in all of

1    those states.

2            And we will follow up with a witness on where they

3    were registered.

4            THE COURT:  And the second step is was this disclosed

5    in the expert designation?

6            MR. RAVENELL:  That's where I'm about to go.

7            MS. SMITH:  It's part of the law, Your Honor.

8            THE COURT:  This is an important and discrete part of

9    the case that has to be developed, Mr. Catizone is going to

10   testify that it is illegal for New Care to have sent

11   prescriptions to Virginia and these other states because New

12   Care was not licensed in those states.  And it was illegal for

13   them to have filled prescriptions for Internet doctors

14   prescribing in Utah or Virginia et cetera because the doctors

15   were not licensed in those states.

16           MS. SMITH:  Yes.  Okay.

17           THE COURT:  So it wasn't -- if that wasn't

18   advertised, then there wasn't proper disclosure.  You can try

19   to get it in rebuttal with this witness, that's fine with me,

20   but it has to be disclosed.

21           MS. SMITH:  Your Honor, I would just like to state

22   for the record I think the Court is holding the government to a

23   standard that the Court is used to applying in civil

24   litigation.  I think the standard is much too high.  I don't

25   think it's realistic in this setting.  But obviously we will

1    abide by the Court's ruling.

2              THE COURT:  Thank you.

3              (Open court)

4              MS. SMITH:  One moment, Your Honor.

5              (Pause.)

6    BY MS. SMITH:

7    Q.  Doctor, Mr. Catizone, what is a rogue pharmacy?

8              MR. RAVENELL:  Objection, Your Honor.

9              THE COURT:  I'll overrule the objection.

10   Q.  What is a rogue pharmacy?

11             MR. RAVENELL:  Could I just be heard, Your Honor?

12             THE COURT:  Well, the first question is there such a

13   term that is current within the pharmaceutical profession?

14             THE WITNESS:  Yes, sir.

15             THE COURT:  Good.  Then you can say what it is.

16             THE WITNESS:  A rogue pharmacy is a designation

17   applied to Internet pharmacies that are operating illegally or

18   utilizing online questionnaires or cyberspace consultations to

19   establish valid relationships and valid prescriptions, or

20   proposed valid relationships and valid prescriptions.

21   Q.  And in your experience with the NABP, when did this type of

22   pharmacy first appear on the radar screen?

23   A.  We noticed these pharmacy surfacing in 1997 as the first

24   occurrence.

25   Q.  And what does VIPPS mean?

1    A.   It's the Verified Internet Pharmacy Practice Site program.

2    Q.   And who started that program?

3    A.   Our organization did in 1997.

4    Q.   Okay.  And what is the purpose of VIPPS?

5    A.   The purpose is to identify for consumers illegally

6    operating Internet sites and to distinguish them from rogue

7    sites, so consumers can make some safe decisions about their

8    medications.

9    Q.   And what standards does a pharmacy have to meet to become a

10   VIPPS certified pharmacy?

11             MR. RAVENELL:  Objection, Your Honor.

12             THE COURT:  I'll overrule the objection.

13   A.   Pharmacy must be in compliance with all state and federal

14   laws.

15             THE COURT:  If I could just interrupt for one second?

16   I take it that there is no legal requirement that a pharmacy

17   had a VIPPS certification?

18             THE WITNESS:  In four states there are, Your Honor.

19             THE COURT:  Four states there are, but not in

20   Maryland?

21             THE WITNESS:  No, sir.

22             MR. RAVENELL:  Your Honor, that's why may counsel

23   approach, Your Honor?

24             THE COURT:  Well --

25             MR. RAVENELL:  I'd like to put something on the

1  record.

2          THE COURT:  You may.

3          (At the bench)

4          THE COURT:  So is the VIPPS pharmacy certification

5  the higher standard than is required by law?

6          MS. SMITH:  No.

7          MR. RAVENELL:  Yes.  Of course, it is.

8          MS. SMITH:  Your Honor, Mr. Nwaehiri, in filling out

9  a questionnaire for McKesson, that asked if he was VIPPS

10  certified, put yes.

11          THE COURT:  Well, but that might come in for false

12  exculpatory or some consciousness of guilt, but if you have a

13  standard, let's assume you have a legal standard, all

14  pharmacies must meet this standard, because that is the legal

15  standard, that's what he's supposed to be testifying to.

16          Let's assume there's another, there's a super

17  designation, the good housekeeping seal of approval, and the

18  good housekeeping seal of approval is awarded only to those

19  pharmacists that are willing to meet some higher

20  classification.

21          MS. SMITH:  It is not a higher classification, Your

22  Honor.  I disagree.  And this witness will testify to that.

23          MR. RAVENELL:  Your Honor, if I could be heard on

24  this?

25          THE COURT:  Well, he's got to then testify that the

1    VIPPS standards are of the standards that are required by law.

2              MS. SMITH:  I will have him do that.  I was about to

3    do that when I asked him how does a pharmacy become VIPPS

4    certified and then that was my next question.

5              MR. RAVENELL:  Let me just be heard on this point so

6    that we're clear.  This witness has testified, A, NABP started

7    VIPPS.  It's something that they started in 1999.

8              To be a member of VIPPS, there are 18 or 19 criteria.

9    No pharmacy is required to be VIPPS certified.  The doctors

10   already testified in two other hearings, and I have the

11   transcript, the government has it, you are not required to be

12   VIPPS to be a legal pharmacy.  So when they have these criteria

13   that you're not required to meet to be a legal pharmacy, how

14   then can it be the same?

15             In fact, he has testified that it is a criteria that

16   many pharmacists are not willing to meet.  Hence, Judge, of

17   64,000 pharmacists in the country, only 15 are VIPPS certified.

18             The government is suggesting that all other 64,000

19   are operating illegally.  The witness would say no, that they

20   are in fact operating correctly.  And so there's no way that, I

21   can't imagine, I can't believe the government's representing to

22   this Court that this witness would say based on his prior

23   testimony that if you are a VIPPS, the criteria is the same

24   that is required by law.  It is way above what is required by

25   law.

1          Hence only 15 people, 15 pharmacies have chosen to

2     join and pay 2 to $5,000 to join.  I can't imagine this being

3     offered.

4          THE COURT:  He's testified that there are 18 or 19

5     criteria.

6          MS. SMITH:  It's actually been reduced to 14 since he

7     testified last.

8          THE COURT:  Good.  I'm going to sustain the

9     objection.

10         MS. SMITH:  Well, how do I -- Your Honor, how do I

11    explain to the jury the significance of the lie that Mr.

12    Nwaehiri told?

13         THE COURT:  Well, you can say -- just wait.  There's

14    there are two things at work here.  The first is, is the VIPPS

15    standard with the 14 criteria, is that the legal standard?  If

16    VIPPS standard is not the legal standard, then you can't

17    explain the VIPPS standard in great detail because there's a

18    danger that the jury is going to confuse the good housekeeping

19    standard with the bedrock legal standard.

20         So he can't hold the VIPPS standard out to the legal

21    standard if there are only 15 members around the country.

22         MS. SMITH:  Your Honor, it is not 15 members, it's

23    8,000 pharmacies.  There are 15 websites that represent 8,000

24    pharmacies that are VIPPS certified.

25         MR. RAVENELL:  That is not correct.

1        THE COURT:  Just if Mr. Nwaehiri said -- it's a

2   factual issue.  Mr. Nwaehiri is on record as stating that New

3   Care was a VIPPS pharmacy.

4        MS. SMITH:  Yes.

5        THE COURT:  Then that raises, he can then be asked

6   what is a VIPPS pharmacy.  What does one have to do to be a

7   VIPPS pharmacy.  And is New Care a VIPPS pharmacy?  And was it

8   ever a VIPPS pharmacy?  Then he'll say I search the official

9   records of VIPPS, and New Care was never a VIPPS pharmacy.

10  That's all right because then the VIPPS standard is not held

11  out to be what the law is.  But it's an industry group that New

12  Care's not a member of.

13       MS. SMITH:  And I can't ask him whether in his

14  expertise whether the VIPPS standard is the same standard in

15  the law, or is it a higher standard?

16       THE COURT:  I would stay away from that.  You're just

17  going to find out whether New Care was a member of it, or

18  whether --

19       MS. SMITH:  Well, I think when I ask him what it is,

20  he's going describe what it is, and I need to instruct him to

21  be very, very general in his response and not talk about

22  criteria and everything else, if that's the Court's wish.

23       THE COURT:  Right.  So the industry group that's

24  voluntary that you can say how many people are a member of it,

25  and how many, but of the point that you can legitimately make

DIRECT EXAMINATION

1   is that it's an industry movement and that holds itself out as

2   having certain standards and New Care is not a member of.

3          MS. SMITH:  Very well.  Your Honor, I am just going

4   approach the witness for a moment.

5          (Pause.)

6          (Open court)

7   BY MS. SMITH:

8   Q.  Approximately how many members are there in the VIPPS

9   program?

10  A.  There are approximately 15 Internet sites, and they

11  represent 8,000 pharmacies.

12          Now, we every year survey the state boards of

13  pharmacy to find out how many pharmacies they have licensed in

14  the country based upon their records.  And the estimate of

15  total pharmacies licensed is approximately 64,000 pharmacies.

16  Of that 64,000 pharmacies, 70 percent of those pharmacies are

17  community pharmacies.

18          MR. RAVENELL:  Objection, Your Honor, way beyond the

19  scope of the question.  He was asked how many were VIPPS

20  certified.

21          THE COURT:  Well, I'll permit it.  You may continue.

22  A.  Of those 64,000, 70 percent are Safeways, CVS and small

23  independent pharmacies, which represent about 45,000

24  pharmacies.  Another 25 percent of those pharmacies are

25  hospital-based pharmacies or nursing home pharmacies, which is

1    about another 50,000 pharmacies, which means of the 64, 65,000,

2    we have about 5,000 that are Internet pharmacies or that are

3    specialty pharmacies specializing in herbal medications or

4    veterinary medications.  So the number of VIPPS pharmacies in

5    15 websites and 8,000 pharmacies encompasses a large number of

6    Internet pharmacies as well as some of the traditional brick

7    and mortar pharmacies that are part of the Internet networks

8    for legitimate sites.

9    Q.  And is it mandatory or voluntary to become part of the

10   VIPPS program?

11   A.  In four states mandatory.  In order to participate or

12   dispense Medicare drugs, to Medicare patients, you have to be

13   VIPPS certified as a requirement of the U.S. government.

14            MR. RAVENELL:  Objection, Your Honor, may counsel

15   approach?  It's just total -- may counsel approach?

16            THE COURT:  Yes, you may.

17            (At the bench)

18            MR. RAVENELL:  I'm going to again move to strike.

19   It's beyond what the scope and the testimony is supposed to be

20   to dispense medications.  It has nothing to do with this case.

21   This is not Medicaid dispensation.  This was hydrocodone pain

22   medication.  And to leave the jury with the impression outside

23   of what I've already objected to is just wrong.  It should be

24   stricken.

25            First of all, it's wrong in general.  Secondly, it's

1    wrong because it goes beyond what the Court has indicated the

2    government can go on my objection.

3            THE COURT:  He testified that in four states that the

4    pharmacy must be VIPPS certified to dispense Medicaid patients.

5            MS. SMITH:  I would point out Your Honor, it seems to

6    me I can ask him, since this case is not about Medicaid

7    pharmaceuticals, this doesn't have any application in this case

8    and just move on, and that Maryland is not one of the four

9    states.  That's all I was going to do.  Frankly, I didn't

10   anticipate an answer of that specificity.  I don't think I

11   necessarily asked for it.

12           MR. RAVENELL:  I move that it be stricken, Your

13   Honor, because I don't this jury left with the impression

14   wrongly, first of all, that all of the states, all states

15   require anyone to be VIPPS certified, to dispense Medicaid,

16   because that's not what the issue.

17           THE COURT:  That's not what he said, four states, but

18   I'm satisfied to have Miss Smith to do it as she proposes to

19   clear this up.

20           (Open court)

21           MR. RAVENELL:  Thank you.

22   BY MS. SMITH:

23   Q.  Sir, just so that we're clear, this case does not involve

24   filling Medicaid prescriptions or anything at all of that

25   nature so that wouldn't have any application in this case,

1   okay.  And Maryland is not one of those four states that you

2   mentioned?

3   A.  Correct.

4   Q.  Okay.  Can you tell us, sir, was New Care ever VIPPS, a

5   VIPPS member or VIPPS certified?

6   A.  No.

7   Q.  Are they now or were they ever?

8   A.  Never, and they are not now.

9   Q.  If someone wanted information about the VIPPS program, is

10  it hard to find?

11  A.  The information is available free via our website or anyone

12  that can access the Internet, it's right there.

13  Q.  And it talks about all the requirements and everything

14  else?

15  A.  Yes, it does.

16  Q.  Okay.  Thank you.

17          Does education a pharmacist receives teach you how

18  drugs work?

19  A.  Yes.

20  Q.  Okay.  Is it a chemical education?  Is it -- what is --

21  what is sort of the format of that kind of education?

22  A.  It's multifaceted in the first two years of your program,

23  you'll learn about the chemical nature of drugs, how they work,

24  and the remaining years of the program, you'll learn how those

25  drugs actually work in a person and how they treat diseases and

1    symptoms.

2    Q.  Okay.  And hydrocodone, for example, what is it and how

3    does it work?

4    A.  It's a medication that works on your nervous system, and it

5    helps control pain for patients.

6    Q.  And what is a synergistic effect?

7    A.  A synergistic effect is something that adds to an already

8    occurring effect or to make something stronger or make

9    something last longer, it extends that effect, makes it more

10   powerful.

11   Q.  Okay.  Is that something that would also be included in the

12   education that a pharmacist receives in training?

13   A.  Yes, it is.

14   Q.  Doctors as well?

15   A.  Yes.

16   Q.  Now, can you tell us a little bit about pharmacy

17   technicians, is there a definition of a pharmacy technician?

18   A.  There's not a definition across all of the states, but the

19   definition accepted by the majority of states is that that

20   person is there to assist the pharmacist in the practice of

21   pharmacy.

22   Q.  And is there a movement in terms of unifying pharmacy

23   technicians throughout the country?

24           MR. RAVENELL:  Objection, irrelevant.

25           THE COURT:  I'm sorry.  Say again, Miss Smith?

DIRECT EXAMINATION

1   Q.  As a director of the NABP, can you tell us is there a

2   movement across the country to unify pharmacy technicians, what

3   they do, how they become certified, things of that nature?

4              MR. RAVENELL:  Objection, irrelevant.

5              THE COURT:  I'll sustain the objection.

6   Q.  Sir, from the viewpoint of a pharmacist, what is a

7   doctor/patient relationship?

8   A.  Doctor/patient relationship is a valid relationship between

9   a doctor and a patient in which a legitimate medical condition

10  has been diagnosed, an examination has occurred, a medical

11  history has been taken, and the doctor's made a logical

12  connection between that history, that examination, and that

13  medical condition.

14  Q.  And who has to participate in that relationship?

15  A.  The doctor and the patient.

16  Q.  Now, is it expressly defined anywhere?

17  A.  No, it's not.

18  Q.  How does a pharmacist know what a doctor/patient

19  relationship is?

20  A.  The pharmacist utilizes a number of resources to know what

21  that doctor/patient relationship is.

22             THE COURT:  If I could just ask, this has to be, your

23  testimony should be grounded in the standard, so you need to

24  reference from time to time to make sure that you're not

25  talking about what you do personally or what some group does,

1   but what the standard is that is incumbent upon all pharmacists

2   A.   The two federal laws that govern the regulation of pharmacy

3   practice, the Food Drug and Cosmetic Act and the Controlled

4   Substance Act set out two large parameters or two legal

5   parameters for a valid prescription in the doctor/patient

6   relationship.  Both say there must be a valid relationship

7   under the constitution under the regulation of pharmacy

8   practice that then is deferred to the state practice acts, to

9   actually define what is a valid patient prescriber relationship

10  and what is a valid prescription.

11        And all of the state practice acts include the

12  parameters as to what defines a valid patient prescriber

13  relationship, not explicitly, but indirectly, and it talks

14  about the responsibilities that a pharmacist has to validate

15  those relationships.  It doesn't say explicitly that it is A or

16  B, it says these are the standards, these are the requirements

17  to establish that.

18        Very similar to what we talked earlier about the

19  speed limit being 55.  State regulations say you may go less

20  than 55 in certain areas or under certain conditions where the

21  road may not allow 55, but there's no way that state can go

22  above 55 because that would violate that law.

23        And the same way those regulations are placed saying

24  this is a standard for a patient prescriber relationship, you

25  can't go below that standard, and you can't alter it.

1          Pharmacists are trained based upon standards taught

2     in the pharmacy program and are part of the law exams use

3     examples of what constitutes a valid patient prescribing

4     relationship and what doesn't.

5          So throughout curriculums they are taught and learned

6     what that is through the standards and through the laws.

7     Q.  So it is part of their training?

8     A.  Yes.

9     Q.  Without a doctor/patient relationship, can a prescription

10    ever be issued within the course of legitimate medical purpose?

11         MR. RAVENELL:  Objection.

12    A.  Under all the state laws --

13         MR. RAVENELL:  Objection.

14         THE COURT:  I'll overrule the objection.  You may

15    answer.

16    A.  Under all state laws, that prescription is invalid and the

17    pharmacist has no legal authority to dispense it.

18         MR. RAVENELL:  Objection, Your Honor.

19         THE COURT:  I'll overrule the objection.  Instead of

20    that, let's put it this way, the testimony stands.

21    Q.  Okay.  With a doctor/patient relationship, does that mean

22    every prescription is always valid?

23    A.  No.  In the judgment of the pharmacist based upon the

24    safety of a patient, the pharmacist as the gatekeeper can

25    overrule --

1      MR. RAVENELL:  Objection, Your Honor.

2      THE COURT:  I'll overrule the objection.  You may

3  testify.

4  A.  Can overrule that doctor's prescription and decide not to

5  dispense it or to make another decision that that prescription

6  may not be legitimate.

7  Q.  Is the term red flags a term that is recognized in standard

8  of pharmacy practice?

9  A.  Yes, it is.

10      MR. RAVENELL:  Objection, Your Honor.

11      THE COURT:  I'll overrule the objection.

12  Q.  And what is generally a red flag?  What is that?

13  A.  Red flag is used to refer to warning signs or information

14  pharmacists should consider.

15      MR. RAVENELL:  Objection.  May counsel approach?

16      THE COURT:  You may.

17      (At the bench)

18      MR. RAVENELL:  Your Honor, I'd ask that this witness

19  be required not to just to say that it's the practice and the

20  standard.

21      As the Court pointed out with Dr. Christo, there's

22  got to be a basis where this comes from, not just saying oh,

23  yes, it's tied to the standard of care.

24      I want to know where this witness can point to

25  anywhere in the law, anywhere, there's talk about red flags in

1    the standard of care anywhere.  So simply saying that, yeah,

2    it's a standard of care and I can go into it, as the Court

3    indicated, there's got to be some way the witness can tell us

4    where that comes from.

5          THE COURT:  Well, that's a matter for

6    cross-examination.  He's been qualified as an expert.  He said

7    that there is a certain terminology that is used in the

8    pharmacy profession, and so it's my job to decide whether it

9    comes in or not.  He's the expert.  He's said there's a certain

10   terminology in the pharmaceutical profession, so you can

11   cross-examine on the point, but I'm not going to exclude it

12   because I don't think that there is one.

13         MR. RAVENELL:  Your Honor, my point is asking is

14   improper where that comes from, the horse gets out of the barn,

15   Judge, so to speak, and when the witness goes on, yes, and

16   cross-examination may be used to deal with many issues, which

17   we certainly will, but I don't think we should be required to

18   wait for cross-examination if the government can't proffer

19   where this standard, where this witness deems is connected to

20   the standard of care.

21         And as the Court, you know, required with Dr.

22   Christo, if there's not some proffer of where this is connected

23   to a standard of care other than the witness just saying it, we

24   should not be forced to put the horse back in the barn later

25   on.

