1        In THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MARYLAND/NORTHERN DIVISION

3    UNITED STATES OF AMERICA

4                                    CRIMINAL NO.

5     v.                            L 06-0444

6    STEVEN SODIPO, ET AL          July 8, 2008

7              Defendants

8    _____/

9                   DAY EIGHTEEN

10          BEFORE THE HONORABLE BENSON E. LEGG,

11          UNITED STATES DISTRICT CHIEF JUDGE

12   APPEARANCES:

13   On behalf of the United States:

14   Andrea Smith, AUSA

15   Paul Budlow, AUSA

16

17   On behalf of the Defendants:

18   Kenneth W. Ravenell, Esquire

19   Kevin Jesse McCants, Esquire

20

21

22

23   Reported By:

24   Jacqueline Sovich, RPR, CMR, FOCRR

25   Official Court Reporter

1    (PROCEEDINGS)

2    THE COURT:  Good morning.  Please be seated.

3    Counsel, I've had the opportunity to review the

4    motion in limine that Mr. Ravenell filed with respect to the

5    testimony of Lewis, MD.  I have also reviewed the report of

6    investigation by County Medical Examiner that Dr. Lewis

7    prepared.  I have reviewed the autopsy report.  And I have

8    reviewed the report of microscopic examination signed by Mr.

9    Lewis, and I've reviewed the test results performed by the

10   AEGIS Science Corporation, 345 Hill Avenue, Nashville,

11   Tennessee, which states what was in the blood of Mr. Hackett.

12   Now, this is a question for the government, will Dr.

13   Lewis be testifying that the blood work by the Aegis

14   Corporation is a class of information that she and other

15   experts in her field rely upon in preparing autopsy reports?

16   MR. BUDLOW:  Yes, of course, Your Honor.

17   THE COURT:  Now, do you have a curriculum vitae for

18   Dr. Lewis?

19   MR. BUDLOW:  Yes.

20   THE COURT:  Good.  I am going to deny the motion in

21   limine.  This is not a murder case, and the defendants are not

22   on trial for murder.  So that the normal rules governing the

23   disclosure of expert reports is operative, and I have reviewed

24   all of these documents, and I find that they adequately

25   disclose the opinions of Dr. Lewis and the bases for the

1   opinions as long as she testifies that she and other

2   pathologists rely on the blood work, then that can form the

3   basis of her opinion.

4       All that's lacking is the curriculum vitae, and the

5   CV should have been provided to the defense earlier, but Mr.

6   Budlow states that he has it and he will turn it over, or has

7   turned it over to Mr. Ravenell.  And the failure to provide the

8   CV earlier is not a sufficient ground for excluding the entire

9   report and testimony of Dr. Lewis.  So I will deny the motion

10  in limine.

11      I have not yet had an opportunity to review the

12  autopsy report concerning Ronald Chartran, Junior, and I will

13  review it now.

14      MR. RAVENELL:  Your Honor, if I could just comment on

15  one thing the Court mentioned, which is the curriculum vitae?

16  And the concern, Your Honor, we got an e-mail last night

17  regarding the curriculum vitae, and shouldn't we have that in

18  advance so we can actually prepare to check you know this

19  witness and check the witness's background so we can properly

20  prepare cross-examination?

21      And you know the question I pose how will the defense

22  be able to do that receiving this information late last night

23  and the witness being scheduled to testify tomorrow?

24      I mean, this is something that should have been

25  turned over, as the Court indicated some time ago, so we could

1    do our due diligence on the background of this particular

2    person.  It was not done.

3              THE COURT:  No.  I understand all of that.  It's an

4    imperfect world.  The CV should have been given to you earlier.

5    If you spot something in the CV that you need to examine the

6    medical examiner about that you couldn't have examined her

7    about today because of short notice, then she can be brought

8    back.  Good.

9              Is there anything else that we need to be discussing

10   this morning?

11             MR. RAVENELL:  Your Honor, what I will, if I will ask

12   the Court, let me inquire of the government real quick.

13             (Pause.)

14             MR. RAVENELL:  Your Honor, what I've advised the

15   government is, Your Honor, what I've advised the government as

16   to not to have Dr. Lewis travel yet, I understand she's going

17   to leave this afternoon.  When we get a break I will rediscuss

18   you know the proposal with the defendant and see if we will

19   follow the Court's stipulation.

20             THE COURT:  Good.  Thank you.  Would that hold true,

21   also, for Chartrand?

22             MR. RAVENELL:  Yes, sir.

23             THE COURT:  Good.  Thank you.

24             MS. SMITH:  Your Honor --

25             MR. RAVENELL:  Actually, my understanding from the

1    government is they were, Mr. Chartrand, they were not planning

2    to call the medical examiner in Chartrand.

3        MR. BUDLOW:  It would depend on the stipulation,

4    depends on the Court's rulings.  Apparently, based on the sort

5    of the underlying motion in the defense's motion this morning

6    is they believe there's a Crawford issue relating to just

7    putting in the report.

8        So if they're still raising that objection, we'd have

9    to resolve that where the government decided whether or not to

10   strictly offer the report or to call a witness.

11       But, fortunately, there are witnesses available right

12   down the street.  We can always have someone here to either

13   proffer the report for testify to its contents.

14       MR. RAVENELL:  Your Honor, I -- actually, if the

15   Court and Mr. Budlow's correct, we've raised a Crawford issue,

16   and that will certainly apply to Chartrand.  We didn't address

17   the Chartrand issue because the government has only indicated

18   we were going to call this particular examiner and focus on

19   those particular record.

20       If there's an intention to use records in lieu of a

21   witness in Chartrand matter, then we would certainly need the

22   Court to address those issues so we can then make a

23   determination on how to proceed with that witness.

24       But I agree with Mr. Budlow, unlike the witnesses

25   traveling from out of town, that witness is down the street.

1    THE COURT:  So the examiner who did the Chartrand

2    autopsy is here in Baltimore?

3    MR. RAVENELL:  Yes, Your Honor.  It's a medical

4    examiner in Baltimore.

5    THE COURT:  Good.  My view, and I have not reviewed

6    the Chartrand autopsy report, and my view is it would be --

7    helpful to have the person who prepared it here to testify

8    about the blood levels.

9    For example, if you look at the report prepared by

10   Dr. Lewis, she says that -- writes that the federal blood

11   ethanol level is 0.09 percent.  The level of these three

12   unpronounceable drugs and hydrocodone found in the postmortem

13   femoral blood is considered therapeutic or subtherapeutic in

14   the absence of other drugs.

15   And I assume subtherapeutic means that any lower

16   dosage than one would find in a therapeutic dosage.  However,

17   the combination of these agents with one another and with

18   ethanol can be lethal.  And that is a subject that requires an

19   explanation from the doctor that she doesn't testify that

20   there's some massive amount of hydrocodone that's in Mr.

21   Hackett's blood alcohol.

22   It's the combination that apparently caused death,

23   and that requires some explanation by a person.  And I would

24   assume that the same holds true for the doctor who did the

25   autopsy report on Chartrand.

1    As I said, I haven't read that one yet.

2    MR. BUDLOW:  Your Honor, so we know we're headed,

3    assuming we're moving forward as planned, the government is

4    intending on calling Dr. Lewis for sure as to the autopsy to

5    make those exact explanations.  In light of what Mr. Ravenell

6    just mentioned in Court, the government would like to inquire

7    whether or not the Court's offer of stipulation is even still

8    on the table.

9    My understanding it was a deadline set by the Court.

10   The defense has explicitly rejected that.  And I think what Mr.

11   Ravenell has just indicated they're going to reconsider whether

12   or not to accept the Court's offer.

13   From a scheduling perspective and planning

14   perspective, the government would like to know if that's what

15   Mr. Ravenell's intending and if so, if the Court's offer is

16   still on the table.  Because, otherwise, we could just move

17   forward assuming this is all relevant and admissible.

18   THE COURT:  Well, the offer is still on the table,

19   but the offer lapses at the time when you have to make a

20   decision.

21   So if the logistics are such that you need to tell

22   Dr. Lewis now that she needs to come, then the offer expires

23   now.

24   If it expired last night because she needed to make

25   plans, then the offer expired last night.

1    In other words, it seems -- it's unfair to her to

2 have to travel all the way here only to be told that there's

3 been a stipulation.

4    MR. BUDLOW:  I appreciate that, Your Honor.  I spoke

5 to Dr. Lewis last night.  I don't know.  She was actually in

6 the process of changing her travel plans to hopefully coming in

7 this evening, but I haven't confirmed that.  She could be on

8 the way.

9    I would say from the government's perspective, it

10 would be fair to say before the lunch break, if the government

11 could be notified why then, and if not, we're going to move

12 forward, and I will assume she's going to catch her flight

13 sometime this afternoon.

14    THE COURT:  Good.  So there are several principles at

15 work.

16    One I think that the compromise is a reasonable

17 accommodation to both side.

18    Second, I don't want her to come and all of us weigh

19 in and told she has to go home without testifying.

20    And, three, I don't want to have her come unnecessary

21 if err inconvenient travel could be overtaken by the

22 stipulation.  But I think you can tell me what the time

23 deadline is, that's the deadline.

24    MR. BUDLOW:  Okay.

25    THE COURT:  If it's noon or 12:30 or 1, but simply

1    advise Mr. Ravenell that is the deadline.

2              MR. BUDLOW:  Very well.

3              THE COURT:  Good.

4              MS. SMITH:  Your Honor, there was one other thing.

5              THE COURT:  Yes, ma'am.

6              MS. SMITH:  Yesterday in front of the jury, when I

7    was questioning Mr. Catizone --

8              MR. RAVENELL:  Before we move on, could I address one

9    other issue, Your Honor, will the Court --

10             THE COURT:  Miss Smith did have the floor.

11             MR. RAVENELL:  I was asking, I apologize, if I could

12   stay on the same point.

13             THE COURT:  This is Dr. Lewis?

14             MR. RAVENELL:  Yes.  On that issue, that's why I was

15   asking, and I said is it okay, maybe I didn't say it as clearly

16   as I should.

17             The point I was making, Your Honor, on the

18   stipulation, I wanted to clarify so that all parties are clear,

19   when the Court will, you know, there will be at some point a

20   stipulation.  I guess the Court will tell the jury there's a

21   stipulation that these two men were hydrocodone abusers, will

22   the Court -- the Court indicated there will not be a

23   stipulation that the defendants were aware of that.

24             Will the Court so instruct the jury that there's no

25   stipulation that the defendants were aware of it, since the

Court has indicated that is also what the Court understands it
to be?

THE COURT: Well, I would not give them the latter,
because then the government, I would simply argue that not
available, hydrocodone abusers, and that's it.

MR. RAVENELL: All right.

THE COURT: I don't know whether the government is
going to specifically argue that they were aware that these
people were hydrocodone abusers, but the government is
certainly going to argue at general massive information that
the defendants knew or were willfully blind to the fact that
these people were ordering hydrocodone were abusing it, and
that the prescriptions were invalid.

MR. RAVENELL: I understand, based on what The court
said and what the government said yesterday, that there would
be no stipulations the defendants were aware of, I want to make
sure we're not going to have at closing argument the government
standing up and saying and the defendants have stipulated that
they are -- that the defendants knew that they were hydrocodone
abusers. Let's deal with it now versus some other time.

THE COURT: That is correct. The stipulation would
not entitle the government to argue at closing that the
defendants -- that there is a stipulation that the defendants
knew that these two individuals were hydrocodone abusers.

MR. RAVENELL: Right. All right. That helps us.

1 THE COURT: They certainly could argue that if they

2 had seen the prescription and put it to go with what was on the

3 Internet website, that they should have known.

4 MR. RAVENELL: I understand. And another thing, Your

5 Honor, I want to make sure the government's not going to then

6 say and because the defendants stipulated that these two

7 abusers, when you look at the numbers for the others that are

8 similar, you know, then the defendants should know it, because

9 it will be just arguing a different way. I assume we're clear.

10 I want to make sure the record's clear. I've had the

11 conversation with the government off the record.

12 THE COURT: The stipulation would only cover these

13 two individuals.

14 MR. BUDLOW: And just so the record's clear, the

15 government's not a party to the stipulation, but the government

16 would not argue either of the improper arguments that Mr.

17 Ravenell suggested, which is one that the stipulation is more

18 than it is, and that somehow they have agreed that they had

19 knowledge of this.

20 Or, two, that because they've stipulated to this

21 fact, therefore, the inference is they should know other facts.

22 We will argue -- we may argue knowledge based on other pieces

23 of evidence, but we would not link it to this stipulation.

24 MR. RAVENELL: All right. That helps us, Your Honor.

25 THE COURT: So I think that what Mr. Budlow says, I

think that's correct, that in closing argument, that Miss Smith

Mr. Budlow could argue to the jury there is a stipulation that

these two men were hydrocodone abusers, and the defendants

should have known it by all this other evidence that has come

into the case.  But that body of evidence would not include any

stipulation that the defendants knew.

MR. RAVENELL:  All right.  Thank you.

THE COURT:  Yes, Miss Smith?

MS. SMITH:  The only other issue I want to bring up,

it doesn't have to be resolved today entirely, but I do need to

bring it to the Court's attention.

Yesterday during the government's direct examination

of Mr. Catizone, when I referred to regulations as laws or vice

versa, at some point Mr. Ravenell yelled out in the courtroom

regulations are not law.

My concern, and to avoid another bench conference, I

just directed the witness let's call them regulations, I just

didn't address it.

In U.S.  -- in U.S. vs. Mitchell, Fourth Circuit

case, I believe I gave the Court the cite, 39 F. 3d, 465, it's

a 1994 Fourth Circuit case, it clearly states that regulations

have the force of law if they are substantive as opposed to

that legislative.

In other words, if they affect individual's

obligations and if they include a legislature grant of

1     authority to promulgate the regulations, which under Title 21,

2     Section 821 the Attorney General is expressly authorized to

3     promulgate regulations.

4         I'm going to craft an instruction, Your Honor, to a

5     add to our request for jury instructions, and I would ask that

6     the Court either instruct the jury today that regulations have

7     the force of law, or at the very least, not have another

8     discussion like that in front of the jury.

9     THE COURT:  Well, I'd be happy to take a look at the

10     jury instruction.  And if the jury instruction is accepted,

11     then I will give it.

12         But the simply to recap the questioning about the

13     laws, pharmacy is a profession that's practiced within a

14     regulatory matrix.  So that the pharmacist must know what the

15     rules and regulations are, and the pharmacist must also know

16     the chemical aspects of his profession.  So that Mr. Catizone

17     can testify about the rules and regulations that govern in his

18     profession.

19         And he can testify that the rules and regulations

20     come from federal law, state law, and regulations if that is

21     his opinion.

22         And he can testify about they operate and guide the

23     filling of prescriptions and the like.

24         And he successfully testified about that orally

25     yesterday.  What I thought was too much, and what I sustained

the objection was actually putting the statutory text up on the Doar machine because it gives too much emphasis to it. So that, but I think that, I'm just sort of puzzling my way through this, so that if he wants to testify, if that is -- if the regulations are part of the matrix, then he can testify that they're part of the matrix.

Now, it could be that he's right or wrong. So I'll take a look at it.

MS. SMITH: Your Honor, it's not my concern what the government was able to establish yesterday. My sole concern is that Mr. Ravenell announced in the courtroom interrupting me regulations are not laws. He announced it. He yelled it, and it's never been answered. That is my concern.

THE COURT: On redirect, you can ask Mr. Catizone whether regulations form part of the matrix.

MS. SMITH: Very well, Your Honor.

MR. RAVENELL: Your Honor, with all due respect, I hope the Court is not just accepting what Miss Smith says as being accurate and relying upon that in making the decision.

THE COURT: No, I'm not accepting -- I'm going to look at the jury instruction, as I said, when it comes in. If it's acceptable, you'll have an opportunity to weigh in.

For the purpose with Catizone, we're simply in the realm of expert testimony. And in a field that is highly regulated such as this one, he can express an opinion as to

what bodies of law govern the field of pharmacy, state,
federal, local, and can he state how they interact, just as he
did yesterday.

So if he is willing to opine that is federal
regulations, COMAR regulations, are part of the landscape, then
a pharmacist practicing pharmacy in Maryland must abide by, and
he can state that they are part of the landscape and what they
require.

MR. RAVENELL:  Your Honor, he's already done that.
In fact, the government showed him the newsletters.  And, in
fact, one of the newsletters states in fact cites the COMAR
regs.

THE COURT:  We've got to get -- I'm not --

MR. RAVENELL:  I thought you said, I understand, Your
Honor.

THE COURT:  He's already said that.  It's just that
Miss Smith wanted one specific problem, and if on redirect she
wants to ask him whether regulations are part of the landscape,
then I would permit her to do that, and he can say yes.

MR. RAVENELL:  Only reason I said when the Court said
she had a problem, I don't agree with her basis for the
problem, that's what I was addressing.

The Court had instructed that the witness should not
be allowed to say certain things.  Miss Smith's witness
consistently went outside of that, and those were the

1    objections I voiced based on the witness going outside of what

2    the Court had ruled.  And those are my objections.  Not just

3    yelling out in court, as Miss Smith suggested.

4              THE COURT:  Well, I wasn't saying that you'd done

5    anything improper.  Miss Smith said that she needed to nail

6    down a point with the witness; namely, that he considers in his

7    professional opinion regulations to be part of the regulatory

8    landscape and binding upon a pharmacist.

9              And if she believes she didn't sufficiently nail it

10   down, I'll permit her to get into that and establish it on

11   redirect.

12             Very good.  Mr. Thompson, if you would bring in the

13   jury, please?

14             MR. BUDLOW:  The government would need an answer

15   before lunch, 2:00 would be sufficient for an answer on the ME

16   question.

17             MR. RAVENELL:  Thank you.

18             (Jury present)

19             THE CLERK:  Jurors all present.

20             THE COURT:  Thank you, Mr. Thompson.

21             Good morning, ladies and gentlemen.

22             THE JURY:  Good morning.

23             THE COURT:  Pleasure to see you.  And we're ready for

24   the cross-examination of Mr. Catizone, who will be coming to

25   join us shortly.

1          Good morning.  You may resume your seat, sir.

2          THE WITNESS:  Good morning.

3          THE COURT:  Whenever you're ready, Mr. Ravenell.

4                    CROSS-EXAMINATION

5     BY MR. RAVENELL:

6     Q.  Court's indulgence, just to get set up here.

7          (Pause.)

8     Q.  Good afternoon, Mr. Catizone.

9     A.  Good afternoon.

10    Q.  Good afternoon, everyone.

11    A.  Good afternoon.

12    Q.  Now, Mr. Catizone, I do have a few questions for you today,

13    and let me start with asking you this, Mr. Budlow went through

14    some of your qualifications earlier and your background,

15    educational, and work experience.

16          Did you -- you didn't go to pharmacy school, did you?

17    A.  No.

18    Q.  And you don't have a pharmacy degree; is that correct?

19    A.  Correct.

20    Q.  And you have never worked as a pharmacist; is that also

21    correct?

22    A.  Correct.

23    Q.  And you have never filled a prescription; is that also

24    correct?

25    A.  Correct.

1  Q.  And are you familiar with the standard of care for a

2  pharmacist?

3  A.  No.

4  Q.  And have you ever qualified in a court of law, sir, to

5  render an expert opinion regarding a pharmacist's standard of

6  care?

7  A.  No.

8  Q.  And you're not qualified based on your training to render

9  an opinion as to a pharmacist standard of care; is that also

10  correct?

11  A.  Correct.

12  Q.  And you told us where you in fact I think you have done,

13  maybe have done some teaching.  Have you ever taught at a

14  pharmacy school?

15  A.  No.

16  Q.  Sir, can a doctor form a medical opinion whether to

17  prescribe drugs or issue a prescription from speaking with his

18  nurse?

19  A.  Yes.

20  Q.  Okay.  And have you ever authorized a prescription over the

21  phone?

22  A.  Yes.

23  Q.  And are you aware of other doctors who have authorized

24  prescriptions over the phone?

25  A.  Yes.

1    Q.  Have you ever received a phone call, say, from your nurse,

2    from a hospital, and given or authorize a prescription or an

3    order over the phone?

4    A.  Yes.

5    Q.  And are you aware of other doctors who have done the same

6    thing?

7    A.  Yes.

8    Q.  Now, in the example that I just mentioned, where you had a

9    phone conversation with your nurse, and authorized a

10   prescription for a patient, you did not perform a physical

11   examination of that patient before authorizing the

12   prescription, correct?

13   A.  Well, incorrect.  I mean, I would do that after having

14   already seen the patient at least once.

15   Q.  I understand.  But I'm talking about on this particular

16   occasion, if your nurse called you, and you authorized a

17   prescription over the phone, as you indicated you have done,

18   you would have done that in that particular scenario without

19   examining the patient on that particular occasion, correct?

20   A.  Correct.

21   Q.  All right.  And you're aware of other physicians who have

22   done the same thing, correct?

23   A.  Yes.

24   Q.  Now, when you authorized your nurse to issue a prescription

25   or order over the phone without a face-to-face with a patient

1   on that occasion, was that prescription issued appropriately?

2   A.  Well, I have a question.

3   Q.  No.  You don't get to ask questions.  You get to answer.

4   A.  Well, okay.  Can you repeat the question, then, please?

5   Q.  Yes.  On the scenario that we just mentioned, where you did

6   not see that patient face-to-face, received a call from your

7   secretary or, excuse me, nurse, and after speaking with your

8   nurse and getting information, you authorized a prescription

9   over the phone, was that prescription issued appropriately?

10  A.  Yes.

11  Q.  All right.  And was that prescription issued inside or

12  outside the usual course of medical practice?

13  A.  Inside.

14  Q.  All right.  And was the prescription issued for a

15  legitimate medical purpose?

16  A.  Yes.

17  Q.  And you were relying on the nurse and the patient giving

18  you information over the phone, correct?

19  A.  Correct.

20  Q.  And if the patient was lying to you, or the nurse was lying

21  to you, you would have issued a prescription possibly that you

22  shouldn't have issued, correct?

23  A.  Correct.

24  Q.  Now, have you ever given or issued a prescription while

25  covering a colleague's patient?

1    A.  Yes.

2    Q.  In those situations, was there ever a scenario where you

3    didn't meet with the patient face-to-face and prescribed

4    medication for a colleague's patient?

5    A.  Yes.

6    Q.  And you just talked to the patient over the phone, correct?

7    A.  Correct.

8    Q.  And in that scenario, was a prescription issued

9    appropriately?

10   A.  I believe so.

11   Q.  You believe so?

12   A.  Uh-huh.

13   Q.  Based on the standard of care that you have been talking

14   about in this courtroom, was that prescription issued properly?

15   A.  Yes.

16   Q.  All right.  Was the prescription issued outside the usual

17   course of medical practice?

18   A.  No.

19   Q.  And was the prescription issued for a legitimate medical

20   purpose?

21   A.  Yes.

22   Q.  So in that scenario that we just went through, you were

23   relying on the patient and your colleague, correct?

24   A.  Yes.

25   Q.  All right.  And then that scenario that we just went

1 through, you never had a face-to-face meeting with the patient,

2 correct?

3 A.  Correct.

4 Q.  Can you tell me, sir, what, if any, control a pharmacist

5 has over your patients?

6 A.  There is no control the pharmacist has.

7 Q.  Do pharmacists routinely check on your patients after they

8 fill a prescription for your patient?

9 A.  I don't think so.

10 Q.  Well, you've been practicing medicine for how long?

11 A.  Since, well, 1995.

12 Q.  Okay.  Do pharmacists routinely ask your patients or ask

13 you for your patient's medical records?

14 A.  No.

15 Q.  Have you ever had a pharmacist ask you for your patient's

16 medical records?

17 A.  No.

18 Q.  If a patient -- a pharmacist asked you for your patient's

19 medical records, would you be allowed to give them those

20 records or release the records without the patient first

21 signing a HIPAA release?

22 A.  No.

23 Q.  When is the last time that you have called one of your

24 patients after they've left your office and just asked them

25 whether they're misusing the drugs that they are taking?

1  A.  I don't believe I've ever done that.

2  Q.  Okay.  Now, going back to example that we talked about with

3  your nurse calling you, and you authorizing a prescription, how

4  many questions would you ask your nurse before you decide to

5  authorize the prescription?

6  A.  Well, that would vary.  That would vary based on the issue

7  at hand.

8  Q.  Sometimes it would be a very short conversation, correct?

9  A.  It could be.

10  Q.  And that is accepted in the medical profession, correct?

11  A.  Yes.

12  Q.  And this happens every day all over this country, doesn't

13  it?

14  A.  I don't know.

15  Q.  Well, based on the standard of medical care, you understand

16  that it is accepted all over this country, whether it happens

17  or not?

18  A.  Yes.

19  Q.  Okay.  You are aware of other -- strike that.

20       Let me ask you, you told us that you were retained by

21  the government to review information about this case and to

22  give testimony in this case, correct?

23  A.  Yes.

24  Q.  When were you first retained by the government to give

25  testimony in this case?

1  A.  Approximately two months ago.

2  Q.  Okay.  And when you were retained by the government two

3  months ago, did the government tell you they had a different

4  person scheduled to testify before you?

5  A.  No.

6  Q.  Okay.  Sir, you would agree that, during the time period,

7  and listen to the question carefully, during the time period of

8  January, 2005 to October 10th of 2006, that there was no

9  federal statutory definition of a doctor/patient relationship,

10  correct?

11  A.  I don't know.

12  Q.  You don't know?

13  A.  I don't know.

14  Q.  So you're telling us that you're giving a definition of

15  what you understand doctor/patient relationship to be, and you

16  don't know whether there was any federal statutory definition

17  of that term?

18  A.  Correct.

19  Q.  Would you agree that, during the time period of January,

20  2005 to October 10th, 2006, that the State of Maryland had no

21  law regarding pharmacists filling prescriptions issued by

22  out-of-state doctors?

23        MR. BUDLOW:  Objection.  Just I don't know the

24  question makes sense.  I don't know what to call that

25  objection.

1    THE COURT:  By out of state meaning?

2    MR. RAVENELL:  Out of state, the doctor being out of

3 state.

4    THE COURT:  So, in other words, the doctor in another

5 state and the --

6    MR. RAVENELL:  Yes.

7    THE COURT:  -- prescription being filled in Maryland?

8    MR. RAVENELL:  Yes.

9    THE COURT:  Good.  I'll overrule the objection.  If

10 you can answer it, sir?

11 A.  Is the -- can you repeat the question?

12 Q.  Sure.  You would agree, sir, that during the time period of

13 January, 2005, to October 10th, 2006, the State of Maryland had

14 no law regarding pharmacists filling prescriptions issued by

15 doctors that did not reside, practice in the State of Maryland?

16 A.  I would agree.

17 Q.  Sir, during your preparation to testify in this case, have

18 you reviewed any document called a DEA 6 or other investigative

19 reports concerning any interviews conducted by the government

20 agents with Internet customers?

21 A.  Yes.

22 Q.  All right.  And what DEA 6 reports did you review?

23 A.  Those that were provided to me.

24    (Pause.)

25    MR. RAVENELL:  Court's indulgence.

1        THE COURT:  Take your time.

2        MR. RAVENELL:  Thank you.

3        (Pause.)

4   BY MR. RAVENELL:

5   Q.  Do you have with you today any of the reports, the DEA 6s,

6   or the reports that you relied upon and reviewed?

