1                In THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MARYLAND/NORTHERN DIVISION

3     UNITED STATES OF AMERICA

4                                      CRIMINAL NO.

5      v.                             L 06-0444

6     STEVEN SODIPO, ET AL           July 25, 2008

7                    Defendants

8     _____/

9                    (TRANSCRIPT OF PROCEEDINGS)

10             BEFORE THE HONORABLE BENSON E. LEGG,

11             UNITED STATES DISTRICT CHIEF JUDGE

12    APPEARANCES:

13    On behalf of the United States:

14    Andrea Smith, AUSA

15    Paul Budlow, AUSA

16

17

18    On behalf of the Defendants:

19    Kenneth W. Ravenell, Esquire

20    Kevin Jesse McCants, Esquire

21

22

23    Reported By:

24    Jacqueline Sovich, RPR, CMR, FOCRR

25    Official Court Reporter

```
 1                    (Jury present)
 2              THE CLERK:  Jurors all present.
 3              THE COURT:  Mr. Thompson, thank you very much.
 4    Please be seated.
 5              Ladies and gentlemen, the first segment of the
 6    government's closing argument will be given by Mr. Budlow, and
 7    the rebuttal will be given by Miss Smith.
 8              Mr. Budlow, whenever you're ready, sir.
 9              MR. BUDLOW:  Thank you, Your Honor.
10              Good morning.
11              THE JURY:  Good morning.
12              MR. BUDLOW:  This is my first opportunity to talk to
13    you.  Unfortunately for you, maybe fortunately, it's only going
14    to be a one-way street.
15              Before we talk about the evidence in this case, and
16    clearly you will see is the overwhelming evidence of the
17    defendants' guilt, I want to leave that for a minute and take
18    an opportunity to thank you for your service in this case.
19              Jury duty is just that.  At one level, obviously, you
20    have no choice, you had to be here.  It's part of being a
21    citizen.  But I think after seven weeks, two days of jury
22    selection, maybe you see it's more than just a duty and
23    privilege.  Certainly, it's been more than just jury duty.
24              I'm sure some of you have made friends, had some good
25    times.  You know we can hear you laughing, but we appreciate
```

1    that.

2            And what we really appreciate is that as you come out

3    laughing, and you have a seat, and we start, immediately

4    everybody's serious, everybody's attentive, everybody's

5    watching the witness, listening to the questions, listening to

6    the Judge.  It's obvious, and it is not that common to see it a

7    hundred percent like that in every case and especially not in a

8    case of this length.

9            So we want to you know, on behalf of the government

10   and on behalf of me personally, how much we appreciate that

11   attentiveness.

12           But more than that, seven weeks is a tremendous

13   sacrifice from you and your families, and we appreciate that as

14   well.  So thank you very much.

15           The defendants Steven Sodipo and Callixtus Nwaehiri,

16   they were licensed pharmacists.  They were trained and educated

17   and licensed.  And with that license came significant

18   professional and legal responsibilities.

19           The defendants turned their back on their

20   professional and legal responsibilities.  Now, as every witness

21   who was asked in this case has said, whether the defense wants

22   to hear it or not, pharmacists, including the defendants, are

23   the final gatekeeper.  They're the final gatekeeper between the

24   public whose hunger for narcotics, addictive narcotics like

25   hydrocodone is insatiable, and the very narcotics they see,

1     they are the final gatekeeper between those two things.

2           By abandoning their role and their responsibilities,

3     and in so doing, the defendants distributed 108,000

4     prescriptions of hydrocodone in 22 months to 26,000 patients

5     throughout the United States.

6           Instead of helping cure, they caused harm.  It's now

7     up to you to hold the defendants responsible for their failure

8     to live up to their legal and professional responsibilities.

9           What I want to do initially is just summarize for you

10    the charges which you've heard over the last three or four

11    hours.  I'm not going to go through all of the instructions,

12    thankfully, but we're going to hit the highlights of the

13    charges and the elements so you're familiar with how the law

14    and the facts blend together to establish the defendants'

15    guilt.

16          Starting just with a summary of the charges, first

17    charge, Count 1 is conspiracy to distribute and possess with

18    intent to distribute controlled substances.  In this case,

19    hydrocodone.

20          Count 2 is, Counts 2 through 7 is the distribution of

21    controlled substances.  These are specific distributions that

22    were charged, and we'll go through exactly who they were and to

23    when they occurred.

24          Count 8 is conspiracy to launder money.

25          Counts 9, 10, and 11 relate to specific checks,

1    specific transactions, and the charge is engaging in illegal
2    monetary transactions.
3              Counts 12 and 13 are filing false tax returns.
4              These counts, 8 and first just 8 through 11, they all
5    relate to Count 1.  You won't even consider those counts until
6    you've found the defendants guilty of conspiracy to distribute
7    narcotics.
8              Counts 12 and 13, the tax counts, are the only counts
9    in this case that are independent of the hydrocodone and the
10   Internet.  Clearly independent.
11             Hopefully, I'll have time to get to the elements and
12   what the underlying facts are at the end, but the false tax
13   return essentially is failure to report all of the income and
14   specifically with respect to Counts 12 and 13, it refers to you
15   may remember Count 6 and 7, which are the defendants' personal
16   piggybank accounts, which record the names, that's what they
17   relate to.
18             Now, before we get to the distribution, and we're
19   going to go through the distribution elements first and then
20   conspiracy to distribute, I want to talk a little bit about
21   aiding and abetting, which His Honor talked to you toward the
22   end of the instructions.
23             The defendants are charged in Count 1 with
24   conspiracy, and the key aspect to conspiracy is the unlawful
25   agreement, the agreement must be between two or more people.

1    But the defendant is also charged in Counts 2 through 7 with

2    distribution of hydrocodone on specific dates.  These

3    distributions were carried out by various pharmacists, not

4    necessarily by the defendants.  The point here is that so long

5    as the defendants were willful participants, it makes no

6    difference whether or not they actually filled the

7    prescription, shipped the prescription, or they were even in

8    the pharmacy at the time.

9         They're the owners, and the evidence has shown they

10   were responsible and knowledgeable about everything that was

11   going on in that pharmacy.  And the evidence clearly shows that

12   they were in the pharmacy regularly and filling prescriptions.

13   But the point of the aiding and abetting instruction is that,

14   as long as they associated themselves with this operation, as

15   long as they said in some way to make these distributions

16   continue, it doesn't matter who did what.

17        If the other elements of the crime are met, they are

18   guilty as if they printed out the prescription, put the pills

19   in the bottle, put the label on the bottle, put the bottle in

20   the Fed Ex package, put it out the door and even hand-delivered

21   it to the customer, it makes no difference.

22        Now, let's go to the elements of distribution of

23   hydrocodone.  The first element -- I will put all three of mine

24   first.  The first element is that the defendant distributed or

25   dispensed a controlled substance.

1              This element, I don't know what the defense is going

2     say, but it appears it's not even in dispute, through their

3     business, that they set up, and profited from, they distributed

4     nearly 10 million dosage units of hydrocodone.

5              As we just discussed in aiding and abetting, this is

6     their business, they made the decision, they knew what was

7     going on.  So regardless of which pharmacy tech filled the

8     bottle, which pharmacist signed the prescription, the

9     defendants are responsible as aiders and abettors to Count 2,

10    element number 1.

11             The next two elements we'll talk about in more

12    detail.  The first one is that the prescription that the

13    defendants filled were invalid.  That relates to the doctor.

14    Did the doctor fill the prescription outside the usual course

15    of medical practice?  And we'll get to that.

16             The third element is the defendants knew that the

17    preparation was invalid.  Did they know that the doctors were

18    acting outside the usual course of professional conduct?  And

19    we'll get to that briefly as well.

20             Let's go through the individual charges relating to

21    distribution.  Count 2, 90 units, I didn't have enough room, to

22    Martin Spangler on May 26, 2006.  You may remember the

23    testimony of Agent Graumlich.  He testified that he'd made an

24    undercover purchase.  He got on the Internet using the name

25    Martin Spangler and purchased 90 units of the hydrocodone.  He

1    made another similar purchase,60 units of hydrocodone.  This
2    time posing as Christopher Owens.

3          You may recall, Will Read, who testified that he also
4    made an undercover purchase, and that he acted as Jason Gorman
5    and received 88 units of hydrocodone.

6          And, finally, Mike Cummins testified that he posed as
7    Thomas Sutton and received 90 units of hydrocodone on September
8    5, 2006.

9          Last two charges relate to RH and RC.  There's been a
10   stipulation about RH and RC, and you heard the Judge instruct
11   you RH is Roger Hacket.  RC is Ronald Chartrand.

12         I would point out in these boxes of prescriptions
13   over here, which are in evidence, which you'll get back there,
14   if you find the date that corresponds to each one of these
15   prescriptions, date the prescription filled, open up the folder
16   on the front, inside is stapled the corresponding prescription
17   from New Care.

18         But, of course, we have a stipulation as to 6 and 7
19   and as to 2, 3, 4, and 5.  You also have the drugs that were
20   received from Fed Ex at the PO boxes and the chemical analysis
21   indicating that it was hydrocodone.

22         Now, let's talk about the elements of conspiracy,
23   which there's quite a few instructions on conspiracy, and
24   you'll have them.  I'm not going go through them all with you.
25   And I am just going to put up the basic elements for you now.

1          Two or more people entered into an unlawful agreement

2    and the defendant knowingly and willfully became a member.

3          The interesting thing that might be different from

4    your previous experience in thinking about conspiracy is that

5    conspiracy does not require a completed act.  It's just the

6    unlawful agreement.

7          The agreement does not need to be express.  It's not

8    two people, doesn't require two people meeting in a dark alley,

9    coming up with a plan.  It doesn't have to be in writing.  It

10   can be implied.  All that is needed is a mutual understanding

11   between two people.

12         Here's an example I will give you, your wife comes

13   them to from work, she gets out the lettuce, washes off the

14   lettuce, vegetables, washes off the vegetables.  Her husband

15   comes home five minutes later, sees her in the kitchen washing

16   vegetable, starts to cut a cucumber.  He doesn't say anything.

17   He stands next to her, grabs carrots and celery together.  They

18   throw all the vegetables in a bowl.

19         If making salad were a crime, those two vegetarians

20   would now be guilty of conspiring to make a salad.  They have a

21   mutual agreement to do the same thing.  And that's what we have

22   in this case.

23         As His Honor told you, actions speak louder than

24   words.  The defendants were clearly conspiring together to

25   distribute hydrocodone based on these Internet prescriptions.

1    So if Steven Sodipo and Callixtus Nwaehiri are conspirators,

2    but they're not the only conspirators, remember, they don't

3    even need to know the names of all the others, just other

4    people out there with the same goals and that they joined

5    business with them; Barry Brooks, Dr. Juan Ibanez, Dr. Dratler,

6    all of the doctors, anybody else that's out there, that has

7    knowledge of this, that's participating in this conspiracy, are

8    co-conspirators of the defendants, whether they have actual

9    knowledge of who the individual -- what the individual's name

10   is or not.

11           The other element is knowledge, obviously, and we

12   will discuss in a moment the overwhelming evidence of knowledge

13   that the defendants had that these prescriptions were invalid

14   in just a moment.

15           But what it boils down to is that the defendants

16   knew, when they joined and over the 22 months of operation in

17   this Internet business was nothing more than a narcotics

18   selling machine.

19           They knowingly joined the conspiracy.  They knew its

20   unlawful aims, and they stayed a member of the conspiracy

21   throughout the entire time.

22           To distribute narcotics simply means to deliver or to

23   transfer the controlled substance to somebody else.  And that

24   can be through the mail.  It can be hand-to-hand.  It can be by

25   owning a business and having your pharmacist and pharmacy techs

1     do it.  This is all that's required.

2             Now, the defendants are also charged with conspiracy

3     to possess with intent to distribute hydrocodone.  This charge

4     relates to the 350,000 or so pills of hydrocodone that were

5     found at New Care at the time of the search warrant.

6             Agent Don Tush testified to about all of those pills

7     that were found there.

8             Once you found that the defendants had knowledge of

9     this, that they knew the aims of the conspiracy, that they

10    intended to distribute and fill these prescriptions outside the

11    course of professional practice, the only question you need to

12    ask yourself is what were they going to do with these 350,000

13    pills that we found?  They shut down for two, three days.  They

14    went to the Board of Pharmacy.  They came back, and they fired

15    it up again.  They were currently continuing to ship more and

16    more hydrocodone day after day right after that.

17            Now, for possession with intent to distribute,

18    possession does not mean necessarily physical possession.  It

19    means control.  And control, which is what they had of their

20    business, with the intent to transfer to the other.  So if they

21    controlled that hydrocodone, which they clearly did, and their

22    intent was to receive prescription, put them in Fed Ex packages

23    and send them to thousands of customers throughout the United

24    States, that's the intent to transfer to another.

25            Now, there's two prongs to the charge of

1    distribution, conspiracy to distribute, that are different in

2    this case, because we're dealing with professionals, because

3    we're dealing with pharmacists.

4           The first prong is that the prescriptions were

5    invalid.  That prong deals with the doctors.  The prescriptions

6    had to have been issued outside the usual course of medical

7    practice.

8           The second prong is that the defendants knew the

9    prescriptions were invalid.

10          Let's talk first about the first prong, that the

11   prescriptions were invalid.

12          There's been a lot of talk here about the law.

13   There's been experts.  The law here is really quite simple.  If

14   the doctors wrote these prescriptions, all 108,000 of them, all

15   for hydrocodone, 26,000 patients, in 50 states, if they did

16   that outside the usual course of medical practice, then the

17   prescriptions are invalid, and that prong is satisfied.

18          You've had a number of instructions on this issue.

19   We've presented expert witnesses to discuss the standards of

20   practice.

21          But keep in mind, in assessing this, in everything in

22   this case, you don't walk into this courtroom and lose your

23   common sense.  That in fact is your most important tool.

24          And when you listen to the experts -- well, let me

25   tell you this first, the experts essentially put the standard

1    of care into context for you.  You didn't have to have the

2    experts to look at this case and say there is something

3    seriously wrong here when everybody's getting the same drug.

4    But experts put it into context for you.

5            And after listening to them, you probably began to

6    realize that the usual course of professional practice is

7    really common sense, at least in this case.  At least with

8    these numbers, and these red flags, and these issues.

9            Just remember this, as you were instructed, when

10   you're judging the usual course of professional practice, it's

11   not the usual course of Dr. Juan Ibanez's professional

12   practice.  It's the usual course of medical professional

13   practice.  Do not judge the usual course from the context of an

14   Internet rogue pharmacy.  You have to look at the profession in

15   general.

16           And when you do that, the result here is really quite

17   obvious, and you realize you probably didn't need an expert to

18   see that to begin with.

19           Let's look at some of the facts that prove that these

20   prescriptions were invalid.

21           The web protocol, perfunctory and meaningless.  How

22   easy was it to get narcotics?  There was no diagnosis.  Look at

23   the undercover buys.  Look at the online questionnaires.

24   They're skimpy, and they suggest most of the answers.  This is

25   what you need to do to get hydrocodone, valid credit card, tell

1    us your back hurts, send in some medical records, two days

2    later, you'll get your hydrocodone.  Getting the drugs was a

3    foregone conclusion.

4          Look at, listen to the CD's of the recorded calls.

5    When the doctor approves, you will receive.  Not he'll take a

6    look at it and then we'll get back to you.  When the doctor

7    approves, you'll get your drug.

8          Look at the bottom of the home page.  This is

9    government's exhibit 11 P.  Here is a

10   prescriptiondrugplanet.com.  You are provided a consultation

11   with a U.S. licensed doctor and will receive medication from a

12   U.S. licensed pharmacy, who will help you get the relief you

13   deserve.  Not you may.  Not if approved.  Not maybe.  You will

14   receive medication.

15         The distribution of these narcotics, these

16   prescriptions, was a foregone conclusion.

17         Speaking of the calls, listen to those calls, read

18   the transcripts, if necessary, and you will see that Matt, who

19   happened to be the customer service rep, actually the PA

20   allegedly, on two of the calls, he was reading from a script.

21         Compare his questions and answers.  Doesn't matter

22   what the answer is, the first 40 percent of that call is

23   identical.  He says the exact same thing every time.  What

24   possible diagnosis could a PA do from a script?  There's no

25   assessment.  This is a foregone conclusion.

 1                  And then at least on one of the calls, and I can't
 2       recall which one it is, you'll see, you have all these screen
 3       shots to understand how this works, you go to the website, you
 4       pick pain medication, you pick hydrocodone, and then you get a
 5       laundry list, and you pick the strength, and you pick order
 6       now, the quantity.  It doesn't say anything about refills.
 7                  You heard the medical call, the consultation with
 8       Matt.  The customer didn't ask for a refill.  About halfway
 9       through, he said, all right, you'll get this strength, I think
10       you should get generic, and you'll get three refills.
11                  This is an addictive narcotic.  What kind of
12       assessment is that?  Everybody got approved for refills.
13       There's no review.  It's a foregone conclusion, if your credit
14       card is good, you're going to get one prescription, strongest
15       strength that you ask for, 90 pills if you're willing to pay
16       for it, 120 if you're willing to pay for it, and three refills,
17       no questions asked.
18                  Ladies and gentlemen, it's really not that
19       complicated on the issue of whether or not these prescriptions
20       were issued outside the course of medical practice.
21                  This website, these telephone calls, the Faxing of
22       the medical records, it's a transparent attempt to create the
23       illusion of a doctor/patient relationship.
24                  This protocol is designed to allow any cardholding
25       credit card paying customer to get narcotics.  It's a mockery

1    of the doctor/patient relationship.

2           Now, I'm sure the defense will spend a lot of time

3    talking to you about face-to-face requirement, whether or not

4    there has to be a face-to-face requirement.  They'll say to you

5    it's not in the law, it's not black and white in the law.

6           Well, my first point, ladies and gentlemen, is the

7    law is what you have been instructed by Judge Legg.  Of course,

8    it's not in the law.  It's in the standard of practice.  That's

9    the law.  So it's not black and white.  But we wouldn't have

10   experts, we wouldn't be here having this discussion if it

11   wasn't part of the standard of practice.

12          You have testimony from Mr. Catizone, who's the

13   Director of the National Association of Boards of Pharmacy.

14   Dr. Paul Christo is the director of the pain management clinic,

15   or of the pain clinic at Johns Hopkins Hospital.

16          You have newsletters from the Board of Pharmacy,

17   guidelines from the Federation of State Medical Boards, DEA

18   guidelines, all lead to one conclusion, the standard of care in

19   the medical profession is that a doctor should only prescribe

20   addictive narcotics to a patient after an in-person

21   examination.

22          That's also again what your common sense tells you.

23   But keep this in mind, this case has never hinged on that fact,

24   the government, in opening statement, never said to you, this

25   case hinges on a face-to-face relationship requirement.  It's

1    not in the indictment.  It's not in the instructions.  Common

2    sense and the standards of practice say, yes, a face-to-face

3    requirement is necessary to prescribe addictive narcotics.

4            But in this case doesn't hinge on that.  If you take

5    that away and you look at all the prescriptions in this case,

6    it is still obvious that every single one of them is invalid,

7    based on all of the other factors that we'll get to, the

8    numbers, all of the warning signs, and the fact that they're

9    all for narcotics.

10           So even if Professor Lander's accurate and you can

11   have a face-to-face, you don't need a face-to-face and you can

12   have a doctor/patient relationship with a letter saying I'll be

13   your doctor.  Yes, I want you to be my patient, even if that

14   were true, this case still screams out these prescriptions were

15   invalid.

16           The point here is that there was no discretion.

17   There was no decision.  There was no professional judgment by

18   anybody in issuing these prescriptions or dispensing them.

19           Look at Doug Chorpenning's testimony.  Didn't matter

20   what was happening in his life.  Addiction, desperation, family

21   problems, no website, no physician's assistant ever said no.

22   He was never declined.

23           Now, his real doctors, doctors that he met

24   face-to-face that he was initially able to deceive into giving

25   them prescriptions for narcotics, they cut him off.  That's why

1   he went to the Internet, where he was never declined.

2          Jennifer Koch, same thing, that was never declined by

3   the websites.  Agent Graumlich, Agent Read, Agent Cummins,

4   never declined.

5          There was no professional judgment.  The conduct of

6   these web doctors was so clearly outside the usual course of

7   professional practice.

8          And if that wasn't enough, everybody's getting

9   narcotics.  So it's not just that there's no professional

10  judgment, it's a foregone conclusion, but 90 percent of the

11  patients are getting hydrocodone.  These doctors were not

12  acting as doctors.  These doctors were acting as drug dealers.

13         Second prong that I told you about is that the

14  defendants knew that the prescriptions were invalid.

15         Ladies and gentlemen, this is the key issue in this

16  case, this case hinges on that fact.  And the evidence that

17  these defendants knew these prescriptions was invalid, so

18  overwhelming.

19         And I'm now going to go through the evidence that

20  will allow you to conclude beyond all doubt that Steven Sodipo

21  and Callixtus Nwaehiri knew full well what was going on.

22         But before I do, let's look at some of the other

23  witnesses and think about the other people who knew that

24  something wasn't right.  D'Andra Kelly.  Do you remember Miss

25  Kelly?  She was the office manager.  She knew something wasn't

1     right.  She was concerned.

2            Robin Brinegar, a pharmacy tech, right out of school,

3     and she noticed issues as well.

4            Theresa Ryan knew there were problems.  Bryn Dawson,

5     she doesn't work there, she worked for Chesapeake Telephone.

6     She was the supervisor of the answering service.  And she

7     noticed the calls were unusual, they were Internet

8     prescriptions.  They were all for addictive narcotics, and she

9     relayed all that information to the defendants.

10           Jim Cloud, pharmacy tech, he's not a pharmacist.  He

11    knew something was wrong.

12           It didn't take him but two seconds.  Now, who didn't

13    know, Steven Sodipo and Callixtus Nwaehiri are the only two

14    people they claim they didn't know.

15           The evidence of their knowledge in sort of general

16    terms are these things, we're going go through each one.  The

17    defendants were warned that this conduct was either improper or

18    illegal.  The operation of the website, the way this website

19    operates, and we talked about it a little bit in terms of the

20    prescriptions being invalid already, clearly gave them notice

21    that there was something wrong.

22           The prescriptions themselves, they knew there were

23    problems with their customer base, double-dipping customers,

24    people trying to get refills too early.

25           They were chasing drug distributors.  They couldn't

1    keep a drug distributor.  They were being cut off by reputable

2    drug distributors and scrambling to get new suppliers so they

3    could feed, feed the hunger for hydrocodone.

4         They lied and they made statements that showed they

5    knew what was going on.

6         The way these doctors operated, and what the

7    defendants knew about that, also shows the defendants knew that

8    these prescriptions were outside the course of professional

9    practice.

10        And, lastly, the numbers.  The sheer numbers, the

11    relevant numbers, all the numbers.

12        Let's talk about the evidence that shows that the

13    defendants were warned that Internet prescriptions might be

14    improper and illegal.  They got newsletters from the Maryland

15    Board of Pharmacy.  They got one in 2001, that's exhibit 22 C,

16    and what this says, there's a message here.  The message is

17    hydrocodone is a drug that may be abused, and that a pharmacist

18    has a corresponding responsibility.  You've been instructed on

19    that responsibility.  But now you're going to see how often the

20    defendants were perfectly aware of that, and especially made

21    aware of it in the context of Internet prescriptions for

22    controlled substances.

23        They received another newsletter from the Board of

24    Pharmacy in 2004.  Now, this newsletter, I want to point out t

25    you does not deal with the Internet.  I'm not going to zoom in

1    on this part, but you'll have in evidence the facts which are

2    listed up here relate to a doctor, either self-prescribing or

3    prescribing for his family.

4         But what the newsletter says about a pharmacist's

5    responsibility is particularly relevant in this case.  If the

6    pharmacist has cause to believe that the prescription is not

7    written for a legitimate medical purpose, the pharmacist has an

8    obligation to not fill the prescription.  This is especially an

9    issue when the drug is a controlled substance.

10        Ladies and gentlemen, this is what you use to

11   determine what is the standard of care, these types of items.

12        April in 2005 is a specific newsletter dealing with

13   prescriptions sent through the Internet.  How much more of a

14   red flag did they need?  Read this, this pertains to you.

15   Okay.  This was exactly when they had gotten started.  They

16   started in January of 2005.  A few months later, this is what

17   they received.

18        Now, I'm not going to read that to you, but what that

19   is, is the corresponding responsibility.  You have that in the

20   jury instructions.  Once again, it's the Board of Pharmacy

21   saying to the defendants, you have a corresponding

22   responsibility.  It's especially important for controlled

23   substances.

24        The import of this, you are responsible for what you

25   do.

 1          And the same newsletter, even starting at the top,

 2     the above regulation is also applicable to any prescription

 3     containing controlled substance that a pharmacist fills when he

 4     or she should have reason to believe it is not written in the

 5     usual course of practice for legitimate medical purpose even

 6     when the prescriber is contacted and indicates that the

 7     medication is appropriate.

 8          They can't just call Dr. Ibanez and say, is it legal?

 9     There's a gray area, good to go.  It doesn't work that way.  If

10     they have reason to believe the prescription is invalid, and

11     after talking to the doctor, or PA, or customer service rep,

12     they still have reason to believe, they still know there's a

13     problem, they cannot fill that prescription.  This is the

14     standard of care.

15          In addition to the newsletters from the Board of

16     Pharmacy, they received the DEA warning letter twice.

17     Actually, there's evidence that they received it three times.

18     Once in the mail.  One was found in the office.  And once it

19     was shown to them, or at least shown to Mr. Sodipo by Miss

20     Jones.

21          This newsletter.

22          Again, there's nothing subtle about this.  Warning,

23     warning, warning, warning.

24          What is this about?  It's about Internet

25     prescriptions.

1          The DEA recognizes that while some Internet sites

2     facilitate legitimate prescribing and dispensing practices,

3     other sites facilitate the illegal sale of controlled

4     substances.

5          Red flag.

6          Page 2 of the same newsletter, a consumer can more

7     easily provide false information in a questionnaire than in a

8     face-to-face meeting with the physician.

9          That's common sense.  But if it wasn't to them, there

10    it is, in black and white.  You can't have a valid

11    doctor/patient relationship.  You can't prescribe addictive

12    narcotics that people seek on the Internet when they can say

13    anything they need to say to get the drug.

14         And I think that there were a number of light moments

15    throughout this trial, out here as well as back there

16    apparently, but one of them that I thought was perhaps the

17    funniest was when Agent, or Diversion Investigator Graumlich

18    took the stand, and he was testifying how he posed as somebody

19    else on the Internet in order to get the prescription.  And we

20    were looking at the height and weight situation.  Do you

21    remember Agent Graumlich was not thin, and I think he wrote

22    somewhat wishful thinking that he weighed 200 pounds, and Miss

23    Smith had asked him questions, sort of a made a joke and said

24    oh, you know, I guess you can be anything you want, anybody you

25    want.  Agent Graumlich said, yeah, on the Internet, you can.

1            And that's the point here.  That's why you can't

2    prescribe narcotics based on an Internet questionnaire, and

3    based on a telephone conversation with a PA who then sends it

4    to a doctor, to his house, sitting there with a laptop

5    computer, that's not proper prescribing.  It's not usual

6    course.  It's just too easy to get drugs.

7            Page 4 of the statement newsletter, does an Internet

8    pharmacy, does being one change a pharmacy's responsibility

9    under the DEA regulations?  No, it doesn't matter.

10           So when the defense gets up here and says we put the

11   Board of Pharmacy on notice, we have this registration,

12   inconsistent as it may be, that clearly says something about

13   the Internet, that doesn't make any difference.  It makes no

14   difference.  There's nothing inherently illegal about being a

15   pharmacy that fills prescriptions on the Internet.  The problem

16   is you have to do it within the standard of care.  You can't

17   fill prescriptions that you know are invalid.  And that's what

18   they did.

19           The standard of practice, whether you're mail order,

20   whether you're brick and mortar, whether you're an Internet

21   pharmacy is exactly the same.  Every controlled substance

22   prescription you get, you have to be vigilant.  And they

23   weren't.

24           Page 3, both the practioner and the pharmacy have a

25   responsibility to ensure only legitimate prescriptions are

1    written and filled.

2         And on page 4, Internet pharmacies have the

3    responsibility to ensure that the legitimacy of the

4    prescription and the prescriber.

5         What is the DEA saying to the defendants?  They're

6    saying these practices are often illegal.  Be vigilant.  Or you

7    will be responsible.

8         What more notice do they need?

9         Well, in the fall of 2006, recovered from Mr.

10   Sodipo's office were these online documents that His Honor has

11   just described to you about how you should use them.  First,

12   there's this letter, this was found in Steven Sodipo's office.

13   That is an online version of the DEA warning letter.  It's the

14   exact same thing, word-for-word.  Read through it, you'll see.

15   He had it in his office.

16        Also is 50 B, which you just heard about.  50 B is a

17   stack of documents printed from the DEA and other websites, and

18   it deals with cases against doctors and pharmacists for very

19   similar types of activity.  Didn't that put them on notice in

20   the fall of 2006?

21        But after the mutiny, and after they got documents,

22   and after they made this bogus trip to the Board of Pharmacy,

23   they printed these documents, and what did they do?  They fired

24   it up again.

25        They did 50 a day for about two days, and then they

1   were off to the races, hundreds and hundreds a day, every day,

2   again until they were shut down.  Even after having all of that

3   information.

4        That's the first point about how we know they have

5   knowledge, because they were warned what you're doing is likely

6   illegal.

7        But then there's the operation of the website.  Now,

8   I want to address an issue here.  The defense might say, well,

9   we don't know what goes on the website, we're just a pharmacy.

10  How do we know what's going on, on the Internet, what's going

11  on with the customers?  That's between them and the website

12  companies, we don't know anything about it.

13       Ladies and gentlemen, the evidence in this case is

14  they did know what was going on in the Internet.  First of all,

15  recovered from the New Care offices, that's the wrong one, was

16  a disclaimer from the Internet.  This is from doctorscrips.com.

17  This is the disclaimer where the patient has to waive all of

18  their medical malpractice rights, which is an unenforceable

19  waiver.  This disclaimer was found at New Care, and this

20  disclaimer would have required somebody to go on the Internet,

21  go past the home page, and find the disclaimer.  Somebody

22  navigated the Internet to find this.

23       Additionally, isn't it a reasonable inference that

24  these defendants knew plenty about this Internet practice?

25       They are involved in a profitable business with these

1    websites.  They had to hire extra staff.  They had to change

2    phone answering policies.  They made over $4 million.  They

3    signed a contract.  They were in this business relationship

4    with the web companies, with IHE, or GDN, and Jack Kennedy,

5    Adam Kaps, Barry Brooks, for 22 months.

6            Wouldn't any reasonable business person have more

7    than just that contract?  Wouldn't any reasonable person have

8    gone to the websites and saw what this was about?

9            And based on what you've heard about the way these

10   two individual ran a very tight ship, in their building?

11           Isn't it reasonable to conclude, of course, they knew

12   what this website was all about?  And if they didn't, if they

13   didn't once go -- if the defense gets up here and says there's

14   no evidence that Mr. Sodipo and Mr. Nwaehiri once went to that

15   website, we don't know who printed that out, they never went

16   there, and the government can't prove otherwise, isn't that the

17   very definition of willful blindness?

18           Any reasonable person would have, they're in business

19   for 22 months?  If they didn't, if they didn't go to the

20   websites, it's only because they didn't want to that know.  And

21   that's exactly what willful blindness is.

22           Now, let's talk about this website and how it gave

23   them notice that these prescriptions were invalid.

24           First of all, there's the perfunctory web protocol we

25   discussed earlier.  There's a script, easy to get a

1    prescription.  It's a foregone conclusion you're going to get

2    it, a complete mockery of the doctor/patient relationship.

3           They don't accept insurance.  DEA guidelines say this

4    is a red flag.  They only accept credit cards.  Why won't they

5    accept insurance?  That's a red flag that these prescriptions

6    are not valid.

7           They'll take your Visa they'll take your Am Ex.

8    They'll not take your Blue Cross and Blue Shield.  The

9    customers chose the drugs.

10          Ladies and gentlemen, it just so happens when you see

11   your doctor, he gives you a laundry list of drugs, you tell me

12   which drug you want, tell me which strength you want and how

13   many you want.  And by the way, would you like a refill?

14          Who's making the decision here?  The evidence in this

15   case is that every person that requested hydrocodone got

16   hydrocodone, not something else.  There's no analysis.  There's

17   no diagnosis.  There's no assessment.

18          Is this the right drug for you?  Do you need drugs at

19   all?  Is this the right strength?  Should you get refills?

20   Who's making the decision?  The patient, the customer, is

21   making the decision.

22          What this is, is online shopping.  That's all it is.

23   It's no different than buying a hat, pair of shoes, a

24   basketball, anything you can buy online, just like you can buy

25   these drugs.

1        Now, what about the costs?  It's $175 versus as low

2    as $40 from Target or Walmart.

3        $175.43 for 90 pills of hydrocodone.

4        Do you remember what Mr. Ravenell said in his opening

5    statement, seven weeks ago?  I took notes.  And what he said

6    was, the Internet has changed every part of our lives.  It can

7    save time and money.  Those are his words.  It can save time

8    and money.

9        Well, ladies and gentlemen, you heard it from their

10   own witness, these customers were paying 100 percent to 300

11   percent more than they could get, they get the same thing from

12   Target or Walmart?  Why would they go on these rogue sites?

13   They did it for the pleasure of buying hydrocodone without

14   actually having to see a doctor.  That doesn't sound like a

15   savings.  It doesn't sound like there's any benefit to getting

16   drugs for $175.  When if they're legitimate, you pay 40.

17       Would a legitimate patient pay $175 if they can walk

18   into the Walmart and get it for 40?  26,000 of them?

19       Is that legitimate?  Does that sound legitimate?

20       What does that tell you about this entire operation?

21       Something else Mr. Ravenell said in his opening

22   statement is people buy their drugs on the Internet because

23   it's easier to buy drugs that way.  You bet it is.  It is

24   easier to get your drugs that way.

25       In addition to the cost, there's this waiver of

1    medical malpractice rights.  Isn't this another red flag,

2    asking the customer to waive any risks of any harm?  This is

3    what the waiver says:

4         "I release prescriptiondrugplanet.com and any and all

5    of its employees and contractors including but not limited to

6    physicians from any and all liability associated or in

7    connection with the medication prescribed to me and or the

8    consultation.

9         When a patient goes to a doctor's office, they're not

10   asked to waive any rights, and certainly not their right

11   against a remedy if there's medical malpractice.

12        First of all, it's not lawful to do so.  And it has

13   absolutely no legal force.

14        But what kind of doctor would make such an improper

15   request?  Imagine a patient, a parent takes their child to a

16   surgeon for an appendectomy, and the surgeon says okay, Mr. &

17   Mrs. Parent, I'd be happy to take out the little one's ruptured

18   appendix just as soon as you waive any rights you have to sue

19   me in case something goes horribly wrong and it's all my fault.

20        Doctors can't do that, and legitimate doctors would

21   not do that.  And the fact that these websites all required

22   such a disclaimer, such an improper waiver, is a red flag that

23   the entire operation was improper.

24        And this was found at New Care with that language.

25   Then there's the certification at the bottom of the

 1   prescription, do you remember this?  We talked about it quite a

 2   bit.  The certification that something called Streetwise says

 3   there's a doctor/patient relationship and some Florida

 4   telemedicine regulation?

 5          Nobody who testified in this case has ever seen this

 6   certification for or anything like that.  Doctors can't write a

 7   prescription for controlled substance unless there is a valid

 8   doctor/patient relationship.  So it's redundant and suspicious

 9   to put this certification on the bottle.  It screams out to

10   you, to anybody looking at it, somebody was asking questions.