DIRECT EXAMINATION

1              THE COURT:  My ruling stands.
2              MR. RAVENELL:  Thank you, Your Honor.
3              THE COURT:  Welcome.
4              (Open court)
5    BY MS. SMITH:
6    Q.  So what generally are red flags?
7    A.  Red flags are warning signs or criteria or signs that a
8    pharmacist looks for when they're trying to decide whether or
9    not a prescription is real or fraudulent.
10   Q.  Sir, do you know in your experience where the term red
11   flags comes from?
12   A.  No, I don't.
13             MR. RAVENELL:  Your Honor, objection.  May counsel
14   approach?
15             MS. SMITH:  If I might ask another question?
16             THE COURT:  Why don't you ask another question?
17   Q.  Is it a term that's used in common parlance in the field
18   that you practice in?
19   A.  Yes, it is.
20   Q.  You just don't know the origin of it?
21   A.  Correct.
22   Q.  Thank you.
23             What does a pharmacist do if they have concerns?
24   A.  If a pharmacist has concerns about a prescription, they
25   believe it's fraudulent or forged, they have a responsibility,

91

1    a legal responsibility under the state law and also under the

2    federal law to verify the identity of that prescriber, that the

3    they're prescribing within their scope of authority, and that

4    prescriber's established a legitimate patient prescriber

5    relationship, and that prescription is for legitimate medical

6    purpose.

7            If they do believe that it is fraudulent, again under

8    state and federal law, they have legal authority to report that

9    doctor or prescriber to the pharmacy licensing board, the

10   medical licensing board, as well as to the DEA.

11   Q.  Okay.  Are fraudulent -- or define fraudulent or forged for

12   me.  I just want to make sure I understand what you're talking

13   about.

14   A.  A fraudulent prescription would be a prescription that was

15   obtained -- not obtained for a legitimate medical purpose,

16   perhaps a patient pretended to have a certain disease or

17   certain symptom in order to get a prescription, or there was

18   not a valid patient/doctor relationship.

19           A forged prescription occurs when a patient may steal

20   prescription blanks from a doctor's office or when they receive

21   a prescription, the doctor writes 10 tablets on it, maybe the

22   patient add a zero and changes it to 100, those would be

23   considered forged prescriptions.

24   Q.  So a fraudulent prescription includes prescriptions issued

25   outside of doctor/patient relationship?

1   A.   Yes.

2   Q.   And fraudulent includes where there is a doctor --

3          MR. RAVENELL:  Objection to Miss Smith testifying,

4   Your Honor.

5          THE COURT:  Ask the question, and then I'll rule.

6   Q.   Does fraudulent also include where there is a

7   doctor/patient relationship but the prescription is issued

8   outside the usual course of practice and not for legitimate

9   medical purpose?

10  A.   Yes.

11  Q.   Sir, in preparation for your testimony, were you provided

12  documents and other materials by the government to review?

13  A.   Yes.

14  Q.   Okay.  Based upon your education and training and more than

15  20 years in the field, can you tell us, sir, as an expert, do

16  the dispensing activities of New Care ,based upon what you

17  reviewed, meet the accepted standards of practice for a

18  pharmacy certified to engage in this practice?

19         MR. RAVENELL:  Objection, Your Honor.

20         THE COURT:  I'll overrule the objection.  You may

21  answer.

22  A.   No.

23         MR. RAVENELL:  Your Honor, may counsel approach?

24         THE COURT:  You may.

25         (At the bench)

1    MR. RAVENELL:  I thought the Court's ruling was that

2    the witness was not allowed to give testimony directly about

3    New Care as to whether New Care in these particular pharmacies

4    what they did is volitive of the law, but that it had to be

5    what a reasonable pharmacist would do under these facts.

6    If I remember correctly, the Court told us to change

7    what we had with Dr. Lander because the testimony should not be

8    specific as to the defendants in this case, and that's what

9    that testimony just was, about the defendants and what New

10   Care's behavior was what I thought was totally off limits, it

11   would be as to a reasonable pharmacist.

12   THE COURT:  Good.  What we're going to do is take a

13   15-minute recess.  I want to look back at my original

14   memorandum, and then I'll come back and rule.

15   MS. SMITH:  Thank you, Your Honor.

16   (Open court)

17   THE COURT:  Ladies and gentlemen, we're going to take

18   a 15-minute recess.

19   (Recess.)

20   THE COURT:  If I could ask you to step outside for

21   one minute, please?

22   Please be seated.

23   The proper phraseology is essentially as follows:

24   That New Care's practice, he can opine that New Care's practice

25   did not meet a certain standard of care and because a

1   reasonable pharmacist acting within the confines of

2   professional standards would have known that the prescription

3   was invalid, or would have known that there was no

4   doctor/patient relationship, or would have known that he was

5   under a duty of inquiry.

6          The expert can be asked also whether Mr. Sodipo and

7   Mr. Nwaehiri lived up to the professional standards, but it

8   must be because a reasonable pharmacist acting within the

9   confines of the professional standards would have known, would

10  have been under the duty of inquiry.

11         What I am trying to avoid is having the expert

12  testify that Mr. Sodipo and Mr. Nwaehiri knew, they knew that

13  the prescriptions were invalid.  And I'm also trying to have

14  counsel skirt around testimony that Mr. Sodipo and Mr. Nwaehiri

15  should have known because I just don't like the way that's

16  phrased.

17         If he says there's really no difference in ultimate

18  outcome between having him testify that Mr. Sodipo and Mr.

19  Nwaehiri should known that they were violating the standards,

20  because we're essentially getting to that by saying that they

21  did not live up to the standards, and a reasonable pharmacist

22  acting in light of the professional standards would have known.

23         But if it's broken up, we're really getting into more

24  objective facts.  One is did the pharmacy in general and did

25  Mr. Sodipo and Mr. Nwaehiri in specific live up to certain

1    standards.  That's the same comparing their actions with the

2    standards.  And if the answer is no they didn't, then it's

3    permissible to say here are the standards, and a reasonable

4    pharmacist acting in light of those standards would not have

5    filled the prescription, would have inquired.

6         If we look at the case law under McIver and the

7    Hughes case that under McIver, the Court said that the expert

8    could testify that the defendant's treatment was outside the

9    course of legitimate medical practice.

10        That's equivalent to saying meet the standards of

11   care.

12        Under the Lawson case, the expert could testify that

13   the prescription that the defendant filled contained flags of

14   illegitimacy that should have signaled to a pharmacist acting

15   under the standards that the prescriptions were invalid.

16        In Hughes, the Court said that the expert could

17   describe the requirements of Michigan state law, or the

18   requirements that Michigan state law imposes upon pharmacists.

19        My objection was having the law itself put up on the

20   Doar machine and have the expert go through the specific

21   language, but I ruled that he could testify to, and he did

22   testify as to the general requirements, which we've now gotten

23   through.

24        In Liel and Hammond, the Court permitted the expert

25   to say that the defendant has as a pharmacist should have seen

1    a pattern developing in the prescriptions written by a doctor

2    and that the defendant violated ethical standards by filling

3    the suspicious prescriptions.  See also Hammond, 781 F. 2d at

4    1538.

5         Well, the first part of that was from Liel, 75 F. 3d

6    at 223, and the second part is from Hammond, 781 F. 2d at 1538.

7    Expert testified that the high volume of drugs prescribed by

8    one doctor should have alerted the defendant, a pharmacist,

9    that the prescriptions were invalid.

10        So this gets somewhat tricky, but the expert can

11   testify as to what the standards are.  He can testify that the

12   pharmacist and the pharmacy did not meet those standards.

13        He can say why, but what I want him to avoid is

14   saying that Mr. Sodipo and Mr. Nwaehiri actually knew that the

15   prescriptions were invalid, and I would like him to steer away

16   from saying that specifically Mr. Sodipo and Mr. Nwaehiri

17   should have known that the prescriptions were invalid , because

18   I would rather not have him commenting directly on their state

19   of mind.

20        But certainly that they violated the standards, what

21   the standards are.  And when he says why they violated the

22   standards, he should phrase it in terms of well, these facts

23   would have alerted a reasonable pharmacist acting within this

24   matrix of standards to the conclusion that the prescriptions

25   were invalid.  It's a subtle point, but that's what I'm trying

1    to accomplish.

2         MS. SMITH:  Your Honor, avoiding saying actually Mr.

3    Sodipo or Mr. Nwaehiri, I inquired already of the witness that

4    whether New Care just generally, and I was going to also ask

5    about the pharmacists at New Care in terms of whether they

6    lived up to the professional standards and then why, but never

7    mentioning these defendants' names.  Is that over the line, or

8    is that acceptable?

9         THE COURT:  Well, the phraseology you asked, I

10   believe, did New Care's practices meet the standard of care

11   applicable to all pharmacists, and that's a good question,

12   because his answer presumably is going to be that a reasonable

13   pharmacist acting within the confines would have known. So that

14   is all right?

15        MR. RAVENELL:  Your Honor, I may?

16        THE COURT:  Mr. Ravenell?

17        MR. RAVENELL:  Yes, a couple points, Your Honor.  I'm

18   a little perplexed.  I'm looking at the government's disclosure

19   notice, and it's dated June 23rd, and the government in

20   paragraph 3 indicates that the witness will find that a

21   reasonable pharmacist should have made these observations,

22   referring back.

23        And the Court may recall when we submitted our

24   disclosure as regarding Dr. Lander, the Court indicated that he

25   thought that we went beyond what the Court would allow the

1    witnesses testify to, particularly when we indicated anything

2    about the particular defendants.  And Mr. Budlow said that I

3    was -- because they had tailored their disclosure to what the

4    Court's ruling was, that the witness would not be allowed to

5    testify particularly about these defendants about what these

6    defendants, whether they met the standards or not, but as a

7    reasonable pharmacist.

8         And then we went back and changed our disclosure as

9    the Court indicated was necessary to meet the Court's order and

10   to be consistent with the government's as well.

11        So my understanding was that there would be no

12   testimony by our expert or the government's expert,

13   particularly about what these defendants, whether these

14   defendants met the particular standard of care or not, or just

15   whether as these things that were there, these red flags, et

16   cetera, would have caused a reasonable pharmacist to see these

17   things.  And that's how I thought Court's ruling was, and

18   that's why we both changed our disclosures.

19        Additionally, Your Honor, I would certainly oppose

20   any testimony from this witness globally that the pharmacists,

21   you know, all the pharmacists at New Care did not meet certain

22   standards, because unless this witness knows what each and

23   every pharmacist did, that would be highly improper, and

24   unfair, because, for example, the Court is aware that Mr.

25   Hartwill, the government doesn't even suggest was a member of

1    the conspiracy, so to blanket, you know, all of the pharmacists

2    when in fact Mr. Hartwill did fill prescriptions on two

3    occasions, there's been clear evidence from Mr. Hartwill, the

4    government's witness, that Takia I think it's Anthony didn't

5    really fill any Internet prescriptions and there's very little

6    evidence of her ever doing it, and indicated I think it's the

7    name, or Taylor, worked on the long-term care side.

8          So to have that kind of testimony that, you know, the

9    pharmacists, you know, all of the pharmacists at New Care acted

10   inappropriately, that would be wrong, and it's also very

11   relevant to this CCE charge that is in this case.

12         The Court's got to deal with at the end of all the

13   evidence of whether these particular people, you know,

14   qualified for the CCE counts.

15         So I think that testimony would be improper.  If the

16   CCE count were to go to the jury with that evidence from this

17   expert that all the pharmacists acted in a certain way without

18   the basis for his conclusion about each particular pharmacist,

19   you know, then that's a problem, Judge.

20         THE COURT:  Good.  Thank you.

21         Simply to reiterate the ground rules, he can't say

22   that Mr. Sodipo and Mr. Nwaehiri knew.  Under the case law, it

23   would be permissible for the expert to testify that they should

24   have seen a pattern or should have known.  But for purposes of

25   this case, I'd like to break that up into two parts.

1          They violated the standard of care, number one.  And

2    number two, that they violated the standard of care because a

3    reasonable pharmacist acting within the confines, you might be

4    able to think of a shorthand way the expert can agree upon to

5    say that would have known/should have known.

6          I'm simply semantically trying to avoid having this

7    witness say that Mr. Sodipo and Mr. Nwaehiri should have known

8    even though that is the import.  I'm just looking for a way not

9    to say that bluntly.

10          My view is as an expert he can testify about the

11    actions of a pharmacy in general, how it behaved as an

12    organization, and the government's not required to establish

13    his familiarity with each individual pharmacist.  Certainly

14    you're entitled to an objection on that issue.

15          Now, this is not, even though we're talking about the

16    generally accepted standard of care, this is not a medical

17    malpractice case, and the defendant is not being held to a

18    medical malpractice standard.  It's simply that the standards

19    of care, the professional standards, are germane in determining

20    whether there's a doctor/patient relationship, whether there's

21    a legitimate medical purpose, whether the prescription is valid

22    or invalid.  So that the generally accepted standards come in

23    to the case on those issues.

24          MS. SMITH:  Your Honor, if I might, I think the

25    standard is the corresponding responsibility.  I mean, I think

1       the question is, if these pharmacists that were issuing

2       Internet prescriptions met their corresponding responsibility

3       within the standard of pharmaceutical practice, the standards

4       that this witness is familiar with.

5               THE COURT:  You mean corresponding means the duty on

6       the pharmacist?

7               MS. SMITH:  It's that specifically relates to the

8       pharmacist, whereas a lot of other language relates to the

9       doctor.  So that I think that is where meeting a particular

10      standard begins.

11              So I probably shortened it by using the terminology

12      corresponding responsibility.

13              THE COURT:  Just make sure that he buys into that and

14      that it's clear.  But he's here not as a doctor, but he's here

15      as a pharmacist, so he can testify as to what pharmacists, what

16      the standards require them to do and not to do.  And one of the

17      requirements I believe he's going to testify as to under

18      certain circumstances, the pharmacist has a duty to look

19      further.  Good.

20              Why don't we simply, there are two things we can do.

21      It's 1:00.  We can simply break for lunch, bring the jury back

22      in for 15 minutes.

23              Let me ask Miss Smith, what's your pleasure?

24              MS. SMITH:  Your Honor, break for lunch.  That way I

25      will be able to instruct the witness at no time to use the

1    names of the defendants.

2             THE COURT:  Thank you.  Good.

3             MR. RAVENELL:  Your Honor, we do take exception to

4    the Court's ruling.

5             THE COURT:  Yes.  That is clear and understood, and

6    you do have an exception.  Good.  Thank you.  If you would tell

7    the jury we're going to break until 2, thank you.

8             (Luncheon recess.)

9             THE COURT:  Please be seated unless you wish to stand

10   for the jury.  I apologize for the delay.

11            (Pause.)

12            (Jury present)

13            THE CLERK:  Jurors all present.

14            THE COURT:  Thank you, Mr. Thompson.  Please be

15   seated.  Ladies and gentlemen, I apologize for the long delay,

16   but we are ready to resume.  Miss Smith, whenever you're ready.

17            MS. SMITH:  Thank you.

18   BY MS. SMITH:

19   Q.  Sir, at the break, I was asking you if the government

20   provided documents for you to review in preparation for your

21   testimony.

22   A.  Yes.

23   Q.  And did you review them?

24   A.  Yes, I did.

25   Q.  Okay.  Do you have an opinion, sir, based upon your

1    training, your experience, and your review of those documents

2    whether the pharmacists at New Care who filled the Internet

3    prescriptions were acting within the standards of professional

4    practice?

5    A.   Yes.

6    Q.   Okay.  And what is that opinion, sir?

7    A.   That the pharmacists were not acting within those

8    standards.

9    Q.   And why do you say that, sir?

10   A.   Based upon the federal and state laws and the professional

11   standards that every pharmacist would follow, those standards,

12   those laws were not adhered to and were not followed.

13   Q.   Okay.  And let me ask you, do you have an opinion, sir,

14   based on your training and experience and your review of the

15   documents whether the pharmacists at New Care who filled the

16   Internet net prescriptions met their corresponding

17   responsibility?

18              MR. RAVENELL:  Objection, Your Honor.

19              THE COURT:  I'll overrule the objection.  But you'll

20   need to define what corresponding responsibility is, and that

21   may have been substance of Mr. Ravenell's objection.

22   Q.   Yes, sir.

23              Before answering that question, can you tell us what

24   is corresponding responsibility?  Let me begin by actually

25   asking you, is that a specific term used in pharmacy practice?

1    A.   Yes, it is.

2    Q.   Okay.  And what is a corresponding responsibility?

3    A.   It's a legal responsibility placed upon the pharmacist to

4    make sure that the prescriptions are legitimate and valid, and

5    responsibility and liability for the pharmacists do that, and

6    if they don't do that, penalties are in place, and the

7    pharmacist has certain responsibilities tied to that.

8    Q.   Okay.  Now, based upon your training and experience, sir,

9    do you have an opinion, also based upon review of the

10   documents, whether the pharmacists at New Care who filled the

11   Internet prescriptions met their corresponding responsibilities

12   as you have defined it?

13   A.   Yes.

14        MR. RAVENELL:  Objection, Your Honor.  May counsel

15   approach?

16        THE COURT:  You may.

17        (At the bench)

18        THE COURT:  Yes, sir.

19        MR. RAVENELL:  Your Honor, two objections up to this

20   point.  One is I don't think that this witness should be

21   allowed to testify globally about what the pharmacists at New

22   Care did or did not do, whether in fact they met their

23   corresponding responsibility or not, or whether in fact they

24   met or violated these standards of care.

25        Additionally, a corresponding responsibility is not,

1   as I see it, on what the Court will be instructing the jury on

2   what the law is.  And the jury will be confused by this witness

3   telling the jury about corresponding responsibility when, the

4   way I understand it, the Court would be instructing the jury,

5   and of course we haven't gotten the jury instructions yet, is

6   that the Court will be telling the jury that defendants have

7   certain responsibilities, and that is what the doctor has to --

8   I don't want to waste time going through all of those

9   standards, state on the record many times, the Court has stated

10  it just today several times, but that standard the Court is

11  going to instruct the jury on I don't believe talks about a

12  corresponding responsibility, and this jury may be confused by

13  that.  They're hearing this person is an expert, and if they

14  choose to accept him as an expert and credit his testimony, you

15  know, the trouble is that whether they can then or will put

16  aside his view about what this corresponding responsibility,

17  and that is the law.

18          This witness is stating that it is the law, and it is

19  not the law.  It is part of a COMAR or CFR regulation.

20          THE COURT:  Miss Smith, has he testified as to what

21  the corresponding duty is, and that it's part of the standard

22  of care?

23          MS. SMITH:  Yes, Your Honor.

24          THE COURT:  Then I will overrule the objection on

25  that part.

1    And, two, my view is that he can testify as to how a
2    pharmacy operates and whether the pharmacists who were filling
3    the prescriptions at New Care met their corresponding
4    responsibilities.  So I will overrule the objection.
5                MR. RAVENELL:  Thank you, Your Honor.
6                (Open court)
7    BY MS. SMITH:
8    Q.  Sir, do you have an opinion, based upon your training and
9    experience and your review of the documents, whether
10   pharmacists at New Care who filled the Internet prescriptions
11   met their corresponding responsibility as you have described
12   it?
13   A.  Yes.
14   Q.  They did meet -- oh, you do have an opinion.  Thank you.
15   And what is your opinion?
16   A.  They did not meet their responsibility.
17   Q.  And why do you say that?
18   A.  The corresponding responsibility places certain
19   requirements on the pharmacist to be the gatekeeper to make
20   sure those prescriptions are not fraudulent, and there's a
21   legitimate doctor/patient relationship existed and the
22   prescription is valid.
23                Based upon the information I reviewed, the
24   pharmacists took none of the steps necessary to verify and
25   serve as a gatekeeper.

1    Q.  And based upon the documents that you reviewed, what are

2    some of the reasons based upon what you saw in the documents

3    why you reached this conclusion?

4    A.  When I went through the documents, there were a number of

5    red flags that immediately came to my attention that would come

6    to the attention of any pharmacist.

7              MR. RAVENELL:  Objection.

8              MR. MCCANTS:  Yeah, objection.

9              THE COURT:  I'll overrule the objection.  But you

10   have to be talking about a pharmacist following the standards

11   as you have stated them to be.

12             MS. SMITH:  Your Honor, I believe he wasn't talking

13   about what he would notice as a pharmacist, but what he

14   observed the reviewing the documents that the government gave

15   him to review.

16             THE COURT:  Right.  But I think Mr. Catizone said any

17   pharmacist, and the lens is not any pharmacist but a reasonable

18   pharmacist following the standards.

19   BY MS. SMITH:

20   Q.  Okay.  And the answer you're about to give, if you would

21   confine it to what any reasonable pharmacist practicing within

22   the standards of pharmaceutical practice what would they have

23   observed?