7   A.  Yes.

8   Q.  May I see what you have?

9   A.  Well, they're in my bag.

10       MR. RAVENELL:  May the witness get them, Your Honor?

11       THE COURT:  Is your bag handy, sir?

12       THE WITNESS:  It is -- it's just right over there.

13       THE COURT:  Go ahead.

14       (Pause.)

15       MR. RAVENELL:  May I approach the witness, Your

16   Honor?

17       THE COURT:  You may.

18       (Pause.)

19   Q.  Now, I've gotten a chance to scan through, sir, what you

20   have given me, and not included -- well, what is not included

21   in this package is what I just asked you about, which is any

22   DEA 6s or any reports concerning interviews that have been

23   conducted or were conducted by government agents with any of

24   the Internet customers.

25       MR. BUDLOW:  Objection.  Sounds like a statement, not

1    a question.

2           THE COURT:  Well, if I could see counsel, please?

3           (At the bench)

4           THE COURT:  Good.  Now, the issue is whether he's

5    seen the DEA 6s, and he said that he thought he had some that

6    was in his bag.  We've now retrieved his bag, and he doesn't?

7    I take it he doesn't have any in the bag?

8           MR. RAVENELL:  If he did, it would be a violation in

9    that the government has told us they didn't give him any such.

10          MR. BUDLOW:  He probably doesn't know what a DEA 6

11    is, Mr. Ravenell.

12          THE COURT:  Because he said he thought he had it.  So

13    the next thing to do is to establish whether or not he brought

14    with him all of the documents.

15          MR. RAVENELL:  I'll do that.

16          THE COURT:  If he says he did bring with him all the

17    documents, then the next thing you need to do would be to get a

18    stipulation with Mr. Budlow that none of the DEA 6s were

19    included.

20          And if there's some part of the record that he has

21    not examined, you certainly are at liberty to point that out,

22    because evidence includes what's said, and jury can decide

23    what's in evidence and what's not.

24          So but we need to have an order of establishing that

25    he doesn't have any of the DEA 6s.

1    MR. BUDLOW:  Your Honor, may I just ask the Court to

2  have Mr. Ravenell sort of clarify with the witness whether or

3  not he knows what a DEA 6 is?

4    Because if the assumption of Mr. Ravenell is true

5  that he doesn't have them, then how would a pain doctor have

6  any idea what a DEA 6 is?

7    MR. RAVENELL:  That's part why I asked the witness to

8  listen the question carefully, have you reviewed any DEA 6s or

9  any other reports concerning any interviews conducted by

10  government agents for the Internet customers.

11    So that there is no -- what we've been told he's been

12  given no reports regarding any of the interviews of the

13  Internet customers.

14    THE COURT:  What about the interviews about the

15  controlled purchases?

16    MR. RAVENELL:  That's not an interview.  This is just

17  -- these are just sheets.

18    MR. BUDLOW:  This is a doctor.  He's not law

19  enforcement.

20    THE COURT:  Just wait a moment, please.  I don't know

21  whether he knows what a DEA 6 is or not, but the question is

22  whether he was given any interviews.  So we can do, you two can

23  stipulate that he doesn't have the DEA 6s.  And then you can

24  ask him whether he's got any interviews.

25    MR. RAVENELL:  Right.

1          THE COURT:  And if he says he doesn't, then where do

2     we go?

3          MR. RAVENELL:  I want the jury to know he didn't get

4     those things.  The jury has already heard there were five

5     interviews done in Louisiana of these Internet customers.

6          THE COURT:  Good.

7          MR. BUDLOW:  I'd ask if there's any stipulation, if

8     the term DEA 6 is used, that whoever's giving the stipulation

9     spell out in plain English what a DEA 6 is, because I think DEA

10    6 is a meaningless term to the ladies and gentlemen the jury.

11         THE COURT:  What is a DEA 6?  A report prepared by

12    DEA officer.

13         MR. BUDLOW:  It's a report of investigation,

14    essentially.

15         MR. RAVENELL:  There is evidence, and I've already

16    had a couple of witnesses tell us what a DEA 6, so it is in the

17    record.

18         Now, whether the jury recalls it is another, and I'll

19    be happy to spell it out exactly what a DEA 6 is, but there is

20    evidence, because other witnesses have testified, Agent Tush

21    and others, that they prepared these DEA 6s.

22         THE COURT:  You can tell them or I'll tell them.  But

23    the protocol is does he have anything else, then a stipulation,

24    that these do not include the DEA 6, and I will tell the jury

25    that a DEA 6 is a report of investigation prepared by a DEA

1     Special Agent.

2          MR. RAVENELL:  I have no problem with you doing that

3     right away.

4          THE COURT:  Let's establish whether he has one first.

5          MR. RAVENELL:  Be happy to.

6          (Open court)

7     BY MR. RAVENELL:

8     Q.  Sir, I have in my hand a package of information that you

9     indicated you reviewed in preparation for your testimony.  Do

10    you have any additional documents that you reviewed that I do

11    not hold in my hand?

12    A.  Yes.

13    Q.  All right.  And what is that?

14    A.  They are documents that are related to the number of

15    prescriptions per physician and a document related to the

16    number of refill rejections.

17    Q.  Okay.  So the only other documents are something Mr. Budlow

18    mentioned to you earlier, a report prepared by Paul Short, the

19    number of prescriptions?

20    A.  Yes.

21    Q.  Okay.  Then the rejections that you made reference to

22    earlier?

23    A.  Yes.

24         MR. RAVENELL:  Okay.  Your Honor, do you wish to --

25         THE COURT:  Good.  Then is there a stipulation

1  between counsel that Mr. Catizone did not receive any of the

2  DEA 6s?

3          MR. BUDLOW:  Yes, there is.

4          THE COURT:  Good.  Thank you.

5          Ladies and gentlemen, what is a DEA 6?  You've heard

6  some testimony as the trial has gone on about a DEA 6.  A DEA 6

7  simply called a report of investigation prepared by a DEA

8  Special Agent or investigative agent.  So DEA 6 is just jargon

9  referring to a specific type of report prepared by a DEA agent.

10          Mr. Ravenell?

11          MR. RAVENELL:  Thank you, Your Honor.

12  BY MR. RAVENELL:

13  Q.  Sir, in your opinion, can a doctor prescribe drugs in the

14  ordinary course of medical practice and for legitimate medical

15  purpose even if the patient lies to the doctor and has no

16  legitimate medical need or purpose for the drugs?

17  A.  Yes.

18  Q.  Isn't it true that some responsibility must be placed on

19  the patient who lies to get the drug?

20  A.  Yes.

21  Q.  And isn't it also true that there's no way that a doctor

22  can in every case tell the patient is lying?

23  A.  Yes, correct.

24  Q.  Now, isn't it true, further true, that if a doctor cannot

25  tell if a patient, a particular patient is lying, there's no

1   way for the pharmacist to meet that patient to know whether

2   that patient lied?

3   A.   Correct.

4   Q.   Would there still be a doctor/patient relationship under

5   the scenario that I've just described?

6   A.   Which scenario?

7   Q.   Yes.  Where the patient lied to the doctor, and you just

8   told us a patient can lie, the doctor could still issue a

9   prescription in the ordinary course of medical practice and for

10  legitimate medical purpose, would there still then be a

11  doctor/patient relationship?

12  A.   Yes.

13  Q.   Now, let me direct you, if two individuals who were

14  patients through the Internet testified that they met with

15  their primary care physicians and gave information to their

16  primary care physician that they suffered from back injury or

17  some injury that caused them pain, and that they in fact lied

18  when they told their doctors they had these particular pains,

19  and they met with the doctors face-to-face, and if they were

20  able to convince the doctors that they had such pains, and be

21  prescribed hydrocodone, in your opinion, would there be a

22  doctor/patient relationship established even though that person

23  lied to the doctor?

24  A.   Yes.

25  Q.   And if the doctor after that, during that face-to-face

1  meeting, prescribed medication, the primary care physician did

2  that, would that prescription have been given in the ordinary

3  course of medical practice and for a legitimate medical

4  purpose?

5  A.  Yes and no.  So, yes, in response to your first question,

6  and no for legitimate purpose, if the patient were lying.

7  Q.  But the doctor would not be, in your opinion, responsible

8  for knowing that that person is lying if he's tricked, correct?

9  A.  Correct.

10  Q.  In fact, you told us that in the past you've been tricked

11  by patients, correct?

12  A.  Correct.

13  Q.  And those are face-to-face meetings?

14  A.  Correct.

15  Q.  Now, are you familiar with the term "telemedicine"?

16  A.  Yes.

17  Q.  And Johns Hopkins University is involved in the field of

18  telemedicine; correct?

19  A.  Correct.

20  Q.  And how long has Johns Hopkins Hospital been involved in

21  the field of telemedicine?

22  A.  I don't know.

23  Q.  Would it be at least since 1999?

24  A.  Could be.

25  Q.  How long have you worked at Johns Hopkins?

1    A.   Since, well, I've been a faculty member since 2001.

2    Q.   I'm sorry?

3    A.   Since 2001.

4    Q.   Court's indulgence, Your Honor.

5         THE COURT:   Take your time.

6         (Pause.)

7    Q.   Here we go.

8         Are you familiar with a physician by the name of

9    Alexander Nason at Johns Hopkins University?

10   A.   No.

11   Q.   You're not familiar with a telemedicine program that he

12   runs there?

13   A.   I'm not familiar with -- I'm sorry.  Yes.  Alex Nason?

14   Q.   Yes.

15   A.   Yes.

16   Q.   And are you familiar with Bill Ruby at Johns Hopkins

17   Hospital?

18   A.   No.

19   Q.   All right.  So you're not familiar with a program, a

20   telemedicine program, that he runs for treatment of prisoners

21   in correctional institution?

22   A.   No.

23   Q.   Okay.  Are you familiar with Johns Hopkins -- Johns Hopkins

24   International?

25   A.   Yes.

1   Q.   What is Johns Hopkins International?

2   A.   It's a program whereby patients from across the world are

3   offered medical assistance by physicians at Johns Hopkins.

4   Q.   And that's done through what we call telemedicine; is that

5   correct?

6   A.   In part, yes.

7   Q.   And there are -- in those programs, you mentioned you're

8   familiar with the doctors from Johns Hopkins and, in many

9   cases, have face-to-face meetings with the patients, correct?

10  A.   Correct.

11  Q.   Now, you mentioned, you mentioned earlier on direct

12  examination that things that you would consider in deciding

13  whether to -- or decisions, things that go into a decision

14  whether to treat a patient, particularly talking about pain

15  medicine, you said something that you use a questionnaire, do

16  you recall that?

17  A.   Yes.

18  Q.   And you also said another thing that is factor is you look

19  at the patient's history, correct?

20  A.   Correct.

21  Q.   Now, the questionnaire and the history of the patient is

22  based on mainly what the patient tells you, correct?

23  A.   Correct.

24  Q.   In fact, you indicated that this questionnaire that you

25  used is something that you send to patients before they even

1  come into your office, correct?

2  A.  Yes.

3  Q.  And the patients fill this questionnaire out in the comfort

4  of their home, or wherever they choose to fill it, correct?

5  A.  Correct.

6  Q.  You don't monitor how they fill it out at all?

7  A.  Correct.

8  Q.  How long it takes to fill that prescription -- that

9  questionnaire depends on what the answers are that the patients

10  have, correct?

11  A.  Yes.

12  Q.  For example, in some parts of your questionnaire, there are

13  areas where if your answer is yes, then give us more detail,

14  correct?

15  A.  Yes.

16  Q.  But if the answer is no, then the person wouldn't be

17  required to give detail, correct?

18  A.  Correct.

19  Q.  And you mentioned that the questionnaire that you use, now,

20  you're not saying that all doctors in the country use that

21  questionnaire, are you?

22  A.  Correct.

23  Q.  That's something that you and others that you work with

24  created?

25  A.  Correct.

1   Q.  Okay.  And it's something that you feel is a tool for you

2   to use in your practice, correct?

3   A.  Correct.

4   Q.  And how long it takes a person -- well, since you're not

5   there when the person fills out these things, you don't time

6   how long it took them to fill it out, do you?

7   A.  No.

8   Q.  And when the patients come in, you say that you get a

9   history of the patient, correct?

10  A.  Yes.

11  Q.  Well, the history that you would elicit a lots of what's

12  already set out in the questionnaire, correct?

13  A.  Yes.

14  Q.  Well, you ask, you have a lot of question about their

15  personal medical history in the questionnaire, right?

16  A.  Yes.

17  Q.  And one of the things that doctors generally inquire about,

18  when they get the person's history, is the medical history,

19  right?

20  A.  Yes.

21  Q.  And about what their family's medical history, correct?

22  A.  Yes.

23  Q.  All of those things are already in your questionnaire,

24  right?

25  A.  Yes.

1  Q.  All right.  So the two of the things that you rely upon in

2  deciding how to treat the patients, the questionnaire, and the

3  history, both relies upon the credibility of the reporting, the

4  patient, correct?

5  A.  Yes.

6  Q.  And there have been occasions where you found that the

7  patients tell you about their medical history, and you may at

8  some time find out that they lied about their medical history?

9  A.  Yes.

10  Q.  And there are times they may have lied that you never find

11  out about, correct?

12  A.  That's right.

13  Q.  Now, you said on direct examination that opiates, which --

14  did you say the hydrocodone was an opiate?

15  A.  Yes.

16  Q.  That opiates are usually considered to be an effective way

17  to treat pain; is that correct?

18  A.  Yes.

19  Q.  And that's still your answer?

20  A.  Yes.

21  Q.  All right.  You also said that one of the things you may

22  ask of a patient is whether that patient has a history of

23  substance abuse in deciding how to treat the patient, correct?

24  A.  Yes.

25  Q.  Again, that is self-reporting, correct?

1    A.   Yes.

2    Q.   Earlier you were asked by Mr. Budlow a question about pure

3    hydrocodone.   You said pure hydrocodone is not more addictive

4    than combination hydrocodone.

5         Do you recall that testimony?

6    A.   Yes.

7    Q.   So you would disagree with the DEA rating of pure

8    hydrocodone as Schedule II and combination hydrocodone as

9    Schedule III?

10   A.   Yes.

11   Q.   Okay.   So isn't it the reason why combination hydrocodone,

12   when it's combined with Tylenol or acetaminophen or Ibuprofen,

13   it is a reason that it's a schedule lower, is because by adding

14   it, these other drugs, it lessens the risk of addiction?

15   A.   No.

16   Q.   No?   So it doesn't lessen?   By adding Ibuprofen to Tylenol,

17   your position is then if hydrocodone was a Schedule II, because

18   of certain activeness properties, it continues and should

19   continue to stay as a Schedule II, because it doesn't become

20   any less likely to become addictive because you combine it with

21   other drugs; is that right?

22   A.   Correct.

23   Q.   All right.   Are you aware that the DEA, in fact, indicates

24   that hydrocodone Schedule II, pure hydrocodone is Schedule II,

25   and combination hydrocodone is Schedule III, are you aware of

1   that?

2   A.   Yes.

3   Q.   Okay.  And you've been aware of that for how long?

4   A.   For since I've been practicing pain medicine.

5   Q.   Okay.  And have you made any efforts to get the DEA to

6   change that schedule?

7   A.   No.

8   Q.   You talked earlier about an informed consent, that you said

9   is to be signed by the patient and the doctor and witnessed by

10  someone else.

11          This informed consent that you indicate that you use

12  in your practice, can you point me to where in the law federal

13  or state, where that's required?

14  A.   No.

15  Q.   Why can't you?

16  A.   Because, to my knowledge, it doesn't exist in the law.

17  Q.   Okay.  You said that under the scenario that you were

18  involved in, in how you treat your patients, that the patients

19  will show up for a followup, that's what you have in your

20  informed consent agreement, and that the patient will submit to

21  urine tests.

22          Do you recall that testimony?

23  A.   Yes.

24  Q.   And is that a requirement in the Internet setting, or is it

25  a requirement in your practice if one comes to your office?

1  A.  It's a requirement in my practice.

2  Q.  You testified earlier about that there is a standard of

3  care which requires a face-to-face examination of a patient for

4  there to be a proper prescription issued.

5          Now, can you point to me where in the law, federal or

6  state, that is written?

7  A.  No.

8  Q.  Why not?

9  A.  Because, to my knowledge, it doesn't exist as a law.

10  Q.  You indicate that in how you conduct your practice, that

11  follow ups must include a face-to-face visit.

12          Can you point me to where in the law state or federal

13  that is required?

14  A.  No.

15  Q.  Why not?

16  A.  Because, to my knowledge, it doesn't exist as a law.

17  Q.  Now, you testified that under your way of seeing things,

18  that there cannot be that doctor/patient relationship without

19  these face-to-face meetings with a patient and the physician

20  for the initial meeting and for the followups.

21          Let me ask you, something, sir, is it your position

22  that you cannot then prescribe hydrocodone, a doctor can't

23  prescribe hydrocodone --

24          MR. BUDLOW:  Objection.

25          MR. RAVENELL:  May I finish the question?

1    MR. BUDLOW:  We'd be here forever.

2    THE COURT:  If you'll let Mr. Ravenell finish,

3    please, go ahead.

4    MR. RAVENELL:  One thing I may tell Mr. Budlow, we

5    may be here forever, but it's for a good reason if we are.

6    THE COURT:  If you could continue framing your

7    questions?

8    BY MR. RAVENELL:

9    Q.  Yes.  Sir, under your theory of what -- or your practice,

10   are you telling the members of the jury that you cannot have a

11   doctor/patient relationship over the Internet if there must be

12   face-to-face meetings originally and then a full up

13   face-to-face meeting with that doctor?

14   MR. BUDLOW:  Objection.

15   THE COURT:  Overruled.  You may answer, sir.

16   MR. BUDLOW:  May we approach briefly?

17   THE COURT:  You may.

18   (At the bench)

19   MR. RAVENELL:  That's a good one.

20   MR. BUDLOW:  You saw me standing there, and you just

21   drag it on.

22   THE COURT:  The question was going rather nicely.

23   MR. RAVENELL:  I thought it was, too.

24   MR. BUDLOW:  Speech.

25   MR. RAVENELL:  I thought it was going along well, it

1  was not a --

2         MR. BUDLOW:  I apologize for interrupting him.

3         THE COURT:  He said Mr. Catizone said you have to

4  have a face-to-face meeting initially.

5         MR. BUDLOW:  Right.  I have no problem with that.

6  The basis of my objection is not through the question in and of

7  itself.  I think that it's otherwise an appropriate question.

8  The problem is when Mr. Ravenell goes on these long questions,

9  he tends to put things that there that assumes some facts not

10  in evidence.  And he did it in this case in both versions of

11  the question.

12         The first question he used the term "in your way of

13  seeing things." And in the second question he said "in your

14  theory of practice."

15         And I think that it was pretty clear that this

16  witness testified that, in his opinion, the standards of

17  practice in the medical community called for these things.  And

18  so the facts that Mr. Ravenell are assuming in evidence are

19  essentially argumentative in trying to place these opinions

20  into a different box other than they were testified to.

21         So when he says you testified to it this way, it

22  really calls, puts facts in evidence that aren't in evidence.

23         THE COURT:  You mean about the your way of seeing

24  things?

25         MR. BUDLOW:  Exactly.  Whether, he didn't testify, if

1   he wants to ask him that, but he can't say you testified that

2   your -- I'm sorry, that your theory of practice, your way of

3   seeing things, and that is how he asked the question.

4       THE COURT:  Well, there is some validity to that,

5   because the question would be is he testifying about what he

6   does in his practice, or is he testifying as to the standards?

7       So I think it would probably make sense you testified

8   to this, you testified to that.  Doesn't then that mean that

9   you can never have --

10      MR. RAVENELL:  That's what I did, Judge.

11      Your Honor with all due respect, there are several

12  times the witness says "in my way of seeing things." And I

13  object to the Court overruling my objection.

14      And I said, Judge, I'll be objecting because it's not

15  about his way of seeing things.  Now that I phrased the

16  question, the government got away with doing that on direct,

17  and now that I phrased question about his way of seeing things.

18  I think it's appropriate.  He did it at least three times this

19  afternoon.  I said I object.  I said his way of seeing things

20  is irrelevant.  The Court said overruled.

21      THE COURT:  Well, but what he said was, when you

22  object to something like, my thinking is, my perception is,

23  which I thought was valid, because if he says my thinking is,

24  there's sort of an implied, it's a phrase some people use

25  sometimes when they're not really sure.  But I thought that it

1    was valid was because he's already said he has his opinion and

2    this thinking is, his thinking about the opinion is you have do

3    such and such.

4         So I don't remember him saying in his way of doing

5    things.  He was talking about what his mental or thinking was,

6    and his mental thinking was you need to do a certain thing to

7    comport with the standards.

8         So I think that what you need to do, and I think it

9    is helpful to walk through.

10        MR. RAVENELL:  Sure.

11        THE COURT:  And it's really an important point, is

12   that under his assessment of medical practice, you have to have

13   a face-to-face meeting.

14        MR. RAVENELL:  I'll walk him through it.

15        THE COURT:  And one of the things for doing it that

16   we all recognize there are some exceptions, when colleagues are

17   filling in for a colleague or when a nurse is right there, or

18   something else, but I think it would be fair to him, we need to

19   establish in a garden variety case you need the face-to-face.

20        MR. RAVENELL:  I'll be happy.  Do you want to take a

21   break?

22        THE COURT:  Why don't we take just a short break and

23   come back for that.

24        (Open court)

25        THE COURT:  Ladies and gentlemen, it's 3:30.  Let's

1    take the mid-afternoon recess until 3:45, and then we'll come

2    back and continue on.

3                Thank you.

4                (Recess.)

5                THE COURT:  Please be seated unless you wish to stand

6    for the jury.

7                Doctor, would you resume the stand, please?

8                (Pause.)

9                MS. SMITH:  The witness wants to know he should stand

10   for the jury?

11               THE COURT:  Oh, if you wish.  It is customary.

12               (Jury present)

13               THE CLERK:  Jurors all present.

14               THE COURT:  Thank you, Mr. Thompson.

15               Please be seated.  Mr. Ravenell, whenever you're

16   ready.

17               MR. RAVENELL:  Thank you, Your Honor.

18   BY MR. RAVENELL:

19   Q.  Doctor, welcome back.

20               Doctor, you testified on direct examination and now

21   on cross-examination that, before prescribing hydrocodone,

22   there must be the standards of care inquiry, there be a

23   face-to-face evaluation of the client, correct?

24   A.  Correct.

25   Q.  And you said that the extent of care how you require you

1      conduct your practice requires a face-to-face followup visit as

2      well; is that correct?

3      A.  Correct.

4      Q.  Now, if the doctor is in California and the patient is in

5      Maryland, then you would indicate, that is your understanding

6      of the standard of care, that there could not be a

7      doctor/patient relationship between those two individuals

8      through the Internet; is that correct?

9      A.  Incorrect.

10      Q.  No?  So if that -- that doctor would have to see the

11      patient for there to be a doctor/patient relationship?

12      A.  Yes.

13      Q.  All right.  So if the doctor actually -- the doctor would

14      actually have to have a face-to-face meeting for the patient

15      for there to be a doctor/patient relationship?

16      A.  Yes.

17      Q.  Okay.  Now, can you point me to where it is in the law that

18      says there must be a doctor/patient relationship established by

19      face-to-face evaluation of the patient by the doctor in

20      California and the patient in Maryland?

21      A.  No.

22      Q.  Why not?

23      A.  Because I don't believe it exists in the law.

24      Q.  Okay.  Now, you're familiar with, you mentioned earlier a

25      Federation of State Medical Boards in the United States?

1    A.  Yes.

2    Q.  What is the Federation of State Medical Boards of the

3    United States?

4    A.  It's a group of individuals, physicians and non physicians,

5    who establish policies regarding healthcare and safety for

6    patients across the country.  And so the Federation oversees

7    the State Medical Boards.

8    Q.  All right.  And did you review and rely upon any

9    publication from the Federation of State Medical Boards of the

10   United States in preparation for your testimony?

11   A.  Yes.

12   Q.  And are you familiar with something entitled the "Model

13   Guidelines for the Appropriate use of the Internet and Medical

14   Practice," published by the Federation of State Medical Boards

15   of the United States?

16   A.  Yes.

17   Q.  And is that a document that you reviewed and relied upon

18   for your testimony here today?

19   A.  Yes.

20   Q.  Now, since you have reviewed that document, and relied upon

21   it, let me ask you, in that document, is there a statement

22   under the section that says treatment including issuing a

23   prescription based solely on an online questionnaire or

24   consultation does not constitute an acceptable standard of

25   care?

1   A.  Yes.

2   Q.  All right.  Now, in this particular case that you've been

3   called to testify in, you're aware that the prescriptions were

4   not issued based solely on an online questionnaire or

5   consultation, but there was a review of medical records by a

6   physician, are you not aware of that?

7   A.  I'm aware of that.

8   Q.  Okay.  Now, in that model guidelines for the appropriate

9   use of the Internet and medical practice, I'll read a portion

10  and ask you a question.

11          There's a section called an "Appropriate Physician

12  Patient Relationship."  And it reads "The relationship between

13  the physician and the patient is complex and is based on the

14  mutual understanding between the physician and the patient of a

15  shared responsibility for the patient's healthcare.

16          "Although the board recognizes that it may be

17  difficult in some circumstances, particularly in an online

18  setting, to define precisely the beginning of the

19  physician/patient relationship, it tends to begin when an

20  individual seeks assistance from a physician with a

21  health-related matter for which the physician may provide

22  assistance.

23          "However, the relationship is clearly established

24  when the physician agrees to undertake diagnosis and treatment

25  of the patient and the patient agrees whether or not there has

1    been a personal encounter between the physician and the

2    patient."

3           Are you familiar with that?

4    A.  Yes.

5    Q.  Okay.  And in that passage that's set forth in an article

6    that you relied upon, it indicates that there can be a

7    doctor/patient relationship over the Internet whether or not

8    there has been a personal encounter between the physician and

9    the patient, correct?

10   A.  Yes.

11   Q.  All right.  And that is from the again the Federation of

12   State Medical Boards of the United States?

13   A.  Yes.

14   Q.  And do you know what year this particular article that you

15   relied upon was published?

16   A.  I believe 2004, but I'd have to refer to the document.

17   Q.  Okay.  Now, let me -- have you ever prescribed medication

18   over the Internet?

19   A.  No.

20   Q.  Now, you told us earlier about the informed consent, and

21   that part of the informed consent that you require your

22   patients to sign is that they would come in, the patient will

23   come in for face-to-face meetings with you, correct?

24   A.  Yes.

25   Q.  Now, the Model Guideline for Appropriate Use of the

1  Internet and Medical Practice speaks of informed consent as

2  well, correct?

3  A.  Yes.

4  Q.  And in that section that speaks of informed consent, there

5  is no requirement by the federal, federation of medical state

6  medical boards of the United States when speaking of the

7  guidelines, particularly Internet practice, that says there

8  should be an inpatient or in person followup, does it?

9  A.  No.

10  Q.  Now, are you also familiar with another publication from

11  the Federation of State Medical Boards -- well, strike that.

12  Let me just ask you a couple of questions in general.

13        Do you agree with this following statement, sir, that

14  contribute to the prevalence of undertreated pain include the

15  perception that prescribing adequate amounts of controlled

16  substances will result in unnecessary scrutiny by regulatory

17  authorities.

18        Do you agree with that statement?

19  A.  Yes.

20  Q.  I'll ask you if you agree with this statement,

21  "Inappropriate pain treatment may result from physician's lack

22  of knowledge about pain management, fears of investigation, or

23  sanctioned by federal state and local agencies that may also

24  result in inappropriate treatment of pain."