11   Somebody challenged this.  And we're going to put this on the

12   bottle so the pharmacy and person has something to cover

13   themselves.  I can put this up, see it right there,

14   doctor/patient relationship?  I'm good.

15          And so it's so suspicious.  It's such a red flag.

16   You can't pay lip service to something as significant as the

17   doctor/patient relationship.

18          You can't pay lip service to assessment, diagnosis,

19   and professional judgment or making people healthy and above

20   all doing no harm.  You cannot disclaim the very tenets of the

21   profession away.

22          Also on this website the customers had no choice.  Do

23   you remember the customers before they even got the

24   prescription, they have to have a consultation with some man

25   named Matt, works from a script, you pay $115 for?  And then

1    they get a prescription.  It's authorized three refills even if

2    they didn't ask, normally they couldn't call up, I changed my

3    mind, I'd rather not pay $175 for Elite or New Care.  I'm going

4    to take it to the Rite Aid next to my house and get it filled

5    there if you don't mind.  They couldn't do that.  They couldn't

6    get the first one filled from Elite and then go the Rite Aid.

7    They weren't allowed custody of their prescription.  They

8    weren't allowed their choice of where to fill the prescription.

9    And even their own witness, Roger Lander, Pharm D, admitted

10   that if the customer doesn't have a choice, that's a red flag

11   that there's something going wrong.  That's an invalid

12   prescription.

13           Now, he said the customers did have a choice, because

14   when they got on the website, they made the choice initially to

15   pay $115, $175, and then three more times $175.  But you can't

16   deny the fact they couldn't change their mind.

17           Another red flag based on the operation of the

18   website that the defendants had knowledge of, the pharmacist

19   could not speak to the prescribing doctor.  So pharmacists, if

20   they ever did their job and got a suspicious prescription like

21   the 108,000 in this case, would take that prescription, say

22   I've got a problem, I need to call Dr. Jones.  They call Dr.

23   Jones and they say, well, I'm sorry, you can't talk to Dr.

24   Jones.  You have to talk to Dr. Ibanez.

25           But wait a minute.  Dr. Ibanez didn't write this

1   prescription.  I want to talk to Jones.  I'm sorry.  Our policy

2   you can't talk to the prescribing doctor, you have to talk to

3   Dr. Ibanez, you know, the guy who manages the doctors and gets

4   paid by Barry Brooks for every prescription the doctor writes,

5   that's the guy you have to talk to.

6           What does that tell the pharmacist, that the policy

7   is they cannot speak to the prescribing doctor?

8           That tells them, again, there is something seriously

9   wrong with this whole operation.

10          That's not congratulations to you, not yet, that will

11  be later.  This is what the patient is told when he is approved

12  for a consultation.

13          Now, approved for a consultation means your credit

14  card went through.  Congratulations, Thomas W. Sutton.

15          Congratulations, you're getting in to talk to a

16  doctor, and then he's going to prescribe you narcotics, and

17  you're going to get four prescriptions of 90 pills of

18  narcotics.  Congratulations.

19          Is that what doctors say when you call them up?  I'd

20  like to have an appointment.  All right.  How's next Wednesday

21  at five?  Perfect.  Okay.  Congratulations.  This is just

22  congratulating them on making their purchase, their narcotics

23  purchase.

24          That's the operation of the website.  That's the

25  information that they knew that put them on notice that these

1    prescriptions were invalid.  It is blatantly obvious to anyone

2    who went on these sites, but especially to a trained pharmacist

3    that these sites are nothing more than a narcotics selling

4    machine.  No or more, no less.

5            So in addition to them being warned and the operation

6    of this website, you've got the prescriptions themselves.  And

7    then when I say the prescriptions themselves, I'm talking about

8    50 boxes of this, these.  You go through them.  You're going to

9    have two boxes of them, probably more than you need.  All

10   narcotics.  Almost all hydrocodone.  All high potency.  And the

11   amount of pills, 30, 60, 90, 120, doesn't anybody get 10 or 12?

12   Isn't there anybody on the website that only needs 15

13   hydrocodone?

14           The website's not about evaluating and assessing what

15   a patient needs.  And the fact that everybody got 30, 60, 90

16   and 120 tells you that, it's about churning it out, making some

17   money, selling that hydrocodone, that's what this is about.

18           I got ahead of myself.  Oral narcotics, oral

19   hydrocodone, high potency, the quantity and refills.  Look at

20   the top of these, it tells you.  Doesn't matter the defendants

21   were doing as refills, they were doing them as new refills,

22   they're on notice of refill one, refill two, refill zero, if it

23   was an original, refill three, everybody got refills.  Not one

24   patient was authorized for one prescription only.  Everybody

25   got a refill.  That's not the usual course of medical practice.

1    That's dealing drugs.

2           Customers were addicts.  This put them on notice.

3    The problems, the calls, the issues that they were having

4    relating to their Internet calls, put them on notice.  Whoa.

5    There's something wrong with the customer base here.  This

6    isn't normal to get these kind of calls.

7           The evidence of this comes from these sources,

8    D'Andra Kelly, Theresa Ryan, Bryn Dawson, Detective Halsey, who

9    worked at the university, and Adam Kaps.

10          We mentioned this early, D'Andra Kelly, she was the

11   office manager.  She testified about lots of calls she received

12   that related to the Internet, more so than anything else, and

13   there were problems with those calls.  People were angry.  They

14   were irate.  They had complaints.

15          And it wasn't the same as they'd always received.

16   They were getting a tremendous amount of calls once they

17   started doing the Internet business.  And she had calls about

18   people who were counting pills.  They would say, well, I got my

19   120 prescriptions, but there was only 119 or there was 118.

20          Theresa Ryan worked with Miss Kelly.  She told you

21   the same thing, calls were constant.  Now, the defense is going

22   to stand up and say to you those ladies lied to you so don't

23   believe anything they say.  They're going say because of

24   inconsistencies when they called each other relative to when

25   they testified based on these phone records, Miss Ryan lied and

1    Miss Kelly lied, they had some plan to get it into evidence.

2             You see, ladies and gentlemen, this evidence is

3    corroborative.  Bryn Dawson, what's her motive to lie?  She

4    just works for the telephone company that takes the messages

5    and she says this, it was crazy.  I got calls all the time, and

6    I'm always taking these calls and giving them to Mr. Sodipo and

7    Mr. Nwaehiri about people that are irate, too few pills,

8    calling about their hydrocodone, and then they have a Fax from

9    Detective Halsey who sent a Fax to Mr. Nwaehiri saying we've

10   got a problem here with a guy that's receiving drugs from your

11   pharmacy.

12            So they had knowledge of this from all of these

13   sources.

14            Now, Adam Kaps is on there.  Adam Kaps's information

15   relating to these phone calls does not go directly to

16   defendant's knowledge.  There's no indication that he relayed

17   anything ever to these men.  But I put Adam Kaps up there to

18   put this all in context because they're going to say these

19   calls are a complete fabrication, don't believe any of it, even

20   though there's no reason for Bryn Dawson and Detective Halsey

21   to lie.  And there's really none for Miss Kelly or Miss Ryan,

22   either.

23            So if you look at Adam Kaps, he testified he used to

24   talk to the customer service reps, that he got complaints all

25   the time.  New Care was just receiving a fraction of these.

1    They had 15, 20 people working at any one time just to field

2    these calls.  He told you he knew about calls of irate,

3    complaining, pill counting, all of the same thing.

4          So Adam Kaps corroborates exactly what those

5    witnesses have told you.

6          I just want to make one comment about pill counting.

7    I'm sure there are some people who count their pills, but it's

8    not a usual thing to do.  Most people do not go to the

9    pharmacy, get their antibiotics, come home, dump it on the

10   table, spread it out, and start counting their pills.  It's not

11   a usual thing to happen.

12         So if one or two calls and New Care came in, I got

13   shorted, there are definitely people who will keep track of

14   every penny, every pill, there's nothing wrong with that.

15         But if they're receiving calls on a regular basis

16   that people are counting their pills, doesn't that say to them

17   maybe these people are desperate for these drugs?  Maybe

18   they're really concerned when they're paying $175 for addictive

19   narcotics, they get every single one of them?  Maybe there's

20   addicts on the other line.  Maybe there's something wrong with

21   this whole operation.

22         That's the problem with pill counting, and that's why

23   all of these witnesses with no pharmaceutical training noticed

24   it.  That's why they remembered it, because it was out of the

25   ordinary.

1           The defendants also knew because of these
2      double-dipping customers -- and this term double-dipping, as
3      you read the transcript and read Mr. Sodipo's own words, that's
4      his term, that's not our term, that's why it's in quotes, he
5      talks about double-dipping on calls.
6           These rejections that the defense will argue to you
7      somehow evidence of good faith, all it is is knowledge of the
8      fact that they have double-dipping customers and then that's a
9      problem again with their customer base.
10          In addition to the 5,000 rejections that they had,
11     most of which was because they were too early, not all, there's
12     another 6,000, as you learned about yesterday, where New Care
13     didn't reject.  In fact, they filled them in less than 20 days.
14     If you do the math, Paul Short testified about how many filling
15     days there were.  I don't have the number in front of me, but I
16     did the math, it's 480 something.  That means that 22 times
17     every day the websites, some doctor at the website approved a
18     description for a customer who had already received a
19     prescription within 20 days, and they just forwarded it to New
20     Care.  Here it is with our stamp of approval, go ahead and fill
21     this.  22 times every day.
22          And what's worse is the rejections that the defense
23     got was only by chance.  Because if you look at the calls that
24     he had with Jim Cloud and the other evidence, you'll see that
25     they're all aware that they're not the only pharmacy that's

1    filling for these websites.  And that in fact they only get by

2    chance certain prescriptions, but the same customers are

3    getting prescriptions by other websites.

4        And you can look at the calls between Mr. Sodipo and

5    Mr. Cloud to see evidence that when they talk about they need

6    to spread it out, they can't send all the prescriptions to one

7    pharmacy, they need to spread it out.

8        So they have knowledge not only that they're in this

9    very random and maybe fortunate way of catching or seeing

10   11,000, 22 a day, that this is going on randomly with every

11   other, every other pharmacy out there.  And they're just

12   getting somebody, look, the ones they get that aren't early,

13   are probably are likely early, and they know that, and they

14   fill them anyhow.

15       So they get this information that 22 times a day.

16   The website is approving improper prescriptions.  What do they

17   do with it?  Do they ask questions?  Do they inquire at all?

18   No.

19       They just keep churning out the prescriptions at 20

20   dollars a pop.  And they'll argue to you this is evidence of

21   good faith.  It shows knowledge.  It shows knowledge that these

22   prescriptions were issued outside the usual course of

23   professional practice.

24       This is the language that I was telling you about.

25   Again, I got ahead of myself.  Mr. Sodipo says to Jim Cloud,

1    you know what happened is sometimes they tried to double-dip.

2    Those are his words.

3            Another factor here that shows the defendants were

4    aware that what they were doing was improper, another red flag,

5    is that they were chasing drug distributors.  They couldn't

6    keep a drug distributor once they found out they were doing

7    Internet work.

8            First of all, despite the high volume that each drug

9    distributor was supplying to New Care, you saw there's a huge

10   chart over there that June Howard went through during the time

11   they were being supplied by McKesson and Cardinal Health.  They

12   were splitting their order, about 50/50.  So McKesson and

13   Cardinal Health only knew about 50 percent of what New Care was

14   really doing.

15           But in spite of that, they were cut off by Cardinal

16   Health, and they were cut off by McKesson right after they

17   filled the answered questions or filled out a questionnaire

18   saying we're filling prescriptions over the Internet.

19   Shouldn't that have put them on notice?  Did that in any way

20   cause them to examine their business practice, being cut off by

21   a reputable drug distributor?

22           That's a danger sign that the prescriptions they're

23   filling is not valid, and ignoring that danger sign, if that's

24   what they did, is evidence of willful blindness.

25           Now, I told you earlier about the lies.  Now, the

1    defendants just might be the honest people that their friends

2    and families say they are in their personal lives, but as you

3    have seen in the seven weeks in this trial, when it comes to

4    the Internet business, the truth is not a requirement for that.

5           Let's look at some of the lies they have told.  In

6    the facts from Callixtus Nwaehiri to Detective Halsey, by

7    giving them information about these prescriptions, he makes

8    reference to a phone number, and he says this is the number of

9    the clinic.  Is there any evidence of a clinic in this case?

10   Why does he say clinic?  Because we wouldn't be doing all the

11   hydrocodone we're doing unless there were some reason for it.

12   It's not the Internet.  It's a clinic.

13          To Jim Cloud, Steven Sodipo says, well, you've got to

14   understand here in Maryland the DEA or the state, they limit

15   how many prescriptions we can do in any day.

16          Well, you've heard over and over and over again, even

17   from the defendant's own expert, they are no limits to how many

18   valid prescriptions any pharmacy can fill.  If there's 10 that

19   are valid, then he can fill 10.  If there's 5,000 and they're

20   valid, and there's no reason to suspect they're not, they can

21   fill 5,000.

22          But he told Jim Cloud they were limits.

23          The facilities list.  To Yuki Nomoto, when they came

24   in to inspect the pharmacy, the defendants gave her

25   government's exhibit 25, which is a facilities list, which you

1        have seen, and it has a list of the various facilities.  And on

2        the far -- the second column from the far right is the number

3        of beds.

4                60 beds, 900 beds, 150 beds.  And Les Stickles

5        testified to you that he went and took photographs of those

6        houses.

7                This is the house that they listed at 50 beds.  50

8        beds in that house.

9                30 beds in that one.

10               70 beds.  Not just the random.

11               Turning these, I didn't point out town houses and row

12       homes in Baltimore City, row homes where they listed 35, 40,

13       50, 80 beds for a row home in Baltimore City?

14               I don't know if you have been in a row home in

15       Baltimore City, but not too many of the standard row homes can

16       take 80 beds.

17               Why did they lie?  Why did they make up these

18       numbers?

19               They needed a justification for the quantity of

20       hydrocodone that was in their storeroom.  The quantity of

21       hydrocodone is not consistent with the legitimate business.  So

22       they said we've got 900 beds in a facility in Florida.  We've

23       got 450 beds in another facility in Florida.

24               That lie is a consciousness of guilt.  They're hiding

25       the true nature of what they were doing.

1          No Internet business.  Yuki Nomoto, after being given
2   this list and after looking at Internet health prices, 900 beds
3   says what are you doing, Internet work?
4          No, not doing Internet work.  Just the -- this is the
5   fall, December of 2005.
6          They're doing about 800 in a given day in that time
7   period, 500, 700, all hydrocodone all over the Internet, no,
8   they say to Miss Nomoto, they are not doing any Internet
9   business.
10          And after the search warrant's executed and Mr.
11   Sodipo is at the Rite Aid talking to his friend Aloysius Ibe,
12   Mr. Ibe says what's this I read about in the newspaper,
13   filling, I think he only knew 4 million, only 4 million
14   prescriptions on the Internet.
15          Mr. Sodipo says, no, no, no, got it all wrong.  Mr.
16   Ibe asked him a follow-up question.  Mr. Sodipo says, no, we
17   don't even have Internet.  We don't even have Internet.
18          Why do they deny?  Why does he deny doing Internet
19   work?  Because he has the knowledge that what he has been doing
20   is illegal.
21          To Cardinal Health, when they had their sit-down with
22   Cardinal Health about what was going on in New Care, they said
23   we don't do any refills.  Take a look at these.  They're all
24   refills, the vast majority of them.
25          To Cardinal Health again, how many beds do you

1    service?  Cardinal Health, what was the reason for the high

2    number of hydrocodone?  How many beds do you service?  We

3    service 18,000 beds.

4                18,000 beds.

5                Even if you believed the lie on their facilities

6    list, it's only about 4,000, but to Cardinal Health to justify

7    those numbers, 18,000.

8                New facilities to McKesson.  Do you remember Gary

9    Adam?  He was their salesman for McKesson.  And he came in

10   midway through the trial, and he testified to you that he spoke

11   to Steven Sodipo at one point because he had gone to his

12   numbers.  He's a salesman.  He doesn't know what they're

13   selling.  He knows how much, and he knows about profit margin,

14   and he notices his profit margin has just shot through the

15   roof, so he gives Mr. Sodipo a call, might have been in person,

16   I don't recall, says what's going on, this is great, what's

17   going on?

18               Mr. Sodipo says, oh, we got a couple new facilities.

19   They didn't get any new facilities.  They were filling Internet

20   prescriptions as fast as they could.  They had to hire new

21   staff to do it.  This has nothing to do with new facilities.

22   That is a lie to cover up to drug companies the true nature of

23   what they were doing.  They lied about it because they knew it

24   was wrong.

25               Now, in addition to their lies, there's other

1    comments that Mr. Sodipo said that show his consciousness of

2    guilt.  This is what he said to Jim Cloud.  These are his

3    words.  I don't want to do too much of it, you know, create a

4    red flag.

5            I mean, who wants attention?  It's better for them to

6    have more, pharmacy, you know.  It would be better for

7    everybody before they mess the whole thing up.

8            He doesn't want any red flags that would draw the

9    attention of the DEA.  If everything is valid, what's wrong

10   with attention?  If everything they're doing is legitimate, why

11   is he concerned with anybody knowing?

12           I'm on schedule.

13           Additional evidence that the defendants knew, the way

14   the doctors practiced.  No physical exam by the prescribing

15   doctor.  There's evidence in this case the defendants were

16   perfectly aware of that.

17           The same doctors are filling these prescriptions over

18   and over and over.  Only 11 doctors wrote 105,000

19   prescriptions.  That's 98 percent of all the hydrocodone they

20   did was from 11 doctors in 22 months.

21           Five of the doctors did the vast majority of them.

22   So the same five doctors are coming in day after day after day,

23   hundreds and hundreds of hydrocodone.

24           What kind of medical practice is that?  They're

25   perfectly aware of that.

1          Additionally, the geography, there are customers in
2     all 50 states.  The doctors and patients are almost never in
3     the same state.  Almost all of the doctors writing these
4     prescriptions are in Florida.  So they're in Florida, and
5     they're writing prescriptions for patients all over the
6     country.
7          Lastly, numbers, numbers, numbers.  Ladies and
8     gentlemen, the numbers are relevant.  The numbers by themselves
9     are so large, they are an important factor.  The numbers in
10    relation to other pharmacies is relevant, and the percentage of
11    CDS to every other kind of drug is relevant.
12         The sheer numbers.  108,000 prescriptions.  9.9
13    million dosage units.  That was their control room.  It's
14    nearly all hydrocodone.  That's their shelves.  The volume that
15    they were doing was so high they had to have pre-filled bottles
16    of all the popular combinations and strengths.
17         There was testimony from Robin Brinegar if that was
18    your task, you could spend all day doing nothing but
19    pre-filling bottles.  Those bottles, you'll have this picture
20    in evidence, each one of these section is marked with a
21    different combination, whether it's acetaminophen or something
22    else mixed, various strength 7.5 and 10 and various quantities.
23         This is an assembly line every day.  One person fills
24    the bottles the day before or in the morning, a tech grabs them
25    off the line, checks the prescription, sticks the shipping

1    label in there, gives it to the pharmacist.  He makes sure the

2    name is right on the label, and the prescription, they stick it

3    in a package, and they send it out the door.  It's nothing more

4    than an assembly line.

5         Hundreds of prescriptions every day.  88 percent of

6    all the prescriptions were hydrocodone.

7         108,000 in 22 months.

8         I'm not sure if you recall this, you probably do,

9    because Agent Rosati testified to it yesterday, this is a room

10   containing -- it's a storage room.  There's a lot of boxes on

11   the right.  These boxes on the left are full of these.  50

12   boxes full of nothing but prescriptions.  And you'll have two

13   boxes as a sample.  That tells you about the numbers that they

14   were dealing with.

15        Now, in addition to this notice that they had,

16   because the numbers are outrageous and the percentages, and the

17   same doctors, there's two days that are worth highlighting,

18   because if there's any sense that these men didn't know, and we

19   know they knew what was going on in their business, these were

20   days that an individual with no training at all would see a

21   clear problem.

22        In two days, the first one is October 5, 2005.  On

23   that day, New Care pharmacists filled 889 hydrocodone

24   prescriptions.  79,000 pills went out the door by Fed Ex that

25   day.  All issued by 10 doctors.  889 prescriptions by 10

1   doctors to patients in 44 states.  How could they not know what

2   was going on?

3            90 of those pills went to Roger Hackett in Tennessee,

4   that's Count 6, was that day, October 5, 2005.

5            The second day is December 19, 2005.  New Care

6   pharmacists filled 471 hydrocodone prescriptions for one

7   doctor, Juan Ibanez.

8            Four people in Alaska, 54 in California, 20 in New

9   York, 25 Illinois.  2 in Wyoming, 9 right here in Maryland.

10  It's almost too obvious to mention, but with this man, they

11  prescriptions, they could not have sufficiently examined those

12  people, not in that day, not in the week before, and not in the

13  month before.

14           Look at Paul Short's charts, it's 89.  And you'll see

15  there's a list in there of all of the top days for all of the

16  doctors.  And you'll see how many days each of these doctors

17  did, 150, 250, 350.  There's a lot of them, every day, every

18  doctor, hundreds and hundreds of prescriptions.

19           There was clearly no doctor/patient relationship.

20  Anyone working in the pharmacy that day and for those 22 months

21  would know it.

22           Now, June Howard from the DEA, this was a long time

23  ago, I think it was about five or six weeks ago, came in and

24  testified to you about ARCOS, and the ARCOS collected data for

25  the purchasing of hydrocodone that they get from all the drug

1    manufacturers, and they find out exact who will they sell it
2    to, compile it in the database called ARCOS.
3         I don't remember what it stands for, but I remember
4    June Howard's testimony, and she put into evidence these
5    charts.  This one is the number of units purchased by New Care
6    on the left versus the state averages and the United States
7    averages.  New Care purchased 10,254,500 units of hydrocodone
8    in 22 months.
9         The average in the United States for any pharmacy was
10   154,000.
11        This shows the top 10 purchasers of hydrocodone in
12   Maryland for the 22-month period in question.  Every licensed
13   pharmacy in Maryland is included in that compilation.  All mail
14   order, all retail, long-term care, every single pharmacy that's
15   licensed in Maryland is in there.  That's the top 10.
16        What did June Howard say?  None of these are mail
17   order.  Defense says they didn't take into consideration all
18   the various types of pharmacy, correct, I don't think included
19   in there is any other rogue Internet pharmacy, but every
20   pharmacy in Maryland, every pharmacy in Maryland, is on that
21   list.  There's no mail order pharmacy on there.  They didn't
22   make it into the top 10.
23        Who's number one?  New Care Home Health Services.
24        Who's number two?  Drug sale.  So you got 10.2
25   million for one and 482,000 for number two.  That means that

1    the number two highest purchasing pharmacy in all of Maryland

2    for that 22-month period purchased less than one-half of one

3    percent of what New Care purchased.  That, ladies and

4    gentlemen, tells you that any pharmacist had to know exactly

5    what was going on.

6          Those numbers are outrageous.

7          So you have all this evidence of knowledge, all these

8    factors that show the defendants clearly knew what was going

9    on.  Add to that one fact.  Remember the testimony of Robin

10   Brinegar?  She explained the process.  She's the only witness

11   that has explained the process from the tech's perspective

12   beginning to end what happened at New Care.  The testimony is

13   completely uncontradicted.

14         The process is she'd get in, and there would be a

15   stack of prescriptions printed out when she got in, sometimes

16   by the defendant, sometimes by other the people, and pharmacy

17   tech's job is data entry.  And they do the shipping label.  And

18   then the tech gets the prescription, puts it in the bottle,

19   puts in the little crate or cart, and ships it down the

20   assembly line to the pharmacist.  The tech signs it.

21         The pharmacist then looks at it, opens up the top,

22   makes sure the drugs look right, makes sure the name on the

23   prescription matches the name on the label, the bottle, puts in

24   the Fed Ex.  Out the door it goes, except before it goes out

25   the door, the pharmacist then signs.

1           Robin Brinegar testified that from her role, once she

2    got it, or actually before her no pharmacists were involved.

3    It was data entry clerks and pharmacy techs.  So there's no

4    professional discretion going on here at all until the

5    pharmacist.  She then gives to it pharmacist.

6           She was asked, well, in the 22 months or however, how

7    long you've worked at New Care the whole time that they were

8    doing Internet work, did any pharmacist ever in taking a

9    prescription from a tech that you know of say no, refuse not

10   send out a prescription?  Her answer, no.

11          Not Sodipo, Mr. Nwaehiri, not Hartwill.  There's no

12   professional judgment going on here.  Not one time did any

13   pharmacist at New Care say no to any of these narcotics

14   prescriptions.

15          Put the top on the bottle, put it in the bag, went

16   out the door.

17          The evidence of the defendant's knowledge is simply

18   overwhelming.

19          They had actual knowledge that these -- that this

20   website was nothing but a sham, that there was no

21   doctor/patient relationship, that there was no diagnosis.  The

22   defendants were filling thousands of narcotics with knowledge

23   that the doctors were handing out these prescription narcotics

24   willy-nilly.  Clearly, outside the scope of professional

25   practice.

```
 1              Your Honor, I'm prepared to continue, but if you want
 2    to do a break, this would be a good time.
 3              THE COURT:  How much more do you have left in your
 4    opening, sir?
 5              MR. BUDLOW:  40 minutes.
 6              THE COURT:  40?  Good.  Now might be a good time to
 7    take a recess.
 8              Ladies and gentlemen, it's five minutes after.  Let's
 9    take a break then until 11:15, and then we'll come back for the
10    conclusion of Mr. Budlow's closing argument.
11              (Recess.)
12              THE COURT:  Please be seated, unless you wish to
13    stand for the jury.
14              (Pause.)
15              MR. RAVENELL:  Your Honor, what's the schedule?
16    We'll be breaking for lunch at one?  Or I don't know what time.
17              THE COURT:  Mr. Ravenell, Pete's not here, but my
18    understanding is the lunch will be ready for the jurors at
19    1:00, so I was planning to break from 1 to 1:30 to let them
20    eat.  But it's possible that it might be here a little bit
21    earlier like 12:30 or so, but I'm Mr. Budlow's going to be
22    finished I think around noon.
23              MR. BUDLOW:  Correct.
24              THE COURT:  Now, if it's here at noon, they could eat
25    at noon so they'll have that out of the way before you begin.
```

1              MR. RAVENELL:  That probably would be the best thing

2       if we could do that.

3              THE COURT:  I'll check with Mr. Thompson.

4              (Jury present)

5              THE CLERK:  Jurors all present.

6              THE COURT:  Mr. Thompson, Thank you.  Welcome back,

7       ladies and gentlemen.  Please be seated.

8              Mr. Budlow, whenever you're ready to resume.

9              MR. BUDLOW:  Thank you again, Your Honor.  I'm glad

10      we took the break when we did, because now we get to the

11      financial and tax counts.  I'm going to read back to you

12      everything that Judge Legg just read to you earlier.  No, I'm

13      not.

14             What we have are these tax counts and financial

15      counts.  Again, these are the ones that I told you earlier

16      relate to Count 1 and Counts 2 through 7.  They hinge on the

17      drug charges.  So once you've concluded that the evidence is

18      sufficient relating to the drug charges, you move on to Counts

19      8, 9, 10 and 11.  Counts 12 and 13, which we'll get to, stand

20      independently.

21             Count 8 is conspiracy to launder money.  Now, the

22      first thing you need to decide is whether or not there's been a

23      conspiracy to do it, and I'm not going to go through what a

24      conspiracy is again, but the same analysis would apply in this

25      conspiracy count as in the first.  I'll just show you the

1    elements, and then I'm going to try to summarize them for you
2    in an easier way.
3          The first element is that the defendant conducted or
4    attempted to conduct a financial transaction with proceeds of
5    Count 1, conspiracy to distribute.
6          The second element is they knew, the defendants knew,
7    the money was proceeds of unlawful activity.  And the third
8    element is that the defendants acted with the intent to promote
9    or disguise.
10          At its core, money laundering is much simpler than it
11    sounds.  Essentially, all that is required is first a
12    conspiracy between the defendants to take the money that's
13    derived from the illegal Internet activity and to continue the
14    Internet operation.  That's promoting, an agreement to take the
15    illegally derived money and promote the business.  That's all
16    money laundering is.
17          Now, the second prong, there's another way of doing
18    the same thing, an agreement to take the money that's illegally
19    derived from the Internet business, and disguise the true
20    ownership or control.
21          As you'll see in this case, both of those elements,
22    both prongs independently have been proven.
23           Element number one is satisfied simply by withdrawal
24    or deposit from a financial institution relating to money in
25    account one, take money out of a federally insured financial

1    institution by way of check, withdrawal, deposit, anything that

2    satisfies element number 1.

3         The second element is that the defendants knew the

4    money, the proceeds of the unlawful activity -- I'm not going

5    to repeat all of the evidence of knowledge, but it is

6    essentially the same.  They are guilty of Count 1.  They're

7    guilty of distribution.  They know that the money from the

8    Internet companies is going directly into account 1, and so

9    they know that those proceeds, that those -- that money is

10   dirty money, and they take that money and do anything with it.

11   They know the source of the money.  Element number two is

12   satisfied.

13        The last element as I told you intent to either

14   promote or disguise.  Here both have been satisfied.

15        Let's talk about whether or not the defendants

16   intended to promote the continuing of the illegal Internet

17   operation.  If they were, then --  this chart didn't show up

18   quite as well as I hoped.  You might remember this chart

19   introduced showing bank account number one and what percentage

20   of bank account number one is dirty money, or money from the

21   Internet sources.

22        You can see, if you look at the bottom of the screen

23   under 2005, in 2005, 45 percent of the money in account number

24   one was dirty money, money from the illegal proceeds of the

25   Internet activity.

1          Now, as time moves on, this account becomes dirtier

2     and dirtier.  The numbers grow and the percentage changes as

3     well, and in 2006, 83 percent of all of the funds that go into

4     account number one are dirty.

5          So now we've got dirty money in the account.  The

6     question is what did they do with it?  In what way did they

7     promote the activity?  This is a very complicated looking chart

8     that summarizes a lot of accounts, but we can use it in a way

9     to show you what is going on here.  You do remember account

10    number two is right here.  Account number two, this is the

11    account that was used to purchase drugs from McKesson, Cardinal

12    Health, and the various ANDA companies.  This is the money, the

13    money went into this account and was used to purchase

14    hydrocodone.  So it started over here with the Internet

15    sources, dirty money is deposited into the account.

16         It's now 83 percent, or 47 percent, depending on what

17    timeframe it is, in the bank account.  Then this money is

18    disbursed to all these various places.  It is dispersed right

19    here, into account number two.  Account number 2 is then used

20    to buy drugs.  Those drugs are sold.  They get $20 per

21    prescription.  They get a wire transfer from IHE.  It goes back

22    into account number one.  It goes back into account number two.

23         They buy more hydrocodone.  They're promoting the

24    continuation of the illegal Internet enterprise.  That is that

25    prong, that prong has been satisfied.  That's promotion.

1          They've also used this money.  They've also concealed
2     the funds from account number one.
3          They hid the ownership, and they hid the control of
4     the money.  And they did this by establishing bogus business
5     accounts they used as their personal piggy banks so they could
6     avoid paying taxes.  So this concealment also is relevant to
7     the tax count that we'll get to, but for the purposes of the
8     money laundering account, if they're hiding the control and
9     ownership of this money, then they have satisfied the second
10    prong of concealment.
11          Remember they established accounts that we have
12    called six, seven, and eight.  They've given them fancy
13    corporate names, and they've used them as their personal
14    piggybank.  These are the subjects, again, of the tax accounts.
15    By setting up these personal accounts under the names of
16    business and setting them as corporate accounts in the account
17    setup, the defendants were hiding the true ownership and the
18    true control of that money.
19          The dirty money went from account one into account
20    six.  So account one from the earlier chart 88,000 goes right
21    into account six.
22          These accounts were used for personal expenses, which
23    we'll get to in the tax count.  What that tells you is that the
24    name of the account isn't Callixtus Nwaehiri.  This is the name
25    we gave it as a result of the overwhelming evidence that it's

1    personal expenses.

2         The name of the account is New Care Home Health

3    Services, Inc.  And you have the records from the account.

4    It's a corporate account.  There's no corporate activity going

5    on in that account.  Dirty money was going into the account,

6    and it gets spent on Callixtus Nwaehiri's personal expenses,

7    friends and family that's concealing the true nature of the

8    ownership and control of the account so as to avoid paying

9    taxes.

10        Account number seven is the New Care Home Health

11   Services account, at Bank of America.  Nwaehiri's was at First

12   Mariner.  Same exact analysis.  Dirty money goes into account

13   seven.  Account seven is in a corporate name, not in Steven

14   Sodipo's name.  It's done that way to hide the true ownership

15   and control of that account.  The controller of the account,

16   the true owner of the account, is Steven Sodipo.  The person

17   that controls who gets that money is Steven Sodipo, and that's

18   proven out by all of the expenses.

19        And account eight, again, is controlled by Steven

20   Sodipo.  This is an account we have termed the Dawnette Sodipo

21   account.  This account, again, money from -- dirty money from

22   account one, $88,000 goes to -- 79 of it checks payable to

23   Dawnette Sodipo.  This was just a ruse.  This was a way to get

24   more income.  So it's clearly -- and we'll get to the tax count

25   later, but in creating this tax crime, avoiding paying taxes,

1    they've set up an account under a false name as a corporate

2    account, to receive money, dirty money, to pay Steven Sodipo's

3    wife.  That's concealment.

4            And, therefore, the defendants are guilty of

5    conspiracy to launder money.  Because they've taken this dirty

6    money, they've known it was dirty, and they've used it to

7    promote their business, and they've concealed it to give

8    themselves added income.

9            One down, four to go.  Illegal monetary transactions.

10   There's five elements, and I'm just going to put those up for

11   you now.  The defendant engaged in a transaction affecting

12   commerce.  It involved criminally-derived proceeds of over

13   $10,000.  The money was from specified unlawful activity.  The

14   defendant knew the proceeds were from a criminal offense.  And

15   they occurred in the United States.

16           Once again, count, element number one, a cleared

17   check is a financial transaction.  If the bank is FDIC insured,

18   it has affected interstate commerce.  Those are the

19   instructions.  That's the evidence in the case.  There's

20   clearly checks, which we'll get to, and all the banks are FDIC

21   insured.

22           Second element, $10,000 of the transaction must be

23   criminally-derived proceeds.  We'll get to that in a minute

24   when we look at the checks.  Specified unlawful activity,

25   conspiracy to distribute narcotics, you've been instructed that

1    is a specified unlawful activity.

2         The knowledge count, element number four, again goes

3    back to the knowledge that we just discussed earlier in the

4    conspiracy to distribute.  And, of course, that it occurred in

5    the United States is pretty simple.  Basically, once you agree

6    that the defendants were guilty of Counts 1 through 7, all you

7    need to find here is that the transactions were from an FDIC

8    insured bank, they involved at least $10,000 of illegal

9    proceeds, and the defendants knew it.

10        The purpose of the check is irrelevant.  It makes no

11   difference why they wrote the check.  There's no intent to

12   deceive.  There's no intent to further the business.  There's

13   no requirement that they intended anything.  They could have

14   written this check and given it to charity.  They could have

15   given it to a friend, written it to themselves, or put it in

16   their own accounts.  It doesn't make any difference.  It is the

17   act of spending $10,000 of dirty money, that is the crime.  The

18   crime is the act of spending $10,000 of dirty money.

19        Now, let's look at the individual checks that make up

20   these accounts.  Count 9 charges Mr. Nwaehiri on January 3,

21   2006, with a deposit of the check in the amount of $25,000.

22        There's the check, it's a $25,000 check from an FDIC

23   insured bank.  It was negotiated.  And remember this is 2006,

24   and in 2006, 83 percent of the proceeds of account number one,

25   which this check came out of, was dirty money.