24   A.  Well, a reasonable pharmacist would have seen the large

25   volume of prescriptions for controlled substances narcotics.  A

1    reasonable pharmacist based upon standards, warning flags, but

2    sought prescribing patterns of particular doctors involved with

3    the websites, or exclusively or 99.9 percent exclusively for

4    controlled substances, they would have noticed the prescribing

5    patterns for drugs were not typical, or similar or in adherence

6    with the standards that a tradition or legal pharmacy would

7    fill because the mix of medications were predominantly for

8    controlled substances and not for medications such as to treat

9    diabetes, high blood pressure, normal diseases and symptoms

10   that a pharmacist would treat under the standards and laws and

11   regulations.

12          MR. RAVENELL:  Your Honor, objection.  May counsel

13   approach on one particular point?

14          THE COURT:  You may.

15          (At the bench)

16          MR. RAVENELL:  I'm just trying to wait for the

17   witness to finish his answer before I objected, Your Honor, but

18   in his answer, he indicated Your Honor what a legal pharmacy,

19   and I think the Court has already indicated this witness is not

20   to be testifying about what is legal or illegal, that is now

21   for the jury to decide whether a pharmacy was legal or illegal.

22          And I think it's highly improper to have this witness

23   saying that a reasonable pharmacist would have known that a

24   legal pharmacy would not have done this.  That is not a

25   standard of care.  A legal pharmacy is not a standard of care.

1          THE COURT:  Miss Smith?

2          MS. SMITH:  Your Honor, I didn't necessarily expect

3     him to say the term legal.  I think if we just change it to a

4     pharmacy practicing within the standards of professional, not a

5     rogue pharmacy, just a pharmacy practicing within the

6     professional standards would have noticed those things.

7          MR. RAVENELL:  I'll ask the Court to strike, tell the

8     jury to disregard the statement about a legal pharmacy.  It's

9     not properly before this jury.  If they want to reask the

10    question another way after the Court strikes it, that's one

11    thing.

12         MS. SMITH:  The problem wasn't with the asking,

13    though, it was the witness's answer.

14         MR. RAVENELL:  I understand.  I'm moving to strike

15    the answer.  I mean --

16         THE COURT:  Well, strike the reference to a legal

17    pharmacy, and then you can follow up some other definition the

18    kind of pharmacy that he's talking about.

19         MS. SMITH:  Very well.

20         (Open court)

21         THE COURT:  Ladies and gentlemen, I'm going to strike

22    the phrase legal pharmacy as that phrase might be interpreted,

23    pharmacy operating legally, and we're going to redefine the

24    question.

25         Miss Smith?

1   Q.   Okay.   I think, well, the question was, sir, what would a

2   pharmacist within the ordinary practice have observed, and

3   confine your answer, sir, to pharmacies that are practicing

4   within the scope of professional standards.

5   A.   Pharmacies that are in compliance with state and federal

6   laws and are following practice standards acceptable for

7   reasonable pharmacists would have a variety of prescriptions

8   dispensed that would reflect other diseases, other symptoms,

9   and the majority of those prescriptions and medications

10  dispensed would not be for simply one or two pain medications

11  or controlled substances.

12  Q.   And what -- you had mentioned red flags.   What should a

13  pharmacist do who is acting within the professional standards

14  of practice, what should they do when confronted with red

15  flags?

16  A.   There are two actions that a reasonable pharmacist would

17  take based upon state law and the standard of practice.

18  There's, one, a duty to protect the patient.   So if the

19  pharmacist detects there may be a problem with that

20  prescription, it's the wrong medication or the dose is too

21  high, or the patient, if they're in child-bearing age shouldn't

22  take that medication because it could cause birth defects or

23  other problems with the fetus, the pharmacist has the

24  responsibility to refuse to dispense that prescription or

25  contact the prescriber and have that medication fixed or

1    adjusted so it doesn't harm the patient.

2           Second responsibility as a gatekeeper if they

3    suspected there's a fraudulent prescription based upon red

4    flags, and red flags are signs that say to the pharmacist this

5    isn't something that seems right, in regard to state laws,

6    federal laws and standards, the pharmacist has an obligation to

7    verify that, with the prescriber, to verify the relationship

8    with the patient, and then to look at these red flags in total

9    and make a determination about whether or not that prescription

10   should be filled or not.

11   Q.  And if a pharmacist acting within the scope of the

12   standards of professional practice is not satisfied that the

13   prescription has been issued within the usual course, what

14   should a pharmacist do?

15   A.  A pharmacist has a legal responsibility not to dispense

16   that prescription.

17   Q.  Now, sir, based upon your training and experience, based

18   upon your review of the documents in this case, do you have an

19   opinion whether the Internet prescriptions issued in this case

20   were valid?

21   A.  Yes, I have an opinion.

22   Q.  Okay.  And by valid, let's be clear, do you have an opinion

23   whether these prescriptions were issued outside the usual

24   course of medical practice?

25   A.  Yes.

1    Q.   Okay.  And what is your opinion, sir?

2    A.   My opinion --

3             MR. RAVENELL:  Objection, Your Honor.

4             THE COURT:  I'll overrule the objection.  You may

5    answer.

6    A.   My opinion, based upon state, federal laws, and

7    professional standards, is that the prescriptions were not

8    valid and did not meet the requirements for a valid patient

9    prescriber relationship and, therefore, should not have been

10   dispensed.

11   Q.   And, sir, do you have an opinion, based upon your training

12   and experience and your review of the documents provided,

13   whether or not these prescriptions reflect a valid

14   doctor/patient relationship?

15   A.   Yes.

16   Q.   And what is that opinion?

17   A.   The opinion is that the prescriptions, again based upon

18   state and federal law, requirements specified in those

19   documents, did not meet the requirements for valid patient

20   prescriber relationship.

21   Q.   Sir, hypothetically, if a pharmacist acting within the

22   professional standards of pharmacy practice saw red flags,

23   called the doctor, and asked the doctor and the doctor said,

24   oh, sure, I issued it, it's fine, don't worry, is that

25   sufficient information for a pharmacist to rely upon?

1    A.  In some --

2             MR. RAVENELL:  Objection.

3             THE COURT:  I'll overrule the objection provided,

4    sir, that you're testifying the professional standards

5    applicable to all pharmacists.

6    A.  The professional standards and laws and regulations

7    require, again, that the pharmacist have knowledge and verified

8    whether or not the patient prescriber relationship exists in

9    order to establish whether it's a valid prescription.

10            If a reasonable pharmacist utilizing those standards

11   called the doctor with whom they're familiar with that doctor's

12   practice, familiar with that doctor's patients, and the doctor

13   said, yes, that's okay, that would be an acceptable

14   authorization by that doctor.

15            However, if that pharmacist was dealing with a

16   physician of which they knew nothing about their practice,

17   whether they were licensed, and if they looked at the

18   prescribing pattern and saw that that doctor was located in one

19   state and the patients were located in multiple states outside

20   of the practice area and the pharmacy was located in still

21   another state from those patients and doctors, the doctor said

22   on the phone, yes, go ahead do it, the pharmacist would not

23   meet the responsibility unless they went further and verified

24   all the requirements of a valid relationship that are again

25   spelled out in state laws and federal laws.

DIRECT EXAMINATION

1    Q.  Sir, I'm going to show you what is in evidence as

2    government's exhibit 89-3.  I don't think I can put -- well, I

3    can put the whole thing on the screen, but then you probably

4    can't read it.

5    A.  I can read it.

6    Q.  Can you read it?  Otherwise, I'll bring it to you.

7    A.  No, that's fine.

8    Q.  Did you review this document in preparation for testimony?

9    A.  Yes, I did.

10   Q.  Okay.  And what, if any, observations did you make about

11   this document?

12   A.  In reviewing the document, based upon standards and state

13   and federal laws for practice that a reasonable pharmacist

14   would know and would follow, the prescribing patterns here, the

15   number of prescriptions and the number of dosage units for

16   hydrocodone is far beyond any standard that a pharmacist would

17   follow or know about.

18            MR. RAVENELL:  Objection, move to strike.

19            THE COURT:  Well, what I'll do is I will strike the

20   reference to any pharmacist.  We need to go back to the

21   standard, Miss Smith, if you would get us there, please?

22            THE WITNESS:  I apologize, Your Honor.

23            THE COURT:  That's quite all right.

24   Q.  Was your answer -- does your answer likewise or more

25   directly apply to the standard that a reasonable pharmacist

1    acting within the standards of professional practice would

2    observe?

3    A.  Yes.

4    Q.  At the end of this chart there's some totals.  And can you

5    read what those totals say?

6    A.  Yes, I can.

7    Q.  And what do they say?

8    A.  The total of prescriptions by state are 108,000

9    approximately, and the total dosage units are a number of pills

10   or capsules that were dispensed is approximately 10 million.

11   Q.  And what is your observation of the number of states that

12   were served prescriptions during this period of time by New

13   Care?

14   A.  It appears to be all of the states including the District

15   of Columbia.

16   Q.  And did the observations that you made in this exhibit,

17   sir, have any impact on your opinion that the pharmacists at

18   New Care who filled the Internet prescriptions were not acting

19   within the standards of professional practice?

20   A.  Yes.

21   Q.  Why?

22   A.  Again, upon review of the standards, the standards call for

23   certain verifications to occur.  They call for certain

24   knowledge about what the medications are that are being

25   dispensed, the totals, and whether or not those medications are

1    being prescribed legitimately.

2           And I could see none of those requirements being met

3    by the pharmacists at New Care.

4    Q.  Let me show you what's been identified as government's

5    exhibit 89-4 A.  It is entitled Dr. Stanley Mark Dratler, daily

6    hydrocodone prescription highest to lowest per day, did you

7    review this document?

8    A.  Yes, I did.

9    Q.  And it is approximately or exactly 14 pages.  And what do

10   the totals represent, as you understand this document?

11   A.  The number of prescriptions prescribed by that doctor and

12   total number of pills or tablets or capsules.

13   Q.  And let me ask you, sir, when you reviewed this, what, if

14   any, observations did you make?

15   A.  Based upon standards which require that a pharmacist, a

16   reasonable pharmacist be familiar with the prescribing patterns

17   of the doctors whose prescriptions they are dispensing and

18   whether or not that doctor's operating within the scope of

19   practice, it's clear to see that this individual doctor

20   prescribed outside --

21          MR. RAVENELL:  Objection, Your Honor.

22          THE COURT:  I will overrule the objection.  But it

23   would be clear to a reasonable pharmacist that, you may

24   complete that sentence, sir.

25   A.  It would be clear to a reasonable pharmacist that the

1    doctor's prescribing totals and pattern here was outside the

2    scope of practice and was indicative of fraudulent or --

3            MR. RAVENELL:  Objection.

4    Q.  Let's use the word invalid.

5    A.  Invalid prescriptions.

6    Q.  Sir, in preparation for your testimony, did you also review

7    a similar chart, government's exhibit 89-4 B with reference to

8    Dr. Juan Antonio Ibanez?

9    A.  Yes.

10   Q.  And did you make observations upon reviewing that document?

11   A.  Yes, I did.

12   Q.  And how did those observations compare to the ones you've

13   just described for the numbers with Dr. Dratler?

14   A.  The observations were again similar.  The number of

15   prescriptions prescribed by this doctor, and the product being

16   described, or prescribed by this doctor all indicate or should

17   indicate to a reasonable pharmacist that they are outside the

18   scope of practice, outside practice standards, and are invalid

19   prescriptions.

20   Q.  And, sir, did you review all of the doctors, charts A

21   through K, did you have all that information?

22   A.  Yes, I did.

23   Q.  And were your observations similar or different with

24   reference to all of these doctors?

25   A.  My observations were similar.

1    Q.   Okay.  Directing your attention, sir, to government's

2    exhibit 89-5, did you review this document?

3    A.   Yes, I did.

4    Q.   And what, if any, observations did you make about the

5    information in that document?

6    A.   Once again, looking at the requirements and the standards

7    for practice, it was clear for a reasonable pharmacist that the

8    physicians were prescribing to patients in almost all of the 50

9    states and that the total prescriptions that these individuals

10   were prescribing would exceed the normal standards of practice

11   that a reasonable pharmacist should be aware.

12   Q.   Sir, what would a reasonable pharmacist, upon observing a

13   pattern of 47 states and D.C, 48 states and D.C, 46 states and

14   D.C, what would a pharmacist, or what does the professional

15   practice standards require that a reasonable pharmacist do?

16   A.   The standards and the laws would require that the

17   pharmacist examine each individual prescriber's pattern and

18   basis for writing these prescriptions.  So the questions they

19   would easily come to mind for a reasonable pharmacist would be

20   what type of practice does this doctor have?  How is this

21   doctor seeing patients in 47 states?  And why is this doctor

22   only prescribing hydrocodone for those patients?

23              Those are reasonable questions that a reasonable

24   pharmacist would ask based upon the standards and the laws in

25   the state and federal law and statutes.

1    Q.  And would a reasonable pharmacist acting within the

2    standards of professional pharmacy practice have known that

3    these prescriptions were outside the scope of medical practice?

4    A.  A reasonable pharmacist looking at the factors that I've

5    just described would know that.

6    Q.  Directing your attention, sir, to government's exhibit

7    89-6.  Did you have an opportunity to review the information

8    contained in this chart in preparation for testimony?  And I

9    can't quite get the whole chart on here, I'll just sort of show

10   it to you.

11   A.  Yes, I did.

12   Q.  And what, if any, observations did you make about the

13   information contained in government's 89-6?

14   A.  Again, a reasonable pharmacist has the requirement and

15   responsibility to monitor the prescription patterns of the

16   doctors whose prescriptions they are dispensing to their

17   patients.

18   Q.  Let me stop you right there.  Tell us what is the

19   information that you learned looking at this chart, just the

20   factual information.

21   A.  What I've learned is that a small percentage of doctors

22   were responsible for the overwhelming majority of

23   prescriptions, and those prescriptions were almost exclusively

24   for hydrocodone.

25   Q.  Okay.  Now, based upon that observation, did it have an

1    impact on your opinion that the pharmacists at New Care who

2    filled the Internet prescriptions were acting outside of the

3    standard of professional practice?

4    A.   Yes.

5    Q.   Okay.  And how did it impact that?

6    A.   My decision was that these pharmacists were acting outside

7    of their scope of practice.

8              (Pause.)

9    Q.   Directing your attention, sir, to 89-7, did you have an

10   opportunity to review this government's exhibit that reflects

11   for each of the 11 doctors, the breakdown of hydrocodone versus

12   other drugs prescribed by them during that period of time?

13   A.   Yes.

14   Q.   And did you make any observations?

15   A.   Yes.  The observations that I made is based upon, again,

16   standards of practice, that the totals are the complete

17   opposite of what you would see in a pharmacy operating legally,

18   won't generally see.

19             MR. RAVENELL:  Objection, Your Honor.

20             MR. MCCANTS:   Objection.

21   Q.   Operating within professional standards.

22             MR. RAVENELL:  Your Honor, may counsel approach?

23             THE COURT:  You do remember, sir, that it's within

24   the scope of the professional standards, so if you would

25   confine your observations to that standard?

1    A.   A pharmacy operating in compliance with professional

2    standards would show a different mix of prescription drugs.

3    The overwhelming majority of prescriptions would be for drugs

4    other than hydrocodone, and the totals would be reversed.

5          So perhaps -- so the totals would be 90 percent other

6    drugs, 10 percent hydrocodone or pain medication.

7    Q.   Sir, skipping ahead to government's exhibit 89-9, did you

8    have occasion to review this document in preparation for your

9    testimony?

10    A.   Yes, I did.

11    Q.   And 89-9 indicates New Care's prescriptions by day for

12    March of 2006.  What, if any, observations did you make of that

13    chart?

14    A.   My observation was that the number of prescriptions and the

15    number of tablets that were dispensed by New Care exceeded

16    standards of care.

17    Q.   And did this impact your opinion that the pharmacists at

18    New Care who filled the Internet prescriptions were acting not

19    within the standard of professional practice?

20    A.   Yes.

21    Q.   Sir, did you have occasion to review government's exhibit

22    89-10, which are the daily totals of New Care beginning in

23    January of '05 and finishing in October of '06?

24    A.   Yes.

25    Q.   And what, if any, observations did you make about the daily

1    totals?

2    A.   As I reviewed the daily totals in comparison of standards

3    of care for a pharmacy and a pharmacist, I noticed that the

4    totals began as you would see that pharmacy or pharmacist

5    operating the number of prescriptions for hydrocodone meeting

6    the standards that other pharmacists and pharmacies adhere to,

7    and that increasing dramatically to totals that far exceeded

8    the standards that pharmacies and pharmacists practicing

9    reasonably would adhere to.

10         MR. RAVENELL:  Objection, Your Honor.  May counsel

11   approach?

12         THE COURT:  You may.

13         MR. RAVENELL:  Thank you.

14         (At the bench)

15         MR. RAVENELL:  This is the second time that this

16   witness has given testimony about something far exceeding.

17   There's no such standard.  Either something exceeds the

18   standard or it does.  But for a witness to be giving this

19   testimony that something far exceeds a standard of care, there

20   is no written standard that says here is the number, so how can

21   you calculate whether something far exceeds the standard or

22   not?

23         If this was something that was written where we had a

24   written standard and says you can only do 10 a day, I think

25   that's appropriate.  But having a witness say this far exceeds

1    the standards, when the standard is not quantified, it's just

2    improper.

3              THE COURT:  Well, I'm not going to micromanage his

4    testimony.  If that's his testimony, that's his testimony.  I

5    think what he's saying is, you know, something can exceed, far

6    exceed is saying that this sticks out essentially like a sore

7    thumb.  So he's using that language.  I'm not going to

8    micromanage it.

9              MR. RAVENELL:  And it's not an issue of

10   micromanaging.  We're objecting where we think something is

11   inappropriate, I don't think it's whether micromanaging, I

12   understand the Court's going to allow it.  I don't think the

13   standard is micromanaging or not, it's whether it's appropriate

14   or not.

15             THE COURT:  I'll overrule the objection.

16             MR. RAVENELL:  Thank you, Your Honor.

17             (Open court)

18   BY MS. SMITH:

19   Q.  Sir, at the end of your answer, you said something about

20   dramatically increases, the numbers are dramatically increased.

21   I'm showing you randomly page 9.  Are there examples of numbers

22   that dramatically increase to that you can observe on that

23   page?

24             If you touch the screen it will put a mark.

25   A.  Sure.  If you look at the total from beginning on December

1    23rd of '05 at 157 prescriptions and then move to January

2    fifth, '06, 537, and you see how those totals remain fairly

3    constant at a couple hundred throughout the rest of the

4    document.

5    Q.  And sir, would -- all right.  Strike that.

6         And did this information impact your decision, I'm

7    sorry, your opinion that these prescriptions were invalid?

8    A.  Yes.

9         (Pause.)

10   Q.  Sir, directing your attention to government's exhibit

11   89-12, did you have occasion to review Dr. Ibanez's

12   prescriptions for December 19, 2005 that were filled by New

13   Care?

14   A.  Yes, I did.

15   Q.  Okay.  And based upon your review of this document, what

16   were the total number of prescriptions written by Dr. Ibanez as

17   filled by New Care on that day, if you can tell?

18   A.  I can't tell from the document.

19   Q.  Okay.  Let me give you the document.  The prescriptions are

20   numbered down at the bottom.  If you would look at this

21   document and tell me how many prescriptions did Dr. Ibanez

22   issue that were filled by New Care on that date December 19th,

23   2005?

24   A.  December 19th?  514 prescriptions.

25   Q.  And of that 514 prescriptions, how many of them were for

1   hydrocodone?

2   A.   Approximately 99 percent of those.

3   Q.   Does that information contained in that document have any

4   impact on your opinion that these prescriptions were invalid?

5   A.   Yes.

6   Q.   And, sir, tell me why?

7   A.   The standards of practice would indicate to a reasonable

8   pharmacist that this prescribing pattern exceeded what the

9   standards for care were and what the requirements for

10  reasonable pharmacists are.

11  Q.   Would a reasonable pharmacist have made that observation?

12  A.   Yes.

13  Q.   Okay.  And showing you government's exhibit 89-13, again

14  with reference to Dr. Ibanez's prescriptions for December 19,

15  do you recall reviewing these?

16  A.   Yes, I do.

17  Q.   Okay.  And did it have an impact on your opinion that these

18  prescriptions were invalid?