25        Do you agree with that statement?

1  A.  Yes.

2  Q.  Do you agree with this statement, "Physicians should

3  recognize that tolerance and physical dependence are normal

4  consequences of the sustained use of opiate analgesics and are

5  not the same as addiction?"

6  A.  Yes.

7  Q.  And do you agree with this statement, "Physician's conduct

8  will be evaluated to a great extent by the outcome of pain

9  treatment"?

10  A.  Yes.

11  Q.  All right.  Now, have you evaluated any of the patients

12  that were treated in this particular case?

13  A.  No.

14  Q.  Doctor, are you saying that there was no doctor/patient

15  relationship in all of the 108,000 prescriptions that were

16  issued in this case and that all the prescriptions were issued

17  outside of the course of medical practice and not for

18  legitimate medical purpose?

19  A.  Yes.

20  Q.  Okay.  Now, in reaching your opinion that you have now

21  testified to, have you reviewed any of the medical records of

22  the 26,000 patients to whom the doctors authorized

23  prescriptions for hydrocodone in this case?

24  A.  No.

25  Q.  Have you talked to any of the doctors who prescribed the

1    drugs to see how they operated their practice?

2    A.  No.

3    Q.  Did you know, or do you know how long on average the

4    doctors took to review the medical records of a patient?

5    A.  Yes.

6    Q.  And you would know that how?

7    A.  In one of the documents I was provided, there was

8    indication of interview with a physician assistant, and it

9    indicated that there was a turnover, in other words, 24 hours

10   or so elapsed before the physician would review the documents

11   and render a decision.

12   Q.  Well, what was indicated wasn't that there would be at

13   least 24 hours for the doctors to in fact review their records?

14   A.  Correct.

15   Q.  But there was nothing indicated in what you read, because

16   I've seen the material you read, that says a doctor will review

17   your medical record on this particular time and for how long,

18   does it?

19           MR. BUDLOW:  Objection as to what Mr. Ravenell read.

20           THE COURT:  Right.  I'll sustain that part of the

21   objection.

22   Q.  I'll rephrase.

23           THE COURT:  Part of the question.

24   Q.  Thank you.  I will rephrase the question.

25           There was nothing in the documents that you read that

1   indicated how long the doctor would take to review any
2   particular medical record, does it?
3   A.   No.
4   Q.   Okay.   Now, have you talked to any of the doctors to see
5   what they relied upon in issuing the prescriptions that you
6   concluded were issued outside of a doctor/patient relationship?
7            MR. BUDLOW:   Objection.   Asked and answered.
8            THE COURT:   I'll overrule the objection.   You may
9   answer.
10  A.   No.
11  Q.   Do you know the pedigree of the doctors who prescribed the
12  drugs in this case?
13  A.   I'm not sure what you mean by "pedigree."
14  Q.   Meaning their background?
15  A.   No.
16  Q.   Okay.   Do you know whether the doctors were in good
17  standing with their state board who issued the prescriptions in
18  this case?
19  A.   No.
20  Q.   Do you know whether the doctors had ever been sanctioned by
21  their state boards who issued prescriptions in this case?
22  A.   No.
23  Q.   Do you know anything about the doctors' practices from any
24  personal knowledge or interviews that you conducted?
25  A.   No.

1  Q.  Do you know whether any of the doctors who issued

2  prescriptions in this case have received any awards for their

3  care of patients?

4  A.  No.

5  Q.  Now, one of the things that was done when you came into

6  this courtroom was that Mr. Budlow had you tell the jury about

7  your pedigree, your background; is that correct?

8  A.  Yes.

9  Q.  And one of the things you have before the jury is who you

10 are, and they can either take it rely upon it or not, correct?

11 A.  Correct.

12 Q.  All right.  Now, have you spoken with any of the five

13 people from Louisiana that Detective Brashier interviewed when

14 he made controlled deliveries of hydrocodone to them?

15 A.  No.

16 Q.  Were you made aware by the government that Detective

17 Brashier had even interviewed those five patients?

18 A.  No.

19 Q.  Did you talk to Jennifer Koch, or Doug Chorpenning, two

20 patients who testified in this case?

21 A.  No.

22 Q.  Did you make a request of the government to speak to those

23 people?

24 A.  No.

25 Q.  Were you even aware that those two people existed?

1   A.   No.

2   Q.   Did you interview any of the pharmacists who worked at New

3   Care?

4   A.   No.

5   Q.   Did you make a request of the government to do that?

6   A.   No.

7   Q.   Did you review any of the reports prepared by the agents

8   who interviewed the pharmacists who worked at New Care?

9   A.   No.

10   Q.   Were you even aware that the agents had interviewed

11   pharmacists who worked at New Care?

12   A.   No.

13   Q.   Did you interview any of the witnesses who worked at New

14   Care, who testified in this case, such as Delores Kelly,

15   Theresa Ryan, Nannette Patterson, any of those people?

16   A.   No.

17   Q.   Were you even aware of the names of those people?

18   A.   No.

19   Q.   D'Andra Kelly.  Thank you.

20        Court's indulgence, Your Honor.

21        THE COURT: Take your time.

22        (Pause.)

23   Q.   Sir, you would agree that one of the things that is key in

24   deciding whether there's a doctor/patient relationship is the

25   intent of the parties?

1    A.  Yes.

2    Q.  If a person wishes to have a doctor prescribe medication or

3    treat him, and the doctor agrees to do that, that is important

4    to determine whether there's a doctor/patient relationship,

5    correct?

6    A.  Yes.

7    Q.  If, for example, I'll give you a hypothetical and say

8    doctor A is my doctor, but doctor B is on call for the weekend,

9    and I have a medical issue during the weekend, I call and speak

10   with doctor B, doctor B reviews my medical records on a

11   computer screen, talks to me for a few minutes on the phone, or

12   has his physician assistant or nurse talk to me, and then

13   prescribes medication to me, after reviewing the medical

14   records, is there a doctor/patient relationship?

15   A.  Yes.

16   Q.  Another example, the patient has a primary care physician,

17   but on the weekend he experiences medical problems and he goes

18   to an urgent care facility.  The patient meets with the urgent

19   care nurse or PA, the nurse or the PA examines the patient.

20   The doctor briefly speaks with the patient for about five

21   minutes, reviews the patient's chart, as created by the nurse

22   or the PA, and prescribes medication; is there a doctor/patient

23   relationship?

24   A.  If there is a physical examination, yes.

25   Q.  All right.  If the physical examination is not done by the

1  doctor, is there a doctor/patient relationship?

2  A.  Yes.

3       MR. RAVENELL:  Okay.  Now, Court's indulgence, Your

4  Honor.

5       THE COURT:  Take your time.

6       MR. RAVENELL:  Thank you.

7       (Pause.)

8  Q.  Now, you were asked some questions about reasons why you

9  determined that there was no doctor/patient relationship in

10  this case, and at some point during the questioning, you were

11  given a cheat sheet by Mr. Budlow to allow you to recall what

12  your reasons were for determining that there was no

13  doctor/patient relationship in this case; is that correct?

14  A.  Yes.

15  Q.  All right.  That's because you were not able to recall your

16  own reasons for not -- for determining that there was no

17  doctor/patient relationship in this case, correct?

18  A.  Yes.

19  Q.  Now, did you come to those, up with these reasons in

20  collaboration with the government?

21  A.  Yes.

22  Q.  You made mention earlier that there were rejections and the

23  rejections indicated -- rejections by the pharmacist, that the

24  rejections indicated that the prescriptions were not issued

25  properly.

1    Now, you said the patients were asking for refills
2  early, and that tells you that the patients were not using
3  properly, and that you used that to determine that there was no
4  doctor/patient relationship.
5    Now, tell me, the fact that a patient asks for
6  medication early, that wouldn't tell you that the doctor
7  initially issued the prescription for an illegitimate purpose,
8  does it?
9  A.  No.
10  Q.  And it wouldn't tell you that the doctor issued the
11  prescription outside the normal course of medical practice
12  because the patient there asked for a refill too early, does
13  it?
14  A.  No.
15  Q.  Now, you mentioned the rejections, you said the rejections
16  were for the patients asking for medication too early.
17    You're aware that all of the rejections were not
18  because the patients were seeking refills too early, aren't you
19  or are you?
20  A.  That was my analysis of what I interpreted.  That was my
21  interpretation of what I saw there.
22  Q.  Okay.  Well, did you review the document, or did someone
23  tell you what was there?
24  A.  I reviewed the documents.
25  Q.  In reviewing those documents, weren't there rejections, for

1    example, because -- are you okay, Your Honor?

2            THE COURT:  I'm fine, thank you.

3    Q.  Weren't there rejections, for example, because there was a

4    bad address?

5    A.  There might have been.

6    Q.  Might have been?  You don't have any recollection today?

7    A.  I don't.

8            MR. RAVENELL:  Nothing further, Your Honor.

9            THE COURT:  Thank you, Mr. McCants.

10            Ladies and gentlemen, I'm going stay here with

11    counsel and to discuss a matter.  And it should take about 15

12    minutes.  So if you could be prepared to come back around 20

13    minutes after.  I'm going stay here and you can go to the jury

14    deliberation room.

15            (Jury recessed)

16            THE COURT:  Thank you, Mr. Thompson.  Please seated.

17    The record will show that the jury has retired.  Miss Smith, if

18    you could?

19            MS. SMITH:  Yes, Your Honor, and also let --

20            THE COURT:  Redirect, please.

21            MS. SMITH:  Let the record show that Mr. Catizone is

22    also not in the courtroom.

23            THE COURT:  Good.

24            MS. SMITH:  Your Honor, I think I only have a half

25    dozen or so brief issues.

1    One of the issues that was inquired of Mr. Catizone

2  was the choices that he made on his resume.  It would seem to

3  me that someone either charged in a criminal case who acquitted

4  or someone involved in a civil case would not want their name

5  all over a resume.  And the fact that the two that are on here

6  were convicted, there are privacy concerns, in other words, to

7  the choices that were made on the resume.

8    Mr. Ravenell went out of his way to point out that

9  certain matters were not on his resume.  As if to imply that he

10  was trying to show that he was a friend of the government and

11  only a friend of the government.  And I think there are other

12  concerns.

13    Without getting into who was convicted and who

14  wasn't, I just want to ask him if there are any privacy

15  concerns when he determines the names of private individuals

16  that he puts on his resume.

17    THE COURT:  Well, you could ask him why didn't he

18  list these cases, these individuals on his resume, and he'll

19  see what he says but you can't --

20    MS. SMITH:  Your Honor, I think -- I think that's

21  dangerous.  I mean that's an open-ended question.  I'm trying

22  to avoid him saying because everybody, because those people

23  were acquitted, and I didn't put them on my resume, the

24  implication being the ones on there are the people where the

25  prosecution was successful.  I'm trying to avoid that.

1    THE COURT:  Well, the problem is that you're not
2    allowed to lead.  So you have to, if you want to ask him the
3    question why he omitted something on his resume, you have to
4    ask him why he omitted it.

5    MS. SMITH:  I will see if I can think of a good way
6    to ask that question.

7    THE COURT:  Good.

8    MS. SMITH:  Next, there was a question about whether
9    the NABP was accredited by the State Pharmacy Boards, and I
10   would just like him to point out that they are the members of
11   the ANBP.  It's like asking, I mean, just to clarify that.

12   THE COURT:  Right.  That's good.  So just like asking
13   the --

14   MS. SMITH:  If the pharmacists credits the Maryland
15   Board of State Pharmacy.

16   THE COURT:  Right.  I was trying to think of either
17   legal or medical, but it's the pharmacies that are members, and
18   there's really, NABP, they're a pharmacist so there's nothing
19   to accredit.  that's all right.

20   MS. SMITH:  I would like to then discuss -- well, I
21   would like to ask him if he knows whether or not -- about the
22   evidence in this case what, if anything, the doctors did,
23   whether they reviewed or didn't review.

24   I would just like to establish that he doesn't know
25   that and thereby also say that it's just not a foregone

1    conclusion as least insofar as this witness.

2         MR. MCCANTS:  Could I ask Miss Smith to repeat that

3    question?  I couldn't hear.

4         MS. SMITH:  I'm sorry.  I was going to ask the

5    witness if he knows anything about the doctors in this case

6    specifically whether they reviewed or didn't review medical

7    records, does he have any information at all about whether or

8    not they reviewed medical records.

9         THE COURT:  Good.  That's good.  Were you given any

10   information concerning whether, that's good.

11        MS. SMITH:  Mr. Ravenell then used government's

12   exhibit 59 to show the printouts from the Internet whether the

13   witness had reviewed any of those.  And that checking for a

14   doctor's registration was one of the things that the NABP

15   recommends and in verifying whether there's a doctor/patient

16   relationship.

17        I would like to ask him to state, I can either do

18   this hypothetically or based upon the evidence that is in the

19   record, the number of tablets of hydrocodone that were already

20   dispensed by the date on the printout, that Mr. Ravenell did

21   not show to the witness, because the date is either late

22   September or early October of '06, and does checking a doctor's

23   credentials after 8 or 9 million doses have gone out the door,

24   is that a good practice?

25        THE COURT:  Well, I'm going -- I won't -- I assume

1    you object to that, Mr. Ravenell?

2          MR. RAVENELL:  I was about to say, Your Honor, that's

3    called argument for the jury.

4          THE COURT:  I'm -- I agree with that Mr. Ravenell on

5    that point, so I will sustain the objection.

6          MS. SMITH:  Can I --

7          THE COURT:  But you can certainly argue that in

8    argument.

9          (Pause.)

10         MS. SMITH:  And then finally, Your Honor -- one

11   moment, Your Honor.

12         (Pause.)

13         MS. SMITH:  Your Honor, a couple more points.

14   Whether or not the witness was asked if he knew that New Care

15   got an approval of their application to do Internet, to fill

16   Internet prescriptions.  I would like to ask him, show him a

17   document again, and ask him if an application, which has been

18   approved, that indicates Internet/mail order, does that change

19   the legal requirements for a prescription, and you know does it

20   matter how the prescription reaches the pharmacy?

21         THE COURT:  If you could, what was, first of all, if

22   we go back to that application, it's a matter of debate, and --

23         MS. SMITH:  I'm not going to debate that issue.

24         THE COURT:  If you --

25         MS. SMITH:  Sorry.

1    THE COURT:  It's a matter of interpretation as to

2    what that application permits the pharmacist to do, and I can't

3    remember what his answer was when he was shown the application

4    by Mr. Ravenell.

5    MS. SMITH:  He was asked if he knew that they had

6    been approved by the Maryland Board of Pharmacy to practice

7    Internet pharmacy.

8    THE COURT:  And his answer was?

9    MS. SMITH:  No.

10   THE COURT:  Good.  So you can ask him whether there

11   is a difference in the prescription requirements depending on

12   whether it is a mail order pharmacy or an Internet pharmacy.

13   MS. SMITH:  Or walk-in pharmacy?

14   THE COURT:  Or a walk-in pharmacy.  You can ask him

15   those.  But I will not get into the application because he

16   doesn't know anything about the application, and he's not an

17   expert on Maryland law on determining what the application

18   permits the pharmacy to do.

19   MS. SMITH:  Very well, Your Honor.

20   Next, and I think finally, I think finally, there was

21   a lot of questions about what Mr. Catizone reviewed and didn't

22   review.  The government would ask him if the information he

23   reviewed, first of all, it was described as statistics.  There

24   was some statistics in there, some of them was just raw numbers

25   establish precisely what he reviewed, the fact that it was all

1    objective data, and that subjective information, such as

2    interviews with people, or testimony or any of that was not

3    given to him, that his opinion is based upon purely objective

4    information.  Did he need anything else to reach his opinion,

5    and if he did, would he have asked for it.

6          THE COURT:  You shouldn't get into this, getting and

7    teasing him through this subjective objective, but you can ask

8    him whether, well, let me think.  You can ask him whether the

9    information that he received was sufficient for him to reach

10   make an opinion, or have an opinion.

11         But the problem with asking him whether any of this

12   other information that he didn't receive would have changed his

13   mind is that he hasn't reviewed it.  So he can't say.

14         MS. SMITH:  I -- I didn't, that's not what I was

15   saying.

16         The question was did he feel he needed anything else

17   to reach his opinion?  And if he did, would he have asked for

18   it?  That's not the same as does he need those things.

19         THE COURT:  Well, I think you can ask him whether,

20   what he received was sufficient, and whether he felt that did

21   you need anything else in order to render an opinion in this

22   case, and I think we'll leave it at that.

23         Mr. Ravenell?

24         MR. RAVENELL:  Your Honor, this witness was asked on

25   direct examination by Miss Smith after he completed his

1    testimony at the end, if he would excise certain information.

2            THE COURT:  Right.

3            MR. RAVENELL:  Would he still reach the same

4    conclusion.  That question was already asked.  So simply to ask

5    the witness what is the witness going to say, no, I didn't have

6    enough information to make my decision.  I mean, Judge, I mean,

7    come on.  I mean, that would be kind of foolhardy to be asking

8    that question.

9            The witness has already indicated that if he excised

10   all this other stuff Miss Smith went through a list of, he

11   would have reached the same decision.  It's there.  He's

12   already said it.

13           THE COURT:  But I will permit it.

14           MR. RAVENELL:  Your Honor, I am sure I'll probably

15   have something else to ask if we go into the area.  I'm trying

16   to avoid us up and down.  I'm sure I'll have some questions.

17           THE COURT:  Preview your anticipated recross.

18           MR. RAVENELL:  Yes.

19           THE COURT:  The other things, once this witness is

20   finished, Miss Smith had indicated you might want to have him

21   back at some point.  And I'm testing my recollection, but I

22   thought that I had ruled out certain testimony by him because

23   that testimony had not been fully, or that the expert

24   designation had not been fully given to Mr. Ravenell, and that

25   you will have an opportunity here in court, if you think you

1    want to have him back, and you think there are other areas

2    that, where he should be designated, that you can do it while

3    he's on the witness stand.

4          So that when we're all finished with him, if you

5    think you want to have him back and you need to complete the

6    designation, you can do it here in court.

7          MS. SMITH:  Your Honor, I believe the Court made that

8    suggestion to the government.  I don't know that the government

9    requested it.  But there is no -- there's nothing else that the

10   government wants to do with him.

11         However, having said that, I recall that there's one

12   more thing that I didn't tell the Court I wanted to do on

13   redirect.

14         THE COURT:  Yes, ma'am.

15         MS. SMITH:  And that is he was asked about the 15

16   sites that the NABP recommends, and he was -- and the others,

17   the 252 they recommended against, and I just wanted to make

18   clear that that's out of a total of 800 sites.

19         In other words, it isn't these 15 and everything else

20   sinks, it's these 15, 252 they have made a statement are not

21   recommended, and then there's others out there that are either

22   still in process or what have you.

23         But the implication by Mr. Ravenell's question was

24   that so you only approved the 15 that you say are good, and I

25   just want to clarify that.

1      THE COURT:  All right.  That's permissible.

2   Good.  Mr. Thompson, if you would bring in the jury?

3      THE CLERK:  Certainly will.

1    (Pause.)

2    THE COURT:  You may take the stand again, sir.

3    THE WITNESS:  Thank you.

4    (Jury present)

5    THE CLERK:  Jurors all present.

6    THE COURT:  Thank you, Mr. Thompson.  Please be

7  seated.

8    Miss Smith?

9              REDIRECT EXAMINATION

10  BY MS. SMITH:

11  Q.  Sir, just a few follow-up questions.

12    You were asked about your resume some of the case,

13  names of cases that are on your resume that you have testified

14  in front of, and you've testified as an expert in other cases

15  that are not listed.

16    Are there reasons, or is there a reason why you

17  choose some over others?

18  A.  Yes, there are two reasons.  The testimony for the

19  pharmacists are part of my day-to-day responsibilities which I

20  engage in all the time because we're responsible for the

21  disciplinary clearing house and the transfer of a license of a

22  pharmacist from one state to the next.

23    When a pharmacist transfers a license, it is sent to

24  us.  We review the information and prepare recommendations for

25  the states to make a decision whether or not to accept that

1    pharmacist's license.

2              In reviewing those cases interacting with State Board

3    of Pharmacy, if there's been a disciplinary issue, or if a

4    state rejects that pharmacist's application, I will intercede

5    and contact and try and testify before that Board of Pharmacy

6    on that pharmacist's behalf.  And that is the reason it was not

7    included as specific cases, because I do that almost day in and

8    day out.

9    Q.  Next question, you testified on cross that there are

10   approximately 15 pharmacy Internet sites that specifically

11   approved or recommended by the NABP, most of which are VIPPS

12   certified?

13   A.  Yes.

14   Q.  And you testified that there are 252 specific sites that

15   you do not recommend?

16   A.  Yes.

17   Q.  But that is, is that all of the Internet pharmacy sites out

18   there, or is that just a portion of them?

19   A.  No.  What we have found is there are probably 1200 web

20   pages, and web pages are different than Internet sites.  What

21   we have found with the rogue pharmacies and some of the

22   networks that are created by these Internet sites is they

23   create different pages.

24             MR. RAVENELL:  Objection, not responsive, objection,

25   to numbers.

1      THE COURT:  I will overrule the objection.  You may

2  continue.

3      MR. RAVENELL:  Your Honor, may counsel approach?

4      THE COURT:  You may.

5      (At the bench)

6      THE COURT:  My understanding is that he's explaining

7  he's going to say what the members are, but he's got to the

8  explain the numbers.

9      MR. RAVENELL:  The witness said there were 1200.

10  He's already given the number.  I don't think there's any

11  reason for him to explain the numbers.

12      In fact, Miss Smith told the Court that the reason

13  she was asking this is to find out, you know, bring out that

14  there are other websites, excuse me, that just doesn't fall

15  into the not recommending or the recommending.

16      And there is no way that necessarily for the witness

17  to go through what they found about rogue pharmacies or web

18  pages, it's not necessary.  He can give the numbers and tell

19  what the numbers are, as Miss Smith indicated she was going to

20  do.

21      MS. SMITH:  Your Honor, I think I just confused him

22  with the question.  I think the question needs to be out of the

23  1200 web pages offering CDS, is your testimony that there's 252

24  that you're recommending against, that's all I'm trying to

25  establish.

1            THE COURT:  And then you would ask him, did he review

2 the rest of them?

3            MS. SMITH:  I guess that's under process.

4            THE COURT:  Okay.  I think that solves the problem.

5            (Open court)

6 BY MS. SMITH:

7 Q.  I'll restate the question.

8            Out of the 1200 web pages, is it 252 of them that you

9 are not recommending?

10 A.  Yes.

11 Q.  Okay.  And the rest are in process of review or what have

12 you?

13            MR. RAVENELL:  Objection to leading.

14            THE COURT:  What's the status of the rest of them?

15 A.  The other sites have either been removed from the list

16 because they don't distribute prescription drugs, they

17 distribute veterinary medications or herbal products or are

18 currently under review as to whether or not they qualify for

19 recommendation or not recommendation.

20 Q.  Thank you.

21            You were asked whether the NABP was accredited by any

22 state pharmacy boards?

23 A.  Yes.

24 Q.  What makes up the membership of the NABP?

25 A.  The jurisdictions that license and regulate pharmacy and

1   pharmacists in all of the states.

2   Q.  But you testified that pharmacists are not members?

3   A.  Correct.  The individual members of the State Boards of

4   Pharmacy are affiliated members of NABP because of their

5   appoint to the Board of Pharmacy by the Governors of the State.

6           But each state only receives one vote on all issues

7   before the association.

8   Q.  So this, so the state boards are members?

9           MR. RAVENELL:  Objection.

10  A.  Yes.

11          THE COURT:  I'll overrule the objection.

12  Q.  Do you, sir, have any information at all about this case

13  whether any of the doctors did or did not review medical

14  records?

15          Were you provided anything to review or any

16  information about whether or not doctors actually reviewed or

17  did not review medical records?

18  A.  No.

19  Q.  Sir, if a pharmacy is licensed to practice mail order

20  pharmacy, Internet pharmacy, or they are a full service walk i-

21  pharmacy, is there any legal differences in the requirements

22  for prescriptions?

23  A.  No.

24  Q.  You were asked on cross about the statistics that you

25  reviewed for the government.  There was also raw numbers in

1    there?

2    A.   Yes.

3    Q.   Okay.  And do you feel, sir, that you had sufficient

4    information to form your opinion?

5    A.   Yes.

6    Q.   Okay.  Did you need anything else?

7    A.   No.

8              MS. SMITH:  I have no further questions.

9              THE COURT:  Good.  Thank you.  If I could see

10   counsel, please?

11             MR. RAVENELL:  No questions, Your Honor.

12             THE COURT:  No questions?  Good.  Thank you, Mr.

13   McCants?

14             MR. MCCANTS:  None, Your Honor.

15             THE COURT:  ladies and gentlemen, it's 12:30, do you

16   have, should we go right now for lunch?

17             MS. SMITH:  That will be great.

18             THE COURT:  Ladies and gentlemen, it's 12:30.  And

19   let's take a slightly earlier luncheon break today coming back

20   at 1:30 and we will resume.

21             So have a pleasant lunch, and I'm going to stay here

22   with counsel.

23             (Jury recessed)

24             THE COURT:  Good.  Please be seated.  I had a couple

25   of questions to ask the our expert witness, just for

1    clarification, if I could.

2              This just for my own curiosity.

3              You had told Mr. Ravenell that Maryland law requires

4    a face-to-face consultation between the doctor and the patient

5    before a prescription can validly issue, and so the question is

6    where does that come from?

7              THE WITNESS:  Your Honor, the federal law, the Food

8    Drug Cosmetic Act/Controlled Substance Act says there has to be

9    a valid prescription and a patient/prescriber relationship.  It

10   then defers to the state acts.  And the states say that a

11   pharmacist must follow the following processes to determine

12   that that exists, and that's specified in regulations in

13   Maryland law.

14             And then the practice standards that have been

15   established for a pharmacy and medicine through the Federation

16   of State Medical Boards and the Medical Practice Acts have

17   added that requirement.  So in total, that exists.

18             THE COURT:  And where are the state standards?  Where

19   would one find those?

20             THE WITNESS:  They would be the practice standards

21   that the board references in through their disciplinary

22   hearings when they take action against pharmacists and cite

23   that as precedent in those cases.  That a physical exam should

24   have occurred as well as published articles on what the

25   standards of care are in the pharmacy journals.

1      THE COURT:  So that if one looked at the federal

2  statute and just the state, if one looked just at the federal

3  statute, the state statutes, and the state regulations, one

4  would not find a specific requirement of a face-to-face

5  meeting, but if one looked further at these practice standards

6  and the published articles, that's where the face-to-face

7  meeting requirement is found?

8      THE WITNESS:  Yes, sir.

9      THE COURT:  Now, one question that Mr. McCants had

10  asked you, I guess what I am looking for is this, is there a

11  difference between the vigilance that the pharmacist must

12  exercise that depends on whether the drug being prescribed is

13  hydrocodone, for example, or a run-of-the-mill antibiotic.

14      THE WITNESS:  Yes, sir.  And if I could explain

15  further and using the example that was given to us about

16  whether or not a medical record would be needed and what the

17  vigilance would be, if a patient from another state presented a

18  prescription, the pharmacist has a legal responsibility.  And I

19  can cite that in Maryland regulations that they must perform a

20  prospective drug utilization review, which means they need to

21  ascertain what the patient's treatment is for, what their

22  allergies are, and whether or not the patient's taking any

23  medications before dispensing that prescription.