1          25,000 times 83 percent is 20,000.  That's greater

2     than $10,000.  That's the guilt of Mr. Nwaehiri during this

3     offense.

4          The next count relates to a check that Steven Sodipo

5     wrote or negotiated on January 28, 2006.  He deposited a check,

6     again from account one, in the amount of $20,000.  There's the

7     check.  It's in evidence.  From an FDIC bank.  And 83 percent

8     of $20,000 is $16,600, which is again more than $10,000.

9          And finally, Count 11, Steven Sodipo, on April 26,

10    2006, deposited a check in the amount of $54,000.  There's the

11    check, which is in evidence. 54,000 times 83 percent is a lot

12    more than $10,000.

13         That's all that is required to convict the defendants

14    of committing illegal monetary transactions.  Dirty money,

15    check over $10,000 from these accounts.

16         Now, the really fun stuff.  Tax count.

17         This is -- we need to separate this count for two

18    reasons.  One, it does not require any guilt.  It's not related

19    directly to the drug charges.  But, secondly, this is the only

20    charge in the indictment where the defendant's honest belief is

21    a defense.  If the defendants honestly believed that they did

22    not have to report the funds in their personal accounts six and

23    seven as we discussed earlier, then they're not guilty.

24         They are charged in this count with cheating on their

25    taxes.  They created the scheme.  They created these bank

1    accounts in corporate names to funnel thousands of dollars of

2    income to bogus business accounts in order to avoid paying

3    taxes.

4         Now, back to this honest belief.  There's no evidence

5    in this case that the defendants held an honest belief that

6    they didn't need to pay taxes.  In fact, the evidence is clear

7    that these accounts were used by the defendants for personal

8    expenses and that they disguised these accounts as corporate

9    accounts, and they did it to avoid paying taxes.

10        At issue in these counts are the defendants' 2005 tax

11   returns.  On both of the defendants 2005 tax returns, they both

12   reported wages of zero. Neither reported any of the funds from

13   accounts six and seven.  None of the funds that -- none of the

14   dirty money that went from account one into six and seven or

15   eight for that matter that were for the personal use and

16   control of Mr. Nwaehiri and Mr. Sodipo were reported in any way

17   in those tax returns.

18        Look at the elements of false tax return.  One, the

19   defendant filed a tax return.  Two, that it was under the

20   penalty of perjury.  Three, that the defendant did not believe

21   the return was entirely correct and true.  And, four, that it

22   was done willfully.

23        The first two elements are satisfied because the IRS

24   received the returns and because the returns were filed, and

25   because the defendants both signed under the penalties of

1    perjury.  So the first two elements are satisfied.

2            And you have in evidence exhibits 85 and 86, which

3    are the returns.

4            Steven Sodipo signed his return on anyone 17th, 2006.

5    And Callixtus Nwaehiri signed his return both under the penalty

6    of perjury on June second, 2006.

7            The certified IRS returns establish that the returns

8    were filed.  So elements one and two are met right off the bat.

9    So you must next decide if the defendants made a willful false

10   statement on their returns when they said they had zero income

11   for 2005.  The false statement is that the defendants did not

12   list any of the income from their piggybanks.

13           Going back to these charts, look at how the money was

14   used.  I want to remind you, I'm going to read this part.

15   Actually, I'm going to read you one of the judge's instructions

16   verbatim.

17           The system of tax collection in the United States

18   relies upon the honesty of taxpayers.  The government needs

19   taxpayers to report timely, completely, and honestly all taxes

20   they owe so that it can collect the taxes due.

21           Congress, therefore, has made it a criminal offense

22   for a taxpayer to evade taxes to file false return or file no

23   return.

24           Ladies and gentlemen, the defendants were not honest

25   in filing their taxes.  They were the opposite of honest.  They

1    were tax cheats.  They didn't report all of their income.  They

2    set up these accounts under the guise of a corporate account

3    and proceeded to use the accounts for their personal use,

4    regardless, I mean, on a regular basis, and as a supplement for

5    their income.

6            This is a hefty supplement.  Over $50,000 in one year

7    each of tax-free money they tried to do.  That's a serious

8    supplement.

9            Ladies and gentlemen, the evidence established

10   clearly that the defendants cheated on their taxes.  They

11   didn't report their taxes.  They essentially stole from the

12   U.S. government, and they are guilty of filing a false tax

13   return.

14           I want to address a couple of the points that have

15   come up during the trial from the defense.  The first thing I

16   want to talk about are these rejections.  The defense says look

17   at the government's exhibit and look at our version of the

18   government's exhibit that says 5,000 prescriptions we declined

19   because some data entry clerk noticed that they were issued too

20   early.  They say this is evidence of due diligence.  That

21   argument just doesn't make any sense.

22           These men are pharmacists.  They know the rules.

23   They know they can't fill prescriptions early, and they know

24   that anyone looking at their records, any kind of audit would

25   clearly review early prescriptions.  They can't keep making all

1   of that money if they're filling prescriptions early on a

2   regular basis.  They have to at least keep up the pretense of

3   some legitimacy.  So they followed one rule some of the times.

4   But they didn't follow the most important rule.

5          Ladies and gentlemen, the defendants in using this

6   due diligence argument relating to the rejection are nothing

7   more than wolves in sheep's clothing.  Sheep's clothing is

8   their pharmacy license, their big building, their conference

9   room, their entertaining of foreign diplomats, following only

10  the rules they choose to follow such as early refills.

11         The truth is, for 22 months, in 2005 and 2006, they

12  were nothing more than drug dealers dressed up in pharmacists'

13  clothing.

14         And then they called an expert, they reached down to

15  Hoover, Alabama, came up with a pharmacist Professor Roger D.

16  Lander, Pharm, MD.  The first thing is, according to Mr.

17  Lander, nobody has done anything wrong in this case.

18         Forget about his views on the doctor/patient

19  relationship.  Forget about the fact that he doesn't subscribe

20  to anything the AMA says.  Forget about the fact he's smarter

21  than all the doctors.  Professor Lander says nobody did

22  anything wrong.

23         In Professor Lander's world, prescription

24  drugplanet.com and doctorscrips.com would still be up and

25  running.  Dr. Ibanez and Dratler all the other web doctors,

1   they'd be sitting poolside in sunny Florida with laptops

2   diagnosing patients while sipping little drinks with umbrellas

3   in them.   That's Dr. Lander's world, according to Professor

4   Lander, the public, real people, like Doug Chorpenning,

5   Jennifer Koch, they should still be able to legally feed their

6   hunger for hydrocodone by logging on to their home computers

7   and saying their back hurts.   That's the expert they paid to

8   give testimony.

9           Now, Professor Lander came in here, and he denied

10  even the most obvious red flags.   I'm not going to go through

11  all of them.   He actually admitted a few as well.   But against

12  all reason, he denied the obvious.   Take, for example, the

13  suspicious certification at the bottom of the prescription.

14  This man, in his 28 years of experience as a pharmacist and a

15  researcher, an educator, has never once seen a certification

16  like that, never seen anything like it.   Even the strange and

17  clearly suspicious certification, in light of all of the

18  evidence in this case, did not give him any concern.   Even

19  though the doctor can't even write a prescription without a

20  doctor/patient relationship.

21          It would be like me coming in here every day and

22  saying to you, good morning, my name's Paul Budlow, and I

23  passed the bar exam.   Now, if I said that to you every day, at

24  some point, wouldn't somebody say, that guy's real a lawyer?

25  No.   Probably maybe some of you said that already, but wouldn't

1   it be worse if I got in front of you every day and say I passed

2   the bar exam, of course, it would be highly suspicious.  Red

3   flags would be jumping out all over this courtroom.  It's not

4   normal behavior.  It doesn't make sense for a doctor to put a

5   certification of something that is legally required.

6          But not Professor Lander Pharm D.  To him, it's not a

7   red flag at all.  In fact, he says it adds to the existence of

8   the doctor/patient relationship.  He says it's a good thing,

9   maybe we should all do it.

10          So if it's not a red flag, what is it, a green flag?

11   Is it a Green flag that there's this suspicious unusual never

12   seen before certification at the bottom of a prescription

13   that's redundant and superfluous?

14          Ladies and gentlemen, it was at that moment doctor --

15   in Professor Lander's testimony, where it became obvious that

16   he had gone from maybe a misguided and somewhat nonsensical

17   witness to just a full-fledged member of the defense team.

18   That man's testimony was outrageous.

19          Now, keep in mind, Professor Lander's role here was

20   to give opinions.  And the fact is he tried to find facts for

21   you, and you should not let that happen.  That's your exclusive

22   job.

23          Professor Lander attempted to say otherwise.  He

24   attempted to say the defendants had reason to believe there was

25   a pain clinic.  There's no evidence in this case of a pain

 1    clinic.  There's no evidence of a pain clinic.  And more

 2    important, there's no evidence that the defendants believed

 3    that there was a pain clinic.

 4          You sat here through six, seven weeks of testimony,

 5    not one single witness said there was a pain clinic or even

 6    that somebody thought there was a pain clinic.

 7          Adam Kaps didn't mention a pain clinic.  He only knew

 8    all about the website operation.  He said IHE was not a pain

 9    clinic.  The contract between IHE and New Care does not contain

10    any mention of a pain clinic.  Recorded calls with Dr. Juan

11    issue, defending his illegal problems, he doesn't mention a

12    pain clinic.

13          New Care employees testified for both the government

14    and the defense.  Nobody mentioned anything about a pain

15    clinic.

16          Professor Lander's entire premises from which he

17    bases so much of his opinion is ridiculous, it's false, and

18    it's not supported in any way by the evidence.

19          He would like you to believe that a pain clinic, even

20    if there was one in this case, would write hydrocodone

21    preparation for 90 percent of all patients.  He would like you

22    to believe that the defendants believed there was one.  Both of

23    those concepts are contrary to the evidence and complete

24    fabrications.

25          Keep in mind even the professor said to you, if the

1    defendants did not believe there was a pain clinic, then the

2    fact that 88 percent of Internet prescriptions were for

3    hydrocodone was a red flag that the prescriptions were invalid.

4    Even he said that.

5           One final point on the pain clinic issue.  Keeping in

6    mind Roger Lander said pain clinic.  He said well, maybe I

7    meant pain management, but when it was showed what he reviewed,

8    what he reviewed said pain clinic.  So he couldn't have meant

9    pain management.

10          Ask yourselves these questions, what kind of pain

11   clinic has doctors?  One in Florida, Ohio, Georgia, what kind

12   of pain clinic serves patients in 50 states?

13          What kind of pain clinic won't let the pharmacists

14   talk to the prescribing doctor?

15          What kind of pain clinic only prescribes narcotics?

16   What kind of pain clinic only prescribes one particular

17   narcotic, hydrocodone?

18          And what kind of pain clinic is there where every

19   patient gets 90 pills of the highest strength hydrocodone and

20   gets three refills?

21          Every patient, no pain clinic anywhere meets that

22   description. That description is only one thing.  That's a pill

23   mill.

24          It's a place where anyone can get narcotics, as long

25   as they have a valid credit card.

1            Then the defense, after calling Professor Lander,

2     decides that their defense is the pound sign.  We're going to

3     talk about why the pound sign is nonsensical and proven to be

4     100 percent false.  The most obvious is just we'll look at the

5     ARCOS numbers.  And remember June Howard says New Care

6     purchased 10,255,500 pills of hydrocodone.  The New Care

7     computers, we put in, assuming every prescription was filled,

8     showed 9.9 million hydrocodone tablets.  The difference is

9     about 320,000.

10            So one would expect if you go into New Care at the

11     end of this, you'd find about 320,000 pills of hydrocodone.

12     Agent Don Tush said they recovered 350,000 tablets of

13     hydrocodone.  That's a statistical match.  Out of 10 million.

14     That's exactly what one would expect.

15            If the prescriptions that the defense is now claiming

16     have pound signs didn't go out the door, that means when Agent

17     Tush went there, there should have been in excess of 4 million

18     tablets of hydrocodone.

19            If they're still going forward with that defense,

20     where are those 4 million tablets of hydrocodone?

21            Ladies and gentlemen, all of the data adds up

22     perfectly.  The defendants filled all of those prescriptions,

23     and they all went out the door.  Did one or two come back as a

24     return?  Of course.  But we're talking about 10 million pills.

25            Then they get into the computer program.  The SQ 1,

1    the way the pound sign works, ladies and gentlemen, this

2    defense, they've tried to perpetrate a fraud on you.  They

3    produced a witness to say, witnesses to say, hey, look, there's

4    a symbol here.  It's inactive.  Let's tell them that the

5    meaning is that the prescription never went out.

6            Preston Hale, of QS 1 told you the pound signs mean

7    don't fill it again.  And he also told you that the last day

8    filled means date filled, and that the defense has been caught.

9            Now, then we have the uncontradicted testimony of

10   Agent Rosati, who in a week was able to pull together five

11   binders of evidence that prove two things.  Those prescriptions

12   were filled, and they were signed prescriptions equals

13   dispensed.

14           Remember Robin Brinegar's testimony.  You see the

15   signature data's been done.  Prescription's in the bottle,

16   Fed-Exed out the door.  Signature means gone.  All of those

17   went out the door, according to New Care procedures.

18           The defendants invoiced for these pound sign

19   prescriptions.

20           Despite only a week and hundreds of boxes, Agent

21   Rosati was able to establish that 90 percent of those pound

22   signs were either filled or billed or both.

23           And then, of course, there's Paul Short, who has been

24   the most significant visitor to this courtroom other than

25   participants and yourselves.  He testified three times.  He

1    testified about the shipments, ladies and gentlemen, that's the

2    gold standard here.

3              Other than a urine test on 26,000 patients, how would

4    we know 100 percent that those prescriptions went there?

5    Shipping records, Fed Ex shipping records.

6              And how many of the pound signs did they introduce

7    into evidence fed Ex records say were shipped?  They'll

8    challenge the Fed Ex records.  They'll say you can't trust a

9    spread sheet.  99 percent of Fed Ex business records of those

10   pound signs were shipped.

11             The prescription was entered as filled in the

12   computer.  It was filled, it was billed, and it was shipped to

13   the customer.  So much for the pound sign defense.

14             I do want to you think a little bit about the pound

15   sign defense, though, when you reflect upon what Mr. Ravenell

16   said to you in his opening statement.  He told you that the

17   government hopes to prejudice you, and that the government will

18   attempt to mislead you.

19             Ladies and gentlemen, it's your job to judge the

20   facts and apply them to the law.  The government's job is to

21   present the facts to you in a clear and fair way.  We've done

22   that.

23             This case comes down to knowing.  Did these two men

24   know the prescriptions that they were filling for 22 months

25   were invalid?  Of course, they did.

1          When a pharmacist is filling thousands of

2     prescriptions for patients all over the United States, being

3     issued by the same doctor, that pharmacist has noticed that the

4     doctor/patient relationship does not exist.

5          And there's a corresponding criminal responsibility

6     for filling those prescriptions.  These men were licensed

7     pharmacists.  They had specialized knowledge, specialized

8     license, and specialized responsibility.  In reality, they

9     acted as large-scale drug pushers, not as pharmacists.

10         And I've said to you, and you've seen throughout this

11    trial, the case boils down to knowledge.  For the past seven

12    weeks, the past two hours, the evidence in this case has

13    literally overflowed with evidence that Steven Sodipo and

14    Callixtus Nwaehiri knew that these prescriptions were invalid,

15    and they simply didn't care as long as that $20 per

16    prescription kept coming in.

17         In evaluating the evidence in this case, ask

18    yourselves this question, were Steven Sodipo and Callixtus

19    Nwaehiri, were they pharmacists?  Were they pharmacists whose

20    responsibility and professional obligation is to consider the

21    welfare of others as their primary concern?  Or were they

22    businessmen trying to make money through the sale of narcotics

23    on the Internet?

24         Now, I will tell you it's possible to be both a

25    pharmacist an businessman.  Pharmacists are entitled to make a

1     living.  They're entitled to make a profit.

2            And they're entitled to use their license and

3     profession to make that profit if it's done legitimately, but

4     they must be pharmacists first.  They must act as pharmacists,

5     and they must abide by the law and their professional

6     responsibilities.  These two defendants abandoned their

7     professional responsibilities, and they abandoned their

8     profession.

9            They considered not the welfare of humanity, but the

10    welfare of themselves.  And for that, they are guilty of all

11    the crimes charged.  Thank you.

12           THE COURT:  Thank you, Mr. Budlow.

13           Ladies and gentlemen, it's 10 minutes of 12.  We'll

14    take a 10-minute recess to allow Mr. Ravenell time to set up,

15    and then we'll come back for the beginning of Mr. Ravenell's

16    closing argument.  So let's break, then, until noon.

17           (Recess.)

18           THE COURT:  Please be seated, unless you wish to

19    stand for the jury.

20           (Pause.)

21           MS. SMITH:  Excuse me, Your Honor.  Has the Court put

22    together a verdict sheet yet?  Are we still waiting on that?

23           THE COURT:  I thought we had.

24           THE CLERK:  We have one.

25           (Pause.)

```
 1              (Jury present)

 2              THE CLERK:  Jurors all present.

 3              THE COURT:  Thank you, Mr. Thompson.

 4              Please be seated.  Mr. Ravenell, whenever you're

 5    ready to begin.

 6              MR. RAVENELL:  Thank you, Your Honor.

 7              Good afternoon.

 8              THE JURY:  Good afternoon.

 9              MR. RAVENELL:  See how we do now, we're getting

10    better and better, after a while.  I must tell you that it's a

11    pleasure to be able to stand before you and actually talk to

12    you this afternoon.

13              Mr. Budlow and I won't agree on many things during

14    this trial, as can you tell from sitting here for the last

15    several weeks or so, and that's to be expected.  We're both

16    adversaries, and we both have people to represent.

17              Now, one thing we will agree upon is that that we

18    thank you all.  You started this process, I think Mr. Budlow

19    said seven weeks ago, and went through the whole process, and

20    we talked about this in opening statement of selecting, you

21    know, the chosen few.  You may say, chosen, all right.  But

22    you're here, and you showed up every day.  Not always easy.

23              I just finished a trial that lasted seven months, so

24    understand this is not as long as some.  And Miss Smith has

25    done many long trials as well.
```

1          So what we have is that when we select people to come
2     in and sit, all we can ask during the entire trial is that you
3     be fair, that you listen to all the evidence, and that you
4     render a fair verdict.
5          Now, I asked you in that opening statement, I'm still
6     asking you that now, I think if you do that, you do justice,
7     that you will find these men not guilty of the crimes charged,
8     you'll be convinced the evidence shows you that.  And we're
9     going to talk about that in some detail.
10         Now, it's difficult, we've been together for seven
11    weeks, and we see each other in the hallway.  We can't talk to
12    each other and openly interact.  When I get up in the afternoon
13    or morning or first time say good morning and good afternoon
14    and you all respond, I appreciate that, because it will be very
15    bad if I said good morning and everyone just looked at me and I
16    got no response.  So I appreciate that is absolutely kind and
17    human and decent.
18         But in this situation, this very serious of cases,
19    can't be more serious for these two men, who are men who are
20    middle-aged now, 50 and 51 years old, who have, you know,
21    impeccable backgrounds, who sit before you as jurors, people
22    they don't know.
23         I think the Court may have mentioned earlier that,
24    you know, in old days, so to speak, when you had jurors, you
25    had people who knew you, and you called the people from the

1    community who knew you, and of course, you know, it's a smaller

2    community in many ways, but the people who sat on the jury were

3    the people who knew you.  They knew John Brown.  They knew Jim

4    Bob, and they sat, and they knew everything about those people.

5    And then they made a decision, and they sat in the court of

6    law.  They made a decision about guilt or innocence, and they

7    made it not just on what they heard in the courtroom, because

8    they brought with them what they knew about the people who they

9    walked in the courtroom.

10           And Mr. Budlow talked to you about common sense.

11   I want you to use that.  But common sense also tells you that

12   it's very difficult to get to know people in a short period of

13   time.  And that's why in this case it was important for us when

14   we presented a case to you to present people who knew and know

15   these men, and that's what counts.

16           And one of the things we tend to do when we consider

17   and decide whether someone has committed a crime, whether

18   someone would commit a crime, is who that person is, the fiber

19   of that person, the background of that person.

20           As I said, in the old days, you would kind of know

21   that already.  But because that's way things are, and in this

22   society, our society, we don't know people that you judge.  You

23   know snippets of those people, and you know what you hear from

24   the prosecution and what you may hear from the defense.

25   And then you have to take that information and go back into a

1    jury room and look at these crimes, look at these charges, look

2    at everything, and then make a decision on whether these men

3    committed the crimes that have been charged.

4            And one of the things that I want you to take back in

5    to that jury room with you is that you don't know these people,

6    but others do.  And others who have known them for many years

7    told you about them.  Many of them sit in the courtroom today

8    still concerned because they know these men.

9            And that is evidence that you have when you go back,

10   and you decide, you know, whether you are going to find these

11   men guilty of the crimes charged, because it's not just about

12   knowledge.  It's whether the government has proven that these

13   men committed a crime, and all the aspects that the Court has

14   told you about, and all the instructions the Court has told you

15   about you must consider.

16           And I listened to Mr. Budlow's closing, and he said

17   to you something that I found shocking, but it's up to you.

18   And he says these men were just wolves in sheep clothing, that

19   they were drug dealers, and the evidence will show that they

20   were drug dealers.

21           And I think the evidence shows differently.  But when

22   you consider whether these men were the drug dealers and, as

23   Mr. Budlow said, they didn't care, you will ask yourself

24   whether the evidence that you've heard in this courtroom

25   suggests to you that Callixtus Nwaehiri, who spent five years

1     in the seminary, Steven Sodipo, who worked diligently, these

2     men started a business back in 1993 that had nothing to do with

3     the Internet.  Not anything to do with Internet.  They started

4     it from scratch.  They worked hard.  Down on Madison street,

5     bought a building, this huge building that you saw, the nice

6     homes that they live in, bought, not through the Internet.  The

7     building you heard about that was so large, purchased before

8     they were involved in the Internet business.

9          What did they do as pharmacists even before they

10    became involved in Internet business?  What did they do?  These

11    men took care of patients.  They prescribed.  They filled

12    prescriptions for many patients over many years, and they did

13    it without ever being before a court of law.

14          Why?  Because they do care.

15          Now, what's interesting about this is that the

16    government would have you believe that they selectively didn't

17    care.  What do I mean by that?  They didn't care about the

18    patients.  They didn't care.  They made a selection.  They made

19    a decision that we are not going to care about those people.

20    We're not going to care about Chorpenning and Koch.  Of course,

21    they had no clue who Chorpenning and Koch were.  They didn't

22    need Chorpenning and Koch.  But they didn't care about those

23    people.

24          But somehow they cared about the nursing home

25    patients that they prescribed, filled prescriptions for every

1    month.

2         They cared about the long term-care patients.  They

3    cared about every other patient they took care of.  But they

4    made a decision, we won't care about these people, who were in

5    fact had prescriptions that were coming via the Internet.  So

6    the defendants made a decision, according to Mr. Budlow, that

7    they were going -- they didn't care they would get that $20 no

8    matter what.  They didn't care.  They're going to get the $20.

9         It belies the facts that these men cared only about

10   the $20 in this situation and did not care anything about the

11   people who were in fact receiving the medication, but, yet,

12   they would care about all the people who received medication

13   for all the years and throughout the same time for the patients

14   that they were in fact sending prescriptions to Internet every

15   day, excuse me, for the long-term care and nursing homes.

16        They cared about the employees.  You heard about how

17   this was a well-run business, multi-faceted business,

18   individuals who the employees in fact testified that this was

19   like a family, close-knit family.  It doesn't mean that at all

20   times everyone in the family gets along.  It happens in your

21   family and happens in mine, I'm sure, that people don't always

22   get along.  But overall, this is a close-knit business where

23   they cared about the people who worked for them as well.

24        But some reason, according to the government, while

25   they were making money before, that there was a time where they

1    decided we don't care about these people, and we'll do whatever

2    is necessary.

3              Character counts.

4              Background counts.  What individuals do in their

5    lives before they walked into this courtroom counts.

6              And you should consider that and consider the

7    evidence as well.

8               Another part of the case when I spoke to you in

9    opening statement we're talking about an area that is evolving

10   area of medicine, use of the Internet to fill medications, fill

11   prescriptions.  We're talking about an area that is changing,

12   that it's changing right before the very eyes of those at the

13   DEA, the drug distributors, the pharmacists, the doctors, and

14   there's nothing wrong about this evolving area of medicine.

15             There's nothing wrong about the use of an Internet in

16   having prescriptions filled and doctors in fact treating

17   patients.

18             What I want to do with you today is to kind of take

19   you back through some of the testimony in this case.  Now,

20   remember that there's been, you know, seven weeks or so, I know

21   a lot of you took notes, some didn't take notes, but one of the

22   things that I find helpful when we're talking to you about all

23   the witnesses that have come forth is to kind of tell you about

24   what the witnesses said before we talk about some of these

25   alleged red flags and this knowledge issue.  We'll talk about

1    it, we will.

2          I want to talk to you about what the witnesses have

3    said and kind of give you a refresher course, what I want to

4    do, why I did that is, this young lady, the stenographer, Miss

5    Sovich, takes everything down, and she gets it verbatim.  Like

6    what the witnesses are saying, you know, I kind of take my

7    notes, check your notes and trying to listen, and it's not

8    easy.  I asked her to prepare transcripts of some of the

9    witnesses' testimony so that there is no doubt over what they

10   said and it's not just what Mr. Ravenell said they said or Mr.

11   Budlow or Miss Smith, but to kind of take you through what I am

12   going to do with some of these witnesses is kind of go through

13   some of their testimony and talk about their testimony.

14          But what will aid me, and you'll see when I go

15   through the slide show, I'll have page numbers, and tell you

16   what page of the transcripts the information came from, because

17   I want you to be sure I'm giving you the information

18   accurately.  And that you can rely upon it, because it's

19   accurate.

20          But as always, it would be how you recall the

21   testimony that controls.  I think this will be helpful for you.

22          Now, the other thing that is also always kind of

23   interested in doing in closing argument is that we stand before

24   you for an hour, two hours.  We talked, you know, kind of

25   talked.  Action.  It's kind of the way that we interact in real

1    life.  It would be great if I could speak to you and say, hey,

2    Mr. Ravenell, what about this point and then I could answer.  I

3    would love that.  That's not the way our system works.

4         But I want to try to talk to you and not at you, and

5    I hope that you will kind of let me talk to you, and not at

6    you, because I think if you just open up to that and kind of

7    share this, it will be a better experience for you, better

8    experience for me, and hopefully will get us to where we need

9    to be.

10        Now, what I am going to do is take you through some

11   of the testimony.  But remember the government told you in

12   opening statement about they didn't call these experts, and

13   it's interesting I heard how Mr. Budlow talked about Dr. Lander

14   and obviously we don't share the same view about Dr. Lander,

15   but we'll talk about some of their witnesses.

16        One of the things that I want to do first is talk to

17   you about the government's experts and take their testimony.

18   The first person I want to talk to you about is Dr. Christo.

19        And here are excerpts from Dr. Christo's testimony

20   that he gave in this courtroom.

21        Now, Dr. Christo, when he was called to testify, he

22   was being asked by Mr. Budlow, this is what he said, and I

23   asked him these questions, he's not familiar with the standard

24   of care for a pharmacist, and he's not qualified based on his

25   training to render an opinion as to a pharmacist's standard of

1    care.

2         He testified as follows:  And this is important, I

3    think everyone knows, he says a pharmacist has no control over

4    his patients.  Pharmacists do not routinely check on the

5    patients after they fill a scrip for his patients.  And he's

6    never had a pharmacist asking for one of his patients' medical

7    records.  This is a doctor at Johns Hopkins University.

8         And what the government is telling you, you know,

9    these pharmacists, the defendants here, they weren't doing

10   certain things.  They were lax in their duty.

11        And you have Dr. Christo, who has been a doctor for

12   ten years.  He says he was never a pharmacist ever, ever, asked

13   me for medical records for one of my patients.  Never happened.

14        Dr. Christo testified that during the time period of

15   January, 2005, January 10th, of 2006, the State of Maryland had

16   no law regarding pharmacists filling prescriptions issued by

17   doctors that did not reside or practice in the State of

18   Maryland.

19        Now, you've heard all the testimony, but you know

20   whether there's a law that says this and a law that says that.

21   This is their expert.  Dr. Christo telling you this

22   information.

23        And then here's a Maryland Board of Pharmacy Board of

24   Pharmacy newsletter from 2002, and the government has mentioned

25   several newsletters to you.  But this is the one that's in

1    evidence as well.

2           And if you look at this newsletter, there's a

3    question, can prescriptions from out of state be filled in

4    Maryland?  Yes.  There is no law, state law, governing the

5    filling of prescriptions from other states.  A prescription may

6    be filled if it is valid as based on professional judgment and

7    the circumstances involved.  Prescription's valid among other

8    things the results from a valid patient/prescriber

9    relationship, a prescription is valid in the state of origin,

10   it's valid in Maryland, may be filled.

11          And do you remember this, this is what Dr. Christo

12   told you, that there is no state law that was controlling

13   whether in fact a pharmacist could fill a prescription.  Now,

14   why is that?

15          Because this is an evolving area of the law.  This is

16   an area of the law that is changing.  You've heard it from the

17   witnesses as well as we go further.

18          Dr. Christo testified as follows, in his opinion, a

19   doctor can prescribe drugs in the ordinary course of medical

20   practice and for legitimate medical purpose even if the patient

21   lies to the doctor and has no legitimate purpose for the drugs.

22          He further agree that is there is no way that a

23   patient -- that a doctor in every case tell the patient's

24   lying.

25          He agrees that if the doctor cannot tell if a

1    particular patient is lying, there's no way for the pharmacist

2    to know that information.

3         And a scenario where a doctor, patients lies to

4    doctor and the doctor issues a prescription in the ordinary

5    course of medical practice, and for a legitimate medical

6    purpose, there would be a doctor/patient relationship.

7         And that's important, because the government talks

8    about the standards, and the Court has instructed you about the

9    standard of whether in fact the prescription was issued in the

10   usual course of medical practice and whether it's for

11   legitimate medical purpose.

12        And we know that people lie.  You've heard it.

13   Patients lie.

14        And the government would basically tell you, look, it

15   doesn't matter whether someone lies, if the doctor issues a

16   prescription, and they find that it's not for a legitimate

17   medical purpose, if someone was an addict and that person was

18   able to deceive the doctor somehow, that that somehow is a

19   crime.  No, that's not what Dr. Christo says.

20        Dr. Christo testified the following, in his opinion,

21   there would be a doctor/patient relationship established in the

22   situation where two individuals who were Internet patients had

23   face-to-face meetings with their doctors and were able to

24   convince those doctors that they in fact were in need of

25   medication when they in fact were not.

1          Who does that remind you of?  Does it remind you of

2    Doug Chorpenning?  Does it remind you of Jennifer Koch?  That

3    even when they met with their physicians face-to-face, they

4    were able to deceive those physicians into believing that they

5    had legitimate medical needs and to be prescribed medications.

6          They told you that they did.  Dr. Christo said, in

7    that situation, he agreed that the doctor would not in his

8    opinion be responsible for knowing the patient was lying if

9    he's tricked.  In fact, he went on to say that he's been

10   tricked.

11         Now, I asked you, you've heard over and over and

12   about the standard of care being the same, whether it's

13   Internet or whether it's a face-to-face.  So would there be any

14   basis, then, for the standard of care to be different if a

15   patient can trick a doctor through the Internet?

16         You heard about how it's easier to trick someone

17   through the Internet.  But if you are able to trick someone, if

18   you're able to deceive someone, whether it was easier or not,

19   if a patient deceives someone, it's the same.

20         The patient deceived someone.

21         Dr. Christo told you the following, that in his

22   practice, he used a questionnaire, and is he really telling you

23   about the questionnaire, the questionnaire, and then the

24   patient comes in who says he in fact asked about the patient's

25   history.  And one of the things I pointed out, and he agreed,

1   was that in getting the patient's history, having the

2   questionnaire completed, which the questionnaire in this case

3   the person sits at home, completes the questionnaire, he's not

4   there.  He has no clue how long it takes them to fill out the

5   question in fact.

6            In fact, what he said was it depends on whether you

7   have a no answer to some of these questions.  And if you have a

8   no answer, then you don't move through the questionnaire the

9   same way.

10           But what is important is that when he's getting a

11   questionnaire that's completed by the patient, or whether he in

12   fact is sitting down and doing a history, he's relying on what

13   the patient tells him.

14           The patient's honesty.  Now, how is that different

15   than the pharmacists in this case, the defendants?

16           How is it different than the doctors where you're

17   relying on the honesty of the patient?

18           Whether it is through the Internet or whether it's in

19   person, if it's the same standard of care, it shouldn't matter

20   whether they lied to you through the Internet or they lied to

21   you in person and are able to deceive someone to obtain

22   medication.

23           Dr. Christo told you that if a doctor's in

24   California, and the patient is in Maryland, the doctor would

25   have to see the patient and have a face-to-face physical.

1              Now, the government says, well, you've heard the
2    defense is going talk about face-to-face.  Well, we talked
3    about it, because that's what we have put forth to you.  They
4    bring the witnesses before you, Dr. Christo, Mr. Catizone, and
5    they talk about there must be a face-to-face evaluation.  And
6    if there's not a face-to-face evaluation, then it's a crime, or
7    it's evidence of a crime.
8              And that if the pharmacist knows that the doctors are
9    not sitting down with the patients face-to-face, that that's
10   information that they should know indicates there is not a
11   doctor/patient relationship.
12             Well, I asked Dr. Christo the question, can he point
13   to a law that says there must be a face-to-face examination of
14   a patient by a doctor in order to establish a doctor/patient
15   relationship?
16             Why not?  Because I don't believe it exists in the
17   law.
18             Now, that's Dr. Christo from Johns Hopkins University
19   telling you that.  He doesn't believe it even exists in the
20   law.  Yet he tells you that there's this requirement that there
21   must be a face-to-face, must be.  Not I suggest, but there must
22   be a face-to-face evaluation, but it's nowhere in the law.
23             He can't point out in the law federal, state, the
24   standard of care that he previously testified about, which
25   required a face-to-face examination.

1           I asked him that question.  Why can't you point me to
2      it?
3           Because to my knowledge, it doesn't exist in the law.
4           Dr. Christo then told us he reviewed the model
5      guidelines for the appropriate use of Internet and medical
6      practice.  Published by the Federation of State Medical Boards
7      at the states in preparation for his testimony.
8           He's familiar with it.  He relied upon it.  And I'm
9      not going to read the entire text to you, but you've heard
10     testimony about this during the trial.
11          While the doctor sat on the stand and says it is
12     required by law that there be a face-to-face evaluation
13     required in the standards of care, and then when we turn to
14     something that he relies upon, the Model Guidelines for
15     Appropriate Use of Internet and Medical Practice, and you read
16     down, what does it say?  The guidelines that are set forth for
17     doctors to rely upon, that the pharmacists would rely upon,
18     says there is a doctor/patient relationship established whether
19     or not there has been a personal encounter between the
20     physician or other supervised healthcare professional and the
21     patient.
22          Now, how can there be such a requirement in law that
23     nobody can point you to?
24          They can't tell you that it's written in any statute.
25     Dr. Christo can't tell you where it's in any standard of care.

1    And when you look at the guidelines, that may help set the

2    standard of care, you're told that you can have a

3    doctor/patient relationship without there being an in-person

4    examination.

5           Now, I posed these two hypotheticals to Dr. Christo.

6    And you'll recall the hypotheticals, I'm sure.  And in those

7    two hypotheticals, neither of them had the prescribing

8    physician examine the patient.