19  A.   Yes.

20  Q.   Sir, could particularly 43 different states receiving

21  prescriptions from New Care issued by Dr. Ibanez on December

22  19th, why did that impact your opinion?

23  A.   Within the standards of care is the necessity that the

24  pharmacist validate the doctor's prescribing patterns, the

25  scope of practice, and the legitimacy of those prescriptions.

1    For a doctor to prescribe or see patients or treat patients in

2    those states without that being established and verified with

3    the pharmacy or pharmacist would be a violation of those

4    standards and legal requirements.

5    Q.  Should a reasonable pharmacist have made that observation?

6    A.  Yes.

7    Q.  Sir, I want to ask you, did you see government's exhibit

8    89-15?

9    A.  Yes.

10   Q.  And this chart lists the other drugs that were not

11   hydrocodone; is that correct?

12   A.  Yes.

13   Q.  And can you tell me, sir, in looking at these, what, for

14   example, is acetaminophen/COD?

15   A.  That's a product for Tylenol with codeine.  It's a pain

16   medication.

17   Q.  Okay.  What's the one right above it Accuprill?

18   A.  Accuprill is to treat high blood pressure.

19   Q.  Now, I'm going down the page, what is alprazolam?

20   A.  Alprazolam is something that works in the nervous system to

21   help treat anxiety, to relax the system.  Actually, the generic

22   name is Xanax.

23   Q.  What Ambien?

24   A.  Again, another medication to help relax people.  It's used

25   many times for as a sleep aid for people having trouble

1    sleeping.

2    Q.   What is carisoprodol?

3    A.   It's a muscle relaxant also known as soma.

4    Q.   Sir, what is Tylenol with codeine?

5    A.   Pain medication.

6    Q.   Okay.  What is Vicodin?

7    A.   Vicodin is a product to help suppress coughs, and it's also

8    a controlled substance.

9    Q.   Okay.  What is Lipitor?

10   A.   Lipitor's a medication to help reduce cholesterol.

11   Q.   What is nifedipine?

12   A.   Nifedipine is used in patients that have heart conditions

13   or high blood pressure.

14   Q.   What, sir, is propoxy?

15   A.   Once again, it's a controlled substance, it's a pain

16   medication.

17   Q.   Tramadol?

18   A.   Again, it's another medication used to the central nervous

19   system to help people relax.

20   Q.   Okay.  And Zaroxolyn, how do you pronounce that?

21   A.   Corallin, that's a newer medication.  I'm not sure exactly.

22   I think it may be for diabetes, but I'm not certain of that.

23   Q.   Just above that you've got Xanax, you already testified

24   there's another drug here, the brand name is Xanax?

25   A.   Yes.

DIRECT EXAMINATION

1   Q.   So this would be the same as that other one?

2   A.   Yes.

3   Q.   Is that alprazolam?

4   A.   Yes, it was.

5   Q.   Okay.  Now, did you review this document?

6   A.   Yes, I did.

7   Q.   And what observations did you make in reviewing this

8   document?

9   A.   Again, based upon practice standards, the number of

10   prescriptions written for controlled substances, hydrocodone

11   and others, exceed practice standards that a pharmacist and

12   pharmacy in compliance with standards would dispense.

13        The mix of non controlled substances, the medications

14   for the high blood pressure, for other diseases and symptoms

15   and the volumes that were written do not meet the standards of

16   care that pharmacists practicing and meeting those standards

17   would meet.

18   Q.   And would a reasonable pharmacist make the observation that

19   these prescriptions were issued outside the usual course of

20   medical practice?

21   A.   Yes.

22   Q.   Okay.  Now, of the other drugs, do you have any

23   observations about the other drugs that are on here, putting

24   the hydrocodone aside, what are the majority of these drugs

25   that make up the other?

1   A.   The majority, again, are controlled substances either for

2   anxiety or drugs that may be used in combination as other pain

3   medications to increase the effect or create a euphoria that's

4   been documented in the literature.

5   Q.   And finally, sir, exhibit 89-16, did you review this

6   document?

7   A.   Yes, I did.

8   Q.   And this document reflects the totals of hydrocodone and

9   other drugs for New Care during the relevant period?

10  A.   Yes.

11  Q.   What observations did you make, and what conclusions did

12  you draw?

13  A.   The observations are that the number of hydrocodone

14  products in comparison to the non hydrocodone products is

15  significant and outside the standards of care.

16  Q.   And outside the standards of care of a doctor?

17  A.   Outside the standards of care of a doctor and a pharmacist.

18  Q.   Okay.   Sir, in preparation for your testimony, were you

19  asked to review government's exhibits, they are 88 A, B, and D,

20  numbers from the ARCOS system?

21  A.   Yes, I was.

22  Q.   And are you familiar, sir, in your experience and in your

23  role as Executive Director of the National Association of

24  Boards of Pharmacy what ARCOS is?

25  A.   Yes, I am.

1    Q.  Okay.  And tell me, sir, did you look, this is 88 A, this

2    is New Care's purchases of hydrocodone from January 1, '02 to

3    October 10, '06, what, if any, observations did you make and

4    what conclusion did you reach?

5    A.  The observations are that --

6              MR. RAVENELL:  Your Honor, may counsel approach

7    briefly?

8              THE COURT:  You may.

9              (At the bench)

10             MR. RAVENELL:  Your Honor, this --

11             THE COURT:  Yes, sir.

12             MR. RAVENELL:  I'm just looking at something, not to

13   waste the Court's time, to make sure I'm looking at the

14   government's disclosure, and we were told about the charts that

15   this witness was going to rely upon from Mr. Short.  I'm

16   looking at the disclosure, and I see no reference to these

17   charts that were prepared.

18             MS. SMITH:  Do you have the May 22nd letter?

19             MR. RAVENELL:  I'm looking at June 23rd, which I

20   thought encompassed everything.  Do you have one where that had

21   something different?  I'm looking at your June 23rd, does may

22   22nd have something additional?  I thought this was your most

23   recent.  I can get the May.

24             MS. SMITH:  If it's not in the 23, I agree with you,

25   it should have been in there.

1          Here it is.  Well, it is not that he got that chart,

2     it's that it's his conclusions in all --

3          MR. BUDLOW:  Maybe ask the clerk of the court.

4          MR. RAVENELL:  I didn't want to that draw attention.

5          MR. BUDLOW:  It's in evidence.

6          MS. SMITH:  It's in evidence.

7          MR. RAVENELL:  Whether it's in evidence doesn't mean

8     that you can --

9          THE COURT:  So what's the --

10          MR. RAVENELL:  I apologize for that.

11          THE COURT:  Mr. Ravenell?

12          MR. RAVENELL:  It was not something that was

13     disclosed that this would be used with this witness, the

14     particular charts.  The charts that were used a moment ago were

15     from Paul Short.  That was disclosed and we didn't object to

16     those.

17          But these are different charts that the government is

18     now relying upon with this expert that were not disclosed that

19     he would be relying upon.  We're checking the disclosure to

20     confirm that I'm accurate.

21          MS. SMITH:  Your Honor, I do have the volume of

22     hydrocodone to New Care substantially exceeds the amount told

23     to the rest of the pharmacies in Maryland and the rest

24     pharmacies in the United States, which are the next two charts.

25     It's B and D.

1          THE COURT:  Well, let me ask this --

2          MR. RAVENELL:  There's a difference in what -- I

3    apologize, the Court was speaking?

4          THE COURT:  What's he going to say about this chart,

5    about the ARCOS chart?  This is just raw numbers of hydrocodone

6    pills that were sold to New Care during this period of time,

7    correct?

8          MS. SMITH:  Yes.

9          THE COURT:  And what's he going to say about that?

10         MS. SMITH:  That he observed the spike.  It would

11   have been something that a reasonable pharmacist that would

12   have, that number of prescriptions for hydrocodone, again,

13   would have been a red flag to the pharmacist within the

14   practice professional standards.

15         MR. RAVENELL:  Again, Your Honor, the government

16   disclosed us to in their June 23rd letter and then followed up

17   with a June 25 letter setting forth information that was

18   provided to the witness that formed the basis of his opinion.

19   This is not a chart that we were told was provided to the

20   witness that forms the basis of his opinion.

21         So this is outside of that disclosure and should not

22   be used.  The government certainly has already gotten evidence

23   in about volumes from the Paul Short charts that were used

24   which were disclosed.

25         THE COURT:  So this chart was not part of the raw

1    material that was given, disclosed as given to him?

2                MS. SMITH:  Well, it was.  I guess I did not mention

3    it.  I did mention the conclusion he was drawing from it.

4                THE COURT:  Let me ask you, where do we go from here?

5                MS. SMITH:  A couple more pieces of evidence that he

6    relied on in reaching his collusion.  I can just skip to the

7    next one, Your Honor.

8                THE COURT:  Good.  If it's something you can cure,

9    you can to bring it back on rebuttal.

10               MS. SMITH:  Very well, Your Honor.

11               (Open court)

12               MS. SMITH:  Court's indulgence.

13               THE COURT:  Take your time.

14               (Pause.)

15               MS. SMITH:  Mr. Thompson, can I have government's

16   exhibit 13, there's A B C D whatever.

17   BY MS. SMITH:

18   Q.  Sir, did you have an opportunity to review information

19   provided to you by the government relevant to undercover

20   purchases made by government agents?

21   A.  Yes, I did.

22   Q.  Okay.  And did that include computer screen printouts?

23   A.  Yes.

24   Q.  Did it include the medical records that the undercover

25   agents sent?

1    A.   Yes.

2    Q.   Did it include transcripts of the customer service calls?

3    A.   Yes.

4    Q.   Did it include transcripts of the consultation call?

5    A.   Yes.

6    Q.   And did the documents also include a disclaimer page?

7    A.   Yes, it did.

8    Q.   Sir, I'm going to show you what has been marked as

9    government's exhibit 13 A, which begins with some of the

10   computer screens.

11            Did you make observations about those screens that

12   were used by the undercover agents to make these purchases?

13   A.   Yes, I did.

14   Q.   Okay.  And can you tell me, sir, what observation did you

15   make?

16            MR. RAVENELL:  Objection, Your Honor.  May counsel be

17   heard?

18            THE COURT:  Yes.  If you would come forward, please?

19            (At the bench)

20            THE COURT:  So these are the computer screens --

21            MR. RAVENELL:  Yes.

22            THE COURT:  -- of the websites?

23            MR. RAVENELL:  Yes.  Your Honor, this witness is not

24   a doctor.  He's certainly not a medical doctor.  And to have

25   this witness review these items, you know, my understanding

1    that this witness is giving testimony about things that

2    particularly would be cause the defendants to know, you know,

3    the reasonable pharmacist to know that these were not

4    legitimate prescriptions or they were invalid prescriptions.

5          There's no evidence that the defendants knew of what

6    information was provided, or when the screens went up, or when

7    someone called in.

8          So this witness can not say not, for example, as he

9    said so far, would be a breach of the standard of care that a

10   reasonable pharmacist should be alerted by because there's no

11   evidence that the defendants or any promises that New Care was

12   privy to what went up on the screen.

13         So this witness's testimony about a pharmacist is,

14   quite frankly, not relevant here, because he's not a doctor.

15   And the only thing he could be testifying to is whether this

16   would somehow indicate to a doctor, to the doctors, that this

17   was not a valid prescription.  And he's not in a position to

18   give testimony to what a doctor should know or not know.  He's

19   not a medical doctor.

20         They had Dr. Christo, if they wanted to get him to

21   say what a doctor should know.

22         THE COURT:  Good.  Thank you.

23         Miss Smith?

24         MS. SMITH:  Yes, Your Honor.  If the pharmacist went

25   to this computer screen, they could make the observations that

1    he will testify to.  There is some evidence in the case at the

2    very least that the disclaimer page was recovered at New Care,

3    someone printed out the disclaimer page.

4         And I believe he can testify the red flags that a

5    pharmacist would see.  This pharmacy is making millions and

6    millions of dollars through this process.  They knew the names

7    of the websites.  If they cared enough to look, if they had any

8    concerns at all, they would have looked at these websites, and

9    they would have seen what they've seen.

10        If not, it goes to willful blindness that they never

11   looked.

12        THE COURT:  Hold on one second.  Is it your view or

13   not your view, it's a matter of fair inference that, well, do

14   you believe that you could be able to argue in closing argument

15   that the defendants must have looked at the websites?

16        MS. SMITH:  And if they didn't, shame on them, it

17   would be willful blindness because had they looked, this is

18   what they would have seen.  22 months in a relationship to have

19   never looked at the website.

20        THE COURT:  So what is he going to testify about the

21   screens?

22        MS. SMITH:  The screens and the things that he

23   observed that concerned him --

24        THE COURT:  Well --

25        MS. SMITH:  -- generally.

1    THE COURT:  As to?

2    MS. SMITH:  That a reasonable pharmacist would have

3  observed that there's -- that they do not form the basis of a

4  doctor/patient relationship.  That, plus the consultation calls

5  with people identifying themselves as RN's or PA's.

6    MR. RAVENELL:  I'm sorry.  Are you finished?

7    THE COURT:  So you propose that he testify that if a

8  reasonable pharmacist were shown these pages, that a reasonable

9  pharmacist would have doubted that there was a doctor/patient

10  relationship because of certain factors?

11    MS. SMITH:  Yes.

12    THE COURT:  And how is he going to tie those factors

13  into his training and expertise and what pharmacists are

14  supposed to look for?

15    MS. SMITH:  I'll be glad to ask him that question,

16  Your Honor.  I think it goes back to what he's been testifying

17  to all along, that there's never -- there's no contact with any

18  of the doctors, and I believe that his position is, his opinion

19  is, that there has to be communication between the patient and

20  the doctor, and there isn't any.  That alone, besides the

21  brevity of the questionnaire, the superficial nature of it, the

22  brevity and the superficial nature of the consultation, the

23  fact that the consultations were foregone conclusions.  The

24  choice of the drug was already made when the customer typed H

25  for hydrocodone.

1     THE COURT:  Well, let's see.  Let's send the jury out

2     and let's see how he answers this, because he simply can't

3     surmise.  He has to tie it into something that he learned in

4     pharmacy school or as a recognized pharmaceutical practice.

5          MS. SMITH:  Sure.  Okay.

6          (Open court)

7          THE COURT:  Ladies and gentlemen, I'm going to have

8     to ask you to step outside while I take something up with

9     counsel, and we'll come and get you as soon as we're finished.

10    And I'm going to stay here with the attorneys.

11         (Jury recessed)

12         THE COURT:  You may stay, sir.  Thank you.

13         The record will show that the jury has retired to the

14    jury deliberation room.  Please be seated.

15         Miss Smith?

16    BY MS. SMITH:

17    Q.  Sir, can you tell us what observation you made about the

18    on-screen information that the customer filled in?

19    A.  The information that the customers required to fill in on

20    the prescription is different than any of the information

21    required for pharmacies that are practicing within the

22    standards of law and practices.

23    Q.  Tell me why you say that?  What is it -- what observations

24    do you make about the information that the patient has to

25    provide in order to obtain a prescription, if any?

1    A.   What I noticed about this particular screen, this website,

2    one, there's no means for a patient to actually submit the

3    prescription information via their doctor.  It requires the

4    patient to sign up for a consultation with a doctor, no

5    discussion of a valid patient prescriber relationship.  And

6    that requires information about their drivers's license, their

7    name, the date of birth, and doesn't require other information

8    to verify the authenticity of that patient as pharmacies

9    operating within the practiced standards would require.

10   Q.   And are those observations things that you observed based

11   upon your knowledge of the professional practice of pharmacy?

12   A.   Those observations are based upon two tenets that I've used

13   to render that observation.  One, my experience with pharmacy

14   regulation and practice and, two, my involvement with Internet

15   pharmacies in which I have personally reviewed over a thousand

16   websites and been able to categorize whether or not those

17   websites appear to be in compliance with the law or appear not

18   to be in compliance with the law, and then publish that list of

19   pharmacies on our websites is not recommended for consumers to

20   use.

21   Q.   And that recommendation is based upon your expert opinion?

22   A.   Based upon my expert opinion, yes.

23   Q.   And that recommendation, based upon your expert opinion, is

24   based upon what you observed?

25            MR. RAVENELL:  Objection to Miss Smith leading the

1    witness, Your Honor.

2              THE COURT:  Well, the jury's not here, so I'll permit

3    it.

4              MR. RAVENELL:  Your Honor, I still -- I understand

5    the Court's allowing some leading, but suggesting an answer is

6    still a problem, Judge, when we're trying to determine

7    something.

8              THE COURT:  My ruling was I will permit it.

9              MR. RAVENELL:  Thank you.

10             THE COURT:  Go ahead, Miss Smith.

11   Q.  Is that based upon strictly your observations of what's on

12   the screen?

13   A.  It's based simply upon the public information provided by

14   website.

15   Q.  And did you also, sir, in reference to this set of

16   documents, review the transcripts of the consultation?

17   A.  Yes, I did.

18   Q.  And what, if any, observations did you make about the

19   consultation?

20   A.  What I observed is that the consultations did not meet the

21   requirements under the practice standards and the law for a

22   valid patient prescriber relationship.

23   Q.  And why do you say that?

24   A.  The requirements that would establish, one, that an

25   examination took place.  Two, that a history, legitimate

1    history was taken.  And, three, that the physician actually

2    interacted with the patient or reviewed those documents.  I

3    could find no evidence of that in the conversations or in the

4    websites.

5    Q.  And would a reasonable pharmacist acting within the course

6    of professional practice, if they had looked at the website,

7    the questionnaire, would they have -- should they have made the

8    observations that you made?

9    A.  Yes.

10   Q.  Where would they have learned that?

11   A.  It would have been part of their training from pharmacy

12   school, part of the requirements that they are required to

13   know, and part of the practice of pharmacy that they're

14   regulated to monitor continuously

15        THE COURT:  I'm sorry.  I missed the last part.

16   A.  It's part of the practice of pharmacy that pharmacists are

17   monitored and regulated on continuously.

18   Q.  And, sir, a moment ago you said that there be a physical

19   examination.

20        Is it not okay that there was a physical examination

21   by some doctor somewhere in the universe within the year before

22   this request for a prescription was made?

23   A.  Based upon my observations, one, I couldn't ascertain

24   whether or not a physical examination ever occurred with these

25   patients or whether the persons, the patients, were simply

1    allowed to submit documents and records that there was no way

2    to validate.

3            And, second, even if a consultation occurred, there

4    was no evidence that the doctor at New Care had issued those

5    prescriptions had any consultation with that doctor or had any

6    doctor relationship.

7    Q.  The doctor's not at New Care?

8    A.  The doctor and the other end of the pharmacy questionnaire.

9    Q.  The doctor at the other end of the pharmacy questionnaire?

10           Your Honor, I don't have any other questions on this

11   topic.

12           THE COURT:  I had a few questions, sir.

13           In all of the things that happened on the web screen,

14   let me jump back for a second.

15           What we've just been talking about are interactions

16   between the website, the web doctors, and the patient, correct?

17           THE WITNESS:  Yes, sir.

18           THE COURT:  And these are interactions that occurred

19   before the prescription is ever submitted?

20           THE WITNESS:  Yes, sir.

21           THE COURT:  And what I am looking for essentially is

22   this, in a pharmacist's training and practice, is the

23   pharmacist required to determine whether there's a valid

24   doctor/patient relationship?

25           THE WITNESS:  Yes, sir.

1    THE COURT:  In the normal writing of the
2  prescription, I take it that you would not call up the doctor
3  and grill the doctor on whether there's a doctor/patient
4  relationship, I would assume that most prescriptions just get
5  filled, correct?
6    THE WITNESS:  Provided, Your Honor, that the
7  pharmacist is familiar with the doctor and the doctor's
8  practice.  If I can explain or --
9    THE COURT:  Well, what I'm looking at, in thinking is
10  that these subjects all test the doctor/patient relationship
11  and whether there's a valid doctor/patient relationship,
12  correct?
13    THE WITNESS:  Yes, sir.
14    THE COURT:  And you have told me that and testified
15  earlier that a pharmacist must either verify that there's a
16  doctor/patient relationship, or if there are red flags to
17  suggest otherwise, must make a reasonable inquiry to determine
18  whether the valid doctor/patient relationship exists, correct?
19    THE WITNESS:  Correct.
20    THE COURT:  So we're now in the posture of our
21  hypothecated reasonable pharmacist operating under those
22  standards of practice who is now sitting in front of his
23  computer screen looking at the website, and that hypothecated
24  reasonable pharmacist is also privy to the telephone exchange
25  between the website and the people trying to order, because

1      that's all things that you had access to, correct?