24      If the patient was unsure of what they were taking or

25  what their allergies were, that would be the pharmacist's legal

responsibility to contact that prescriber to get that
information, whether it's a medical record or whether it's a
conversation between the prescriber and the pharmacist to
ascertain what the patient was being treated for, what the
allergies were, and anything else of importance that
pharmacists would need to know.

If they say they're allergic to aspirin and don't
know what it is, and suffers from anaphylactic shock, the
pharmacist is still legally responsible for that patient.

When a hydrocodone prescription is presented, because
of the additional requirements under the Controlled Substance
Act federally, and at the state level, there are additional
verifications that must occur, and additional red flags or
warning signs if the pharmacist, a reasonable pharmacist is
aware of and must investigate.

THE COURT:  So let's assume that you have a
brick-and-mortar pharmacy patient walks in for a prescription
of 30 tablets of hydrocodone, you don't recognize the name of
the doctor, but he's a doctor here in Baltimore, and the
patient is let's say a new patient, the pharmacist is at a Rite
Aid, he walks in and says here's my prescription for 30 tablets
of hydrocodone, and here's the Dr.Jones from Mount St.
Joseph, what does the pharmacist have to do before filling the
prescription?

THE WITNESS:  Because it's a controlled substance,

1     they have to be absolutely sure that prescription is

2     legitimate, that that patient and prescriber have had a

3     relationship, and the quantity of prescribed is exactly what

4     the physician wanted.

5           The rationale to that is not only the law, but with

6     all due respect to DEA, pharmacists are aware that there are no

7     exceptions to any violations of any of the DEA requirements or

8     statutes.  And those prescriptions in those instances are

9     treated much more significantly than anything else in the

10    pharmacy.

11          THE COURT:  Well, let's assume under that

12    hypothetical what physically does the pharmacist do?  He looks

13    at the prescription and 30 tablets of hydrocodone, local

14    doctor, doesn't recognize the doctor, doesn't know the patient,

15    what does the pharmacist do mechanically before he fills that

16    prescription?

17          THE WITNESS:  Probably indicates to the patient's

18    it's going to be a few minutes.  Then they will search the

19    database to see whether or not physician has a DEA

20    registration.

21          THE COURT:  Let's assume he does.

22          THE WITNESS:  Okay.  If the doctor is located outside

23    of the State, then he needs to verify that doctor is licensed

24    to prescribe in the state, if this is something he believe is

25    going to be a regular occurrence with that doctor.

1    If it's a one-time prescription, they won't check

2 with the license, but they will call that doctor or should

3 physically call that doctor's office to say I'm just verifying

4 that the prescription exists, can you tell me what you're

5 treating the patient for, and what's the relationship?

6    THE COURT:  Is this an out-of-state doctor or

7 in-state doctor?

8    THE WITNESS:  For an out-of-state doctor, they would

9 call.  They should call all the time.  If it was in state, it's

10 a judgment call a pharmacist can make assuming the doctor is

11 licensed in the state.

12    THE COURT:  So a local doctor licensed in the state,

13 the pharmacist could fill that prescription without calling the

14 doctor's office, it's a one-time prescription?

15    THE WITNESS:  And they didn't suspect anything.  But

16 if there was anything wrong that it was not a bona fide

17 relationship or that prescription was obtained fraudulently,

18 that pharmacist is still legally responsible.

19    THE COURT:  And what does the pharmacist have to do

20 to make sure that, if anything, to determine what other

21 medicines that a patient is taking and what kind of allergies

22 he has?

23    THE WITNESS:  They can interview the patient and ask

24 the patient for information.  If the pharmacist feels that

25 information is unreliable, then they need to contact that

1  patient's prescriber.  And, again, if the pharmacist doesn't do

2  that, sir, and there's a problem with the patient, it's the

3  pharmacist's legal responsibility.

4         THE COURT:  Good.  Thank you.  Thank you very much.

5  You may step down.  And at 1:30 we see who, ma'am?

6         MS. SMITH:  We will see Paul Short.

7         THE COURT:  Paul Short.  Good.  I need to give you my

8  rulings.

9         MS. SMITH:  There is a little bit that he will

10  testify to even if the Court rules completely against the

11  government.  So he will be here, and the Court can just tell us

12  when we come back, and I'll just know how much of my direct to

13  do and how much not to do.

14         MR. RAVENELL:  Your Honor, I will point out that I

15  was given an up-to-date chart by the government this morning,

16  which I haven't even had a chance to look at.

17         THE COURT:  Is this a new chart?

18         MR. RAVENELL:  The one that I gave you yesterday I

19  understand is updated version, and now I have to compare.

20         MS. SMITH:  It's 20 pages papers.  There's nothing

21  new in it.

22         MR. RAVENELL:  I still have to compare whether it's

23  20 less pages or not, I have to compare it, depends on how the

24  Court rules.  But if it is, I'm going to have to review these

25  carefully.  As I told the Court, we were trying to review from

1    our client's --

2            THE COURT:  We've had argument on this yesterday.

3    Let me see whether Evan has it.  I went over the ruling

4    yesterday.

5            MR. RAVENELL:  I understand.

6            THE COURT:  Let me see if he has it.  And I'll have

7    him e-mail you the results.

8            MR. RAVENELL:  E-mail us the Court's ruling.

9            THE COURT:  During the luncheon hour.

10           MR. RAVENELL:  Yes.

11           THE COURT:  Good.  Thank you.

12           (Luncheon recess.)

13           THE COURT:  Good afternoon.  Please be seated.

14           MR. RAVENELL:  I'm sorry.  Could we have a few more

15   minutes to discuss with -- the defendants, they had gone out,

16   just a minute to finish discussing the issue about the witness

17   out-of-state?

18           THE COURT:  This is the stipulation?

19           MR. RAVENELL:  Yes.

20           THE COURT:  How long do you think you'll need?

21           MR. RAVENELL:  Just a couple minutes.

22           THE COURT:  Good.  False alarm.  Thank you.

23           (Pause.)

24           MR. RAVENELL:  Thank you, Your Honor.

25           Your Honor, after discussions with Mr. Sodipo and Mr.

1    Nwaehiri and Mr. McCants, we accept begrudgingly the Court's

2    offer regarding the stipulating.

3              THE COURT:  Good.  And this is with respect to both

4    of the --

5              MR. RAVENELL:  Yes.

6              THE COURT:  -- medical examiners?

7              MR. RAVENELL:  Yes.  And obviously we do take

8    exception to the Court's ruling, but accept under those

9    conditions, Your Honor.

10             THE COURT:  Absolutely.  Good.  Thank you.  Good.

11             Mr. Thompson, if you would bring in the jury, do you

12   need to call the --

13             MR. BUDLOW:  Yes, thank you.  Your Honor, I can give

14   the number to Agent Rosati, if that's okay.

15             MR. RAVENELL:  Are you still calling Short?  Just

16   making sure.

17             THE CLERK:  Ready for the jury?

18             THE COURT:  Yes, please.

19             (Pause.)

20             (Jury present)

21             THE CLERK:  Jurors all present.

22             THE COURT:  Thank you, Mr. Thompson.  Welcome back,

23   ladies and gentlemen.  And Miss Smith, if you would call your

24   next witness, please?

25             MS. SMITH:  Thank you.  At this time, the government

1    recalls Paul Short to the witness stand.

2            THE COURT:  Certainly.  Mr. Short, welcome back, sir.

3            THE WITNESS:  Thank you, Your Honor.

4            THE COURT:  You are still under oath, sir, from the

5    previous time.

6            THE WITNESS:  Yes, sir.

7            (The Witness is sworn.)

8                         DIRECT EXAMINATION

9    BY MS. SMITH:

10   Q.  Thank you, Your Honor.

11           Mr. Short, without getting into anything substantive,

12   just so we can refresh your 30 seconds, the last time you were

13   here, we put a number of documents into evidence.  And again

14   what is contained in this box again very generally?

15   A.  Very generally, that is a printout of the prescriptions

16   that were found in New Care's server.

17   Q.  Okay.  And this document as well as there's another

18   notebook are summaries, if you will, of everything that's in

19   this box?

20   A.  That is correct.

21   Q.  Okay.  And there could be more summaries, but these are

22   summaries?

23   A.  Correct.

24   Q.  Okay.  Now, let me ask you, are you familiar with another

25   server referred to as the Off-planet server?

1    A.  Yes.

2    Q.  Okay.  And were you given an opportunity and a request to

3    analyze the data in that server as well?

4    A.  Yes.

5    Q.  Okay.  And what were the names, or was there similar lines

6    of information, if you will?

7    A.  Yes.

8    Q.  Were they some of the same fields?

9    A.  Yes.

10   Q.  Was there an identifying set of initials with each of the

11   entries, if you would like a source?

12   A.  Yes.

13   Q.  Okay.  And do you recall today, sir, what those initials

14   were?

15   A.  May I refer to my notes?

16   Q.  Certainly.  And this is -- my specific question is, what

17   did you observe in the Off-Planet server?

18   A.  The information I received relating to four, they referred

19   to them as companies, and it was GEN, PMS, PDP, and ONC.

20   Q.  The last one was ONC?

21   A.  That's correct.

22   Q.  Okay.  Were there any other designations in the server?

23   A.  No.

24   Q.  Okay.  And did you see anywhere a designation for IHE?

25   A.  Not in the database.

1  Q.  And do you have any underlying information about whether

2  these are the same, different, anything at all?

3  A.  Same.

4  Q.  Do you have any underlying information about who maintained

5  the database, how it was created, any kind of human input

6  information?

7  A.  Only thing information I have on the database is that it

8  was Off-Planet was kind of an IT --

9        MR. RAVENELL:  Objection, Your Honor.  This witness

10  is not a fact witness.

11        MS. SMITH:  We'll move on, Your Honor.

12        THE COURT:  All right.  Thank you.

13  BY MS. SMITH:

14  Q.  And did the government ask you, not line-for-line, but ask

15  you to compare the information that was found in the New Care

16  computers with the database from the Off-Planet servers?

17  A.  Yes.

18  Q.  Now, directing your attention to government's exhibit 90.1,

19  let me do it this way.

20        Mr. Thompson, thank you.

21        And of course this much too tiny to read.

22        MR. RAVENELL:  Your Honor, objection.  I apologize,

23  I'm talking to you back here, Judge.  May I object and approach

24  briefly for a minute?

25        THE COURT:  Yes.

1    (At the bench)

2    MR. RAVENELL:  I meant nothing by it, trying do a

3    million things.

4    THE COURT:  Yes, sir.

5    MR. RAVENELL:  I just want to make sure, Your Honor,

6    did the Court rule the some of these documents can come in or

7    all of the Off-Planet documents are not coming in?  I just

8    wanted to make sure it was clear.

9    THE COURT:  Well --

10   MS. SMITH:  The Court ruled the stuff that I gave you

11   late last week is not coming in.  The stuff I gave you before

12   he testified the last time that you complained you needed more

13   time is what I'm doing today.

14   MR. RAVENELL:  Okay.  Just want to make sure which

15   group we're in.

16   THE COURT:  My recollection was that there were a

17   couple of exhibits when he was here the last time that you

18   stated you had not had enough time to review.  Those can all

19   come in now.  But the documents that were delivered late last

20   week can't.

21   MR. RAVENELL:  All come in except the Florence

22   pharmacy matter.

23   MS. SMITH:  He said they couldn't come in.

24   MR. RAVENELL:  When the Court said all can come, all

25   can come in except the Florence Pharmacy matters from last

1   week, so all can come in except for the Florence Pharmacy

2   matter.

3           THE COURT:  My recollection of this is hazy.  I

4   thought there were a couple of exhibits from the last time, and

5   those were coming in, but I can't remember what they were.

6           MS. SMITH:  The Court has ruled that the Florence

7   exhibits don't come in because it's not a relevant argument.

8           And but this exhibit, I don't even think the

9   defendant addressed it in its motion in limine.

10          MR. RAVENELL:  No.  I know which we're talking.  I

11  was not looking.  My fault.  I thought it was the old one.

12          THE COURT:  You were multitasking.

13          MR. RAVENELL:  Not doing a very good job.

14          MS. SMITH:  Men don't multitask.

15          Your Honor, may I remind the jury there was testimony

16  by Adam Kaps about the Off-Planet server, just to state that as

17  we go forward, it's been many weeks it's in evidence, refresh

18  their recollection?

19          MR. RAVENELL:  Your Honor, the government has

20  objected every time I've stated system from a prior witness,

21  and I would object to that as well.  The jury is presumed to

22  have taken notes and recall the testimony, just like there will

23  be a time called closing argument where the government will

24  refresh their memory as much as they want.

25          THE COURT:  The thing is that  in cross-examination,

1    which your examination has consisted of so far, you've had free

2    reign to point out other parts of the testimony to refresh

3    recollection.  Sometimes during a long trial, I will have

4    permitted counsel to have a period of time to remind the jury

5    of what he's testified, what's happened.  And sometimes I've

6    passed out even a list of who the witnesses have been as sort

7    of a memory jogger.

8            So I'm not offended with Miss Smith simply to remind

9    the jury where this came from, that he did testify about it, or

10   did the docs come from, was that authenticated during his

11   testimony.

12           MS. SMITH:  He testified about how he was the one

13   responsible for setting it up.  And some of the charts he put

14   in was information that he drew, the credit card information.

15           MR. BUDLOW:  If I could, Mr. Kaps testified that in

16   his role with keeping all of the data and the computer

17   information for the four various companies, which include IHE,

18   GDN, PMS, they moved -- one of his first jobs there was to move

19   all of the servers to a place called Off-Planet and that all of

20   the data from the web companies was kept on Off-Planet included

21   prescription information, shipping information, financial

22   information.

23           And then he later testified to some of the data that

24   he had run based on reviewing the actual server or a copy of

25   the server that he obtained from the government to include

1    credit card receipts and total prescriptions.

2             THE COURT:  So the only thing you would tell the jury

3    now is simply, to put this in context, to remind them that Mr.

4    Kaps testified that the website servers were removed to a place

5    called Off-Planet, and this information is from the Off-Planet

6    server.

7             MS. SMITH:  That's good.  Thank you, Your Honor.

8             THE COURT:  Good.  I think that's neutral enough and

9    would be helpful to the jury, so I will permit it.

10            MR. RAVENELL:  Is the Court saying it's from the

11   Off-Planet server, did this witness take it off?

12            MS. SMITH:  He was provided the same Off-Planet

13   server, that he got Adam Kaps's Off-Planet server, the same one

14   you got.

15            MR. RAVENELL:  Well, my only problem is that before

16   trial, we stipulated to certain documents, you know, this is

17   not what we stipulated to that these documents would come in

18   without an authenticating person.  So there's a question of how

19   do we get this information as being -- as coming from the

20   Off-Planet server.  There's no -- the prior information that

21   Kaps testified to, yes, I understand that, he said he pull it

22   off the Off-Planet server.  There's no testimony that this

23   information came from Off-Planet server.  This witness didn't

24   take it off, how does he know?

25            THE COURT:  Well, that is a different issue.

1      MS. SMITH:  Your Honor, before trial we cleared with

2   the defense that they would not require any authenticating

3   information for the Off-Planet server, for New Care's

4   computers, for ARCOS data, for everything we were going to use

5   in this case.  This witness has already testified that this

6   came from the Off-Planet servers.

7      Moreover, the government is representing on the

8   record that this is the exact same information that the defense

9   has had before trial that was used in Mr. Kaps's testimony.

10      And I think at this late hour, in light of the fact

11   that they have known this has been coming in for well over a

12   week, that this argument is waived, and it's completely unfair.

13   They have allowed us to believe until this moment that there

14   was no trouble with the authenticating of this, because it is

15   exactly the same as what has already been allowed.

16      THE COURT:  Let's go back for a minute.  I take it

17   that the Off-Planet server is  some sort of a computer.  And

18   what these computers were physically moved to a physical

19   location that Mr. Kaps and his associates nicknamed Off-Planet?

20      MR. BUDLOW:  I think Off-Planet was the business that

21   is in the business of maintaining servers for other companies,

22   so they put their data and their server at Off-Planet.

23      At the time that the search warrants were executed in

24   the Florida businesses, Mr. Kaps assisted the government agents

25   in obtaining -- actually, I might be -- the government obtained

the servers through Off-Planet.

MR. RAVENELL:  If I could maybe short-circuit because I don't want to make a mountain out of a molehill if it's something we agreed upon.  I don't think we agreed to these particular documents.  I'll be happy to check the stipulation. But I have no problem with, after consulting with the government, maybe we can agree that the Court doesn't have to deal with it, if I could just have a moment with the government?

THE COURT:  Go ahead.

(Pause.)

MR. RAVENELL:  I withdraw the objection.

THE COURT:  Good.  Thank you.

(Open court)

MS. SMITH:  Your Honor, with the Court's permission, I will note for the record and remind the jury that witness Adam Kaps did testify in this courtroom about the data from the four companies in Florida was maintained on servers at a business called Off-Planet, and this testimony is related to that same server database.

THE COURT:  Good.  Thank you.

BY MS. SMITH:

Q.  Directing your attention, sir, to government's exhibit 91. And, actually, one other question, sir, were you able to determine from the database the date range on it?

1    A.  Yes.

2    Q.  And what was that date range, sir?

3    A.  It was February fourth, 2004 through November 16th, 2007.

4    Q.  And, sir, I'm going to ask you looking at government's

5    exhibit 90.1.  Can you identify what we're looking at?  And of

6    course it's only a part of the document because I want it to be

7    legible.  What are we looking at?

8    A.  This is a prescription record from the Off-Planet server.

9    Q.  Okay.  And just tell us what these fields mean, what does

10   this mean?

11   A.  The row number is a unique field to each individual

12   prescription in the database to get back to that individual

13   record in the row.

14   Q.  This is row number 496,387?

15   A.  That's correct.

16   Q.  And the patient?

17   A.  Patient Marty Spangler and the name mentioned here also a -

18   and then the individual's state of residence.

19   Q.  Did you do that?

20   A.  Yes, I did.

21   Q.  And you did that the same that you testified with New

22   Care's computers to differentiate from ten different Bob

23   Smiths?

24   A.  That's correct.

25   Q.  And what does -- what does this information reflect right

1  here?

2  A.  The date of birth, the date shipped, the quantity, and the

3  drug name, and then the shipping address.

4  Q.  Okay.  And the address and city?

5  A.  The shipping address, city, state, and zip.

6  Q.  Then what?

7  A.  The doctor, prescribing doctor's name.

8  Q.  Okay.  And what is the rest of the information?

9  A.  The pharmacy that filled the prescription, a fill listed as

10  total and company name.

11  Q.  Do you have any idea at all what this information total is?

12  A.  It was a field that said total.

13  Q.  It was a field that said total and it had a number in it?

14  A.  Correct.

15  Q.  Okay.  Now, directing your attention to government's

16  exhibit 89.1, which you have identified as contents of New

17  Care's server, specifically page 1862, let me see if I can

18  direct your attention, sir, can you see that entry?

19  A.  Yes.

20  Q.  Okay.  And again, what is this field?

21  A.  That is the line number in the New Care database.

22  Q.  Is this the same information?  Well, actually I could

23  probably put the other one up at the same time.

24          Let me see if we can do this.

25          (Pause.)

1    Q.   Does it appear to be the same information?

2    A.   Yes.

3    Q.   Okay.  Now, what is this number in the New Care database?

4    A.   That is a prescription number.

5    Q.   Did that appear in the Off-Planet database?

6    A.   No, it didn't.

7    Q.   And then there's more information.  I'm not very good at

8    this.

9         Okay.  If we could compare the address?

10   A.   Yes, they're the same.

11   Q.   All right.  And, finally, what does the information reflect

12   here?

13   A.   Dr. Gregory Gooden.

14   Q.   Okay.  And that's the same as the Off-Planet server?

15   A.   That's correct.

16   Q.   Okay.  And, finally, with regard to the Off-Planet server,

17   there's this number again, is that the same exact number as the

18   beginning of the line?

19   A.   Oh, yes, on the first one, yes.

20   Q.   Okay.  And that's just so you can find it depending upon

21   which side you're reading from?

22   A.   That's correct.

23   Q.   Okay.  Directing your attention to 92 -- 90-2, and what is

24   this information, sir?

25   A.   This is a prescription for Christopher Owens of Florida.

This is from the Off-Planet server as well.

Q.  All right.  And this reflects what, sir, starting with the date shipped?

A.  That on 6-9-06 this individual was shipped 60 hydrocodone 7.5/750s to that address in Orlando, Florida.

Q.  Okay.  And who was the doctor?

A.  Dr. Lois Miles.

Q.  And who was the pharmacy?

A.  New Care.

Q.  All right.  And the company?

A.  PMS.

Q.  All right.  Now, did you verify, sir, that this exact information just like we did is in the New Care server?

A.  Yes, I did.

Q.  I'll show you, sir, government's exhibit 90-3, and tell me what we're looking at?

A.  These are three prescriptions for Jason Norman, of Maryland.

Q.  Okay.  And what are these three dates?

A.  The dates shipped, July 28th, 2006, August 25, 2006, and September 28, 2006.

Q.  They're all the same prescription?

A.  Same quantity, same drug.

Q.  Same address?

A.  Same address.

1    Q.  Okay.  Same doctor?

2    A.  Same doctor.

3    Q.  And in each instance, where did these prescriptions come

4    from?

5    A.  The first prescription came from New Care.  The second

6    prescription came from Elite Pharmacy.  And the third

7    prescription came from Pharmacy 101.

8    Q.  Okay.  And, again, the company for all three?

9    A.  PMS.

10   Q.  And, sir, did you look at these three lines, compare with

11   what was in here, and did you determine that it's exactly the

12   same information?

13   A.  Yes, they are.

14   Q.  And if we want, this box is in alphabetical order?

15   A.  Alphabetical and chronological.

16   Q.  So if we went to G, we could find it?

17   A.  Yes.

18   Q.  Okay.  If anybody's interested.

19        And again, 90-4, this is with regard to what patient?

20   A.  Thomas Sutton of Maryland.

21   Q.  Okay.  And just scanning across so everyone can just read,

22   there's the same information with regard to the others?

23   A.  That's correct.

24   Q.  And the doctor?

25   A.  Dr. Gregory Gooden.

1    Q.  And the two pharmacies?

2    A.  Elite Pharmacy and New Care Pharmacy.

3    Q.  Okay.  And the company?

4    A.  PDP.

5    Q.  All right.  And does this information reflecting these two

6    entries regarding Thomas Sutton appear in the New Care box?

7    A.  Yes.

8    Q.  Sir, directing your attention to 90-05, 90-5, who is this a

9    chart in reference to?

10   A.  This relates to Jennifer Koch.

11   Q.  Now, were you told names other than Koch to search in

12   reference to Jennifer Koch?

13   A.  Yes.

14   Q.  Okay.  And what names were you told to search, sir?

15   A.  Jennifer.

16   Q.  Just spell them.

17   A.  K A C H, the K  O C H, K O C K, and there's also another

18   name Annette Baldt, B A L D T.

19   Q.  Okay.  And did you search for those names when you search

20   the Off-Planet database for this particular chart?

21   A.  Yes.

22   Q.  And this chart is a reflection of what you recovered?

23   A.  Yes.

24   Q.  And it goes on to a second page; is that correct?

25   A.  That's correct.

1   Q.  There it is.

2           Now, directing your attention to line 271,218, do you

3   see a name there?  What name is that?

4   A.  Jenny Kach.  K A C H.

5   Q.  And this reflects what, sir?

6   A.  The date shipped of May 9th, 2005.

7   Q.  Okay.  And how many pills?

8   A.  60 pills.

9   Q.  Okay.  By the way, is this only hydrocodone?

10  A.  Only hydrocodone.

11  Q.  Okay.  You weeded out anything else?

12  A.  That's correct.

13  Q.  And the address for all of these, are they the same on

14  every single one of them, sir?

15  A.  No.

16  Q.  Okay.  What's different?

17  A.  There is one that has 525 Pittsburgh Street as opposed to

18  526.  There's a few of those.

19  Q.  And that one, is that the one we're on?  No, is -- no.

20  We're on this one here.  And the one that has that other

21  address is here, is that right, I think?

22  A.  I believe there's two of them.

23  Q.  Okay.

24  A.  At leave two.

25  Q.  Where are we?

1   A.  I believe May 9th.

2   Q.  May 9th, is that where we were?  That's where we were.

3           I'm asking you to identify, sir, the doctor?

4   A.  Dr. Dratler.

5   Q.  And the pharmacy?

6   A.  New Care.

7   Q.  Okay.  Now, with reference to Miss Koch, everything that

8   appears on this printed page, did you find them in the New Care

9   box?

10  A.  Yes.

11  Q.  Let me ask you, sir, I'm not sure quite sure how to do

12  this, Your Honor, so we can follow it.  I'm going to try my

13  best.

14          Can I have the ruler, please?  Zoom out a little bit?

15          We're going to zoom out a little bit, but we might

16  have to come back in to read it.  Let's see.

17          Mr. Short, I don't want you to hurt your eyes, so

18  just work with me here.

19          Directing your attention to the two prescriptions

20  that appear above the ruler.

21          The numbers right here are the one ending in 43 and

22  44?

23  A.  That's correct.

24  Q.  And what days were those shipped, sir?

25  A.  August 25, 2004, and August 27th, 2004.

1    Q.  And what did she get in each of those packages?

2    A.  90 hydrocodone, 10/650s.

3    Q.  And I'm trying to maintain this.  Do they go to the same

4    address?

5    A.  That is correct.

6    Q.  Okay.  And what pharmacy shipped those drugs?

7    A.  North Howard Pharmacy.

8    Q.  Okay.  Now, directing your attention again, sir, a couple

9    lines down, to the one ending in 47 and the one ending in 46.

10   What were the dates of the shipments of those two

11   prescriptions?

12   A.  They were both October 21st, 2004.

13   Q.  And if you would look at the dates on both, tell me are

14   they the same?

15   A.  Yes.

16   Q.  Okay.  Now focusing on it a little bit more, the dates of

17   birth for this one?

18   A.  I'm sorry.

19   Q.  And that one?

20   A.  The one's January 22nd, 1968, one's 1-23-1968.

21   Q.  Okay.  Now, moving across these two prescriptions on the

22   same day, where did they come from?

23   A.  One came from Genmark Pharmacy, and the second from

24   Trifasic Pharmacy.

25   Q.  And this is all in the same database?

1   A.  That's correct.

2   Q.  Now, directing your attention, sir, to the two lines above

3   the ruler there, the one ending in 18, and the one ending in

4   55.

5          Describe for us in the first one, what is the name of

6   the patient?

7   A.  Jenny Kach, K A C H.

8   Q.  And in the second one?

9   A.  Jennifer Koch, K O C H.

10  Q.  They're both indicated Pennsylvania?

11  A.  Yes.

12  Q.  The dates of birth are the same or different?

13  A.  Different.

14  Q.  Okay.  And what days were these two shipped?

15  A.  May 9, 2005, and May 10, 2005.

16  Q.  Okay.  A day apart?

17  A.  That's correct.

18  Q.  Okay.  And to what address were they both shipped to the

19  extent that you can see that through my exhibit label?

20  A. 525 Pittsburgh Street and 526 Pittsburgh Street.

21  Q.  Okay.  And the doctors that wrote these?

22  A.  Dr. Dratler and Dr. Ibanez.

23  Q.  And the pharmacy that filled both of them?

24  A.  New Care Pharmacy.

25  Q.  Okay.  Now, did you find both of these in that box?

1  A.  Yes.

2         (Pause.)