9           Now, does this fly in the face of what Dr. Christo

10   told you, that there must be an examination by the doctor in

11   person?  When I gave them both these hypotheticals, he said,

12   yes, there would be a doctor/patient relationship, and the

13   examination does not have to be conducted by the doctor who is

14   issuing the prescriptions.  It can be done by someone else,

15   another physician.

16          Dr. Christo testified about informed consent

17   agreement that he uses in practice.

18          And there was much to do about how he has the

19   patients sit down, the patient signs informed consent, has to

20   be witnessed by someone else, and how he requires the patients

21   to come in and followup, and pill counts, and all these things

22   that he says he requires.

23          Do you recall the Court's instruction that Mr. Budlow

24   told you, he said to you it's not about Dr. Ibanez's standard

25   of care, it's also not about Dr. Christo's standard of care.

1   And when asked, in fact, can he tell me anywhere in the law

2   that that is required, a requirement to have this informed

3   consent?  His answer, because to my knowledge, it doesn't exist

4   in the law.  You got a lot from Dr. Christo.

5          It says that in his practice, followups must include

6   a face-to-face visit.  Now, the key there is in his practice.

7   Not that it's the standard of care.  Not that it's required by

8   law.  And I asked him, we know that's not what he's saying,

9   because I asked the question, again, can he point in the law

10   state or federal where it says that?

11          No.  Because to my knowledge, it doesn't exist in the

12   law.

13          Dr. Christo testified, again when I referred him back

14   to the Federation of State Medical Board Guidelines that deals

15   with the appropriate use of Internet and medical practice, I

16   asked him about this informed consent.  Not only do we now find

17   that it's not just it's not in the law written anywhere, but in

18   the guidelines that he follows, that he relied upon, it's not

19   even in those guidelines that there's any requirement that

20   there be such followup, in-person followups.

21          So at some point, you've got to be able to say to

22   yourself what we're being told.  We're being told that if Dr.

23   Christo says it, it is, you know, because Dr. Christo is from

24   Johns Hopkins University.  And I applaud Johns Hopkins

25   University.  They do great work.

1        But the suggestion that if Dr. Christo from Johns

2   Hopkins says it, it is.  And therefore, somehow that's a

3   standard of care that these men somehow and everyone involved

4   in the Internet business here because Dr. Christo said it, the

5   Court has told you that's not about what one particular

6   physician says or does in his business.

7        Now, there's some interesting points here.  Dr.

8   Christo agreed with the following statements, and I want you to

9   think about these statements.

10        He says circumstances have contributed to the

11   prevalence of undertreated pain include the perception that the

12   prescribing of adequate amounts of controlled substances will

13   result in unnecessary scrutiny by regulatory authority.

14        He said inappropriate treatment, pain treatment, may

15   result from the physician's lack of knowledge about pain

16   management.

17        And look at the next sentence, fears of investigation

18   or sanctions by federal, state, and local agencies that may

19   also result in inappropriate treatment of pain.

20        Physicians should recognize that tolerance and

21   physical dependence are normal consequences of the standard use

22   of opiates, analgesics, and are not the same as addiction.

23        Remember the government talked about what Mr. Budlow

24   mentioned comments that Mr. Sodipo made in a call with Mr.

25   Cloud.  Do you remember what Mr. Sodipo said?

1          Mr. Budlow said, well, why would he want to avoid DEA

2     scrutiny?  Because of statements like this that are supported

3     by Dr. Christo, that even if you're doing it right, because one

4     thing we realize we know is that chronic pain is real.  Chronic

5     pain is real, and people suffer from chronic pain.

6          And one of the things that we know from what Dr.

7     Christo has told us, and he agreed with these statements, that

8     people, physicians, pharmacists, are all concerned that if they

9     are involved in the proper treatment of pain, that they would

10    face this kind of scrutiny, unnecessary scrutiny, from

11    regulatory agencies and law enforcement and others.

12         It's also consistent with what you heard.  Remember

13    in that one phone call where Dr. Ibanez was saying, you know,

14    he wasn't talking to anyone at New Care, but he was saying to

15    someone else on the phone, you know, if these men get rid of

16    Miss Jones, do you remember that conversation, if they get rid

17    of Miss Jones, the DEA may be down on them.

18         And he said some other things, DEA would come down on

19    them if they get rid of her, because they're to bring the DEA

20    to them.

21         Now, it's interesting, because you know people often

22    say, well, you know, I did not and do not cheat on my taxes.

23    But I damn sure don't want the IRS looking over my shoulder.

24    It doesn't mean that anyone's cheating on their taxes because

25    they don't want the IRS to conduct an audit.

1           And the government will have you believe that if Mr.
2    Sodipo says, look, we're doing this, we're doing it the right
3    way, but I don't want the DEA coming down on my shoulders, I
4    don't want them in my business watching over my shoulders.  But
5    does that mean that everything he's doing is illegal?
6           Does that mean that the person that he was and is has
7    somehow changed?
8           I don't think so.  One has to question Dr. Christo's
9    opinions in many ways about whether they're fully informed.
10   You'll recall even Mr. Catizone said that when you give an
11   opinion, it should be a fully informed opinion.  And look at
12   the things that Dr. Christo did not have when he came before
13   you and gave you his opinions about whether, in this particular
14   case, all of the prescriptions that were issued were not for
15   legitimate medical purpose.
16          Now, he's saying that there was no doctor/patient
17   relationship in every one of these prescriptions, every one.
18   Now, that is a broad sweep, ladies and gentlemen of the jury.
19   Broad sweep.  The government tells you 108,000 prescriptions.
20   26,000 patients.
21          And what Dr. Christo can tell you is that by
22   reviewing the few things that he reviewed in this case, he can
23   tell you that not one of those individuals had a legitimate
24   need for medication.  How could that be?  How could that be?
25          What else did he have?  There was nothing in the

1    documentation that he read to indicate how long a doctor's

2    going to take to review any particular medical records.  That

3    he told us.  He's not talked to any of the doctors.  He doesn't

4    know the doctor's background, doesn't know whether the doctors

5    are in good standing with the state board.  He doesn't know

6    about their practices from any personal knowledge.

7            And he admits that when Mr. Budlow put him on the

8    stand, what Mr. Budlow did was go through his background.  Why?

9    They wanted to impress you about his background.  Similar to

10   what we did were with Dr. Lander, background does matter.

11   Information matters, and he didn't have it.

12           Here's what else he didn't have, you'll recall there

13   was -- Miss Reamy questioned Agent Brashier, Detective Brashier

14   from Louisiana, that there were these patients who in fact

15   received prescriptions in Louisiana, and they made these

16   controlled deliveries, and Detective Brashier and others sat

17   down with these patients, read them their rights, and agreed to

18   sit down and talk and answer all the questions.

19           Now, you heard from two people, Koch and Chorpenning,

20   who said we were addicted to hydrocodone.  The government

21   interviewed these other five people.  Did you hear from any of

22   them?

23           They have detailed interviews with these people.

24   Does that mean that they were addicts?  Does it make you wonder

25   whether they didn't give the answers the government wanted?

1    You don't hear from them.

2          Dr. Christo didn't interview any of the pharmacists

3    that worked at New Care, didn't even make such a request.  He

4    didn't review any of the reports prepared by the agents who

5    interviewed the pharmacists.

6          He didn't review the Grand Jury testimony of the many

7    individuals who testified for the Grand Jury.

8          You know that Liteia Jones, the pharmacist at New

9    Care the government told you about in opening statement -- by

10   the way, you never heard from Liteia Jones.  The government

11   told you all about Liteia Jones in opening statement.  Liteia

12   Jones, put a stop to this, and Liteia Jones came forward.  They

13   take her before the Grand Jury twice.

14         They don't call her before you.  Why?

15         This Dr. Christo doesn't even review the Grand Jury

16   testimony of the pharmacists.  Yet he can come in and tell you

17   about whether these men, they committed a crime.

18         Do you think it would be helpful, as Dr. Lander did,

19   to review all those grand jury of what the witnesses said?

20         Babu Abraham, Ken Hartwill.  Now, the government

21   called Ken Hartwill.  They called Ruth Walker.  But Dr. Christo

22   wasn't -- didn't have their testimony.  Of course, he didn't

23   have their trial testimony.  He didn't have their testimony in

24   the Grand Jury.

25         You know that the government believes this

1    information is important?  Why?  Because as I said, they gave

2    it to you.  They would give you all this information because

3    why?  It's important.  They certainly didn't spend seven weeks

4    giving you information that was not important.

5             And if it's important for you to have, to form an

6    opinion, why would it be important for their experts to have

7    when they come before you and they tell you about this case?

8             One thing Dr. Christo also said is this, intent of

9    the parties is important, and Dr. Lander told you as well.  If

10   the parties intend for there to be a doctor/patient

11   relationship, that is a huge part of it.  Do I intend to be

12   treated, and do I intend and agree to treat you?

13            He recalls Dr. Christo, you'll recall that during his

14   direct examination, that he was given this -- the term actually

15   is cheat sheet.  Not only does this doctor not review the Grand

16   Jury testimony, not review any of the other witness's

17   testimony, not review any of the police reports, not review

18   anything other than a few items the government chose to give

19   him.

20            Even when he's asked to tell you what his opinions

21   are based on, he was given this cheat sheet by Mr. Budlow so he

22   can try to recall what his testimony was.  And then he told

23   you, really, that it wasn't his opinion.  Yet he didn't just

24   get the information and reach an independent judgment.  Make an

25   independent judgment.  It's in collaboration with the

1    government.

2            And then he comes before you and he spouts to you

3    what they want him to say.

4            Well, shouldn't it be a full review of information?

5            He testified that he used the fact that the patients

6    were asking for early refills and probably not using the drug

7    properly to form his opinion that there was no doctor/patient

8    relationship.  Think about it.  That's very important.  That's

9    the statement.

10            He looked at the fact they were asking for early

11    refills, some of the patients, and said, well, that's his

12    testimony.

13            He relied upon that in deciding there's

14    doctor/patient relationship.  Then I asked him the following

15    question.  I asked him if the fact that a patient asks for

16    medication early, that wouldn't be help you?  Wouldn't it tell

17    you that the doctor initially issued the scrip for illegal

18    purpose, does it?  The answer was no.  And would, it wouldn't

19    tell you that the doctor issued a scrip outside the normal

20    course of medical practice because the patient asked for a

21    refill too early, does it?

22            No.  And why does it matter, like I asked earlier, if

23    it in fact does not mean the conclusion of these matters, that

24    there in fact were not doctor/patient relationships, and the

25    fact it was issued outside the scope of professional practice

1    and not legitimate medical purpose?

2          The fact that someone asked for medication early

3    doesn't tell you that it was not prescribed properly.

4          It doesn't say that there wasn't a doctor/patient

5    relationship when it was prescribed.

6          Your Honor, I'm going to move into another matter.

7    We've about five minutes until lunch.  Do you want to break

8    here?

9          THE COURT:  Thank you for asking.  The lunch will be

10   here in about 15 minutes, I believe, right, Mr. Thompson?

11   Good.  So why don't we press on.  Thank you.

12         MR. RAVENELL:  Thank you.

13         The next witness that I want to talk about is Carmen

14   Catizone.  Mr. Budlow talked about someone who would say

15   anything.  He talked about Dr. Lander being someone who would

16   say anything.  Here's a witness who would say anything.  And

17   I'm going to show you some of the things that he said, and you

18   may not have recall he said, I hope you have, but I'm going to

19   show you some things that this witness said that has to make

20   you wonder about him.

21         Now, here's his background, tells you that he's with

22   the NABP, been there for 23 years.  And he's not one -- he's

23   not a pharmacist who's out in the field working every day as a

24   pharmacist.  Really, he's a bureaucrat.  He's an administrator.

25   Nothing wrong with that.  But he doesn't have hands-on,

1    day-to-day experience with what a pharmacist does.  And he

2    hasn't had for many, many years.

3              And the man is biased.

4              Now, he told you about this VIPPS membership, the one

5    that only has 15 pharmacists, apparently, of the 1200 or at one

6    point he said 800, and then he said 1200, 800 to 1200 Internet

7    sites, Internet pharmacy, about 15, this great VIPPS

8    certification you've heard about.

9              Now, here's what he says, when I asked him early on,

10   he agrees that when giving an opinion and asking the jury to

11   rely upon it, the opinion should be fully informed.

12             But before he formed his opinion, he didn't read the

13   Grand Jury testimony of Ruth Walker.  Ken Hartwill.  Babu

14   Abraham.  Liteia Jones.  None of the witnesses.

15             Fully informed before a jury should rely upon it, it

16   should be fully informed.  This man wasn't even aware that

17   these people had gone to the Grand Jury.  He had no clue that

18   they had testified.

19             There was a phone call that the government played for

20   you.  They played it because they said it was important between

21   Liteia Jones and Dr. Ibanez.  This man wasn't even aware of

22   that phone call, that it even existed, not only not listened to

23   it.          Again, information being imparted to you, is

24   important.  Information that you should have, but apparently

25   their experts don't need it.

1          Give them a little stack of information and say go at

2     it, and get your opinion, and just come into court and say it.

3     Don't review anything.

4          Here's what he said, he agreed the majority of the

5     items he reviewed were charts and statistics.  Do you remember,

6     do you remember he formed his opinion without ever having those

7     Grand Jury documents, not even knowing about them?

8          He agreed to be an expert way back in May of '07.

9          A year ago.  Over a year ago.

10         And the charts the government has placed before you,

11    Paul Short charts that have the numbers on it, and we're going

12    to talk about it, and this man's already formed his opinion, he

13    hasn't even seen the charts.

14         Mr. Catizone has already formed his opinion, never

15    seen those charts the government makes a great to-do about.

16    Never reviewed the Grand Jury testimony.  Doesn't know it

17    exists, but he's got an opinion these men are acting outside

18    the scope of professional practice and that fact these

19    prescriptions are all not for legitimate medical purpose.

20         How does one do that?

21         Now, ask yourself, if you didn't have all the

22    information that these experts didn't have, would the

23    government be asking you to make a determination?

24         They wouldn't.  But their own experts, who they can

25    control what they get, they don't do anything.

1           The man who says I deny holding myself out as a
2    doctor, but, yes, I'm a doctor.  You know, Mr. Budlow said
3    doctor, Professor -- Professor Lander, Pharm D, well, yes, he
4    is.  He is a Pharm D.  And he in fact did complete the course
5    work that makes him a doctor, unlike this man who gets a
6    designation from the Oklahoma Board of State Board of Pharmacy,
7    and he holds himself out to be a doctor.

8           His resume, four items on his resume, I asked him,
9    doctor, is that kind of usual?  You saw Dr. Lander's CV, does
10   he have information on there about where he'd been previously
11   testified or when he previously sat as an expert in civil
12   matters?  No.  No.

13          But this man has four incidents where he testified
14   for the government.

15          Then he told you I've testified for pharmacists
16   before, but he chooses what best represents him.  And what best
17   represents him, his opinion is, that he's testified for the
18   government four times.

19           Now, what's interesting, talking about the
20   contradiction between the government's own experts, remember I
21   showed you earlier where Dr. Christo said there is no Maryland
22   law between 1-1-05 and 10-10-06, federal or state, that
23   requires an in-person examination.

24          When I asked this gentleman, he says there is.  Can
25   you tell me where it is?  Can you tell me where it is?  Can't

1  really tell me where it is, can you?

2          But Dr. Christo told you just the opposite.  I don't

3  believe it exists in law that there is such a requirement for

4  an in-person examination.  Yet, this man says it is.

5          Then he testified that he's familiar with HR 3880,

6  which was a bill that was before the House and Congress.  And

7  he told you that in his opinion that there was a loophole that

8  exists about defining a doctor/patient relationship.

9          Now, isn't that consistent with you heard Mr. Sodipo

10  saying on the phone call -- do you have the transcript of the

11  call?

12          Mr. Sodipo's talking to Jim Cloud, and he says

13  there's a gray area in the law.  And Mr. Budlow actually showed

14  you part of that this morning when he said -- Mr. Budlow, Mr.

15  Sodipo said about the senate, talking about the senate actually

16  at some point may change the law.

17          Look through the transcript and look at the

18  testimony.  Mr. Budlow has -- and Mr. Sodipo is talking to Jim

19  Cloud, and he says it's a gray area in the law.

20          That's kind of interesting, because that's kind of

21  what Mr. Catizone feels.  Because there's this area in the law

22  that is not clear about what a doctor/patient relationship is,

23  and whether there need be an in-person examination.

24          Now, this is involved evolve an area of the law,

25  things are changing.  This is new.  This is Internet, and their

1    experts can't even agree, but these men are to be held

2    criminally liable.

3           They told you he testified, Mr. Catizone, before

4    Congress, and that he agrees -- and this was interesting, he

5    agrees that he testified before Congress that the proposed

6    requirement, proposed requirement of an in-person medical

7    examination will not adversely impact the practices of what?

8    Telemedicine and telepharmacy.

9           Now, he's talking directly about what these men are

10   involved in, telemedicine and telepharmacy before Congress in

11   2004, telling Congress that the proposed requirement of adding

12   there be an in-person examination won't adversely affect what

13   these pharmacists and doctors do with the Internet.

14          And then I asked him, and you are proposing that

15   requirement because there is no such requirement in the law?

16   No.  I fully expected his answer to be yes, I'm proposing

17   something because it doesn't exist.  What's his answer?  No,

18   sir.  I asked him.

19          So you were proposing a requirement that was already

20   in the law?  His answer is yes.

21          Now, does that make a lot of sense to you?

22          Dr. Christo tells you that he's not aware of anywhere

23   in the law that there is such a requirement.

24          We showed you the federal, the Medical Board

25   Examiners Guidelines where they make no requirement and no

1    suggestion that there be an in-person examination by the

2    prescribing doctor.  Yet, this man tells you that there is such

3    a law, had been such a law, and he goes before congress and

4    proposed what is already in existence.

5              It's not credible.

6              He told you that that requirement that he was

7    proposing didn't pass.  Congress does not change the law as he

8    suggested to make it a requirement that there be an in-person

9    examination.

10             Then he told you, the rogue pharmacy, Mr. Budlow used

11   the word rogue pharmacy several times, that's supposed to be

12   the catch, rogue pharmacy, because now you're supposed to take

13   the word rogue pharmacy and simply and walk up and attach it to

14   these men because they say it's a rogue pharmacy.

15             Well, listen to what read carefully please what

16   Catizone said a rogue pharmacy is before you simply attach it

17   to these men.

18             Rogue pharmacy is a legal pharmacist that relies

19   solely on an online questionnaire in a cyberspace consultation

20   to fill a scrip.

21             Is that what happened here?

22             That's what he said.  He testified that he's aware

23   that in this case the medical records were required and

24   reviewed by a doctor for each patient before the patient could

25   receive a scrip.

1              So his definition of a rogue pharmacy doesn't even

2     stand up in this case just on the fact that there was not

3     simply an online questionnaire with a cyberspace consultation.

4     There in fact were the medical records that he understood were

5     received and reviewed.

6              Now, how then would you stand before a jury and say

7     it's a rogue pharmacy?  Doesn't even meet his definition of a

8     rogue pharmacy.

9              But why?  The government brought him in.  He's going

10    to say it.  And he's going say it just like he would propose

11    something that was already in existence.

12             And he testified that in a previous matter, he

13    testified in this Trinity, matter of Trinity Healthcare that he

14    gave this definition of a valid prescription.  And I asked him,

15    when you say where in this definition is it written in federal

16    or Maryland statute?  Can't point to anywhere in the CFR,

17    COMAR, where that definition is written, his definition.  He

18    creates a definition.  He puts it before you.  You should

19    accept it because Catizone's doing this for 23 years, and

20    Catizone to tell you that it is because it's what Catizone

21    says.

22             Again, mindful, the Court told you it's not about a

23    particular person's standard of care or his belief, or even

24    what he thinks should be the law.  And Catizone's view is I

25    think it should be the law.  I go to Congress and heck with

1        what Congress chose not to do, I think it should be the law, so

2        it is.

3                 That's a lack of credibility.

4                 He said -- and it got really interesting here.   He

5        says even if a doctor issues a valid prescription, valid for

6        legitimate medical purpose, then the scrip can still be invalid

7        once the doctor has complied with the law.

8                 Now, once they complied with the law, they can be a

9        violation of the law?

10                That's what he testified to.

11                It is so clearly not the law.

12                Gave him the hypothetical question that I presented

13       to Dr. Christo.   Well, actually, it's not the one I presented

14       to Christo.   I forget what he said in this hypothetical.

15                If a doctor has written a prescription for about ten

16       years in the State of Maryland for pain medication, the doctor

17       has given those prescriptions to his patients, and they take

18       that prescription and go to a pharmacy and they fill it, and if

19       the pharmacist hasn't ascertained from the doctor that there is

20       a bona fide doctor/patient relationship, that pharmacist is

21       violating the law.

22                Now, does that mean that Dr. Christo and every one of

23       the pharmacists he's done business with over the last ten years

24       violated the law?   Christo told you pharmacists don't contact

25       him.   They don't get in touch with him.

1          And they don't call him and say that prescription you
2    wrote for hydrocodone and whatever else, is that a good
3    prescription?
4          And I guess because those pharmacists from Rite Aid
5    or CVS didn't contact Christo, they're all violating the law,
6    but there's just no such requirement.  And Catizone will say
7    whatever need be said if it makes his point.
8          He admits that ways that the NABP suggests that VIPPS
9    certified, these are 15 VIPPS certified pharmacies, here's what
10   they tell their VIPPS certified pharmacies, one of the ways to
11   determine whether there's a doctor/patient relationship is to
12   verify whether the doctor is certified by the DEA.  And you've
13   heard a lot of testimony about that in this case.  And you know
14   that in this case, every one of the doctors who issued the
15   medication in this case were in fact DEA certified, and that
16   the defendants knew that.
17         You've heard a lot of testimony about how they knew.
18   In fact, Miss Ball told you that one of the parts of her job,
19   Miss Ball, was to check every six months to confirm that the
20   DEA certifications were in place.  We know that when the
21   contract with IHE was signed and sent to New Care, that Mr.
22   Kaps told you they in fact sent along the DEA certification for
23   those doctors so that New Care and other pharmacists would
24   know.  And he told you that any time a pharmacist wanted
25   information, they got it.

1          Now, in this case, even though the defendants had

2     that information had an informed opinion, knew it, this man

3     will tell you that it's a rogue pharmacy, Catizone.

4          Another thing I found interesting, you'll see here

5     that he told you that with the VIPPS pharmacists that they

6     have, they don't even have a requirement that the VIPPS

7     pharmacist checks whether the doctors are licensed properly in

8     their state.

9          Now, this is the VIPPS certification.  That is the

10    higher, higher standards.  That's not even a requirement yet in

11    this case.  The defendants did that.  They knew that the

12    doctors are not just DEA certified.

13         There's government's exhibit 59.  If you look at 59,

14    you'll see that in that 59, there are printouts about doctors

15    and some of the doctors in this particular case, that shows

16    whether they're licensed.  It's there.

17         You heard testimony from again Roberta Ball that she

18    in fact checked every six months because Mr. Sodipo required it

19    of her.

20         Mr. Catizone then testified that a red flag to a

21    reasonable pharmacist would have been viewing the online screen

22    of the website, in this case, that there was no identification

23    that a doctor was licensed.  I kind of got ahead of myself a

24    little bit, because that's what I was talking about.

25         What he's telling you is that if a doctor -- if a

1    pharmacist looked at the screens in this case --

2              THE COURT:  If I could, Mr. Ravenell, if I could just

3    stop?  What we'll do, we'll break at 1:15.  That's flexible.

4    If you wrap up this point, then we'll break for half hour.

5              MR. RAVENELL:  Absolutely.

6              What Mr. Catizone told you is that if you look at the

7    pharmacists' online screen, so there's no didn't tell you

8    whether the doctor was licensed, that should be a red flag for

9    a reasonable pharmacist.  Yet, as I pointed out, they don't

10   even require that of their own VIPPS certified pharmacists.

11   They check the state where the doctors are licensed to confirm

12   that they're licensed.  But the defendants did.  Again, look at

13   exhibit 59, you'll see.

14             He told you the following, and this is where we're

15   talking about getting where there's a contradiction between the

16   government's two experts, Catizone said to you, in his opinion,

17   that a doctor cannot prescribe drug in the ordinary course of

18   medical practice and for legitimate medical purpose if the

19   patient lies to the doctor and in fact has no legitimate

20   medical purpose use for drugs.

21             Doesn't that clearly contradict what Dr. Christo told

22   you?  Here's what Christo said, and you have the cites from

23   both of their transcripts, Christo says in his opinion that

24   doctor can prescribe drugs in the ordinary course of medical

25   practice and for legitimate medical purpose, even if the doctor

 1    lies to the patient and has no legitimate purpose for the drug.

 2            Can you trust the government's case when there are

 3    two experts that can't even agree on something so significant

 4    and is so important?

 5            The exact question I asked both of them, and they

 6    gave completely different answers.  Just odd.

 7            This would be a good time, Your Honor.

 8            THE COURT:  Good.  Thank you.  Ladies and gentlemen,

 9    it's a little bit after about 1:12.  What we will do is break

10    for half hour until quarter of.

11            Mr. Thompson has advised me that your lunch is ready

12    and waiting for you in the jury deliberation room.  So to make

13    sure that we finish today, we'll truncate the lunch hour to

14    half an hour, and I'll see you at quarter of.  Thank you.

15            (Luncheon recess.)

16            THE COURT:  Please be seated, unless you wish to

17    stand for the jury.

18            (Pause.)

19            THE COURT:  Counsel, by my count, the government has

20    used 1 hour and 45 minutes.  So the government has 1 hour and

21    15 minutes remaining.

22            Mr. Ravenell has used 1 hour and 5 minutes, so that

23    the defense has 2 hours and 25 minutes remaining.

24            MS. SMITH:  That will take us till later than 5:15, I

25    think.

```
 1              THE COURT:  I haven't done the math.  We may have
 2   shave a few minutes.  Let me do the math and see.
 3              (Pause.)
 4              (Jury present)
 5              THE CLERK:  Jurors all present.
 6              THE COURT:  Thank you, Mr. Thompson.
 7              Please be seated.
 8              Mr. Ravenell, whenever you're ready.
 9              MR. RAVENELL:  Thank you.
10              Good afternoon, everyone.
11              THE JURY:  Good afternoon.
12              MR. RAVENELL:  I know I was happy to get the break
13   for my voice.  You were probably happy to get a break from my
14   voice, so it worked out just fine.
15              I want to spend more time for you, and let me just
16   talk about the witness, not experts, talk about the witness the
17   government called early on in the case, their first witness
18   Adam Kaps.  I want to highlight a few thing that Mr. Kaps told
19   you.
20              He told you that he met Mr. Brooks in February of
21   2003.  It was the kind of comment made while working with Mr.
22   Brooks, and of course we all know Mr. Kaps, who the government
23   called as their witness, sat before you and testified on behalf
24   of the government, but there's something we asked Mr. Kaps as
25   well that came out during the examination.
```

1          Now, he says he was aware that the DEA had raided

2     this business in Haines City, in 2003.  He's aware that Dr.

3     Dominique started working for the business, and they had

4     brought in the Salvatore DeFrank, and DeFrank worked for the

5     company.  And Brooks told Kaps that DeFrank had been arrested

6     and been charged.

7          So after 2003 in the raid, he overheard one

8     particular conversation with Brooks, Strickland Hollander

9     talking about getting legal advice told us how he in fact went

10    with Mr. Brooks, you know, to meet with the lawyer and that

11    what they explained to the lawyer was consistent with how he

12    expected the business to run and that Brooks told the attorney

13    in fact about the 2000 raid.

14         And by the end of 2003, he had learned from Brooks

15    there were problems with pharmacies in Pennsylvania and Tampa,

16    and he learned either the pharmacy board and DEA had come in

17    and shut those pharmacy down.  He told us about going to the

18    DEA website and information about the telemarketing, the

19    telemedicine, excuse me, prescribing medication was.

20         And he pointed out particular documents of standards

21    of telemedicine for his own review and to meet with Brooks.

22         Now, here's a document that's in evidence, the

23    standard for telemedicine, prescribing practice, that Mr. Kaps

24    talked about, and what he was relying upon in addition to the

25    information he was receiving from Mr. Brooks and from Dr.

1    Ibanez.

2         Now, here's what Mr. Kaps eventually ends up doing.

3    And in 2007, do you remember he started this business back in

4    2003?  He was aware of these DEA raids and everything else that

5    was occurred with Brooks's business, but he continued the

6    business for some, you know, three years, four years.

7         And he told you that what he observed in all the

8    business and what he learned, he felt that his business was

9    legal.  And the government called Mr. Kaps as a witness to give

10   testimony, and, obviously, the government should not be calling

11   witnesses they think is lying.

12        Mr. Kaps even told you he had an agreement which was

13   that if the government thought he was lying, they're required

14   -- they had the right to have him submit to a polygraph

15   examination.

16        So the government calls this man as a witness, and he

17   says I've seen all these things, I've worked there three or

18   four years, and I believe this business was legal.  The

19   government tells you one of two things, either believe Mr. Kaps

20   is lying to you when he says all the things that were odd,

21   everything that he saw, he thought the businesses were

22   operating legally.

23        They think he's lying to you, the government should

24   not be vouching for such a witness by calling him, should never

25   do that.  Why?  Because it's not at win at all costs,

1    particularly when it's the mighty United States government

2    against citizens.

3          You know not winning at all costs.  So either Kaps is

4    telling truth, or that with all the information that he

5    observed in the time period that he worked for the business,

6    and all the inside information he had, information the

7    defendants certainly didn't have, the defendants didn't have

8    information back in 2005 when they joined this business,

9    anything about a raid in 2003, about other pharmacies and Tampa

10   or Pennsylvania.

11         He didn't have information about what Kaps and Brooks

12   knew about the inner workings of what happened with DeFrank

13   back in 2005.  They didn't have that information back in

14   January of 2005 when the defendants joined and decided to work

15   with IHE.  They didn't have this information.

16         But we know that Mr. Kaps had it, and he had it, and

17   he continued to have it for four years.  Everything was

18   happening inside.

19         Mr. Budlow says, you know, Mr. Kaps told us about

20   calls that were coming in about individuals who he says they

21   thought may have been, but yet he continued to operate in the

22   business and government calls as him as a credible witness.  He

23   said not once did the government say we're not sure about your

24   credibility, Mr. Kaps.  You've got to take that polygraph.

25   They said they never asked him to do that.  They put him before

1     you and say rely upon his testimony.

2           Now, if he in fact did not have knowledge that

3     something should be amiss, as the government says, what's

4     amiss, something is criminal.  Knowledge is not whether

5     something is awry, but whether or not the defendants had

6     knowledge that a crime was committed, that they were supposed

7     to be committing a crime.  So you can't have it both ways.

8           He told you he met with the AUSA in Florida to sign a

9     proffer letter, and he's not been charged with any crime to

10    date.

11          So the agreement that he had, he had to be truthful,

12    and he agreed, and in fact he told you that he was testifying

13    truthfully.

14          I asked him the question, when he said he believed

15    that Barry Brooks's business was operating legally, he was

16    telling the truth.  That's what he said, on page 477, "Sir, do

17    you believe when you said Barry Brooks was operating legally,

18    were you telling the truth?"

19          "Yes."

20          He was also telling truth when he said he relied upon

21    what Dr. Ibanez told him about the certification.

22          And about his -- that he in fact his review of the

23    telemedicine guidelines, that the doctors in fact reviewing the

24    medical records.  These are all the things they relied on.

25          Now, he had a lot more.  But some of the things they

1    relied upon, things the defendants have knowledge of, DEA

2    certification, that there were medical records being requested

3    and reviewed and information they had.

4         The government says, well, the defendant has that

5    information.  Yeah, it doesn't matter.  It doesn't matter when

6    they have information about the DEA certification and medical

7    records being reviewed, but this man, put on the witness stand,

8    a being a truthful witness, they certainly didn't put him on as

9    I hope as a lying witness, then we know that he's made $2.5

10   million during the time they worked with this business, and he

11   said there's no they're not going take any of it away.

12        So he in fact he knows in 2004 Ibanez in fact met

13   with the doctors, and he talked with the doctors about the

14   change in policy.

15        He remembers that Dr. Dratler and Zurrantz were

16   present at this meeting, and he testified that it was routine

17   to send newly hired doctors, or when a new pharmacy began

18   working, it was routine for the pharmacists to have copies of

19   the doctors' DEA license and state licenses.

20        Now, that's also information that the defendants got.

21   We know they got it.  And they are supposed to rely upon, do

22   you remember what Mr. Catizone said?

23        They tell the VIPPS certified, one thing you relied

24   upon to determine whether there's a doctor/patient relationship

25   is whether there's a DEA certification, even though Catizone

1    would not recommend the VIPPS certified doctors provide state

2    licenses, the defendants had even more.  They had the state

3    licenses as well.

4           And for Kaps, this is what he said, the websites were

5    not trying to hide information about the doctors and would

6    provide the information upon request from a pharmacist.

7           He told you about this trail, this worldwide

8    telemedicine group where they would in fact work and recruit

9    pharmacies, and they targeted independent pharmacies, targeted

10   people, companies such as New Care.  Independent pharmacies.

11          And here's what he told you on medical records.

12   Because there's been much to do about whether in fact either

13   doctors did anything in this case or whether they just signed

14   off.

15          And I don't know what the doctors did.  I wasn't

16   there.  You weren't there.  But one thing we have is that a

17   witness the government called and put on the witness stand told

18   you about what the doctors did with the medical records.

19          This inside guide, Mr. Kaps, tells you the following,

20   that medical records are required up front starting in January

21   '05.

22          Interestingly, that's when the defendants started in

23   this business, January '05.  So we know from the time period,

24   at least when New Care was involved, there were medical records

25   being required.  They were sent -- they went to the doctor who

1     approved or declined the particular medical records.

2              He did not know the percentage offhand, and here's

3     what I want you to focus on.

4              What Mr. Budlow said to you was that everybody who

5     was asked for hydrocodone got hydrocodone.  Well, is that borne

6     out by what Mr. Kaps told you?  Mr. Kaps told you that the

7     doctors were in fact rejecting individuals who would seek

8     medication from the Internet now.  That's their inside guy

9     telling you this.

10             When asked by Mr. Budlow in fact to tell us what the

11    percentage was of those who would receive prescriptions and

12    those who would not, he says all I can tell you that over 50

13    percent got the prescriptions.

14             Now, that leaves at 49 percent, maybe less, where the

15    records were being reviewed by the doctors and the doctors were

16    saying we're not going to grant a prescription.  We're not

17    going to give a prescription, because we determined upon review

18    of the medical records that you do not -- there's no basis to

19    give medication in this case.

20             Now, do you remember when Dr. Lander was questioned

21    by Mr. Budlow and said the initial request, initial selection

22    of medication comes from the patient?  But he said it is up to

23    the doctor, a doctor to make the final determination whether a

24    person or a patient should receive medication.

25             And this was kind of inconsistent with what Mr. Kaps

1       told you.  He said medical reports were received, and there was
2       a screen for the medical records in a section that tracked the
3       action of approving or declining.

4               He went on to say the records medical records were
5       Faxed to an outside service, who would then create this TIF
6       file.  We talked about the TIF file, that was being created for
7       the medical record, and the medical records were the images
8       stored inside the database.

9               Here's what he told you, that he had recently been
10      given access to the data had that been kept on Brooks's server,
11      this is he was working for the government, the data included
12      medical information and medical records.

13              Then ask yourself, where are the medical records?
14      Where are the medical records?  The government brings five
15      undercover purchases with the fake medical records, they don't
16      bring you any of the medical records that Mr. Kaps said that he
17      had access to.  And he told you he estimated there were at
18      least 26,000 medical records.  26,000.  He's telling you that
19      the medical records were there.  And that he had access.

20              Oh, can't draw here.

21              He had access to the medical records when he was in
22      fact cooperating with the government, and that those medical
23      records there in the database.