2                THE WITNESS:  Yes, sir.

3                THE COURT:  So what I'm looking to is to find out is

4      what you just testified to just your personal opinion, or how

5      could that be grounded in the standards and practice of

6      pharmacy and what you learn in pharmaceutical school and

7      practice every day?

8                THE WITNESS:  Okay.  The first condition that a

9      pharmacist would look for is whether or not a physician was

10     licensed to practice medicine in the state where the patient

11     was.

12               That would be the first question they would ask on a

13     prescription.

14               If that was absent, the pharmacist then would see

15     that as a significant red flag.

16               The second condition would be what type of medication

17     that prescription was for.  If it was for a non controlled

18     substance, the pharmacist would then validate with the patient,

19     the patient knew what the medication was for, and that there

20     was a reasonable occurrence of a legitimate medical purpose.

21               If it was for a controlled substance, immediately

22     raises it to a more significant level, where the pharmacist now

23     has two conditions they're looking at.  One, whether the

24     physician is licensed in the state.  Two, they have an

25     out-of-state patient that's presented a controlled substance

1    and the pharmacist now has a more significant degree of legal

2    responsibility to validate that prescription.

3         There's nothing on these websites for one to indicate

4    the doctor's licensed to practice where is patient is located.

5    There's nothing to indicate that the cyberspace or the doctor

6    consultation is going to meet that the legitimate medical

7    purpose or doctor/patient relationship.

8         THE COURT:  So if you were to summarize, it would be

9    fair to say that our hypothecated reasonable pharmacist would

10   have a significant red flag raised for him or her if they were

11   to look at the website?

12        THE WITNESS:  Yes, sir.

13        THE COURT:  Good.  If I could see counsel, please?

14        (At the bench)

15        MR. RAVENELL:  Could we ask the witness to step down

16   since the jury's not here?

17        THE COURT:  Yes, certainly.  We're going to take a

18   five-minute recess afterwards, any way.

19        Sir, you can step down.  Thank you.

20        THE COURT: Yes, sir.

21        MR. RAVENELL:  Your Honor, there's several things

22   that jumps out.  There is absolutely no way that the defendants

23   would have been privy to the information that this witness is

24   privy to.  It's impossible either gone onto the website.  For

25   example, they would never been privy to the phone conversation

1    between the patient and the website people.  They just

2    wouldn't.  They would not be privy to whether there were

3    medical records reviewed.  You have a witness who says I could

4    find nothing on the website that tells me that the medical

5    records were reviewed.

6         Well, you have testimony from the government's own

7    witness, Mr. Kaps, that the doctors reviewed all of the medical

8    records.

9         This testimony about what a pharmacist should know,

10   based on what this witness has reviewed after the fact, and

11   Your Honor, let's be mindful, this witness himself only has

12   this information because after the fact, after the arrest, the

13   government was able to get this stuff out of the computer and

14   because there were undercover operations where they were

15   recording the calls for investigative purpose.

16        These calls are not routinely recorded for people to

17   have, so the defendants couldn't have even gotten the calls

18   even if they had asked for them.

19        So to suggest that they should now be able to held to

20   a standard where this witness can go in after the fact and look

21   at all this information, and this witness again is looking at

22   only where there was a planned undercover operation.  He's not

23   looking at any of the calls where there are legitimate patients

24   calling or whatever who is calling and making these contacts.

25        He's looking at these undercover calls after the

1    fact, where the defendants would never have access to the same

2    information that he has.

3              THE COURT:  Good.  Thank you.

4              Miss Smith?

5              MS. SMITH:  Your Honor, it goes to whether the

6    doctor/patient relationship was a valid one.  It goes to

7    whether the prescriptions were valid, actually what's on the

8    website, and I did neglect to ask the witness while he was on

9    the witness stand just now about the language in the

10   disclaimer.  It's the government's position what is on the

11   website and what is the process that a customer goes through

12   would give the pharmacist notice.

13             The testimony about the consultation goes toward the

14   first prong that these prescriptions were invalid.

15             MR. RAVENELL:  Your Honor, I'll just add that this

16   witness said that his decision is based strictly on the public

17   information produced on the website.  Well, that isn't even

18   true, because the public information would never have the phone

19   calls that he was now able to listen to because it was part of

20   an undercover investigation.  It is not even true what he's

21   told the Court.

22             THE COURT:  Well, let's do this, it's 3:20, let me

23   think about it, and we'll come back at 3:30, and then I'll

24   rule.

25             But from the government's standpoint there are two

1      things at work here.  The first is was the prescription valid?

2      If it's valid, then he can look at anything.

3          There's the second question is what the reasonable

4      pharmacist should know.  And Mr. Ravenell has a very good

5      point, and that is the only thing that even if Mr. Sodipo and

6      Mr. Nwaehiri had looked, the only thing that they could have

7      seen would be the web screens.

8          MS. SMITH:  I will divide it that way, Your Honor.

9          THE COURT:  So I'm going to think it through and see

10     whether I'm going to let it in at all.  But if it comes that,

11     it would have to be carefully gone through as to the two

12     different scenarios, and I'm going to be thinking about in the

13     next few minutes whether in my view there is a reasonable

14     inference that the websites when there's nobody who says that

15     they did.

16         MR. RAVENELL:  Your Honor, on the valid prescription

17     aspect, I want to get this in before thinking about it is again

18     the valid prescription aspect really for this witness is

19     talking about what goes to the doctors, and Dr. Christo

20     certainly would be a doctor to testify, could have testified

21     about what was a valid prescription for a doctor.

22         This witness has been called as an expert to talk

23     about what would a reasonable pharmacist have concluded under a

24     corresponding responsibility.  And if they fall short because

25     the defendants would not have had this information before them,

1    then his testimony about whether this is a valid prescription

2    is highly irrelevant because he's not a medical person who

3    could testify about what a doctor would look for.  It's just

4    not in his bailiwick.

5         In fact, this witness has testified previously when

6    asked a question, and I can point to his testimony in a prior

7    trial, he's not competent to testify to what a doctor would

8    look for.

9         THE COURT:  Good.  So let me think about it for ten

10   minutes.

11        MS. SMITH:  Your Honor, I need to add one more fact,

12   recovered at the New Care at the search was a printout from the

13   computer screen of one of the websites, specifically the

14   disclosure page.  The disclaimer page, rather.

15        And I did want to ask this doctor, this witness, what

16   is wrong with the disclaimer page and would it have given a

17   reasonable pharmacist notice.  We know somebody saw that at New

18   Care.  I think it's reasonable to suspect they saw all of it,

19   but they cannot deny that that those papers were recovered at

20   New Care.

21        MR. RAVENELL:  That doesn't mean the defendants saw

22   it, Judge.

23        THE COURT:  Good.  Thank you.

24        (Recess.)

25        THE COURT:  Please be seated.  And you might as well

1    wait outside for another minute, sir?

2         In my view, the answers to the questions that we were

3    debating before the break can be found in United States versus

4    Lawson, 682 F. 2d, at 480.  In footnote 6, the Court wrote:

5    Lawson argues that Professor Fedder should not have been

6    qualified to testify about the medical legitimacy of the

7    prescriptions because the pharmacists and not the doctors were

8    on trial.  Admittedly, the only issue is whether the pharmacist

9    knew the prescriptions were not genuine.  However, contrary to

10   the defendant's arguments, Dr. Fedder's testimony did not stray

11   from that issue.  Although Professor Fedder was asked if in his

12   opinion the prescriptions were issued for a legitimate medical

13   purpose, he answered from a pharmacist's perspective pointing

14   to the flags of illegitimacy, such as the uniformity of the

15   prescriptions, which should signal a pharmacist that the

16   prescriptions were not legitimate."

17        So if we extrapolate that ruling to the instant

18   situation, we need to have a flag of illegitimacy which will

19   signal to a pharmacist that the prescriptions were not

20   legitimate, which would mean that the Dr. Catizone can testify

21   as to what a pharmacist would see if the pharmacist visited the

22   website.

23        And I think it's a fair inference that the fair

24   argument in this case is that based upon the length of the

25   association between the pharmacy and the pharmacists and the

1    website, and other factors, it's a fair inference, fair

2    argument, that the pharmacists did look at the websites and saw

3    what was there to be seen.

4         But the pharmacist would not have been privy to the

5    telephone consultations because the consultations were not on

6    the website.

7         So my ruling is that Mr. Catizone can testify about

8    flags of illegitimacy based on what was there in the web

9    screens if someone, if the pharmacist were to look at the

10   website, but that he should not testify as to the validity of

11   the prescriptions based upon all of the other factors that he

12   would not have been privy to, and it's redundant we've already

13   had all that testimony from the doctor who testified in

14   considerable detail about the examinations and his conclusion.

15   So in my view it's repetitive.  So we'll stick to the web

16   screens.

17        And Miss Smith, you had mentioned a disclaimer, are

18   we talking about the disclaimer about the Florida statutes and

19   --

20        MS. SMITH:  No, Your Honor.  The disclaimer that's on

21   the web screen.

22        THE COURT:  And what does that say?

23        MS. SMITH:  It's two pages long, very small print,

24   and it was included in government's exhibit 13 A.  It's in

25   evidence.

1          I will just provide it to the Court.  And I was just

2     going to ask him if that would give him any, provide any red

3     flags, so to speak.

4          (Pause.)

5          THE COURT:  Good.  That's there to be seen.  So the

6     question then is was there disclosure?

7          MS. SMITH:  I'm not following the Court, whether the

8     defendants saw it?

9          THE COURT:  That this was part of his expert

10    testimony.

11         MS. SMITH:  Yes.  Oh, clearly it was disclosed to

12    him, yes, Your Honor.  And it was described in the government's

13    letter to the defense that it was included with the disclosure.

14    It was everything related to the undercover buys that is an

15    exhibit in evidence with the undercover business.

16         THE COURT:  Good.  Then that is my ruling.  What was

17    there to be seen but not -- he can't testify about the oral

18    part of the communications that he may be privy to.

19         MR. RAVENELL:  I just want to review the document

20    once the Court's finished.

21         THE COURT:  Yes.  I'm done.

22         (Pause.)

23         THE COURT:  Good.  Mr. Thompson, if you would bring

24    in the jury, please?

25         (Pause.)

1            (Jury present)

2            THE CLERK: Jurors all present.

3            THE COURT:  Thank you, Mr. Thompson.  Please be

4    seated.

5            Miss Smith, whenever you're ready.

6    BY MS. SMITH:

7    Q.  Directing your attention, sir, to government's exhibit 13

8    A, which are from the undercover purchases on the screen, if

9    you would look at that document and tell us what are the red

10   flags that a reasonable pharmacist should have noticed if they

11   looked, if they'd gone to the website and looked at what's on

12   there?

13   A.  The red flag that a reasonable pharmacist would notice

14   would be, one, there is no information indicating whether or

15   not the doctor is licensed to practice medicine in the state

16   where the patient is located.

17           Two, the website focuses on the doctor consultation

18   with no information about whether or not that's a valid patient

19   prescriber relationship.

20           Two -- third, I'm sorry, third is the site focuses on

21   pain medications and doesn't provide any indication that there

22   are other medications that the patients can order.

23           Fourth, there is no means for the patient to submit a

24   prescription through their doctor as other pharmacies that

25   operate within the law -- pharmacies meet.

1          MR. RAVENELL:  Objection, Your Honor.

2          THE COURT:  I'll strike operate within the law, if

3     you would find a different phrase, please?

4     A.   Sure.  Pharmacies that comply with standards in the state

5     and federal laws would provide for the patients.

6     Q.   Can you tell me, sir, what do you mean by there's no means

7     for a patient to submit a prescription?  What were you saying?

8     A.   There is no means for the patients through their doctor to

9     submit a prescription to this website.

10    Q.   From their own doctor that they know in their own town?

11    A.   Yes.

12    Q.   Okay.  So they couldn't send that prescription to the

13    website and have that pharmacy fill it?

14    A.   No.

15    Q.   Is there any means that you can see on there for a patient

16    to get a prescription and take it to the pharmacy of their

17    choice and fill it?

18    A.   No.

19    Q.   Sir, if you would turn a few pages back, there's a tab, to

20    page marked disclaimer, if a reasonable pharmacist went to the

21    website, clicking the hyperlink to look at the disclaimers,

22    tell us what is it in the disclaimers that would cause a

23    reasonable pharmacist to believe there are red flags?

24    A.   The disclaimer removes the legal responsibility from the

25    pharmacy or from the prescriber and places it on the patient,

1    and that is not possible.

2    Q.  Any other observations?

3    A.  Websites that display these disclaimers do not operate as

4    pharmacies that adhere to the standards and the state and

5    federal laws.

6         I'm not aware of any pharmacy that adheres to

7    standards.

8         MR. RAVENELL:  Objection, Your Honor, what he's aware

9    of.

10   Q.  In your training and experience, sir.

11        THE COURT:  Well, if I can see counsel, please?

12   Q.  Your Honor, I'll just withdraw the question.

13        THE COURT:  All right.

14   Q.  Sir, directing your attention to defendant's exhibit 2, I

15   don't know that I have it here, but I have a copy of it.  Mr.

16   Thompson, maybe you can provide it for me.  And I'll take that,

17   sir.  Thank you.

18        Sir, as part of your preparation for today, did you

19   look at defendant's exhibit number 2?

20   A.  Yes, I did.

21   Q.  And did you make any observations about that exhibit?

22   A.  Yes, I did.

23   Q.  Okay.  And what would a reasonable pharmacist being

24   presented with that document or 300 of those documents --

25        MR. RAVENELL:  Objection, Your Honor, may counsel

1    approach?

2              THE COURT:  You may.

3              (At the bench)

4              MR. RAVENELL:  Your Honor, this is so blatantly in

5    violation of your rule this morning, your order this morning

6    that there was not to be any opinion about this witness

7    regarding the disclaimer, which is defense exhibit number 2.

8              The Court said that all the witness could say that he

9    in fact had never seen this certification before, that it was

10   not disclosed, and that they could not -- for the government to

11   even attempt to go into this after the Court has ruled is just

12   blatantly wrong.

13             THE COURT:  Are we in the certification or the

14   disclaimer on the website?

15             MR. RAVENELL:  Certification.

16             THE COURT:  Certification at the bottom of the

17   prescription?

18             MS. SMITH:  I hadn't asked him about the

19   certification.  I was just having him observe the prescription

20   what are the things they observation, observes that the patient

21   is in one state, the doctor is in another state, things of that

22   nature that he's already testified to.

23             THE COURT:  Well, is he now getting down to the

24   disclaimer?  The certification?

25             MS. SMITH:  The certification, I was going to then

1    ask him if he'd ever seen that.  I hadn't asked him that yet.

2            THE COURT:  So you're going to ask him if he's ever

3    seen a certification like this before?

4            MR. RAVENELL:  That's fine, Your Honor, that's not

5    the way the question was being phrased.

6            THE COURT:  Well, there was something about if he saw

7    a hundred or 300, just so we're now getting to the

8    certification.

9            MS. SMITH:  Well, not yet, but unless the Court is

10   telling me I can't ask any other questions about the face of

11   the prescription.

12           THE COURT:  What was the 100 or 300, what was the end

13   of that question?

14           MS. SMITH:  What would a reasonable pharmacist would

15   notice when presented with this prescription or 300 of these

16   prescriptions, what would a reasonable pharmacist observe.

17           MR. RAVENELL:  And, Your Honor, that's just a

18   backdoor way to get into, because that disclaimer is on the

19   prescription.  And what the government is attempting do is to

20   get this witness to say if I saw a prescription like this,

21   which of course includes the disclaimer, that this is what it

22   would mean to me.  It's just a backdoor way of getting around

23   your order, and it's so clearly just that.

24           THE COURT:  Well, is he going to get into the

25   certification, or is he going to talk about the doctor in one

1    state and patient in another?

2         MS. SMITH:  That's what I expect him to --

3         THE COURT:  Make sure that the only thing comes out

4    about the certification that he's never seen wasn't like this

5    before.

6         MR. RAVENELL:  Your Honor, it's not the phraseology,

7    to give the witness the document which the jury knows has the

8    disclaimer on it, and to ask a question, you know, if you were

9    given a hundred of these, 300 of these, you know, what would

10   that tell you, and the witness goes and launches into this

11   would tell me there's no valid doctor/patient relationship,

12   assuming that's his answer, that answer encompasses the

13   certification.

14        Now we have to then back out of that answer about the

15   disclaimer.

16        THE COURT:  Well, the only thing that he's going to

17   testify to is about the things other than the certification

18   until the certification is pointed, just please make sure that

19   happens.

20        MS. SMITH:  I will begin my question with the

21   certification across the bottom do not look at that for the

22   time being I have a question about the rest of the

23   prescription.

24        THE COURT:  Well, just when you go back, just make

25   sure he doesn't, don't do it that way.  Just I don't want to

1  hear about the certification until the end, when you ask him

2  have you ever seen one like this before.

3         MS. SMITH:  Your Honor, what if I ask him about that

4  first get it out of the way and then ask him about the rest of

5  the prescription?

6         THE COURT:  Good.  That's fine.

7         (Open court)

8  BY MS. SMITH:

9  Q.  Sir, have you had an opportunity to look at that?

10 A.  Yes, I did.

11 Q.  And did you in fact have an opportunity to look at that in

12 preparation for your testimony today?

13 A.  Yes, I did.

14 Q.  Okay.  There is a certification at the bottom.  It says "I

15 certify that a patient/physician relationship exists as per

16 Street-wise Medical Risk Management, Inc.  Gaffner, Rosemary,

17 Edition D, page 57, 7th printing, and that the prescription was

18 given in compliance with the Florida standards for telemedicine

19 prescribing practice 64B8-9.014 and using federal guidelines.

20         Do you see that, sir?

21 A.  Yes, yes, I do.

22 Q.  In your experience and training and background, have you

23 ever seen a certification like that?

24 A.  No.

25 Q.  And let me ask you, sir, have you reviewed Rosemary

1   Gaffner's Street-wise?

2   A.  Yes, I have.

3   Q.  Okay.  At my direction, did you turn to page 57?

4   A.  Yes, I did.

5          MR. RAVENELL:  Objection, Your Honor, may counsel

6   approach?

7          THE COURT:  Let me see counsel, please.

8          (At the bench)

9          MR. RAVENELL:  Is there a reason why?

10         THE COURT:  I thought that all we're going to do with

11  the certification at the bottom was that he hadn't seen one.  I

12  didn't think that we'd be getting into Rosemary Gaffner or

13  Florida.

14         MS. SMITH:  What I understood the Court to instruct

15  me, he was not to interpret the meaning of anything that was

16  contained in there.  My only question to him was do the words

17  doctor/patient relationship appear on page 57?

18         THE COURT:  This is --

19         MS. SMITH:  That's a fact question.  That's not an

20  analysis.

21         THE COURT:  But it's beyond.  You can do it in your

22  rebuttal case, but you can't do it now.  The only thing that's

23  going to come in about this certification is that he's never

24  seen one like it before.  That was the ground rule that we

25  established last week and that we'll stick to.

1          MS. SMITH:  Very well.

2          MR. RAVENELL:  Thank you.

3          (Open court)

4    BY MS. SMITH:

5    Q.  And, sir, looking at the rest of the prescription, putting

6    the certification aside for a moment, what, if any,

7    observations do you make about that prescription that would

8    cause a reasonable pharmacist to observe red flags?

9    A.  There are two general observations:  One, there's some

10   errors in the prescription.  There's misspelling of words, such

11   Apocillin that would suggest to the pharmacist that the

12   allergies as recorded, perhaps somebody was not familiar with

13   those allergies, or that someone conducted this that wasn't

14   competent to do so, it would be a red flag for the pharmacist

15   to make sure that was correct.

16          MR. RAVENELL:  Your Honor, objection.  Your Honor,

17   may counsel approach?

18          THE COURT:  You may.

19          (At the bench)

20          MR. RAVENELL:  This is not a prescription that New

21   Care filled.  It is a rejected prescription.  It is one that

22   New Care rejected.  So to have this witness testify about what

23   comes to mind, it's not relevant to this prescription.  It was

24   not filled.

25          THE COURT:  It doesn't have to have been filled.

1    It's simply a red flag.  It's simply generated by the website

2    that would make a prescription, or make a pharmacist think

3    twice about filling it.

4           So the fact that it was either filled or rejected is

5    not the seen or known, so I will overrule the objection.  So

6    let's press on.