3  Q.  And one moment, Your Honor.

4         (Pause.)

5  Q.  I'm going to start going blind doing this.  Here we are.

6         If you could look at the one ending in 64 and the one

7  ending in 65.  And what are the names of the patient?

8  A.  Jennifer Koch.

9  Q.  Okay.  Date of birth?

10  A.  Both 1-23-1968.

11  Q.  And the date they were shipped?

12  A.  First was March second, 2006, the second March 3, 2006.

13  Q.  Same drug?

14  A.  Same drug.

15  Q.  Address?

16  A.  Same address.

17  Q.  What doctors issued it?

18  A.  Dr. Miles.

19  Q.  And what pharmacy filled them?

20  A.  New Care Pharmacy.

21  Q.  Finally, sir, directing your attention to the last page,

22  are these all the same patient has best you can tell?

23  A.  Yes, same spelling, same date of birth.

24         MR. RAVENELL:  Objection as to whether they're the

25  same patient, Your Honor, the witness is pulling information

1    off the --

2    Q.  I'll rephrase the question.  Does the patient information

3    appear to be the same?

4    A.  Yes, it does.

5    Q.  Okay.  And can you go through the top four, not counting

6    the bottom one, what are the dates shipped?

7    A.  7-14-2006, 7-31-2006, 8-14-2006, and 9-1-2006.

8    Q.  I didn't promise you know math.  How many days apart are

9    they?

10   A.  Approximately two weeks, 14 days.

11   Q.  Okay.  And based upon the information, does the product

12   that was sent appear to be the same?

13   A.  Yes, it does.

14   Q.  And the address?

15   A.  526 Pittsburgh Street, Mars, Pennsylvania.

16   Q.  And the doctors?

17   A.  That's correct.

18   Q.  And what pharmacy?

19   A.  New Care.

20   Q.  On all four of them?

21   A.  That's correct.

22   Q.  Sir, did you look in this box for that information?

23   A.  Yes.

24   Q.  Okay.  Did you notice a difference at all in the spelling

25   of the names as you found them in the Off-Planet server and in

1    the New Care server?

2    A.   Yes.

3    Q.   Okay.  Tell us what you mean by that.

4    A.   Sometimes it would be K O C H, sometimes it would be K A C

5    H.  There appeared to be a difference between the two.

6    Q.   But did they also not match between the two servers

7    sometimes?

8    A.   That's correct.

9    Q.   That is correct?

10        And, in fact, so that the record is clear, these last

11   four we looked at, actually, let me just pull it out of the box

12   so we know exactly what we're talking about.

13        Okay.  Government's exhibit 89.1, page 1018, let me

14   just show you for a moment, is this one of the entries, sir,

15   that we were talking about?

16   A.   That is one of the entries.

17   Q.   And that's actually the 5-9-05 that we started with this

18   morning --

19   A.   Correct.

20   Q.   -- with Miss Koch?  Okay.

21        Now, in this listing over here, are those, miss

22   Koch's prescriptions to here?

23   A.   Yes.

24   Q.   Okay.

25   A.   That's correct.

1   Q.  And what we're looking at right now is from New Care's

2   server?

3   A.  That's correct.

4   Q.  Okay.  Further down on the page, there's some more

5   listings?

6   A.  Correct.

7   Q.  As far as you know, the rest of the information here

8   matches what's in the Off-Planet server?

9   A.  That's correct.

10          MR. RAVENELL:  Objection, leading.

11          THE COURT:  I'll overrule the objection.

12   Q.  And I want to make sure that we're clear what we're saying

13   to be fair, that these names --

14          THE COURT:  To be clear.

15          MR. RAVENELL:  I think that's what she meant, not

16   fair, clear.

17   Q.  These names right here, these lines of information, as they

18   appear in the Off-Planet data, how are they spelled?

19   A.  They could be K O C K or K O C H.

20   Q.  Okay.  Were those the only differences you found?

21   A.  The one difference in the databases was New Care has a date

22   filled, whereas Off-Planet has the date shipped.  So there may

23   be a variance of a day through that.

24   Q.  Sir, I show you what's been marked as government's exhibit

25   90-06.  Who is the identified patient on this?

1    A.   Douglas Chorpenning of Colorado.

2    Q.   And this is from Off-Planet?

3    A.   That's correct.

4    Q.   Okay.  Now, directing your attention to this date, can you

5    tell me, sir, what is the difference between these dates

6    shipped, if you will, starting with that one?

7    A.   That would be a five-day difference, and there were two

8    shipments on January 9th and --

9    Q.   You don't have to do the next one.  But starting with the

10   next one, do the one after that.

11   A.   That would be on February 16th, four days later, on

12   February 20th.

13   Q.   Okay.  And then starting with this one?

14   A.   March 20, 2006.  And then three days later on March 23,

15   2006.

16   Q.   And this one?

17   A.   First one's April 20, 2006, the next is April 28, 2006,

18   eight days later.

19   Q.   Okay.  And this one and this one?

20   A.   June 30, 2006, and approximately 13, 14 days later on July

21   13th, 2006.

22   Q.   All right.  And standing up so we can just try to keep an

23   eye on that, and the one you started reading from was that one;

24   is that correct?

25   A.   That's correct.

1    Q.   Okay.  And the pharmacies that filled most, if not all, of

2    those prescriptions?

3    A.   Elite Pharmacy and New Care Pharmacy.

4    Q.   Were you asked to gather the same information for Wendy

5    Moore, Margaret Holmes, Greta Carter, George Ellis, and Paula

6    Dunaway?

7    A.   Yes, I was.

8    Q.   Sir, with reference, and Your Honor, for the record, Paula

9    Dunaway is 90-11.  George Ellis is 90-10.  Wendy Moore is 90-7.

10   Homes is 90-8 and Carter is 90-9.

11            Directing your attention, sir, to 90-12, were you

12   asked in reference to the search of the Off-Planet servers to

13   search for the name Caleb Goddard?

14   A.   Yes, I was.

15   Q.   Okay.  And were you asked not to exclude other drugs?

16   A.   Yes.

17   Q.   And, sir, can you tell me looking at this list of dates --

18   how did I do that?

19            Looking at the date shipped, if you see any kind of

20   pattern at all in terms of what's reflected in this server?

21   A.   An individual received two prescriptions hydrocodone

22   alprazolam, in each instance, and the dates that are

23   approximately two weeks apart.

24   Q.   Okay.  So initially, each time there's a prescription,

25   there's two?

1    A.  Yes.

2    Q.  For the record, this 90-12, I thought I'd said that.  Okay.

3         And let me ask you, sir, as doubles, if you will,

4    were they usually sent, filled by the same pharmacy, for

5    example, whoever filled the hydrocodone also filled the

6    alprazolam, and whoever filled the next hydrocodone also filled

7    the alprazolam, does that appear to be what you observed in

8    this as well?

9    A.  Yes.

10   Q.  Now, directing your attention, sir -- I lost my ruler.

11        Directing your attention, sir, to prescriptions dated

12   two on 1-24, and two on 1-27.  And the two on 1-24 are for

13   what?

14   A.  Hydrocodone and alprazolam.

15   Q.  And the two on 1-27 are for what?

16   A.  Hydrocodone and alprazolam.

17   Q.  And the two from 1-27 were issued by what pharmacy.  If you

18   can tell?  Probably, let me go back.

19        The two on 1-27?

20   A.  New Care Pharmacy.

21   Q.  And with reference to Mr. Goddard, it's the page and a

22   little bit more?

23   A.  That's correct.

24   Q.  And that last prescription on this list, sir, is I know you

25   can't read that.

1              Is --

2    A.   November 3, 2005 for alprazolam and hydrocodone.

3    Q.   Okay.  And issued by?

4    A.   Dr. Ibanez.

5    Q.   And filled by?

6    A.   New Care Pharmacy.

7    Q.   Now, did the government ask you, also, to search in the

8    Off-Planet data for a patient by the name of Roger Hackett?

9    A.   Yes.

10   Q.   And, sir, once again, the records of Mr. Hackett are a page

11   and then some?

12   A.   That's correct.

13   Q.   And what, if anything, did you observe any pattern in terms

14   of what was ordered?

15   A.   Hydrocodone.

16   Q.   Go ahead.

17   A.   Hydrocodone.  And then there was also hydrocodone with

18   carisoprodol.

19   Q.   Okay.  So there's -- so these two were together and these

20   two were together, and so on?

21   A.   Correct.

22   Q.   And can you tell me, sir, between these days, 6-7 and 6-13

23   how much time has passed?

24   A.   About six days.

25   Q.   And 6-23?

1    A.  10 days.

2    Q.  And 7-12?  Now it's getting hard.

3    A.  19 days.

4    Q.  Okay.  7-25.

5    A.  13 days.

6    Q.  Okay.  And from September first to September 6th?

7    A.  Five days.

8    Q.  And actually in September sixth you got three

9    prescriptions?

10   A.  That's correct.

11   Q.  Okay.  And September 6th to September 12th?

12   A.  Six days.

13   Q.  And three more?

14   A.  That's correct.

15   Q.  And September 12th to the 9th?

16   A.  17 days.

17   Q.  To October 6th?

18   A.  Approximately eight days.

19   Q.  And October 13th?

20   A.  Approximately seven days.

21   Q.  And one set of prescriptions, October 6th is issued by what

22   pharmacy?

23   A.  New Care Pharmacy.

24   Q.  And, finally, on this point, did the government ask you to

25   search for the numbers and the Off-Planet server for a Ronald

1    Chartrand?

2    A.  Yes.

3    Q.  Can you tell me, sir, the first prescription on this

4    document is when, let me see if I can straighten it up a

5    little.

6              (Pause.)

7    A.  First one is dated May second, 2005.

8    Q.  And who issued that, sir?  Who filled that, rather?

9    A.  New Care Pharmacy.

10   Q.  And then the second one, the next one, is what date

11   shipped?

12   A.  May 24, 2005.

13   Q.  How many days later is that?

14   A.  22.

15   Q.  And what pharmacy filled that?

16   A.  New Care pharmacy.

17   Q.  And the next one, sir, what day is that for or shipped?

18   A.  June first.

19   Q.  How many days past May 24th is that?

20   A.  Approximately seven.

21   Q.  Okay.  And what pharmacy filled that?

22   A.  New Care Pharmacy.

23   Q.  And, sir, these records that I've gone through, did you

24   find all of them in New Care's computers?

25   A.  Yes.

1        MS. SMITH:  One moment, Your Honor.

2        (Pause.)

3        THE COURT:  Take your time.

4        (Pause.)

5        MS. SMITH:  Your Honor, could we approach the bench

6   briefly?

7        THE COURT:  You may.

8        (At the bench)

9        THE COURT:  Yes, ma'am.

10        MS. SMITH:  Your Honor, we would ask the Court to

11   instruct the jury at this time about the stipulation.

12        MR. RAVENELL:  Absolutely not.  Absolutely not.

13   Judge, I wouldn't want this highlighted.  You know it's already

14   going to be stipulated.  I don't want it highlighted now.  The

15   witnesses are unavailable.  I will ask this be done tomorrow,

16   Judge.  Why would we want to highlight this?

17        THE COURT:  Well, what I'll do is I will give the

18   stipulation after Mr. Short has finished.

19        MS. SMITH:  Very well.

20        THE COURT:  And the stipulation will be with respect

21   to Ronald Chartrand Junior and Roger Hackett, that they are

22   unavailable to testify, and that both individuals were

23   hydrocodone abusers.

24        MR. RAVENELL:  Your Honor, I'm sorry.  The Court was

25   still writing.

1          THE COURT:  Yes.  I'm finished now.  Yes, sir, I'm

2     done.

3          MR. RAVENELL:  I'm sorry.  Your Honor, the witness

4     would not have been called until tomorrow.  And Miss lee --

5     Lewis, excuse me, the medical examiner, I would ask that this

6     stipulation be read when the witness would be called.

7          There is absolutely no reason to stipulate to this if

8     this was going to be read to the jury any sooner than that

9     witness would have been called.

10          THE COURT:  I'm not going to give it now, but I'm

11     going to give it after Mr. Short has left the witness stand.

12     It's the logical time to do it.  So I'm not going to highlight

13     it, but I'm not going to delay it until tomorrow.

14          MR. BUDLOW:  Your Honor, when you were saying what

15     the stipulation was, the first one, did you say unable or

16     unavailable?

17          THE COURT:  Unavailable.

18          MR. BUDLOW:  My hearing.

19          THE COURT:  Just simply unavailable, and that both

20     individuals were hydrocodone abusers.

21          MR. MCCANTS:  Judge, I think that kind of maybe

22     implies they could be deceased.

23          MS. SMITH:  Were at the time of the orders, that's

24     what we're talking about.

25          THE COURT:  And were at the time of their orders.

1    Good.  Good.

2          MS. SMITH:  Your Honor, I've just got a little bit

3    more, I'm going have him, just going to pick out about four

4    patients out of the New Care box itself and go through some of

5    their patterns and then I'm done.

6          THE COURT:  Good.  Thank you.

7          MR. RAVENELL:  Your Honor, I'm sorry.  There is going

8    to -- I will need a break after the witness just to make some

9    copies and to give the government on for cross-examination.

10          THE COURT:  Sir, we'll break when Miss Smith is

11    finished.

12          MR. RAVENELL:  Thank you, Judge.

13          (Open court)

14    BY MS. SMITH:

15    Q.  Sir, I'd like to direct your attention back to the New Care

16    data.  And ask you to review with me just a handful of your

17    records.

18          And showing you government's exhibit 89.1 from the

19    New Care servers, page 1604, are you familiar with this

20    particular information?

21    A.  Yes, I am.

22          MR. RAVENELL:  I'm sorry, what number is this?

23    Q.  Page 1604, of 89.1.

24          And I don't remember if I asked you in preparation

25    for testimony if you counted the number of prescriptions in

1    this New Care database for Gail Rabinowicz?

2    A.  I have not counted those.

3    Q.  Okay.  And the column right after the name-state is what?

4    A.  The date filled.

5    Q.  Okay.  And if you would, sir, tell me what the first one

6    is?

7    A.  On September 21st, 2005.

8    Q.  Okay.

9    A.  The 21st.

10   Q.  And the next one?

11   A.  September 29th, 2005.

12   Q.  Okay.  Are these all hydrocodone, or are there other drugs

13   in here?

14   A.  These are hydrocodone.  There are other drugs as well.

15   Q.  But we can see what the drug is to the right?

16   A.  That's correct.

17   Q.  And then September 29th is how many days after?

18   A.  Eight days.

19   Q.  Okay.  And October 15th?

20   A.  16 days.

21   Q.  And let me show you this one is 11-23 approximately how

22   many days is 12-13?

23   A.  About 20 days.

24   Q.  12-22?

25   A.  Nine days.

1    Q.   In between 1-6 and 1-16?

2    A.   10 days.

3    Q.   In between 1-16 and 2-4?

4    A.   Approximately 19 days.

5    Q.   In between 2-4 and 2-20?

6    A.   16 days.

7    Q.   2-20 and 2-27?

8    A.   Seven days.

9    Q.   And 2-27 and 3-14?

10   A.   15 days.

11   Q.   3-14 and 4-3?

12   A.   20 days.

13   Q.   4-3 and 4-17?

14   A.   14 days.

15   Q.   4-17 and 5-8?

16   A.   21 days.

17   Q.   5-8, 5-22?

18   A.   14 days.

19   Q.   5-22 and 6-5?

20   A.   14 days.

21   Q.   This is a prescription for something other than

22   hydrocodone?

23   A.   That's correct.

24   Q.   Okay.  And 6-5 and 6-20?

25   A.   15 days.

1    Q.  And 6-20 and 7-5?

2    A.  15 days.

3    Q.  7-5 and 7-25?

4    A.  20 days.

5    Q.  7-25 and 8-4?

6    A.  10 days.

7    Q.  Again, this is 8-4, it's two different prescriptions.  8-4

8    and 8-23?

9    A.  19 days.

10   Q.  And I think we're done with Gail Rabinowicz.

11           Let me ask you something, did you compare the

12   addresses on here?

13   A.  Yes.

14   Q.  Are they the same or different?  I want to make sure I'm in

15   the right place.  Any of the address different?

16   A.  They're all the same.

17   Q.  And this is from New Care's computers?

18   A.  That's correct.

19   Q.  And let me -- did you also review at my request a Joseph

20   Gallagher and a Joe Gallagher?

21   A.  Yes.

22   Q.  What, if any, observations did you make between the names

23   of Joseph Gallagher and Joe Gallagher to determine if they were

24   the same or different?

25   A.  The same address.

1    Q.  So and let me put it over this way.

2              For Joe Gallagher of Tennessee, the first

3    prescription is?

4    A.  May 11, 2005.

5    Q.  Okay.  And the next one?

6    A.  September 28th, 2005.

7    Q.  And the next one?

8    A.  10-24-05.

9    Q.  And as we move down, there are about a month apart at

10   least?

11   A.  Yes.

12   Q.  And then this one is 3-28-06, how long after the one

13   before?

14   A.  18 days.

15   Q.  Okay.  And 4-17-06?

16   A.  19 days.

17   Q.  5-4-06?

18   A.  About 17 days.

19   Q.  5-22-06?

20   A.  18 days.

21   Q.  6-15-06?

22   A.  About 21 days.

23   Q.  Between 7-13 and 8-11?

24   A.  Approximately 30 days.

25   Q.  Now, does the dates for Joseph Gallagher, does the

1    chronology start over?

2    A.  Yes.

3    Q.  So this one on 12-7-05 to Joseph Gallagher, how long after

4    that was one issued to Joe Gallagher if it was on 12-29-05?

5    A.  22 days.

6    Q.  And if one was issued on 4-17-06, how much later to Joe

7    Gallagher, how much later did Joseph Gallagher get one?

8    A.  Nine days.

9    Q.  After this?  I'm sorry?

10    A.  Excuse me, nine days.

11    Q.  And if Joe Gallagher got one on 6-15-06, how long before

12    and after did Joseph Gallagher get one?  And you can't see

13    because it's not on the screen.

14    A.  There's one on June first for June 15th.  June first and

15    June 30, so there's three.

16    Q.  June 15 is the one up here?

17    A.  Yes.

18    Q.  To Joe Gallagher?

19    A.  Joseph had 6-1 and 6-30.  Joe had one on 6-15.

20    Q.  And coming across, these are all the same address?

21    A.  Yes.

22    Q.  Did I ask you to look at Paula Pickard?

23    A.  Yes.

24    Q.  And if you can tell me, sir, looking at some of these

25    dates, did Paula Pickard use more than one name or just one

1    name?

2    A.  Just one name.

3    Q.  Okay.  So the time difference between this one for 9-22 and

4    this one for 10-5?

5    A.  13 days.

6    Q.  And then on 10-13?

7    A.  Eight days.

8    Q.  And now this is a different drug on 10-13; is that correct,

9    the second prescription on 10-13?

10   A.  Correct.

11   Q.  Okay.  I guess you can't see that.

12            Is that better?

13   A.  Yes.

14   Q.  And the next hydrocodone prescription on 11-2, how much

15   time since the prior one?

16   A.  About 20 days.

17   Q.  And if there was one on 12-5, how much time had passed on

18   the next one for 12-20?

19   A.  15 days.

20   Q.  Again, there were two on 12-20.  On January 3, '06 is how

21   much time after 12-20-05?

22   A.  14 days.

23   Q.  And 1-19-06 is how much time?

24   A.  16 days.

25   Q.  And again there were two of them there.

1       And then from January 19th of '06 to 2-6-06?

2   A.  18 days.

3   Q.  And to 2-20-06?

4   A.  14 days.

5   Q.  And again two on that day.

6       And 3-11-06?

7   A.  19 days.

8   Q.  4-3-06?

9   A.  23 days.

10  Q.  And two of them on that date.

11      4-20-06?

12  A.  17 days.

13  Q.  5-4-06?

14  A.  14 days.

15  Q.  5-18-06?

16  A.  14 days.

17  Q.  6-7-06?

18  A.  20 days.

19  Q.  And between 8-2 and 8-21?

20  A.  19 days.

21  Q.  8-21 and 9-6?

22  A.  16 days.

23  Q.  And one last one, Ron Grantham, did I ask you to review

24  that, sir?

25  A.  Yes.

1    Q.  And did he go by more than one name?

2    A.  There was a Ron Grantham and the database and Ronny

3    Grantham in the database with the same address.

4    Q.  Again, would the numbers have been integrated the dates or

5    would they have been separated?

6    A.  They would have been separated.

7    Q.  So, for example, Ron Grantham got a prescription on 7-5-06

8    for hydrocodone?

9    A.  That's correct.

10   Q.  And how much time passed 7-17-0-6 when Ronny Grantham got a

11   prescription for hydrocodone?

12   A.  12 days.

13   Q.  I'm sorry.  One moment.

14          (Pause.)

15   Q.  And if you can tell me, sir, after that, Ron Grantham got a

16   prescription how much time later?

17   A.  I'm sorry, between when?

18   Q.  Between 7-17 when Ronny Grantham got the prescription and

19   8-2 when Ron Grantham got the prescription?

20   A.  It would be 16 days.

21   Q.  Okay.  And all of these starting here down are Ron or Ronny

22   Grantham's prescriptions?

23   A.  That is correct.

24   Q.  Sir, in preparation for your testimony today, you were

25   asked to review for refills under a certain amount of time?

1    A.  Correct.

2    Q.  And what date cutoff were you looking for?

3    A.  20 days and less.

4    Q.  Were these the only ones you found?

5    A.  No.

6    Q.  Okay.  If a person wanted to sit down and go through here,

7    they would find them?

8    A.  Correct.

9         MS. SMITH:  Thank you.  I have no further questions

10   of this witness.

11        THE COURT:  Thank you, Miss Smith.

12        Ladies and gentlemen, it's about five minutes of 3.

13   We'll take a break and come back at 3:15.

14        Mr. Ravenell, is that enough time?

15        MR. RAVENELL:  Yes, Your Honor, that's fine.

16        THE COURT:  We'll come back, then, at 3:15 for

17   cross-examination.  Thank you.

18        (Recess.)

19        THE COURT:  Please be seated, unless you wish to

20   stand for the jury.

21        (Pause.)

22        MR. RAVENELL:  Your Honor, the copier is really slow.

23   I need to get these copied so the government will have it, it's

24   a matter --

25        THE COURT:  How many more pages do you have left?

1          MR. RAVENELL:  It's two more, let me just check.

2          (Pause.)

3          MS. SMITH:  Your Honor --

4          THE COURT:  Yes, ma'am.

5          MS. SMITH:  -- I have been handed documents.  I'm

6    just trying to find out what they are, so I don't have to worry

7    about foundation being laid before he's talking about them in

8    front of the jury.  The witness is in the courtroom.  So I

9    don't know if we can have this conversation with or without the

10   witness.

11         THE COURT:  Good.  Mr. Short, if I could ask to you

12   step outside, please?  Good.

13         The witness has stepped outside of the room.  Mr.

14   Ravenell, if you could describe the documents, please?

15         MR. RAVENELL:  Your Honor, there are documents that

16   are from New Care's server that I'll be using to cross-examine

17   the witness.

18         THE COURT:  And do we know whether he's ever seen

19   these documents before?

20         MR. RAVENELL:  He said he went on the server.  I

21   guess we'll find out.

22         THE COURT:  And --

23         MR. RAVENELL:  I have no clue, Judge.  I didn't

24   interview the witness in advance.

25         THE COURT:  Now, let's assume that he's never seen

1   the documents before, then what?

2           MR. RAVENELL:  Then he'll tell us that, and I'll ask

3   other questions.

4           THE COURT:  Good.  Thank you.

5           Mr. Thompson, if you would bring in the jury?

6           (Pause.)

7           (Jury present)

8           THE CLERK:  Jurors all present.

9           THE COURT:  Thank you, Mr. Thompson.

10          Welcome back, ladies and gentlemen.

11          Mr. Ravenell, whenever you're ready, sir.

12          MR. RAVENELL:  Thank you, Your Honor.

13                  CROSS-EXAMINATION

14  BY MR. RAVENELL:

15  Q.  Good afternoon, Mr. Short.

16  A.  Good afternoon, sir.

17  Q.  Welcome back.

18  A.  Thank you.

19  Q.  Good afternoon everyone.

20          THE JURY:  Good afternoon.

21  Q.  Mr. Short, I promise I will keep you short.  Now, I'm going

22  to keep you for a little while, it won't necessarily be short.

23          Now, you were shown a series of documents this

24  afternoon by Miss Smith, which you indicated either came from

25  this Off-Planet server, or from New Care's server; is that

1    correct?

2    A.  That's correct.

3    Q.  And if I understood your testimony previously and today,

4    that you didn't create any of the documents, they were just

5    pulled from those servers; is that correct?

6    A.  The information was pulled from the server.

7    Q.  Information pulled from the server obviously created the

8    documents, the charts, but you actually pulled some of the

9    information from the server; is that correct?

10   A.  That's correct.

11   Q.  And by pulling from the server, you went on the server and

12   were able to print information from the server; is that

13   correct?

14   A.  There's a database, and then I extracted database files and

15   created a database, and from that the records are extracted.

16   Q.  Okay.  Now, the documents that came from those servers, and

17   Miss Smith was asking you questions about these documents that

18   indicated that there were prescriptions filled on particular

19   dates and shipped on particular dates, you don't know whether

20   those items were actually shipped or not, this is what you got

21   from the server; is that correct?

22   A.  That's correct.

23   Q.  And when it says it was actually filled by New Care, for

24   example, you don't know whether those prescriptions were

25   actually filled, you were going by something you pulled from a

1    server, correct?

2    A.   In this instance, it would be both servers.

3    Q.   From both servers, right?

4    A.   Correct.

5    Q.   There were occasions when you had in fact Miss Smith talked

6    with you about sometimes the servers didn't match up; is that

7    correct?

8    A.   That's correct.

9    Q.   There was information that appears in New Care's server

10   when you checked Off-Planet server, it didn't match it in all

11   respects; is that correct?

12   A.   Not in all respects.

13   Q.   Okay.  Now, the charts that you prepared, well, when you

14   looked at the New Care's server, you get a screen that shows,

15   for example, a patient profile?

16   A.   These were consecutive records based on patients.

17   Q.   Right.

18   A.   Correct.

19   Q.   Now, let me show you what has been marked as defense

20   exhibit 53 for identification, and tell me whether this is a

21   sample of a snapshot of what you would see if you look at a

22   prescription profile for a patient in New Care's server?

23                (Pause.)

24   A.   This appears to be some of the information.

25   Q.   All right.  And this is -- while this particular person,

1    the name that's on here, Robin Walters, is not one that you

2    testified about, this is the kind of information that you see

3    when you look at a snapshot or of a profile for a particular

4    New Care customer prescription filled, correct?

5    A.   Some of the fields are the same, that's correct.

6            MR. RAVENELL:  Your Honor, I'd move defense 53 into

7    evidence.

8            MS. SMITH:  Your Honor, I object.

9            THE COURT:  If I can see counsel, please?

10           (At the bench)

11           THE COURT:  If I could see the documents, please?

12   Thank you.

13           MS. SMITH:  That's --

14           (Pause.)

15           MR. BUDLOW:  It is incomplete.

16           THE COURT:  Yes, ma'am?

17           MS. SMITH:  The witness has just testified that some

18   of the fields are the same.  But he can't identify all the

19   information on there.

20           I just don't think that's good enough.

21           MR. RAVENELL:  Your Honor, if you look at what's

22   there and compare it with what the government has introduced on

23   the documents here, it's the same information.  And the witness

24   can certainly point out, I'll have him point out what fields

25   are different from the fields, that the jury will know any

1  fields that's different than the fields that are on the records

2  that are already in evidence.