24              What the government brings to you instead, is, we'll
25      give you these five undercover officers with fake medical

1    records and tell you that you should assume, so to speak, that

2    everyone who gave said medical records the same thing.

3         Why should you conclude that?  Do you recall the

4    testimony from Miss Koch and Mr. Chorpenning that they went to

5    their primary care physicians and they would get their actual

6    medical records from the primary care physicians and they would

7    use those medical records to send in to the websites?

8         So just for those two witnesses alone, we know that

9    every individual who was seeking medication through the

10   websites were not sending in fake medical records.

11        And, in fact, even in this case where the government

12   witnesses sent in fake medical records, they still in fact, as

13   Dr. Lander pointed out to you, had detailed information about a

14   person's background.

15        We know that Dr. Ibanez implemented this policy that

16   the medical records would be no more than one year old.  Now,

17   certainly, the government says it's all a ruse.  Certainly,

18   they can say no medical records, we do not require any medical

19   records at all.  All medical records could be ten years old.

20   But there's a requirement if you're going to rely upon medical

21   records, doctors, they can't be more than one year old.

22        Now, here's what else Mr. Kaps told you, and I want

23   you to read this carefully.  I'll read this as well.  Kaps

24   recalled a meeting on the fourth of November, 2004 between

25   Ibanez and persons who said they were pharmacists in Illinois.

1          Kaps later learned that the purported pharmacy owners

2     were actually undercover DEA agents.  Kaps acknowledged that

3     Dr. Ibanez's DEA certification, which had been attached to the

4     contract with New Care, indicated that it had been issued on

5     11-16-04, which certainly occurred after the 11-4-04 meeting,

6     when Ibanez had met with undercover agents, where he told them

7     exactly what he was doing with, and that Ibanez's new

8     certification didn't expire until 11-30-07.

9          So here's Mr. Kaps, who's telling you that there were

10    undercover agents, DEA agents, who were posing as pharmacists,

11    who sat down with Dr. Ibanez before the defendants ever got

12    involved, with IHE.  This is the government's inside mentality

13    you, that Ibanez explained to the DEA everything he was doing

14    with the business.

15         And what does the DEA do?  12 days later, they

16    recertify him to continue an operation in October.  And he

17    continues in operation beyond the defendant's arrest on October

18    10, 2006 but the defendants should know what Ibanez and others

19    are doing is so blatant, so much a crime, who did he sit down

20    with?  Ibanez didn't sit down with the defendants.  Do you

21    remember that call when one of the individuals from IHE, or had

22    called Dr. Ibanez and said we need you to call New Care.  And

23    he said who?

24         Do you recall, it is a pharmacy, New Care.  Who?

25         Barry Brooks.  There are conversations where you have

1      the transcripts.  They had no clue who the defendants were,

2      Sodipo, Nwaehiri, you heard them mention their names other than

3      the guy at one point saying Steve, we're going to talk about

4      it.  But the people who were our clients were supposedly

5      conspiring with, you have Brooks and Ibanez, they don't have a

6      clue who these men are.  Not one clue.

7            So the defendants didn't sit down with Barry Brooks.

8      See, one thing the government cannot tell in this case that

9      they have, they have had Mr. Sodipo and Mr. Nwaehiri sat down

10     with Barry Brooks, sat down with Ibanez and said, you know,

11     basically, this is how we run this business.  This is all

12     steam, we're all just pushing pills, we're just doing this to

13     make money, and the defendants said okay.  We're all on board

14     with that.

15           There's just not scintilla of evidence.  That's why

16     we're talking about red flags and green flags and red flags

17     because they don't have any such evidence.  It doesn't exist.

18           But what we do know is that early as 11-4-04, some

19     people did sit down with Dr. Ibanez, and Ibanez explained

20     exactly how the business worked.  And who was it?  The DEA.

21           And the government tells you about, you know, one of

22     the gatekeepers.  First, in this trial, the defendants are the

23     gatekeepers.  Then now it's become as we take that suddenly Mr.

24     Budlow said in his closing the final gatekeeper.

25           And, you know, it's all this emphasis on you should

1    convict these men because they're the final gatekeepers.

2    That's the basis to convict, because they were the final

3    gatekeeper, not whether in fact they committed a crime, but

4    whether they were gatekeepers.

5           I asked Catizone, I said you said, Mr. Catizone, you

6    said that the defendants are the gatekeepers.  And finally

7    after going around, he said, oh, they're one of the

8    gatekeepers.

9           Who are the other gatekeepers?  He said DEA is a

10   gatekeeper.  Who else?  The doctor.  What we're being told one

11   gatekeeper DEA sits down with the other gatekeeper, Dr. Ibanez,

12   and they talk, and Ibanez doesn't know they're DEA.  They're

13   undercover, but they know they're DEA, and Ibanez tells them

14   all he's trying to recruit them, unlike the defendants, but

15   he's trying to recruit this pharmacy, and he tells them all

16   this is how we operate.

17          And Kaps told you how the business operated.  And

18   that's what Ibanez is passing on to these men.

19          If so if Ibanez is tell you them that you get medical

20   records, we have the medical records reviewed, whatever he's

21   telling them, have the information, because Kaps says tells

22   them all the evidence in detail.

23          Does the DEA recertify Ibanez?  You know they did.

24          Did they allow Ibanez to continue to work as a doctor

25   prescribing?  All the medications that they're talking about

1    that New Care filled all came after this meeting.  Every single

2    one came out of this meeting.

3              Then we have the testimony of Jim Graumlich.  James

4    Graumlich.  And here's what he tells you, that he began this

5    operation investigation back in 2002, when he focused on the

6    corporation IHE.  He was investigating Dr. Dominique, and Dr.

7    Dominique stopped practicing in 2003, but the DEA served an

8    immediate suspension on him.  And he said that means it was the

9    DEA thought it was in the public interest to suspend his

10   license to prescribe.

11             MS. SMITH:  The government objects.  May we approach?

12             THE COURT:  You may.

13             (At the bench)

14             MS. SMITH:  Your Honor, we've been listening to

15   argument about the DEA's inertia.  We've been listening to

16   argument that the DEA hasn't -- it was slow in investigating.

17   They recertified the defendants, the doctors, even after they

18   had the meeting.  There's been details about this meeting that

19   were never in evidence.  And this is -- the Court specifically

20   said you cannot argue misconduct to be excused by DEA inertia

21   and they have completely done that.  I waited for him to move

22   on.  I thought he did, and he started up again with talking

23   about Graumlich saying they got shut down, and there were

24   suspensions and DEA, what they were doing and what they weren't

25   doing, this is precisely what the Court told Mr. Ravenell.

```
 1              MR. RAVENELL:  Actually, Your Honor, you told us we
 2    could not rely on the 11-4-04 tape which you struck from the
 3    evidence.  Everything I've referred to is in evidence, it's
 4    what Mr. Kaps testified to, what Mr. Graumlich testified to,
 5    and the government elicited the testimony from Graumlich that
 6    I'm pointing to.
 7              And their suggestion I can't point out what a witness
 8    said?  This is direct testimony from the witness that they
 9    called and put on.  And now we're precluded from commenting on
10    the evidence?
11              THE COURT:  What's the evidence that what did
12    Graumlich say?
13              MR. RAVENELL:  That's what's on the screen.
14              (Pause.)
15              THE COURT:  Evan.
16              MS. SMITH:  Your Honor, I have the Court's order
17    right here.
18              THE COURT:  If I can see it?
19              (Pause.)
20              THE COURT:  What I wrote in the order is that the
21    undercover, the defendants seek to introduce a tape recording
22    of a meeting between the website doctor and two DEA agents who
23    were working together.  The tape recording demonstrates that in
24    2004, the DEA had substantial information about the Florida
25    websites allegedly distributing hydrocodone.  The undercover
```

1    meeting is irrelevant.  There is no doctrine of contributory

2    negligence in criminal cases which can serve as a defense when

3    regulatory agency has been investigating violations.

4           Thus, in closing argument, the defendants cannot

5    argue that their misconduct should be excused because the DEA

6    approved inertia shall.  And, moreover, the defendants point to

7    no evidence that they knew about the 2004 meeting, or what was

8    discussed.  Thus, they cannot argue that they relied on the

9    meeting as a flag.  The analysis lids would be different if

10   they could establish such reliance.

11          The Court did admit evidence of a DEA search warrant

12   that was served on the Florida website companies in 2003.  This

13   evidence was admissible as providing notice of the legality of

14   principles of the website companies, who were co-conspirators

15   of the defendants.

16          As such, the evidence was a red flag to the

17   co-conspirators.  The evidence is also to prove the invalidity

18   of the prescriptions written by the website doctors.

19          2004 search warrant evidence was not, however,

20   admitted to prove the guilty knowledge of defendant Sodipo and

21   Nwaehiri.  As mentioned, there was no evidence that the

22   defendants knew about the 2004 search warrants, that in closing

23   argument, therefore, the government counsel would not be

24   permitted to argue that the search warrants provided notice to

25   the defendants either directly or through the concept of

1    willful blindness.

2         So that what the argument is with respect to the 2004

3    meeting was that essentially that the DEA recertified the

4    doctors having known how the websites operated, and therefore

5    the DEA was approving of what the websites did.  That's an

6    argument that is directly in violation of the order that I

7    wrote.

8         MR. RAVENELL:  Your Honor, with all due --

9         THE COURT:  This is, more of the same.  You can't

10   argue that the DEA by certifying the doctors approved the

11   operation for website, or that the DEA was somehow negligent

12   because, if that were the case, then the DEA would be permitted

13   to -- the government would be permitted to prove their

14   suspicions and their entire investigation they did.

15        MR. RAVENELL:  Your Honor, if I may, the Court, what

16   we're -- what we presented to the Court was an 11-04 transcript

17   of a call that the Court precluded.  What I'm relying on is

18   evidence that was in the record.  You're telling me I can't

19   comment on evidence in the record that the government put in

20   the record that the Court hasn't stricken?

21        THE COURT:  I assume the only reason that evidence

22   came in was to show notice to the co-defendants.  You can't

23   argue that the DEA acquiesced about the contact they knew about

24   it, and you can't argue that the DEA was negligent in

25   permitting to continue.

1          MR. RAVENELL:  I haven't argued they were negligent.

2     I pointed out to the jury.

3          THE COURT:  You argued.  I don't mean to cut you off.

4     You directly argued in your prior argument, not five minutes

5     ago that, the DEA knew about it --

6          MR. RAVENELL:  Right.

7          THE COURT:  -- was told of this, and they didn't

8     serve as a gatekeeper.

9          MR. RAVENELL:  If I may, I said they recertified Dr.

10    Ibanez, which is correct.

11         THE COURT:  You did exactly what I told you you

12    couldn't do.

13         MR. RAVENELL:  I don't think I'm doing that at all.

14    I'm relying on different evidence than what the Court found.

15         THE COURT:  This is not the evidence.  It's the

16    argument.  You have argued to this jury that the DEA was

17    negligent in not stopping it, and you have told the jury that

18    the DEA knew all about it, and they recertified Ibanez, and

19    therefore they've approved it.  That's the argument.

20         MR. RAVENELL:  I never said he approved it.  I said

21    the DEA had information and they recertified.

22         THE COURT:  So why is that relevant?

23         MR. RAVENELL:  Let me make sure I understand, I'm

24    understanding something.  If the jury reached the same

25    conclusion from the evidence, it's the same conclusion already

1    in evidence, you didn't strike this evidence.  If the jury
2    reached the same conclusion, how is that a violation?  And if I
3    simply point out what's in the record, how's that a violation
4    if I said they point --
5              THE COURT:  You're arguing what I told you you
6    couldn't argue.  I'm going to forbid you to make this argument,
7    so move on to something else.  Your objection is noted.  It
8    couldn't have been more clear, in my opinion.
9              MR. RAVENELL:  This is absolutely outrageous what the
10   Court is doing.
11             THE COURT:  It's not outrageous.
12             MR. RAVENELL:  It is.
13             THE COURT:  You've now used 10 minutes of your time.
14   You can go back.  You know exactly what you're doing, you're
15   not dumb.  You know you're violating the rule.  So go back.
16             MR. RAVENELL:  You're pointing at me with the jury in
17   the box, don't do that.  I appreciate the Court not pointing at
18   me.
19             THE COURT:  You have two seconds to get back to your
20   podium or your closing argument is over.
21             (Open court)
22             MR. RAVENELL:  Now, other persons I want to talk
23   about is a witness, from the testimony of Patrick Barstow.
24   Now, Barstow was an individual who worked at Cardinal Health.
25   You may recall that Mr. Barstow testified and also a Mr.

1    Brantley testified.  And let's talk about what Mr. Barstow told

2    you when he sat on the witness stand a little bit.

3         He said that when he spoke to Cali, he called him

4    Cali, Cali confirmed that New Care was filling prescriptions

5    through the website.

6         Now, you've heard from Mr. Budlow that there's this

7    effort by the defendants to hide what they were doing.  You

8    know, that the defendants somehow were going to lie to Mr. Miss

9    Nomoto.  Talk about interesting, Miss Nomoto talked about --

10   one of the nicest ladies to meet, she wasn't, but really

11   reliable.

12        Let's talk about her testimony.  You may recall,

13   you'll get there in a minute, the government is saying to you

14   that Miss Nomoto, the defendants lied to Miss Nomoto.

15        In fact, Mr. Budlow made mention that the defendants

16   told Miss Nomoto in December, 2005, that they were not involved

17   in the Internet business.

18        Well, we'll talk about that in a little bit.  But we

19   know that when Mr. Nwaehiri spoke with Mr. Barstow, and this is

20   in '06, February of '06, just a couple months after he had the

21   meeting, the defendants had the meeting with Miss Nomoto, they

22   don't tell -- Mr. Barstow and Mr. Brantley were present from

23   Cardinal Health, that we're not doing Internet.  In fact, when

24   he was -- when he was asked, he said that when he met Steve and

25   Cali, he asked for the names of the sites they were involved

1    with, and they gave them the names of the Internet sites.

2              You ask yourself if they're giving information to

3    Cardinal Health and Barstow, why would they hold back and not

4    give it to Miss Nomoto?

5              When he spoke with Steven Cali and with Brantley, he

6    asked whether they had a license from the prescribing

7    physician.  They told him they had a license, actual licenses,

8    and they showed it.

9              This is exactly proof of that the defendants had,

10   these licenses, had the information, and they had it before

11   September, 2006.  When there's information in government's 59

12   when the government in fact raided New Care on 10-10-06, and

13   recovered government's 59, which has information about the

14   doctors.

15             As of 2-9-06, we know they had the license

16   information, because they showed it to Mr. Barstow and Mr.

17   Brantley.

18             The defendants had this information about these

19   doctors.

20             They advised Barstow and Brantley there'd been an

21   inspection by the state prior to the meeting, and at the

22   meeting, the defendants were told the inspection would be

23   December of '04.

24             Interesting, the government says the defendants are

25   trying to hide something from the BOP, Board Of Pharmacy, in

1    their meeting with Cardinal Health, who was asking questions

2    about Internet business, and they volunteered to tell Cardinal

3    Health that they had a meeting in December '05 with the Board

4    of Pharmacy.

5            Doesn't sound like someone who's trying hide that

6    such a meeting occurred or information, does it?

7            He told you that he was a sales consultant from these

8    days, and he in fact came to an alternate care manager and said

9    something interesting, he said New Care was a customer during

10   time period, which obviously is inconsistent with what Mr.

11   Brantley told you, because obviously he said that they

12   concluded business with New Care in March of 2006.

13           Another witness I want to talk a little bit is about

14   Miss Kelly.  Mr. Budlow says, oh, Miss Kelly and Miss Ryan, and

15   corroborated by Chesapeake, you know, Miss Bryn Dawson that all

16   these calls were coming through, and people were just

17   constantly saying that people were addicted to drugs, and

18   addicts, and you know the pills are short, everything was

19   happening.

20           But one thing that's interesting is you've got a

21   chance to listen to Bryn Dawson, and I want you to go back and

22   review her testimony.  What she told you was that she worked

23   with Chesapeake, and they got calls, sure enough, they got

24   calls, people were saying they were short on pills.

25           But what's interesting is that you have the book with

1    all the calls, and I showed you, if you may recall on the

2    screen some of those calls, and you compared the number of

3    calls that were from local patients who were upset versus

4    Internet patients who are upset, it's about 50/50.

5              I went through a few.  In fact, we created an exhibit

6    that you'll have we culled out some of those actual calls.  But

7    you're going to have the entire book.  You go through it.

8    You'll see that the calls that were come, in through New Care

9    from Chesapeake was not anywhere inconsistent with the calls

10   coming in from the local patients, Internets, or local

11   patients, and what you'll find missing from that thick book

12   that Chesapeake had was any call where someone is saying my

13   family member is addicted to drugs, they, in fact, are

14   supplying drugs to a member of my family, anything like that.

15             It's not one scintilla of evidence that anyone at

16   Chesapeake received such calls.  So when Mr. Budlow says Bryn

17   Dawson corroborates what Kelly says, well, not really.

18             What did Miss Kelly tell you?  That the DEA came to

19   New Care twice while she was employed at New Care.  She was

20   adamant that it occurred.

21             Agent Tush got on the witness stand and says, not

22   true.  Miss Kelly says they identified themselves to me as DEA

23   agents, and it happened on two occasions.

24             Agent Tush, not true.

25             She also told you, Miss Kelly, that all the mail,

1    every piece of mail, she said junk mail, every piece of mail

2    had to go to Mr. Sodipo, went to him, doesn't matter whether it

3    had someone else's name on it, it went to him.

4            Now, Roberta Ball, who worked the floor, all the

5    years she worked there, told you it wasn't true.

6            Miss Patterson told you it wasn't true.  They all

7    told you in fact there were mail slots there that the location

8    -- where the persons would get the mail, sort the mail in this

9    prescription department, went to the department.

10           If it was a particular person, it would go a

11   particular person, and you ask yourself a question, if someone

12   like Miss Kelly would come in before you and give such false

13   testimony, can you rely upon her testimony?

14           Would you rely upon her testimony?

15           And Mr. Budlow said, you know, she has no reason to

16   lie.  Well, we know that's not true.

17           Now, this is not the best thing, but you have this in

18   evidence, defense exhibit 25.  This is a picture of the mail

19   slots that are there.  And we showed this to you earlier.

20           Now, of course, you have these mail slots, people's

21   names on it, why would they be there?

22           Obviously, you have mail slots, so someone can sort

23   the main place before where it belongs and not one person would

24   corroborate what Miss Kelly told you that the defendant just

25   controlled all the mail.

1          This is her effort to work with the government to

2     say, okay, if anything came in, that when the DEA or anywhere

3     else, it's not helping the government's case.  That's what Miss

4     Kelly's trying to do.

5          Defendants had to see if there was, for example, a

6     letter that came from New Care from the DEA warning letter,

7     Department of the Justice, had to go to the defendant because

8     the defendant just grabbed all the mail.

9          This is her effort to try to help the government.

10         Now, the government says she has no reason, no reason

11    at all to be upset with Mr. Sodipo.  There's a memo that she

12    received, you have the memo in evidence, where Mr. Sodipo told

13    her she was going to be terminated if she didn't do what she

14    was supposed to do.

15         We know after she received this document that Friday,

16    she never came back to work.  We know from Miss Ball, who

17    worked there and had a lot of interaction with Miss Ball, told

18    you Miss Kelly's behavior changed even toward her.  She wasn't

19    friendly, didn't talk, and she left and didn't come back.

20         Here's Mr. Sodipo telling her I have given you an

21    instruction, a directive, you have not followed.  You will be

22    terminated if you do not comply.

23         She leaves.  And, of course, the government tells you

24    she has no reason to be upset with Mr. Sodipo.

25         And this incidence occurrence form, this report we

1    talked about and some of the witnesses told you about, Miss

2    Haines, Miss Burston, Miss Ball, if there's something that is

3    unusual that's happening at New Care, and this is a well-run

4    business, they created this form that you could document

5    information if there's something important, something serious.

6         And you would have -- the government would have you

7    believe Miss Kelly thought when there is someone, a member of

8    the family, calling and saying that there is a person who has

9    overdosed, she wouldn't put that in writing.  She wouldn't do

10   anything in the document.  She would make no note of it, even

11   though we know that when there are things of importance,

12   there's a form just for that purpose.

13        Now, we get to the trial testimony of Theresa Ryan,

14   worked for New Care, 2004 until June, 2006.

15        She told you that she was hired initially to perform

16   receptionist duties such as answer phones and letting people in

17   the door, letting people in the door.

18        She testified that she worked primarily with the

19   office manager Kelly, and that she worked in the office in the

20   basement near Sodipo and Kelly.

21        Now, we know that's not true.

22        Shanelle Burston and Roberta Ball told you where that

23   young lady was located was upstairs.  You saw photographs of

24   where you look into, she was there letting people in the door

25   and greeting people.  And that's where she was located, not

1    downstairs in an office next to the defendant where she

2    happened to overhear a conversation between Mr. Sodipo and Miss

3    Kelly.

4         Now, why would she tell you she's located somewhere

5    else when people who worked at New Care, such as Miss Ball and

6    Burston, her good friend Miss Burston, told you that's just not

7    true.  Why is she placing herself somewhere else?

8         She claimed that Mr. Sodipo handed -- physically

9    handed her the prescriptions and performed data entry.  She

10   testified about calls transferred for the pharmacy were picked

11   up most of the time by Sodipo and Nwaehiri, and that she said

12   this twice, that those calls would go to the pharmacy would be

13   picked up by Sodipo and Nwaehiri.

14        What did Laticia Haines tell you?  Laticia Haines

15   worked there in 2001, showed you where she sat.  She said I

16   answered that phone 80 percent of the crime when calls were

17   transferred to the pharmacy.  It was me.  I answered the phone.

18        But Miss Kelly told you, no, no, it was Mr. Sodipo,

19   and when he was at least four hours a day generally sitting in

20   the pharmacy.  Not one other witness told you that Mr. Sodipo

21   would be sitting in the office with all the many faceted

22   businesses that he operated and ran.  And you all heard about

23   them.  And he's moving there, moving here, and he's sitting in

24   the pharmacy for four hours a day.

25        You heard from Miss Walker that there were three

1    full-time pharmacists who worked in the pharmacy.

2            No one said that Mr. Sodipo was there sitting in the

3    pharmacy four hours a day.  But this is Miss Kelly, because she

4    now wants to place Mr. Sodipo and Mr. Nwaehiri as receiving the

5    phone calls, and she knows she's going to testify for the

6    government.  It's clearly contradicted by Laticia Haines, who

7    answered the phone.

8            I think when you consider credibility, Laticia Haines

9    and Miss Ryan, it's not even close.

10           She described that a meeting of the typical family

11   member would call as ranting and raving.  She received these

12   kind of phone calls all day long, these ranting and raving

13   phone calls.  And the people would say things like a spouse or

14   relatives are addicted to narcotics and that the calls of this

15   nature came in several times a week.

16           Again, Laticia, who answered 80 percent of those

17   calls, said we got calls, people did call, said they were short

18   on medication, some of them were upset, some were not.  But

19   nothing about someone calling and in fact suggesting that

20   members of the family were addicted to medication,

21           And this was happening all day long.  Laticia Haines

22   was there.  She answered the phone again.  Consider her

23   credibility versus Miss Ryan's.

24           As I said, she told you, Miss Kelly, that she

25   happened to be in this location, Miss Ryan was, and heard this

1    conversation between Mr. Sodipo and Miss Kelly.

2            Do you believe her?

3            Well, let's talk about her credibility some more.   In

4    response to question Mr. Budlow -- excuse me -- Miss Kelly

5    friends, after the private investigator we sent to talk to her,

6    she ended up calling Miss Kelly.

7            Now, when I asked her on cross-examination, she

8    affirmed at first that she was a friend of Miss Kelly.   She

9    called her Dee.   And then as a break and she comes back in and

10   she said we're not friends, we're really associates.

11           I said, well, interesting that Miss Kelly used that

12   term associates.   Could it be that you in fact got that

13   information from Miss Kelly?

14           Oh, no.   While I was sitting outside, I thought of,

15   thought it of, and we were really associates, not friends.

16           Why would she lie about her relationship and

17   friendship with Miss Kelly?

18           She testified she had spoken to Kelly recently a week

19   and a half before her June 25th testimony.   Now, she testified

20   on June 25th, Miss Kelly testified on June 20th.   And this

21   young lady told you in her testimony, I'll give you the page

22   numbers, that she spoke to Miss Kelly about a week and a half

23   before her June 25th testimony.

24           Is that truthful?   No, it's not to be.

25           Here's how we know.   After she testified, and you

1    heard me ask her for a phone number, we wanted check it out to

2    find out whether she was telling the truth.  We didn't know

3    what we would find.  Something told us to do it.  Here's what

4    you find.

5              This woman who said she'd only spoken to Miss Kelly

6    last about a week and a half before her testimony, June 20,

7    Miss Kelly's testifying on the witness stand, about 9:40 in the

8    morning.  And who's calling her?  Miss Ryan.  Trying to get

9    through to her.

10             What happens the next day?  Calls her again.  Now,

11   she does get through, and she talks to her for 10 minutes.

12             Then there's another call on June 21st.  Then on June

13   23rd, two days before she's going to testify, two days before

14   she's going to testify, she has a 15-minute or so conversation

15   with Miss Kelly.

16             But she comes into court and tells you she had not

17   spoken to Kelly about a week and a half before her June 25

18   testimony.

19             Why is she lying?

20             Now, she didn't know we're going to get her phone

21   records.  She thought she could get away with it, thought she

22   could lie, tell you there was not that the relationship, tell

23   you there was not that conversation.

24             Cell phone calls between Miss Ryan and Miss Burston.

25   Miss Burston tells you, very good friends.  They hang out, go

1    nightclubs together.  Miss Burston would have Miss Kelly's

2    mother watch -- excuse me -- miss Ryan's mother watch her

3    child.

4            A lot of phone calls between them.  Very good

5    friends.

6            She told you not once in all the times we hung out,

7    all the times we spent together, did Miss Ryan ever say to her

8    that they were receiving phone calls at New Care, people who

9    were addicted to drugs, or individuals who in fact were saying

10   members of their family were addicted to drugs.

11           So that's the kind of stuff you would expect Miss

12   Ryan to share with her good friend when they're going shopping

13   and hanging outside, and, you know, because she certainly had

14   the relationship.

15           There's a lot of phone calls between these two

16   individuals.  In fact, on the day that the DEA was at New Care,

17   October 10th, 2006, we know that it was Miss Ryan who called

18   and alerted Miss Burston that the DEA was at the business.

19           In fact, if you look through the phone records,

20   you'll see there are at least three or four calls on 10-10-06

21   confirming what Miss Burston told you.

22           That's the kind of relationship they had.

23           But she wouldn't tell Miss Burston these things, but

24   it happened.  She lied to you about whether she had in fact

25   with Miss Ryan -- excuse me, Ryan had contact with Miss Kelly,

1    but you should believe her, anyway.

2          Number of phone calls between Ryan and Kelly, 654

3    during the December 15th '05, 6-26-08.  Just an associate.

4          The Judge gave you this instruction, if you find that

5    any witness has willfully lied about any material matter, you

6    have the right to conclude that the witness also lied about

7    other matters, disregard all the witness testimony or you may

8    accept whatever part you think it deserves to be believed.

9          I suggest to you that it when you come before a jury,

10   raise your hand, swear under oath to tell the truth, and lie

11   and lie about her relationship with Miss Kelly, lie about her

12   contact with Miss Kelly, and then you should believe her,

13   according to the government telling you you still believe her,

14   and she says she overheard this conversation between Miss Kelly

15   and Mr. Sodipo.

16         The Court told you the following:  If you find that a

17   particular witness is hostile or biased against either

18   defendant, you should take that into consideration when

19   weighing that witness's testimony.

20         Evidence that a witness's biased or prejudice or

21   hostility requires you to view that witness's testimony with

22   caution, to weigh it with care, and subject it to close and

23   searching scrutiny.

24         The Court told you about witness credibility.  And

25   the Court said did the witness have some incentive, loyalty, or

1    motive that might cause him or her to shade the truth?

2          Does the witness have some bias or prejudice or

3    hostility that may have caused the witness to give you

4    something other than a completely accurate account of the facts

5    he or she testified to?

6          All those instructions apply to Miss Kelly and Miss

7    Ryan.

8          The Court told you you were trying to decide whether

9    a person is truthful, straightforward and accurate in his or

10   her recollection.

11         Miss Ball testified, Roberta Ball, checked with the

12   DEA, checked the DEA certification.  She believed the

13   defendants visited Board of Pharmacy occasionally.  She told

14   them because she believed them to be truthful, worked with them

15   a lot, just as character witnesses.  The government brought out

16   the character witnesses that didn't work with Mr. Sodipo, you

17   didn't work with Mr. Nwaehiri, you weren't there with him on a

18   daily basis. Miss Ball was.  She was there with them on a daily

19   basis.

20         And she told you that the facilities list was not

21   created at New Care for the Board of Pharmacy, that the

22   government has harmed so much.

23         She told you that these men have been truthful with

24   her, over the time period she worked with him, she had every

25   reason to believe them when she said they went to the Board of

1    Pharmacy.

2           How else do we know they were doing these things?

3    They kept management meetings, regular meeting 9-25-06, the

4    first Monday the defendants are back from Nigeria, they return

5    back from Nigeria on 9-22. 9-25, they're having a meeting and

6    they're talking.  They're members of the management team.

7           And one of the things they say is that in the 9-25

8    meeting, we know that they point out that they were going to,

9    they were suspending IHE.  IHE was being suspended temporarily

10   and indefinitely until they actually filed what was going to be

11   happening with the particular business.

12          We know that on the records, in fact, did go, they go

13   -- they went to the Board of Pharmacy.  They went about 9-2-06

14   because Mr. Collins Eversly told you that he met with Agent

15   Tush on 9-29-06, and that about two days before that, he'd seen

16   the defendants at the Board of Pharmacy, which would have put

17   it at 9-27-06.

18          IHE has been suspended until further notice.

19   Nevertheless, they needed to replace the loss of revenue so

20   that the staff will not suffer, more marketing to identify new

21   accounts.

22          Those are the meeting notes from 9-25-06.

23          And there's a meeting on 10-2-06, again, another

24   meeting where defendants in fact bring out the fact that they

25   had gone to the Board of Pharmacy.  We know they'd gone,

1    because several witnesses told us they'd gone, and we know even

2    from Mr. Collins Eversly and from Miss Costley down at the

3    Board of Pharmacy, they said we've cleared it up.  We've only

4    preparing a minimum amount, minimum amount of the prescription

5    at this time to minimize the cost.

6            In fact, talked about the JAECHO survey you

7    mentioned, Miss Ball told you about JAECHO.  In fact, working

8    on JAECHO, and that it was now completed.

9            10-9-06, there's another meeting.  Now, there's not a

10   lot to discuss at this meeting, particularly about the Internet

11   server, because we know it's important because the defendants

12   are still operating their business as they had been before,

13   which is meeting with their individuals working with them,

14   talking to those managers.

15           You may recall that Miss Ball told you that when they

16   decided that New Care to become involved in the Internet

17   filling prescriptions, the prescriptions they were filling,

18   that there was a meeting.

19           Mr. Sodipo and Mr. Nwaehiri met with them, explained

20   that what they thought about entering this business, had a full

21   conversation.

22           They all got to talk it about it.  This was not some

23   backdoor decision.  It's not some let me make the decision and

24   inform those who work for me later as they had done in the

25   past, they met with the members of their team and had a full

1       discussion and then decided that it was the proper thing to do.

2               These are not pharmacists who were just making willy

3       nilly decisions, but they're thinking it through and deciding

4       whether it's something that their business should become

5       involved in.

6               Miss Burston, let me talk a little bit about her.

7       She told you she hung out in the pharmacy a lot, that she,

8       Ryan, as I said, were very good friends.

9               She told you these department meetings that Mr.

10      Sodipo and Mr. Nwaehiri were very accessible, open door policy.

11      They had general meetings where everyone got a chance to

12      participate in the meeting.  These were not individuals who

13      were keeping their people in the dark.  They in fact let

14      everyone participate.  Not just the managers, but even those

15      who worked for them who were regular employees.

16              Nanette Patterson told you that while the defendants

17      were in Nigeria, Miss Jones came to her, and what did Miss

18      Jones say to her?

19              Miss Jones told her that some of the doctors writing

20      the prescriptions were currently under investigation.  The

21      defendants, when they called in Nigeria, said I'll take care of

22      it.  And that he when returned, Mr. Sodipo and Mr. Nwaehiri

23      went to the Board of Pharmacy, and they said everything was

24      okay.  She didn't ask for details, because she in fact trusted

25      and relied upon them based on her history with them.

1          Well, what Miss Jones said to Miss Patterson was that

2     she believed the doctors were currently under investigation,

3     and there was no information that she had to support that.

4          Shirley Costley, we talked about a little while ago,

5     we mentioned, she's the young lady at the Board of Pharmacy,

6     she was involved in licensing.  And when the defendants went

7     there, she says, I can't really tell you really what they were

8     asking.  The defendants were talking about filling

9     prescriptions for a Florida clinic.  She had problems

10    understanding them.

11         Now, that's possible, you know, they speak with heavy

12    Nigerian accents.  Maybe she did have problems understanding.

13    You certainly heard witnesses on the witness stand who have

14    spoken with heavy accents, and sometimes we have all asked them

15    to repeat themselves.  But this incident occurs almost three

16    years ago from when she was testifying.  She doesn't have a

17    recollection of the conversation other than what she testified

18    to.  She wasn't clear exactly what they were asking, and she

19    never reviewed New Care's file.

20         She said she doesn't believe that she told the

21    defendants to file an addendum to their existing permit.  Yet I

22    didn't know they were licensed.  When pressed on it, she said I

23    didn't tell them.  I did not tell them to add an addendum.

24         Well, then Agent Tush got on the witness stand.

25    Agent Tush had written a report on 9-29-06 about his interview

1   of Miss Costley.  And what did he tell you?  That Miss Costley

2   told him that she in fact did tell the defendants that if they

3   wanted, if there was a situation where one is seeking to do, or

4   is involved in Internet practice, that you must have it added

5   as an addendum to your existing license.

6          The defense has already done that.  They already had

7   an addendum to their license.  We know that.

8          Another witness was Ruth Walker that the government

9   called.  Miss Walker was a pharmacist who worked at New Care.

10  She told you that she said Steven and Cali assured her

11  everything was fine.  They were going to the Board of Pharmacy.

12  They did go.  This was early on when she was working.  She

13  remembers they came back and reported to her they'd gone to the

14  Board of Pharmacy and were reassured that what they were doing

15  was okay.

16         The next time she had a conversation about this issue

17  is when Miss Jones came to her, we know this is September,

18  2006.  So for the nine months or so ten months almost that Miss

19  Jones, Miss Walker's working as a pharmacist there, other than

20  when the defendants originally went to at one time when she was

21  there earlier went to the board of pharmacy, there's no one

22  who's saying anything to her about a problem with these scrips.

23         She's a pharmacist.  She's been there for a long time

24  and been working as a pharmacist for a long time.  She said

25  that when Mr. Nwaehiri and Mr. Sodipo returned from Nigeria,

1    she had a conversation with him.  She believed she told Steve

2    they didn't feel comfortable because of the information that

3    was given to them.  They needed assurance it was okay.

4            And what did the defendants say?  They didn't say

5    don't worry about.  They said we'll go to the Board of Pharmacy

6    again.  They went.  How do you know?  Because they told me

7    that, and I have no reason to not believe them.

8            Miss Walker indicated as of 10-6-06, Mr. Sodipo was

9    considering contact further with the DEA investigating the

10   claim.  He sold you Mr. Sodipo went to the Board of Pharmacy.