7           Miss Smith, how much more do we have on this?

8           MS. SMITH:  I think I've got three more areas that

9    I'm trying to get through, exhibits that he was provided.

10          THE COURT:  Thank you.

11          MR. RAVENELL:  Your Honor, there are -- I know we're

12   going get -- I don't know how much longer Miss Smith has, but

13   three areas, but if we get to the point of 4:30, there are a

14   couple issues we need to take up with the Court.  I was going

15   to ask the Court to break instead of starting the cross.  There

16   are at least three areas that I need to bring to the Court's

17   attention about a witness issue for a motion in limine that I

18   don't want to be giving to you tomorrow morning, so however you

19   want to handle it.

20          THE COURT:  Let's see how far we get.

21          (Open court)

22   BY MS. SMITH:

23   Q.  Sir, are there any other observations you would make on the

24   face of that prescription?

25   A.  One of the red flags indicated by practice standards of

DIRECT EXAMINATION

1    state and federal law is the fact that the patient lived in a

2    state different than the prescribing doctor.

3    Q.   And how does that -- how is that fact a red flag?

4    A.   There's a legal and practice standard responsibility placed

5    upon the pharmacist to verify that that was a legitimate

6    patient prescriber relationship.

7    Q.   And, sir, are you familiar with the statistics issued by

8    the DEA for the number of prescriptions issued in the year 2006

9    across the United States?

10   A.   Yes, I am.

11   Q.   Okay.  And what number was that?

12   A.   The total number of prescriptions issued across the United

13   States was approximately 3.7 billion.

14        MR. RAVENELL:  Objection, Your Honor.  May counsel

15   approach?

16        THE COURT:  You may.

17        (At the bench)

18        MR. RAVENELL:  I'm looking, Judge, and I'm hopeful

19   I'm wrong, but I don't see any such disclosure.

20        MS. SMITH:  June 23, be advised that he has been

21   provided the following items, prescriptions statistics provided

22   by DEA, this document is attached.

23        On page 4 of the letter, the opinion is the volume of

24   hydrocodone prescribed, prescriptions filled by New Care during

25   the period, the question substantially exceeds the percentage

DIRECT EXAMINATION

1    controlled substances and the percentage of hydrocodone

2    prescriptions filled by pharmacies throughout United States.

3              MR. RAVENELL:  Let me look at my June 23rd, what was

4    -- okay.  I have it now.

5              (Pause.)

6              MR. RAVENELL:  Let me check something.

7              (Pause.)

8              MR. RAVENELL:  Your Honor, this is basically hearsay.

9    What we have attached here is a witness.  This is what we were

10   given, Judge, by the government.

11             THE COURT:  Thank you.

12             (Pause)

13             MR. RAVENELL:  The government says he has

14   information.  He doesn't have any information that he has any

15   personal knowledge of.  It's some piece of paper that we have,

16   that's what we have, and he's basing this information on.

17             (Pause.)

18             THE COURT:  Well, this goes to disclosure.  I don't

19   know what source.

20             MR. RAVENELL:  I'm sorry.  I apologize.  I'm not

21   talking about disclosure.  I agree that it was disclosed.  I'm

22   talking about whether this witness is able to testify about the

23   number of prescriptions that was given, written in the United

24   States based on this piece of paper.  If that's his basis of

25   knowledge, it's hearsay.

DIRECT EXAMINATION

1          THE COURT:  He may have some other source, and

2     experts can rely upon hearsay.  So I think it's a matter for

3     cross-examination.  He says he knows how many prescriptions

4     were issued, so he can testify.

5          MS. SMITH:  Based upon the statistics.

6          MR. RAVENELL:  All right.  Thank you.

7          (Open court)

8     BY MS. SMITH:

9     Q.  Sir, you were testifying that, according to statistics

10    released by the DEA in the year 2006, 3.7 billion prescriptions

11    were filled in the United States?

12    A.  Correct.

13    Q.  And based upon those same statistics and source of

14    information, can you tell us, sir, what prescriptions were for

15    -- what percentage were for controlled substances?

16    A.  Approximately 12 to 13 percent.

17    Q.  And of those 12 to 13 percent, what percentage were for

18    hydrocodone?

19          MR. RAVENELL:  Same objection, Your Honor.

20          THE COURT:  I'll overrule the objection.  Do you have

21    a basis of knowledge for answering it, sir?

22          THE WITNESS:  Approximately 25 percent of the 12

23    percent.  So about three percent of the total 3.6 billion

24    prescriptions were for hydrocodone.

25    Q.  Okay.  Sir, your basis of knowledge for that information?

1    A.   The information that the states present to us in regard to

2    the prescriptions dispensed and the percentages, our

3    interactions with the Drug Enforcement Administration,

4    information that is widely available in the pharmacy journals

5    is what I base that information on.

6    Q.   Sir, in preparation for your testimony today, were you

7    asked to review the Maryland Board of Pharmacy newsletters?

8    A.   Yes, I was.

9    Q.   Before we move on, sir, do the numbers that you have just

10   described, the 3 percent of prescriptions issued in 2006 were

11   for hydrocodone, did that have any impact on your opinion that

12   these pharmacists at New Care who filled the Internet

13   prescriptions were acting outside the standards of professional

14   practice?

15   A.   Yes.

16   Q.   And why is that, sir?

17   A.   The 3 percent sets a standard that is used to regulate

18   pharmacies and pharmacists.  The percentages of hydrocodone

19   prescriptions dispensed by New Care far exceeded that standard.

20   Q.   Now, directing your attention, sir, to government's exhibit

21   22 C, as been identified, it might be on the back, it has been

22   identified as the July, 2001 newsletter.

23   A.   Yes, sir.  Yes, ma'am.

24   Q.   Have you reviewed all of these newsletters?

25   A.   Yes, I have.

1    Q.   Okay.   And in your opinion, are these consistent with

2    federal and Maryland laws on pharmacy practice?

3    A.   Yes.

4    Q.   And are the passages in there that address the

5    responsibility of a pharmacist consistent with your

6    understanding of what that responsibility is?

7    A.   Yes.

8    Q.   Okay.   Now, I'm going to ask you in a moment to read some

9    passages, and then the follow up question is going to be would

10   a reasonable pharmacist having read that been on notice as to

11   what their responsibility would be.   Okay?

12   A.   Understood.

13   Q.   So if we would turn to 22 C?

14            MR. RAVENELL:  Objection, Your Honor.  It's not in

15   evidence.

16            MS. SMITH:  It is in evidence.

17            MR. RAVENELL:  No, they aren't.

18            THE COURT:  If I could see counsel, please?

19            (At the bench)

20            THE COURT:  Now, these are the newsletters that were

21   purportedly mailed to New Care and the pharmacists, correct?

22            MS. SMITH:  That is correct.

23            THE COURT:  My understanding is that they are in

24   subject to Mr. Ravenell's request to redact certain portions of

25   them.

1          MS. SMITH:  Yes.

2          MR. RAVENELL:  Actually, we never had any such

3     discussion.  What the Court -- can I just speak as the Court's

4     directed to me, I'll be happy to speak.

5          The government has shown the newsletter to several

6     witnesses as ID only.  The documents have never been moved in

7     and never been accepted as being in evidence.

8          The Court found that the documents could not come in

9     unless and until it was admitted through the expert.  We're now

10    at that stage, because the Court said that those other

11    witnesses would not be able to say whether these items were

12    used in the ordinary course, et cetera.  And there has never

13    been an offer since those documents were shown by the

14    government to move it into evidence.

15         And the Court has not ruled on whether this is now in

16    evidence.  So it can't be shown.  I want to be heard on whether

17    it comes into evidence.

18         MR. BUDLOW:  Your Honor, could I be heard from the

19    government?

20         THE COURT:  That sort of refreshes my recollection.

21    I remember there was an issue about the mailing in the ordinary

22    course of business, and then we had the woman from the Board of

23    Pharmacy who came to testify, that she mailed it all in the

24    ordinary course of business.

25         MR. RAVENELL:  Right.

1        THE COURT:  I can't remember whether it was they were
2   all received, what number is it?
3        MR. BUDLOW:  22 A, B, C, D.  And there's also a
4   defense exhibit, which number I don't have it handy.
5        THE COURT:  Good.  Let me ask, Mr. Thompson?  22 A, B
6   C, D are they in?
7        MR. RAVENELL:  Actually, Mr. --
8        THE COURT:  Pardon?
9        THE CLERK:  They're all identified.
10       THE COURT:  Identified only.
11       MR. BUDLOW:  Your Honor, my recollection is that
12   Summer Goodman testified, and I am very wary of ever
13   contradicting Mr. Thompson because I know I'm going to be wrong
14   but I'll say --
15       THE CLERK:  If I could, 22 A and B are in.
16       THE COURT:  Are?
17       MS. SMITH:  But those aren't the newsletters.
18       THE CLERK:  22 C, D, E, F are ID only.  G, H, I are
19   in.
20       MS. SMITH:  Your Honor, as I recall, as I recall, the
21   Court had some concerns that they be established to be
22   consistent with Maryland and federal law.  My witness has just
23   testified to that.  I would move them into evidence at this
24   time, because I believe we have satisfied the Court's concerns.
25   That was the last concern.

1          The major concern was proving that they had been

2     mailed in the usual course, and we did that, too.

3          THE COURT:  What portions is the witness testifying

4     consistent with Maryland law?

5          MS. SMITH:  He testified that his review of all of

6     these documents, the contents, the part that discusses the

7     responsibility of a pharmacist, are consistent with his

8     understanding of the responsibility of the pharmacist as

9     defined in federal law and Maryland law.  He has just testified

10    to that.  And I was going to have him read a handful of

11    passages and ask if each of those passages would put a

12    reasonable pharmacist on notice of what his responsibilities

13    are.

14         THE COURT:  And what passages were they?

15         MR. RAVENELL:  Can I get my copies?

16         THE COURT:  Sure.

17         (Pause.)

18         THE COURT: Thank you.

19         MR. RAVENELL:  This is 2001.  Do I have a 2001?

20    Okay.

21         THE COURT:  Good.  So the highlighted portion, let me

22    read it, please.

23         (Pause.)

24         THE COURT:  Miss Smith, what else?

25         MS. SMITH:  The next page will have the next marking,

1    Your Honor.  These are just the passages I was going to direct

2    him to the exhibit number and the page number and then the

3    passage.  So this would be July '04, exhibit 22 D, and it's

4    that passage on page 3.

5           THE COURT:  Miss Smith, everything that's

6    highlighted, or just the second one, is that everything that's

7    highlighted?

8           MR. RAVENELL:  Thank you.  Let me make sure look at

9    it so I have the same thing.

10          (Pause.)

11          MR. RAVENELL:  Okay.  Thank you.

12          (Pause.)

13          THE COURT:  Good.  Thank you.

14          Miss Smith, is there any others?

15          MS. SMITH:  There's one more.  There's one more.  The

16   passage is -- I'm -- actually, Your Honor, it's this whole

17   passage.  It's that column and a half.

18          THE COURT:  Good.  Thank you.  Do you have it?

19          MR. RAVENELL:  I have it.  Just I'm looking at it.

20          (Pause.)

21          MS. SMITH:  That's it.  Your Honor, I would also like

22   to point out that the exhibits themselves are stamped in

23   evidence on July first, the date that they were marked for

24   identification.  He says they are in.  He indicates that they

25   are in.

1          MR. RAVENELL:  Who's he?

2          MS. SMITH:  Mr. Thompson.

3          MR. BUDLOW:  I have a specific recollection of it.  I

4    examined Summer Goodman and made a motion in court in front of

5    the jury to admit these documents, and my recollection is that

6    they were admitted at that time. Without objection.

7          MR. RAVENELL:  I'm sure it wasn't without objection,

8    of that I'm sure.

9          THE COURT:  Thank you.  Mr. Ravenell?

10          MR. RAVENELL:  Your Honor, first of all, whether Mr.

11    Budlow remembers without objection, the Court may recall that

12    we had objections to all these documents coming in from day

13    one, so I don't want the record to in any way suggest that Mr.

14    Budlow's accurate that these documents ever came in over our

15    objection, if they in fact came in.

16          Turning to the documents, you know, themselves, the

17    government wishes to elicit information from this witness,

18    Judge, and if the Court, if these are somehow in evidence, you

19    know, we would again argue the aren't in evidence, the first

20    thing to decide is whether they're in evidence, or whether I'm

21    moving to have it stricken or whether I'm moving to keep it

22    out.  That would be I guess helpful in the Court's analysis on

23    what we're doing.

24          So I'm not sure if the Court wants to determine that

25    first.  But I'll be happy to be heard on what's on the

1    document.

2          THE COURT:  Well, the answer is I don't know, so just

3    tell me, why they shouldn't be in evidence, and what they are,

4    why they should be stricken?

5          MR. RAVENELL:  Your Honor, turning first to the --

6    I'm sorry.  I don't have the government's numbers on this, this

7    July '04 newsletter.

8          MS. SMITH:  22 D.

9          MR. RAVENELL:  22 D, thank you.

10         The first thing that comes out, Your Honor, is that

11   the Court -- and this is a problem that actually creeps up in

12   the April '05 newsletter, which is -- what number is that, Mr.

13   Budlow?

14         MR. BUDLOW:  22 E.

15         MR. RAVENELL:  22 E.  Is where we had, the Court has

16   indicated that you're not going to let the government place

17   before this jury through this witness, that these COMAR

18   regulations where he's comparing COMAR with the CFR's, and this

19   does exactly that.

20         What we have are these COMAR, if we look at 22 E, for

21   example, you have a newsletter which says, you know, the

22   specific area of Maryland pharmacy law, and then cites COMAR,

23   10.190304 and then cites the purpose of issuing of prescription

24   21 CFR 13.0604.  We're doing exactly what the Court has

25   indicated should not be done with this witness, and because of

1    the possibility of having a jury confused about what the law

2    is, which is one of the reasons we argued against this coming

3    in originally and continue to argue against it coming in, of

4    course, our other argument was there's no evidence that the

5    defendants saw it.

6         But on this particular issue, what we will now have

7    is the jury having before it in these COMAR regulations that

8    the Court just said this morning should not be before the jury

9    for the reasons of confusion, and the jury thinking that, well,

10   if the Board of Pharmacy says this is the Maryland law and

11   cites to the COMAR regulations, that that is the law.

12        And we have those same confusions that you're trying

13   to avoid by not having this witness do it.  And that's what

14   runs through these exhibits, particularly, additionally, on

15   exhibit 22 D, it's the question for the practice committee, is

16   it legal to dispense a prescription that was written for the

17   prescriber or a member of the prescriber's family?  And the

18   answers that flow from that are about whether it's proper to

19   for one to fill a prescription where it's for the prescriber's

20   family, which is not at all at issue in this case.

21        Now, while it does talk about COMAR, it talks about

22   COMAR outside of the context of what's before this jury, with

23   additional references to COMAR is a problem as well.

24        And then the 2001 newsletter, which if I may ask Mr.

25   Budlow what that number is?

1          MR. BUDLOW:  That is --

2          MS. SMITH:  22 C.

3          MR. RAVENELL:  22 C, is a reference to Oxycontin, you

4     know, which is obviously a Schedule II narcotic, not a Schedule

5     III, not before this jury, and now the jury's got information

6     about again COMAR, what the COMAR regulations say and what it

7     says as to Oxycontin.

8          And what the jury -- what the government is going to

9     be doing is getting before this jury, again, what they term to

10    be a COMAR reg, which is they can say it as much as they want

11    it is the law, it isn't the law, but what it does have the jury

12    accept relying upon these references and the law is when the

13    Court has to be the one to instruct the jury of what the law

14    is.

15         When the jury hears the law, I don't think they're

16    going to hear these references to COMAR.  It's one the thing

17    for the witness to have testified as he has, the Court has

18    aloud him to over our objection about the standard of care.

19    But this is about actually having before this jury a Board of

20    Pharmacy saying this is Maryland law when, A, it isn't Maryland

21    law.  And, B, it's for the Court to instruct on what the

22    federal law is that's in place.

23         THE COURT:  Thank you.  My view is this, and my

24    ruling is this, that I will permit 22, these exhibits 22 C, D

25    and E.  In my view, the rule has been satisfied with the

1    testimony by the person who testified they were mailed in the

2    ordinary course of business, and they are admissible so long as

3    the witness is prepared to state that they accurately state the

4    duty imposed upon a pharmacist by the standards of professional

5    practice.

6          MR. RAVENELL:  Your Honor, I'd ask the Court then to

7    move in the defense exhibit that the witness also testified to,

8    which is the 2002 newsletter, that the Court held in the same

9    purpose, I don't have it.

10         MR. BUDLOW:  Actually, the government moved that in

11   as well, through Summer Goodman.

12         MR. RAVENELL:  The point is the Court --

13         THE COURT:  They're all admitted, so that if they've

14   been identified --

15         MR. RAVENELL:  Right.

16         THE COURT:  -- they're newsletters that were mailed

17   in the ordinary course of business, mailbox, and they're

18   admitted as well.

19         MR. RAVENELL:  So the four items that are before the

20   jury would be the 22 C, D, E?

21         MS. SMITH:  And F, which I'm not using, but there is

22   an F.

23         MR. RAVENELL:  I understand the Court just said C, D,

24   E, and but I'm hearing an F from Ms. Smith.  Defense is 27.

25         THE COURT:  27.

1          MR. RAVENELL:  And the Court has admitted it.  I

2     understand the government's 22 C, D and E, but I'm hearing --

3          MS. SMITH:  I didn't offer to the Court to read any

4     part of it, but I'm not asking the witness to read any part of

5     it, but the mailbox rule is satisfied with regard to this one

6     as well.

7          THE COURT:  What is that again?

8          MS. SMITH:  December '05.

9          MR. RAVENELL:  December '05.  That's fine, Judge.  So

10    that's 22 F.

11         THE COURT:  22 F now over objection.

12         MR. RAVENELL:  Yes.

13         THE COURT:  So over objection 22 C, D, E, and F, and

14    27 is admitted, but the defense is they're only putting in 27

15    just to balance things out.

16         MR. RAVENELL:  Correct.

17         THE COURT:  And not put that in affirmatively.

18         MR. RAVENELL:  That is correct, Judge.

19         (Open court)

20    BY MS. SMITH:

21    Q.  Sir, directing your attention to government's exhibit 22 C,

22    page 4.  And all the way on the right hand column, about the

23    third of the way down, skipping the title, there's a passage

24    that begins much has been written and said.

25         Do you see that?

1   A.   Yes, I have.

2   Q.   And have you read that passage to the bottom of the page?

3   A.   Yes, I have.

4   Q.   Is that consistent with both your understanding of federal

5   law and Maryland law?

6   A.   Yes, it is.

7   Q.   Okay.  Would you, sir, read out loud that passage?

8   A.   "Much has been written and said about the use of Oxycontin

9   and other Oxycodone and hydrocodone products.  The Board of

10   Pharmacy expects pharmacies to handle these products in the

11   same way that they do all drugs which may be abused.

12       While COMAR 10.19.03.07 do.  D 1, spells out that the

13   responsibility for the proper prescribing and dispensing of

14   controlled dangerous substances is upon the prescribing

15   practioner.  The corresponding responsibility rests with the

16   pharmacist who fills the prescription.

17       The pharmacist must balance the problem of possible

18   inappropriate use with the valid needs of the patient.  The

19   December 1999 transmittal sent by the board to all permit

20   holders echo the concerns of the Attorney General of Maryland

21   that the goals of care and pain management might provide

22   adequate pain symptom management.

23       In order to walk the line between the valid needs of

24   the patient in pain and the pharmacist's responsibility to help

25   control illicit drug use, it is advisable that a relationship

1    be established with both the patient and prescriber to gain as

2    much insight as possible.

3    Q.  Would a reasonable pharmacist reading this newsletter in

4    October of 2001 be aware of the corresponding responsibility as

5    required in the standards of pharmacy and in the law?

6    A.  Yes.

7    Q.  Directing your attention, sir, to government's exhibit 22

8    D, the July, 2004 newsletter.  And on page 3, sir, on the right

9    hand column, entitled "Questions for the Practice Committee,"

10   there is a paragraph beginning about halfway down, if the

11   pharmacist has cause to believe.  Do you see that?

12   A.  Yes, I do.

13   Q.  And have you reviewed that paragraph and the next paragraph

14   as well as the whole context of the article?

15   A.  Yes, I have.

16   Q.  And, in your opinion, is this consistent with Maryland law

17   and federal law?