3          THE COURT:  Well, to me it's a problem of

4  authentication.  If he can authenticate that, and we go back

5  through the steps.

6          Is this the New Care server?

7          MR. RAVENELL:  Yes.

8          THE COURT:  The New Care server?

9          MR. RAVENELL:  The witness said it is information

10  from New Care server are consistent with some of the fields.

11          THE COURT:  So he's familiar with the New Care

12  server, because he looked through the New Care server, and

13  extracted information.  So --

14          MS. SMITH:  Your Honor, I'm sorry.

15          THE COURT:  So the question is, can he say that this

16  is information that I saw, that I can verify that this is a

17  field --

18          MR. RAVENELL:  Yes.

19          THE COURT:  -- that was there on the New Care server?

20          MR. RAVENELL:  Correct.

21          THE COURT:  Now, if he says he doesn't know or it's

22  put together in a way that he can't verify it, then he can't

23  authenticate it.  So it's an authenticate issue.  Let's assume

24  that he authenticates it, then what?

25          MS. SMITH:  Well, my concern was he said some of the

1    information was the same.  Unlike what Mr. Ravenell just said,

2    that he said some of it is different.

3         He said he recognized some of the information as the

4    same kind of information or as the same information.

5         To me, that just wasn't enough.  If he says that he

6    can identify this and he knows what it is, then great.  If he

7    had more time to look at it, he might have been able to do that

8    for the defense, but we haven't seen it before this moment.

9         THE COURT:  My view is that he does not have to have

10   a familiarity with all of the information contained on the

11   page.  He simply must be able to state that I can vouch for the

12   fact that this is a page from the New Care server.

13        MR. RAVENELL:  And the government has had the New

14   Care server, so you know we're talking about the issues of

15   authenticity.  If the government's going put it to -- the

16   government has New Care server.  They copied the entire server.

17        MS. SMITH:  But I don't know what that page is.

18        THE COURT:  Counsel, Miss Smith, remember, ask me

19   questions.  I can ask Mr. Ravenell questions, but you cannot

20   ask him questions.

21        MS. SMITH:  Yes, Your Honor.

22        THE COURT:  But that doesn't mean that they know

23   everything that's in there, the server.  It's just a routine

24   authentication problem, and if he can say what this is so.  I

25   think you need to lay a better foundation.

1            MR. RAVENELL:  We'll do that.  Thank you.

2            (Open court)

3    BY MR. RAVENELL:

4    Q.  Now, Mr. Short, you indicated -- you were shown by Mrs.

5    Smith several documents from government's exhibit 891, which

6    are pages from New Care's server; is that correct?

7    A.  That's correct.

8    Q.  I'm showing you one of those pages right now, page 1604,

9    and I showed you defense exhibit 53 for identification, and you

10   said that the screen, this page 53 was similar, but there are

11   different fields.

12           Tell me what you mean by different fields?

13   A.  First of all, I didn't get the information on this screen.

14   I received the basically the tables of this information, so

15   this instead of having the patient name on the top of the

16   screen, it would have been like on a separate line.

17   Q.  Okay.

18   A.  So some of the information, this shows part of the drug.

19   Q.  This being 53 for identification?

20   A.  53.  This has -- I'm not sure it doesn't appear on this

21   screen, but the type of drug, hydrocodone, but it doesn't have

22   the doses in here that mine would have.  Also --

23   Q.  The dosage isn't there?

24   A.  Right.  Just says hydrocodone, acetaminophen, doesn't have

25   the strength.

1    Q.  So it doesn't have the strength, has hydrocodone and then

2    has the quantity as well, correct?

3    A.  Correct.

4    Q.  And only thing it doesn't have, for example, 10-3-25?

5    A.  The strength of the drug.  Also the original and last

6    dates, that information I had a fill date.

7    Q.  Okay.  And other than that, is this consistent with the

8    information that you reviewed from New Care's server?

9    A.  In this instance, again, I'm not sure what the PC field is

10   on here.  I did not have that available to me.

11   Q.  All right.  But the other information consistent with what

12   you were able to observe on New Care's server?

13   A.  Yes.

14          MR. RAVENELL:  All right.  Your Honor, move it into

15   evidence.

16          THE COURT:  If I could just ask a question, Mr.

17   Short?

18          MR. RAVENELL:  I'll step out of the way.

19          THE COURT:  Thank you.  The issue is essentially

20   this.  You went on New Care's server and my understanding is

21   the server's a computer, correct?

22          THE WITNESS:  Correct.

23          THE COURT:  And that you went into the New Care

24   server, and you pulled up information, if that's the right

25   term, certain fields on the computer screen, correct?

1           THE WITNESS:  Correct.

2           THE COURT:  So a field, as I understand, is what you

3    can see on the screen on the monitor?

4           THE WITNESS:  Correct.

5           THE COURT:  So what I'm looking to see is whether you

6    can authenticate that the document Mr. Ravenell showed you,

7    which is exhibit marked 53 for identification, comes from the

8    New Care server.

9           THE WITNESS:  I did not personally pull the

10   information from the server.  The servers were done by a

11   different entity.  I received the database files from them.

12   I'm not the one who extracted the files from the New Care

13   server.

14          THE COURT:  So are you in a position to say or not to

15   say that if somebody went to the New Care server, they would or

16   would not see the field that appears on exhibit 53?

17          THE WITNESS:  I'm not familiar with how the screen

18   would appear on New Care's computer.

19          THE COURT:  Okay.

20          THE WITNESS:  How the information appeared I have it

21   in a database, but not how it would have appeared on the

22   screen.

23          THE COURT:  Now, the database that you looked at did

24   not consist of different screens from the New Care computer,

25   but rather were data compiled and tabulated by somebody else?

1          THE WITNESS:  That's correct.

2          THE COURT:  Thank you.  If I could see counsel,

3     please?

4          (At the bench)

5          MR. RAVENELL:  I'm sorry.  I was going to --

6          THE COURT:  He can't identify that is from New Care's

7     computer.

8          MR. RAVENELL:  Well, the problem I had, Your Honor,

9     is that Mr. Budlow represented just the opposite when we were

10    at the bench earlier that the witness in fact didn't just look

11    at a database, but the witness actually had the server and that

12    it was the same, when we raised an earlier objection.

13         THE COURT:  Just --

14         MR. RAVENELL:  We raised an earlier objection, you

15    know, by the information to them, and when we had the

16    conference, it was represented that that information is what

17    was in fact pulled off the server, and that the database that

18    he had was consistent with, you know, what we'd see on the

19    server.

20         Now the witness is saying something totally

21    different, which is, and if that's going to be a sticking

22    point, then we've got another issue to revisit, because we

23    stipulated to something based on information given to us that

24    I'm now hearing is not accurate, and the government is now

25    holding us to a standard, and that's fine if they want to do

1    that.  But I'm going to ask the Court to revisit the other

2    issue.

3              THE COURT:  I don't know what the other issue you

4    want to revisit, but you have just an authentication issue.

5    You have some document you need somebody to authenticate and

6    he's never seen it.

7              MR. RAVENELL:  Had the --

8              THE COURT:  If you can have someone authenticate

9    them, you can have a legal assistant go on the New Care

10   computer and authenticate them.  It's just a problem of he

11   can't authenticate them because he's told me that he hasn't

12   seen them before.

13             MR. RAVENELL:  We can do it all, but I didn't want to

14   have to bring the witness back once we authenticate it.  I

15   would ask for leave to bring the witness back.  It's easy to

16   authenticate.  We took it from New Care's server last night.

17   It's going to be easy to authenticate.

18             MS. SMITH:  Your Honor, if he'd given it to us last

19   night, we might not be in this position.  Everything we've

20   asked him to agree to he's had plenty of time to look at.  And

21   the things he didn't have time to look at like a week's worth

22   he got pressed.

23             So all we were asking for was the same courtesy.  And

24   I have a letter in writing that I can provide if Mr. Ravenell

25   needs to have his memory refreshed where I told him

1   specifically what Mr. Short's role was in reference to the New

2   Care servers.

3        Today we were talking about the Off-Planet servers,

4   not the New Care servers.

5        THE COURT:  So did he actually look in the fields of

6   the Off-Planet server?

7        MS. SMITH:  The Off-Planet server, he got the copy of

8   the server.  That's what we were talking about earlier today.

9   We were not talking about the New Care.  New Care, someone took

10  it at the forensic lab, sent it to his office, another person,

11  then formatted it so that Mr. Short -- so that Mr. Short could

12  use it.

13       I told that to Mr. Ravenell, in fact, in writing, and

14  I will be happy to provide that letter that he knew exactly

15  what he agreed to and to claim that we misrepresented something

16  is just wrong.

17       THE COURT:  Good.

18       MR. RAVENELL:  Your Honor, can I see the documents,

19  please?

20       MR. RAVENELL:  I will tell you that.

21       THE COURT:  How many of these do we have?

22       MR. RAVENELL:  We have one of those.

23       THE COURT:  How many in this class of documents do

24  you want to get in?

25       MR. RAVENELL:  There is exhibit 51 has -- each one

1    probably has about 20 of these on it, probably like I'd say

2    about 60.

3              THE COURT:  Well, what's the point that you're trying

4    to make with these?

5              MR. RAVENELL:  Your Honor, what you will see, the

6    government has suggested that each prescription that is on the

7    list for New Care actually went out the door.  That's not true.

8    They didn't go out the door.  And these pound signs tell us

9    they didn't go out the door.

10             THE COURT:  Well, he's testified that he doesn't know

11   whether they went out the door or not.

12             MR. RAVENELL:  I understand.  But I wanted -- we'll

13   bring someone else.  We'll bring another person in who can

14   authenticate the screens.

15             THE COURT:  There's only so much you can do with him.

16   He says that does he not know whether the drugs went out the

17   door.  So he, as I understand it, you want somebody who will

18   say that under the methodology used in the New Care server, a

19   pound sign means the prescription was never filled.

20             MR. RAVENELL:  Correct.

21             THE COURT:  Now, he can't do that for you.

22             MR. RAVENELL:  I agree.

23             THE COURT:  Because he doesn't know anything about

24   New Care's personal practices, and he doesn't know what the

25   pound sign means because he didn't look in the New Care

1    computer.

2         MR. RAVENELL:  If he never looked in the New Care

3    computers, he would not have seen the pound signs.  He's going

4    to see what somebody else pulled off the database.  That's what

5    he testified to.  That's fine.  We'll put someone on tomorrow,

6    as we start our case, we'll bring the server into court.

7         THE COURT:  Now, what you could do is, I take it, the

8    exhibits that he does not have, that he was using the data he

9    was using did not --

10        MR. RAVENELL:  I'm going to go through and show they

11   don't have the pound sign.

12        THE COURT:  Good.  Now, are you representing that

13   this is right from the New Care computer?

14        MR. RAVENELL:  11:55 p.m. last night, I think the

15   time is on there.

16        THE COURT:  Good.  What you can do is have it marked

17   for identification.  Even though it's not going to come into

18   evidence now, you can put it on the screen.  You can ask him

19   whether he knows anything about these pound signs.  He's going

20   to say he doesn't know anything about the pound signs.  Then

21   you can ask him whether had anybody ever told him about the

22   pound signs, and were there ever any pound signs on the exhibit

23   that he has.

24        MR. RAVENELL:  All right.  Thank you.

25        THE COURT:  That way you've essentially done what you

1    need to do, but this document hasn't come into evidence yet.

2            MR. RAVENELL:  Thank you.

3            THE COURT:  Since it's from a New Care server, it can

4    come into evidence.

5            MR. RAVENELL:  We'll connect it.

6            MS. SMITH:  Your Honor, I've asked him specifically

7    the defense counsel not be able to say to the witness did

8    anybody tell you these pound signs mean.  The question of this

9    witness is do you know what the pound sign means, yes or no.

10           What they mean should not be suggested in the

11   question asked by Mr. Ravenell.  That would be improper.

12           MR. RAVENELL:  I'll ask the question the Court said

13   that I could ask.

14           THE COURT:  I think I said he could ask does he know

15   what the pound signs mean.

16           MR. RAVENELL:  Actually, you said I could ask him

17   whether --

18           THE COURT:  Whether anybody told him what they meant.

19           MR. RAVENELL:  Yes.

20           MS. SMITH:  But nothing more.

21           THE COURT:  But I think that's fair.  But you

22   shouldn't, because nobody, if nobody told him, just ask him

23   whether anybody told him what it meant.

24           MR. RAVENELL:  I will.

25           THE COURT:  And if they said nobody told me what it

1   meant, then you can't show it.

2           MR. RAVENELL:  He's going to say he's never seen it

3   because he's never seen the screen.

4           (Open court)

5           (Pause.)

6   BY MR. RAVENELL:

7   Q.  Now, sir, if I understand your testimony correctly -- well,

8   let me just ask you, you did not look at the New Care server

9   and the screens on New Care's server yourself; is that correct?

10  A.  That is correct.

11  Q.  Someone else from the government went on to the server,

12  pulled up the screen that you would see if you open up the

13  computer; is that correct?

14  A.  Correct.

15  Q.  If you would go on your computer and log in and you go into

16  a particular patient's name and a screen comes up, you never

17  saw that because you didn't actually go and look at what's on

18  the server, correct?

19  A.  Correct.

20  Q.  What happens was that someone culled information from --

21  someone culled information from New Care's server and created a

22  database, and then you used that database to create the charts

23  that you've testified about; is that correct?

24  A.  The information would have been taken from the tables

25  within New Care's server.

1    Q.  Well, did someone create a database?

2    A.  They didn't create a database.  They extracted the

3    database.

4    Q.  They extracted a database?

5    A.  Correct.

6    Q.  And extracted the database from New Care's server?

7    A.  Correct.

8    Q.  And once you received that information, the database was

9    extracted from New Care's server, you then created these charts

10   from that information?

11   A.  Correct.

12   Q.  Okay.  Now, let me show you what is marked as defense 53

13   for identification.  Let me back out.

14        Now, this is marked as defense 53 for identification.

15   You did not go on to New Care's server, you indicated, so if

16   this were a page from New Care's server, a patient's profile,

17   you didn't see this information; is that correct?

18   A.  I didn't see it in this form, no.

19   Q.  Right.  You didn't see it in this form.

20        What you saw was information that allowed you to

21   create something such as from page 1, 1601, 1604, excuse me, of

22   government's exhibit 89-1, this is what you have; is that

23   correct?

24   A.  That's correct.

25   Q.  All right.  And now, the information that you have, let me

1    just zoom in next to the names, you made reference to these

2    names earlier in testimony from Miss Smith.

3          And you mentioned the Gail Rabinowicz's name and

4    particular prescriptions, correct?

5    A.   Correct.

6    Q.   And the information that you saw is before the jury on this

7    page; is that correct?

8    A.   That is correct.

9    Q.   All right.  Now, when you were reviewing the information

10   that someone had culled from New Care's computer, you didn't --

11   from the server, there was no pound sign by any of these names;

12   is that correct?

13   A.   That's correct.

14   Q.   All right.  Now, showing you defense exhibit 53, do you see

15   the pound symbols next to prescriptions?

16   A.   Yes, sir.

17   Q.   Okay.  Those pound signs, as you said, did not appear on

18   the information that was given to you, correct?

19   A.   Correct.

20   Q.   Now, do you know what the pound sign means, that's

21   displayed here?

22   A.   No, sir.

23   Q.   Okay.  Did anyone tell you what those pound signs -- what

24   the pound signs mean?

25   A.   I didn't see the pound sign, so it wouldn't have been

1    explained to me.

2    Q.  You didn't have a conversation with anybody about the pound

3    signs until today; is that correct?

4    A.  That's correct.

5    Q.  Okay.  Let me show you, you made reference to government

6    exhibit 90-14 for a Ronald Chartrand.  I'll put the name on the

7    screen first.

8            Ronald Chartrand Junior, you testified about this

9    document, 90-14; is that correct?

10   A.  That's correct.

11   Q.  And one of the things that Miss Smith had you point out,

12   and you testified about, is that what I've circled here.  And

13   this is my copy, not the government's copy, so it's circled in

14   red, that there was a date shipped of 5-24-05 and that another

15   of June 1, '05.

16           Do you see that?

17   A.  Yes, sir.

18   Q.  And as you told us earlier, you don't know whether that

19   item, those boatload of items left New Care's pharmacy as being

20   filled, correct?

21   A.  Correct.

22   Q.  Now, let me show you what's been marked as defense exhibit

23   52 for identification.  I'm sorry.

24           Court's indulgence.

25           (Pause.)

1  Q.  I apologize.  Let me show you actually defense 54.

2          MS. SMITH:  Your Honor, I object.

3          THE COURT:  To?

4          MS. SMITH:  Same objection.

5          THE COURT:  To?  Let me --

6          MS. SMITH:  Different document.

7          THE COURT:  So this is the same kind of field?

8          MR. RAVENELL:  Yes.

9          THE COURT:  Good.  So the objection's noted.  This

10  will be simply marked in for identification, but not put into

11  evidence.

12          MR. RAVENELL:  Thank you.

13          MS. SMITH:  And we object to it being on the screen,

14  Your Honor.

15          THE COURT:  Well, is this 54 is the same kind of

16  field as 53?

17          MR. RAVENELL:  Yes, Your Honor.

18          THE COURT:  Good.  I'll overrule the objection.

19  Q.  Just let me staple this so I have it together and I don't

20  lose it and Mr. Thompson gets on me later.  Let me find the

21  stapler.

22          (Pause.)

23  Q.  I'm showing you, come back to just where we were, you have

24  these dates of 5-24-05 and 6-1-05 on Ronald Chartrand, if I

25  show you defense 54 for identification, and turn to the right

1    page that would be helpful, there's a malfunction.

2              There we go.

3              Turn to the right page of this, and I'll show you

4    page that indicates RK profile for Ronald Chartrand, and if I

5    move over to, try to get this date and let me pull out and get

6    the date in.

7              THE COURT:  Now, what's on the screen, that's exhibit

8    54 marked for identification only.

9              MR. RAVENELL:  Yes, Your Honor.

10   BY MR. RAVENELL:

11   Q.  Now, if I show you this date, or this document, Ronald

12   Chartrand, and you'll see these pound signs here?

13   A.  Yes, sir.

14   Q.  Okay.  And if I kind of compare these two documents, there

15   is a prescription that indicates the prescription went out the

16   door from New Care on 6-1-05.

17             Do you see that?

18   A.  Yes, sir.

19   Q.  And if I show you -- I'm trying to do this so we have both

20   for Mr. Chartrand, and let me clear this, and do you see that

21   pound sign?

22             And if I circle the date, do you see the 6-1-05 that

23   I've circled?

24   A.  Yes.

25   Q.  Now, do you know what the pound sign indicates, when

1    there's a pound sign by that prescription for 6-1-05?

2    A.  No, sir.

3    Q.  Okay.  If I show you another page from defense exhibit 54

4    for identification, and this is the first page of defense

5    exhibit 54 for identification, there's a RX profile for a Jeff

6    Ceccola and pound sign.

7         Do you see that?

8    A.  Yes, sir.

9    Q.  Now, I'm going to, instead of going through this entire

10   stack, which is about I don't know how many pages, I'm going to

11   approach and ask you to look at these and ask you questions so

12   we can move a little more quickly.

13        Let me show you defense exhibit 54 for identification

14   and ask you to look through this document and see if there are

15   pound signs that appear next to these patients's names and

16   prescriptions, and I'm going to flip through with you.  Okay?

17        It's probably quicker for you to do it than for me to

18   hold on to you.

19        (Pause.)

20   A.  Sir, this doesn't have pound signs on all of them.

21   Q.  We didn't count the pages.  You didn't count the papers; is

22   that correct?

23   A.  That's correct.

24   Q.  I'll show you defense exhibit 52, showing defense exhibit

25   52 for identification, ask you to review these and see whether

1    those patient profile have a pound sign next to some of the

2    prescriptions?

3              And you don't have to review all of them, but review

4    as many as you need.

5              (Pause.)

6    A.   Yes, sir.  Most of them have pound signs, but not all of

7    them.

8    Q.   If I may show you on the screen defense exhibit 52 for

9    identification, that's the first page of a patient profile for

10   a Leslie Woodin, W O O D I N, and there are these pound signs

11   that appear; is that correct?

12   A.   That's correct.

13   Q.   Thank you.

14             And if we go to the next page, for a Chester Woods,

15   there's a pound sign here; is that correct?

16   A.   That's correct.

17   Q.   And we'll skip ahead to a page randomly, and show you one

18   for a Karen Wyatt, I think it is.

19             THE COURT:  If I could see counsel, please?

20             MR. RAVENELL:  Yes.

21             (At the bench)

22             MR. RAVENELL:  Yes, Your Honor.

23             THE COURT:  Since he's never seen these documents,

24   then he can't get any meaningful testimony, all he can simply

25   say is what the jury can see there are all these pound signs.

1          MR. RAVENELL:  Your Honor, if I cut you off, I will

2     just show him the first page of the documents instead of going

3     through the documents and have it marked for identification and

4     only one more that I have.

5          THE COURT:  Now, tomorrow, the problem is are you

6     going to go through all these one at the time as well?

7          MR. RAVENELL:  No.  I'm not going to have anyone go

8     through one at a time tomorrow.  Once we have the information

9     in, we'll bring in people to authenticate it, and then we will

10    argue to the jury once we are able to get it in, we put the

11    documents in.

12         So I'm not going to show someone and have them go

13    through all of them again.

14         THE COURT:  We're going to have to have some

15    admissible evidence as to what this all means.

16         MR. RAVENELL:  Absolutely.  We understand that.

17         MS. SMITH:  Your Honor --

18         THE COURT:  Yes, ma'am?

19         MS. SMITH:  Aren't we done with this by now?  If the

20    next exhibit is the exact same thing, can't he just mark for

21    identification and move on?

22         Do we really have to keep doing this, especially

23    since they're not in evidence?

24         THE COURT:  Well, if there's only one more, just

25    going to, then I'm happy, but I didn't want to have to do it

1    all again tomorrow I think with the jury.  So we're almost

2    finished.

3              MR. RAVENELL:  Yes.  Absolutely.

4              THE COURT:  Good.

5              (Open court)

6    BY MR. RAVENELL:

7    Q.  Going back to the front page of defense exhibit 52 for

8    identification, show you the RX profile for Leslie Woodin, and

9    there's pound sign.

10             Let me show you a page from government's exhibit 89

11   one, page 216.  Now, the name that I just showed you on defense

12   exhibit 52 for identification, the Leslie Woodin, appears to be

13   the same name as this individual; is that correct?

14   A.  That's correct.

15   Q.  All right.  And on the information that you had, when you

16   review it, those pound signs were not there; is that correct?

17   A.  That's correct.

18   Q.  And as you indicated, you did not look at the actual

19   computer screen or RX profile, you looked at what someone else

20   had pulled from that database?

21   A.  The table, that's correct.

22   Q.  The table.

23             And the last one in this series, showing you what is

24   defense exhibit 51 for identification, and ask you just to

25   review this document and look through the pages and tell me

1    whether the pound sign appears on any of those pages next to

2    hydrocodone drugs or in the patient profile?

3         (Pause.)

4    A.  It appears on some, but not all.

5    Q.  Okay.  Thank you.  I'll take this back with me.

6         You were also shown by the government page 680 from

7    government exhibit 89-1 where you indicated the names of

8    Gallagher and Joseph Gallagher appeared.  And again when you

9    reviewed it, there's no pound sign next to the information you

10   reviewed; is that correct?

11   A.  That's correct.

12   Q.  And you were shown by the government page 1554 from

13   government's exhibit 89-1, and the name Paul Rickard, and when

14   you reviewed the information, no pound sign appeared next to

15   it; is that correct?

16   A.  That's correct.

17   Q.  And you were also shown government's exhibit, from

18   government exhibit 89-1, page 751, the information for Ron

19   Grantham, and again information that you were privy to did not

20   have the pound sign, correct?

21   A.  That's correct.

22   Q.  Now, were you ever asked to go back and actually review the

23   screens that would appear if you looked at the information on

24   the website just looked at -- not the website, excuse me -- on

25   the computer if you could, just actually where you pulled the

1    computer and looked at the server, were you ever asked to do

2    that?

3    A.   No.

4    Q.   You were also shown additional documents from you said it

5    was Off-Planet server, correct?

6    A.   Correct.

7    Q.   And did you actually go onto the Off-Planet server and

8    review information yourself and can you tell it or was it done

9    similar to what you testified to where someone else pulled the

10   information from the server and provided it to you?

11   A.   It was provided to me.

12   Q.   So you did not actually go on the server and pull it?

13   A.   No.

14   Q.   So you don't -- when you -- so you never looked at the

15   Off-Planet server to see whether there was any symbols by any

16   of the names on the actual server for Off-Planet, either?

17   A.   No.

18   Q.   And you did tell us that there are times when the

19   information on New Care's server did not match up with

20   information on Off-Planet's server, correct?

21   A.   Correct.

22   Q.   All right.  And the accuracy of your charts depends on the

23   accuracy of the information on those servers, correct?

24   A.   Correct.

25         MR. RAVENELL:  Court's indulgence, Your Honor.

1           THE COURT:  Take your time.

2           (Pause.)

3           MR. RAVENELL:  Nothing further at this time, thank

4    you.

5           THE COURT:  Thank you.  Mr. McCants, any questions,

6    sir?

7           MR. MCCANTS:  One or two.

8           MR. RAVENELL:  I'm -- I actually did have something

9    else.  I apologize.

10          (Pause.)

11   BY MR. RAVENELL:

12   Q.  Now, do you know what kind of software that was used by New

13   Care for the server?

14   A.  I believe it was QS 1 was the software.

15   Q.  Okay.  And what is QS 1?

16   A.  That's a type of pharmacy software.

17   Q.  Pharmacy software?

18          And were you familiar with it prior to your

19   involvement in this case?

20   A.  I've seen it in the past.  I've worked with data extracted

21   from that in the past.

22   Q.  I'm sorry?

23   A.  I've worked with data extracted from QS 1 in the past.

24   Q.  Okay.  And on the XS 1 system, does the QS 1 system have an

25   ability for one to delete something from its system?

1    A.  I'm not aware of that.

2    Q.  You're not aware of that?  Okay.

3         And are you aware of whether the XS 1 system has the

4    ability for one operating it to flag something in the system?

5    A.  I'm not aware of that.

6    Q.  You're not aware of that?

7    A.  (Shakes head negatively.)

8    Q.  Do you know whether the QS 1 -- and you say New Care had

9    the QS 1 system -- whether there's ability to flag

10   prescriptions not to go out that would have gone out in the

11   past?

12        MS. SMITH:  Objection.

13        MR. RAVENELL:  Does he know the system has the --

14        THE COURT:  I lost the train of thought.  What was

15   the question beginning, please?

16   Q.  Do you know from the QS 1 system they said New Care had,

17   that its ability to flag a prescription as being previously

18   filled, or not to be sent again?

19        THE COURT:  Do you know?  Can you answer that, sir?

20        THE WITNESS:  No, sir.  I'm not familiar with the

21   features of the QS 1 software.