11   We know they went around 9-27-06 and she said 10-10-06.  She

12   was talking about Miss Jones coming into the business, on

13   10-10-06, where she in fact met with Mr. Sodipo, and at that

14   time, Mr. Sodipo was considering now calling the DEA to get

15   more information.

16           Is that someone burying their head in the sand?  They

17   come back from Nigeria.  They said we're not going to fill

18   prescriptions right away.  We're going to suspend IHE.  We're

19   not going to do anything until they go to the Board of

20   Pharmacy.

21           They go, and we certainly know Miss Costley is not a

22   good person to really know what happened with the defendants.

23   We know she's not a good reporter.  She couldn't remember she

24   told them to add information to the license addendum if in fact

25   they wanted to be involved in Internet practice.  The

1    defendants knew that's what to do.  We were there.  We already

2    had the information added to our license.  There's no reason to

3    add it.

4         Miss Walker told you she never agreed with the

5    defendants or anyone else to commit a crime.  If she thought

6    what she was doing in filling these prescriptions was a crime,

7    she wouldn't have done it.

8         The government is calling her as a witness why?  28

9    years as a pharmacist.  She tells you she's answering phone

10   calls at the pharmacy, and at the pharmacy, she's talking to

11   individuals.  She's the one who is there full time, Miss

12   Walker, Miss Jones, and Mr. Abraham.

13        Liteia Jones, you didn't hear from her.  Now, Miss

14   Jones is the one who in fact brought this to Mr. Sodipo and

15   others in September '06.  We don't know, but it certainly seems

16   to me if Miss Jones thought the time she worked there up until

17   September '06 they were filling prescriptions for people who

18   were addicts and violating her code, she wouldn't have been

19   doing it or she wouldn't have had the conversation she had with

20   Dr. Ibanez in September '06.

21        These were pharmacists working on a daily basis,

22   filling these prescriptions. 28 years, Ruth Walker, Liteia

23   Jones, who in fact is the one who brought this matter to the

24   attention of others.

25        Are they going to fill these prescriptions if they

1    think they're filling for addicts?

2              Is that what they would do?  And they're the ones

3    that are there every day.  All the prescriptions that you've

4    heard about, you have that, this number and that number, it's

5    Miss Walker, Miss Jones, and Mr. Abraham who were filling the

6    prescriptions.  And they're pharmacists with experience.

7              And the government would say, well, these reasonable

8    pharmacists, these men should know that because of the number

9    of prescriptions that they're filling, because it's

10   hydrocodone, and it's a crime.

11             Yet Ruth Walker, Liteia Jones, Babu Abraham, many

12   years of experience, are filling these prescriptions, and they

13   the ones every day doing it.

14             And Miss Jones tells you, if I thought what I was

15   doing was a crime, I wouldn't be doing it.

16             I would not intentionally violate my professional

17   responsibility and put my license at risk.  I wouldn't do it.

18             You've had a chance to observe Miss Walker on the

19   stand.  The defense didn't call her.  They called her later.

20   Originally she's called by the government as a witness for the

21   government, told you what happened.

22             What else did she tell you?  That Liteia Jones

23   expressed to her concerns about filling prescriptions for

24   fictitious doctors.  Jones felt like they may not have been

25   real doctors.

1            She recalls heading to a meeting 10-6-06, said Jones

2    came into the office and met with Mr. Sodipo.  She heard Steve

3    at that time tell Miss Jones that none of the doctors' names on

4    the scrips were fictitious.

5            Now, why does he tell her that?  Because that's the

6    information that's been given to Mr. Sodipo, that Miss Jones

7    was believing that these doctors are fictitious, that they're

8    somehow doctors who do not really exist.

9            She remembers, Miss Walker does, Steve coming out of

10   with a list of doctors, and that these are the doctors and

11   their DEA numbers and everything was in place.

12           Look at government 59, you'll see it's there, the

13   list, and here's the list.  You'll see it up close when you can

14   view it.  And here's the list, it's dated 10-25-06, 10-25-06 on

15   the corner.  It says New Care Home Health, prescriber, and this

16   document was found at New Care.  Inside what is government's

17   59.

18           Mr. Sodipo returns on 10-25-06 to the office.  They

19   print this list.  Why is he printing this list?  Because he's

20   being told by Miss Jones that the doctors who are filling these

21   prescriptions are fictitious.  They're suspended.  They're not

22   licensed to do what they're doing.  And he investigates.  He

23   doesn't just sit on his hands like the government would have

24   you believe.  He investigates, he pulls this.

25           Go back.  She remembers Steve coming out with a

1   license list of doctors and saying these are the doctors and

2   their DEA license and numbers,

3   Everything was in place.

4            Look at that list.  Joe Jose Cruze, Stanley Dratler,

5   Gregory Goodwin, Juan Ibanez, with checkmarks.

6            Those are the names that he's looking for because

7   he wants to confirm what he believes is that these doctors are

8   in good standing, they already have a DEA certification with

9   the doctors, they have the licenses information.  We know they

10  had it as of 2-9-06 at a minimum because they showed it to

11  Barstow and Brantley.

12           We know they had it before that, because we were

13  told by Adam Kaps they sent it along.  We know they had

14  information on Dratler and Ibanez, because if you look at

15  government's 2 A, the contract, the IHE contract, inside that

16  same sleeve is the DEA licenses for Ibanez and Dratler.

17           And what Mr. Sodipo's doing, first day back, 9-25-06,

18  not only does he go to the Board of Pharmacy on 9-27-06, but

19  the first day back, they check this information.  And when he

20  gets a chance to speak to Miss Walker, Miss Jones.  He talked

21  to Miss Jones about it, showing her that the doctors are not in

22  fact fictitious.

23           Is that someone who was just turning a blind eye that

24  something who in fact is making effort to inquire?

25           We know that he's talking to Ruth Walker about

1    contacting the DEA on 10-6-06, and four days later, before he

2    got a chance to do that, the DEA comes in and executes a

3    warrant.

4           Even then he doesn't stop cooperating.

5           You heard testimony upon his arrest, Mr. Sodipo got

6    in the car with the DEA.  He didn't have to come to New Care

7    and agree to help.

8           Is that the sign of someone who was guilty?  He's

9    going to take the DEA there.

10          You heard from Miss Ball, when they went in, Mr.

11   Sodipo's walking, unusual, he's wearing the same clothes he

12   wore the day before.  He's looking confident.  He's walking

13   back and forth between the Administrative Office and the

14   pharmacy accompanied by a DEA agent.

15          We know that when asked by Agent Rosati, he makes a

16   phone call to Nick Cammarata.  That's not a man who is not

17   cooperative, a man who just buried his head, or a man who in

18   fact said I'm going to cooperate.  I'm going to do what I can,

19   and man who is in fact willing to investigate and not just bury

20   his head.

21          The government would have you believe it's a red

22   flag, and they just turned their heads to it, you know, fired

23   up again, as Mr. Budlow said.  Fired it up.  They didn't just

24   fire it up.

25          They had a meeting, and he said suspend it.  9-25,

1    we're checking the doctors out. I'm being told they're

2    fictitious.  I'm going to check it out.  He does that. 9-27

3    goes to the Board of Pharmacy, he has a meeting.  He's told if

4    you want to do this, if one is going to be involved in Internet

5    practice, then you have to have it on your addendum, your

6    application.  He goes we already did that.  May 19, '05, he

7    sent a letter to the Board of Pharmacy, Mr. Nwaehiri did.

8    10-10-05, we filed an application telling them that's what we

9    wanted to do, we were doing what we're supposed to do.

10          What else did we do?  We're going to check with the

11   DEA as well.  The government tells you there were documents

12   they say were found in Mr. Sodipo's office.  Look at those

13   documents, 50 B, look at the man who buries his head in the

14   sand.  Those doctors that he reviewed, was he looking for

15   information?

16          Documents, though, are dated, if you look at them

17   9-16, 19-19, 9-20 and 10-4.  Some of these obviously are

18   printed when he was not in the country.  He didn't return until

19   9-22.  The government says these are in his office.

20          Does it sound like a man who's burying his head, r is

21   it a man seeking information?

22          Also in government 59, these documents, and there's

23   several like this, printed, again at the bottom 9-25-06.  Not

24   only do they have the list of doctors they were reviewing, but

25   they actually have the batch of the information. Juan Ibanez,

1   lead physician, main doctor in charge, licensed in the State of

2   Florida, and there's several documents like this, one for Reppy

3   and others that they have now pulled, 9-25-06.

4          Does this look like a man who's just burying his head

5   in the sand and not investigating what has been brought to his

6   attention?  It's just the opposite.

7          That's the other part of the document, page 2 of 4,

8   Dr. Ibanez, and there are others in there.

9          And Miss Walker said Steve said he had checked the

10  doctors and that they were fine.

11         Miss Walker didn't have any knowledge of the doctors

12  that they were filling scrips for those doctors were

13  fictitious.  She had no information on Mr. Sodipo had no

14  information.  In fact, he had just the opposite.  He was

15  checking it.  He did check it, and that's why he could tell

16  Miss Walker that they were fine.  That's why he could tell Miss

17  Jones that they were fine.

18         She said that calls came into the pharmacy.  She took

19  some of those calls, Miss Walker.  She had no reason to believe

20  that she was filling Internet prescriptions for drug dealers.

21  She's taking the calls.  Laticia Haines is taking calls and

22  they're telling you there's nothing that made them reach these

23  conclusions.

24         She said yes, people were upset.  Yes, people were

25  asking about shortage of pills, but they didn't tell this

1     28-year pharmacist that people were supposedly drug addicts the

2     government would say these men should have concluded.

3           She said that Steve went to Board of Pharmacy on at

4     least two occasions she's aware of, early on after she started

5     working, and then again in September, 2006.  She was asked how

6     do you know that?

7           She said she believed them because she had no reason

8     not to.

9           THE COURT:  Mr. Ravenell.  We've had a time-out

10    signal from the jury, so we'll need the time out.

11          And ladies and gentlemen, it's 3:00, so let's come

12    back at 3:10.  We're on a tight schedule, and I want to make

13    sure counsel have full opportunity to make their arguments so

14    if you could hustle back, I would appreciate it.  Thank you.

15          (Recess.)

16          THE COURT:  Thank you.  Please be seated unless you

17    wish to stand for the jury.

18          Mr. Thompson?

19          THE CLERK:  Yes, sir.

20          (Pause.)

21          (Jury present)

22          THE CLERK:  Jurors all present.

23          THE COURT:  Thank you, Mr. Thompson.

24          Welcome back, ladies and gentlemen.  Please be

25    seated.

1          Mr. Ravenell whenever you're ready, sir.

2          MR. RAVENELL:  Thank you, Your Honor.

3          We're almost, I promise, we're getting there.  We're

4     getting there.

5          Famous last words.  We're going to get there.  And I

6     must tell you I know we've been keeping you for, obviously, you

7     know, this is important to both sides, so we're going to try to

8     soldier on, as the Judge said, soldier on and get there.

9     Because once I sit down, I can't get back and talk to you.

10    That would be a good thing for you, but I do want to keep

11    talking to get my points across, and you'll do with it as you

12    may once you go back to the jury room.

13         Let me kind of continue along.  I must tell you that

14    I appreciate the attention that you've shown to be able to give

15    Mr. Budlow, and I know you'll give Miss Smith the same.  People

16    talking to you for a long time and you can't respond back.

17         Now, what I was pointing out when we left is this

18    28-year pharmacist told you that in person who knew Mr. Sodipo

19    for a period of time said she decided to believe him based on

20    her history.  That's what I said when I got up earlier, we're

21    not talking about people who knew Mr. Sodipo and Mr. Nwaehiri

22    in their personal life.  People who knew them in their business

23    life as well.

24         One of the things the government

25    harped on when the character witnesses testified, you don't

1    know what happened at New Care, you don't know what occurred in

2    the business.  You didn't, you didn't really, you weren't

3    really there.  That was a fair question to ask.

4         But here's how we respond.  It's not just the people,

5    personal lives, but those who knew them, like Miss Ball and

6    Miss Walker, whom the government called, telling you that based

7    on their everyday relationship with these men, they trusted and

8    believed in them.

9         And Miss Walker, who, as I said, was the pharmacist

10   for 28 years saying there was nothing there.  There's nothing

11   that told me that these people were addicts.

12        She also told you that she knew Theresa Ryan, knew

13   Miss Kelly.  She never heard them say anything to her.  It

14   doesn't mean they have to, but this is the whole business.  And

15   only two people are coming before you and telling you that Mr.

16   Sodipo was being told that people were addicts, and people

17   answering the phones, Miss Haines, they aren't getting that.

18        Again, trust your -- the credibility of those two

19   young ladies, Miss Kelly and Miss Ryan, versus those who

20   testified.

21        A couple things before we move onto the area and talk

22   about some of these red flags that Mr. Budlow has talked, he

23   mentioned a couple of things.

24        When the government talked about, you know, chasing,

25   you know, they were chasing, the defendants were chasing

1    distributors, one of the things they neglected to point out to

2    you is that Gary Adams, who testified for McKesson, told you

3    that when they decided, when McKesson cut back in March of

4    2006, the amount of hydrocodone that New Care had occurred,

5    that Mr. Sodipo called and said why?  What's happened?  And he

6    said I went up the line.  I couldn't get any information to

7    give him.

8         Do you remember that testimony?  He said, I didn't

9    have the information to give to you.  So the government's

10   saying that that should tell you, well, you knew something was

11   wrong and they cut you off.  But he asked for the information,

12   and he didn't get it.

13        So how, then, can you characterize that he has

14   information that they thought he was doing something wrong

15   being the distributors, so he cut him off, when they didn't

16   even tell him why they reduced the numbers to it?

17        Same thing with Cardinal Health.  Mr. Brantley said

18   when I met with the defendants on March 9, 2006 at New Care, I

19   told them that, based on my understanding of the DEA regulation

20   and what the law is, that there must be an in-person

21   examination for there to be a doctor/patient relationship by

22   the prescribing physician.  And if you don't have that, there's

23   not a doctor/patient relationship.

24        Now, these pharmacists knew better.  So when Cardinal

25   then says we're terminating our business relationship they knew

1    Cardinal Health was doing it based on a flawed analysis of the

2    law, because there is no in-person requirement of examination

3    by the prescribing physician.   There is no such.

4              So keeping in mind, and consider, you know, these

5    actions by the distributors.

6              Another thing is, the government made a lot to do

7    with Mr. Boyd about Robin Brinegar's -- well, please, I didn't

8    get her transcript, because I had enough, I hope you search

9    your notes and read what Miss Brinegar said.

10             Miss Brinegar said I was new out of the pharmacy tech

11   school.  Do you remember she was trained by Laticia Haines, who

12   had worked there since 2001?  She said I was concerned about

13   the form of the prescription.  It wasn't what I was normally

14   seeing, and I wanted to see the actual prescription.

15             So when she's getting this form that comes through

16   the via Internet, and it's not what she's taught in pharmacy

17   school, it's something different to her, so she asked

18   questions.  Fair.

19             But asking that kind of question does not suggest

20   that there's something wrong with the prescriptions coming from

21   the Internet.

22             So be careful when Mr. Budlow told you that Miss

23   Brinegar saw it.  No.  What she saw was this form of

24   prescription is unusual to me and what they just taught me in

25   school so I have questions.

1           Legitimate questions.

2           And Mr. Sodipo told her it's okay.  Those

3    prescriptions do not create a problem, because it's a

4    prescription from the Internet, which is as you know the law in

5    fact says to have the prescription from the Internet.  The

6    government's not telling you it's a crime to receive

7    prescriptions from the Internet.

8           So what Miss Brinegar's concern was addressed.

9           Now, let's talk about these red flags, and the

10   government spent a lot of time on that.  Let's go to one thing

11   I forgot to mention, and this defense 37.  I made mention it to

12   you about Miss Nomoto, and I want you to look at defense 37,

13   which you'll have.  Do you remember that, that this document

14   was sent to Miss Nomoto, addressed to her, and has a photograph

15   of Mr. Nwaehiri and a photograph of Mr. Sodipo, and it was sent

16   to her by the government to see if she could identify two men.

17   She got them wrong.  50/50 chance, and she got them wrong.

18          This is someone who had gone to New Care, Miss Nomoto

19   told her, on many occasions to conduct these inspections

20   yearly.  She couldn't even tell you which defendant is which

21   defendant after saying she met with them and said they told her

22   certain things, consider that when you start to rely on what

23   she said that they somehow tried to deceive her that they were

24   involve in the Internet business.

25          The government's made a lot about the red flags.

1    Now, their experts, Catizone and Christo testified, this is

2    something they talked about being red flags.  The first one is

3    you've heard a lot about it.  No examination of the patients by

4    the doctor who wrote the prescription.

5        Not going to belabor the point.  You know by now

6    there's no law that requires this.  The government hasn't

7    pointed you to one, one statute, one thing, that tells you that

8    there was a law, this is required, and the Court's instructed

9    you on the law.  You didn't hear the Judge one time telling you

10   in his instruction that there's a requirement in law that there

11   be an in-person examination by a prescribing physician.

12       Dr. Christo and Dr. Lander agree.  In fact, I gave

13   you a hypothetical early this morning that I presented to Dr.

14   Christo, about, you know, the urgent care situation or call on

15   the weekend, and clearly the doctor has not seen that person.

16       Then the DEA warning letter that the government has

17   put so much stock in doesn't even say -- we'll talk about that

18   in a minute.  We know that the Internet allows this kind of

19   interaction with people through the Internet.  That's what it's

20   all about, that you can in fact be involved in doctor/patient

21   relationships without having a face-to-face interaction that

22   the law doesn't even require.

23       They make a big deal about doctors and patients

24   geographically distant.  I say so what?  Here's why I say so

25   what, again, this is what the Internet is all about.

1            Geographic distance is expected.  Even the VIPPS

2     certified pharmacists serve patients at a geographic distance.

3     They brought Catizone on the stand.  Mr. Catizone, VIPPS

4     certified, 15 VIPPS certified pharmacies, they serve people all

5     over the country.

6            So and they have these standards that they want their

7     VIPPS certified pharmacies to meet.

8            And nowhere does it say you can't serve individuals

9     from a distance because it's expected.  Johns Hopkins

10    University, well-respected university, one of the top notch in

11    the field, right?

12           You heard testimony from Dr. Christo.  They service

13    patients all around the world without having in-person contact.

14           Doctors prescribe hydrocodone for almost all of the

15    patients.  Hydrocodone is the most popular pain medication in

16    the treatment of chronic pain.  Dr. Christo doesn't deny it.

17           Dr. Lander told you, he testified hydrocodone and

18    Tylenol III are the drug generally used to treat mid-level

19    chronic pain.  The websites did not only treat pain or supply

20    pain medication.  How do we know that?

21           This 11 P, anxiety, these are the different

22    categories one can seek medication, anxiety, stress, sleep,

23    gastro health, men's health, muscle relaxant, pain medication

24    sexual health.

25           These are different medications and allergy, anxiety,

1    stress, sleep, gastro health, men's health.

2          So and it's also says pain medication, but to suggest

3    that's all they have, and all this the websites are geared to

4    do is to give pain medication, where's the evidence of that?

5          There's documents the government introduced last

6    week, maybe this week, certainly cuts against that.  The fact

7    that these doctors in fact were receiving information from

8    people who in fact were seeking pain treatment, people who had

9    pre-existing conditions, Mr. Budlow's made a lot about they

10   were not diagnosed.  Well, they weren't diagnosed.  I agree.

11         Those doctors were reviewing medical records of

12   individuals who in fact had pre-existing conditions based on

13   their medical records and decided whether to continue treatment

14   not whether to start treatment.

15         In fact, we talked about that when Dr. Lander was on

16   the stand.  There's nothing in the record to suggest

17   individuals were coming in and saying I hurt my back yesterday.

18   Even the information that the DEA agents sent in, none of them

19   said I just hurt my back yesterday.  It's all I've had this

20   problem for a time period, I've seen a doctor in the past.

21   I've received Vicodin in the past.  Here is my -- here are my

22   medical records.  Please determine whether in fact I should get

23   medication.  That's very different than someone who's seen for

24   the first time in diagnosis.

25         Now, the government -- let's go back to one other,

1   there's no precautions were taken to ensure that the customers
2   were taking the drugs rather than selling them.  Again, there's
3   no such requirement in the law.  None.  There's no one who was
4   giving you that information that said to tell you there's a
5   requirement in law.  Dr. Christo and Lander testified to that.
6   Christo, the pharmacists do not check on his patients after
7   they fill prescriptions.
8           Christo, he's never called one of his patients to ask
9   whether they were misusing drugs, even as detailed as Christo
10  is.
11          And his testimony, he said I never call my patients
12  to ask whether they're in fact misusing the medication.  The
13  government would say this is a red flag, because no precautions
14  were taken to show the customers were taking those drugs other
15  than selling them.
16          Dr. Christo, even though it's not a standard of care,
17  even though he may have a higher standard of care than one may
18  necessarily need have, he doesn't do it.
19          For Christo, a pharmacist, has no control over his
20  patient.  And as I indicated, more important, how would the
21  defendants, the pharmacists here, ever know what followup a
22  doctor conducts with a patient?
23          Think about it.  Talk about common sense.  This red
24  flag that the government's experts testified to, Dr. Christo
25  and Catizone.  No precautions taken.

1              Do you remember Dr. Christo, I bring the patients in,

2     I have them count the pills, and all the precautions that he

3     says he takes.

4              How do the pharmacists know?  The defendants are on

5     trial as pharmacists, not doctors.

6              And how would they ever know whether a doctor

7     conducts follow up with their patient?

8              Another red flag, there were no followups to ensure

9     that there were no side effects.  Again, not a requirement in

10    the law for doctors to do this, and certainly not the

11    pharmacist would be doing the followup.

12             And again, ask yourself how would a pharmacist know

13    whether there's been followup by a doctor?

14             Ask yourself the question, how often do you, when you

15    get a prescription filled, receive a followup call from your

16    pharmacist asking whether you have any side effects?

17             But these men should do it?  Where's that in the law?

18    Where's that a requirement for them?  How is it a red flag for

19    them that they didn't call to check with someone who was

20    experiencing side effects?

21             11 doctors wrote 90 percent of all the hydrocodone

22    prescriptions.  Defendants were aware that the doctors were

23    treating these patients for pain.

24             How do we know that?  It's everywhere.  Let me see.

25    You have Babu Abraham testifying in the Grand Jury, and you

1    have all the prescriptions that many were filled for.

2    Hydrocodone is a pain medication.  You have the prescriptions

3    that are for hydrocodone.

4           Epainmeds, you have a document that was received with

5    the contract that indicates that the doctor, one doctor in fact

6    worked at epainmeds, and the defendants are filling

7    prescriptions for hydrocodone, which they know is used to treat

8    pain.

9           The number of pills and per prescription was

10   appropriate, 30, 60, and it is not one extra who says 90 pills

11   is too much for a prescription.  60 pills is too much for a

12   prescription.

13          And then the government harps on refills.  The number

14   of refills, that there are two to three refills when the law

15   allows five.

16          Look at the DEA letter, DEA warning letter, and

17   you'll see that's in there, in the DEA notes that you're

18   allowed to have five refills.

19          I can even show you in the Maryland pharmacy log when

20   the Dr. Catizone, that doctors are allowed to have five, fill

21   five, in a six-month period.

22          Many of the prescriptions of New Care, filled at New

23   Care, were for refills, not new prescriptions, from other

24   doctors.

25          Now, we can know that when we talked about it a

1    little bit, these prescriptions where many of them were just

2    that, refills.  They were not one doctor writing many

3    prescriptions on one day.

4         The government says hydrocodone made up approximately

5    88 percent of all prescriptions issued by the doctors.  Again,

6    use of hydrocodone versus Tylenol III, unless one can say

7    hydrocodone is not a proper drug to treat chronic pain.

8         And the defendants as pharmacists know this, just as

9    Dr. Lander told, that it is -- it would not be unusual at all

10   to treat one for chronic pain, that hydrocodone, the drug of

11   choice because it is the most popular drug used in this country

12   to treat chronic pain.

13        So why should they be surprised when they see

14   hydrocodone being used to treat pain?

15        Then we have one day, 12-19-05, one doctor issued

16   prescriptions, 514 prescriptions, most of them for hydrocodone

17   I told you on this chart is false.  We showed it to you during

18   the evidence.  Here's how many.

19        Do you remember when Dr. Lander was on the stand, Mr.

20   Budlow showed Dr. Lander a prescription and he Lander asked Dr.

21   Lander and talked about whether Dr. Ibanez whether it was a red

22   flag because Ibanez filled for him 71 prescriptions issued once

23   a day, and Dr. Lander said, wait, I've got a question.

24        So may I ask a question?  What does this date at the

25   top mean, date of process?

1          And we talked about it, and the parties agreed, and

2     we were told that means that was the date about when the first

3     prescription was issued.

4          And Dr. Lander told you, well, if that's the

5     situation, then these prescriptions aren't all being issued by

6     Dr. Ibanez on the same day because they have different varied

7     amounts of refills.  You look at the prescriptions.

8          Grab those prescriptions for December 19, 2005 the

9     government has harped on in opening statement and during this

10    trial that this is such a red flag because the defendants

11    should know, and Mr. Budlow said to you in his close today

12    there's no way that the doctor could see that many patients in

13    one day and examine the patient.  We know they weren't

14    examining the patient, so that doesn't make a lot of sense, or

15    he couldn't even review the medical records in one day.

16         Well, they weren't.  The number of prescriptions

17    prescribed by Ibanez that was filled -- filled by New Care on

18    12-19-05, 471 prescriptions, for hydrocodone, other

19    prescriptions 43, a total of 514.  This a breakdown now.

20         What was prescribed by Ibanez new prescriptions on

21    12-19-05, 26.

22         So the suggestion that, you know, Dr. Ibanez couldn't

23    have seen all these patients, talk about misleading, the

24    government says the defense was misleading with pound signs,

25    misleading you with this, we were misleading?

1          They come before you in opening statements and are

2     telling you when they got their experts on the stand talking

3     about 471 prescriptions on one day by Dr. Ibanez, he couldn't

4     have done it and defendants should know it's a red flag.

5          Misleading?  26 new prescriptions.  The others are

6     refills, refills, which means that Ibanez would not have to

7     review the records again.

8          The number, new hydrocodone prescriptions total 92.

9     92 of the 766 prescriptions that were filled on that day, 674

10    were for refills from Ibanez and other doctors, and only 92

11    were new prescriptions, 12 percent.

12         The government likes to give you percentages.  I'll

13    give you percentages, 12 percent.

14         Total number of hydrocodone prescription from

15    12-19-05, 92.  Look at what the doctors did on that date, of

16    the new prescriptions Ibanez, only 26, they didn't have to

17    review.  Zurrantz, 11, Miles 4, Cruz 30.

18         Do you remember also, December 19 was a Monday.  So

19    the prescriptions would have come in and be there for New Care

20    on Monday.

21         Do we know when the doctors reviewed it, whether they

22    reviewed it on 12 19?  Probably not.  The prescriptions are

23    there in the morning when they came in.  Did they review them

24    over the weekend?  Did they review them a couple days before?

25    But 26 or 30, not 471.

1          The government gave you all these charts, do you
2     remember, the Dr. Ibanez, highest, the lowest per day, 471,
3     went through all the days and every one, none of these days
4     worked.  None of these numbers worked when you break it down.
5     Just like the 471 doesn't work, none of the others work,
6     because they're not prescriptions issued by Dr. Ibanez in one
7     day.  Every one of these numbers is wrong.
8          When you break it down that these are not new
9     prescriptions.
10         Same thing, days 250 prescriptions for RX, for
11     hydrocodone, excuse me.  Here we've got all these doctors, 250
12     per day.  Again, the numbers aren't right.
13         Because you look at those prescriptions, you have
14     them all, Mr. Budlow says you have two boxes, look at the
15     prescriptions.  Look at the top date, the date processed, you
16     look at the number of refills, and you'll begin to see just
17     what we're telling you here as we broke down 471 on 12-19, all
18     these numbers fall.
19         They all fall.
20         And the pharmacists who were filling the
21     prescriptions, Ruth Walker, Babu Abraham, Liteia Jones, they
22     know what they're seeing.  They know the refill numbers.  They
23     can see.  They can read.  They know it's not just one doctor
24     doing all these.
25         March 2006, another one the government has in

1    evidence, 89-9, if we go through the months or the days of 366,

2    670, doesn't happen on one day that these are issued.

3            And then they give you another list, October fifth,

4    2005, Mr. Budlow made mention of.  Look at the different

5    doctors.  Again, numbers don't work.  Suggesting that all these

6    prescriptions were filled by, or were issued by the doctors in

7    one day.

8            Now, let's look at the numbers actually filled by New

9    Care.  Do you remember there was testimony from Dr. Lander that

10   a pharmacist could fill 200 prescriptions by himself without a

11   tech?  With a tech, he could do like 300, 350.

12           We know with New Care they had three full-time

13   pharmacists and the same number of technicians working.  So why

14   would it be impossible, or be something of a stretch that they

15   would think, oh, they're doing 889 prescriptions for

16   hydrocodone for treatment of pain, and we have three

17   pharmacists filling those prescriptions with the same number of

18   techs, and they're filling these prescriptions?

19           That's very consistent with a pharmacist at Rite Aid

20   or CVS that could fill 350 with a tech.  Very consistent.

21           Now, let me go back, make sure I didn't miss.

22           Number 9, the number of reactions by New Care, many

23   with patients or patients seeking early refill.  Well, do you

24   remember the question of Dr. Christo, when he told you that the

25   fact a patient seeks early refills, remember I showed you his

1    testimony earlier, doesn't prove that the doctor issued a

2    prescription for an illegitimate purpose or the doctor issued a

3    prescription outside the course of professional practice.

4            Page 43 of his testimony, so these early refills, Dr.

5    Christo says that, wouldn't tell me that the prescriptions were

6    issued.  The standard you have to find, you have to find that

7    the defendants, that the doctors issued the prescriptions

8    outside the scope of professional practice and not for

9    legitimate purpose.

10           And if you can even find that, you have to find that

11   they knew, the defendants knew it.

12           And these early refills, Dr. Christo says it would

13   not tell me that a patient seeking early refills would prove

14   that.  And Dr. Lander told you.  He explained to you, when a

15   patient is taking medication for pain, and it's like as you, as

16   necessary, how the patient can run out of medication earlier,

17   that is not uncommon at all.

18           So what we do know about Dr. Lander versus people

19   like Carmen Catizone is that he's there every day working with

20   doctors.  He's actually taught doctors how to write

21   prescriptions.  And he's working every day in the clinic with

22   the doctors, meeting with the patients.  So what he's telling

23   you is not just based on what he teaches students as he does.

24   It's not just based on what he had read in a book.  It's based

25   on real life, what he sees what happens, what happened with the

1    doctors.

2         The length of the questionnaire and the length of the

3    consultation, the government makes a big deal about the length

4    of the consultation, length of the questionnaire.  Well, let me

5    ask you this, were the defendants present when the consultation

6    was going on?  Were the defendants there?

7         The only way you have access to these consultations

8    is because there was an undercover operation where they

9    recorded these five -- you actually didn't hear all of them,

10   because one of the agents testified he didn't hear when he was

11   in fact present.  But the information here is so clear that you

12   don't have all of these individuals.  In fact, no one, the

13   pharmacists knowing what the conversation is, they wouldn't

14   have any reason to know.  They're not privy to it.

15        The other, I'm not going to go through all A, B, C,

16   D, from the ones we just checked.  Next patient made the sole

17   choice of medication we talked about that before.

18        Dr. Lander works with doctors on a daily basis, told

19   you it's not unusual at all for the doctor to be asked, the

20   doctors asked the patient what does work best in the past?

21        The DEA warning letter.  Talking about the DEA

22   warning letter.  Patient has a medical complaint.  Medical

23   history had been taken.  Physical exam had been formed in

24   connection exists between the medical complaint and the medical

25   history.

1          That's what the DEA warning letter tells us to look

2     for in deciding whether there's a doctor/patient relationship.

3     I asked Dr. Lander, I ask you, were those things present?  Of

4     course, they are.  In each and every, in this case each and

5     every time the DEA warning letter the government makes such a

6     big deal does not tell you this is a violation of the law.  It

7     says if a patient's completing a questionnaire alone, this is

8     not a questionnaire alone.

9          Look at the fact that we talk about McKesson and

10    Brantley, and what they told you, Gary Adams, I already

11    mentioned that, that these were not people who just quit

12    dealing with New care.

13         In fact, we know that they were getting pressure from

14    the DEA.  Now, the government didn't bring that out originally.

15    We know that from the stipulation we read to you that these

16    distributors were getting pressure.  It wasn't like they woke

17    up one day and said we've got to do something.

18         The defendants knew.  The defendants -- in fact, I

19    don't know, how when the defendants weren't told by Brantley,

20    and weren't told by Adams, that there was purchase by Adams

21    that there was any particular problem with what the defendants

22    were purchasing from McKesson, that the defendants would ever

23    know as we talked about early were, was what was occurring what

24    was in the mindset of those of McKesson.

25         Certainly, with Brantley, we certainly know they told

1    the defendants -- well, might have said there has to be a

2    doctor/patient relationship.  You must actually examine these

3    patients, not you, but there must be an examination in person.

4            Let me go back for a moment to another point.

5            (Pause.)

6            MR. RAVENELL:  On the warning letter.  One thing I

7    wanted to point out is that the government tells you that the

8    DEA warning letter was found, and we're not suggesting that the

9    defendants ever saw it.  But the first DEA warning letter that

10   came, DEA found it when they searched the accounting office in

11   a file drawer.  That's where it was found.

12           But even if they had, as I pointed out, the DEA

13   warning letter does not say this is a crime.  You must cease

14   and desist.

15           And all the things they tell you that you can look

16   for is there.

17           The patient has a medical complaint, medical history

18   has been taken, physical, some logical connection exists

19   between the medical history and physical examination.  And I

20   think I skipped over one, I'll go back to that.

21           The reference for the purpose of guidance,

22   telemedicine refers to the provision of healthcare using

23   telecommunication to transmit and receive information including

24   voice communication, images, and patient records.

25           This is about telemedicine.  This is not defendants

1    being drug dealers.   These men are so far from being drug

2    dealers.

3            As I mentioned to you earlier, if you look at this

4    DEA letter, there's the mention about the five refills that can

5    occur.   It's in the documents.   The defendants get this

6    document that shows that there are refills occurring for

7    hydrocodone, a Schedule III narcotic, and they know that, okay,

8    the refills that occurred in this case are consistent with what

9    the DEA allows.

10            Phone calls from Internet customers regarding

11    shortage of pills.   Dr. Lander told you, as I said earlier,

12    it's not usual when people run out of medication.   And Miss

13    Walker told you, do you remember again Miss Walker, 28 years,

14    doing this, telling you, she was answering some of these phone

15    calls.

16            And she didn't find that people calling in asking for

17    the pills indicated that they were drug addicts.   There's no

18    evidence that the defendants or any of the pharmacists at New

19    Care thought they were filling prescriptions for addicts.

20    There's just no evidence of that.

21            Now, Miss Jones' concerns about the website, we

22    touched about it on a moment ago when I talked about what Miss

23    Walker told us.   She testified Miss Jones expressed concerns,

24    her main concern about whether the website doctors were fake or

25    fictitious.

1        The DEA, defendants were aware that and later
2   verified that the doctors that I told you were legitimate
3   doctors, good standing with the DEA, good standing with their
4   state license board, and Miss Walker testified that the
5   defendant had completed -- had not concluded his investigation
6   when Miss Jones brought it to his attention that he was still
7   considering calling DEA.

8        As I pointed in there, Mr. Sodipo fully cooperated
9   with the DEA.

10       Those are the things the government has told you
11   about in their view of the red flags.

12       And we went over each and every one.  But where's the
13   evidence these men, everything you know about them and the
14   people who have told you about them, that they would abandon
15   all and just not care that well these drug addicts are, just
16   going to become drug dealers.  That matters.  History matters.