18   A.  Yes, it is.

19   Q.  Could you read those two paragraphs, please?

20   A.  If the pharmacist has cause to believe that the

21   prescription is not being written for a legitimate purpose, the

22   pharmacist has an obligation to not fill the prescription.

23   This is especially an issue when the drug is a controlled

24   substance.  If the pharmacist fills a controlled substance in

25   this case, he or she is in violation of COMAR 10.34.10.08.

1          Furthermore, the pharmacist is obligated under this

2   regulation to report the prescriber to the prescriber's

3   licensing board.

4          A dentist who writes a drug for erectile dysfunction

5   is obviously prescribing outside of the normal course of

6   professional practice.  In this case, the prescription is no

7   longer legitimate, and thus may not be filled.

8          Furthermore, the board strongly advises the

9   pharmacist to report the prescriber to the prescriber's

10  licensing board.

11         In fact, if the pharmacist has consulted with the

12  prescriber and the pharmacist has reason to believe the

13  prescription for a controlled dangerous substance was not

14  issued for a legitimate medical purpose in the usual course of

15  the prescriber's practice, the pharmacist is required to report

16  the prescriber to the prescriber's licensing board under the

17  pharmacist code of conduct.

18         The illegitimate use of controlled substance --

19  Q.  You can stop there, sir.

20         And, finally, directing your attention to 22 E.  And

21  that would be the April, 2005 Maryland Board of Pharmacy

22  newsletter, the very first page in the left hand column, third

23  paragraph down, it begins the specific area of Maryland

24  pharmacy law.  If you could begin there and read through the

25  end of that page, please?

1    A.  This specific area of Maryland pharmacy law that affects

2    pharmacists who are filling prescriptions for controlled

3    substances in scenarios such as or similar to the above is

4    found in COMAR 10.19.03.07(C), purpose of issuing prescription

5    21 CFR 1306.04.

6    Q.  Let me stop you right there.  21 CFR, 1306.04 is the

7    federal law?

8    A.  Yes, it is.

9    Q.  Okay.  Continue.

10         MR. RAVENELL:  Objection, Your Honor, federal law.

11   Q.  The federal regulation.

12         THE COURT:  Are we reading from the newsletters

13   again?

14         MS. SMITH:  Yes, sir.  I just asked him to note for

15   the record that when he was reading the Maryland law, there was

16   a reference within it to 21 CFR 1306.04.

17         MR. RAVENELL:  Objection.

18         MS. SMITH:  I simply just asked him to stop and tell

19   us again is that the federal law.  I will change the question

20   to is that the federal regulation that he was talking about

21   before.

22         THE COURT:  I'll overrule the objection.  You may

23   answer.

24   A.  Yes, it is.

25   Q.  And now if you would continue reading after that subheading

1    that cites the federal regulation?

2    A.   Number one, a prescription for a controlled dangerous

3    substance to be effective must be issued for legitimate medical

4    purpose by an individual practioner acting in the usual course

5    of the individual practioner's professional practice.   The

6    responsibility for the proper prescribing and dispensing of

7    controlled dangerous substances is upon the prescribing

8    practioner.   But a corresponding responsibility rests with the

9    pharmacist who fills the prescription.   An order purporting to

10   be a prescription issued not in the usual course of

11   professional treatment or in legitimate and authorized research

12   is not a prescription within the meaning and intent of the

13   Maryland Controlled Dangerous Substances Act, Criminal Law

14   Article Section 5-501, 5-505, Annotated Code of Maryland.   And

15   a person knowingly filling such a purported prescription as

16   well as the person issuing it shall be subject to the penalties

17   provided for violations of the provisions of law relating to

18   controlled dangerous substances.

19        The wording above appears in Maryland law and in 21

20   CFR 1306.04 of the Code of Federal Regulations.   The above

21   regulation is also applicable to any prescription containing a

22   controlled substance that a pharmacist fills when he or she

23   should have reason to believe it is not written in the usual

24   course of practice for legitimate medical purpose even when the

25   prescriber's contacted and indicates that the medication is

1    appropriate.  COMAR 10.34.08, refusing to dispense a controlled

2    substance describes the steps a pharmacist must take for after

3    consulting with the prescriber, he or she decides not to fill

4    the prescription.

5         Please do not confuse the above responsibilities with

6    the need to fill appropriate prescriptions for patients who

7    have legitimate need for pain relief.  Pharmacists have to be

8    willing to participate in the treatment when palliative care is

9    necessary.

10   Q.  Thank you, sir.

11        And would a reasonable pharmacist reviewing the

12   Maryland Board of Pharmacy article that you just read a part of

13   from April of 2005, would they be on notice of what the refusal

14   statute says and the corresponding responsibility is?

15   A.  Yes.

16   Q.  Okay.  And what was the name of that article?

17   A.  "Prescriptions Sent Through the Internet."

18   Q.  Sir, do you know in your training and experience if a

19   pharmacy's license indicates that the pharmacy's doing mail

20   order or Internet, does that change their corresponding

21   responsibility in any way?

22   A.  No.

23   Q.  If a prescription is valid under federal law, is there a

24   limit to how many of those valid prescriptions a pharmacy can

25   fill on a given day?

1   A.  No.

2   Q.  If a prescription is valid under Maryland law, did I just

3   say that, under Maryland law, is there a limit of how many of

4   those valid prescriptions can be filled on any given day?

5   A.  No.

6   Q.  Any state law that you're aware of that limits the number

7   of valid prescriptions a pharmacy can --

8           MR. RAVENELL:  Objection.  By state law that he's

9   aware of.

10          THE COURT:  I'll overrule the objection.  You may

11  answer.

12  A.  No.

13  Q.  Have you ever heard in your position, sir, as the Executive

14  Director of the National Association of Boards of Pharmacy, in

15  your training and experience of the DEA, or any state

16  regulating authority asking a pharmacy to limit the number of

17  prescriptions it fills in a single day?

18  A.  No.

19  Q.  Can you think of any reason why the DEA or any state

20  regulated authority would do such a thing?

21  A.  No.

22          MR. RAVENELL:  Objection to what he can think of.

23          THE COURT:  Well, I'll sustain the objection and ask

24  the jury to disregard the answer.

25  Q.  Finally, sir, if all you knew about this case were the

1    number of prescriptions issued in 22 months, 122,549, and that

2    108,456 of them, or 88 percent, were for hydrocodone that 11

3    doctors wrote more than 98 percent of those prescriptions, and

4    that the doctors were mostly in Florida and the patients were

5    in 49 states and the District of Columbia, if that is all the

6    information that you had, would your opinion change the opinion

7    in question is whether the opinion that you've given is that

8    the pharmacists of New Care who filled the Internet

9    prescriptions were not acting within the standards of

10   professional practice, if that is all the information you had,

11   would that opinion change?

12   A.   My opinion would not change.

13           MS. SMITH:  Thank you, sir.  I have no further

14   questions, Your Honor.

15           THE COURT:  Good.  Thank you.  If I could see

16   counsel, please?

17           MS. SMITH:  Your Honor, I do have one last question.

18   Sorry.  One last question.  I told him to remind me.

19   BY MS. SMITH:

20   Q.   Sir, are you being paid for your appearance here?

21   A.   No, I'm not.  I do this as part of my responsibility to

22   help the states protect the people --

23           MR. RAVENELL:  Objection.

24           THE COURT:  I'll sustain the objection.

25           MR. RAVENELL:  Move to strike, the answer is no, I

1    understand.

2                THE COURT:  Right.  I will strike the answer so that

3    the answer is no, he is not.

4    Q.  Okay.  Is the government is reimbursing you for your travel

5    expenses?

6    A.  Correct.

7                MS. SMITH:  Thank you.  No further questions.

8                THE COURT:  Thank you.  If I could see counsel

9    briefly, please?

10               (At the bench)

11               MR. RAVENELL:  Your Honor, I'm going to be a while

12   with this witness, as you may suspect.  There are a couple of

13   issues that I know, for example, the government has indicated

14   they're going to be calling a medical examiner tomorrow, and we

15   want to bring up an issue with the Court about that.  And there

16   are couple other notes.  The jury instructions we wanted to

17   talk to the Court about, the jury instructions that we were due

18   to get some to you by the end of the day, I tried speak to your

19   clerk earlier.  He was tied up.

20               THE COURT:  If they're all boilerplate.

21               MR. RAVENELL:  I thought we were to get more than

22   just boilerplate.

23               THE COURT:  Oh.  His piece of the puzzle, I've only

24   gone through the boiler plate.

25               MS. SMITH:  I think he's talking about the ones he

1    owes the Court.

2         MR. RAVENELL:  That's what I want to talk to this

3    Court about that as well as other issues.  I was going ask if

4    we could break and discuss those issues.  And I mean I'll

5    soldier on tomorrow and be a while with this witness.

6         THE COURT:  How long do you think you'll be with him,

7    any feel?

8         MR. RAVENELL:  I would say two to three hours, maybe,

9    I guess.  I can't imagine more than that.  I've looked at my

10   notes, and I'll obviously review it again tonight and try to

11   incorporate what went on here today so that I can make it flow

12   as quickly as possible and may take out some things based on

13   some of the rulings the Court made earlier.

14        MS. SMITH:  Yes or no answers don't take very long.

15        MR. RAVENELL:  I don't think that's what it will be.

16   I have a feeling it won't be --

17        THE COURT:  Good.

18        MR. RAVENELL:  -- yes or no answers.

19        THE COURT:  And then who else is in your panoply of

20   witnesses?

21        MS. SMITH:  We're in a position where we have two

22   more witnesses from out of town.  Unfortunately, Mr. Catizone

23   will be spending the night, which was not planned.  We have two

24   more already here and another one that is expected tomorrow.

25   Those witnesses are Paul Short, Agent Wood-Brown, and Dr.

1   Lewis, who is the medical examiner from Tennessee.  I'm

2   actually thinking maybe we need to call her off and put her

3   back on for Wednesday.

4           Finally, our last witness is an IRS Agent Bennett

5   Strickland, who recovered one document at New Care.  And that

6   would be it for the government's case, barring something

7   unforeseen.

8           THE COURT:  So is the only one of any length, is

9   Wood-Brown going to be long?

10          MS. SMITH:  I don't think so, but I sort of never

11  imagined that Mr. Catizone would be all day.  I don't think any

12  of them are particularly long.  There's still a chance we could

13  rest by the close of business tomorrow.  Otherwise, it will be

14  Wednesday.

15          THE COURT:  And is there any feel for how long your

16  case is going to be?

17          MR. RAVENELL:  Judge, I don't know, because one of

18  the things that's going to determine is whether the defendants

19  testify.  If they testify, I would suspect Mr. Sodipo will be

20  on the stand for a couple days, you know, between direct or

21  cross at least a day maybe longer.

22          THE COURT:  Let's assume they don't.

23          MR. RAVENELL:  Assume they don't, Judge?  If we start

24  on Wednesday, I think we could get all of our testimony on by

25  Monday.

1          MS. SMITH:  Your Honor, can we get a copy of the

2     defendant's witness list and the order that they're calling

3     them?

4          MR. RAVENELL:  When you finish your case.

5          MR. BUDLOW:  That gives us --

6          MS. SMITH:  That gives us maybe minutes.

7          MR. BUDLOW:  We've been giving them notice as we go

8     along.

9          MR. RAVENELL:  Knock off list we submitted to the

10    Court just as you do, what you've been doing is giving the us

11    the witnesses.

12         MS. SMITH:  Maybe tomorrow you'll give us your

13    witnesses for Wednesday.

14         THE COURT:  So it would be tomorrow.  So you need to

15    tell them tomorrow who's coming Wednesday.

16         MR. RAVENELL:  And if that chances, obviously, as

17    they've done with us, if it changes.

18         THE COURT:  If it changes, they have to have some

19    good faith assessment.

20         MR. RAVENELL:  Sure.  Absolutely.

21         THE COURT:  Who's coming the next day?

22         MR. RAVENELL:  Now, Judge, at some point, I know

23    we're going to need to, once the government's rested, we expect

24    there's going to be at least some argument on some of these

25    issues about where we go on the JOA issues.  I fully expect it

1    to be to make some arguments on this point and not just rest on

2    the JOA issues.  So we need to work that in as well.

3              THE COURT:  Well, you have the motion for directed

4    verdict, which I can always table.  But then you have the

5    motion on the conspiracy.

6              MR. RAVENELL:  Right.  Which I think the Court has to

7    hear us on before we decide to put on a case, you know, because

8    we need to know whether they are dealing with those issues in

9    the case or not, we should not be I mean that's my thoughts.

10   Obviously, we can talk about those things.

11             THE COURT:  Why don't we do this, let me excuse the

12   jury, only 10 minutes left, tell them I'll see them tomorrow at

13   9:30.

14             (Open court)

15             THE COURT:  Ladies and gentlemen, we're going to

16   break for the day and come back tomorrow at 9:30 in the

17   morning.  Mr. Ravenell has a substantial cross-examination of

18   the witness and needs to get his exhibits ready so we only have

19   20 minutes left.  So instead of taking a recess for 10 minutes

20   and starting up again with only 10 minutes left to go, we might

21   as well just break for the day.

22             We will start tomorrow at 9:30 a.m., and we should be

23   able to start promptly at 9:30.  So if you could all shoot to

24   be here on time.

25             And remember the standard admonitions that you now I

1    assume know by heart.  So I look forward to seeing you

2    tomorrow at 9:30.  I'm going to stay with counsel.  Thank you.

3              Thank you.  You are excused until tomorrow at 9:30.

4    Have a pleasant evening.

5              (Jury recessed)

6              MS. SMITH:  We'll just be in our offices.  We'll be

7    down shortly.

8              (Pause.)

9              THE COURT:  Good.  Please be seated.  The record will

10   show that the jury has retired.

11             Mr. Ravenell, you had an issue with --

12             MR. RAVENELL:  Yes, Your Honor.

13             THE COURT:   -- that medical examiner?

14             MR. RAVENELL:  If I understood Miss Smith, they

15   intend to call the medical examiner probably on Wednesday.

16   What I will do, we've been working, Mr. Morrow and me, on my

17   time getting a motion in limine to exclude the testimony of

18   this witness.  I have a draft here.

19             What I will do, Judge, is I can probably file this

20   tonight so if the Court will have it as well as the government.

21   I need to review the last draft with Mr. Morrow sent to me,

22   which I'm told is last copy was just sent.  But I do have a

23   copy.  I think I'm going to review this.  We'll get it to the

24   Court tonight, the government tonight, on a motion to exclude

25   Dr. Lewis.

1          Now, I just want to make sure, Your Honor, I was

2     trying to determine from the government whether they intend to

3     call both medical examiners or just one, and Miss Smith was I

4     think trying to tell me what she was going to do, and I yet

5     have -- don't have whether they're going to be calling both or

6     one.  But if they're calling both, I need to amend the motion

7     to address both of those medical examiners.  If they're only

8     calling one, then I will only deal with one intended to call.

9          THE COURT:  What generally is the ground on which you

10    seek exclusion?

11         MR. RAVENELL:  Yes, Your Honor.  It's the late

12    disclosure, again, of information regarding these witnesses.  I

13    will tell the Court that basically we got is a autopsy report.

14         Now, these witnesses have never been designated as

15    experts.  We've asked over and over who the government will be

16    calling as expert witnesses.  These witnesses have never been

17    disclosed as being witnesses to be called as experts even to

18    that this day they haven't been disclosed.

19         I'm filing a motion to exclude them, even though they

20    have not yet been disclosed as an expert, because I've been

21    told they're going to be called.

22         THE COURT:  Good.  Thank you.  Miss Smith, on the

23    disclosure issue?

24         MS. SMITH:  Your Honor, the autopsies were provided a

25    year ago, something like that.

1          In the ordinary course of criminal practice, that's

2     disclosure, Your Honor.

3          Did we follow the same rulings we're doing for these

4     other experts?  No.  We have provided the autopsy report.  It

5     has the basis of the conclusions of the doctor.  It has the

6     doctor's opinion.  It has the doctor's qualification as medical

7     examiner.  I'm not sure what else there would be to give him.

8          MR. RAVENELL:  Your Honor, I've never seen a medical

9     examiner report that hasn't been qualified as an medical

10    examiner.  What the report simply submits here is a medical

11    examiner's report that says this person died and tat the

12    conclusion is he died of this.

13         I'm waiting yet to get one.  We don't even have a CV

14    for these medical examiners.  We have never received one.  So

15    and this will all be addressed in our written papers, but,

16    Judge, are those are the general issues.  I've tried many, many

17    murder cases, as both of these attorneys, and I can tell Your

18    Honor that never once has anyone shown me a medical examiner

19    report which I have both here that gives me any background

20    about the medical examiner.  It simply is an autopsy report.

21         THE COURT:  Good.  I will look at it when it's filed,

22    and then I'll be prepared to rule.

23         Good.  And then are there any other in limine issues,

24    Mr. Ravenell?

25         MR. RAVENELL:  Your Honor, it was another issue I'm

1    trying to --

2              MS. SMITH:  Something about Mr. Short?

3              MR. RAVENELL:  Yes, Mr. Short, Your Honor.

4              Thank you, Miss Smith.  I was trying to remember what

5    it is, and I appreciate it.

6              Your Honor, on Friday -- I apologize talking to the

7    Court with my back to you, I'm trying to find something.

8              THE COURT:  No.  Take your time.

9              (Pause.)

10             MR. RAVENELL:  The Court, where you have that the

11   government had Mr. Short on the stand last week, and the

12   government disclosed to the defense some additional charts that

13   Mr. Short was prepared to testify about, and the Court found

14   that with the late disclosure of those charts that Mr. Short

15   would not be allowed to testify about those particular charts

16   at the time until certain documents were provided to the

17   defense to review.

18             We were given at the time government exhibit 90-1 and

19   I believe through 14, which we have, Friday we received from

20   the government, not a chart, but a stack of documents that is

21   entitled New Care Pharmacy Refills 20 days and under.

22             And then we were told, and this is by sent by e-mail,

23   says the government's still working on this, and there may be

24   changes, and we'll let you know what the changes are.

25             Now, I'm not sure whether there are any changes

1    because to date, I have not received any changes from the

2    government, and it has not been mentioned.  And I know we've

3    all been busy.  But I don't know whether there are any changes

4    to this document one way or the other, but we haven't received

5    any.

6              Your Honor, here we are again, these -- and I will

7    give the Court a stack of these things, if I have a copy, so

8    you can see what we receive, if I may approach?

9              THE COURT:  You may, if you would hand them to Mr.

10   Shea, please?

11             MR. RAVENELL:  Yes.

12             (Pause.)

13             MR. RAVENELL:  Yes, Your Honor.  And I don't know,

14   again there are no numbers to tell us at this point how many

15   prescriptions these are, and we just have this, what the

16   government has turned over to us.  I don't know what he intends

17   to do with it.  This is what we have.  So we'll first get the

18   government's proffer what this is, other than the title refills

19   20 days and under, and what are we supposed to do with this?

20             I will tell the Court, you know, we've spent -- Miss

21   Reamy will tell you hours yesterday with our client, including

22   Mr. McCants's, client trying to deal with some of these

23   particular what we think these issues are.  We did not -- Miss

24   Smith has communicated by email.  I don't know who she

25   communicated with.  She didn't communicate with me or Mr.

1    Morrow over the weekend.  We got no further email other than

2    the one on Friday from the government about these documents.

3         I'm not sure what the communication was she was

4    referring to that happened all over the weekend because we

5    didn't have it.

6         THE COURT:  Good.  Thank you.  What I'll do is I'll

7    then ask the government, Miss Smith, is this a Rule 1006

8    compilation?

9         MS. SMITH:  It is, Your Honor, and it's a compilation

10   from government's exhibit 89.1, which is already in evidence.

11   It's that monster box that has all 122,000 plus prescriptions

12   in it.

13        It is right out of the New Care computers, which

14   information was available to Mr. Ravenell.  When I sent him

15   that information on Friday, the chart that he's provided to the

16   Court, number one, it was in an X-cel Spread Sheet.  And I know

17   counsel could have easily totaled the number of lines if that

18   was his concern.

19        I also, which Mr. Ravenell didn't point out to the

20   Court, told him that this chart was drawn from the New Care's

21   computers by Mr. Short, who was then going to spend the weekend

22   manually checking it to make sure that there was no

23   double-counting, and there were no mistakes between names, and

24   if the document changed, it would enure to the defendant's

25   benefit.