22        MR. RAVENELL:  Thank you.  No further questions.

23        THE COURT:  Thank you.

24        Mr. McCants, your witness, sir.

25        MR. MCCANTS:  Thank you, Judge.

1                        CROSS-EXAMINATION

2    BY MR. MCCANTS:

3    Q.  Good afternoon, Mr. Short.

4    A.  Good afternoon.

5    Q.  Good afternoon, ladies and gentlemen.

6         THE JURY:  Good afternoon.

7    Q.  Mr. Short, you've noted that there was a difference in the

8    New Care server than as opposed to that of the people in

9    Florida, or the Off-Planet server, inasmuch as New Care

10   actually maintained a field on the prescription numbers; is

11   that correct?

12   A.  That's correct.

13   Q.  Okay.  So that was actually kept a detailed list, you would

14   say, of the number of prescriptions, and they actually filled?

15   A.  That's correct.

16   Q.  Okay.  And irrespective of the pound sign and regardless of

17   what may have been and what you know about the pound sign and

18   shipments, but there was also records of the date prescriptions

19   were shipped, that was maintained on New Care server; is that

20   correct?

21   A.  New Care had date filled.

22        MR. MCCANTS:  Okay.  No further questions, Your

23   Honor.

24        THE COURT:  Thank you.  Good.  If I could see

25   counsel, please?

1          (At the bench)

2          THE COURT:  Yes, ma'am.

3          MS. SMITH:  Your Honor, if I might, when I objected

4     last to the question, the previous question had been and do you

5     know if the server could do this, do you know if the server

6     could do that, and he kept saying I don't know anything about

7     it.  So the question I objected to was one of those fact-filled

8     chunky questions, which essentially had already been asked and

9     answered because the witness had already insisted they didn't

10    know anything about it.  He puts facts in that are not in

11    evidence.  That's why I object.

12         THE COURT:  Well, he said he didn't know, and I'm

13    going to instruct the jury the question isn't evidence.

14         MR. RAVENELL:  And Your Honor, just the Court's

15    already ruled in our favor, but Miss Smith has the facts wrong.

16    The witness in fact said he was familiar with the QS 1 system,

17    so this was a system that he was familiar with.

18         Your Honor, I would like to bring up another issue.

19         THE COURT:  I need to get in what's the redirect?

20    Miss Smith, do you have any redirect?

21         MS. SMITH:  I wanted to ask him about information

22    data systems, just generally, a few questions about how they

23    work.

24         And I wanted to ask him about some of the other

25    differences between the New Care server and the Off-Planet

1    server.

2              For example, Off-Planet has the date of birth, I

3    don't know if New Care's system had the date of birth, but Mr.

4    McCants pointed out information on the New Care server that the

5    Off-Planet didn't have, and I would like to see if there's

6    anything in the opposite direction.  That's it.

7              THE COURT:  Thank you.

8              Mr. Ravenell?

9              MR. RAVENELL:  The other issue while we're here, it's

10   not going to take long, I'll bring it up later, Miss Smith and

11   we were at the bench earlier told the Court she could assure

12   the Court that this witness Mr. Short in fact took the

13   information from Off-Planet server.  The witness just said he

14   totally the opposite.  He said in fact what I represented to

15   the Court was this witness said he did the same thing with the

16   Off-Planet server as he did with New Care, someone else pulled

17   it off.  He reviewed it.

18             I said that Mr. Budlow said that earlier.  I was told

19   I was just flat out wrong by Miss Smith, and that was not true.

20   The witness just testified exactly as to what I said was that

21   he did not review the Off-Planet server, so I'm going to ask

22   the Court to revisit the issue about the documents that are in

23   evidence based on a misrepresentation that this witness had in

24   fact reviewed the Off-Planet server.

25             MS. SMITH:  Your Honor, I believe what I said

1    standing up here was that we told Mr. Ravenell that he did not

2    review the Off-Planet server, that he has a copy, the same copy

3    that was given to him, is the same copy that this witness got

4    that Adam Kaps had.  That's what we said.

5              With regard to the New Care server, I even gave him

6    the name of the two other witnesses that I would have to put on

7    the witness stand to establish the chain, and he said it's not

8    necessary, and I am going to bring that letter with reference

9    to the New Care server up here and put it in evidence for the

10   Court.

11             MR. RAVENELL:  You don't have to put it in evidence,

12   but Miss Smith is confusing New Care.  It's not a dispute about

13

14

15

16

17

18

19

20

21

22

23

24

25

1    New Care.  We're talking about the Off-Planet server.  I'm

2    talking about what was relayed about the Off-Planet server.  We

3    did not -- the Off-Planet server came along after we in fact

4    talked about the New Care.

5              I agree that the government, that we said the

6    government could bring in information about the New Care

7    server.  That's not what we're talking about.  We're talking

8    about Off-Planet.

9              THE COURT:  Let's get him off the stand and on his

10   way.

11             MR. RAVENELL:  All right.

12             (Open court)

13             THE COURT:  Miss Smith, your witness.

14                     REDIRECT EXAMINATION

15   BY MS. SMITH:

16   Q.  Sir, just a couple questions.

17             In the New Care database, were dates of birth

18   recorded?

19   A.  No.

20   Q.  But that information was in the Off-Planet server?

21   A.  That's correct.

22   Q.  So each database had a little something that the other

23   didn't?

24   A.  That's correct.

25   Q.  And you're talking about the QS 1 system, is that one of

1    the many information storing systems, if you will, that are out

2    there?

3              MR. RAVENELL:  Objection.

4              THE COURT:  Overruled.  You may answer.

5              MR. RAVENELL:  Relevance, Judge, to what else is out

6    there.

7              THE COURT:  Pardon?

8              MR. RAVENELL:  I said relevance, or was giving the

9    Court the rationale for my objection, relevance to what else is

10   out there, how it is relevant, whether it's relevant there's

11   other things out there.  Excuse me.

12             THE COURT:  Good.  I'll overrule the objection.  You

13   may answer.

14             MR. RAVENELL:  Thank you.

15   A.  There are many types of software.

16   Q.  Okay.  And in your experience, sir, are all of them capable

17   of adding information to it?

18             MR. RAVENELL:  Objection.  Your Honor may counsel

19   approach?

20             THE COURT:  Well, there was questioning during cross

21   about what different systems could do.  So I will overrule the

22   objection.  You may answer.

23   A.  Adding in what sense?

24   Q.  Adding pound signs?

25             MR. RAVENELL:  Objection.  There's absolutely no

1    basis for this testimony, or for the question.

2             THE COURT:  Well, do you know whether -- if I could

3    see counsel, please?

4             (At the bench)

5             THE COURT:  Now, when it comes to the pound signs, I

6    assume that whoever looked at the computer, the question is, is

7    this man some sort of computer expert or is he just somebody

8    who uses a computer?

9             MS. SMITH:  I think he's somewhat of a computer

10   expert.  Your Honor, my question, the questions that were asked

11   him on cross does this have an ability to delete?  Does this

12   have an ability to flag?

13            My question is does it have the ability to add.  That

14   is all that I was trying to ask.

15            MR. RAVENELL:  The witness has indicated on

16   questioning that he in fact was not that familiar with the QS 1

17   system, he said he knew what the QS 1 system was, and he did

18   not.

19            And if Miss Smith wanted to ask a question about

20   whether something could be added, I could object, that's one

21   thing.  But to now connect it and say before the jury adding a

22   pound sign, which he has absolutely no basis, none, no basis,

23   none, to suggest that these pound signs are added.  She has the

24   server.

25            THE COURT:  Now, he's already said he doesn't know

1    anything about the QS 1 system, correct?

2              MS. SMITH:  Yes.  I was asking about databases and

3    generally those kind of information storing systems.

4              THE COURT: Good.  And the QS 1 system is the one that

5    was used with the New Care database?

6              MS. SMITH:  Which he says he has extracted

7    information from in the past.

8              THE COURT:  Well, didn't he testify that he didn't

9    know whether you could add something or subtract something?

10   Good.  So I'm going sustain the objection, because he doesn't

11   know anything about the QS 1 system.

12             MS. SMITH:  Your Honor --

13             THE COURT:  Ask him whether he knows anything about

14   how the QS 1 system operates, has he ever operated it, and when

15   he says no, then that's the end of it.

16             Because as he already testified, he doesn't know

17   whether you can add, subtract, multiply on it.

18             MS. SMITH:  It didn't stop him from asking three more

19   questions, Your Honor.  I'll withdraw it, Your Honor.

20             (Open court)

21   BY MS. SMITH:

22   Q.  Sir, the information that you received, was that a copy

23   provided to you by the DEA, through the DEA computers?

24   A.  That's correct.

25   Q.  And do you have any information where those computers are?

1    A.   No, I don't.

2              MS. SMITH:   Thank you.   No further questions.

3              THE COURT:   Thank you.

4              Mr. Short, thank you very much for coming. You are

5    excused, sir.

6              Ladies and gentlemen, before we continue, I wanted to

7    read a stipulation that has been entered into between the

8    government and the two defendants, Mr. Sodipo and Mr. Nwaehiri.

9              And the stipulation relates to two names that you

10   heard about, Ronald Chartrand Junior and Roger Hackett.

11             There are two stipulations that apply to both

12   Chartrand and to Hackett.

13             First, is that these individuals are unavailable to

14   testify, and that both individuals were hydrocodone abusers at

15   the time of their hydrocodone orders.

16             Miss Smith, do you have another witness to call?

17             MS. SMITH:   I do, Your Honor.   At this time, the

18   government calls Agent Wood-Brown.

19             HE COURT:   Good.   Thank you.

20             Good afternoon.

21             THE WITNESS:   Good afternoon.

22             THE CLERK:   If you'll raise your right hand?

23             (The Witness is sworn.)

24             THE CLERK:   Please be seated.   Ma'am, if you would

25   adjust the microphone to yourself, there's some water there if

1    you need it.

2              If you would state your name and then spell your name

3    for the record?

4              THE WITNESS:  Excuse me?

5              THE CLERK:  State your name and then spell your name

6    for the record.

7              THE WITNESS:  Dorothia Wood-Brown, D O R E T H I A,

8    Wood, W O O D, Brown, B R O W N.

9                        DIRECT EXAMINATION

10   BY MS. SMITH:

11   Q.  And you're recovering from laryngitis?

12   A.  Yes.

13   Q.  We'll do our best.

14              Ma'am, how are you employed?

15   A.  I'm employed with the Internal Revenue Service Criminal

16   Investigation.

17   Q.  And how are you employed with the IRS?

18   A.  Oh.  I'm a Special Agent, Internal Revenue Service.

19   Q.  And can you tell me how long you've been with the IRS?

20   A.  I've been with them for approximately 20 years.

21   Q.  And how have you been assigned in your 20 years with the

22   IRS?

23   A.  The first, I will say first 14 years, I was with the civil

24   side of the Internal Revenue Service.  I worked as a clerk and

25   then a secretary, and then for about 12 years as a revenue

officer on the civil side of the internal revenue service.

Q. Can everybody hear the witness? No. We're having a little trouble.

THE COURT: Is the microphone adjusted?

THE CLERK: I'm turning it up now.

MS. SMITH: Your Honor, could we approach?

THE COURT: Yes. Certainly.

(At the bench)

MS. SMITH: Your Honor, it's my suggestion, because I truly believe we're going to back up a few minutes, let the witness go home. The government would be happy to describe where I'm going in direct. We can work through those issues, and any other issues we have. And maybe with one more night with the witness resting her voice we can start fresh in the morning.

After her, we have one more witness, who is literally a 10-minute witness. So we are that close to being done.

THE COURT: And the second witness is who?

MS. SMITH: IRS Agent Bennett Strickland.

THE COURT: Is Strickland available to testify, or is he --

MS. SMITH: He's not here till the morning.

MR. RAVENELL: We're not opposed, we don't want her suffering.

THE COURT: Good. So we will do that.

MS. SMITH:  Thank you.

THE COURT:  Thank you.

(Open court)

MS. SMITH:  Your Honor, you were going to --

THE COURT:  Well, you need to tell Miss Wood-Brown what we're doing.

MS. SMITH:  Okay.  We're going to take advantage of the time left in our day to talk issues, give you another night to rest your voice and the jury gets to go home.

THE WITNESS:  Okay.

THE COURT:  The jury is not to consider Miss Wood-Brown's illness to be their good fortune.

(Laughter)

THE COURT:  They're being charitable, I'm sure.

But so, Special Agent Wood-Brown, we will start tomorrow at 9:30, and drink plenty of tea and honey and perhaps you'll be feeling better tomorrow.

And Mr. Thompson's going to play with the amplification system.  Make sure to rest your voice as best as possible.

We will start tomorrow at 9:00, 9 a.m., and press on through the end of the day.

I've been advised that the government has only two additional witnesses, Miss Wood-Brown and then?

MS. SMITH:  And one other.  And so that we are making

1    progress.

2           THE COURT:  Remember, please, the standard

3    admonition, not to discuss the case among yourselves, or with

4    anyone else, no independent research or investigation, and if

5    you happen to see or hear saying about the case in the media,

6    stop looking, stop listening, let Mr. Thompson know, and look

7    forward to seeing you tomorrow at 9 a.m.

8           And I'm going to stay here with counsel.  And Miss

9    Wood-Brown, you are excused until tomorrow at 9.

10          (Jury recessed)

11          THE COURT:  The record will show that the jury has

12   retired.  Miss Wood-Brown has also retired.

13          And Miss Smith?

14          MS. SMITH:  Yes, Your Honor.  I think this time will

15   be well spent.

16          I'm going to ask Agent Wood-Brown in preparation for

17   her testimony what she would reviewed, which would be old bank

18   records, the tax records, the documents that came out of New

19   Care, and the homes of the defendants.

20          I'm going to ask her, based on her 20 or so years

21   with IRS, to give us a few definitions of some general terms,

22   like what is income, what is the basic premise behind a tax

23   return, income, you subtract legal deductions and you pay taxes

24   on what's left.

25          And I'm not seeking to get more detailed than that.

1        I'm going to ask her to review some of the
2   information in the checking accounts, documents that are
3   already in evidence, some of the check stubs and the
4   information on them.
5        I'm going to go over some of the payroll at New Care
6   and how it relates to the information that is on New Care's
7   1120 that is in evidence.
8        Where on the 1120 it reflects the income, in whatever
9   form, to Mr. Nwaehiri and Mr. Sodipo, and then jump from that
10  to the 1040s.
11       Again, a very superficial review of the 1040s.
12       And then I will be asking the agent to talk
13  specifically about account 6, exhibit 76, and where, if at all,
14  the dollar amount that appears in that account is reflected on
15  Mr. Nwaehiri's tax return and the same for account 7 and Mr.
16  Sodipo's tax return.
17       And then, finally, I'm going to show her a copy of --
18  I'm going to show her government's exhibits 80, 81 and 82,
19  which are the three checks related to counts 10, counts 11 and
20  counts 12.
21       And I'm going to ask her questions of when they were
22  presented, the amounts of each check, what country the
23  transaction took place in, the bank is an FDIC bank and based
24  upon exhibit 79 A, the amount of the check, what portion of
25  what amount is 83 percent of each of those checks.

1        And that would be the sum of my testimony.  And I

2    figured if you knew where I was going, it might be a little

3    easier to get through this.

4        THE COURT:  Good.  Now, will Special Agent Wood-Brown

5    be testifying expressing an opinion that the income should have

6    been reported on the tax return and the tax return is false?

7        MS. SMITH:  Your Honor, I thought what I would do was

8    have her state that if the income in account 6 were for the

9    benefit of, for example, Mr. Nwaehiri, then it should be

10   reflected on the tax return.

11       That leaves open the factual questions for the jury

12   of whether it was the benefit of Mr. Nwaehiri and whether in

13   fact it is on the tax return, I think is the safer way to go

14   about it.  And then the same for account 7 and Mr. Sodipo.

15       I guess not an opinion, just whether the money is

16   calculated.  I'm going have to have her account for the money

17   that is reported on the tax return from the payroll checks or

18   any other source, and then what's left is there something

19   representing the funds from account 7 or account 6, and if that

20   money was to benefit them personally, should it appear there as

21   income?

22       I don't know if that's the same question the Court

23   asked me.

24       THE COURT:  Well, somewhat.  Good.  Thank you very

25   much.

1       Mr. Ravenell, do you have any objection to any of

2   that?

3       MR. RAVENELL:  Well, Your Honor, obviously, hearing

4   just the global overview, I don't know until I hear the

5   question.

6       I mean, that the witness is going to testify about

7   many different areas.  I'll guess I wait until I hear what the

8   witness says, and if there's an objection, I'm not going to be

9   shy about it.

10       I certainly object to this witness giving an opinion.

11  She's not an expert witness.  So I absolutely am going to

12  oppose this witness opining that information, if it had an

13  opinion personally what should be on that account.

14       Because just number one, that is not accurate, but

15  number two, more importantly, it's a matter, her opinion should

16  not be in this record since she is not an expert witness

17  designated as such.

18       THE COURT: Now, what about the -- there's a second

19  area that could possibly be opinion testimony, and that is a

20  definition of what income is, expenses, do you have any --

21       MR. RAVENELL:  Yes, Your Honor.

22       THE COURT:  -- problem with that?

23       MR. RAVENELL:  Yes.  Anything -- and I didn't write

24  everything down that Miss Smith said, maybe I should have, but

25  anything that this witness is intending to testify where it's

1   an opinion, we object to it.

2           She's not been designated as an expert.  The

3   government, in fact, had a tax accountant on the stand that

4   they chose not to designate and didn't call, that's fine, they

5   can choose not to designate anyone they want.

6           But I don't think that this witness, who has not been

7   designated, even if she were to qualify as an expert, I don't

8   know that she could, but she did not give this testimony,

9   because, A, she's not been identified as an expert, nor has

10  this testimony been disclosed.

11          THE COURT:  Now, I'm drawing a blank.

12          Did the expert accountant testify that the income

13  should have been reported on the 1040?

14          MR. RAVENELL:  Actually, he wasn't an expert, either.

15  So there was no expert called.  And the fact witness, I don't

16  recall him saying that, but I don't think he did.  But I don't

17  recall him, recall him saying anything about this information,

18  or this money should have been on tax return.

19          THE COURT:  Good.  Thank you.

20          I don't have any problem with her talking about

21  defining certain terms like what's income, what's an expense,

22  going through the 1040, but I do have some misgiving about her

23  expressing an opinion.

24          So let me go back to Miss Smith, why wouldn't an

25  opinion by Special Agent Wood-Brown that the income in these

two accounts that was siphoned out to Mr. Sodipo and Mr.
Nwaehiri should have been reported on the 1040 as income?

MS. SMITH:  I'm sorry, Your Honor, I didn't
understand your question.  Why should she be able to say that?

THE COURT:  Yes.  Because she's --

MS. SMITH:  Well --

THE COURT:  If I could just set the stage.  There's a
great deal of very straightforward information through here,
she looked at the payroll, she extracted certain numbers.  She
looked at the bank accounts.  Here's what the bank accounts
say.  Here are the checks that were written.  That's all
straightforward, what she observes.

But then at the end of the day, as you had proposed
it, she would be asked essentially do you have an opinion as to
whether the monies that were funneled to Mr. Sodipo's family
and to Mr. Nwaehiri's family were income that should have been
reported on the 1040 as such?

And she would then say, yes, I do have an opinion,
and then the question, the question would be well, what is that
opinion?

And then she would say my opinion is that that is
income that should have been reported because it was for the
use and benefit of Mr. Sodipo and Mr. Nwaehiri and their
families.

So why isn't that statement of hers subject to the

normal opinion rule?

MS. SMITH: Well, I wasn't going to ask her that, Your Honor. I was going to ask her factually what the source of money that was in the extra account was, and ask her if any of those dollars can be accounted for on the 1040 as income.

THE COURT: You mean whether they were reported on the 1040 as income?

MS. SMITH: Whether she can find them in the tax return.

THE COURT: Good.

MR. RAVENELL: How would she know what a dollar is? I'm sorry.

THE COURT: But you had said that you were going to ask her whether they were -- these expenditures were for the benefit of the Sodipo family and the Nwaehiri family and whether they should have been reported as income.

MS. SMITH: I was going to ask her if this income were for the benefit of the family, should it have been reported as income?

And you know I think that's close to the line. I don't think it's over.

But if the Court advises me not to ask that question, I won't. I am satisfied for her to describe the kind of expenditures she sees in the account, the source of the money in the account, and whether based upon all the other money that

1    she can put her finger on looking at the account where it came

2    from, if there's any other money in there that could be this

3    money.

4            That's -- that's where I'm going with her.

5            I think it's just a simpler approach than having to

6    get into the weeds with a tax expert.  I think I would be lost.

7            THE COURT:  Now, how are you going to then prove to

8    the jury that this is all income that should have been

9    reported?  Just through the jury instructions?

10           MS. SMITH:  I think the jury instructions, Your

11   Honor.  I think it's common sense.  I think the expenditures

12   are so blatantly personal for personal use, that I think it's a

13   common sense analysis.

14           THE COURT:  So your view, then, it's not a matter in

15   which you need expert testimony?

16           MS. SMITH:  I don't think so.

17           THE COURT:  Good.  Thank you.

18           Mr. Ravenell?

19           MR. RAVENELL:  I guess it's a good thing she doesn't

20   need it since she doesn't have it, Judge.  Our position is

21   still that any testimony that will be opinion testimony should

22   not be allowed, and obviously we'll have to wait until we hear

23   the question and then we'll deal with it at that point.

24           But I think the Court should rule that this witness

25   should not be allowed to give any opinion testimony for the

1    reason I've already stated.

2         And then we'll kind of got a hear-it-when-it-comes.

3         THE COURT:  My view is she can testify about the

4    1040.  She can testify about what's income, what's an expense,

5    to guide us through the 1040.  But that she should not render

6    an opinion as to whether these extractions from the bank

7    accounts were income that under law must have been reported.

8         Good.  So that appears to be relatively

9    straightforward.

10         Now, tomorrow we should be -- let me go back a

11   second.  How long do you anticipate this will take, Miss Smith?

12         MS. SMITH:  Well, depending upon objections, I would

13   think about an hour at most.

14         THE COURT:  Good.  So we should be into the defense

15   case sometime before lunch.  So there are two things we have to

16   do, and there are a couple things that have to be done.

17         The first is that the defense needs to advise the

18   government of the order of witnesses for tomorrow.

19         Two, that the defendants, before the defense case

20   begins, well, they don't have to decide whether they're going

21   to testify or not until the end of the defense case.

22         But at some point, if the defendants elect to

23   testify, then Mr. McCants and Mr. Ravenell will formally on the

24   record advise the defendants of their right to silence, which

25   they are waiving, and that they, if they do testify, will be

1  cross-examined Miss Smith or Mr. Budlow.

2        And the converse of that is also true that if the

3  defendants elect not to testify, then on the record Mr. McCants

4  and Mr. Ravenell will advise their clients of their right to

5  testify, that they are waiving, that they weighing.

6        And then I will instruct the jury not to draw any

7  adverse inference from their silence, so that that's simply a

8  long-winded way of saying that the moment of truth is coming in

9  which the defendants, Mr. Sodipo and Mr. Nwaehiri, will have to

10 decide whether they wish to testify or not.

11       The other order of business is that I need to hear

12 the defense motion for a directed verdict of acquittal.  And,

13 two, the conspiracy arguments.  And I'm going to set aside an

14 hour total for those two arguments giving each side 30 minutes.

15 If counsel wish to reserve on the motion for directed verdict

16 until the end of the case, then you can do that, or I'd be

17 happy to hear from you tomorrow.

18       So we'll finish up the government's case.  We'll hear

19 those two motions.  The defense is required to give the

20 government the order of witnesses for tomorrow.  The same rule

21 that has been in force concerning exhibits is in force.

22       And the jury instructions, I will be getting them

23 when?

24       MR. RAVENELL:  Your Honor, I have the draft, as soon

25 as I leave here, I will finish up with Mr. Budlow and then

1  send, do you want us to send the disk how?  I think Mr. Shea

2  could just e-mail.

3          THE COURT:  I'll send them out and he can --

4          MR. RAVENELL:  I'll work out with him once I review

5  these, and we get back to the office, we'll have them to you

6  this evening.

7          THE COURT:  Good.

8          MS. SMITH:  Your Honor, the government did file some

9  supplemental requests yesterday and I will put together the

10 other one before the morning maybe even by later tonight on the

11 regulation force of law that we discussed earlier.

12         THE COURT: Good.  Thank you all I look forward to

13 seeing you tomorrow.

14         MR. BUDLOW:  Excuse me.  There's a couple issues the

15 government wants to raise.

16         THE COURT:  Go ahead.

17         MR. BUDLOW:  First of all, I think you mentioned the

18 defense is supposed to give us order of witnesses for tomorrow,

19 I assume you meant now, so I think now would be a great time

20 for us to get that.

21         THE COURT:  That is correct.  Before you leave the

22 courthouse, both sides, Mr. Ravenell, and Mr. McCants need to

23 tell you all who's coming tomorrow.

24         MR. BUDLOW:  Great.

25         The second point the government wants to raise is

1    probably tangentially related to this issue I know Mr. Ravenell

2    mentioned he wants to raise, but the defense has provided today

3    defense exhibits 51 through 54.  Three of those exhibits appear

4    to be summaries.  And this is the first we've seen of those

5    summaries.

6         The government has not been given the backup data,

7    for lack of a better term, that relates to those summaries,

8    although the witness has just testified did have at one point,

9    or probably estimate has a copy of the data that came from the

10   defendant's computers.

11        Based on his testimony today, it's apparent that

12   certain fields were not contained in that data.  And the

13   defense apparently has copies, or they have the original that

14   of data, the fields that are not available to the government.

15        And so the government would need a reasonable time to

16   have that backup information so that we can make sure that the

17   summaries that we have been given are true and accurate and

18   decide whether or not we need them produced, whether we request

19   for them to be produced.

20        We are requesting for them to be produced.

21        THE COURT:  Good.  Well, let me ask you, my

22   recollection, I didn't see all the exhibits, is there are two

23   types.  There is what looks like a computer screen that was

24   printed out, and then there are what look like summary

25   exhibits.

1        So what do you need with respect to the fields that
2   look like a computer screen?  Is that a summary exhibit?
3        MR. BUDLOW:  I guess I wasn't referring to that
4   screen shot.  I don't know what that is.  But it appears to be
5   sort of a sample from which the other documents were generated.
6        So what we need to be, first of all, all of the
7   summaries that the defense is planning on introducing, assuming
8   it's more than just those three, those three summaries appear
9   to be extractions or prescription summaries for individual
10  customers.
11       At this point, I think they're separated by letter so
12  one of them was for C, one was for W, one was for Y.  We would
13  need whatever the complete backup information from which they
14  were generated.  It's impossible to tell whether those are all
15  the fields, all of the individuals with under those letters,
16  and it's impossible to tell whether or not those are all the
17  prescriptions for those individuals.  So we would need every
18  piece of backup information to determine whether or not those
19  are accurate summaries or not.
20       THE COURT:  Good.  Now, are you objecting to them
21  under Rule 1006?
22       MR. BUDLOW:  Based on notice at this point, Your
23  Honor, it's impossible to determine if there would be another
24  objection until we receive the backup information.
25       THE COURT:  Good.  So you're going to look at the

1  backup information, look at the summaries, and then decide

2  whether you're lodging a Rule 1006 objection?

3          MR. BUDLOW:  Yes.

4          THE COURT:  Good.

5          MR. RAVENELL:  Your Honor, may I be heard?

6          THE COURT:  Yes.

7          MR. RAVENELL:  Just so I can clarify?  These are not

8  summaries, so 1006 plays no part.  These are what you get from

9  the server.  So they're the actual documents.  So there's no

10 1006 issue.

11         That you know, obviously, Mr. Budlow can present, if

12 he had asked me I would have told him the same thing, that it

13 was not a summary.