17       Another thing that the government brought out when
18   Dr. Lander was on the stand was the Maryland pharmacy laws.
19   And there's a couple passages I had Dr. Lander review I wanted
20   to bring to your attention.

21       Here's one.  Do you remember he told you Mr. Budlow,
22   here's what we have, first thing Maryland Pharmacy Laws, and
23   inside there's a section that reads along the side here DEA
24   Pharmacist Manual.

25       And this appendix this is what the DEA places inside

1    the manual.  And this is what they said.  DEA supports the 1998

2    model guidelines for the use of controlled substance for the

3    treatment of pain, prepared by the Federation of State Medical

4    Boards of the United States.  The DEA believes the Model will

5    protect legitimate medical uses of controlled substances while

6    preventing drug diversion.

7         We went through that document earlier in discussing

8    the points in there.  What I asked Dr. Catizone about, Mr.

9    Catizone about, and asked Dr. Lander about, and also Dr.

10   Christo.

11        And I pointed out where in that manual DEA's

12   supporting, there's nothing, no requirement there be an

13   in-person examination.  There just isn't.  But they support it.

14        There's another thing I wanted to read to you comes

15   from this manual, it's a note.  Here's what the note says, in

16   this DEA pharmacist manual, the quantity of drugs prescribed

17   and the frequency of prescriptions filled are not alone

18   indications of fraud and are proper prescriptions, especially

19   if the patient is being treated with opiate or pain management.

20        It's the quantity of drugs prescribed and the

21   frequency of the prescriptions filled by not are not alone an

22   indication of fraud or improper prescribing, improper

23   prescribing.

24        The government's saying that if you prescribe, you

25   know these amounts of hydrocodone for patients, that treatment

1      for pain, it can't be, because it's a red flag.

2              With the DEA, in this manual that is in the pharmacy

3      law book the government says the defendants should be relying

4      upon, in that book, is what it says.

5              Pharmacists should also recognize that drug tolerance

6      and physical dependence may develop as a consequence of the

7      patient's sustained use of opioids and analgesics for the

8      legitimate treatment of chronic pain.

9              So even being treated legitimately for the pain, one

10     can develop a tolerance.  One can develop physical dependence.

11     And this is what the DEA is telling, in the book they're

12     telling you they should rely upon.

13             Now it's do you see people getting pain medication,

14     for chronic pain, you've got to say red flag and stop doing it

15     because it's chronic.

16             The government suggests that defendants were making

17     all these efforts to hide what they were doing.  They, in fact,

18     according to the government, they lied to Miss Nomoto that they

19     were doing Internet business.

20             Look at this letter.  They meet with Miss Nomoto on

21     December '05.  This letter written May 19, '05 from Mr.

22     Nwaehiri to the Board of Pharmacy, Maryland State Board of

23     Pharmacy saying New Care Home Health Services is requesting a

24     Maryland State Board of Pharmacy to add mail order/Internet

25     prescription services to our current pharmacy waiver license

1    number PW 0101, which expires December 31, 2005.

2            Now, they're going to write to the Board of Pharmacy

3    ask to add Internet services to their license, but then they

4    would lie to the Board of Pharmacy?  Miss Nomoto in December?

5    After they already asked for it?

6            And what did Mr. Mouli tell you?  All one has to do,

7    same with Miss Costley, actually said the defendant, all one

8    has to do as a pharmacy or pharmacist, if you wish to do

9    something else, such as Internet service mail order, you have

10   to add an addendum.  That's what you do.

11           They did that.

12           That's not all they did.  Here's a letter that was

13   written by Mr. Nwaehiri to Mr. Mouli, one of the government's

14   witnesses, when there was a complaint filed by a Christian

15   Cullen, an Internet patient.

16           Now, according to the government, the defendants are

17   trying to hide from the Board of Pharmacy they're doing

18   Internet work.  He writes on the letter explaining exactly what

19   they do.  IHE, New Care has direct contact with IHE at 8

20   Broadway Avenue in Kissimee, Florida.

21           New Care's contract with IHE is cost plus dispensing

22   fees.  Miss Cullin made all the arrangements financially with

23   IHE.  How much more clear can they be that they're in fact

24   involved in Internet business on June 13th, 2005?

25           About a month after the letter's written by Mr.

1    Nwaehiri to the Board of Pharmacy, we already know that they've

2    gone to the Board of Pharmacy.

3         Do you remember Miss Ball told you after they got

4    started in about April of 2005 she recalls, maybe March, 2005,

5    that Mr. Sodipo and Mr. Nwaehiri went to Board of Pharmacy back

6    in March or April, 2005 as well.

7         Then they have a letter on May 19th, there's another

8    one June 13th.  But they lied to Miss Nomoto.  They're involved

9    in Internet business.

10        What else do we know?

11        Now, these are things that are attached to that

12   letter that Mr. Nwaehiri sent to the Board of Pharmacy.

13   Stanley Dratler, the doctor, where's he?  Florida, Haines City.

14        Is he hiding that the doctor is in one place and the

15   patient is in another place?

16        Look at the address for Miss Cullin.  Antioch,

17   Tennessee.  Are they hiding they're in fact servicing patients,

18   or the doctors are servicing patients in a different state?

19        How much more blatant and clear can it be?  They're

20   telling the Board of Pharmacy exactly what they're doing.  But

21   red flags?  They're open, open and honest about what they're

22   doing with the Board of Pharmacy here.

23        And here's the response from Mr. Mouli, the

24   government's witness, to Mr. Sodipo, dated July 31.  We've

25   investigated the matter.  The Maryland Board of Pharmacy has

1    investigated the matter, and no action's going to be taken.

2           Now, if the Board of Pharmacy thinks that what the

3    defendants are doing in filling prescriptions where the

4    doctor's in one state, patient's in another, they get a

5    complaint from Miss Cullin, they investigate it, they take no

6    action.

7           But defendants should think what we're doing is

8    wrong.  The regulator board, we've sent them a letter saying we

9    want to do Internet business.  They know we're doing Internet

10   business because they've got a complaint about us that stems

11   around it.  Stems around it.  We tell them in a letter

12   everything we're doing, IHE, and they do nothing.

13          But the Board of Pharmacy is not in fact

14   knowledgeable of what they're doing.  They're lying to the

15   Board of Pharmacy.  They lied to Miss Nomoto.  They won't lie

16   to Mr. Mouli.  The entire board has reviewed this, according to

17   Mr. Mouli's letter, but they're going to lie to Miss Nomoto.

18          Now, think about this, when you go to the Board of

19   Pharmacy, and you ask for help, Mr. Malik, Miss Costley, Miss

20   Costley didn't even sit the defendants down in their office,

21   didn't ask any detailed question.  She says I can't really

22   understand what they were telling me.  Does she really make an

23   effort to learn what they were asking her?

24          Mr. Mouli, you heard his testimony, and then Miss

25   Nomoto, you know, who can't even distinguish who the men are

1    from each other. That's the help they get at the Board of

2    Pharmacy.  But keeping it from the Board of Pharmacy?  What

3    else do they do?

4           Remember when the incident occurrence form we talked

5    about.  Here's it is being used right here by Mr. Nwaehiri.

6    When Mr. Nwaehiri has an incident, this complaint from Miss

7    Cullin, he writes it up.  Documents it.  That's what you'd

8    expect one to do.  Document.  There's an incident, you document

9    it.  So we know the form's being used.  It's being used as of

10   May 11-05 by Mr. Nwaehiri.

11          The suggestion that this is a form that is not being

12   used, we know it's being used.  But it's just not being used by

13   people like Miss Kelly or Miss Ryan when there's information

14   that's important to document.

15          What else did the defendants do?

16          October, 2005, 10-6-05, after sending the letter on

17   May 19th, '05, they send another, fill out their application

18   for renewal, and what do they include?

19          Put in number 5, and you'll have the actual copy, but

20   this is the best copy, but you'll have the actual document, and

21   here it's hard for to you see, but we'd have this, this area,

22   what are they going to be doing, one of the things is mail

23   order/Internet.  That's what they're telling the Board of

24   Pharmacy in October of 2005.

25          But then, according to the government, Miss Nomoto

1    shows up, and now they decide we got to lie.  We gotta lie.

2    We're doing Internet business when we've told the board in no

3    uncertain terms that we aren't, but for some reason on December

4    23, or 26th, they decide we've got lie to her, but the only

5    person telling you that is Miss Nomoto, and she recalls they

6    told her.

7         Remember I asked Miss Nomoto whether she could have

8    confused what Mr. Nwaehiri said to her because maybe of the

9    language barrier, one person with the Japanese accent, another

10   one with a Nigerian accent.  Actually, I didn't.  Miss Reamy

11   tried to ask her, but when Miss Reamy tried to ask her the

12   question, and you may recall how the testimony went with Miss

13   Nomoto, and but what she said no, yeah, it couldn't have been.

14   Well, you know they couldn't have been.  You know she may not

15   have even heard them right, heard Mr. Nwaehiri right.

16        THE COURT:  If I could see counsel just briefly,

17   please?

18        (At the bench)

19        THE COURT:  I just wanted to remind you you have to

20   start winding things down.

21        MR. RAVENELL:  I'm near that point.

22        THE COURT:  How much more time do you need?

23        MR. RAVENELL:  Could I just check my notes real

24   quick?

25        THE COURT:  Certainly.

```
 1              (Pause.)

 2              MR. RAVENELL:  15 minutes, Judge.

 3              MS. SMITH:  15?

 4              THE COURT:  I'll give you 10.  Until 15 after and

 5      we'll have to really --

 6              MR. RAVENELL:  I'll wrap it.

 7              MS. SMITH:  Your Honor, can we --

 8              THE COURT: I'll give you -- I'll give you some extra

 9      time, too, but I've got to --

10              MR. RAVENELL:  I understand.

11              THE COURT:  What I'll do is, Mr. Ravenell I will tell

12      once you finish, I will tell the jury, do you want me to call

13      on Mr. McCants and say you've ceded your time to Mr. Ravenell,

14      or do you want me to --

15              MR. MCCANTS:  I thought Mr. Ravenell was.

16              MR. RAVENELL:  I'd be happy to.

17              THE COURT:  Why don't you do that?

18              MR. RAVENELL:  Sure.  Okay.

19              (Open court)

20              THE COURT:  Good.  Thank you.  Ladies and gentlemen,

21      just I've asked Mr. Ravenell to look at his notes, because in

22      order to get you out of here before 5:30, I've had to put time

23      limits, and so Mr. Ravenell is going to wind up in within 10

24      minutes.

25              MR. RAVENELL:  Thank you, Your Honor.
```

1          We talked about the red flag, and one thing I wanted

2    to remind you is this, when the law is clear, there is no need

3    to argue red flags.  You know, if someone comes up and a person

4    has, you know, a kilo of cocaine, and that person passes a kilo

5    of cocaine, obviously, knowing it's cocaine, it's clear.

6          But that's not what we have here.  So what the

7    government is relying upon now is red flags, not here's what

8    the evidence is, here's what the law is.  These men are guilty

9    because they knew it and they did it.  No.  This is red flags,

10   and they turn to willful blindness.  Not did they know the law

11   is they have to know, but we're going to prove it through this

12   willful blindness when the law is clear, there is no need to

13   resort to red flags.

14         I'm going to touch on a couple things quickly.  I

15   want to you look at this document, you know, it's a call from

16   the transcript of Liteia Jones and Ibanez, and you have the

17   tape, and there's some things that sticks out here.

18         You'll recall where Dr. Ibanez is talking to Miss

19   Jones, and I pulled this page out where he's telling her how

20   the doctors in fact are reviewing medical records and that in

21   his understanding of the law that there is no state law or

22   anywhere that tells you that no state guidelines, Maryland

23   Board of Pharmacy Guidelines, that tells you that a

24   doctor/patient relationship means an examination by the

25   physician in person.

1              And says no one has yet said there has to be such a

2        requirement.

3              I want to talk about jury instructions.  The Court

4        has point out and given instruction.  One of them is

5        pharmacist's good faith.  Pharmacist is exempt from the

6        prohibitions of the Controlled Substance Act if he dispenses a

7        controlled substance in good faith, customs in the regular

8        course of professional practice.

9              Pharmacist dispenses the drug in good faith if he in

10       good faith believes the prescriptions are valid.  There's a

11       doctor/patient relationship.

12             Do you remember that?  Good faith in this context

13       means good intentions.  And honest belief for prescriptions was

14       written for a valid medical purpose and by a doctor acting in

15       the usual course of professional practice.

16             If you find the defendant acted in good faiths in

17       dispensing drugs, you must find him not guilty.

18             And that burden is on the government to establish

19       they do not act in good faith.  That's the government's burden,

20       the burden the government has.

21             There are a couple of other instructions.  I'm going

22       to move forward and talk about this one you'll look at very

23       carefully is whether one has joined a conspiracy.  And I'll

24       tell you that there's just no evidence that these men agreed

25       with Dr. Ibanez, Barry Brooks, or anyone else, to commit a

1    crime.  Just as Ruth Walker didn't.  Liteia Jones didn't.  They
2    didn't.
3            The Court told you this, and this is important, this
4    is an instruction that I think is very important, the Court
5    told you this is not a medical malpractice case.  The Judge
6    told you, and it's very important to consider.  It is not a
7    medical malpractice case.
8            This is not the one that violates just the standards
9    of care.  It is whether in fact the person has committed a
10   crime.
11           The government must prove beyond a reasonable doubt
12   that when -- when the doctors wrote the Internet prescriptions,
13   the doctors -- that the defendants filled -- the doctors were
14   acting outside the course of professional practice.
15           Ask yourself this, would a drug dealer ask for a
16   medical record?
17           Would a drug dealer turn away possibly 49 percent of
18   the customers?
19           Would the defendants would have any reason to believe
20   that these doctors were drug dealers?
21           The government saying, you know, they violated a
22   standard of care, and you're given instructions about standard
23   of care, and the Court told you consistently over and over
24   again is a violation of the standard of care does not equate to
25   a criminal violation of the law.

1          These men are on trial whether they have committed a

2     crime, not whether they violated a standard of care that may

3     lead to some sanction by the Board of Pharmacy.  That's not

4     what they're here for.  The question is did these men commit

5     the crime?  Did they know -- let me back up.

6          Did the doctors issue the prescriptions outside the

7     scope of professional practice, not for legitimate purpose?

8     Did the defendants know?  It's not a civil case.  And that's

9     why the Court gave this instruction.  Read it carefully.

10         Legitimate medical purpose.  The defendants knew that

11    the website doctors were acting as drug dealers.  That's what

12    the Court has told you.  Where's the evidence these men, these

13    website doctors, were acting as drug dealers?

14         Let me say that you have a tall task ahead of you.

15    There's quite a few counts that you have to consider.  I've not

16    touched on each and every one of them.  I will say briefly on

17    the tax count, the Court has given you an instruction on the

18    good faith of whether in fact the defendants believed that the

19    funds they in fact used were properly used, and it's not a

20    violation of the law, they in good faith used funds.

21         Do you remember I called, I asked a question of Agent

22    Wood-Brown whether in fact she did any investigation to

23    determine whether the defendants had loaned any monies to the

24    business when they first started the business, and whether they

25    were entitled to monies back.  She said no.  I only got the tax

1    returns for 2004, not bank records for 2004.  She has no clue

2    as to what the defendants did or do not do prior to 2004, the

3    money's going into the business, because that investigation was

4    limited.  There's 2004, 2005, get those records.

5            And then the government says, well, the money's

6    coming out of the account.  They spent it, that's proof.

7            Is that really enough to prove, because they spent

8    monies from accounts?  At New Care where they owned the

9    business?

10           Is that enough to prove the fact they violated the

11   law?  I think not.

12           Now, Mr. McCants has asked that I speak on behalf of

13   Mr. Nwaehiri, which hopefully I've done in speaking to you for

14   the last couple hours, because I think what I've told you

15   certainly applies to both defendants.

16           You're going have a tall task ahead of you, which is

17   to go back and do justice.  And I would ask you to do that, and

18   just that, do justice.

19           It is highly important that you consider all the

20   things that you've heard that I've spoken for you for some

21   time, and Miss Smith will have a chance to come back and speak

22   to you now that when I sit down in about an hour or so, it will

23   be her job to rebut what I've said to you, and understand that

24   she will say Mr. Ravenell said this, here's my rebuttal, and

25   I'm going want to get up there and oh, am I going to want to

1     get up.

2             But I can't.  There are rules, and, you know, I

3     think, you know, Judge Legg would tell me to sit my you know

4     what down.  I'm not going to be embarrassed in front of you.

5     I'm not going to get up, but I'll be chomping at the bit.

6             And what I want you to do when Miss Smith said Mr.

7     Ravenell said this, he said that, here's rebuttal, ask

8     yourself, what would Mr. Ravenell's rebuttal be?  We've been

9     here seven weeks.  You know one thing is that I'm not shy.  I'm

10    be happy to say something.

11            And I would have a rebuttal, I'd asked you to be my

12    rebuttal think of what I would say.  It probably won't be that

13    difficult.  One thing you know probably is I'll disagree with

14    her, and the question is why would I disagree with her and what

15    would the reason be?

16            You're going to have that tall task of going in to

17    decide the fate of these two men, whom you've heard a lot about

18    over the last seven weeks, and I think that you will ask

19    yourself not just the elements of the crime, but has the

20    government prove those elements and how do they prove it and

21    how do they not prove it?

22            I told you before, this is about not just is it

23    knowledge, did these men, did these men join a conspiracy?  Did

24    they intentionally willfully, knowingly join a conspiracy to

25    work with drug dealers?

1          The Court's instructions told you.

2          Look at these red flags, this is about criminal

3     activity.  This is about did they do the crime, not a

4     malpractice.

5          You'll do justice.  And I think when you do justice,

6     and you really do justice, you'll find that these men are not

7     guilty of these crimes.  It's not about whether you think they

8     may have violated some standard of care that may result in some

9     sanction by the Board of Pharmacy.  This requires the higher

10    standard of proof there is, proof beyond a reasonable doubt

11    they committed these crimes that they joined a conspiracy

12    knowing intentionally to become drug dealers.

13         And that means that every one of the people who have

14    told you about them are wrong.  People who have known them for

15    many years, minister, other citizens, friends and family

16    members, the people who you think would know you, who know

17    them, told you about them.  Those who work with them.  Those

18    who saw them in their personal lives.  These men are not drug

19    dealers.

20         Thank you.

21         THE COURT:  Thank you very much, Mr. Ravenell.

22         Ladies and gentlemen, as Mr. Ravenell told you, Mr.

23    McCants has ceded his time to Mr. Ravenell to make a closing

24    argument on behalf of both Mr. Sodipo and also Mr. Nwaehiri.

25         As you know, the two, Mr. Ravenell and Mr. McCants,

1   have worked cooperatively throughout the case.  That is not any

2   signal that that is not evidence, and there's nothing wrong

3   with that.  It's just that we have two defendants in the case,

4   and their attorneys have worked cooperatively and well

5   together, and I know there are many things that Mr. McCants

6   would like to have said on behalf of Mr. Nwaehiri.  But in

7   order for there to be a unified presentation to you, he ceded

8   his time to Mr. Ravenell.

9         We're going to have just like Nascar have a very

10  quick turn around so that that we can finish up the closing

11  argument by 5:25.  So if you could come back in five minutes,

12  and Miss Smith will have an hour and five minutes to rebut.

13        (Recess.)

14        THE COURT:  Please be seated.  Counsel, my plan is to

15  bring all of the jurors including the two alternates in on

16  Monday, complete the instructions.

17        We'll then talk to Juror Number 6 about his travel

18  plans, and then all of us can talk about whether we want to

19  excuse the juror with travel plans or to take the chance that

20  they'll be finished within five days.

21        THE CLERK:  Ready?

22        (Pause.)

23        MS. SMITH:  Your Honor, on Monday morning, I'd ask

24  the Court to tell the jury that Mr. Budlow had an appointment

25  he absolutely couldn't miss and will be returning if they

1    wonder where he is on Monday morning.

2            THE COURT:  That's right.  He'll be learning some

3    very interesting information.

4            (Pause.)

5            (Jury present)

6            THE CLERK:  Jurors all present.

7            THE COURT:  Mr. Thompson, thank you very much.

8            Welcome back, ladies and gentlemen.  As advertised,

9    Miss Smith will now be delivering the rebuttal for the

10   government.

11           Miss Smith?

12           MS. SMITH:  Thank you very much, Your Honor.

13           I have the distinct pleasure of speaking to you in

14   the last hour on a Friday afternoon after a very long week and

15   a very long several weeks, and I join everyone in thanking you.

16           I have some very direct responses to some of the

17   things Mr. Ravenell said, and probably some less direct

18   responses, and I'm going to move along as quickly as I can,

19   because I know that you know when I sit down and be quiet,

20   you're out of here.  So let me just respond to some of his

21   comments.

22           And let's make no mistake about this.  No one is

23   saying hydrocodone is illegal.  No one is saying use of the

24   Internet is illegal.

25           Even the DEA doesn't say that.  That's one of the

1    exhibits Mr. Ravenell just showed you, which sort of cuts

2    against the Draconian image of the government and the DEA that

3    he's been trying to paint.

4           But what we're saying is what they were doing was

5    illegal with the hydrocodone over the Internet.

6           It was the tone and intent of Mr. Ravenell's comments

7    just sort of weaved in there, the government is bad, other

8    people weren't arrested, just sort of blaming everybody else,

9    and there's a reason for that.  There's a reason for that.  And

10   all the other mixing of apples and oranges, very skillful at

11   that, because if you start worrying about things that are

12   really not the point, then you won't look at the evidence.  You

13   won't look at the issues.  And if you do that, then you can't

14   come to a decision that's based on reason and based on logic

15   and based upon the evidence.

16          Mr. Ravenell says that the government is arguing

17   willful blindness.  Make no mistake about this, the government

18   is arguing to you and telling you and saying that we have

19   proven to you that these men knew flat out what they were doing

20   was wrong.  They knew.  Willful blindness is knowledge.

21   There's no willful blindness here.  They knew.

22          A couple more points.  The government's exhibit 87,

23   it's the tax return for New Care despite the Court's

24   admonitions that questions are not evidence, but answers are,

25   so when Mr. Ravenell asked Agent Wood-Brown if she had any

1      information about a loan from Mr. Sodipo to his companies and

2      she said yes, he sort of dropped that on you just now as if to

3      suggest that might explain why Mr. Sodipo had this little

4      private piggybank.

5             Well, let me tell you in evidence the tax return for

6      New Care for the year in question, page 4, line 7, loans to

7      shareholders, there's nothing here about a loan.  That's the

8      end of that discussion.

9             He brings up the letter from Miss Cullin to the Board

10     of Pharmacy and this whole thing, and they weren't hiding

11     anything.  There was no problem.  The letter doesn't talk about

12     Internet.  And if it did, the government isn't saying there's

13     anything wrong with the Internet.  It's how they were doing it,

14     and that's not in the letter.

15            And Mr. Ravenell basically was arguing to you that

16     the Board of Pharmacy failed to stop him, didn't stop him.

17            Did the Court instruct you anywhere, and please look

18     in those instructions, that if a law enforcement agency or

19     regulatory agency could have stopped the defendants, but

20     didn't, then they're not guilty?

21            I mean, that is an absolutely ridiculous argument.

22            But if you worry about that, if you get caught up in

23     what the DEA did or didn't do, what the Pharmacy Board did or

24     didn't do, if Miss Walker was charged, if Adam Kaps was

25     charged, all of those things, you won't be sitting down and

1    looking at the issues in this case.

2           We heard about the old jury system, about how jurors

3    used to be the people that knew you.  Well, there's a reason,

4    ladies and gentlemen, why a jury is comprised of 12 strangers.

5    You are not being asked to judge the defendants, as Mr.

6    Ravenell said.  You are being asked to judge their conduct.

7    You are being asked to look at the evidence and apply it to the

8    law.

9           If Mr. Ravenell said it once, he said it five times,

10   character counts, who they are, where they've been, what

11   they've done.  Evidence counts.

12          Can you trust the government's case?  Scare you off

13   the mark, that's what they're trying to do.

14          You know from sitting here who struggled day after

15   day to bring you the evidence clearly.  And you know day after

16   day what attempts were made to blur the lines and confuse the

17   issues and mix apples and oranges.

18          For example, Dr. Christo said -- I don't even

19   remember which item was just now, Dr. Christo said at some

20   point that there was no followup was not proof that there was

21   doctor/patient relationship.  What he said was it was a red

22   flag.

23          One minute we're talking about red flag, and then the

24   next minute we're jumping to proof of a doctor/patient

25   relationship.  These terms just fly around and get sort of

1    slipped in and slipped out.

2             You have to pay attention, of course.

3             How does a pharmacist -- how does a pharmacist know

4    that there's no followup?  Well, if the patient is in Alaska

5    and the doctor's in Florida, you can be pretty sure there

6    wasn't any.

7             And speaking of no followup, the government didn't

8    say that Dr. Ibanez wrote 514 prescriptions in one day.  They

9    said that New Care filled 514 prescriptions in one day.  And

10   Mr. Budlow specifically said he couldn't have reviewed all

11   those records in a day, in two days, in a week, or in two weeks

12   or a month.

13            So to represent to you that the government said

14   something when that's not what we said, I bring this to your

15   attention because I want you, when you get back there next

16   week, to take a clean dispassionate look at the evidence.  The

17   evidence speaks volumes.

18            The government never said that the defendants elected

19   to not care about the Internet customers.  Frankly, there's no

20   evidence that they cared about any of their customers.  The

21   government never charged Kaps.  They never took his money.

22            The Court's instruction number 10 and number 12, says

23   this is about these defendants, and nobody else.  It is not for

24   you to be concerned who was charged and who wasn't.

25            Again, why did he spend some of his three hours plus

1   talking about these things?  None of it is relevant to the

2   crime the defendants committed.

3            Kaps said early on that the doctors reviewed records.

4   Then he said mostly they were reviewed by PA and RN's.

5            Mr. Ravenell said there's no evidence that Mr. Sodipo

6   or Mr. Nwaehiri knew any of those Florida guys.  Again, the

7   Court's instruction on conspiracy, they don't even need to know

8   everybody in the conspiracy.

9            That Mr. Ravenell said that Mr. Kaps didn't think

10  what he was doing was a crime, he thought it was okay.  I guess

11  Mr. Ravenell really likes that, because if Mr. Kaps thought it

12  was okay, then it must be okay.

13           Mr. Kaps is what we call a very bright man, IT man,

14  high school dropout, certainly not a trained pharmacist and not

15  a doctor.

16           Why does he want you to believe that Kaps is the

17  standard but goes running and screaming from Jim Cloud?

18           If you look at the return address on all the packages

19  from New Care that were recovered throughout this case, after

20  New Care Home Health Services is a hyphen that says GDN or IHE

21  or PDP or PMS.  They embraced those contacts.

22           Mr. Ravenell suggested that the reason why Mr. Sodipo

23  wanted to avoid the scrutiny of the DEA and all their

24  intentions was because of the pressure that law enforcement

25  puts on people.  They're fearful of interference when they're

1    trying to do legitimate pain management.

2          There is no evidence why Mr. Sodipo said to Mr. Cloud

3    to avoid the attention of the DEA.  There's no evidence because

4    he just didn't want the DEA's interference, because the DEA has

5    all these problems with proper pain management and everything.

6          What is in that conversation was when Mr. Sodipo said

7    to Mr. Cloud, well, nobody wants attention, ah, ah, ah, listen

8    to the call.  Listen to the tone of the call.

9          Mr. Ravenell said Mr. Sodipo got right in the car

10   with the DEA on the day he was arrested went to New Care,

11   helped them out.  He didn't have to.  Excuse me?

12         He was under arrest.  He was going where the DEA was

13   taking him.  I'm not suggesting that he wasn't cooperative and

14   pleasant, but come on.

15         He called Gary Adam.  He said why?  That McKesson,

16   they wouldn't tell him.

17         No.  He called yelling, threatening to take his

18   business elsewhere, demanding an explanation, and told Gary

19   Adam that McKesson was putting him out of business.

20         One of the last charts that Mr. Ravenell had up on

21   the screen said that even Johns Hopkins has embraced the

22   Internet.  The only evidence about the Internet and Johns

23   Hopkins was Dr. Christo who testified that people search out

24   doctors that can help them on the Internet and then they get

25   flown in.

1             And Mr. Ravenell says, well, how do you know that if

2    you're not in it?  And he says because I've seen some of those

3    people.  I mean, maybe there is other information, but it

4    wasn't brought into this courtroom.

5             This is what the Internet is all about.

6             He talked talks about Yuki Nomoto.  That was a

7    character, and how she misID'd them in a letter.

8             Well, first of all, her meeting with them was both of

9    them.  It wasn't like we need to figure out who said what, her

10   entire discussion of what happened was both of them.  Whoever

11   was speaking, the other one was right there in hearing.  They

12   didn't disagree.  It was a meeting with both of them.

13            And second of all, you were here when she identified

14   them.  She pointed them out in her way of speaking, but she

15   identified them.  She knew who she was talking about.

16            Mr. Ravenell said, well, they didn't bring the people

17   up here from Baton Rouge.  Well, he had the report.  Why didn't

18   he call them?

19            How many witnesses does the government call?  Should

20   we call all 26,000 customers of the Internet?  Seven weeks

21   isn't long enough for you all?

22            He told you that Liteia Jones was in the Grand Jury

23   twice.  I'm not sure that evidence was ever brought into this

24   courtroom.  But regardless, he knew about her testimony.  Why

25   didn't he call her?

1          The defendants have no burden to put on a case at

2     all, but they did put on a case.  And there's no doubt that

3     this high-powered defense team has stopped at nothing to bring

4     to you whatever evidence and point they want to make.

5          I ask you to look at Paul Short's exhibit.  It's the

6     Off Planet data.  While we're talking about Baton Rouge, I want

7     to mention to you when you read, when you read the indictment,

8     and you read the overt acts, you will see there are initials of

9     people because we don't put people's names in indictments.

10    It's a public record.

11         So you'll see names like PD for Paula Dunaway or WM

12    for Wendy Moore, or GE for George Ellis, the five people in

13    Baton Rouge.  They're listed in some of the discussions.  RH is

14    Roger Hacket.  RC is Ronald Chartrand.

15         And when you sort of see that and figure it out, come

16    look at this document.  This is the Off Planet data, and if you

17    look at tab, it's the last one, tab 12.

18         For example, you will see Off Planet's records of the

19    drugs bought by Paula Dunaway.  And you will see all the drugs

20    that she bought in October 28th, hydrocodone, 120 days, had

21    October 31 hydrocodone, 90 pills.  It means it's just

22    ridiculous.  Do we really need to bring her in for you to know

23    she's an addict?  You can look at this and see.  It's

24    outrageous.

25         How could they not know?

1          Mr. Ravenell was making fun of Mr. Catizone and

2    talking about the VIPPS certification and that whole thing, and

3    there's only 15 pharmacies.  No.

4          What he said was there are 15 websites, 8,000

5    pharmacies affiliated with those 15 February websites.

6          Just sort of a little selective wiggle room here.

7          Dr. Christo said that urine testing and the written

8    agreement was part of his practice.  And he didn't know if it

9    was the standard of care outside of pain management.  But he

10   did say that all of medical practice, the followup exam is

11   critical, absolutely critical.

12         Mr. Ravenell has called Dr. Christo not credible.

13   Members of the jury, that man came here.  He didn't come here

14   to opine about pharmacists.  He wasn't a pharmacist.  He was

15   the doctor.  And he was not only here to talk about being a

16   doctor, but he was here to talk about pain management.  Because

17   isn't that what they are claiming they were treating?  He told

18   you injection -- see if I can even remember them, injections,

19   physical therapy, medication, psychotherapy, all sorts of

20   things, implants, that you can do for pain, the whole range.

21         So out of the five, one of them's medication.

22         Okay.  And out of the medication, there's

23   antidepressants, analgesics, anti-inflammatories.  There's

24   other such drugs, and there's opioids.  So out of the five,

25   there's opioids.  And out of the opioids, there's a whole range

1   of controlled substances.

2           How come everybody here was getting hydrocodone for

3   pain management?

4           Dr. Christo believes there must be a face-to-face.

5   He said it doesn't exist in the law.  I suggest to you the

6   man's not a lawyer.  What he was saying to you is it's not

7   written in a statute.  No one is disputing that.

8           And if you take this implication to the extreme that

9   Mr. Ravenell is suggesting, it is not a law.  It doesn't exist.

10  Well, anything goes?

11          It has -- there has to be some rules that we live by.

12          The government has never, however, suggested that it

13  has to be a face-to-face according to a statute.

14          He said that it was the standard of care is what he

15  requires.  Dr. Ibanez doesn't require it, obviously.  Which

16  doctor would you like treating you for your pain?

17          There was also a conversation about good faith.  Mr.

18  Ravenell said the defendants thought the laws were gray, then

19  that's a good faith belief.  No.  They have to believe that the

20  prescriptions were valid, not that the law says what they're

21  doing is okay.  It's a difference.

22          Good faith means good intentions and the honest

23  belief that the prescription was written for valid medical

24  purpose and by a doctor acting in the usual course of

25  professional practice.

1         The Court's instruction 44, it doesn't say good faith

2    belief that the law was cool on what they were doing.  It's

3    different.  It's different.

4         They argue the law is not clear.  It is a gray area.

5    Really?

6         The only reason it might seem confusing is because

7    that was the defendant's goal to confuse you.  How are we to

8    know what the law is?

9         Well, we know what doctor treatments are, because

10   we've all probably -- I'm willing to guess, we've all seen a

11   doctor or two in our lives.

12        And what is the reason for a doctor/patient

13   relationship?  Did you need Dr. Christo and Mr. Catizone to

14   tell you it's for diagnosis and treatment?

15        Mr. Lander says that's not the purpose, diagnosis and

16   treatment.  Why else do you go see a doctor?  Doctor, I'm

17   having a problem with X.  The doctor figures out what the

18   problem is and helps treat it.

19        Mr. Catizone told you what the duty of the pharmacist

20   is.  The Maryland Board of Pharmacy sends out newsletters.

21   They tell you what is the duty of a pharmacist.  DEA issues a

22   warning letter.  The Court's instructions describe the

23   statutory scheme for you, and there is nothing unclear about

24   the Court's instructions.  Please, read them again.  Read them

25   as many times until you are comfortable with them.  Your common

1     sense tells you that what happened in this case was not right.

2          The statutory scheme, Title 21, Section 841, doctors

3     and pharmacists can prescribe controlled substances only as

4     authorized.  Unless expressly authorized, don't do it.  That's

5     what the statute says.  Unless expressly authorized by law,

6     don't do it.

7          1306.04, that's the CFR, that's the regulation that's

8     tied into that statute.  It's the purpose of a prescription.

9     You've heard it.  For a prescription to be legitimate, it must

10    be issued by blah, blah, blah, blah.  You all probably can

11    recite it in your sleep.

12         First and foremost there must be a doctor/patient

13    relationship.  Without that, there is no possibility of a valid

14    prescription, period, end of discussion.

15         If you believe, as the government has argued, that we

16    believe the government -- that the evidence supports that there

17    is a doctor/patient relationship, you have satisfied the first

18    element.  Those prescriptions cannot be valid.

19         Even if you have a valid doctor/patient relationship,

20    they could still be invalid.  But in this case, there is no

21    relationship.  It must be issued in the usual course of

22    professional practice and for legitimate medical purpose.

23         If it is both, the prescription is valid.  If one is

24    missing, it is an invalid prescription, and the pharmacist has

25    a corresponding responsibility to that of the doctor or the

1    practioner to be sure the prescription is valid.