1          In other words, this was as bad it was going to be,

2     and it would possibly be better.  I gave it to the defense as

3     soon as I had it.

4          And, again, it is merely a summary of what is already

5     in evidence, and of what the defendants have had for quite some

6     time.

7          This is from the defendants' server, and it is a full

8     five days before he testifies.

9          THE COURT: Good.  And so I think I have a handle on

10    this.  Mr. Ravenell, are there any other?

11         MR. RAVENELL:  Yes, Your Honor.  And continuing with

12    that point, Judge, which is that the information that the

13    government has given in this stack of, I don't know, I still

14    haven't heard whether there were any changes to this, I heard

15    that we were going to get it, and that Mr. Short was working on

16    it.

17         The first question is, are there any changes?  And if

18    is there a new document that we'll be receiving is my first

19    question.

20         THE COURT: Let me ask this, in order to check the

21    veracity of the document, you have to go into the box and look

22    at the individual prescriptions and then check them against the

23    accuracy of this document.

24         MR. RAVENELL:  Actually, Your Honor, a little more

25    than that, that's part of it.  What the government has given

1    us, for example, they show that if you look at some of the

2    prescriptions, it says -- well, look at the first one, it says

3    Michael Abatae, days since last prescription 14 days.  What it

4    doesn't have is anything that references when that other

5    prescription was.

6          So we'd have to go back on each and every one of

7    those to check each and every one of these prescriptions to see

8    when the prescription before that, for example, particularly in

9    the first prescription for a patient was issued, to find out

10   whether in fact there was a prescription that was issued 14

11   days before by New Care, and it has to be done with each and

12   every one of those.

13         Now, we attempted to do some of that on yesterday and

14   ran into a problem with the server that we have, which is our

15   server that we got back from the government, having a problem

16   getting information from the server, because I don't want to

17   rely on just, you know, the box information.  We want to

18   actually look at what's on the server, and that has not been

19   able to accomplished because there's a problem with that.

20         So we can't really go into the server right now to do

21   that.

22         And we had the defendants with Miss Reamy at their

23   office for several hours yesterday, and one of our IT persons

24   today, two IT persons in fact, our head IT person trying to

25   work on that server to get the information so we can properly

1    review it.

2         I understand that Mr. Short may testify tomorrow.

3    There's just no way without fully knowing what this information

4    is and whether this is a final copy and then force us to go

5    back and check all these things and not just rely on some paper

6    documents that were produced previously.

7         I want to actually look at what's in the server based

8    on information my client has given me.

9         THE COURT:  Thank you.  Are there other in limine

10   motions?

11        MR. RAVENELL:  Your Honor, the other part of these,

12   one of the documents given to us by the government is a matter

13   regarding Florence Pharmacy.  I'm not sure what that exhibit

14   number is.  It says Foundational Information.

15        Miss Smith, is there an exhibit number?  It's not

16   being introduced?

17        MS. SMITH:  No.

18        MR. RAVENELL:  Okay.  Is there an exhibit with this?

19        MS. SMITH:  No, sir.  At the last time we were here,

20   I explained that I was going to elicit from the witness the

21   dates.

22        MR. RAVENELL:  Your Honor, I apologize.  I'm asking

23   Miss Smith a question, but it would be helpful for me that

24   respond if the Court doesn't mind.

25        MS. SMITH:  The witness was going to be ask the range

1    of dates that Florence Pharmacy filled for the Florida

2    websites, and the total number of prescriptions that they

3    issued.  That was part of the reason why he was asked to come

4    back, so the defense would have time to look at that evidence.

5    It's from the Offplanet servers, which again have been

6    available to the defense for some time.

7            THE COURT:  Now, is that part of the exhibits that

8    Mr. Short produced relatively late in his earlier, his

9    testimony in the first time?

10           MS. SMITH:  This was provided to defense last, the

11   day that Mr. Short was here last.  I don't even remember what,

12   that it was that was part of it.  That's why the Court said he

13   had to come back.  It was that plus some other documents.  And

14   I'm not putting that evidence in, but that document was

15   provided so that they knew what the foundation of the numbers

16   he was going to testify to.

17           So that they wouldn't have to go searching the

18   Offplanet server for it, they had it right there, because we

19   gave it to them.

20           THE COURT:  Good.  So this supports the numbers to

21   which he'll be testifying tomorrow?

22           MS. SMITH:  Yes.  It's just a momentary piece of his

23   testimony.  And then there were the 14 other exhibits that we

24   gave last Monday as well.

25           MR. RAVENELL:  What I learned over the years, Judge,

1    is to always be mindful of the momentary testimony.  That's the

2    one that gets you.  So you know just telling me that it's

3    momentary doesn't change whether in fact it should come in or

4    not, and particularly as to this Florence Pharmacy, to have a

5    witness testify about the involvement of Florence Pharmacy and

6    the website group, we move to strike, keep out for other

7    reasons.

8             It's misleading, first of all.  The DEA did not

9    obtain this information that is on the Off-planet server until

10   Mr. Kaps's business was raided and or arrests, and in either

11   November or December '07, long after the defendants were

12   arrested and long after Mr. Cloud had been involved with the

13   Florence Pharmacy, I've had conversations by Florence Pharmacy.

14            And what the government is attempting to do is have

15   this witness introduce information about Florence Pharmacy to

16   say, ah, the reason they went after New Care not Florence

17   Pharmacy is because Florence Pharmacy wasn't doing the kind of

18   numbers the defendants were doing.  So go after the defendants

19   and not Florence Pharmacy.

20            Well, that is so misleading because the DEA didn't

21   have this information.  They had no such information, until

22   they got it from Off-planet server and in 2007 or later.

23            In fact, this information was turned over to us

24   shortly before Mr. Kaps came to testify.

25            And Mr. Kaps testifying obviously the first week of

1   trial we got this information about 30 days or less before Mr.

2   Kaps testified.  That's the first anyone had it.  So to suggest

3   that it should be an introduction of this evidence about what

4   the government learned in 2007 that somehow explains why Mr.

5   Cloud was told not to call Florence Pharmacy in 2006, when the

6   DEA did not have this information, is improper and misleading.

7         It does not in any way show why the DEA chose not to

8   pursue Florence Pharmacy because they didn't have the

9   information.  And it would be so misleading to have the jury

10  have the information and then take it and act upon it as, oh,

11  this is a reason why they did not pursue Florence Pharmacy.  It

12  should not come into this case, because that's all that it's

13  coming in for.

14        THE COURT:  Good.  Thank you.

15        Miss Smith?

16        MR. RAVENELL:  I'm sorry.  I do you want me to go on

17  to other issues?

18        THE COURT:  Why don't we leave this one, I'm going to

19  ask Miss Smith the relevance of the Florence Pharmacy

20  information, please.

21        MS. SMITH:  Yes, Your Honor.  A couple of points.

22  Jennifer Koch testified I believe within the bottles that were

23  recovered and put into evidence were bottles from Florence

24  Pharmacy.  Agent Graumlich also testified that Florence

25  Pharmacy was amongst pharmacies that were involved.  Paul Short

1    has of course identified it as one of the pharmacies.

2             But most specifically, Mr. Ravenell specifically

3    asked Mr. Cloud and made frankly very big deal about the fact

4    that he wasn't asked to go after Paul Brand, who was the

5    pharmacist operating Florence Pharmacy.  There have been a

6    number of questions that have hinted at a selective

7    prosecution?  Why are you picking on New Care?  Why aren't you

8    going after these other pharmacies?

9             Now, Mr. Ravenell's point that the DEA might not have

10   had this information till after the fact is true.  But all the

11   indicia of a pharmacy putting out 10 million doses of

12   hydrocodone versus a substantially smaller amount would have

13   shown up in other places.

14            That's how the government got involved in the

15   investigation on New Care, because their packages were turning

16   up in Baton Rouge.  Their packages were turning up all over the

17   place.  And that is precisely what got the government involved.

18            Not because someone gave us a computer printout and

19   said look at what New Care did after the fact.

20            See, it's for the very same reasons that Florence was

21   not targeted because, compared to New Care, they were a real

22   bit player, and the numbers bear that out.  There wouldn't have

23   been indicia all over the country of these packages.  They were

24   involved for maybe six months.

25            And I can't remember now off the top of my head.  I

1    don't know if Mr. Ravenell wants to look at the numbers, but it

2    was a substantially tiny amount in comparison to New Care.  And

3    we think that is a fair showing because we think the defense

4    opened that door and made argument to the defendant, to the

5    jury.

6            MR. RAVENELL:  Your Honor, if the government had

7    information that they wanted to present about what the

8    government, what the DEA knew about Florence Pharmacy at the

9    time in April of '06, that would be one thing.  But to simply

10   bring in the fact that, oh, we now learned about Florence

11   Pharmacy's involvement and the scale of their involvement a

12   year after the defendants were arrested and that that somehow

13   plays into what the DEA chose to or did not choose to do, quite

14   frankly, does not rebut any points that Miss Smith believes we

15   have unfairly raised.

16           THE COURT:  Good.  And you had another argument, sir,

17   another motion in limine?

18           MR. RAVENELL:  Yes, Your Honor.  And Your Honor, we

19   were also given by the government provided a doctor, on Friday,

20   July second, or Thursday, excuse me, that Paul Short will also

21   testify to the totals from Off-planet server, that the total

22   number of customers with unique names as 62,189, the number of

23   prescriptions are 583,367, and the total number of hydrocodone

24   prescriptions was 514,520, and the number of doses of

25   hydrocodone described as reflected in the server was 46,974,176

1    doses.  And we object to this evidence.

2         This is certainly not something that the defendants

3    would have had notice of or any red flags for defendant of what

4    was in Off-planet's server that the government seized in late

5    2007 that wasn't even taken from the computer web, from the

6    server until this year.

7         THE COURT:  And what again is the Off-planet server?

8         MR. RAVENELL:  The Off-planet server, Your Honor, is

9    the server from the website, you know, Mr. Kaps brought, took

10   information from the website server, and Off-planet, that is

11   Off-planet website, excuse me, server, where the information

12   from IHE and the other websites were stored.

13        And when Mr. Kaps was talked to in November '07, you

14   know, he in fact took the DEA over to give them certain

15   information off the servers.  And then as you all know, some

16   time later, he came into this Court to testify about

17   information that he had pulled off of the servers, and this

18   information Mr. Short is going to testify to is information off

19   of that server, then information the defendants would not have

20   had any notice of about the 46 million doses of hydrocodone

21   that was dispensed by the website as a whole, websites as a

22   whole, Judge.

23        THE COURT:  And when did you get the summary exhibit?

24        MR. RAVENELL:  We didn't get any exhibit.  All we got

25   were these numbers in a letter.  We've gotten no exhibit.  We

1    just have these numbers.  We have nothing to check it against,

2    other than if we then go back through the server.  This is not

3    even a summary chart.  This is just a letter that says the

4    witness will testify to these numbers, and I guess we can then

5    go through the server, the server and check it all out.

6          I'm not sure how we're supposed do that, but I guess

7    that's what we're supposed to do.

8          THE COURT:  Thank you.  On that issue, Miss Smith?

9          MS. SMITH:  Yes, Your Honor.  While I didn't provide

10   the exact numbers, I advised counsel last week that Mr. Short

11   would be testifying to the totals in the Off-planet computer.

12         I provided them the totals sort of as an

13   afterthought, but I provided them to him.  They've had access

14   to it.

15         They have also had, there has also been admitted into

16   this trial a lot of similar information from Adam Kaps, on

17   government's exhibits 2 I and 2 J, reflect data from the web

18   servers, the Off-planet servers on the credit card totals.  2

19   J, again already in evidence, shows the top pharmacies, and the

20   summaries, and what each of the prescriptions, what each of the

21   websites provided.

22         This information actually may already be in evidence,

23   just in a different form.

24         I would -- Your Honor, it shows the scope of the

25   conspiracy.  It does not go to notice.  It goes to the size of

1    the conspiracy, the scope of the conspiracy.  This is what

2    their co-conspirators Dr. Ibanez and Dr. Brooks were doing from

3    the beginning to the end.

4            THE COURT:  Good.  Thank you.

5            Mr. Ravenell, are there any other motions in limine?

6            MR. RAVENELL:  Let me look at my notes, Judge, if I

7    may.

8            THE COURT:  Good.

9            (Pause.)

10           MR. RAVENELL:  I'm trying to think of all of them now

11   before we leave, and I think I've covered them all, Judge.

12   There is another issue that is not a motion in limine, that I

13   need to address with the Court regarding the jury instructions

14   when the Court's ready to hear from me.

15           THE COURT:  Why don't I hear that about that, then,

16   jury instructions?

17           MR. RAVENELL:  Your Honor, you had indicated that you

18   were going to give I think to us what you had worked up on the

19   boilerplate instructions and you didn't.  We would then work

20   from what you had, and you were going to try to get that to us

21   last week.  I understand you didn't, it happens, talk about

22   things happens.

23           I know we called and spoke to Mr. Shea I think on

24   must be Thursday, or Friday, Thursday, and he indicated that

25   you were not able to get those to us yet.  So --

1          THE COURT:  Well, think of the jury instructions,

2    there's the beginning boilerplate.

3          MR. RAVENELL:  Right.

4          THE COURT:  There is the non standard instructions,

5    and then there's the ending boiler about how they're to

6    deliberate.  I made some mostly cosmetic changes to the

7    beginning boilerplate and he should be able to get--

8          MR. SHEA:  Should be by the end of the day.

9          THE COURT:  And then I haven't touched the end

10   boilerplate, but I will do the same.  And I have looked at it,

11   but I have not changed the middle because I want to see what

12   you have to say about it.

13         MR. RAVENELL:  I was going ask whether we could get

14   that to you by the end of the day tomorrow versus today because

15   we've been working on these other matters that have come up.

16   We were short an office.  Mr. Morrow had to leave early today

17   for a matter with his son, excuse me, so he couldn't finish it

18   up for me to review.  So I ask to get it to you tomorrow.

19         THE COURT:  So this is all --

20         MR. RAVENELL:  We're going to do, yes.

21         THE COURT:  Everything tomorrow, Miss Smith?

22         MS. SMITH:  Your Honor, Mr. Ravenell has a team.  He

23   has a lawyer that's been writing his cross-examination and his

24   experts for him.  I mean, he has this extensive team.  I'm not

25   real clear why he couldn't make the Court's deadline, but

1    that's fine.

2            MR. RAVENELL:  Writing my cross-examination?  Okay.

3    Apparently I do, Judge.  Thanks for telling me.

4            THE COURT:  I do need, do you have a feel for what

5    the middle section is going to look like?

6            MR. RAVENELL:  I have a estimated number of pages,

7    Judge, you mean or --

8            THE COURT:  Well, just whether you have a lot of

9    difficulty with it, whether mostly out of Sand and Siffert, if

10   you --

11           MR. RAVENELL:  Judge, quite frankly, I do not, but I

12   haven't had a chance to even review.  Mr. Morrow's going to

13   work on the draft.  He and I have had conversations, but what

14   I'm looking for, but I've not even seen the draft at this point

15   which I will do tonight.

16           THE COURT:  I'll need it tomorrow then by the close

17   of business.

18           MR. RAVENELL:  You will have it.

19           THE COURT:  On the co-conspirators, if you could, I'm

20   trying to think through that issue, if we think about the

21   hearsay problems based upon the testimony of co-conspirators,

22   who are they, at least at this point?

23           MR. RAVENELL:  I'm sorry.  Who are the

24   co-conspirators?

25           THE COURT:  Who are the co-conspirators who have

1    offered hearsay?  Who are the co-conspirators who have made

2    statements that the government wishes to attribute to your

3    clients as members of the conspiracy?

4              MR. RAVENELL:  Your Honor, there would be all the

5    people who were on the phone calls, and I did not write the

6    list out, on the phone calls, Dr. Ibanez, Mr. Brooks,

7    Cammarata, Jason Greene, Jack Kennedy.

8              THE COURT:  All right.  So they'd be all the people?

9              MR. RAVENELL:  On the calls.

10             THE COURT:  That's a manageable, and I have a handle

11   on those.

12             MR. RAVENELL:  I don't know if the Court is

13   indicating that the texts are not part, there's Miss Walker, I

14   guess, who testified.

15             THE COURT:  The second would be --

16             MR. RAVENELL:  I'm sorry.

17             THE COURT:  The second theoretical group would be the

18   pharmacists who worked at New Care, but I don't think that

19   there were many.  We didn't have a lot of hearsay statements.

20   I'm trying to remember.

21             MR. RAVENELL:  I don't think there were a lot from,

22   you know, Mr. Hartwill, you know, is not a part of the

23   conspiracy the government has indicated, so we're not worried

24   about -- I'm trying to think Miss Walker is the only pharmacist

25   who has testified who worked at New Care other than Mr.

1    Hartwill.

2          So now there are statements that, for example, miss

3    Brinnegar has indicated those people made, Robin Brinnegar,

4    indicated she spoke to Miss Jones and spoke to Miss Walker.

5          THE COURT:  Before we get there, let's talk about

6    Miss Walker.

7          MR. RAVENELL:  Yes.

8          THE COURT:  The only statements that can I recall

9    that she testified about were statements that she said were

10   relayed to Mr. Sodipo and/or Mr. Nwaehiri, so I don't remember

11   from her any statements that she made.

12         For example, she didn't say I had a conversation with

13   another pharmacist at New Care who said X, Y, and Z.  And that

14   and X, Y and Z was not related to one of the defendants.  I

15   just don't remember that.

16         MR. RAVENELL:  Your Honor, again, Your Honor, I have

17   not done that, gone through my notes about all these witnesses,

18   which I would certainly intend to do before we have a hearing

19   on it to refresh my recollection.  I don't want to tell the

20   Court that I recall exactly either what Miss Walker said about

21   whether there was information communicated to her that or

22   didn't get to Mr. Sodipo.

23         I don't recall, to be honest with you.

24         THE COURT:  And the next would be we had some

25   testimony from other people about their conversations with New

1    Care pharmacists.

2         MR. RAVENELL:   Correct.   Robin Brinegar testified

3    about conversations she had New Care pharmacists, and those

4    were not, is my recollection, communicated to Mr. Sodipo.   She,

5    Miss Brinegar, testified about the conversation she herself had

6    with Mr. Sodipo, but was also allowed to testify about

7    conversations she had with other pharmacists, particularly

8    Latia Jones, Ruth Walker, and I believe Abu Abraham, but I'm

9    not sure on the Abraham part.

10        THE COURT:   And these are conversation that Miss

11   Brinegar had with the other pharmacists?

12        MR. RAVENELL:   Right.   But were not communicated to

13   Mr. Sodipo.

14        THE COURT:   Then can you think of anyone else I

15   should be thinking about?

16        MR. RAVENELL:   I'm trying to think.   I know others,

17   Kelly and Ryan indicated, they spoke directly to Mr. Sodipo,

18   but I think they also indicated they spoke to other

19   pharmacists.

20        At least I know Miss Ryan said she spoke to other

21   pharmacists is my recollection.   Again don't hold me to it, but

22   that's my recollection.   And I don't recall whether Miss Kelly

23   said she spoke to other pharmacists or not, that I don't

24   recall.

25        THE COURT:   And then testimony from Adam Kaps, I know

1    he testified about talking to Ibanez and Brooks, but I was

2    trying to think about his conversations with New Care, and I'm

3    sort of drawing a blank.

4              MR. RAVENELL:  I think he said he doesn't have any

5    recollection of speaking to anyone at New Care, but he did

6    testify as to the Court indicated about conversations he had

7    with these other individuals.

8              THE COURT:  So it seems as though it's a fairly

9    manageable group.

10             MR. RAVENELL:  Manageable as long as we can all

11   recall and after weeks of testimony, but I'm sure we'll all

12   review our notes and do the best we can.

13             THE COURT:  Good.  So we'll start tomorrow at 9:30.

14             Miss Smith, anything else we need to be talking

15   about?

16             MS. SMITH:  No.

17             THE COURT:  Good.  Thank you.

18                  (Proceedings adjourned)

19             I, Jacqueline Sovich, RPR, CM, do hereby certify
     that the foregoing is a correct transcript from the
20   stenographic record of proceedings in the above-entitled
     matter.

21   _____

22   Jacqueline Sovich                          DATE
     Official Court Reporter

23

24

25

```
 1
 2                        I N D E X
 3    WITNESS              DIRECT   CROSS   REDIRECT   RECROSS
 4    Carmen Catizone         22
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```