14         THE COURT:  Well, I thought that this issue came up

15 with Mr. Short, short's anticipated testimony, and I thought we

16 had a discussion about this yesterday, and that is, that if

17 somebody has to go on the server and going on the server to

18 pull out something takes time, then that is summary evidence.

19         In other words, the server or the box is a great mass

20 of information, the information is extracted and distilled,

21 then the other side needs time to look at it.

22         MR. RAVENELL:  Your Honor, this is from the server.

23 The government has a copy of the server.  What, this is

24 directly from the server, if they go into the patient profile,

25 they pull this information out.  This are not summary

1    information.  It's just information from the server.

2           Unlike what the government did was to pull out

3    certain information and then create 90, 13, and 99, that's not

4    what it's done here.

5           This information is a patient profile.  Each patient

6    has a profile.  And if you go in and look, they have the

7    server.  They can look at the server and exactly what we have

8    here we have, they have.

9           MR. BUDLOW:  Your Honor, with all due respect, I

10   disagree.  The government's exhibits that were excluded based

11   on notice essentially were all of the data for a particular

12   individual.  So the expert went to the server, pulled the

13   information for that one individual, and printed it out.

14          Mr. Ravenell is saying they put up a screen shot for

15   one individual, or one set of letters, and printed it out.  I

16   think we're splitting hairs here.  We need to have the backup

17   information to determine if this is accurate.

18          MR. RAVENELL:  Your Honor, there's no backup

19   information.  It is the server.  Mr. Budlow can call it what he

20   wishes.  There is no backup other than going onto the server,

21   looking at it, and pulling the information.

22          The suggestion that Mr. Budlow's given you doesn't

23   even fit with what his witness said.  The witness said that he

24   in fact did not look at the server.  He actually was given

25   something that was culled from the database and then created

these charts.

Now, they chose to do it that way without in fact using the patient profiles. They culled the information, how they chose it, they made information that was a chart from information they chose to narrow. We don't have the information narrow. We simply have the patient profiles.

Miss Reamy has seen it. She's looked at it on the screen. It's just the raw data. If you look on the server, that's what it is.

THE COURT: Well, let me ask this, where is the server?

MR. RAVENELL: The server is at the client's business. It was returned by the government after they cloned it.

And the government, the government seized it on 10-10-06, Judge --

THE COURT: Right.

MR. RAVENELL: -- and held it for so many months and then returned it.

THE COURT: How many patient profiles are there?

MR. RAVENELL: We don't know, Judge, but there should be a patient profile for each of the patients. So I don't know how many, I didn't count them, but there are many patient profiles.

THE COURT: The documents, how long would it take the

1    government to go into the server and to extract the information

2    that you propose to offer tomorrow?

3           MR. RAVENELL:  Your Honor, if they -- if they

4    download it, it takes however long it takes to download it, to

5    create a disk if they wish to.  I don't know how long it would

6    take them to do it on the IT board, but they go in, they do a

7    thumb drive or whatever, and it's there.  It's something that's

8    on the server.  I don't know what else to tell the Court.

9           It's right there.

10          THE COURT:  Mr. Budlow, do you have the server

11   available that you can access?

12          MR. BUDLOW:  We do not, Your Honor.  We have a copy

13   of the data that was pulled from the New Care computers, but

14   apparently there's additional information on the server that's

15   being offered by the defense.

16          When Mr. Ravenell says these are just screen shots,

17   the problem is the screen shots clearly don't contain all of

18   the information so they include some additional information,

19   but just by looking at the data that Paul Short entered that

20   came from the computers that includes significantly more fields

21   and columns with addresses, this piece of information, they

22   might pull up a screen, but that screen essentially is summary.

23   It's pulling up a limited piece of information from a server

24   that contains significantly more data.

25          That is exactly what a summary is.  Just because it

1   was easier to create than the one that Paul Short created

2   doesn't make it any less of a summary.

3         MR. RAVENELL:  Your Honor, again --

4         THE COURT:  Well, let's do this, let's take a

5   15-minute recess, and I'll come back and rule as to whether

6   it's a summary or not.  And if it is a summary, what's to be

7   done about it, because I don't want this to slow things up

8   tomorrow.  So we'll come back at five minutes after the hour.

9         (Recess.)

10        THE COURT:  Please be seated.  Now, are there other

11  issues, or is this the last issue?  Miss Smith?

12        MS. SMITH:  Your Honor, I did want to offer to the

13  Court a letter written on March 11, 2008, to the defense, the

14  paragraph 4 it was a letter specifically about a request for

15  stipulations, and this was well ahead of when we had

16  stipulations.

17        But this preceded it and the paragraph 4 in

18  particular says the stipulation as follows, when you get down

19  to 4, the technical computer witnesses.

20        Specifically, New Care computers were seized October

21  10th, 2006.  Mark Morgan of the DEA forensic laboratory

22  mirrored, downloaded the contents that information was sent to

23  the National Drug Intelligence Center of the Division of

24  Department of Justice where John Dayton converted into a usable

25  format.

Paul Short created the spread sheet and has analyzed the information. The government intends to call Paul Short. The question is whether the defendants will stipulate to the testimony of Mark Morgan and John Dayton. They were also provided at least 50 pages of reports from Mark Morgan.

THE COURT: Now, the question that was raised is whether that stipulation covers the New Care computers and/or the Planet Earth?

MS. SMITH: Off-Planet.

THE COURT: Off-Planet.

MS. SMITH: And the point that I made at the bench at the time was there was a stipulation to Adam Kaps testifying about that information, as long as we provided it to the defense, then they would not seek the underlying information.

This was the same core of information that from which Mr. Short pulled the data that he put into court today that the defense few about a week ago.

In fact, it may have been less than that he pulled it from, but it is the same information that they had agreed to some time ago that could be used with the testimony of Adam Kaps.

I don't think there's anything unreasonable about the government believes that we didn't have to then authenticate that information since there was never an objection to its authenticity when it was already testified to.

1    THE COURT:  Well, let's go back for a minute.  Mr.
2  Ravenell, I'm going ask Miss Smith if you could go to the
3  podium, please, just to make life easier for our court
4  reporter.
5    MS. SMITH:  Yes.
6    THE COURT:  Let's go through this one step at the
7  time so I can understand it.
8    Mr. Short testified as to summaries both from the New
9  Care and from?
10    MS. SMITH:  Off-Planet.
11    THE COURT:  Off-Planet.
12    Now, what summaries, if you would just describe again
13  the summaries that he testified about with respect to
14  Off-Planet?
15    MS. SMITH:  It is one exhibit.  It is government's
16  exhibit 90-1 through 90-14.  I think Mr. Thompson has it.  It's
17  a small white notebook, unless I didn't give it to you.  It's
18  still sitting here.
19    THE COURT:  The exhibit says what, show what?
20    MS. SMITH:  And it is each page, each item number 1
21  is on Martin Spangler, it reflects the drug purchase that was
22  an undercover purchase.  It was in the Off-Planet as well as
23  the New Care database.
24    Number two showed the undercover purchase from
25  Christopher Owens.

Number three showed the undercover purchase and two refills from Jason Gorman.

Number four showed the two purchases from Thomas Sutton.

Number five was information about Jennifer Koch.

Six was Doug Chorpenning.

7, 8, 9, 10, 11 and 12 were the five people, I'm sorry, through 11, were the five people in Baton Rouge.

THE COURT:  So these are from Off-Planet, and they show the hydrocodone purchasing history of a number of designated people?

MS. SMITH:  Yes.  And where in each of these it indicates that New Care as opposed to some other pharmacy filled that prescription, that information was matched up with the New Care information that Mr. Short had already put into evidence.  And then the last three one was Caleb Goddard.  One was Roger Hackett, and one was Ronald Chartrand Junior.

THE COURT:  The original authentication of the data from the Off-Planet computer was established by whom?

MS. SMITH:  Adam Kaps.

THE COURT:  And what did he testify to?

MS. SMITH:  I think Mr. Budlow knows this better, but he testified to creating the entire system and how -- where the servers were stored and the way they were maintained, and that the information that went into them was basically in the final

step in the pharmacy when the scan, when the mail scanner
scanned the label and creating and then notified the shipping
company, and the package sent out was sent out.

That's how the information finally went back to each
of the IHE PDPE, each of their servers, and the four servers
were the four companies that were all stored together on these
servers, which were maintained by a company called Off-Planet.

THE COURT:  Good.  So did he simply testify to that
orally or did he identify, did he authenticate government's
exhibit 90-1 to 90-14?

MS. SMITH:  He did not authenticate that. We did put
in evidence through him other information drawn from the
Off-Planet server.

THE COURT:  Good.

MS. SMITH:  2 I through 2 J.

THE COURT:  What stipulation did you have with Mr.
Ravenell concerning what we've covered so far?

MS. SMITH:  Mr. Budlow is checking the actual written
stipulation, but there was no objection to authenticity issues
of the information drawn from the Off-Planet servers provided
we gave them a copy of that Off-Planet server, which we did,
back before Mr. Kaps testified.

THE COURT:  So the arrangement was we will give you
in discovery the contents of the Off-Planet server, and if we
do, you will not raise an objection to the authenticity of the

1    information on the Off-Planet server?

2         MS. SMITH:  That is correct.  Now, at the time, we

3    were talking about Mr. Kaps's information.

4         And all it says here on item 15 there's no general

5    objection to the testimony of Adam Kaps, former employee of

6    IHE, co-worker associated with Barry Brooks, Ibanez and other

7    defendants reserve right to object on relevant grounds to the

8    scope of the testimony.

9         There's no objection to the admission of the data

10   shown to the defense from the web servers reflecting total

11   sales, things of that nature.

12        THE COURT:  Say that again.

13        MS. SMITH:  There is no objection to the admission of

14   the data shown to the defense from the web servers, at IHE,

15   GDN, PMP, PDP, reflecting total sales rejections by New Care

16   and credit payments by customers.

17        There's still some dispute about the scope of the

18   credit card data, which I believe we worked out.  And if the

19   parties cannot agree, we will bring it to the Court's

20   attention.

21        And, Your Honor, I think the point the government

22   seeks to make is the defendants were advised a week ago

23   yesterday of what the government intended to do again.

24        THE COURT:  If I could just -- I'm just

25   fast-forwarding for a minute, if I could.  We then have Mr.

1    Short, who created the summary chart, the Rule 1006 summary

2    charts.

3         MS. SMITH:  Yes.

4         THE COURT:  And the objection that was made to the

5    Rule 1006 summary charts was to the effect that the defense was

6    not given the summary seasonably in time to check them.

7         MS. SMITH:  That is correct.

8         THE COURT:  And then the objection is now made, I

9    believe this is accurate, Mr. Ravenell can tell me if it isn't,

10   is as follows:

11        That the defense had been advised that information

12   had been culled from the New Care computers by the

13   technologically adept, and then had been, that information had

14   been culled, provided to Mr. Short.

15        Mr. Short then put the information into a chart and

16   summary and charts and summaries that was then disclosed

17   pursuant to Rule 1006, but that the defense was under the

18   assumption that the same procedures had been -- the defense was

19   under the assumption that Mr. Short himself had culled the

20   information from the Off-Planet servers and did not realize

21   that the information had been produced for Mr. Short by the

22   same process as has been produced from the New Care computers.

23        Mr. Ravenell, that's essentially correct, isn't it?

24        MR. RAVENELL:  Well, Your Honor, essentially, but it

25   was actually not that we were not that, we were told that.

1    While Miss Smith is saying we, that I somehow said
2 she misrepresented as to New Care, that's not even the issue.
3 The issue is only been about the Off-Planet server.
4    THE COURT:  I now understand that.  I am going to get
5 to you in just a minute.  I just wanted to make sure I framed
6 that properly.
7    So your view, then, is that Mr. Short, that the data
8 for the charts and summaries, the new chart and summary is the
9 Off-Planet computer, and that they have had sufficient time to
10 check the Off-Planet database against the chart and summary,
11 correct?
12    MS. SMITH:  Yes, Your Honor.  Because that was what
13 their objection was.  The Court ruled that I could not do it
14 last Monday, we brought Mr. Short back eight days later, and
15 now there's this new objection to authenticity.
16    I just think that that's not fair.
17    THE COURT:  Okay.  Good.  Thank you.  I think I now
18 understand.
19    Mr. Ravenell?
20    MR. RAVENELL:  Your Honor, I am always, you know,
21 happy to try to resolve these disputes, and Miss Smith was
22 adamant she wanted to put a letter in the record, and I don't
23 know why, but the letter that she's referring to in no way
24 addresses the issue, quite frankly, before us, because nothing
25 in the letter that we had addressed, and the conversation we

had, addressed these documents that we had some time before trial.

When we met, the government asked us whether we would have an objection to the information, which was 2 I through J, I believe that Mr. Budlow was going to introduce through Mr. Kaps, and they showed us that information.

What was never shown to us was the information regarding this particular witness.

And the Court may recall we were at the bench, in fact, I asked, and I'm not saying that that Mr. Budlow's trying to misrepresent, he just didn't know, but you know he turned and I know he said he said that this witness in fact pulled the information himself.

I'm not suggesting Mr. Budlow was making it up. He may have been mistaken. But the point is that he did say it, and that's what we relied upon.

I'm still not opposed to us trying to work this out among ourselves, but the government wanted to put it on the record. Miss Smith did. I think we can resolve the matter among ourselves, Judge, quite frankly.

THE COURT: Good.

MR. RAVENELL: If we can't, then the Court will deal with it.

THE COURT: Now, the statement by Mr. Budlow, that was today, wasn't it?

1    MR. RAVENELL:  Yes, at the bench, yes.

2    THE COURT:  Good.  So, good.  Thank you.  I'm going

3    to rule on this issue, and then I only have one more issue to

4    rule on, and that's the Rule 1006, whether the Off-Planet

5    information that you want to put in is Rule 1006.

6    MR. RAVENELL:  Actually, that's New Care information.

7    It's not Off-Planet information.  The information that we were

8    --

9    THE COURT:  New Care, is New Care not Off-Planet?

10    MR. RAVENELL:  I think we can resolve that, one, if

11    we actually sent it back through your clerk, I thought that we

12    had, I thought resolved that one as well.

13    THE COURT:  Has peace broken out?

14    THE CLERK:  Yes.

15    MR. RAVENELL:  So Mr. Budlow and I think we've

16    resolved that one as well.  Not as well, we resolved that one.

17    Another one we really haven't talked about.

18    THE COURT:  My view is whatever Mr. Budlow said today

19    or said today was said today so we don't have reliance on

20    something that he might have said a month ago.

21    And my view is that this issue is covered by the

22    stipulation that there's no objection to the admission of data

23    shown from the web server.

24    So that there are two issues.  One has do with

25    authenticity, and the second has to do with Rule 1006, whether

1    it is a summary.

2           And if there's no objection to the admissibility of

3    data from the Off-Planet server, then that covers the

4    authenticity point.

5           The Rule 1006 point was covered by my ruling that

6    they couldn't, the government could not put in the summary

7    until they had given seasonable notice to you of the contents,

8    we made Mr. Short come back later.

9           So two issues, authenticity and Rule 1006 notice.  My

10   view is both were recovered.  So I will not construe Mr.

11   Ravenell's motion as a motion to strike the exhibits, which I

12   believe were government's exhibits 90-1 to 90-14, and I'm

13   denying that motion to strike them.

14          Now, in terms of ground rules, what do we do about

15   going further with information that's in the computer?

16          The computer age essentially creates a hole or an

17   inconsistency in Rule 1006, so that it's now to my mind

18   somewhat ambiguous.

19          And the reason for that is that you can construe the

20   contents of a computer, as Mr. Ravenell has, that it's simply

21   like a big filing cabinet.  And in criminal litigation, if the

22   defense wants to produce a document that's in a big filing

23   cabinet, then you don't have to show it to the government

24   unless you've entered into a Rule 16 agreement that requires

25   you to show that particular document to the government.

1        Mr. Ravenell, that's essentially correct, is it not?

2        MR. RAVENELL:  No, actually.

3        THE COURT:  I'm just talking about the filing

4   cabinet.

5        MR. RAVENELL:  I'm sorry?

6        THE COURT:  The filing cabinet analogy, that's

7   essentially correct, isn't it?

8        MR. RAVENELL:  Well, I do agree in the computer as

9   much like a filing cabinet, but I'm not suggesting that.

10        THE COURT:  Right.

11        MR. RAVENELL:  I'll let the Court finish.

12        THE COURT:  The only thing I wanted to see whether

13   you agreed with, if you as the defendant wanted to produce a

14   document that was in one of your clients's filing cabinets, you

15   would not have to show that document to the government unless

16   the document were covered by Rule 16.

17        MR. RAVENELL:  That's correct.

18        THE COURT:  So one way of looking at the computer is

19   it's just a big filing cabinet.  And if there is an object in

20   the filing cabinet like a document, then it's not a chart and

21   summary.

22        And, Mr. Ravenell, your point is this these printouts

23   are just artifacts that are in the computer, that they're not

24   been massaged and extrapolated and compiled, and they are

25   simply printed out by you?

MR. RAVENELL:  Yes.

THE COURT:  The second way to look at it is that the contents of a computer are like voluminous books or records. The Rule 1006 says that the contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart summary or calculation.

The originals or duplicates shall be made available for examination or copying, or both, by other parties at reasonable time and place.

The Court may order that they be produced in court. The 1972 proposed rule was as follows, the admission of summaries of the books, records, or documents offers the only practical means of making their contents available to judge and jury.  The rule recognizes this practice with appropriate safeguards.

And my view is that if either side is going to introduce something that was in a computer database, then the other side needs to have a meet meaningful opportunity to verify that, yes, this information printout, what have you, was in the database.

And, two, that the database hasn't been tampered with.  So there's you need to have somebody who can come in and say, yes, I'm the computer person.  This is, we have these computers.  Exhibit 1 was in our computer database.  And this

1    is how we extracted it from the computer.  And the other side

2    has to have an opportunity to verify that.  And that's a rule

3    that operates for both side.

4         So I would assume that you've worked out some

5    accommodation along those lines, but going forward, for the

6    rest of the case, that is a ground rule.  Good.  Look forward

7    to seeing you all.

8         MR. RAVENELL:  There are a couple of things, Your

9    Honor.  One is that, I don't have the government exhibit

10   number.

11        MS. SMITH:  We still need to talk about 27, 50 A and

12   B.  No.  That's 50 B I think.  I think that's 50 B.  50, well,

13   I think it's 50 B.

14        MR. RAVENELL:  Your Honor, 50 B is one I need to

15   discuss.  The government sought to introduce 50 B, which was a

16   document that they allegedly seized from Mr. Sodipo's office.

17   And at the time we objected to the introduction because it's a

18   whole slew of information about cases that people have been

19   convicted of crimes, and Miss Smith indicated, you know, that

20   the Court table it and Miss Smith --

21        THE COURT:  Right.  So we'll deal with the other.

22   That's right.  That refreshes my recollection.  It's that

23   database that was tabled and not the Maryland Pharmacy

24   Newsletters.

25        MR. RAVENELL:  Correct.  And so what we need to do,

Your Honor, I don't know if the Court has had a chance to review 50 B, and I know we had mentioned it to you, we hadn't mentioned it to you in weeks so you may not have.

When you look through it, you'll see we've tabbed a lot of these, Judge, people who have been convicted of crimes, through the Internet crimes, or pharmacists, doctors, people who have been suspended, statements from house committee investigates online pharmacy, and you know, there's already testimony that they received, that was recovered from Mr. Sodipo's office was information about doctors, et cetera.

So that's already -- we just don't think the only thing we would argue, we would dispute whether the item was recovered there. We're not going to dispute what it is.

We don't think this kind of prejudicial information can be before a jury just a slew of people who have been convicted of crimes that are similar in some regards and unsimilar to having the court and expect the jury to ignore that and say if all those guys have been convicted of these crimes and only have blurbs and not the whole cases, well the defendants as well.

The government issue was it was in for notice and they were having the witnesses saying this was recovered from Mr. Sodipo's office and they've given a summary of what it is. And our position may be whether he saw it, but not that it was not a summary of what the witnesses said.

1    THE COURT:  So your view is that the government's
2  gotten all that it needs?

3    MR. RAVENELL:  Yes.

4    THE COURT:  And that putting in the entire 50 B would
5  be prejudicial?

6    MR. RAVENELL:  Yes.  Particularly when we're not
7  going to argue, you know, that it doesn't state what the
8  witnesses said it was.

9    THE COURT:  Good.  Thank you.

10    Miss Smith, and the government's view of 50 B?

11    MS. SMITH:  Your Honor, other than identifying where
12  it came from, we haven't told the jury what it is at all.  And
13  it is -- there couldn't be more notice to the defendant.

14    THE COURT:  Well, if I could ask this, what about,
15  there is something to be said for having this voluminous packet
16  that does have a lot of legal surmise and cases.

17    MS. SMITH:  Your Honor, I think a limiting
18  instruction to the jury that they cannot conclude because of
19  what happened to anyone in this literature, they cannot draw
20  conclusions from it.  But I can't imagine anything more on
21  point for Mr. Sodipo, and the dates of the printout are at the
22  exact time when he returns from Africa, realizes what's going
23  on, is doing some of this checking, the printouts on all the
24  doctors are around that period of time, and then his response
25  is fire it up again.

1    I just think it is so incredibly probative, and if

2  they are adducing a good faith defense and if they are trying

3  to say that they relied on green flags, I just think this goes

4  right to that point, and they can't have it both ways.

5    THE COURT:  Well, let me ask this, let's assume that

6  the document stays in, is introduced, what would you, and stays

7  in evidence, what would you say about it in closing, would you

8  quote from it?

9    MS. SMITH:  Your Honor, the point to be made about it

10  is, it should have given him concern.  He should have looked at

11  this and had second thoughts about what he was doing, and he

12  shouldn't have fired it back up and started cranking out the

13  prescriptions again.

14    It would have given a reasonable pharmacist as like

15  maybe the 15th or 20th billboard down the road that he should

16  have stopped.  Is the government going to argue look what

17  happened to them and that's what should happen to these

18  defendants?  Of course not.  Absolutely not.

19    THE COURT:  Good.  Thank you.

20    Mr. Ravenell?

21    MR. RAVENELL:  Your Honor, I can't think of anything

22  that could be more prejudicial, quite frankly, other than the

23  death evidence that is in the case, than having a jury, we're

24  talking about receiving a fair trial, the defendants receiving

25  a fair trial, that we will have before the jury were legal

1    information about doctors who have been convicted of crimes or

2    suspended and pharmacists convicted of crimes and sent

3    information that suggests that, for example, Internet pharmacy

4    operator receives 50-long month prison sentence.

5         It just goes on and on.  And if this is not what

6    prejudice is that overweighs probative value, outweighs -- it's

7    outweighs any probative, when you consider that the government,

8    if they don't think the evidence is in, I think it's in, they

9    can put a witness on the stand who will say we recovered this

10   from Mr. Sodipo's office, again, and give a summary that it's

11   about cases, and that's about cases involving doctors, and

12   pharmacies, and even if the date is on there.

13        Now, I don't see it.  Miss Smith said there was date

14   after Mr. Sodipo returned, I don't see that.

15        MS. SMITH:  On the printout on the top, top corner.

16        MR. RAVENELL:  Yes.  I don't see any printout dates.

17        THE COURT:  Why don't we do this, I have not looked

18   at this exhibit for a while.  I've looked at it when we had the

19   original motion in limine.

20        We've got copies, so I'm going to look at it

21   overnight, review it.

22        MR. RAVENELL:  Your Honor, may I see the copy Mr.

23   Shea, if there's something different on the one he has than I

24   have?

25        MS. SMITH:  The original.

MR. RAVENELL:  I think the original now at the
bottom, Your Honor, mine is cut off at the bottom, so there's a
date on the bottom, yes.  The one we have was cut off at the
bottom, and Your Honor what we certainly understand the Court
is going to review this, but just to be heard, Your Honor, this
is giving a limiting instruction telling the jury to ignore
this, quite frankly, I don't see how any jury, you know, could
ignore, whether the government's going to argue, the Court
asked whether the government would quote from it.  Well,
quoting from it or not, the jury's going to have it in the jury
room to review it.  And you have to assume they will review the
evidence as any jury would.

And for the jury go through in some 100 pages of
information about people who have been convicted of committing
crimes and Internet, pharmacists, and pharmacies and expect the
jury to then say, oh, we can set that aside and decide that
these defendants acted without relying upon this information.
The government has this information or can have it through a
witness who will say a summary of what it is, about cases
involving doctors on the Internet or pharmacists on the
Internet, and whatever else.

We can call a list and that is there.  And we're not
going to argue that the items aren't in the document.  But
whether we argue that whether Mr. Sodipo saw it or not is a
different issue.  Because that's the same issue we have with

1    the DEA warning letter and all those other things.  That's no

2    different.

3        It's not an ambush, but to have this information

4    before a jury and expect all the other things that's already

5    here that they can get a fair trial, I would suggest that it is

6    would be a farce to suggest to this jury they could parse it.

7        I understand there's a rule that jurors are presumed

8    to be able to follow instructions, but there are cases, and we

9    pointed out in our memorandum that the Court is now

10    reconsidering on the motion for mistrial, where the courts have

11    said sometimes it is just too much to expect a jury to set it

12    aside and be fair.

13        We have cited cases on the death issue that the Court

14    has, you know, when we argue that it is too much, and I think

15    it's the same kind of -- it is too much for a jury to be asked

16    to set aside.

17        THE COURT:  Good.  Thank you.  I'll look at the

18    documents tonight and rule tomorrow.

19        MR. RAVENELL:  Thank you.

20        MS. SMITH:  Your Honor, I was going to ask Mr.

21    Ravenell if maybe we could reach a stipulation on it.  Maybe we

22    can for example put Agent Rosati on the witness stand to

23    describe what it is, we can hammer out what it is he can say it

24    is, a copy a couple of the representative pages, black out

25    parts of it, and if we can come to some agreement that

1    indicates that it's prosecutions about Internet pharmacies,

2    pharmacists, and doctors, and not guilty, not punishment, not

3    details that make it similar or not similar, indicate the

4    number of cases, and the dates on the bottom of the paper and

5    the dates of the cases, that maybe we can just do it that way.

6          THE COURT:  Now, that was my thinking, that we had,

7    like the proposed stipulation with respect to the issue of the

8    deaths of the two people, that there has to be a way to

9    characterize the document perhaps with some of the material,

10   some of the headlines that would give the jury a clear

11   understanding of what it is without all of the doing too much

12   without all the legal descriptions.

13         So I'll have looked at it tonight and if you can

14   craft a stipulation, I think that would be the preferable

15   course because I think that in notice, the jury, the government

16   is entitled to prove the tenor of the document, to prove the

17   strength of the notice.

18         But there's still the 403 undue prejudice issue, and

19   that putting if the whole document may be overkill on the issue

20   of notice.

21         MR. RAVENELL:  Your Honor, we have no problem with

22   meeting with the government to try to resolve it.

23         THE COURT:  Good.  Thank you.  Look forward to seeing

24   you tomorrow at 9.

25                    (Proceedings adjourned)

1

2          I, Jacqueline Sovich, RPR, CM, do hereby certify
that the foregoing is a correct transcript from the
3   stenographic record of proceedings in the above-entitled
matter.

4

5   _____

6   Jacqueline Sovich                          DATE
Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Carmen Catizone | | 17 | 69 | |
| Paul Short | 83 | 125 | 158 | |
| S/A Wood-Brown | 162 | | | |