2         The duty couldn't be more clear.  And the pharmacist

3    is expected to know what that duty is.  It's expected to know

4    from their training in school, the years of practice, their

5    common sense, their information from the Board of Pharmacy from

6    the DEA, they are expected to know these things.  And they are

7    expected to adhere to the professional standards and the law.

8         If the duty isn't clear to pharmacists, if it's so

9    gray, if we don't know, how do we know what we're supposed to

10   do?  We might as well get our drugs from the plumber.  Or how

11   about the gardener?  Or maybe we'll go into an alley and buy

12   them from a creep?  I know, let's get them from the Internet.

13        The CFR is the same as the Maryland regulation.  The

14   Court told you that, it's in the instructions.  The Maryland

15   has adopted the federal standard.

16        Then there's the refusal statute, Judge Legg read it

17   to you.  It is a statement of the professional standard in

18   Maryland.  Nothing more.  It is not a criminal statute, but it

19   is nothing less, it is the standard.

20        If there's something wrong with this prescription,

21   you do not fill it.  If the explanation you get doesn't

22   satisfy, then don't fill it and report that doctor.

23        I guess if you don't ask questions, then you can't

24   get an answer that doesn't satisfy.

25        I'd like to point you to government's exhibit 1, the

1    letter from the DEA, and respond to another point made by Mr.

2    Ravenell.

3            At the bottom of the first page, it says the

4    following four elements as an indication that a legitimate

5    doctor/patient relationship has been established:

6            A patient has a medical complaint, a medical history

7    has been taken, a physical examination has been performed, and

8    some logical connection exists between the drug and the

9    complaint.

10           If you take what Mr. Ravenell is arguing to you, if

11   you take the implication of what he has said to you that this

12   doesn't mean face-to-face, this doesn't mean, this doesn't say

13   that the doctor writing the prescription has to be the one to

14   form the doctor/patient relationship.

15           Well, so what does that mean?  The patient has a

16   complaint.  A medical history has been taken by some doctor

17   somewhere in the universe.  A physical examination has been

18   performed by some doctor somewhere, is that really what that

19   means?

20           The common sense import of what that means is they

21   are talking about the prescribing doctor.

22           So, again, were these prescriptions valid?  Of course

23   not.

24           Dr. Lander told you that, fine, I see nothing wrong

25   with it.  These can never been valid prescriptions.  It offends

1   every conceivable notion of common sense and practical life

2   experience to suggest that a person who has never met their

3   doctor, spoken to their doctor, and didn't even know their

4   name, has a relationship at all with this doctor, much less a

5   professional.

6           Now, take another step.  Man goes into see his

7   doctor, one that he has a relationship with.  Can you imagine

8   they hand him a catalog of treatments?

9           If you can put the other one back up?  Thank you.

10          They hand him a catalog of treatments, medications

11  that you can ask for.  And you say, well, you know, doctor, I'm

12  really in the mood for a coronary bypass, okay?  I'd like

13  Allegra because my allergies lease are bothering me.  I'm going

14  on a trip.  I don't like flying, how about had a little Xanax,

15  could you help me out here?

16          By the way, I've got an ache in my back, and it's

17  radiating, could you help me out here?  And the doctor goes,

18  sure, no problem, says, just stop by the receptionist on the

19  way out, give her your credit card, pay for the consultation,

20  pay for the drugs, you'll get them in a day or two, and they

21  show up in the mail.

22          Sound right?  Because that's the equivalent of what

23  we've got on these websites, at best.

24          And don't forget, in two or three weeks, the

25  receptionist calls you up and says are you ready for your

1    refills?  Because they're coming at you.  That's the

2    equivalence of what we've got on this these websites, at best.

3          Then there was Matt, in the undercover buys, Matt was

4    the customer service man.  Actually, he was the consultant.

5    Martin Spangler calls up.  It was actually Agent Graumlich.

6    What's your name?  Martin Spangler.  Okay, Marty, let me just

7    pull it up on the screen, and we'll get you taken care of.

8          You can be anybody you want to be on the Internet.

9          The customer chooses what they want.  Automatic

10   refills, no followup, dangerous controlled substances.

11         I almost -- when you listen to Matt or Judy, remember

12   Judy, you hold on, please?  She's on the other line talking

13   about an appointment.  I mean, how unprofessional.  Who are

14   these people?

15         I mean, how much do we all need to see?

16         But I felt like saying, you know, you listen to Matt

17   and Judy, well, you want 20, 30, 60.  I feel like saying do

18   they come in Navy?  Because that's what it is.

19         The cold hard facts.  The testimony and the charts

20   presented.  June Howard, the ARCOS documents, exhibits 88.

21         Eric Brantley, Cardinal Health documents, exhibit 29.

22         Paul Short, exhibits 89, 90, 92, 131, 132, and 133.

23         The numbers are stunning.  And they happen to match

24   Adam Kaps's numbers for New Care, and they happen to match New

25   Care's computer numbers.  All the numbers match.

1          All devastating to the defense.

2          The cold hard fact, the only question is what do they

3    know and when did they know it?

4          Do they act in good faith?  I want you to think about

5    this, knowledge and good faith are two sides of the same coin.

6    If there is knowledge, there cannot be good faith.  If they

7    willfully closed their eyes to what they didn't want to see,

8    there cannot be good faith.

9          So as you consider good faith, it's not a third

10   element.  It's another way of approaching the decision that you

11   need to make.

12         They argue that they took measures to be sure

13   everything was okay.  They did their due diligence.  Really?

14   Well, the only evidence of checking doctor's licenses on any

15   regularity was from Roberta Ball, who was only checking them

16   for that JCAHO accreditation, not because Mr. Sodipo or Mr.

17   Nwaehiri had any concerns about the Internet operation.

18         There's not one shred of evidence reflecting their

19   concern for the public.

20         She said she checked them regularly every six months.

21   Maybe she did.  But then why wasn't that enough for Liteia

22   Jones?  If that was the only concern Liteia Jones had, then why

23   wouldn't that have been the end to it?

24         According to Ball, the only concern Liteia Jones had

25   was the doctors weren't real.

1          There's also evidence of checking.  In government's

2     exhibit 59, government's exhibit 59, which the defendants want

3     to you look at, because it shows that they checked, I suggest

4     to you, members of the jury, it was just like the trip to the

5     Pharmacy Board, it was for show.

6          It was after the mutiny.  It was for show, and they

7     started checking.  If the defendants knew what was in exhibit

8     59, as Mr. Ravenell urges you they did, well, that disclaimer

9     page from the Internet is in the same exhibit in the same file

10    folder.  So somebody did navigate the Internet site and saw

11    those ridiculous malpractice waivers.

12         By the way, speaking of doctors and being certified

13    and registered, I have a driver license, does that mean I can't

14    drive recklessly?  Doctors were certified, does that mean they

15    can't break the law?

16         And another, by the way, where does the law define

17    what reckless driving is?

18         It's one of those terms, you know.  Just common

19    sense, living in society, you figure it out.  Sort of like

20    professional standards and doctor/patient relationship.

21         MR. RAVENELL:  May counsel approach?

22         THE COURT:  You may.

23         (At the bench)

24         THE COURT:  Yes, sir.

25         MR. RAVENELL:  Your Honor, reckless driving is

```
 1    defined in the Transportation Articles, and it is very improper
 2    for an attorney to stand before this jury, and even though Miss
 3    Smith has misstated facts about 20 times so far, I've tried to
 4    keep track, we have not objected because we let the jury hear a
 5    misstatement.  But she's starting to misstate the law.
 6    Reckless driving is in fact defined in the Transportation Code.
 7            THE COURT:  I have no clue.
 8            MS. SMITH:  I have no clue, either, but I'd be happy
 9    to discuss manslaughter instead, which is not defined.
10            MR. RAVENELL:  It's defined in the law.  It's in the
11    statute and the law.
12            Judge, the point is she's told this jury what is not
13    correct, that reckless driving is not defined.  It is defined.
14    And I'm asking the Court tell the jury that that is incorrect.
15            THE COURT:  Well, I think the point is that there are
16    terms in the law that legal consequences are defined or
17    negligence, or something like that.  I think what we're going
18    to do, the issue isn't whether reckless driving itself is
19    defined in the law.  The issue is whether there are terms that
20    are used in the law that are not defined in some statute.  So
21    --
22            MR. RAVENELL:  Your Honor, with all due -- I don't
23    want to belabor the point.
24            THE COURT:  I can tell them, if you want me to, I
25    will tell them reckless driving may be defined in the law, but
```

1    there are other terms that the consequences that aren't

2    defined.

3           MR. RAVENELL:  I don't think the Court should be

4    helping Miss Smith with closing.  I don't think you should ever

5    be weighing in on closing argument.

6           I'm asking the Court to correct what was said that

7    was inaccurate.  I don't think the Court should then be telling

8    the jury there are other terms, because I asked the Court to

9    correct what was said incorrectly, that now the Court should be

10   weighing in on Miss Smith's closing argument to give a legal

11   proposition that there are areas not defined, I just don't

12   think that would be nearly right or fair.

13          THE COURT:  Well, the answer is I don't think it

14   makes a real difference to the jury.  I'm going to deny the

15   request, but she's going to move on.

16          (Open court)

17          MS. SMITH:  Even Professor Lander told you that

18   checking the licensure and the registration of a doctor is just

19   the beginning of making sure a prescription is valid.  It is

20   not the end of the inquiry.

21          They argue they took other measures to make sure it

22   was okay.  They went to the Maryland Board of Pharmacy for

23   direction and guidance.  Really?

24          There were two sources of evidence about that trip to

25   the Board of Pharmacy.  Roberta Ball and Ruth Walker both

1  reported that the defendants said they went and got the Board

2  of Pharmacy's stamp of approval.  That's what they told them.

3  They told both Roberta Ball and Ruth Walker.  They waited for

4  the answer.  That's what they were told.

5         Mr. Eversly and Shirley Costley, they both testified

6  that in that third week of September, probably the 26th or 27th

7  in the days after the defendants' return from Nigeria, Mr.

8  Sodipo and Mr. Nwaehiri showed up.  They asked some very vague

9  questions about some plans they had for future, future plans

10  for the Internet.  They were told to write their questions down

11  and send them in.

12         Miss Costley wasn't unclear on what they said.  She

13  was clear that they were unclear about what they said.  She was

14  also clear that it was about something in the future.  She was

15  also clear that they were there four maybe five minutes, and

16  they left.

17         That's a stamp of approval for you.  They went back

18  to the pharmacy, and they told not only Roberta Ball and Ruth

19  Walker, they told the staff at the staff meeting everything's

20  fine, Board of Pharmacy says it's okay.

21         The defendants really believed they were servicing

22  the pain clinic?  Really?  Is there any evidence of a pain

23  clinic?  Where?  It's not in the contract.  It's not on the

24  website.  It's not in the conversation between Dr. Ibanez and

25  Miss Jones.

1          Wouldn't Dr. Ibanez, if that's what he was

2    pretending, even, even if some conversation with Mr. Sodipo

3    that there's no evidence of, but if that was the thing, he

4    would have said to Miss Jones, look, we've got this pain clinic

5    here.  We're treating hundreds of people.  He didn't say that.

6          It's not in conversation between Mr. Sodipo and Jim

7    Cloud, either.  He told Jim Cloud, oh, there's some kind of

8    consultation, people send records.  No, no.  It's not really an

9    Internet thing.  It's not in the customer service conversations

10   between the undercovers and the website.  It's not in any

11   records found in New Care.

12         Even Professor Lander said that if there wasn't a

13   pain clinic, 99 percent hydrocodone prescriptions should have

14   caused New Care to question the validity of the prescriptions.

15         The only thing they point to -- well, there's two

16   things they point to.  Epainmedsglobal.com, well, must be a

17   pain clinic.

18         Okay.  And then the other one was it must have been a

19   pain clinic because all that was being prescribed were

20   narcotics.  It's a little circular, isn't it?

21         Let's talk about the mutiny.  In September of 2006,

22   what do we know from the evidence?  Concerns were growing.

23   Kenneth Hartwill had gotten there in January.  He had discussed

24   it.  Ruth Walker had discussed it.  Babu Abraham had discussed

25   it.  Liteia Jones had discussed it.  Robin Brinegar had

1    discussed it.  D'Andra Kelly had discussed it.  And all of

2    them, most, if not all of them, talked to the defendants about

3    it.

4            This was a topic, are you sure this is okay?  Are you

5    sure this is okay?

6            I'm not going to comment on what Ruth Walker and Babu

7    Abraham and Kenneth Hartwill and Liteia Jones should have done.

8    I suggest to you, members of the jury, if they were sitting

9    here in this courtroom as defendants, they would be sitting in

10   a different light.

11           The government makes decisions that it makes, and the

12   evidence today is about these defendants.

13           The defendants were away in Nigeria, and Liteia

14   Jones, in 20 minutes of research, long overdue --

15           MR. RAVENELL:  Objection, Your Honor.

16           THE COURT:  If I could see counsel, please?

17           (At the bench)

18           MR. RAVENELL:  Judge, this is just going too far with

19   this, making up of facts.

20           THE COURT:  I'm sorry, can you restate that?

21           MR. RAVENELL:  That Miss Jones took 20 minutes of

22   research.  Where's there any evidence of how long Liteia Jones

23   did research on the Internet or anywhere else?

24           She doesn't bring Liteia Jones in, and now she's

25   telling the jury Miss Jones took 20 minutes of research on the

1    Internet to find information that she found?  There's just no

2    evidence.  Not one person has testified about how long Liteia

3    Jones took to find any information, and it's just absolutely

4    not in evidence.

5              MS. SMITH:  Your Honor, I thought I remembered it.

6    Maybe I remembered it from her Grand Jury testimony.  It was a

7    fair inference.

8              THE COURT:  Just wait.

9              MS. SMITH:  I'd be happy to tell them there's no

10   evidence of that.

11             THE COURT:  She didn't testify?

12             MS. SMITH:  No, be happy to tell them.

13             THE COURT:  And any evidence about the time that she

14   took would have been hearsay, so it's a probably matter before

15   the Grand Jury.

16             MR. RAVENELL:  I hope she's not going say she heard

17   it from the Grand Jury.

18             THE COURT:  No.

19             MS. SMITH:  No.  You told them about the Grand Jury.

20             (Open court)

21             MS. SMITH:  There's no evidence, members of the Jury,

22   that it took her 20 minutes to do this.  So she did this

23   Internet research, long overdue, gets the answer she needs.

24   She goes to Miss Patterson.

25             How do we know what she brought to Miss Patterson?

1      Well, Miss Patterson recognized, and so did Ruth Walker, let's

2      see, did I grab the right one?  Yes.

3              They both recognized government's exhibit 27.

4              Government's exhibit 27 is a lot of exhibits.

5              It is the page from the Internet.  Warning.  DEA.

6      It's one that's verbatim, government's exhibit 1, the letter

7      that was sent, and this is what she had in her hand that day.

8              Nannette Patterson identified it.  Ruth Walker

9      identified it, and a copy of the same exact document but

10     printed this way was found in Mr. Sodipo's office.  But the

11     print date on this is September 14th, the day before the

12     mutiny, and the date on the other one is after the date of the

13     mutiny.

14             Isn't it amazing how the truth just fits?  You know,

15     it's just one of those things about evidence, you know, they

16     said she brought something in, that she'd been looking on the

17     Internet, and there it is, September 14th, 2006.

18             So she goes to Miss Patterson.  They call Mr. Sodipo.

19     They make the decision to stop the Internet operation.

20             Dr. Ibanez calls Miss Jones.  He tries to pedal the

21     same load of hooey to her.  Well, it's gray.  It doesn't define

22     a doctor/patient relation.  Tell me where it says there must be

23     a face-to-face, same nonsense Lander was selling.

24             So now New Care is dark.  Ibanez, Green, Cammarata,

25     Kennedy and Barry Brooks are in a tailspin.  Listen to those

1    calls again.

2            They're just calling each other.  What are we going

3    to do?  It's priceless.  And what's really interesting is the

4    snippets of the conversation, it corroborates everything Adam

5    Kaps said about the way it was set up.

6            They're in a tailspin.  Their best pharmacy is down.

7    But then Mr. Sodipo and Mr. Nwaehiri come back.  Steven and

8    Cali are back, and they pretend to get the blessing of the

9    Maryland Board of Pharmacy, because that's all they did.  And

10   what do they do?

11           Even if you want to believe they didn't know, even if

12   you want to believe they acted in good faith, even if you want

13   to believe that Mr. Sodipo said to Ruth Walker I'm going to

14   call the DEA and ask about this, I don't remember that

15   testimony.  It's whatever you remember that counts.  How do you

16   explain what happened next?

17           They fired it up.  They fired up the assembly line.

18   Not a care in the world, for welfare of the public, no regard

19   at all.

20           And by the way, Jones never came back.  She quit.

21   Babu Abraham, he resigned.  Ruth Walker never filled another

22   Internet prescription after that.

23           Talk about D'Andra Kelly, Theresa Ryan for a moment.

24   Mr. Ravenell referred to D'Andra Kelly as someone like Miss

25   Kelly.

1        He was talking about her recall that the DEA was

2   there twice.  And there was a stipulation, or I believe Agent

3   Tush testified that the DEA was never there.

4        I don't know how that would help the government's

5   case if the DEA had been there.  Maybe I'm just -- my brain is

6   just not working.  But I guess the implication is she was

7   lying, and she was trying, but I don't understand how that

8   would help the government's case.

9        They were both at New Care when the Internet business

10  started, both D'Andra Kelly and Theresa Ryan, and they both

11  noticed the change in the quantity and tenor of the calls.

12  They described angry people calling.  They didn't receive the

13  right amount of pills.  Where's their medication?  And then

14  family friends and relatives calling about how New Care had

15  gotten their son, their daughter, their loved one addicted.

16  And both remember, how could they not, the call about the

17  overdose.

18        And according to both of them, they were in the front

19  office when the call came in, and Miss Kelly went in to tell

20  Mr. Sodipo in his office.

21        It never went through the pharmacy.  It didn't start

22  in the pharmacy.  Perfectly understandable why no one else

23  heard about it.  Do you think Mr. Sodipo was going to let

24  anybody talk about it?

25        And by the way, Mr. Sodipo told Miss Kelly to take a

1    message.

2          Miss Ryan said she worked downstairs and upstairs.

3    Miss Burston confirmed downstairs and upstairs.  That poor

4    woman was put on the stand to authenticate a document that was

5    supposedly created during the time period of 2001 to 2005, but

6    somehow some documents from 2008 from the Internet had snuck in

7    there.

8          Latitia Haines, another defense witness.  You heard

9    when Miss Burston was on the witness stand that there were

10   checks to Miss Haines in that account, and that was not

11   payroll.

12         Mr. Ravenell said D'Andra Kelly had planned a plan to

13   testify.  She was ready to testify.

14         Well, Theresa Ryan testified that when she asked Miss

15   Kelly who she called at the U.S. Attorney's office, Miss Kelly

16   couldn't remember who she talked to.  I don't want to tell you

17   my feelings weren't hurt, but that's some plan to testify when

18   she couldn't even remember who she spoke with.  Let's face it,

19   my last name's Smith, I mean.

20         The defense team doesn't like Miss Ryan.  They don't

21   like Miss Kelly.  They don't like the evidence.  I guess not.

22   Why would they?

23         But beating up Kelly and Ryan does not change the

24   facts.  Calling them liars does not change the reality.

25   Painting them like disgruntled employees, it's a nice try.

1            Look in the minutes of the New Care meetings, May 23,

2     2006, approximately one week before she was supposedly let go,

3     or didn't come back or something, it's government's exhibit 83.

4     Mr. Sodipo's talking about all the wonderful things Miss Kelly

5     has done in the meeting.  It's all transcribed in the minutes.

6     It certainly doesn't sound like someone who's not happy with

7     Miss Kelly.

8            Mr. Ravenell asked Miss Kelly when she was on the

9     witness stand if she knew where her employee file is, rather,

10    personnel file, where was it?

11           Well, if he didn't know where it was, where did that

12    letter of reprimand materialize from?

13           Miss Ball identified it, the woman who helps Mr.

14    Sodipo and Mr. Nwaehiri fill, take a false facilities list to

15    get a JCAHO accreditation, to get City of Baltimore and State

16    of Maryland contracts.  This is the woman who swears to what

17    they say.

18           And you know what?  Maybe Mr. Sodipo was looking to

19    get rid of her.  After all, Miss Kelly was asking too many

20    questions, and that will certainly cause a morale problem if

21    Kelly and Ryan were lying about the calls.

22           What do you remember about Miss Brinegar?  She said

23    she talked to Mr. Sodipo about the calls.  She said how do we

24    handle these?  What do we do?  Adam Kaps remembered similar

25    calls.  He called them "pill heads."

1              What about Bryn Dawson from Chesapeake Telephone,

2      level-headed calm, intelligent, great witness.  Managed 700

3      accounts, but remembered this one.  Why would she lie?

4              She remembered the distinct differences with the

5      out-of-state Internet customers, angry, upset, very specific

6      about pill counts.

7              She also recalled there were only two pharmacists

8      that were ever on call, Steven and Cali.

9              She recalled at some point there was a policy change

10     with reference to the Internet customers.  When they called in

11     the middle of the night, no matter how upset they were, don't

12     bother me.  Just like Mr. Sodipo said to Miss Kelly.  Take a

13     message.

14             Why would she lie?

15             What possible motive could she have?

16             And then there's a telephone call on April 26th

17     between Mr. Sodipo and Mr. Cloud.

18             Mr. Budlow, if you would put that exhibit on the

19     screen?

20             It's in your transcript book.  More importantly,

21     you'll listen to the tape and find it in the transcript book.

22     I called it a tape showing my age, the CD.

23             And if you can, in this conversation, Mr. Sodipo says

24     -- this is page 8 of that transcript, "So, you know, we just

25     stay within the -- we just stay -- at one point we were doing a

1    lot, we just decided to slow down."

2              Mr. Cloud says, "Okay.  Okay.  You had to slow down?"

3              And Mr. Sodipo says, "Yes, slow down, slow down.  We

4    were doing about 200, now a day, and since then, you know,

5    nobody call, even the -- because if you hear it, different

6    people calling, you have to experience it."

7              Mr. Cloud says yeah.  He says you know, when you

8    monkey around, you have to experience it.

9              I suggest to you, members of the jury, that he's

10   talking about all the calls.

11             That's what he's talking about.  He was talking about

12   the experience of the phone at New Care ringing off the hook.

13             The defendants say they didn't hide anything.  Well,

14   Sergeant Ray Brashear of the Baton Rouge Police Department told

15   you when he was on the witness stand this is not a who-done-it.

16   This isn't a HIDTA crime.  The fact they were doing Internet

17   work is not in and of itself a crime.

18             And the defense that's been put before you more than

19   anything else is that these were honest men.  These were

20   honest, good men.  You are being asked to disregard the

21   evidence because these are good men.

22             That's the argument.

23             And we heard from all the witnesses, that family,

24   friends of these defendants, everyone has someone who believes

25   in them.

1          Sometimes accurately, sometimes blindly.

2          Not one of these witnesses knew anything about the

3     evidence that you know about.

4          And I suggest to you they will be horrified.

5          And what is that evidence about the defendant

6     character for truthfulness and veracity?

7          Well, there's Ruth Walker.  They told her they went

8     to the Maryland Board of Pharmacy, and that the Board said that

9     New Care, what they were doing was great.

10          They also told they weren't refilling any

11     prescriptions under 25 days.

12          Roberta Ball, they told Roberta Ball that the

13     Maryland Board of Pharmacy blessed their Internet operation.

14     They lied to the staff at New Care, told them they went to the

15     Board of Pharmacy and everything was okay.

16          It's in the meeting minutes, September 25th and

17     October 2, 2006.

18          The staff at the Maryland Board of Pharmacy, Eversly

19     and Costley, they told them they were considering an Internet

20     operation in the future.

21          D'Andra Kelly, Sodipo told her that the patients

22     sometimes saw their doctors, but you know the prescriptions,

23     they're all refills.

24          But then they told Cardinal Health, not only was 40

25     percent of their business from the Internet just a little

1    understated and involved a pain clinic, but they didn't know if

2    the doctor actually saw the patient.  But that's okay, because

3    all the prescriptions were originals.  They didn't do refills.

4            And the one that Mr. Ravenell never discussed at all

5    was when they told the men from Cardinal Health that they were

6    servicing 18,000 beds.

7            They also lied to McKesson.  Mr. Sodipo told Gary

8    Adams New Care picked up two new assisted living facilities.

9    And Mr. Nwaehiri told them that 85 percent of their business

10   was from the Internet.  This was in the questionnaire.  It's in

11   evidence, you'll see it.

12           Mr. Nwaehiri said they were VIPPS certified.  He said

13   a physical exam was conducted on each patient.  It's written

14   right in there.  Nwaehiri said mostly do about 200

15   prescriptions a day for combined hydrocodone, Alprazolam and

16   phentermine.

17           They lied to Yuki Nomoto.  They told her they didn't

18   do Internet work.  They provided her a facilities list with not

19   only grossly inflated bed numbers, but it listed IHE in

20   Kissimmee, Florida with 900 beds, and GDN with 400 beds, and

21   PMS with 150 beds.

22           Really?  They lied to the JCAHO people, Mr. Ravenell

23   did not address this, by using that false facilities list to

24   get their accreditation.  And they ultimately lied to the City

25   of Baltimore and State of Maryland to get contracts with them.

1          Mr. Nwaehiri lied to Detective Tony Halsey.  He told

2    them that there was a clinic that he could call to get more

3    information.

4          Mr. Sodipo lied to Jim Cloud, told Cloud that they

5    did no more than 100 to 200 hydrocodone prescriptions a day.

6          By the way, the defendants didn't like Mr. Cloud, but

7    Mr. Ravenell didn't like Mr. Cloud.  Remember, he's not a

8    pharmacist.  What does he know?

9          MR. RAVENELL:  Objection, Your Honor, what I liked.

10          THE COURT:  Well, the only point, ladies and

11    gentlemen, that argument was made against him.  Whether Mr.

12    Ravenell liked him or disliked him is beside the point.

13          Go ahead, Miss Smith.

14          MS. SMITH:  Your Honor, I am winding up.

15          Even a local pharmacy tech took one look at the

16    prescriptions and knew they were rotten.  He also told Mr.

17    Cloud that the DEA set the limit.  Sodipo said besides, we do

18    mostly assisted living facilities, that's the majority of our

19    business.

20          You saw the books, the financial books.  That's not

21    true.  That's a lie.

22          Mr. Sodipo to lied to Aloysius Ibe.  Mr. Ravenell

23    didn't discuss this.  Ibe said the newspapers said you did 4

24    million doses, more than Giant, Rite Aid, and Target combined.

25          He says no, they got it all wrong, we didn't order

1    that much.

2            Ibe said the newspaper said you were sending them to

3    people all over the country.  He goes, yeah, well, we got a

4    contract with a facility in Florida.

5            Ibe said the newspapers said it was all over the

6    Internet.  And Sodipo says, no, they got it wrong.  We don't

7    even have the Internet.

8            Is everybody lying?

9            Did all these people come in here and lie?

10           And they lied to the IRS.  They had secret bank

11   accounts and filed false returns.  You start to notice that the

12   truth depended on to whom they were speaking.  And you know it

13   didn't stop at the courtroom door.

14           The defendants have no burden.  They don't have to

15   put on a defense.  They don't have to call witnesses or offer

16   evidence.

17           They don't have to do a thing.  But they chose to put

18   on a case.

19           So let's talk about honesty.  This is the defense

20   team who tried to intimate, suggest, imply, that those pound

21   signs, all 48,000 plus sprinkled through New Care's database

22   meant anything more than being a shortcut key and indicated

23   that a prescription that was already filled had no more

24   refills.

25           MR. RAVENELL:  May counsel approach?

1          THE COURT:  You may.

2          (At the bench)

3          MR. RAVENELL:  Your Honor, this is highly improper.

4    Miss Smith is commenting on the defendant's failure to testify

5    and saying that the defendants are lying.

6          She can try to dress it at up as she may.  She just

7    told the jury that the defendants were lying and the lying

8    didn't stop when they came into the courtroom.

9          And then she goes on to talk about -- you know, tries

10   couch it as the defense team, you know, but it is clearly

11   indicating to this jury that the defendants lied.

12         And the defendants did not testify, and it is a

13   comment about what the defendants did, this comment that the

14   defendants lied, and it crept up when they came into the

15   courtroom.  It is highly improper argument.

16         THE COURT:  Miss Smith?

17         MS. SMITH:  Your Honor, number one, I began the

18   entire conversation about talking they had no burden to put on

19   a defense at all, but they chose to put on a defense.  I began

20   talking about the defense of the pound signs.

21         MR. RAVENELL:  That's not what she did.  It's not

22   even close to that what she did.  What she said --

23         MS. SMITH:  The defense team tried to imply, suggest

24   or imply those pound signs, all 48,000 plus sprinkled through

25   their database.

1          MR. RAVENELL:  Here's what Miss Smith said, Judge.

2     She can dress it up.  She said the defendants lied, and went

3     down the whole list of lies, against Mr. Sodipo and Mr.

4     Nwaehiri supposedly told, and then she told the Jury the lying

5     didn't stop when they came into the courtroom, and then tried

6     to dress it up by saying the defense team on the pound sign.

7          The clear inference from that is that when you say

8     the defendants lied, here's one lie.  Here's two lies.  Four

9     lies and five lies, and the lying didn't stop when they came

10    into the courtroom.

11         Simply she didn't use the word defense team.  What

12    else is she telling this jury other than these defendants lied?

13         THE COURT:  What instruction, what relief do you

14    want?

15         MR. RAVENELL:  We're going to move for a mistrial,

16    first thing we're moving for.  It is such -- you know, the

17    courts are so clear that commenting on a defendant where the

18    defendant doesn't testify and for the government to make any

19    comment about what the defendants did or did not do in the

20    courtroom is absolutely beyond the violation of the law, quite

21    frankly.

22         MS. SMITH:  Your Honor, actually, where the

23    government was going was to point out, in preparation for Mr.

24    Dardaris's testimony, he was helped on how to use the computer

25    by both defendants.  They were directly involved in that

1    defense.  He testified to that, their witness.  That is in

2    evidence, and that is what I am commenting on.  That is where

3    I'm going.

4         MR. RAVENELL:  There was absolutely all -- quite

5    frankly, Mr. Dardaris never, ever said that the defendants told

6    him anything.  Miss Smith asked him, the witness, I think it

7    was Mr. Budlow asking him who was present with him.

8         MS. SMITH:  No, we consulted.  We consulted.  We were

9    --

10        MR. BUDLOW:  He was my witness.  He clearly testified

11   that he spoke to both defendants in preparation.

12        MR. RAVENELL:  Okay.  That he spoke to both

13   defendants.  Where is the fact that he spoke to both defendants

14   in any way change what Miss Smith has said and implied, Judge,

15   that the defendants lied?

16        There's the fact that they spoke to the defendants.

17   How does that in any way justify the government commenting

18   about a defendant's lying when they came into the courtroom?

19        THE COURT:  My understanding of what the government

20   wants to do is to extrapolate, put together the following

21   facts, the pound sign evidence is false and misleading, that

22   the pound sign evidence came in part from the defense because

23   Mr. Dardaris was the defense witness who said that he talked to

24   the defendants.

25        And my view is that the government should skip all of

 1     that.  If you want to argue about the pound sign, pound sign

 2     evidence is misleading because all it was offered for the

 3     proposition that prescriptions were not delivered, and we know

 4     from Mr. Short that they were.

 5          My view is it gets too close to commenting on fact

 6     the defendants didn't testify.  So I'm going to sustain the

 7     objection, but I'm not going to grant a mistrial.

 8          Mr. Ravenell, we'll talk about it more on Monday, but

 9     we're --

10          MS. SMITH:  I'll finish it up.

11          (Open court)

12          MS. SMITH:  Finally, in reference to the pound signs,

13     the government called Preston Hale, the man who owned a company

14     that owns the software.  Mr. Hale installs it in pharmacies and

15     updates it.  He told you exactly what the program was designed

16     to do.  And based upon the volume at New Care and the fact that

17     more than 48,000, 48,000 prescriptions had pound signs, I

18     suggest that it was used at New Care exactly the way Mr. Hale

19     suggested it was, to stop future refills of a prescription

20     already filled and a data entry shortcut.

21          Now, think about it.  The defense team had Mr. Hale

22     on a three-hour conference call days before Mr. Dardaris

23     testified.  Why didn't they ask Mr. Hale to explain it to you?

24          Why wouldn't they want him to testify?

25          Maybe the truth was not what they were after.

1          Instead, they offered Ted Dardaris, a witness who
2    can't tell you what the pound signs mean.
3          What other reason would there be to have offered this
4    evidence?
5          Was there some relevance to what the computer screen
6    at New Care looked like that we've missed?
7          Members of the jury, this is not a game.  This is
8    serious.  There is nothing like the truth.  It rings loud and
9    clear.
10          And 9.9 million doses of hydrocodone went out on the
11    street to people that were absorbing them with reckless
12    abandon.
13          These pharmacists knew what they were doing.  They
14    turned their back on their duties and distributed these drugs.
15          I ask you to please take your time, consider the
16    evidence, read the Judge's instructions.  We've kept you
17    waiting.  We'll wait for you now.  Thank you very, very much.
18          THE COURT:  Thank you, Miss Smith.
19          Ladies and gentlemen, we have now completed
20    four-fifths of the trial.  Here's what we're going to do next
21    week, the remaining fifth, is for the jury to deliberate.
22          We're going to reconvene on Monday at 9:30, because
23    as I explained earlier during the jury instructions, there are
24    a few more jury instructions that I need to give you on how the
25    jury deliberates.  I also want to go over the review with you

1    carefully, the verdict form, so you'll know exactly how to fill

2    it out.  So we will reconvene at 9:30 on Monday.

3           Because you have not yet received all of the jury

4    instructions, please follow the standard admonition that I give

5    you every day not to discuss the case among yourselves or with

6    anyone at home or at work, no independent research or

7    investigation.  Keep an open mind.

8           If you happen to see or hear anything about the case,

9    let Mr. Thompson know about it on Monday, and I will see you

10   bright and early Monday at 9:30.

11          But the case is almost in your hands, and as I told

12   you before, you have the last word, and you'll have it next

13   week.  So have a pleasant weekend.  I'm going to stay here with

14   counsel.

15          (Jury recessed)

16          THE COURT: Good.  Please be seated.  So on Monday

17   we'll review the remaining jury, I will give the remaining jury

18   instructions.  I also would like to -- we need to review and

19   I'm blocking is it exhibit 50?

20          MS. SMITH:  50 B.

21          THE COURT:  We need to review exhibit 50 B.  So on

22   Monday, Mr. Ravenell, if you could be prepared to say no need

23   -- what redactions that you would have me make, if you can

24   discuss them beforehand with Miss Smith or Mr. Budlow, then

25   that might expedite matters, because I think they've already

1    agreed that they would acquiesce to another one including

2    taking out Dr. DeFrank's name and then the references to the

3    gentleman whose name I can't remember, but it's the testimony

4    that Dr. Lander gave in another court.

5           Because he did testify, he did mention that name, and

6    it is mentioned in the exhibit.

7           Good.  So have a pleasant weekend, and Mr. Budlow,

8    good luck on Monday morning to you and your wife.

9           MR. BUDLOW:  Thank you, Your Honor.

10          THE COURT:  I'll see you bright and early.

11          MR. RAVENELL:  What time?

12          THE COURT:  9:30.

13          MR. RAVENELL:  9:30.

14          MS. SMITH:  Have a safe trip, Your Honor.

15          THE COURT:  Thank you.

16                 (Proceedings adjourned)

17

18

19          I, Jacqueline Sovich, RPR, CM, do hereby certify
     that the foregoing is a correct transcript from the
20   stenographic record of proceedings in the above-entitled
     matter.

21

22   _____

23   Jacqueline Sovich                        DATE
     Official Court Reporter
24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25